Emily Cooper OSB #182254
ecooper@droregon.org
Thomas Stenson OSB #152894
tstenson@droregon.org
**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Amicus Curiae Disability Rights Oregon*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| LEGACY EMANUEL HOSPITAL & HEALTH CENTER d/b/a UNITY CENTER FOR BEHAVIORAL HEALTH; LEGACY HEALTH SYSTEM; PEACEHEALTH; PROVIDENCE HEALTH & SERVICES—OREGON; and ST. CHARLES HEALTH SYSTEM, INC., | Case No. 6:22-cv-01460-MO<br>Case No. 3:02-cv-00339-MO (Lead Case)<br>Case No. 3:21-cv-01637-MO (Member Case)<br><br>AMICUS BRIEF IN SUPPORT OF THE MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT |
| Plaintiffs, | |
| v. | |
| PATRICK ALLEN, in his official capacity as head of the Oregon Health Authority, | |
| Defendant. | |

Several major Oregon hospital corporations (hereinafter Hospital Corporations) filed an amended complaint in the above-captioned matter, *Legacy Emanuel Hospital et al. v. Allen*. Dkt. 327. The matter was consolidated with two other ongoing lawsuits involving related issues. Amicus DRO, while a party in the case-in-chief, *Disability Rights Oregon v. Mink*, is not at this time a party in *Legacy Emanuel Hospital et al. v. Allen*. Amicus offers this memorandum brief in support of Patrick Allen's Motion to Dismiss the Amended Complaint, with permission from the Court to do so. Dkt. 329; Dkt. 337.

Amicus does not seek to comment on Hospital Corporations' claims regarding their own direct corporate standing, where Hospital Corporations allege that their individual rights as hospital corporations have been infringed. Instead, Amicus wishes to discuss with the Court the standards by which Hospital Corporations may or may not seek to represent the rights of third parties, namely their patients. As the federally-designated Protection and Advocacy System for the State of Oregon, Disability Rights Oregon is in a unique position to advocate for the rights of those patients, to assess the relative interests of Hospital Corporations and their patients, and to analyze how those interests intersect and conflict. 42 U.S.C. 10805(a); *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1110 (9th Cir. 2003)(finding that people "with mental illnesses receiving care in the state" of Oregon are the members and constituents of Disability Rights Oregon, then known as Oregon Advocacy Center, and that DRO is specifically designated to pursue legal and other remedies on their behalf).

Amicus DRO observes that generally the amended complaint fails to allege grounds sufficient to justify third-party standing of Hospital Corporations on behalf of their patients. Inherent in the claims advanced in the amended complaint are numerous serious conflicts of interests between Hospital Corporations and the third parties—their patients—that they purport to represent. The substantial conflicts of interest defeat the requirement of a "close relation to the third party" for a plaintiff to represent the interests of a third party. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Similarly, the complaint makes only conclusory allegations that patients

who are civilly committed and represented by their own counsel in the civil commitment proceedings are somehow hindered in advancing their own interests without alleging any facts necessary to meet the applicable legal standards.

## I.    Legal Standards

Amicus DRO addresses only those claims advanced by Hospital Corporations in which Hospital Corporations allege no personal interest, but seek to advance the rights of third parties not represented by Hospital Corporations. "In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). The U.S. Supreme Court "has long applied a presumption against third-party standing as a prudential limitation on the exercise of federal jurisdiction." *Miller v. Albright*, 523 U.S. 420, 445 (1998) (O' Connor, J. concurring). By requiring demonstrated individual standing and generally disfavoring third-party standing, courts ensure that a litigant "has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). For all these reasons, "[f]ederal courts have traditionally been reluctant to grant third-party standing." *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987).

Third-party standing is only granted in the rare circumstances where a litigant demonstrates their own "injury in fact," a "close relation to the third party," and some "hindrance to the third party's ability to protect his or her own interests." *Powers*, 499 U.S. at 411; *Shaw v.*

*Hahn*, 56 F.3d 1128, 1130 n.3 (9th Cir. 1995).[1] The required "close relation" to a party does not manifest as a "per se" entitlement of any party to represent others with whom they have a commercial or professional relationship. *Hong Kong Supermarket*, 830 F.2d at 1081; *Kowalski*, 543 U.S. at 134 (rejecting third-party standing for lawyers, as such holding would be tantamount to "a holding that lawyers generally have third-party standing to bring in court the claims of future unascertained clients"). Instead, the party seeking third-party standing must "convince the court that it would be as effective a proponent of its customers' rights as they would be." *Hong Kong Supermarket*, 830 F.2d at 1081. The litigant must show a "[m]utual interdependence of interests" with the third parties on whose behalf they claim to speak. *Id.* at 1082. An appropriate representative of a third party must "reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984).

A party purporting to represent the rights of other individuals must also make a nonspeculative and nonconclusory showing that the individuals holding the right are in some way "hindered" from pursuing their interests. *Kowalski*, 543 U.S. at 132 (attorneys' "hypothesis" that criminal defendants would be unable to advance their own interests was not supported by evidence, defeating claim for third party standing); *HomeAway Inc. v. City & Cnty. of San Francisco*, No. 14-CV-04859-JCS, 2015 WL 367121, at *11 (N.D. Cal. Jan. 27, 2015) (conclusory statement that customers might not assert their interests not sufficient to give business third party standing).

---

[1] Amicus will not address whether Plaintiffs have alleged an injury-in-fact in their own claims and leave that argument to Defendant. Should the Court find Plaintiffs lack standing to assert their own interests, they would fail this first prong of the third-party standing test.

## II.     Legal Argument

### a.     Hospital Corporations Cannot Make a Showing of the Kind of Close Relationship with Civil Commitment Patients Because of Manifest Conflicts of Interest

Conflicts of interest between patients and Hospital Corporations abound in their pleadings. Intrinsic to the required finding of a "close relationship" between a litigant and the third party is a lack of conflict of interest between the litigant and the third party. *Hong Kong Supermarket*, 830 F.2d at 1082 (where supermarket pursued relief that benefited it and not its customers, its actions demonstrated a "conflict, rather than a congruence of interests" that undermined its claim to third party standing).

In *Hong Kong Supermarket v. Kizer*, a supermarket that had been cited for misuse of federal funds under the Women, Infants, and Children (WIC) program sought to defend itself by collaterally attacking the WIC program's discriminatory preference for dairy products as the policy relates to Asian grocery store customers who are more likely to be lactose intolerant. 830 F.2d at 1079. The grocery store sought to enjoin the function of the WIC program on equal protection grounds until its provisions could be made more equitable towards Asian beneficiaries. *Id.* at 1080. The government defendants properly noted that this requested relief was adverse to the interests of Asian WIC beneficiaries, who would then have *no* grocery benefits, dairy or non-dairy. *Id.* at 1081. The Ninth Circuit extensively held that 1) the supermarket did not acquire automatic standing to represent its customers simply by its identity as a vendor; 2) third-party standing could only be granted where the goal of the litigant was "in harmony with that of the absent third parties," 3) that third party standing should be denied where the interest of the litigant and the third parties are "not inextricably intertwined"; and 4) that other cases where third-party standing was approved often relied on an extensive records of

the litigant's "vigorous and cogent presentation of the issues" of interest to the third party. *Id.* at 1081-82.

The closest analogue to the present matter was a recent lawsuit in California. *Siskiyou Hosp., Inc. v. California Dep't of Health Care Servs*., No. 220CV00487TLNKJN, 2022 WL 118409, at *1 (E.D. Cal. Jan. 12, 2022). In that matter, a private hospital sought to challenge the county's practices in leaving civilly committed patients in the hospital's emergency department "for unduly long periods of time" without reimbursement, even though the hospital alleged it was "neither equipped nor staffed to provide" mental health care services. *Id.* Along with claims brought on the hospital's own account were claims on behalf of the patients whose rights, the hospital alleged, were jeopardized by placement in the hospital's inadequate services. *Id.* at 3. The Court dismissed the complaint because the hospital's obvious conflicts of interest precluded third-party standing allowing the hospital to represent the patients' interests. *Id.* at *4-*5. Siskiyou Hospital, by "seeking to avoid providing *any* care to these patients" was "clearly putting its own stated interests . . . above those of the 5150 patients."[2] *Id.* at *4 (emphasis in original). The court particularly noted that the relief sought would preclude civilly committed patients from getting mental or physical health care at the plaintiff's hospital during their civil commitment. *Id.* at *4. Siskiyou Hospital could not rely on the "provider-patient relationship" as grounds for a "close relation" with the third parties where the hospital "is essentially seeking to foreclose that relationship." *Id.* at *5. As a result, the court rejected the assertion that the civil commitment patients "would advance the same arguments or seek the same outcome as

---

[2] "5150" is a shorthand term used in California to describe its primary civil commitment process, from the California statutory provision governing civil commitments. Cal. Wel. & Inst. Code 5150; *Stokes v. United States Dep't of Just*., 551 F. Supp. 3d 993, 995 (N.D. Cal. 2021).

Plaintiff." *Id.* at *4. While that matter was only a district court case, the close similarities of fact and legal claim between the present matter and the *Siskiyou Hospital* case should be persuasive to this Court.

### 1. Hospital Corporations Seek a Court Order Allowing Them to Deny Treatment to Patients, Not to Provide Them Treatment

The interests of Hospital Corporations and the civilly committed patients are fundamentally in conflict, because Hospital Corporations declare on their own behalf that their rights are violated any time they must care for an unwanted patient. Dkt. 327, ¶66 (complaining that OHA violates Hospital Corporations' due process rights when "a civilly committed individual [housed at a community hospital] is committed to the custody of OHA and not immediately transferred to an appropriate long-term placement"); *id.* ¶68 (community hospitals are "forced to house civilly committed individuals"); *id.* ¶77 (complaining that commitment of patients to their care "deprives Hospital Corporations and other community hospitals of their hospital beds" thus accomplishing a taking). Anything other than the "immediate[]" transfer of a civilly committed patient away from a community hospital would thus allegedly violate the rights of Hospital Corporations.

By contrast, the patients whom Hospital Corporations both seek to represent in court and to avoid treating in their hospitals have ultimate interests in obtaining appropriate physical and mental health care for themselves in the least restrictive, most integrated setting, regardless of who provides it or pays for it.[3] *Olmstead v. L.C.*, 527 U.S. 581, 593-95 (1999); *Youngberg v.*

---

[3] Hospital Corporations never entertain *any* relief that would allow *any* civilly committed patients to be committed to their care for *any* reason. Although Hospital Corporations complain that the OHA reimbursement is insufficient, Dkt. 327, ¶43, they never ask this Court for a higher reimbursement rate to improve the staffing and care they provide to civilly committed patients. They request as relief the complete removal of all civilly committed patients from their care.

*Romeo*, 457 U.S. 307, 324 (1982). Like the hospital patients in *Siskiyou Hospital* who might like better behavioral health services, but might *also* like good physical health care in a community hospital, civilly committed patients have interests in obtaining adequate treatment in whatever setting is available and most suitable to their needs. Those needs may include physical health needs, like the *Siskyou Hospital* patients, which OSH is ill-positioned to address.

The world is not divided neatly into people with mental health needs and those with physical health needs. People with mental health needs have the same array of medical conditions as people without mental health needs; if anything, their medical needs are typically *greater* than those of people without mental illnesses.[4] The Court should take particular note of the sometimes acute medical and physical health needs of patients civilly committed under the "basic needs" prong of the Oregon civil commitment. ORS 426.005(1)(f)(B). While many people are civilly committed as a danger to themselves or others, some people are civilly committed because of their inability to "provide for basic personal needs." *Id.* Those "basic needs" include food, shelter, and "life-saving medical care." *Oregon v. D.M.*, 263 P.3d 1086, 1089 (Or. App. 2011). A person who is unable, by reason of their mental illness, to reliably take life-saving medications or do routine self-care for a co-occurring physical condition may be civilly committed under this provision. *See, e.g., Oregon v. C.C.*, 311 P.3d 948, 953 (Or. App. 2013)

---

[4] *See, e.g.,* Thornicroft, Graham, *Physical Health Disparities and Mental Illness: The Scandal of Premature Mortality*, 199 British J. Psych. 441 (2018) *available at* https://www.cambridge.org/core/journals/the-british-journal-of-psychiatry/article/physical-health-disparities-and-mental-illness-the-scandal-of-premature-mortality/06CD314810155127BFE42EEDFFFE49BB (noting that, in wealthy countries, men with mental illness tend to have lifespans 20 years shorter than men without mental illness and women with mental illness tend to have lifespans 15 years shorter than women without mental illness); Osborn, David P., *The Poor Physical Health of People with Mental Illness*, 175 West J. Med. 329 (2001) *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1071612/ (discussing increased likelihood of poor health, including cardiac illness, among people with mental illness).

(civil commitment justified where strong evidence showed, where person's mental illness interfered with capacity to manage diabetes medication and dietary needs, unmanaged symptoms of diabetes had repeatedly resulted in hospitalization and posed serious risk of death); *Matter of C. K.*, 451 P.3d 243, 245 (Or. App. 2019)(person with mental illness with co-occurring complex medical conditions, including hypertension, hepatitis C, and chronic kidney disease, was unable to manage her medical treatments, including keeping an ostomy site from a colostomy clean, and was properly civilly committed as unable to care for her basic needs). For patients experiencing complex medical conditions like fragile diabetes or who have wounds or ostomy sites that need regular attention, the role of a community hospital in supporting their physical health may be equally important as its role in supporting their mental health. Attempting to block all access to community hospitals for all civilly committed patients fails to consider those civilly committed patients who have substantial co-occurring medical needs.

Hospital Corporations neglect to consider or address whether the interests of patients in distant parts of the state may be poorly served by a court order requiring treatment at OSH. *Cf. Siskiyou Hospital*, 2022 WL 118409, at *1, *4 (noting only other hospital in county is 37 miles away). Even if community hospitals do not offer ideal behavioral health services, those patients may end up in even less appropriate settings if, as Hospital Corporations urge, those patients must be "immediately" removed from community hospitals upon a civil commitment order issuing, regardless of the availability or suitability of other placements, or the distance between the new placement and the patient's home, family, and other supports.

Hospital Corporations do not claim that public hospitals are, by virtue of government ownership, better at treating behavioral health patients. Neither do Hospital Corporations claim that they are legally prohibited from offering long-term behavioral health care. Instead, Hospital

Corporations claim that their hospitals are "not equipped, staffed, or intended to provide long-term treatment for mental illness." Dkt. 327, ¶6. Together the five Plaintiff Corporations operate *twenty-three* hospitals in the State of Oregon and have the enormous financial resources such a volume of hospital services would imply.[5] *Id.* ¶¶ 8-12. They do not allege that they lack the resources to create programs that would better serve people in need of behavioral health care. They admit that civilly committed patients have largely been directed to community hospitals for several years. Dkt. 327, ¶31. Hospital Corporations point out that the shrinking civil commitment population at Oregon State Hospital (OSH) and related increase in civil commitments to community hospitals has been ongoing and increasing for 20 years. Dkt. 327, at 14 (chart). While OHA implemented a practice several years ago that resulted in more placement of civilly committed patients in community hospitals, no one has prohibited community hospitals from improving their overall care for behavioral health patients. After years of such outcomes, the conditions inside community hospitals for long-term behavioral health care are the product of the choices of the community-based hospitals. Hospital Corporations ultimately determine how their hospitals are "equipped" and "staffed" and in what manner they "intend" to serve patients.

Tellingly, many of the conditions Hospital Corporations complain of in their own hospitals are ones over which they have complete control. While it may be correct that the acute care hospitals that they operate are "highly restrictive," Dkt. 327, at ¶19, no one prohibits Hospital Corporations from cultivating their own long-term behavioral health placements, contracting for appropriate services, or designating portions of their facilities to be more suitable for long-term patients. As part of their argument, Hospital Corporations contrast the "freedom

---

[5] By contrast, the community hospital plaintiff in *Siskiyou Hospital* was a single hospital of only 25 beds in Yreka, California. 2022 WL 118409, at *1.

and better quality of life" at OSH and secure treatment facilities with conditions in their own hospitals. *Id.* ¶32. In support of this allegation, Hospital Corporations produce photos of two sparsely furnished rooms within their own facilities that they describe as "confined, closed-off, heavily monitored physical spaces" and one of a more typical hospital room, as contrasted with a photo of a dormitory-style room with a nightstand and desk that they imply is a patient room at either OSH or a secure residential facility. *Id.* Yet no one, including OHA, prohibits or deters community hospitals from buying basic furnishing for patients, a cost which is surely within the financial capacity of Hospital Corporations. In fact, Oregon law requires hospitals to provide such furniture to all patients. OAR 333-510-0060(1) (hospitals must provide each patient with a "[s]eparate storage space for clothing, toilet articles, and other personal belongings"). If Hospital Corporations are aggrieved by their own furnishings, policies, and physical plant limitations, the redress for that problem lies in their own hands, not the Court's.

Similarly, Hospital Corporations complain that, at OSH, patients can "go places on day passes, wear their own clothes, and go outside daily for fresh air" or attend "family and friend events," while those opportunities are unavailable in community hospitals. Dkt. 327, ¶32. If community hospitals restrict their patients' freedom without specific, individualized determination of a need to wear the clothes they like, to leave the hospital (accompanied or unaccompanied, as appropriate) for trips during the day, or to meet with family and friends, those choices are made by no one but Hospital Corporations. Not only may Hospital Corporations not complain about their own policy choices, such blanket prohibitions likely violate the rights of patients. *See, e.g.,* 28 CFR 36.203 (requiring all places of public accommodation, including health care organizations, to "afford . . . services . . . to an individual with a disability in the most integrated setting appropriate to the needs of the individual"); 42 CFR 482.13(e)(requiring

Page 11 -  AMICUS BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED
             COMPLAINT

hospitals to limit seclusion of patients to only that "imposed to ensure the immediate physical safety of the patient, a staff member, or others, and must be discontinued at the earliest possible time"); 42 CFR 482.13(h)(requiring "full and equal visitation privileges" for all patients). Oregon law requires that every civilly committed patient be permitted to "wear the clothing of the person", to have a "private storage area with free access thereto", to have "daily access to fresh air and the outdoors," and to "communicate freely in person. . . ." ORS 426.385(1). The redress for Hospital Corporations' apparently flagrant disregard for the rights and liberties of their patients ("amenities," as Hospital Corporations describe them, Dkt. 327, ¶32) should be for Hospital Corporations to cease those violations. Instead, Hospital Corporations seek a court order protecting Hospital Corporations from having to treat undesirable patients, so that Hospital Corporations will not violate their patients' rights.

Apparently implicit in Hospital Corporations' theory of the case is that, because OHA (in their view) should admit the majority of long-term civil commitment patients to OHA facilities, Hospital Corporations have no duty of their own to provide any better care for those patients than Hospital Corporations wish to provide, nor any obligation to reassess their practices regarding long-term behavioral health patients. They provide no legal authority for the premise that they are allowed to mistreat their patients simply because they never wanted to admit their patients in the first place. This crisis in behavioral health care has now dragged on for years, long past any time to claim surprise on Hospital Corporations' part. If Hospital Corporations refuse to provide adequate care to their patients or to respect their rights, the Court should not ratify that maltreatment by allowing the hospitals to represent the interests of people whose rights they violate.

A party who has divergent interests and divergent aims from a third party cannot

represent those third-party interests. Even for a parent and child, third-party standing is not permitted where their interests "are not parallel and, indeed, are potentially in conflict." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15, *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118 (2014); *Amato v. Wilentz*, 952 F.2d 742, 753 (3d Cir. 1991)(third-party standing not permitted where parties' interests "potentially diverged"). Hospital Corporations cannot reconcile their expressed desire to offer no treatment whatsoever to civilly committed patients and to compel the immediate transfer of all such patients out of their hospitals with robust advocacy for the rights of those patients. Hospital Corporations cannot trample on the rights of their patients, then seek to vindicate those same patients' rights.

### 2. Hospital Corporations Have Neglected to Bring Obvious Claims on Behalf of Patients that Might Subject Themselves to Liability

The repeated theme of Hospital Corporations' complaint is that OHA bears the sole and exclusive responsibility for how services are delivered to civilly committed patients and that Hospital Corporations bear little to no responsibility at all. The third-party claims that have been selected by Hospital Corporations are largely claims that can *only* be enforced against the Oregon Health Authority. In crafting their complaint, Hospital Corporations avoid valid and important claims on patients' behalf that would apply to *both* OHA and Hospital Corporations.

The due process claims advanced by Hospital Corporations on behalf of the patients (First Claim) obviously only apply to government entities. Dkt. 327, ¶¶ 51-61; U.S. Const., Amdt. XIV, s 1 ("No State shall . . . deprive any person of life, liberty, or property without due process of law. . . ."). Similarly, the patients' state law claims under the Fifth and Sixth Claims focus on OHA's failures under the state law provisions of civil commitment law. Dkt. 327, ¶¶

90-101.

Absent from the allegations made by Hospital Corporations is any *Olmstead* claim or any other claim under the Americans with Disabilities Act, the claim most clearly on point. In *Olmstead v. L.C.*, two long-term patients at a psychiatric hospital challenged the state of Georgia's failure to place them at appropriate community placements. 527 U.S. at 593-95. In that case, the U.S. Supreme Court found that state agencies could not unnecessarily leave patients in hospital settings and in similarly restrictive settings when patients were appropriate for more integrated settings. *Id.* at 607. Under federal rules associated with Title II of the ADA, a "public entity must administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 CFR 35.130(d). Where Hospital Corporations repeatedly complain that patients are unnecessarily placed "in the most restrictive setting possible," an *Olmstead* claim seems like an obvious choice for a claim in this complaint. Dkt. 327, ¶39. Plaintiffs do not raise it.

The problem for Hospital Corporations with asserting such a claim is that a reciprocal *Olmstead* standard also applies to *private* entities, such as private hospitals, under Title III of the ADA identical to the responsibility placed on public entities. 28 CFR 36.203 (imposing the same "most integrated setting" standard on private places of public accommodation). If Hospital Corporations raised the *Olmstead* claims against OHA on behalf of the patients, the reciprocal nature of those claims would make it obvious that OHA and community hospitals have a *joint* responsibility to ensure that patients are housed in the most integrated, least restrictive environment. Hospital Corporations have an obvious conflict of interest in, essentially, not suing themselves for *Olmstead* violations. By neglecting to bring an essential claim, Hospital Corporations neglected to press important rights of their third-party patients while protecting

themselves from a reciprocal claim.[6]

The civilly committed patients have an obvious *Olmstead* claim against both Hospital Corporations and OHA, based on the facts alleged in the Complaint. Hospital Corporations have not sought to advance this vital claim on behalf of their patients against OHA, showing a lack of diligence in exploring claims for the patients. More obviously, Hospital Corporations have not brought and cannot bring an *Olmstead* claim against themselves on behalf of the patients. Hospital Corporations assert that they hold patients in "highly restrictive, locked environments" that patients "are able to leave . . . only for short periods of time, if at all." Dkt. 327, ¶ 6. They recount isolating a patent to such a degree that he could leave his room only "10-15 minutes per shift" over the course of five months of detention in their hospital. *Id.*, ¶36. Having essentially confessed in their own pleadings to routine violations of patient rights by imposing unnecessarily restrictive conditions on them, Hospital Corporations cannot successfully engage in the necessary advocacy of patients' *Olmstead* rights against OHA and against themselves.

### 3. Hospital Corporations Have Obvious Contrary Financial and Occupational Interests Adverse to Their Patients and Manifest Obvious Animus Towards Civil Commitment Patients in Their Complaint

Hospital Corporations' complaint provides occasional nods to the rights of their patients, but primarily addresses civil commitment patients as a financial and occupational nuisance. To summarize Hospital Corporations' expressed positions regarding their patients, civilly committed patients represent a net financial loss to Hospital Corporations. Dkt. 327, ¶43. Civilly committed

---

[6] To the extent Hospital Corporations allege that they failed to bring an *Olmstead* claim in either their original or first amended complaints by oversight rather than intention, Amicus notes that a plaintiff seeking third party standing must be "vigorous" and demonstrate "effective advocacy" on behalf of the third party. *Hong Kong Supermarket*, 830 F.2d at 1082.

patients "unnecessarily occup[y]" beds that hospital corporations would rather give to "other patients who need them." *Id.* ¶42. Civilly committed patients disrupt the "care environment," "divert significant resources" from Hospital Corporations' other patients, and require "significant care by physicians, nurses, and other healthcare professionals" that cannot be directed to Hospital Corporations' preferred patients. *Id.* ¶¶40-41. Hospital corporations begrudge giving the unwanted patients "a hospital bed, medication, food, housekeeping services, and other hospital resources" rather than giving those resources to other patients Hospital Corporations would prefer to host. *Id.* ¶40. The undesired patients cause damage to hospital property, drive away staff, create "working conditions for Hospital Corporations' care providers that many find intolerable," exacerbate the existing workforce crisis, and "routinely assault[], . . . kick[], punch[], shov[e], or bit[e]" staff. *Id.* at 4, 29-31. In light of their allegations regarding these patients, it is little surprise that the only relief Hospital Corporations seek is to be relieved of the perceived burden of continuing to treat them. A healthcare agency that resents even providing their patients with a bed or with food is ill-positioned to advocate robustly for their patients' rights. *Siskiyou Hospital*, 2022 WL 118409, at *4 (hospital was "clearly putting its own stated interests in avoiding disruptions, safety threats, and costs" above patient interests).

The Complaint itself is rife with inappropriate commentary on patients by a party supposedly seeking to advocate for their own patients. *See e.g.,* Dkt. 327, ¶¶35-39. A key element of the resolution of this problem in a way that benefits patients will surely be the creation of and use of more community-based beds for behavioral health care, which Hospital Corporations nominally agree with in their complaint. *Id.* ¶32 (complaining OHA has failed to "create appropriate long-term placements in the community"). In considering any order to create those placements in the community, the Court will surely consider the impact of any such relief

on the safety of the community, as well as the safety of staff and other residents at those placements. Repeatedly and gratuitously focusing the Court's attention on the danger posed by civil commitment patients is inconsistent with robust advocacy for their patients. Throughout their Complaint, Hospital Corporations repeatedly amplify and emphasize the dangerousness of their patients and their assaultive behavior in a way inconsistent with being an advocate for their patients' interests. That focus is instead completely consistent with dramatizing the burden placed on Hospital Corporations and advancing Hospital Corporations' interests.

The Complaint highlights several individual anecdotes ("harrowing experiences" in Hospital Corporations' terms) regarding civil commitment patients placed in community hospitals. *Id.* ¶¶35-39. Hospital Corporations describe one physician identifying a civilly committed patient as "ONE OF THE MOST DANGEROUS patients" the physician had treated in 30 years as a psychiatrist. *Id.* ¶36 (emphasis in original). The Complaint describes the patient's "exceptionally aggressive behavior that was instantaneous and unpredictable" and highlighted an assault on a nurse, resulting in a concussion. *Id.* The Complaint describes another patient as "arrested for threatening pedestrians with a knife" and describes his violent arrest, even though the nature of his alleged offense and arrest had nothing to do with the lengthy delay in placement by OHA identified as the ultimate problem by Hospital Corporations. *Id.* ¶37. The Complaint likewise describes the admission of another patient with "convictions for attempted kidnapping, assault in the fourth degree, and strangulation." *Id.* ¶38. The hospital was allegedly "unable to keep other patients and staff safe from her explosive and violent outbursts." *Id.* The Complaint says the patient was discharged to a Secure Residential Treatment Facility but then returned the following day. *Id.* The Complaint describes her "highly aggressive sexual behavior towards others." *Id.*

An attorney retained to represent the sole interests of the civilly committed patients, trying to convince this Court of the desirability of creating more community-based placements for those patients, would surely not choose to repeatedly highlight the danger posed by his clients to other patients, staff, and the general public. *Singleton v. Wulff*, 428 U.S. 106, 115 (1976) (third-party standing allows participation by other parties who may be "fully, or very nearly, as effective a proponent of the right as the [party whose rights they protect]"). Few attorneys would choose to highlight descriptions of their own clients with the repeated use of phrases like "exceptionally aggressive" or "ONE OF THE MOST DANGEROUS patients" under any circumstances. Selectively recounting an anecdote where a patient is actually released to an SRTF, an outcome which Hospital Corporations supposedly believe to be desirable, but immediately returns to the community hospital after "aggressive sexual behavior" at the SRTF is inconsistent with Hospital Corporations' ostensible purpose of obtaining a court order to increase SRTF placements for civilly committed patients—unless, of course, the *actual* purpose of the framing is to convince this Court that civilly-committed patients are so dangerous and unstable that they should all be removed from community hospitals and placed in the Oregon State Hospital.

Throughout this Complaint, the language of Hospital Corporations evokes a sense of fear of the patients they seek to represent, not a sense of empathy or injustice that a bona fide advocate for their interests would use. Hospital Corporations cannot be a "suitable champion" of their patients if they use language and argument completely inconsistent with their patients' interests. *Hong Kong Supermarket*, 830 F.2d at 1080. Their argument and rhetoric obviously press the Court into ordering these patients into the Oregon State Hospital and actively discourages this Court from contemplating less restrictive, more integrated placements for them

in the community. Since Hospital Corporations use language and argument in the Complaint that obviously favors Hospital Corporations' own interests over those of their patients, Hospital Corporations' own Complaint demonstrates that they cannot act as effective representatives of those patients.

### 4. Hospital Corporations Erroneously Characterize the Interests and Rights of Patients, Masking Obvious Important Patient Interests

As Hospital Corporations have done in the related cases also before this Court, Hospital Corporations' complaint wrongly creates and then relies on an image of a mental health system of discrete groups of patients who go into civil commitment placements and patients who go to OSH on aid-and-assist commitments. Dkt 327, ¶¶26-28. The reality that Hospital Corporations fail to acknowledge is that, far from being discrete classes of people, these two categories of people overlap strongly. They all share in common that they are people with mental illnesses involved in the justice system who have been court-ordered to receive treatment.

For this reason, the patients who are *currently* in civil commitment have very real reason to fear that they may *in the future* end up charged with a crime and found unable to aid-and-assist. For that reason, even those patients currently in civil commitment may not wish to have a rule that would place a patient in civil commitment ahead of a patient on aid-and-assist commitment. Even taking Hospital Corporations' assertions about the poor services they offer to behavioral health patients at face value, a civilly committed person might choose to spend more time in a community hospital with poor services than risk spending months in a jail cell during some future aid-and-assist commitment.

Hospital Corporations, on the other hand, harbor no such hesitation. By pressing for civilly committed patients to be "immediately transferred" out of their hospitals after a civil

commitment proceeding, without regard for what effect such an immediate transfer would have on that particular patient or on other people with mental illnesses, Hospital Corporations demonstrate the fundamental conflict of interest here. If one of their current patients spends more time in jail at some future date as a result of their actions, then Hospital Corporations' interests will not be impaired at all.

Where a party seeks to represent the interests of a third party in litigation, but that third party has not come forward to seek adjudication of their rights, courts should be cautious in allowing third-party standing. *See, e.g.*, *Mercer v. Michigan State Bd. of Ed.*, 379 F. Supp. 580, 584 (E.D. Mich.), *aff'd* 419 U.S. 1081 (1974). The relief that Hospital Corporations seek would affect a complex system in ways that may not redound to the benefit of civilly committed patients. Where a party seeks a "drastic remedy" that conflicts with the interests of a third party, the Court cannot allow them to represent that third party's interests. *Hong Kong Supermarket*, 830 F.2d at 1082; *Pony v. Cnty. of Los Angeles*, 433 F.3d 1138, 1147 (9th Cir. 2006)(attorney could not assert fee claim on behalf of client where client had no interest in pursuing fees and fee claim was against client's interest); *Siskiyou Hospital*, 2022 WL 118409, at *4 (even recognizing civilly-committed patients' interest in getting appropriate mental health care while civilly committed, "it is not reasonable to assume they would necessarily put that interest above their" other interests). The general rule against third-party standing embraces the possibility that the party in interest has the "appropriate incentive to challenge (or *not challenge*) governmental action. . . ." *Kowalski*, 543 U.S. at 129 (emphasis added). Given the complex collateral effects of changing the rules for admissions of civilly committed patients on those same patients who may be later caught up in aid-and-assist commitments, the Court cannot properly conclude that Hospital Corporations' interests are aligned with those of their patients.

Page 20 -  AMICUS BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED
        COMPLAINT

**b. Hospital Corporations Fail to Allege that Patients Are Hindered in Their Access to the Courts**

Hospital Corporations provide only conclusory allegations regarding whether patients are hindered in access to the courts. The final prong of the third-party standing test is whether the third party is hindered in their ability to protect their own interests. *Kowalski*, 543 U.S. at 568-69. Hospital Corporations generally allege in a footnote that civilly committed patients "have no one to advocate on their behalf," but their only allegation in support of this conclusion is that government-appointed legal representation in civil commitment hearings "ends at the time the civil commitment order is entered." Dkt. 327, ¶ 24 n.1. That allegation is both demonstrably wrong and insufficient as a matter of law.

First, appointed legal representation for civilly committed patients does not end at "the time the civil commitment order is entered." While facts alleged in a complaint are generally entitled to deference, the robust docket of literally hundreds of civil commitment cases in Oregon that are litigated to appeals is a judicially noticeable fact. Fed. R. Evid. 201; *Interstate Nat. Gas Co. v. S. California Gas Co.*, 209 F.2d 380, 384 (9th Cir. 1953)(courts may take notice of judicially noticeable facts in reviewing a motion to dismiss). A search of Westlaw or LexisNexis for civil commitment cases in the appellate courts of Oregon should yield more than 300 appellate cases on civil commitments, demonstrating representation long post-dating the initial commitment order. In many cases, the attorney's representation of the committed person actually lasts longer than their period of commitment. *See, e.g., Oregon v. B.A.F.*, 414 P.3d 486, 488 (2018)(holding court could hear case on civil commitment, even though petitioner's time of commitment had ended, under mootness exception); *Oregon v. K.J.B.*, 416 P.3d 291, 295-96 (2018)(holding that court could hear challenge brought by civilly committed patient, represented

by Multnomah Defenders, even though patient's 180-day commitment had expired under

mootness exception). The appellate records of Oregon cases show that hundreds of civilly

committed patients enjoy ongoing representation for months or years after the issuance of a civil

commitment order.

Second, published cases show that civilly committed patients have in fact found means to

challenge the conditions and circumstances of their confinement, not just the civil commitment

order itself. *Olson v. Allen*, No. 3:18-CV-001208-SB, 2019 WL 1232834, at *1 (D. Or. Mar. 15,

2019) (plaintiff complained that, after two months at a community hospital, he was transferred to

OSH where he was "confined virtually every day, in a barren cell-like room that was devoid of

environmental stimulation, recreation and normal social interaction" at the state hospital)

(internal citations and quotations removed);[7] *Unterreiner v. Goldberg*, No. CV 06-277-HU, 2007

WL 9808320, at *2 (D. Or. July 27, 2007) (raising objections to the placements where plaintiff

was civilly committed and recommitted to). Where there is evidence that third parties have in

fact raised the allegedly hindered claims, a plaintiff cannot assert the interests of the third party.

*McCollum v. California Dep't of Corr. & Rehab*., 647 F.3d 870, 879 (9th Cir. 2011) (Wiccan

prison minister could not assert religious freedom of inmates where inmates had brought claims

in that case and other litigation on same topic, so no hindrance existed); *SurvJustice Inc. v.

DeVos*, No. 18-CV-00535-JSC, 2019 WL 1434141, at *8 (N.D. Cal. Mar. 29, 2019) (citing other

cases where rights holders had "challenged the 2017 guidance despite the alleged hindrances").

Lack of a specially appointed attorney to handle a specific concern is not in itself a hindrance

---

[7] Although the plaintiff in *Olson* was ultimately acting pro se, the court noted that it "had appointed two volunteer attorneys to represent *Olson*," one of whom had a conflict and the other withdrew after a "breakdown in the client relationship," but that Olson "has been able to articulate his claims effectively without the assistance of counsel." 2019 WL 1232834, at *6 n.4.

adequate to allow a plaintiff to assert a third party's rights. *Kowalski*, 543 U.S. at 132.

Finally, Hospital Corporations do not allege that they know of patients who have sought out counsel but been denied, that they have encouraged attorneys familiar with the needs of civilly committed patients to take on their claims, nor any other efforts made by Hospital Corporations, the patients, or any other person to find counsel for the patients or to advance their claims pro se. *Legal Aid Soc. of Hawaii v. Legal Servs. Corp.*, 145 F.3d 1017, 1031 (9th Cir. 1998) (attorneys could not litigate constitutional interests of indigent clients where attorneys made "no showing that the clients are unable to assert their own interests"). The Court should have caution that, in lieu of evidence of any action by Hospital Corporations to obtain independent counsel for the patients (who might choose to file suit against Hospital Corporations as well), Hospital Corporations have seized on the opportunity to buttress their own claims with patients' claims for their own purposes and their own benefit, not the patients'.

## III.    CONCLUSION

Oregon's mental health system is in profound chaos. Every participant in the system—counties, Oregon Health Authority (OHA), state judges, Oregon State Hospital (OSH), district attorneys, private hospitals, Coordinated Care Organizations (CCOs), and individual providers—take their own share of joint responsibility within the system for the ways in which they have impacted it for better and worse. In such a complex, dysfunctional system, allowing one party—especially one with its own legal exposure, as well as its own financial and internal interests—to claim to represent the interests of patients would create serious risks of harm to patient interests. Courts are justly cautious about allowing one party to step into the shoes of another and litigate their rights. Such third-party standing is highly disfavored.

In the present circumstances, Hospital Corporations have manifest conflicts of interests with the patients they purport to represent. They admit to abusing the rights of their own patients.

They speak derogatorily of their own patients in a way that impairs efforts to assert the patients'

rights and in a way that evinces the nuisance they believe those patients to be. They fail to raise

*Olmstead* claims on behalf of their patients when those very same claims could be levelled

against them. They fail to consider the downstream effects of the relief they seek on their

patients who may later be charged with crimes. Hospital Corporations have also failed to allege

any effort to identify independent counsel to handle these claims.  For these reasons, Amicus

DRO respectfully requests the Court dismiss their claims that are rife with conflicts of interest.

DATED January 13, 2023.


DISABILITY RIGHTS OREGON

/s *Thomas Stenson*
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
511 SW 10th, Suite 200
Portland OR 97205
Tel:     (503) 243 2081
FAX:   (503) 243 1738

*Counsel for Amicus Disability Rights Oregon*