Eric J. Neiman, OSB No. 823513
ENeiman@ebglaw.com
Emma P. Pelkey, OSB No. 144029
EPelkey@ebglaw.com
EPSTEIN BECKER & GREEN, P.C.
1125 NW Couch Street, Suite 500
Portland, OR 97209
Telephone:  503.343.6475

Thomas R. Johnson, OSB No. 010645
tom.johnson@stoel.com
Alex Van Rysselberghe, OSB No. 174836
alex.vanrysselberghe@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone:  503.224.3380

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| DISABILITY RIGHTS OREGON; METROPOLITAN PUBLIC DEFENDERS INCORPORATED; and A.J. MADISON, <br><br> Plaintiffs, <br> v. <br><br> SEJAL HATHI, in her official capacity as Director of Oregon Health Authority; and SARA WALKER, in her official capacity as Interim Superintendent of the Oregon State Hospital, <br><br> Defendants. | Case No.: 3:02-cv-00339-MO (Lead Case) <br> Case No.: 3:21-cv-01637-AN (Member Case) <br> Case No.: 3:22-cv-01460-AN (Member Case) <br><br> PLAINTIFFS LEGACY EMANUEL HOSPITAL & HEALTH CENTER d/b/a UNITY CENTER FOR BEHAVIORAL HEALTH; LEGACY HEALTH SYSTEM; PEACEHEALTH; PROVIDENCE HEALTH & SERVICES – OREGON; and ST. CHARLES HEALTH SYSTEM'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS <br><br> **ORAL ARGUMENT REQUESTED** |
| JAROD BOWMAN; and JOSHAWN DOUGLAS SIMPSON, <br><br> Plaintiffs, | Case No.: 3:21-cv-01637-MO (Member Case) |

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

v.

SARA WALKER, Interim Superintendent of
the Oregon State Hospital, in her official
capacity; DOLORES MATTEUCCI, in her
individual capacity; SAJEL HATHI, Director of
the Oregon Health Authority, in her official
capacity; and PATRICK ALLEN, in his
individual capacity,

                Defendants.

LEGACY EMANUEL HOSPITAL &
HEALTH CENTER d/b/a UNITY CENTER
FOR BEHAVIORAL HEALTH; LEGACY
HEALTH SYSTEM; PEACEHEALTH;
PROVIDENCE HEALTH & SERVICES –
OREGON; and ST. CHARLES HEALTH
SYSTEM,

                Plaintiffs,

v.

SEJAL HATHI, MD, in her official capacity as
Director of Oregon Health Authority,

                Defendant.

Case No.: 6:22-cv-01460-MO (Member Case)

PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

I.      INTRODUCTION ................................................................................................ 1

II.     LEGAL STANDARD........................................................................................... 4

III.    BACKGROUND .................................................................................................. 4

        A.      Hospitals Provide Emergency and Acute Care...................................... 4

        B.      Hospitals Are a Doorway to Oregon's Civil Commitment System........................ 5

        C.      Civil Commitment in Oregon ................................................................. 6

        D.      Hospitals' Allegations and Claims.......................................................... 7

        E.      Procedural History ................................................................................. 9

IV.     ARGUMENT ...................................................................................................... 10

        A.      Hospitals have third-party standing to bring claims on behalf of civilly
                committed patients. .............................................................................. 11

                1.      Hospitals have a close relation with their patients................................. 12

                2.      Hospitals need not articulate specific relief at the pleadings stage........... 14

                3.      Patients face "some hindrance" in bringing their own claims. ................ 17

        B.      Hospitals sufficiently assert substantive and procedural due process claims on
                behalf of civilly committed patients. .................................................... 20

                1.      Substantive Due Process ........................................................ 21

                2.      Procedural Due Process ......................................................... 23

        C.      Hospitals sufficiently assert substantive and procedural due process claims on
                their own behalf. ................................................................................... 23

                1.      Substantive Due Process ........................................................ 24

                2.      Procedural Due Process ......................................................... 26

        D.      Hospitals sufficiently assert Federal and State Takings claims. ........................... 27

        E.      Hospitals sufficiently assert disability claims on behalf of patients. .................. 30

        F.      Hospitals sufficiently state Oregon statutory law claims...................................... 34

V.      CONCLUSION.................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................................................4, 22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)......................................................................................................4

*Bone v. Univ. of N.C. Health Care Sys.,*
    No. 1:18cv994, 2021 WL 395547 (M.D.N.C. Feb. 4, 2021)......................................32

*Bowman v. Matteucci,*
    No. 3:21-cv-01637, 2021 WL 5316440 (D. Or. No. 15, 2021) ....................25, 33, 35

*Bowman v. Matteucci,*
    No. 3:21-cv-01637-HZ ..................................................................................................1

*Cedar Point Nursery v. Hassid,*
    594 U.S. 139 (2021)....................................................................................................28

*Colasanti v. City of Portland,*
    No. 3:19-cv-00443-YY, 2019 WL 8545841 (D. Or. Sept. 23, 2019)..........................32

*Conner v. Branstad,*
    839 F. Supp. 1346 (S.D. Iowa 1993) .........................................................................19

*County of Sacramento v. Lewis,*
    523 U.S. 833 (1998).....................................................................................................24

*Crown Point Dev., Inc. v. City of Sun Valley,*
    506 F.3d 851 (9th Cir. 2007).......................................................................................24

*Davidson v. Kimberly-Clark Corp.,*
    889 F.3d 956 (9th Cir. 2018) .......................................................................................18

*Doyle v. City of Medford,*
    356 Or. 336, 337 P.3d 797 (2014) ..............................................................................34

*Elizabeth Retail Props. LLC v. KeyBank Nat'l Ass'n,*
    83 F. Supp. 3d 972 (D. Or. 2015) .................................................................................4

*Endsley v. Mayberg,*
    No. CIV S–09–2311, 2010 WL 4829549 (E.D. Cal. Nov. 22, 2010)..........................19

*Salcido ex rel. Gilliland v. Woodbury Cnty., Iowa,*
    119 F. Supp. 2d 900 (N.D. Iowa 2000)........................................................................19

*Horne v. Dep't of Agric.*,
  576 U.S. 350 (2015)..........................................................................................28

*IAP Worldwide Servs., Inc. v. United States*,
  141 Fed. Cl. 788 (2019) ...................................................................................30

*Kellas v. Dep't of Corr.*,
  341 Or. 471, 145 P.3d 139 (2006) ...................................................................34

*Kriz v. Roy*,
  No. 8:20CV110, 2020 WL 6135442 (D. Neb. Oct. 19, 2020)...............................19

*League of Or. Cities v. State*,
  334 Or. 645, 56 P.3d 892 (2002) .....................................................................34

*Lingle v. Chevron U.S.A., Inc.*,
  544 U.S. 528 (2005)..........................................................................................24

*M.R. Dreyfus*,
  697 F.3d 706, 720 (9th Cir. 2012) ...................................................................33

*Managed Pharmacy Care v. Sebelius*,
  716 F.3d 1235 (9th Cir. 2013) .........................................................................27

*Martyr v. Mazur-Hart*,
  789 F. Supp. 1081 (D. Or. 1992) .....................................................................21

*McCollum v. California Department of Corrections & Rehabilitation*,
  647 F.3d 870 (9th Cir. 2011) ...........................................................................19

*McGary v. City of Portland*,
  386 F.3d 1259 (9th Cir. 2004) .........................................................................31

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ...........................................................................20

*Ohlinger v. Watson*,
  652 F.2d 775 (9th Cir. 1980) ......................................................................21, 22

*Olmstead v. L.C. ex rel. Zimring*,
  527 U.S. 581 (1999)......................................................................................30, 31

*Olson v. Allen*,
  No. 3:18-cv-001208-SB, 2019 WL 1232834 (D. Or. Mar. 15, 2019) ....................19

*Or. Advocacy Ctr. v. Mink*,
  322 F.3d 1101 (9th Cir. 2003) ..................................................................... passim

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002)..................................................................17, 18

*Parsons v. Ryan*,
  912 F.3d 486 (9th Cir. 2018) ...................................................................30

*Pharm. Rsch. & Mfrs. of Am. v. Williams*,
  64 F.4th 932 (8th Cir. 2023) ....................................................................29

*Pharmaceutical Research & Manufacturers of America v. Stolfi*,
  724 F. Supp. 3d 1174 (D. Or. 2024) ...................................................29, 30

*Playmakers LLC v. ESPN, Inc.*,
  376 F.3d 894 (9th Cir. 2004) ...................................................................30

*Porter v. Warner Holding Co.*,
  328 U.S. 395 (1946)..................................................................................16

*Powers v. Ohio*,
  499 U.S. 400 (1991)......................................................................12, 17, 18

*Rawson v. Calmar S.S. Corp.*,
  304 F.2d 202 (9th Cir. 1962) ...................................................................30

*Sharp v. Weston*,
  233 F.3d 1166 (9th Cir. 2000) ...........................................................21, 22

*Shinault v. Hawks*,
  782 F.3d 1053 (9th Cir. 2015) .................................................................23

*Sierra Medical Services Alliance v. Kent*,
  883 F.3d 1216 (9th Cir. 2018) ...........................................................27, 28

*Singleton v. Wulff*,
  428 U.S. 106 (1976)........................................................12, 14, 17, 18

*Siskiyou Hospital, Inc. v. California Department of Health Care Services*,
  No. 2:20-cv-00487-TLN-KJN, 2022 WL 118409 (E.D. Cal. Jan. 12, 2022) .........................16

*State v. T.T.*,
  293 Or. App. 376, 428 P.3d 921 (2018) (Aoyagi, J., dissenting) ...........................17

*Townsend v. Quasim*,
  328 F.3d 511 (9th Cir. 2003) ...................................................................33

*TVKO v. Howland*,
  335 Or. 527, 73 P.3d 905 (2003) .............................................................34

*United States v. Howell*,
    318 F.2d 162 (9th Cir. 1963) ........................................................................15

*Unterreiner v. Goldberg*,
    No. 06-277-HU, 2007 WL 9808320 (D. Or. July 27, 2007).........................19

*Updike v. Clackamas County*,
    No. 3:15-cv-00723-SI, 2015 WL 7722410 (D. Or. Nov. 30, 2015) ..............32

*Viceroy Gold Corp. v. Aubry*,
    75 F.3d 482 (9th Cir. 1996) .........................................................................13

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .....................................................................12

*Yellowhammer Fund v. Att'y Gen. of Ala. Steve Marshall*,
    Nos. 2:23cv450-MHT & 2:23cv451-MHT, 2024 WL 1999546 (M.D. Ala.
    May 6, 2024).................................................................................................19

*Youngberg v. Romeo*,
    457 U.S. 307 (1982).................................................................................21, 22

**Statutes**

42 U.S.C. § 92.101(b)(1) ...................................................................................33

42 U.S.C. § 1395dd(a) .........................................................................................5

42 U.S.C. § 1395dd(b)(1)(A).................................................................................5

42 U.S.C. § 1395dd(b)(1)(B) ................................................................................5

42 U.S.C. § 12101(a)(2) ......................................................................................31

42 U.S.C. § 12101(a)(5) ......................................................................................31

42 U.S.C. § 12132 ...............................................................................................31

Affordable Care Act.........................................................................10, 30, 32, 33

Americans with Disabilities Act ................................................................. passim

Declaratory Judgments Act.................................................................................34

ORS 426.060...............................................................................................34, 35

ORS 426.060(2)(a)......................................................................................7, 8, 34

ORS 426.060(2)(d) ...............................................................................................7

ORS 426.074 ................................................................................................................6

ORS 426.130(1)(a)(C) .............................................................................................6, 28

ORS 426.130(2) ..........................................................................................................6

ORS 426.150 ........................................................................................................34, 35

ORS 426.150(1) ......................................................................................................6, 34

ORS 426.232(1) ..........................................................................................................6

ORS 426.232(2) ..........................................................................................................6

ORS 441.053(2) ..........................................................................................................8

ORS 441.054 ...............................................................................................................8

ORS 659A.139(1) .......................................................................................................32

ORS 659A.142 ......................................................................................................32, 33

ORS 659A.142(5)(a) .............................................................................................30, 32

ORS 659A.142(6)(a) ..................................................................................................30

ORS chapter 426 .........................................................................................................6

Rehabilitation Act ............................................................................................... passim

**Rules**

Fed. R. Civ. P. 8(d)(2) ..............................................................................................25

Fed. R. Civ. P. 8(d)(3) ..............................................................................................25

Fed. R. Civ. P. 15(a)(2) .........................................................................................4, 17

Fed. R. Civ. P. 54 .....................................................................................................16

Rule 12(b)(1) ..............................................................................................................4

Rule 12(b)(6) ....................................................................................................4, 11, 26

**Regulations**

42 C.F.R. § 482.13 .....................................................................................................8

42 C.F.R. § 482.43 .....................................................................................................8

42 C.F.R. § 489.24(a)(1)(i) ...................................................................................5

42 C.F.R. § 489.24(a)(1)(ii) ..................................................................................5

89 Fed. Reg. 37,522 ........................................................................................32, 33

89 Fed. Reg. 37,609 ............................................................................................32

89 Fed. Reg. 37609 .............................................................................................33

OAR 309-032-0870(2) .........................................................................................21

OAR 309-033-0270 .............................................................................................26

OAR 309-033-0270(3)(a) ......................................................................7, 8, 26, 35

OAR 309-033-0290 .............................................................................................23

OAR 309-033-0290(1)(a) .......................................................................................7

OAR 309-033-0290(3)(a) ....................................................................................23

OAR 333-505-0055 ...............................................................................................8

OAR 333-520-0070(3)(i) ........................................................................................5

OAR 333-520-0070(3)(a) .......................................................................................5

OAR 333-520-0070(3)(f) ........................................................................................5

OAR 333-520-0070(3)(h) .......................................................................................5

OAR 333-520-0070(3)(j) ........................................................................................5

OAR 333-520-0070(4) .........................................................................................8, 9

OAR 333-520-0070(7) ............................................................................................5

OAR 333-520-0070(9) ............................................................................................5

**Constitutional Provisions**

Fifth Amendment ................................................................................................28

Fourteenth Amendment .......................................................................................22

U.S. Constitution...................................................................................................7

**Other Authorities**

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*
    § 1357, Westlaw (4th ed. Database updated July 2024) ..........................................................14

U.S. Dep't of Just., Statement of the Department of Justice on Enforcement of the
    Integration Mandate of Title II of the Americans with Disabilities Act and
    *Olmstead v. L.C.* (June 22, 2011),
    https://archive.ada.gov/olmstead/q&a_olmstead.htm .............................................................33

I.      **INTRODUCTION**

This case is the latest in a series of important cases arising out of Oregon Health Authority's ("OHA") failure to meet its responsibilities to Oregonians suffering from severe mental illness.  While struggling to address the unacceptable crisis affecting aid-and-assist ("AA") and guilty-except-for-insanity ("GEI") patients, *see Or. Advocacy Ctr. v. Mink*, No. 3:02-cv-339, *Bowman v. Matteucci*, No. 3:21-cv-01637-HZ, OHA has also neglected a third population of patients in its care: individuals subject to orders of civil commitment.  Much like how *Mink* and *Bowman* rightly seek to remedy the crises of AA and GEI patients, this case seeks to remedy the civil commitment crisis impacting both patients and the providers who treat them.

Hospitals are four of Oregon's nonprofit health systems that have proudly provided emergency and acute psychiatric care to civilly committed patients for decades, and plan to continue doing so for decades into the future.  For years, OHA has taken advantage of Hospitals—and neglected patients—by adopting a practice of abandoning patients civilly committed to OHA's custody in Hospitals' emergency and acute care units, long after it is medically appropriate for them to be there.

This injures both patients and Hospitals.  After civilly committed patients receive emergency and acute care from Hospitals, they often need to continue or complete their recovery at a long-term treatment facility in an appropriate community setting, which offers fewer restrictions and more restorative options than exist in an emergency or acute care setting.  OHA has failed, however, to create, fund, or otherwise make available sufficient treatment options throughout Oregon.  Instead, OHA often leaves civilly committed patients in Hospitals' facilities for weeks, months, and sometimes their entire 180-day period of commitment.  As a result, patients do not receive the long-term, restorative treatment they need (and are entitled to) to have

a realistic opportunity to recover from their illness and end their detention.  Meanwhile, Hospitals' emergency and acute care resources are made unavailable to other psychiatric patients (including other civilly committed patients) who desperately need emergency and acute care.

Although this crisis has persisted for years, no advocacy organization or other stakeholder has meaningfully petitioned OHA about these issues.  Civil commitment patients, in particular, have gone without a voice.  Only Hospitals have pleaded (unsuccessfully) to OHA to ensure appropriate long-term treatment for civilly committed patients.  On this issue, patients' and Hospitals' interests are uniquely aligned: securing more long-term treatment benefits *both* patients, by affording them care appropriate to their needs, *and* Hospitals, by enabling them to use their resources for the emergency and acute care they were designed to provide (including for other detained and civilly committed patients).  After OHA repeatedly failed to address this crisis, Hospitals brought this action, seeking to enforce the rights of both Hospitals and patients.

OHA does not deny that a crisis exists.  *See* SAC ¶¶ 56–57 (discussing two major OHA studies detailing the crisis).  Despite this, OHA responds to this lawsuit aggressively, impugning Hospitals' motives and mischaracterizing Hospitals' claims.  OHA asserts, remarkably, that it is not legally required to give civilly committed patients anything more than "minimally adequate" care, rather than restorative care.  OHA also blames *Hospitals* for their injuries, reasoning that, since some of Hospitals' facilities have sought certification to provide short-term treatment to detained and civilly committed patients, Hospitals brought this on themselves.  OHA has essentially told Hospitals that, if Hospitals do not like the situation, they should just discharge severely ill patients to the street and withdraw from offering civil commitment care altogether— which would both endanger mentally ill individuals and deplete more than *half* the certified beds available in Oregon.  This is not a responsible answer from Oregon's public authority on health.

Nonetheless, Judge Mosman, who was previously assigned to this case, agreed with OHA and dismissed Hospitals claims, denying leave to replead. The Ninth Circuit swiftly reversed and vacated, rejecting not "one narrow aspect" of Judge Mosman's ruling, as OHA misleadingly asserts, MTD at 9, but *all* of Judge Mosman's reasons for dismissal. After Hospitals have now— two years deeper into the crisis—refiled the complaint (this time with even more detailed allegations), OHA again moves to dismiss, making most of the same arguments it made before.

The Court should deny OHA's motion, which seeks dismissal by imagining a different case than the one here. OHA applies an inapplicable legal standard and mischaracterizes the Ninth Circuit's decision as imposing the absurd burden on Hospitals to specify, in the pleadings, a particularized remedy capable of singlehandedly achieving a "practical and realistic fix to [Oregon's behavioral health] crisis." MTD at 17. Unsurprisingly, the Ninth Circuit never imposed such a requirement. OHA also continues to falsely insist—directly contrary to Hospitals' allegations—that Hospitals want to "remov[e] civilly committed individuals from [Hospitals'] beds" and discharge them to "inferior . . . or no treatment at all." *Id.* at 9, 20. These statements, however, have *no basis* in the pleadings. And in any event, the Ninth Circuit already rejected this reason as a basis to dismiss Hospitals' third-party claims.

OHA's arguments on the merits also fail. OHA asks this Court to simply adopt, in blanket fashion, Judge Mosman's "tentative thoughts" from oral argument two years ago concerning Hospitals' *First* Amended Complaint—"tentative thoughts" on which, as OHA admits, Judge Mosman never actually ruled. OHA again ignores the allegations in Hospitals' Seconded Amended Complaint (including new allegations that Judge Mosman never considered) which directly refute the premises of OHA's arguments. Accordingly, for the reasons below, this Court should deny OHA's motion to dismiss and allow this case to proceed to discovery.

## II.    LEGAL STANDARD

At the outset, OHA cites the wrong legal standard for questions of third-party standing, which are not matters of Article III standing analyzed under Rule 12(b)(1) but, rather, issues of *prudential* standing analyzed under *Rule 12(b)(6)*.  *See Elizabeth Retail Props. LLC v. KeyBank Nat'l Ass'n*, 83 F. Supp. 3d 972, 985–86 (D. Or. 2015) ("While constitutional standing is evaluated under Rule 12(b)(1), prudential standing is evaluated under Rule 12(b)(6).").  As such, under Rule 12(b)(6), the Court must construe Hospitals' allegations relevant to third-party standing as true and draw all reasonable inferences in Hospitals' favor.

And as to OHA's other arguments under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To the extent certain necessary allegations are lacking from the Second Amended Complaint, the Court should "freely give leave" to amend "when justice so requires."  Fed. R. Civ. P. 15(a)(2).

## III.    BACKGROUND

### A.    Hospitals Provide Emergency and Acute Care

Hospitals operate emergency departments and acute behavioral health units throughout Oregon.  SAC ¶¶ 5–12.  Emergency and acute care involves careful and coordinated teamwork by doctors, nurses, security personnel, and other staff, all of whom must be specially trained and experienced to provide such care. *Id.* ¶¶ 6, 17, 19.  Because some patients in acute crisis may resist treatment or exhibit aggressive tendencies, emergency and acute care must occur in restricted and heavily monitored settings to ensure the safety of both patients and staff. *Id.*

Although most of Hospitals' acute psychiatric patients are stabilized and discharged within days or weeks, some require long-term treatment after being stabilized. *Id.* ¶ 18. Hospitals' emergency and acute care units are neither designed nor equipped to provide the type of care and setting necessary for these patients. *Id.* ¶¶ 6–12, 18–19. While short-term treatment is intended to manage patients' acute symptoms and stabilize the patient, long-term treatment is aimed at helping patients recover and restoring them to the community. *Id.* ¶¶ 17–20. Long-term treatment requires a less-restricted setting, a more stable environment, more socialization, more group counseling, more peer support, and more patient independence so that patients can develop life and health skills for being successful in the community. *Id.* ¶ 18. Emergency and acute care settings cannot operate and are not intended as long-term treatment settings. *Id.* ¶ 19.

### B.     Hospitals Are a Doorway to Oregon's Civil Commitment System

Most individuals enter Oregon's civil commitment system through the "doorway" of Hospitals' emergency and acute care units. Under state and federal law, all individuals who come to Hospitals' emergency and acute care units must receive an appropriate medical screening examination to determine whether they have an emergency condition, including a psychiatric crisis. 42 C.F.R. § 489.24(a)(1)(i); 42 U.S.C. § 1395dd(a); OAR 333-520-0070(7), (9). If an emergency condition exists, Hospitals must provide necessary stabilizing treatment or, if the individual needs care that Hospitals do not provide, arrange for an appropriate transfer to another setting. 42 C.F.R. § 489.24(a)(1)(ii); 42 U.S.C. § 1395dd(b)(1)(A), (B); OAR 333-520-0070(3)(a), (f), (h), (i), (j). Unfortunately, because there are currently far too few acute psychiatric beds available in Oregon, transferring patients is generally not an option. SAC ¶ 38.

Some of the patients who enter Hospitals' emergency and acute care units suffer from severe psychiatric crisis. A physician may place these patients on an involuntary five-day hold

so it can be determined whether the individual, due to mental illness, presents a danger to themselves or others or is unable to take care of their basic needs.  ORS 426.232(1), (2); ORS 426.074.  If the patient continues to meet commitment criteria after five days of treatment, the state may request that a court "order commitment of the person with mental illness to [OHA] for treatment" for up to 180 days.  ORS 426.130(1)(a)(C), (2).

Many of Hospitals' facilities are specially certified by OHA to provide specific, limited kinds of treatment to civilly committed patients in their care.  SAC ¶ 42–46.  Importantly, however, all of Hospitals' facilities with certification are certified *only* to provide *short-term* care (either five-day holds or "acute care" services, which typically last less than 14 days).  *Id.* ¶ 45. Moreover, some facilities are certified to provide care to civilly committed patients for only 12-hour "transport custody" holds.  No Hospitals are certified to provide long-term care.  *Id.*

## C.    Civil Commitment in Oregon

ORS chapter 426 sets out Oregon's laws regarding civil commitment.  Once an order of commitment is entered, the patient becomes committed "to the Oregon Health Authority for treatment" and, from that point on, is in OHA's custody.  ORS 426.130(1)(a)(C), (2); ORS 426.150(1); ECF 75 at 30 (admitting OHA is "responsible" for civilly committed patients).

While OHA asserts that it enjoys unfettered discretion to place a civilly committed individual wherever OHA wants, *see* MTD at 11, Oregon law dictates that OHA must find an appropriate placement for individuals requiring long-term treatment.  Specifically, "[u]pon receipt of the order of commitment, [OHA] or its designee shall take the person with mental illness into its custody, and ensure the safekeeping and proper care of the person until the person is delivered to an assigned treatment facility . . . ."  ORS 426.150(1).  Moreover, OHA must direct civilly committed persons "to the facility *best able to treat*" them, or delegate to a

community mental health program director the responsibility for assignment of civilly committed persons to a "*suitable*" facility. ORS 426.060(2)(a), (d) (emphasis added). Assignments may be made only to facilities that OHA has approved and that "appropriately meet the mental health needs of the person under civil commitment." OAR 309-033-0290(1)(a).

OHA is also not the only decisionmaker with respect to where an individual may be placed. If OHA or its delegee wishes to place a civilly committed patient in a community hospital, the community hospital must consent first: under OAR 309-033-0270(3)(a), the admitting physician of the community hospital must be consulted and must determine whether "the best interests of [the] person under civil commitment are served by an admission to [the] community hospital." As a consequence, OHA must, at a minimum, consult with others when determining what facility is "best able to treat" a civilly committed patient. ORS 426.060(2)(a).

OHA must further abide by both the U.S. Constitution and Oregon laws and regulations. Contrary to what OHA argues, civilly committed patients are entitled to not merely "minimally adequate" treatment, but "restorative treatment" that gives them "'a realistic opportunity to be cured or improve the mental condition for which they were confined.'" *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) (citation omitted). OHA is ultimately responsible for ensuring that civilly committed patients in its custody receive restorative treatment.

### D.    Hospitals' Allegations and Claims

Hospitals bring this lawsuit because, for years, Oregon's civil commitment system has broken down and OHA has failed to address the problem. SAC ¶¶ 47–59. As noted, Hospital patients suffering from acute mental illness may become civilly committed while in Hospitals' care. When these patients are stabilized, OHA (or its delegate) has the obligation to transfer the patient to a suitable long-term care facility "best able to treat" the patient so that the patient's

liberty can be restored. ORS 426.060(2)(a). If a patient needs to stay longer at one of Hospitals' facilities for purposes of receiving additional emergency or acute psychiatric treatment, the assignment decision should be made by *both* the state and the admitting physician of Hospitals' facilities, and the patient should be eventually transferred to an appropriate long-term treatment facility when ready. OAR 309-033-0270(3)(a).

The problem is that this is not happening. Rather than assign civilly committed patients to appropriate long-term facilities, OHA forces patients to remain indefinitely in the hospital to which they were brought before commitment (without consulting Hospitals' admitting physicians). Because Hospitals cannot (and would not) safely discharge these patients for ethical and legal reasons, they remain in a care setting not ideal for their treatment. *See* 42 C.F.R. § 482.43; 42 C.F.R. § 482.13; ORS 441.053(2); ORS 441.054; OAR 333-505-0055; OAR 333-520-0070(4). This continued placement, sometimes long after stabilization, is contrary to the specific needs of individual patients subject to commitment orders. Moreover, OHA's inaction also forces Hospitals to use otherwise scarce resources for the care of individuals in need of long-term, specialized care, which they are not equipped or staffed to provide. In sum, because of OHA's failures, patients do not receive access to the long-term care needed to recover and other patients in psychiatric crises become backed up in emergency departments.

Critically, Hospitals are experiencing this problem in *all* their facilities, *regardless* of whether the facility is certified to care for civilly committed patients. This is because, regardless of certification, Hospitals still must accept and screen all patients who enter their emergency rooms, including those experiencing psychiatric crises who may later become civilly committed. SAC ¶¶ 33–34, 42–46. Even where a facility is not certified to care for civilly committed patients, patients who arrive *before* commitment—and are civilly committed *at* the facility—

cannot be discharged once committed and, meanwhile, cannot transfer to a certified facility because there are typically no beds to accept them. *Id.* ¶¶ 33–34. Hospitals thus experience the same result irrespective of whether they are certified to treat civilly committed patients.

Hospitals have tried for years to work with OHA to address these problems. *Id.* ¶ 55. But OHA has done nothing to indicate that it will change its practices. *Id.* Hospitals accordingly filed this action, seeking to enjoin OHA to change its conduct and stop violating the rights of vulnerable civilly committed patients whose liberty has been restricted by the state.

### E.    Procedural History

Shortly after Hospitals originally filed this action in September 2022, OHA moved to dismiss, arguing that Hospitals lacked Article III standing to assert claims on their own behalf and third-party standing to assert claims on behalf of patients. ECF 30. OHA also argued that Hospitals' claims failed on the merits. *Id.* The case was assigned to Judge Mosman, who agreed with OHA's standing arguments. ECF 88 at 6–7. Regarding third-party standing, Judge Mosman reasoned that Hospitals "complain about how much civilly committed patients are costing them and about the harms [the patients] inflict on their staff members," creating an adversity of interest that precludes the "close relation" needed for third-party standing. *Id.*

The Ninth Circuit[1] reversed, vacated, and remanded. ECF 105 at 9. The Ninth Circuit held that Hospitals had Article III standing to pursue their claims and that Judge Mosman was wrong to dismiss Hospitals' third-party standing claims based on the perceived adversity of interests urged by OHA. *Id.* at 3, 7–8. The Ninth Circuit noted that "some tension in [Hospitals'] complaint between the needs of civilly committed patients and [Hospitals] is not necessarily enough to show that [Hospitals] lack[] a 'close relation' to the patients." *Id.* at 8.

---

[1] Judges John B. Owens, William A. Fletcher, and M. Margaret McKeown sat on the panel.

Rather, whether Hospitals' interests are "sufficiently aligned" with patients' interests "may depend on what outcome [Hospitals] in fact [are] likely to achieve in this litigation and whether that outcome would benefit the patients whom [Hospitals] seek[] to represent." *Id.* at 6–7. The Ninth Circuit reasoned that the "present record is insufficient to determine whether [Hospitals have] third-party standing" and vacated the third-party standing decision and remanded for reconsideration. *Id.* at 7–9. Contrary to OHA's assertions, the Ninth Circuit did not instruct Hospitals to "clarify the specific relief they could feasibly achieve" in the pleadings. MTD at 9.

Hospitals filed the Second Amended Complaint, adding new allegations clarifying the relief Hospitals seek and elaborating on their representation of their civilly committed patients. Hospitals also added new discrimination claims against OHA on behalf of patients under Title II of the American with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, Section 1557 of the Affordable Care Act ("ACA"), and Oregon law. SAC ¶¶ 104–137. OHA now moves to dismiss the Second Amended Complaint, again arguing that Hospitals lack third-party standing and, further, that each of Hospitals' claims fails on the merits.

## IV.    ARGUMENT

In seeking dismissal, OHA ultimately asks this Court to consider a different case than the one before it. Here at the pleading stage, OHA asserts the worst about Hospitals' intent in bringing this lawsuit, urging that Hospitals seek to "quickly remove civilly committed patients from their hospitals" and discharge them to "inferior treatment, or no treatment at all." MTD at 20. OHA claims that Hospitals have "voluntarily" agreed to treat "every civilly committed patient" abandoned by OHA to their care, and thus cannot blame OHA for the situation OHA has created. *Id.* at 29. And OHA argues that, in any event, its practices do not deprive patients of

any rights because, instead of "restorative treatment," patients are only entitled to "minimally adequate" treatment. *Id.* at 26.

But on a motion to dismiss under Rule 12(b)(6), OHA cannot rewrite Hospitals' allegations, or the law, to fit its arguments. This Court must look to what Hospitals have actually alleged in the complaint. Here, Hospitals allege *the very opposite* of most of the core premises of OHA's motion. Hospitals allege that they *do not* want to reduce the number of civilly committed patients in their care and *do not* seek permission to discharge patients to inferior care, and that they will—as they always have—continue treating all patients in their care until more appropriate care is available.[2] SAC ¶ 61. Hospitals explain how their involvement in OHA's broken behavioral health system is *not* voluntary, given that Hospitals experience the same injuries regardless of whether they have agreed to provide limited short-term care services to civilly committed patients. *Id.* ¶¶ 33–34, 42–46. And Hospitals explain that Ninth Circuit law obligates OHA to provide patients with not just "minimal" treatment, but "restorative" treatment, which patients who need long-term treatment cannot access in Hospitals' facilities. *Id.* ¶ 67. OHA may not ignore these and other allegations in asking the Court to dismiss Hospitals' case.

## A. Hospitals have third-party standing to bring claims on behalf of civilly committed patients.

Unlike Oregon's AA and GEI populations, Oregon's civilly committed population has, for years, gone without a voice in Oregon's behavioral health crisis. Hospitals are the first

---

[2] Meanwhile, OHA has (remarkably) advised that Hospitals should seek to avoid losses arising from the civil commitment crisis by simply discharging civilly committed individuals—who are, by definition, a danger to themselves or others or are unable to care for their own basic needs—to the sidewalk, without any further care. *See* ECF 75 at 31–32. Among other outcomes, this would violate court orders requiring the patients to be civilly committed.

litigants to set out to establish that OHA's violation results in the deprivation of patients' constitutional rights, and to seek equitable relief to stop the deprivation.

OHA seeks to bar Hospitals from pursuing patients' claims on the ground that Hospitals lack a "close relation" to their patients, and further that patients (notwithstanding their severe illness and confinement) are not hindered from bringing such claims on their own. *See Powers v. Ohio*, 499 U.S. 400, 411 (1991) (discussing elements of third party standing, including that the litigant has a "close relation" with the third-party and the third-party faces "some hindrance" to asserting their own claim). Indeed, these issues were already litigated in part before Judge Mosman and the Ninth Circuit, and Judge Mosman agreed with OHA that Hospitals lacked a "close relation" because they purportedly "complain about how much civilly committed patients are costing them and about the harms [the patients] inflict on their staff members." ECF 105 at 7. But the Ninth Circuit rejected Judge Mosman's (and OHA's) reasoning, holding it was error to dismiss Hospitals' third-party claims on this basis. *Id.* at 7–9 (vacating Judge Mosman's ruling on third-party standing).

Seemingly without regard to the Ninth Circuit's opinion, OHA now urges this Court to dismiss Hospitals' third-party claims based on largely the same arguments it raised before. The Court should reject these arguments and hold, for the reasons below, that the "close relation" and "hindrance" elements of third-party standing are met.

### 1.    Hospitals have a close relation with their patients.

A "close relation" exists where a third party's rights are "inextricably bound up with the activity the litigant wishes to pursue," *Singleton v. Wulff*, 428 U.S. 106, 114 (1976), such that the litigant's and third party's interests are "aligned," *Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017). The Ninth Circuit applies this standard liberally. Here, the Ninth Circuit has

recognized that health care providers generally have third-party standing to assert the claims of their patients.  ECF 105 at 6.  The Ninth Circuit also has found interests to be "aligned" even where the parties ordinarily have "some degree of adversity."  *Id.* at 4–5, 8; *see, e.g.*, *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 485–86, 489 (9th Cir. 1996) (employer may assert employees' claims to challenge law protecting workers from excessive hours); *see generally* ECF 43 at 27–29 (collecting cases where litigants could proceed with third-party claims).

Here, the Ninth Circuit noted that Hospitals' First Amended Complaint sought to benefit patients by ensuring they had access to beds at the Oregon State Hospital ("OSH").  ECF 105 at 2 (describing Hospitals' case as claiming "that OHA fails to maintain adequate bed space *at OSH* for people who are civilly committed due to mental illness" and seeking to remedy that failure (emphasis added)).  But the Ninth Circuit also noted that "bed space at OSH is limited, and OSH is under competing pressure from the injunction upheld by our circuit in [*Mink*]."  *Id.* at 6.  Thus, whether Hospitals' "interests are sufficiently aligned with the interest of its civilly committed patients may depend on what outcome [Hospitals] in fact [are] likely to achieve in this litigation and whether that outcome would benefit the patients whom [Hospitals] seek[] to represent."  *Id.* at 6–7.

Hospitals have addressed these issues in their Second Amended Complaint.  The Second Amended Complaint focuses primarily on OHA's failure to create, fund, and otherwise make available adequate bed space in Oregon as a whole, at OSH, *and in the community*.  *See* SAC ¶¶ 26–27, 29, 55, 61–62.  This does not raise the same concerns of competing bed space at OSH and the *Mink* injunction.  Hospitals further clarify that they "do not seek relief that will result in fewer placement options for civilly committed patients, the creation of less-suitable placement options for Plaintiffs' patients, or that will allow for the premature discharge of Plaintiffs'

patients to inappropriate settings," which would "contravene Plaintiffs' missions to ensure high-quality, compassionate, and patient-centric healthcare for patients." *Id.* ¶ 62. Rather, the "only outcome [Hospitals] will be satisfied with is one in which OHA creates *more* treatment options for Plaintiffs' patients, *in addition to* those that already exist within Plaintiffs' hospitals and elsewhere in Oregon." *Id.* "Unless and until" that happens, Hospitals "will continue treating all civilly committed patients in their care—as [Hospitals] have done for decades—in accordance with [Hospitals'] patient-focused nonprofit missions." *Id.*[3]

### 2. Hospitals need not articulate specific relief at the pleadings stage.

In arguing that Hospitals lack a close relation with patients, OHA misrepresents the Ninth Circuit's decision and rewrites Hospitals' allegations. OHA first contends that the Ninth Circuit required that Hospitals plead, with heightened specificity, the exact relief they will seek and how that relief is "likely" to solve Oregon's longstanding behavioral health crisis. MTD at 17.

The Ninth Circuit held no such thing. Nowhere does the Ninth Circuit's decision instruct Hospitals to, as OHA argues, specify an "exact remedy" that is capable of achieving a "practical and realistic fix to the current crisis" in the complaint. *Id.* at 16. Requiring Hospitals to "fix . . . the current crisis" at the pleadings stage puts an absurdly difficult burden on Hospitals to, in a pleading document, solve a complex, decades-long behavioral health crisis (which *OHA* caused, and *only OHA* has the power to change)—and, indeed, *before* any discovery can occur. Plaintiffs are not held to such a stringent standard in the pleadings. *See* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, Westlaw (4th ed. Database updated July 2024) ("[I]t need not appear that the plaintiff can obtain the particular relief prayed for in the

---

[3] Hospitals also have inherently close, fiduciary, and confidential relationships with patients (which OHA does not dispute). SAC ¶ 60. This itself is typically enough to establish third-party standing between healthcare providers and patients. *Singleton*, 428 U.S. at 117–18.

complaint, as long as . . . some relief may be granted by the court."); *accord United States v. Howell*, 318 F.2d 162, 166 (9th Cir. 1963).

Nor did the Ninth Circuit hold, as OHA suggests, that Hospitals' preexisting or current allegations were themselves insufficient to proceed with third-party claims past the pleadings. The Ninth Circuit held merely that *Judge Mosman's reasoning was insufficient to support the dismissal of the third-party claims*. That is why the Ninth Circuit vacated that part of Judge Mosman's order. Had the Ninth Circuit in fact decided, as OHA asserts, that Hospitals' allegations were insufficient to establish third-party standing altogether (and thus should be dismissed), the Ninth Circuit would have *affirmed* Judge Mosman's dismissal (and perhaps allowed leave to replead). Instead, the Ninth Circuit held that the "record" was insufficient to decide the third-party question dispositively, as the specific "remedy" that Hospitals were "likely to achieve"—an issue that generally does not crystallize until late in litigation—was not yet apparent on the record. The Ninth Circuit did not order that Hospitals had to articulate clearer relief *in the pleadings*, as OHA argues Hospitals must do.[4]

It is more than enough that Hospitals have alleged that they seek to have OHA expand long-term treatment services statewide, which will obviously benefit civilly committed patients by affording them a greater array of suitable treatment options. The details of precisely *how* this will be best achieved by OHA are not necessary to know to determine whether Hospitals' pleaded remedy will benefit patients. Regardless of how this is achieved (i.e., building more

---

[4] OHA argues that the Ninth Circuit rejected the Hospitals' allegations about seeking additional bed capacity and treatment options throughout Oregon as "insufficient" to establish an alignment of interests. *Id.* at 18. But the Ninth Circuit did not, as OHA asserts, find Hospitals' current allegations about increasing bedspace *statewide* and expanding *statewide* options for treatment to be insufficient. The Ninth Circuit's ruling was limited to considering Hospitals' First Amended Complaint, which was the only pleading subject to Judge Mosman's order. ECF 105 at 2, 6–8.

long-term beds, funding more providers, etc.), more long-term options will undoubtedly benefit patients who need but currently cannot access them.  Insofar as a more specific request for equitable relief is needed, Hospitals are entitled to (like in any case) develop their claims through discovery to support, based on facts learned in that process, more specific requests for relief.  To the extent OHA speculates that Hospitals may later seek relief that might not benefit patients, this Court has broad discretion to craft relief to ensure patients are protected.  *Porter v. Warner Holding Co.*, 328 U.S. 395, 399 (1946) (court's equitable powers are broad and include power to "decide all relevant matters in dispute and to award complete relief"); Fed. R. Civ. P. 54 (court may award relief even where party has not demanded it in pleadings).

Critically, OHA has not identified (because it cannot) any way that Hospitals' pleaded relief will *not* benefit civilly committed patients, aside from OHA's utterly baseless insistence that Hospitals secretly want to discharge patients "quickly" to "inferior" or no care and "prioritize" other patients.  MTD at 20–22.  But all these statements have no basis in the pleadings—indeed, Hospitals' Second Amended Complaint alleges *the opposite*.  SAC ¶ 62 ("[Hospitals] are not seeking any relief that will . . . allow for the premature discharge of [Hospitals]' patients to inappropriate settings.").  That Hospitals have "other patients," who go untreated due to OHA's practices, does not suggest that Hospitals will "prioritize" such patients "over" civilly committed patients (the "other patients," in fact, include other civilly committed patients, *see* SAC ¶¶ 51, 84).  The Court must rule on the allegations actually in the pleadings and look past OHA's blaming of Hospitals for its own failures.[5]

---

[5] As before, OHA asserts that this case is materially the same as *Siskiyou Hospital, Inc. v. California Department of Health Care Services*, No. 2:20-cv-00487-TLN-KJN, 2022 WL 118409 (E.D. Cal. Jan. 12, 2022), in which hospitals brought third-party claims for their patients but sought to remove patients from their hospitals entirely—critically, *without seeking relief that would provide patients subsequent care*.  That is, however, the opposite of what Hospitals allege.

It is important not to lose sight of the ultimately simple question at issue here: whether Hospitals have merely alleged sufficient facts—taken as true and construed in a light favorable to them—to make a *threshold* showing that asserting patients' claims will "likely" benefit patients, such that Hospitals' and patients' interests are "aligned" enough for Hospitals to proceed with the claims into discovery. Hospitals have amply showed, for purposes of this threshold inquiry, that the relief they seek will at least "likely" benefit patients. That is enough for third-party standing at this early stage of litigation.[6]

### 3.    Patients face "some hindrance" in bringing their own claims.

Hospitals also have established the "hindrance" element of third-party standing. This factor presents an especially low threshold, requiring only "*some* hindrance" in the "ability to protect his or her own interests." *Powers*, 499 U.S. at 411 (emphasis added). Contrary to OHA's suggestion, it "does not require an absolute bar from suit"; a party "need not face insurmountable hurdles to warrant third-party standing." *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 290 (3d Cir. 2002) (citing *Powers*, 499 U.S. at 411). A mere "'practical disincentive to sue may suffice.'" *Id.* at 290 n.14 (citation omitted).

Here, patients face numerous, independently sufficient hindrances. For one, courts have recognized that "[t]he stigma associated with receiving mental health services presents a considerable deterrent to litigation." *Id.* at 290; *see State v. T.T.*, 293 Or. App. 376, 386, 428 P.3d 921 (2018) (Aoyagi, J., dissenting) (noting "'serious . . . social stigma . . . attendant to a civil commitment'" (citation omitted)); *see also Singleton*, 428 U.S. at 117 (woman's desire to protect privacy could discourage her from challenging abortion statute, constituting hindrance).

---

[6] If the Court disagrees and finds that Hospitals must provide more specific relief, the Court should permit Hospitals to do so in an amended pleading. *See* Fed. R. Civ. P. 15(a)(2).

Patients also face the overwhelming likelihood that their 180-day commitment will end before a lawsuit resolves, leaving them with little or no redress.  *See, e.g.*, *Singleton*, 428 U.S. at 118 (imminent mootness constitutes hindrance); *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (past wrong alone insufficient to establish standing for injunctive relief).  To be sure, even if release from commitment did not moot a patient's claim, the unlikelihood of obtaining relief by the end of a 180-day commitment deters patients from going through the trouble of filing suit.  *See Powers*, 499 U.S. at 415 (parties unlikely to obtain relief have "little incentive to set in motion the arduous process needed to vindicate [their] own rights").  This lawsuit is exemplary: it was filed in 2022 yet remains at the pleadings stage *805 days* later.

Patients' impaired condition during commitment also hinders many from advocating for themselves.  *Pa. Psychiatric Soc'y*, 280 F.3d at 290.  Moreover, patients may not have the resources to fund litigation of this scale, which is expensive and time consuming.  *Powers*, 499 U.S. at 415 ("economic burdens of litigation" can be hindrance meriting third-party standing).

OHA nonetheless argues that civilly committed patients are not hindered because they have a "right to counsel" under Oregon law.  But the *right* to counsel is not the same as *having* counsel for purposes of bringing claims like those brought here.  Critically, Oregon does not appoint counsel to advocate for patients' rights to *appropriate treatment during* commitment.  OHA is wrong that the appointment of appellate counsel sufficiently protects these rights— rather, appellate counsel represent patients only to challenge orders of commitment themselves, not to help patients obtain proper placement and treatment during commitment.

OHA also notes that other patients have filed lawsuits over "disagreements about proper placements."  MTD at 23.  But nearly all of these actions were filed in other states, which have different civil commitment laws and thus say nothing about whether it is easy or even possible to

bring similar cases in Oregon.[7]  Meanwhile, OHA's only examples in Oregon involve facts and claims unlike those here.  *See, e.g.*, *Olson v. Allen*, No. 3:18-cv-001208-SB, 2019 WL 1232834 (D. Or. Mar. 15, 2019) (involving not civil commitment placement, but pro se plaintiff's allegations that OSH staff injured him and refused to fund in-home care *after* commitment ended); *Unterreiner v. Goldberg*, No. 06-277-HU, 2007 WL 9808320 (D. Or. July 27, 2007) (concerning patient in *residential* facility who challenged the *re*-commitment procedure).[8]

In any event, even if these cases said what OHA claims, they still do not disprove that "*some* hindrance" exists, meeting the low bar for third-party standing.  That a "few individuals may be willing to brave the risks, costs, and inconveniences of litigation . . . does not negate the magnitude of those risks, costs, and inconveniences or the likelihood that they will significantly deter others."  *Yellowhammer Fund v. Att'y Gen. of Ala. Steve Marshall*, Nos. 2:23cv450-MHT & 2:23cv451-MHT, 2024 WL 1999546, at *10 (M.D. Ala. May 6, 2024).

OHA finally argues that Hospitals "have not established that no other organization can seek to intervene" on behalf of their patients.  MTD at 17.  But that is not the standard.  As the

---

[7] Moreover, the out-of-circuit cases cited by OHA do not in fact favor OHA's position, and many deal with inapposite situations.  *See, e.g.*, *Kriz v. Roy*, No. 8:20CV110, 2020 WL 6135442 (D. Neb. Oct. 19, 2020) (pro se plaintiff wrote handwritten complaint that was promptly dismissed); *Salcido ex rel. Gilliland v. Woodbury Cnty., Iowa*, 119 F. Supp. 2d 900 (N.D. Iowa 2000) (concerned whether either state or county must pay for patient's placement at mental health institution); *Conner v. Branstad*, 839 F. Supp. 1346 (S.D. Iowa 1993) (not about civilly committed individuals, but instead challenged Iowa's residential state hospital schools); *Endsley v. Mayberg*, No. CIV S–09–2311, 2010 WL 4829549 (E.D. Cal. Nov. 22, 2010) (concerned GEI patient, not civil commitment).

[8] OHA's reliance on *McCollum v. California Department of Corrections & Rehabilitation*, 647 F.3d 870, 879 (9th Cir. 2011), is also misplaced.  The *McCollum* court denied third-party standing to represent prisoners because, in that case, prisoners were themselves already a party to the litigation.  *Id.*  Here, there are no civilly committed patients who are parties to *this* lawsuit.

Ninth Circuit reaffirmed, Hospitals need only show they have a "close relation" with patients and that patients face "some" hindrance.  ECF 105 at 3–4.  Hospitals meet these elements.

To be clear, Hospitals support Oregon's chapter of the National Alliance on Mental Illness ("NAMI-Oregon") intervening.  But OHA is wrong that NAMI-Oregon's intervention, or another advocacy organization's intervention, means "there will be no need to have Plaintiffs pursue claims on behalf of civilly committed individuals."  MTD at 18.  Both Hospitals and NAMI-Oregon have unique perspectives that should be before this Court regarding patients' claims and remedies.  Although an overlap of interests exists, Hospitals are uniquely positioned to advocate for their present and future patients, due to the close, confidential, and fiduciary provider-patient relationship they share.  Moreover, the Ninth Circuit has repeatedly held that it is unnecessary to address each plaintiff's standing in a multi-plaintiff case, where all plaintiffs seek the same relief, so long as one of the plaintiffs has standing.  *See Melendres v. Arpaio*, 695 F.3d 990, 999 (9th Cir. 2012) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." (citation and internal quotation marks omitted)).  Sure enough, in *Mink*, the Ninth Circuit held that, because Oregon Advocacy Center had associational standing, there was no need to address Metropolitan Public Defender Services' standing.  *Mink*, 322 F.3d at 1109 (only one petitioner need have standing for case to proceed).

### B.    Hospitals sufficiently assert substantive and procedural due process claims on behalf of civilly committed patients.

Hospitals' First and Second Claims allege that OHA's failure to provide long-term treatment to civilly committed patients deprives them of their constitutional liberty right to "restorative treatment."  *See* SAC ¶¶ 64–78.  OHA moves to dismiss these claims on the merits, primarily arguing that civilly committed patients have no right to "restorative" treatment.  MTD

at 26–27.  OHA instead argues that patients are entitled to only "minimally adequate" treatment.

*Id.* at 26–27 (citing *Youngberg v. Romeo*, 457 U.S. 307, 319 (1982)).  OHA is wrong, and the

Court should deny OHA's motion to dismiss patients' due process claims.

### 1. Substantive Due Process

In arguing that patients are entitled to only "minimally adequate" treatment, OHA

repudiates Ninth Circuit law.  For decades, the Ninth Circuit has held that "civilly committed

persons must be provided with mental health treatment that gives them 'a realistic opportunity to

be cured or improve the mental condition for which they were confined.'" *Mink*, 322 F.3d at

1121 (quoting *Sharp v. Weston*, 233 F.3d 1166, 1172 (9th Cir. 2000) and citing *Ohlinger v.*

*Watson*, 652 F.2d 775, 779 (9th Cir. 1980)).  The Ninth Circuit first stated in *Ohlinger*:

> [A] person committed solely on the basis of his mental incapacity
> has a constitutional right to receive "such individual treatment as
> will give each of them a realistic opportunity to be cured or to
> improve his or her mental condition."  Adequate and effective
> treatment is constitutionally required because, absent treatment,
> appellants could be held indefinitely as a result of their mental
> illness, while those convicted and sentenced under [a criminal] . . .
> statute need only serve the [crime's] maximum term.

652 F.2d at 778 (citation omitted).  The Ninth Circuit later reaffirmed this liberty right to

"restorative" treatment in *Sharp*, 233 F.3d at 1172, and again in *Mink*, 322 F.3d at 1121 (first

labeling such treatment as "restorative" and observing that civilly committed patients enjoy the

same right to such treatment).  And as Judge Helen J. Frye of the District of Oregon recognized

decades ago, patients further have rights arising from Oregon law, *see Martyr v. Mazur-Hart*,

789 F. Supp. 1081, 1087 (D. Or. 1992)—including OAR 309-032-0870(2), under which patients

are to be returned to "a less restrictive environment" as soon as possible.  It is on these liberty

interests that Hospitals base the First and Second Claims.  *See* SAC ¶¶ 65–67.

OHA is wrong that *Youngberg*, not *Ohlinger*, provides the applicable constitutional standard of care for civilly committed persons, and that *Ohlinger* applies to only "sex offenders serving indeterminate life sentences in prison." ECF 30 at 29 n.1. This argument is squarely refuted by *Sharp*, which the Ninth Circuit decided long after *Youngberg* yet nonetheless followed *Ohlinger*. 233 F.3d at 1172 ("[The] Fourteenth Amendment Due Process Clause requires states to provide civilly-committed persons with access to mental health treatment that gives them a realistic opportunity to be cured and released."). *Sharp* reasoned that, "[b]ecause the purpose of confinement is not punitive, the state must . . . provide the civilly-committed with 'more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.'" *Id.* (quoting *Youngberg*, 457 U.S. at 322). The Ninth Circuit reaffirmed *Sharp* and *Ohlinger* a few years later in *Mink*. *See* 322 F.3d at 1121.

OHA is likewise wrong that Hospitals' allegations "fall short" because "Plaintiffs identify no specific patients, no specific mental health conditions allegedly going untreated, and no specific 'overly-restrictive' placements." MTD at 26–27. Hospitals allege that civilly committed patients in Hospitals' care typically suffer from various conditions like psychosis, suicidal or homicidal ideation, or sometimes aggressive behaviors, and generally require long-term treatment to recover, which they cannot obtain. SAC ¶¶ 18–20, 47–49. This is more than enough for purposes of stating a plausible due process claim. *See Iqbal*, 556 U.S. at 678 (requiring only allegations that, if true, "allow[] the court to draw the reasonable inference that the defendant is liable," and not necessarily "'detailed factual allegations'" (citation omitted)).[9]

---

[9] At oral argument on OHA's first motion to dismiss, Judge Mosman opined that patients' substantive due process claim likely should survive on the merits. ECF 75 at 8–9.

### 2. Procedural Due Process

OHA also seeks dismissal of patients' procedural due process claim on the ground that Hospitals have not pleaded a protected liberty interest of patients. MTD at 27. OHA argues that civilly committed patients have no liberty interest "to not be placed in community hospitals" or "specific placement." *Id.* at 27. OHA's argument, however, mischaracterizes Hospitals' allegations, which (as detailed above) are in fact based on the deprivation of patients' rights to receive restorative treatment. The Court should disregard this argument.

The Court should also reject OHA's argument that there is no due process violation because there is an adequate "appeal mechanism" under OAR 309-033-0290 for "patients who wish to be assigned to a different facility." *Id.* at 27–28 (citing SAC ¶ 76 and OAR 309-033-0290(3)(a), which requires civilly committed persons appealing their placement to do so "in writing" and include the "reason(s)" that the "current placement is inappropriate" and a "proposed alternate placement" with reasons supporting the alternative placement). Hospitals have explained why this "appeal mechanism" is insufficient. For one, it provides only a *post*-deprivation remedy. SAC ¶ 76; *see Shinault v. Hawks*, 782 F.3d 1053, 1058 (9th Cir. 2015) (due process generally "'requires some kind of a hearing *before* the State deprives a person of liberty'" (citation omitted)). Further, even if a severely ill patient in confinement can avail themself of the appeals procedure, Hospitals have explained how OHA is *unable* to follow the procedure given the shortage of beds that OHA has permitted throughout Oregon. SAC ¶¶ 38, 42–43, 57. This amply establishes the lack of procedural protections available to patients.

### C. Hospitals sufficiently assert substantive and procedural due process claims on their own behalf.

OHA next urges the Court to dismiss Hospitals' substantive and procedural due process claims asserted on Hospitals' own behalf. The Court should reject each of OHA's arguments.

1.    **Substantive Due Process**

Hospitals' Third Claim alleges that OHA is violating their fundamental property rights by unlawfully leaving patients in OHA's custody in Hospitals' care indefinitely, forcing Hospitals to use beds, rooms, space, and consumable resources to care for patients who are ready to transition to long-term care. *See generally Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 539 (2005) (holding that a property owner's "right to exclude others from entering and using her property" is "perhaps the most fundamental of all property interests"). OHA first argues that this claim fails because it is "subsumed by [Hospitals'] federal takings claim." MTD at 28.

OHA admits, however, that a substantive due process claim is *not* subsumed into a Takings claim where the deprivation of property is the result of arbitrary, irrational, conscience-shocking, or deliberately indifferent conduct. *See Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 856 (9th Cir. 2007) (such deprivations "'cannot be remedied under the Takings Clause,'" because if a government action "'is so arbitrary as to violate due process,'" then "'[n]o amount of compensation can authorize such action'" (citation omitted)); MTD at 28.

OHA's conduct with respect to civil commitment is without question "shocking," and Hospitals allege such conduct in significant detail. Hospitals describe how OHA has, for years, and despite knowing the harmful impact on patients and providers, intentionally abandoned civilly committed patients in Hospitals' facilities. SAC ¶¶ 47–59. And with knowledge of the irreparable damage its practices cause to patients and providers, OHA has refused to meaningfully address the issue (which simultaneously benefits OHA by passing the costs and responsibility for caring for civilly committed patients to community hospitals). *Id.*; *see County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (conscience-shocking conduct includes "deliberate indifference" where actor has reasonable time for deliberation before acting). A jury

could certainly find from these facts that OHA's conduct is arbitrary, conscience-shocking, or deliberately indifferent. *See also Bowman v. Matteucci*, No. 3:21-cv-01637, 2021 WL 5316440, at *2 (D. Or. No. 15, 2021) (rejecting argument that a shortage of funding or resources absolves OHA of its obligations under the Due Process Clause).[10]

OHA also argues that OHA has not infringed on Hospitals' rights because "OHA is not requiring Plaintiffs to treat civilly committed patients" and, rather, Hospitals "have voluntarily sought certification to treat civilly committed patients." MTD at 29. But this argument simply ignores the numerous allegations in the Second Amended Complaint saying *precisely the opposite*. Hospitals allege that they are legally mandated to accept, screen, and treat "all patients who enter through their emergency rooms, regardless of whether they might later be civilly committed or whether the hospital is approved to treat detained or civilly committed patients." SAC ¶¶ 33, 42. When these patients are later civilly committed, Hospitals "have no feasible options other than to continue housing the patients and providing basic care (i.e., administer medications) and consumable resources (i.e., food, toiletries, and other basic provisions) indefinitely" because of "state and federal laws and regulations, medical ethics, and civil commitment orders" that prohibit discharge. *Id.* ¶ 37. Nor can Hospitals "transfer the patients elsewhere because, almost always, there is nowhere for the patient to go." *Id.* ¶ 57. For these reasons, Hospitals must continue to treat civilly committed patients regardless of any decision they made in the past about certification. *Id.* ¶¶ 42–46.[11]

---

[10] Hospitals' federal and state Takings claims are, effectively, pled in the alternative to Hospitals' Substantive Due Process claim. Fed. R. Civ. P. 8(d)(2), (3). The Court should permit all claims to proceed through discovery and to trial because if, for some reason, OHA were to convince the factfinder that OHA's conduct was short of being arbitrary, irrational, conscience-shocking, and deliberately indifferent, Hospitals could still prove other facts supporting their Takings claims.

[11] Hospitals have also alleged that their "voluntary" choices to become certified to provide treatment to civilly committed patients are, themselves, involuntary. Hospitals have alleged that,

OHA makes no effort to address these allegations in the Second Amended Complaint. But the fact that OHA either ignores Hospitals' allegations, or in effect denies them as untrue, is no basis to dismiss Hospitals' claims at the pleadings stage. Properly accepting Hospitals' actual allegations as true, Fed. R. Civ. P. 12(b)(6), Hospitals have sufficiently pleaded a substantive due process claim on their own behalf.

### 2.    Procedural Due Process

OHA's arguments for dismissing Hospitals' procedural due process claims are largely the same as OHA's arguments for dismissing Hospitals' substantive due process claims. OHA again argues that Hospitals have not alleged a deprivation of any property interest because Hospitals "have volunteered for and sought approval to treat every civilly committed patient." MTD at 29. This argument fails for the reasons discussed above and is no basis to dismiss Hospitals' claim.

OHA also argues that Hospitals have not alleged that they have been denied "adequate procedural protections" in light of OAR 309-033-0270(3)(a), under which OHA must consult with admitting physicians at Hospitals' facilities to "determine whether the bests interests of a committed person are served by an admission to [that] community hospital." *See id.* at 29–30 (citing SAC ¶ 90). But Hospitals have detailed how OHA is simply not following OAR 309-033-0270, thus depriving Hospitals of any meaningful opportunity for recourse. SAC ¶ 90. While OHA argues that Hospitals have not alleged that they have "tried to engage in" the process, this ignores that OAR 309-033-0270 puts the *onus on OHA*—not Hospitals—to engage

---

"Due to the complex interplay between federal and state laws and regulations, Plaintiffs have no choice but to become certified . . . to avoid violating the law and jeopardizing Plaintiffs' licensure and funding. This is because, among other reasons, OHA requires hospitals to be approved and certified in order to provide 'care and treatment services for persons under civil commitment or for persons in custody.'" SAC ¶ 46. Hospitals thus obtain certifications because they are required to be certified to provide short-term stabilizing acute care treatment to patients experiencing severe mental health crises who enter through their emergency departments.

in the process.  In any event, OHA does not address Hospitals' allegations that they have, for

years, tried to work with OHA to secure long-term treatment for patients, but to no success.  *See,*

*e.g.*, *id.* ¶¶ 55, 58.  The Court should allow Hospitals' procedural due process claim to proceed.

> ### D.     Hospitals sufficiently assert Federal and State Takings claims.

OHA next seeks to dismiss Hospitals' Takings claims on various grounds.  OHA first

argues that Hospitals fail to show that OHA is "requiring" Hospitals to admit and treat civilly

committed patients, such that OHA "has not 'taken' anything."  MTD at 30.  OHA also argues

that Hospitals fail to show a "direct invasion or appropriation of physical property," or that

"OHA has physically entered their hospitals and directly taken their beds."  *Id.* at 31.

At the outset, this Court must reject OHA's argument that OHA is not "requiring"

Hospitals to admit and treat civilly committed patients.  As already discussed at length, Hospitals

have amply pled that OHA's conduct forces Hospitals to house and treat civilly committed

patients long past any understanding or agreement regarding this care.

Neither *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1252 (9th Cir. 2013), nor

*Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216 (9th Cir. 2018), changes the analysis.

Those cases involved takings of an alleged property right to have sufficient Medicaid

reimbursement rates, rather than, as here, the taking of separately owned property that plaintiffs

owned irrespective of their participation in Medicaid.  Indeed, the Ninth Circuit in *Sierra*

rejected OHA's very argument here.  In *Sierra*, ambulance companies brought Takings claims

against California for setting exceedingly low Medicaid reimbursement rates, allegedly depriving

companies of their rights both to adequate Medicaid rates and separately owned personal

property.  883 F.3d at 1224.  The Ninth Circuit held that, although the companies lacked a

protected interest in rates due to their voluntary participation in Medicaid, they nonetheless had a

protected interest in their separately owned property. *Id.* at 1225 ("[V]oluntary participation in a

market that is subject to regulation does not defeat a takings claim."). Thus, under *Sierra*, even

if Hospitals' participation in the civil commitment system is "voluntary" (it is not), this does not

foreclose their Takings claim based on the deprivation of their separately owned property.[12]

The Court should likewise reject OHA's argument that Hospitals have failed to show a

"direct invasion or appropriation of physical property." MTD at 31. OHA again ignores

Hospitals' allegations, which allege that OHA is leaving its own patients—who are committed

"to [OHA] for treatment" and are in OHA's custody and control—in Hospitals' physical spaces.

*See* SAC ¶¶ 21–22; *see also* ORS 426.130(1)(a)(C). OHA admits that it enjoys ultimate control

of where civilly committed patients, for which OHA is responsible, are physically placed. MTD

at 11; ECF 75 at 30 (OHA's counsel acknowledges "OHA is responsible for [patients] once they

are civilly committed[.]"). OHA exercises that control by leaving *its* patients in Hospitals'

facilities, thus appropriating Hospitals' physical spaces, beds, and consumable resources for its

patients' housing and care. SAC ¶¶ 47–54. This is no mere "regulation" of Hospitals' use of

property—it is a direct *physical appropriation* of Hospitals' space and property. *See Cedar*

*Point Nursery v. Hassid*, 594 U.S. 139, 149–52 (2021) (requiring agricultural employer to allow

union advocates to "take access" to employer's property for intermittent periods was not mere

regulation of use of property, but physical appropriation, thus physical taking); *Horne v. Dep't of*

*Agric.*, 576 U.S. 350, 354, 361–62 (2015) (requiring grape growers to set aside crops for

appropriation by the government was "a clear physical taking").

---

[12] Indeed, although OHA asserts that Judge Mosman believed that Hospitals "can't get the
physical taking because of the voluntariness issue," OHA omits that Judge Mosman *also*
remarked that the Takings "issue stands or falls on the . . . voluntariness question. If you win on
voluntariness on standing, then you win it on Fifth Amendment taking." ECF 75 at 39. Sure
enough, the Ninth Circuit held that Hospitals "won" on voluntariness for standing purposes.

OHA finally argues that Hospitals' Takings claim must be dismissed because it improperly seeks equitable relief rather than monetary compensation.  MTD at 31.  OHA is wrong.  Judge Mosman recently rejected this very argument in *Pharmaceutical Research & Manufacturers of America v. Stolfi*, 724 F. Supp. 3d 1174, 1188–91 (D. Or. 2024).

In *Pharmaceutical Research*, an association of drug manufacturers asserted a Takings claim against Oregon on the ground that a state drug-price disclosure law required the disclosure of the association's trade secrets, which destroys the value of the trade secrets and thus effects a taking.  *Id.* at 1183–84, 1189.  Rather than seek compensation for each trade secret destroyed by the law, the association sought a declaration that the law violated the constitution.  *Id.* at 1186.  Judge Mosman allowed the association's Takings claim to proceed.  *Id.* at 1190–91.

The court explained that, while compensation is ordinarily the remedy for Takings claims, declaratory and injunctive relief may be appropriate where the available state procedures for acquiring compensation for each taking is inadequate.  *Id.*  The court further noted that, to recover, the association would have to litigate "a multiplicity of suits involving the same underlying takings," which still would be "'incapable of compensating the manufacturers for the repetitive, future takings that will occur.'"  *Id.* (citation omitted).  "'By contrast, equitable relief would protect manufacturers from those future harms.'"  *Id.* at 1191 (quoting and discussing *Pharm. Rsch. & Mfrs. of Am. v. Williams*, 64 F.4th 932, 945 (8th Cir. 2023)).

The reasoning from *Pharmaceutical Research* applies here.  Hospitals have alleged that OHA "will continue engaging in its conduct" that constitutes a Taking and that "[s]eeking just compensation for OHA's repeated deprivations of [Hospitals'] property would require [Hospitals] to repeatedly litigate a multiplicity of suits involving the same and similar repeated deprivations of property as long as OHA's practices continue indefinitely."  SAC ¶¶ 100–01.

Hospitals "cannot feasibly seek adequate and just compensation through individual legal actions

for each civilly committed patient left in [Hospitals'] care because, among other reasons, the

expenses of pursuing so many individual legal actions may exceed the compensation [Hospitals]

seek to recover" for the Taking. *Id.* ¶ 101. Thus, Hospitals have adequately pled that

compensation is inadequate and that equitable relief, under the circumstances of this case, is an

available remedy. *See Pharm. Rsch.*, 724 F. Supp. 3d at 1190–91.

      **E.**    **Hospitals sufficiently assert disability claims on behalf of patients.**

     The Court should reject OHA's arguments that Hospitals fail to allege claims under

Title II of the ADA, Section 504 of the Rehabilitation Act, Section 1557 of the ACA, and

ORS 659A.142(5)(a) and (6)(a). OHA's primary argument is that Hospitals fail to allege

discrimination because they do not allege that placement in "one authorized[13] facility (e.g. a

community hospital) over another constitutes a discriminatory denial of care," nor do Hospitals

identify "any groups or individuals" who suffered discrimination "since the entire set is

identical."[14] MTD at 32–33. OHA, however, misunderstands Hospitals' claims and, indeed, the

federal and state statutes, regulations, and Supreme Court decision in *Olmstead v. L.C. ex rel.*

*Zimring*, 527 U.S. 581, 597 (1999).

---

[13] Long-term placement is not "authorized" in Hospitals' acute care hospitals. As noted, Hospitals are not certified to provide long-term care, nor are they equipped or intended to do so.

[14] OHA takes a stray comment by Judge Mosman out of context, falsely implying that he previously ruled on Hospitals' disability discrimination claims. The Court should reject OHA's invitation to adopt Judge Mosman's "tentative thoughts" (on which he never ruled) about Hospitals' former First Amended Complaint (which did not assert ADA, Section 504, or Section 1557 claims). *See Parsons v. Ryan*, 912 F.3d 486, 499–500 (9th Cir. 2018) (declining to consider trial judge's oral remarks preceding written decision); *Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 896 (9th Cir. 2004) (same); *Rawson v. Calmar S.S. Corp.*, 304 F.2d 202, 206 (9th Cir. 1962) (trial judge not to be "lashed to the mast on his off-hand remarks" before written ruling); *IAP Worldwide Servs., Inc. v. United States*, 141 Fed. Cl. 788 (2019) (court's remarks at oral argument do not constitute a binding decision).

In *Olmstead*, the Supreme Court held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." 527 U.S. at 597. This principle reflects the understanding that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 600–01. Notably, in reaching its decision, the Supreme Court considered and rejected the *same* arguments made by OHA—that mentally ill individuals: (1) "encountered no discrimination . . . because they were not denied community placement on account of those disabilities" but instead due to inadequate funding; and (2) were not "discriminated" against because discrimination "necessarily requires uneven treatment of similarly situated individuals," which the plaintiffs had not identified. *Id.* at 598. The Court instead explained:

> Ultimately, in the ADA, enacted in 1990, Congress not only required all public entities to refrain from discrimination, *see* 42 U.S.C. § 12132; additionally, in findings applicable to the entire statute, **Congress explicitly identified unjustified "segregation" of persons with disabilities as a "for[m] of discrimination**." *See* § 12101(a)(2) ("historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"); § 12101(a)(5) ("individuals with disabilities continually encounter various forms of discrimination, including ... segregation").

*Id.* at 600 (brackets in original; emphasis added); *see also McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004) (noting Supreme Court "foreclosed the . . . 'comparative' approach to determining whether an individual was discriminated against because of his disability").

In short, *Olmstead* and its progeny established that the ADA and Rehabilitation Act (and their implementing regulations) prohibit disabled individuals from being placed in restrictive

settings when they are able to receive adequate treatment in integrated settings. This is exactly what Hospitals allege: specifically, that OHA's practices force patients to reside indefinitely in restrictive emergency and acute care settings, even when treatment professionals believe that less-restrictive community-based treatment is appropriate, patients do not oppose such treatment, and the services can be reasonably accommodated. SAC ¶¶ 112, 126.

The same analysis applies to Section 1557 and ORS 659A.142.[15] Thus, contrary to OHA's argument, Hospitals adequately allege that OHA is discriminating against patients "on the basis of their disability" under each statute.

OHA also contends that Hospitals' claims fail because they do not "identify" "individual incidents" of discrimination. MTD at 33. But this again ignores Hospitals' allegations, which repeatedly describe how OHA fails to place patients in appropriate integrated settings, denies or excludes patients from having meaningful access to services and benefits, and employs criteria or methods of administration that prioritize and permit unjustified institutionalization. *E.g.*, SAC at 2–4, ¶¶ 25–29, 31–32, 36–37, 47–49, 54, 56–58, 112–18, 126–30, 135, 161–62. OHA also assumes, incorrectly, that patients must have already suffered discrimination to state a claim. Disability discrimination claims "extend to persons at serious *risk* of institutionalization or

---

[15] Other courts have expressly reached this conclusion with Section 1557 claims. *See, e.g.*, *Bone v. Univ. of N.C. Health Care Sys.*, No. 1:18cv994, 2021 WL 395547, at *8 (M.D.N.C. Feb. 4, 2021) ("Taken together, Title II, Section 504, and Section 1557 . . . prohibit the exclusion of individuals with disabilities from the services, activities, and programs, including health programs, of entities receiving public funding."). The Final Rule of Section 1557 also provides that the integration mandate applies to Section 1557. Nondiscrimination in Health Prog. & Act., 89 Fed. Reg. 37,522, 37,609 (May 6, 2024). And the same analysis applies to ORS 659A.142. *See* ORS 659A.139(1) (ORS 659A.142 to be construed consistently with ADA); *Updike v. Clackamas County*, No. 3:15-cv-00723-SI, 2015 WL 7722410, at *5 (D. Or. Nov. 30, 2015) (ORS 659A.142(5)(a) is the "Oregon statute most analogous to Title II of the ADA"); *Colasanti v. City of Portland*, No. 3:19-cv-00443-YY, 2019 WL 8545841, at *7 (D. Or. Sept. 23, 2019) (Oregon disability laws share standards with "analogous ADA provision[s]").

segregation." U.S. Dep't of Just., Statement of the Department of Justice on Enforcement of the

Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*

(June 22, 2011) (emphasis added).[16]  Thus, plaintiffs "need not wait until the harm of

institutionalization or segregation occurs or is imminent."  *Id.*; *accord M.R. Dreyfus*, 697 F.3d

706, 720 (9th Cir. 2012).  The Final Rule of Section 1557 makes this clear:

> Section 1557's incorporation of section 504's integration provision through
> § 92.101(b)(1) makes clear that serious risk of institutionalization is covered
> under section 1557 as well, given that the vast majority of courts have found
> section 504 and title II of the ADA prohibits actions, omissions, policies, and
> practices that place individuals at serious risk of unjustified isolation. Indeed,
> nearly every court of appeals to address the issue has held that the integration
> mandate of the ADA and section 504 apply not only to people with disabilities
> who are currently in institutions, but also to people with disabilities who are at
> serious risk of segregation or institutionalization.

Nondiscrimination in Health Prog. & Act., 89 Fed. Reg. 37,522, 37609.

OHA lastly argues that Hospitals cannot establish discrimination because OHA's "actions

are governed by the *Mink* Order."  MTD at 33.  But Hospitals' claims are about much more than

OSH—Hospitals challenge Oregon's under-resourced civil commitment system as a whole.  In

any event, the *Mink* Order simply does not excuse OHA's discrimination against civilly

committed patients.  Even if OSH is full, OHA still must satisfy its obligations to all patients

committed to its custody.  *See Bowman*, 2021 WL 5316440, at *2 (rejecting OHA's attempt to

prioritize AA patients over GEI patients); *Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003)

(violates integration mandate to provide only some disabled individuals with long-term services).

Hospitals have plausibly alleged that civilly committed patients are discriminated against

by OHA in violation of the ADA, the Rehabilitation Act, Section 1557, and ORS 659A.142.

Accordingly, the Court should deny OHA's motion to dismiss those claims.

---

[16] *See* https://archive.ada.gov/olmstead/q&a_olmstead.htm.

**F.    Hospitals sufficiently state Oregon statutory law claims.**

Hospitals' Tenth and Eleventh Claims seek declarations that OHA is violating two Oregon statutes: (1) ORS 426.060(2)(a), which requires OHA to direct civilly committed patients "to the facility best able to treat" them; and (2) ORS 426.150(1), which provides that, "[u]pon receipt of the order of commitment, [OHA] or its designee *shall take* the person with mental illness into its custody" and "ensure the safekeeping and proper care" of them.  (Emphasis added.)  OHA is violating these statutes by leaving civilly committed patients in emergency and acute care settings indefinitely and failing to make any placement decision for them.  SAC ¶¶ 148, 154.  Hospitals also seek injunctive relief to remedy the violations.  *Id.* ¶¶ 151, 157.

OHA urges the Court to dismiss these claims because "neither statute provides a private right of action."  MTD at 33.  But that does not matter here, where Hospitals seek equitable relief.  *See Doyle v. City of Medford*, 356 Or. 336, 339, 337 P.3d 797 (2014) (no need to create common-law tort claim where plaintiffs sought determination of statutory rights and duties under Declaratory Judgments Act).  To seek equitable relief, a plaintiff need only articulate a "real or probable" "injury or other impact upon a legally recognized interest beyond an abstract interest in the correct application . . . of a law."  *League of Or. Cities v. State*, 334 Or. 645, 658, 56 P.3d 892 (2002); *TVKO v. Howland*, 335 Or. 527, 534, 73 P.3d 905 (2003).  A plaintiff must also show that "the court's decision will have a practical effect on that person's individual rights or interests."  *Kellas v. Dep't of Corr.*, 341 Or. 471, 484–85, 145 P.3d 139 (2006).  Hospitals readily meet these requirements: they allege that OHA's violations of ORS 426.060 and 426.150 deprive patients of liberty rights, and that a declaration that OHA is violating these statutes—and an injunction prohibiting the same—will stop further violations.

Next, OHA contends that Hospitals' claims fail because OHA has "exclusive discretionary authority" to place civilly committed patients where OHA chooses.  MTD at 34. OHA also notes that Hospitals do not assert that OHA is "prohibited from placing civilly committed individuals at" Hospitals.  *Id.* at 35.  But this ignores the crux of Hospitals' allegations, which are that OHA is *failing* to make *any* placement decisions for patients, to take them into custody, and to ensure their safekeeping and proper care.  *See, e.g.*, SAC ¶¶ 148, 154. Even if OHA had unfettered discretion to make placement decisions (it does not), OHA still violates its duties by making no placement decision at all.  *See also id.* ¶¶ 23, 36, 44, 45, 48, 49, 90 (further alleging OHA does not honor Hospitals' certifications or consult with admitting physicians to "determine whether the best interests of a committed person are served" in Hospitals' facilities under OAR 309-033-0270(3)(a)).

OHA finally argues that the *Mink* Order excuses it from complying with either statute. But as discussed, injunctions in *Mink* do not excuse OHA's statutory and constitutional obligations to patients committed to its custody for treatment.  *See Bowman*, 2021 WL 5316440, at *2.  In any event, the *Mink* Order pertains only to OSH and do not prohibit OHA from creating or funding long-term placement options elsewhere in Oregon, which could also cure OHA's violation of ORS 426.060 and 426.150.

In short, OHA again recasts both the law regarding declaratory relief and the allegations in the complaint to fit its preferred narrative and outcome.  Hospitals have sufficiently pled claims for declaratory relief, and this Court should reject OHA's motion to dismiss them.

## V.    CONCLUSION

For all the reasons above, the Court should deny OHA's motion to dismiss, or, in the alternative, grant Hospitals leave to replead.

DATED: December 11, 2024

EPSTEIN BECKER & GREEN, P.C.          STOEL RIVES LLP

*/s/ Eric J. Neiman*                          */s/ Thomas R. Johnson*
Eric J. Neiman, OSB #823513           Thomas R. Johnson, OSB #010645
ENeiman@ebglaw.com                    tom.johnson@stoel.com
Emma P. Pelkey, OSB #144029           Alex Van Rysselberghe, OSB #174836
EPelkey@ebglaw.com                    alex.vanrysselberghe@stoel.com

*Attorneys for Plaintiffs*