Emily Cooper OSB #182254
ecooper@droregon.org
Thomas Stenson OSB #152894
tstenson@droregon.org
Dave Boyer OSB # 235450
dboyer@droregon.org
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| **DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC.,** & **A.J. MADISON,** Plaintiffs, | Case No. 3:02-cv-00339-AN (Lead Case) Case No. 3:21-cv-01637-AN (Member Case) |
| v. | |
| **SAJEL HATHI,** in her official capacity as head of the Oregon Health Authority, & **SARA WALKER**, in her official capacity as Superintendent of the Oregon State Hospital, Defendants. | PLAINTIFF DISABILITY RIGHTS OREGON'S MOTION FOR A RULE TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT, AND FOR A REMEDIAL ORDER |
| **JAROD BOWMAN** and **JOSHAWN DOUGLAS-SIMPSON**, Plaintiffs, | ORAL ARGUMENT REQUESTED |
| v. | |
| **SARA WALKER**, Interim Superintendent of the Oregon State Hospital, in her official capacity, **SAJEL HATHI**, Director of the Oregon Health Authority, in her official capacity, Defendants. | EXPEDITED HEARING REQUESTED |

### LR 7-1 Certification

Plaintiffs and Defendants have met in mediation with Judge Beckerman to discuss this

Court's orders and the steps necessary for compliance. Dkt. 538 (Minute Order). The parties

were not able to strike an agreement to avoid this filing.

MOTION FOR CONTEMPT & REMEDIAL ORDER
Page 1

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

## I.    Motion

Plaintiff Disability Rights Oregon (DRO) hereby moves this Court pursuant to its inherent authority to enforce its own orders, to impose civil contempt sanctions, and to issue writs to require compliance with its own injunctions or judgements. *See Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992) (federal courts have "wide latitude" and "inherent power" to enforce their "lawful orders through contempt). The federal rules confer on federal courts the authority to issue injunctions. Fed. R. Civ. Pro. 65. The rules specify who is bound by those orders, including the "parties" to a case. Fed. R. Civ. Pro. 65(d)(2).

The All Writs Act also provides federal courts with the ability to safeguard the integrity of their proceedings and judgments. 28 U.S.C § 1651(a)("The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."); *see also Doe #1 v. Trump*, 458 F.Supp.3d 1220, 1223 ("There must be some connection between the underlying claims and the newly-challenged conduct for that conduct sufficiently to interfere with the Court's jurisdiction to support an extraordinary writ under the All Writs Act"). Plaintiff DRO respectfully asks this Court to use its "inherent power to enforce compliance" with its own permanent injunction and to issue appropriate remedial orders including but not limited to levying civil contempt. *Shillitani v. United States*, 384 U.S. 364, 370 (1966).

## II.    Brief Memorandum

In 2002, after a bench trial, this Court issued a permanent injunction requiring Defendants to "ensure that persons who are declared unable to proceed to trial" be committed "as soon as practicable" to the state psychiatric hospital or other suitable treatment facility "in a

reasonably timely manner, and completed not later than seven days after the issuance" of an appropriate order finding the individual unfit to proceed to trial. ECF 51. For years, Defendants maintained compliance with the permanent injunction. However, starting in the Fall of 2018, Defendants have been largely out of compliance with only brief periods of compliance. At the last hearing in this matter, Defendants stated that they had no projection of when they would come back into compliance with the permanent injunction. Cooper Decl. Ex. A at 27.

During the last few years of noncompliance, at least two jail detainees found unable to aid and assist have died while waiting for a hospital bed, as a result of complications of their mental illnesses and the related inability to eat or drink. Cooper Decl. at ¶3-5. Hundreds of other detainees have spent weeks or months languishing in jail, often in isolation and without treatment, while their conditions worsened. The human costs of Defendants' noncompliance have been enormous. Plaintiff DRO seeks relief from this Court due to Defendants lack of an immediate plan to comply with the permanent injunction.

### III.    Procedural History

Plaintiffs filed a complaint in this matter on March 19, 2002, alleging that the Defendants failed to admit pretrial detainees found unable to aid and assist their attorneys in a prompt manner. ECF 1. The matter went to trial in April 2002. The Honorable Owen Panner issued an opinion and a permanent injunction in May 2002, holding that Defendants violated the Fourteenth Amendment by failing to admit detainees unable to stand trial in a prompt manner and requiring Defendants to admit them in a timely manner, not less than seven days from the entry of an appropriate order. ECF. 51. Defendants appealed the judgment to the Ninth Circuit, which rejected the appeal and upheld the judgment of the district court. ECF 76.

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

Over the next many years, Defendants remained in compliance with the permanent injunction. No filings were filed in the district court from August 2003 to May 2019. In May 2019, both plaintiff organizations filed motions seeking to hold Defendants in contempt of court, as Defendants had been out of compliance with the order since October 2018. ECF 85 and 91. This Court considered these arguments but declined to hold Defendants in contempt at that time. ECF 127. Defendants did not dispute that they were out of compliance, simply that contempt was not appropriate. ECF 103, at 2. The Court retained jurisdiction and continued to monitor the situation. In August 2019, Defendants filed a report indicating that they had regained compliance. ECF 133.

Six months later, in April 2020, Defendants filed a motion to modify the permanent injunction in light of the COVID-19 pandemic, alleging that they were unable to manage the intake of patients safely. Dkt 151. Defendants indicated that they were not in compliance with the injunction and had not been for weeks. *Id.* Following motion practice, the Court issued an order in May 2020 altering the permanent injunction. Dkt. 167. Plaintiffs appealed this decision to the Ninth Circuit, which overturned the district court's decision. Dkt. 221.

Ongoing proceedings continued to document Defendants' failure to comply with the law, but without further substantial relief or intervention from the district court, other than continuing orders relaxing the standard in response to COVID-19 outbreaks in the hospital. As the pandemic wound into its second year, however, it became clear that whatever challenges created by the pandemic were secondary to the larger problems associated with the long atrophy of the Oregon mental health system and the increased demand for competency restoration services. *See*, *e.g.*, ECF 199, at 3-4 (detailing OSH's inability as of April 2021 to keep up with referral rates from the community); *id.* at 5 (detailing list of detainees ready to place, many whom OSH and OHA

Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, OR 97205
(503) 243-2081

could not find a community placement). Even once patients were no longer testing positive for COVID-19, the waitlist both for admission and for release of those ready to place persisted. ECF 228-1 (showing zero patients testing positive for COVID-19, but continued violation of the injunction).

In December 2021, Plaintiffs and Defendants presented a limited agreement to the Court, asking the Court to appoint a neutral expert to advise Defendants and to formulate a basis for further agreement between the parties and redress of the longstanding noncompliance. ECF 238; ECF 238-1. Dr. Pinals was appointed as the Neutral Expert and began issuing periodic reports for a total of ten to date. In August 2022, Plaintiffs filed an unopposed motion for an enforcement order incorporating the expert's recommendations. ECF 252. The Court granted that motion in part and then, essentially, in full in successive orders. ECF 256; ECF 271. The primary substance of these orders was to restrict the amount of time Defendants could keep patients at the state hospital for competency restoration treatment. The aim was to create greater capacity to admit those prospective patients languishing in jail for court ordered restoration services.

As part of this process, numerous amici and putative intervenors approached the Court in August and September 2022, including multiple county governments, multiple District Attorney's Offices, multiple state court judges, and multiple private health care corporations. ECF 259; ECF 267; ECF 274; ECF 280. To briefly summarize some very complex actions, intervention was denied (except for a short period in which the private health care corporations were permitted to intervene) and virtually all entities were permitted to participate as amici. The amici presented different arguments for why the Court either should not have or could not have entered its orders in August and September 2022. The Court rejected these arguments and left its order in place. ECF 338.

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

The parties and amici then went into mediation to discuss possible amendments to the

September 1, 2022, Court Order. The mediation was successful in identifying two important

"safety valve" provisions, allowing certain exceptions to the timelines at issue, both of which

were then incorporated into the July 2023 order. ECF 416. The enforcement process led to

several specific challenges that required some further litigation. ECF 398; ECF 401; ECF 425;

ECF 441; ECF 445; ECF 448; ECF 452; ECF 460; ECF 475.

In early 2024, likely due to the time limits for inpatient competency restoration,

Defendants briefly achieved compliance with the permanent injunction but fell out of compliance

by the summer. In July 2024, the Court held a status conference pressing the question of when

long-term compliance could be expected. Mediation was held in August 2024 and a follow-up

status conference in November 2024. During the November 18, 2024, status conference,

Defendants confirmed that they were not in compliance with the permanent injunction and did

not have a projection for when compliance would be achieved. Cooper Ex A at 27. This lack of

urgency to comply with a federal court order and its constitutional underpinnings is what lead

Plaintiff Disability Rights Oregon to bring this motion.

## IV.    Factual Background

### A.    2012-2019: Rising Aid-and-Assist Commitments and the Oregon Performance Plan

The lack of adequate mental health competency restoration services facing Oregon today

did not begin in the summer of 2024 (with the surge in referrals Defendants point to), nor in

2021 (when Dr. Pinals was hired), nor even in 2019 (when the first enforcement motions were

filed in this case). At least as early as 2012, Oregon was aware of significant problems regarding

the aid-and-assist population in Oregon and the operations of the state hospital. First, while the

number of aid-and-assist cases had remained steady around 100 patients at any one time for most

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

of a decade since the permanent injunction, the number of aid-and-assist patients began to rise

sharply starting in 2012. ECF 123-1. Second, beginning in November 2012, the U.S. Department

of Justice entered a collaborative agreement with Defendants to make efforts to address the

problems in Oregon's "services and supports for individuals with serious and persistent mental

illness in the community." ECF 107-1. This initial agreement between Defendants and the U.S.

Department of Justice would become the Oregon Performance Plan, resulting in years of

oversight by the federal government of the system, including the state hospital.

As the federal government watched, the availability of community mental health

resources dwindled.[1] The government continued to press the state to reduce the length of stay for

civilly committed patients, to increase community-based services, and increase the supply of

housing. After several years, the federal government began a new phase of enforcement,

initiating the Oregon Performance Plan in 2016 and requiring Defendants to meet certain

requirements. Oregon promised to implement the plan across a three-year period. ECF. 107-1.

The plan required, among other metrics, that Defendants enact substantial improvements to the

state hospital, including:

- By 2019, OSH would successfully discharge 90% of individuals found ready to place/ready to transition within 20 days of placement on the list;
- To facilitate these discharges, OHA would "enter into performance-based contracts" with community health providers, community care organizations, and other entities as appropriate;
- That OSH would discharge 90% of individuals within 120 days of admission; and
- That every person discharged from the state hospital would be released to the "most integrated setting appropriate for the individual," without regard to cost.

*Id.* at 9-11.

---

[1] U.S. Dep't of Justice, Narrative Report, Oct. 2014, at 32 (showing community services declined across 2013 and 2014) *at* https://www.oregon.gov/oha/hsd/bhp/Documents/Narrative-USDOJ-Report-10.2014.pdf

MOTION FOR CONTEMPT & REMEDIAL ORDER
Page 7

Defendants, while they had some success with the other provisions in the plan, never came close to achieving most of these metrics with regard to the hospital. In fact, the metrics regarding prompt discharge from the hospital got significantly *worse* over the three-year scrutiny by the Department of Justice. The percentage of patients promptly discharged after entering the ready to place list dropped from between 55% and 62% in 2017 to 45 or 46% in 2019, rather than moving towards the goal of 90% compliance.[2] While Defendants had moderate success at moving patients through the hospital in 2021, improving from 41% to 61% across three years, Defendants never approached the stated goal of achieving prompt discharge in 90% of cases. *Id.* The state also failed to reach other vital goals, like achieving barely half of the promised supported housing by 2019 (1137 people actually living in supported housing, relative to a goal of 2000 by 2019). *Id.* at 22. Its progress on discharge planning was determined to be "mixed," with "continuing concerns regarding OSH discharge timelines from Ready to Transition."[3]

As part of this process of assessing the Defendants, many of the contract revisions with CCOs and CMHPs nominally intended to improve care standards remained vague as to whether they were properly enforceable. ("As with other . . . issues" with OHA's new CCO contract, "how OHA will hold CCOs accountable to the new requirements is not yet totally clear."). *Id.* at 23. The then-serving expert assessed the issue of "performance based" contracts for CCOs and CMHPs, stating that "much more needs to be done regarding CCO and CMHP compliance

---

[2] Independent Consultant Report: Oregon Health Authority Activities to Implement The Oregon Performance Plan (March 2020)("March 2020 Report"), p. 26, available at https://www.oregon.gov/oha/HSD/BHP/Oregon%20Performance%20Plan/IC-Report-6-06-29-20.pdf

[3] Independent Consultant Report: Oregon Health Authority Activities to Implement The Oregon Performance Plan (September 2018)("September 2018 Report"), page 34, available at https://www.oregon.gov/oha/HSD/BHP/Oregon%20Performance%20Plan/IC-Report-4-FINAL-11-21-18.pdf

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

overall." March 2020 Report at 56. While the state had expressed an intent to revise these contracts more substantially, that plan was diminished, with any changes in 2021 "now expected to be minor," leaving to some future date the further revisions needed. *Id.*

While this interaction with the federal government was proceeding, Defendants were keenly aware that a steadily increasing number of detainees were being referred to the state hospital. In November 2017, a psychiatrist from the state hospital, Dr. Tolan, testified that the number of aid-and-assist patients at the hospital had grown steadily from January 2012 (110) to September 2017 (190), with a peak of 232 in September 2016.[4] Dr. Tolan testified to the legislature that OSH and OHA would in fact reduce the length of stay at the hospital to 120 days for 90% of patients and release 90% of the patients within 20 days of their being ready to place. *Id.* During this time, however, Defendants did little to prepare for the prospect of continually increasing caseloads of aid-and-assist patients that would quickly tax the limited resources of the hospital. While Defendants made haphazard efforts towards some community-related services, its primary response was to transform more and more units at the state hospital into aid-and-assist units, even as the finite utility of this practice was obvious. *See, e.g.*, ECF 103, at 4-5; ECF 123, at 3-4 (discussing how the state hospital accommodated the growth in aid-and-assist detainees by converting units at the state hospital to house them). Defendants never developed a plan for what would happen when there were no other units to convert for aid-and-assist placement. Defendants never truly assessed—and indeed still have not really assessed today—how to right-size its services to meet demand.

---

[4] Related to the Maximum Benefit of Commitment HB 2308, Hearing Before House Judiciary Committee, 79th Oregon Legislative Assembly – 2017 Regular Session (Oregon Health Authority Testimony) available at
https://olis.oregonlegislature.gov/liz/2016R1/Downloads/CommitteeMeetingDocument/138933

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

Defendants took a few steps during the Oregon Performance Plan to seek funding to make its services to aid-and-assist patients sustainable. Dr. Tolan's 2017 testimony to the legislature, while noting the alarming rise in aid-and-assist referrals, sought no further action from the legislature either in policy or spending that would plausibly address the growing numbers of aid-and-assist detainees at the hospital. While Defendants participated in limited efforts to improve the system as a whole, the presentations to the Legislature remained comparatively restrained and indicated confidence that minor tweaks to the system would be adequate. At the same time, the Governor's requested budget for the Oregon State Hospital in the 2017-19 biennium requested only a three percent increase from the 2015-17 budget, while decreasing the request for general fund request dollars by three percent.[5] The Governor's budget proposal for OHA Health Systems Division, including community behavioral supports, reduced funding by three percent overall, increasing general funds by one percent. *Id.* at 64. Even as the problems at the hospital became manifest, Defendants budgetary requests failed to keep up with inflation or demand and instead represented actual cuts to prior service levels.

While Defendants clearly rely on legislative appropriations, Defendants failed to convey to the legislature any proportionate urgency around the growing problems or to request needed funds to provide the level of care that was needed in the mental health care system to comply with the DOJ's performance plan.

**B.      2019-2021: Early Enforcement Proceedings**

Due to the lack of investments into Oregon Health Authority and the Oregon State Hospital, the inevitable was predictable. In the fall of 2018, the slow, steady rise in aid-and-assist

---

[5] The 2017-2019 Governor's Budget, p. 68, available at
https://www.oregon.gov/das/Financial/Documents/2017-19_gb.pdf

Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

referrals filled all available units at the state hospital, until there were no longer any new units to divert patients to. ECF 123-4. Plaintiffs filed motions to hold the state in contempt in the spring of 2019. ECFs. 85 and 91.  Defendants responded by pointing to its investments in abating the problems: $5.8 million for community restoration, $1.5 million for investment in the community mental health system, and $29 million for jail diversion, aid-and-assist treatment, and crisis treatment. ECF. 103, at 7-9. While surely intended to sound impressive in 2019, the comparatively small sums Defendants sought were obviously inadequate, given what we now know about the scale of need in Oregon. More troubling, the requested appropriations were far too low to bring the state into compliance, let alone make the kind of changes that would sustain compliance through long term investments in the community behavioral healthcare system.

Defendants nevertheless insisted in 2019 that it was taking an aggressive approach "designed to bring it back into strict compliance with the injunction." *Id.* at 13. Among the steps suggested by Plaintiffs in 2019 that Defendants rejected were: "aggressive benchmarks for compliance," hiring an expert to "provide direction," requiring defendants to "educate state courts" and "intervene in state courts" to promote prompt disposition of cases. *Id.* at 14. Defendants instead insisted Plaintiffs' proposed relief would not be better than the Defendants' plan of action to comply with the injunction, which was "already on track." *Id.*

By August 2019, Defendants had modestly increased some funding for community options, opened a contract with the Northwest Regional Reentry Center, and taken other minor steps to address the noncompliance. ECF 133. At the end of their report, Defendants stated that they "expect to remain in compliance for the foreseeable future." ECF 133, at 9.

Five months later, as the COVID pandemic swept the nation, Defendants fell out of compliance in March 2020 and would not regain compliance for years. ECF 151. As of April

MOTION FOR CONTEMPT & REMEDIAL ORDER
Page 11

2020, Defendants anticipated that they would be back in compliance by June 2020. ECF 151, at 8. Defendants continued to largely be out of compliance for the next four years.

By the start of the 2019 legislative session, Defendants were actively out of compliance with the permanent injunction, but their budgetary and policy requests still did not reflect the urgency needed. The Governor's 2019 budget noted the problem and proposed a modest "muti-faceted" strategy: opening a new unit at the OSH Junction City campus as a "stop-gap," investing $7.6 million to increase capacity in the community, and requesting modest statutory changes.[6] In February 2019—mere months before the filing of early contempt proceedings and at a time when the state had been actively out of compliance with the permanent injunction for months—the superintendent of the hospital provided a briefing to the Legislature asking for no assistance beyond the passage of two pending bills.[7] One of those two pending bills, SB 24, outlined the community restoration process. The second, SB 25, was focused on making psychiatric evaluations more efficient. The budgetary requests largely reflect these modest goals noted in the Governor's budget at the time, seeking the $7.6 million mentioned above for community services and the costs of temporarily opening the Junction City unit.[8] As a measure of the state's failure to assess the scope of the problem facing it, the Governor's budget assessed that this small investment in community services would "enable the new [Junction City] unit to eventually draw down its population and close." *Id.* The new unit remains open.

---

[6] The 2019-2021 Governor's Budget, p. 64-65, available at https://www.oregon.gov/boppps/Documents/Stats%20and%20Reports/GRB2019-21.pdf.
[7] Forensic Evaluation Efficiencies, SB 24 and SB 25, Hearing Before Senate Judiciary Committee, 80th Oregon Legislative Assembly – 2019 Regular Session (Oregon State Hospital Testimony) available at https://olis.oregonlegislature.gov/liz/2019R1/Downloads/CommitteeMeetingDocument/164128
[8] The 2019-2021 Governor's Budget, p. 64-65, supra at footnote six.

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

The scope of Defendants' failure to anticipate, assess, or respond to this crisis for at least a decade is perhaps best captured by a letter from one of its attorneys in March 2021. Defendant Oregon State Hospital's attorney addressed the legislature on the topic of the aid-and-assist population, saying that the state "must quickly build capacity for community restoration – capacity that was largely not necessary before the dramatic increase in this population since 2012 – capacity that cannot be served and should not be served at the state hospital."[9] The Court may well wonder why Defendants were scrambling in March 2021 to obtain funding to build community capacity for a problem that had been growing, largely unaddressed, since 2012.

Also in 2021, the Oregon Legislative Fiscal Office noted that "Oregon ranks 48th in the nation for mental health services . . . [and] scored particularly bad in terms of prevalence of mental illness and adults with any mental illness reporting unmet needs."[10] The aid-and-assist problem "remained tenuous" as of 2021 but received a Governor's recommendation of only $22 million to address a complex statewide issue. *Id.* Similar to the U.S. Department of Justice's findings in the Oregon Performance Plan from the proceeding years, another of Oregon's "major problem[s]" was "providing adults with a serious and persistent mental illness (SPMI) the community services necessary to enable them to live in the most integrated setting appropriate to their needs and avoid unnecessary institutionalization." *Id.* Despite the documented concerns related to a constitutional crisis, Defendants failed to adequately alert the legislature or make a

---

[9] Related to Fitness to Proceed, SB 395, Hearing Before Senate Judiciary Committee, 81st Oregon Legislative Assembly – 2021 Regular Session (Oregon State Hospital Legal Affairs Department Testimony) https://olis.oregonlegislature.gov/liz/2021R1/Downloads/PublicTestimonyDocument/11877
[10] Legislative Fiscal Office, Legislatively Approved Budget 2021-2023, Budget Review, available at https://olis.oregonlegislature.gov/liz/2021R1/Downloads/CommitteeMeetingDocument/230880 at 7-8

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

legislative request in the 2021-23 biennium for any real, urgent and detailed funding to address the full scope of the problem due to insufficient resources to respond to people who wait in perilous jail conditions for court ordered mental health competency restoration services.

**C.     2021-Present: Supervision and Enforcement from the Neutral Expert**

Instead of seeking contempt in 2021, Plaintiffs reached an agreement with Defendants to appoint a neutral expert to issue recommendations for both short and long-term compliance with the Courts' orders. ECF. 238; *see also* ECF. 238-1. Dr. Debra Pinals is the Neutral Expert, and she has issued ten reports with detailed recommendations.[11] If the parties agree with a recommendation from the Neutral Expert, "Defendants will follow her recommendations and report their progress in their next monthly report." *Id.* at 3. Defendants have not rejected a single recommendation from the Neutral Expert. However, they have failed to fully implement the following six recommendations that Dr. Pinals has repeated over the past three years:

1.    *Discharging patients on the Ready to Place list.* "Every effort should be made to examine discharge practices for both GEI and AA patients to expedite timely and safe processes."[12]  As of December 15, 2024, there are 75 aid and assist (AA) patients on the Ready to Place list.[13]  There are 50 guilty except insane (GEI) patients who have also been determined to no longer need hospital level of care waiting, on average, 225 days.

2.    *Divert patients from the state hospital to community placements.* "By August 2022 regardless of whether there is a court-led 'jail review', OHA should engage stakeholders to develop a process for real-time ongoing local in-jail review/consultation of all currently detained defendants in the Aid and Assist process ordered for restoration, and leverage resources expended on jail diversion programs in the community to conduct these reviews."[14] There is no real time review of the entire waitlist.

3.    *Enforce contracts with community mental health providers.* "OHA should review existing contracts with the [Community Care Organizations] CCOs and [Community Mental

---

[11] *See* Oregon Health Authority's website on the Mink-Bowman Order Compliance with waitlist data and the expert's reports available at https://www.oregon.gov/oha/OSH/Pages/mink-bowman.aspx.

[12] Neutral Expert Fourth Report, December 21, 2022, at 21; *see also* Cooper Decl. Ex. C at 1-2.

[13] OSH Forensic Admission and Discharge Bi-Weekly Report, December 2-15, 2024, available at https://www.oregon.gov/oha/OSH/reports/2024-12-02to15-OSH-Forensic-Bi-Weekly-Admission-Discharge-Report.pdf

[14] Neutral Expert Second Report, June 5, 2022, at 24.

MOTION FOR CONTEMPT & REMEDIAL ORDER
Page 14

Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

Health Providers] CMHP's to determine the scope of the existing contractual obligations to serve the Aid and Assist and GEI population."[15] No information has been shared regarding OHA's review of existing contracts or related enforcement.

4.    *Expand substance use disorder treatments.* "These services are critical as the data shows there is a close nexus between recidivism or even referral for AA evaluations and restoration and co-occurring substance use disorders. These services should be incorporated into the refinements of services offered for people in Community Restoration Programs (CRPs)."[16] No information has been shared regarding OHA's expansion of substance use treatment services in community programs.

5.    *Create Community Restoration Timelines.* "In my opinion, the potentially indefinite period of community restoration represents an ironic and challenging problem for the state, with overreliance of competency services rather than other parts of the system, when that is not what restoration is intended to achieve… As it currently stands, defendants can spend their maximum time in hospital-based restoration, only to be discharged to indefinite community restoration, taking up slots for other individuals for whom community restoration would prove more useful."[17] There are no limits for community restoration.

6.    *Obtain Funding, Duration of Restoration, and Community Restoration Refinements.* "It would be my strong recommendation that OHA, with support of the Governor's Office, revisit this legislation as a priority but organize itself around socializing it. Although the federal order is in place, it is not a sustainable solution for the state. A legislative remedy to the appropriate use of OSH beds and community restoration slots is critical."[18] There has been no consistent funding nor statutory change to enact true system reform.

These six outstanding recommendations were repeated in many of Dr. Pinals reports. For example, Dr. Pinals first focused on the Ready to Place list in her first report on January 30, 2022. Pinals First Report, p. 18. On June 5, 2022, she repeated herself finding adherence to timely discharge "is critical for compliance." Pinals Second Report, p. 25. In April 2023, Dr. Pinals found:

> There are too many people identified as ready for non-hospital level of care settings who are not being discharged, and too many people coming into the hospital who very early on do not appear clinically to need this level of care. This is a major concern… If discharges are realized, it could yield compliance most immediately.

---

[15] *Id.* at 26 and 33.
[16] *Id.* at 26.
[17] *See Id.* at 27-28; *see also* Neutral Expert Third Report, September 15, 2022, at 20.
[18] Neutral Expert Fifth Report, April 17, 2023, at 20.

MOTION FOR CONTEMPT & REMEDIAL ORDER
Page 15

Dr. Pinals Fifth Report at 19; *see also* Dr. Pinals Sixth Report, p. 21. Many of Dr. Pinals'
recommendations echo concerns identified but not resolved in the prior decade, in the state's
federal oversight process.[19]  Ultimately, Defendants lack of compliance is due to their failure to
fully implement all of Dr. Pinals recommendations including a focus on timely discharge of
patients to ensure timely admission.

In December 2024, Plaintiff DRO hired an expert, Dr. Ira Packer, to review Defendants'
lack of compliance in light of Dr. Pinals' recommendations. Cooper Decl. Ex. J. Dr. Packer
found both "the recommendations of the Neutral Expert are reasonable and consistent with
national standards" and "there are areas that OHA and OSH have not adequately addressed" to
implement Dr. Pinals' recommendations and subsequently comply with this Court's orders. *Id.* at
4-5. Dr. Packer found that a critical component of Defendants noncompliance was "delays in
discharging patients from the State Hospital who are deemed ready to place (RTP)."  *Id.* at 4.

> Based on the latest data in Dr. Pinals' tenth report, there were 76 RTP (ready to place)
> individuals from the Aid and Assist (A&A) population at OSH – or about  20% of the
> total A&A population - who were not discharged. P. 6  It is noted that as of 11/1/24 there
> were 76 individuals on the waitlist for admission to OSH (which is the same number in
> the hospital deemed RTP). Although it is not expected that every individual on the RTP
> list could be immediately placed, expedited placement of this group would have a
> significant impact on the waitlist.

*Id.* While Plaintiff DRO maintains its high regard for Dr. Pinals and her work; our concerns with
her recommendations are solely limited to Defendants' failure to fully implement them.  This
failure is why Plaintiff DRO requests a show cause order from this Court to determine why
Defendants should not be held in contempt of this Court's orders.

---

[19] ECF 107-1, at 9-10 (requiring OSH to discharge patients deemed ready to place); *id.* at 16
(requiring OHA to engage in criminal justice diversion); *id*. at 19 (requiring OHA to "issue
regulations or enter into performance-based contracts with CMHPs and other providers, either
directly or through its CCOs" detailing the "expectations" for performance); *id.* at 5 (requiring
"diligent efforts" to pursue funding).

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

## V.    Argument

Considering the complex and long-standing nature of the concerns before the Court, Plaintiff Disability Rights Oregon will present a variety of types of relief, both in the form of further enforcement orders to facilitate Defendants' compliance and in the form of civil contempt to coerce Defendants' into becoming compliant. Of course, this Court has its broad authority to implement any just and reasonable relief as it sees fit.

### A.    Defendants Admit Their Lack of Compliance with the 2002 Permanent Injunction and Are Subject to Contempt Proceedings

A district court has the inherent power to hold a party in civil contempt in order to enforce compliance with an order of the court or to compensate for losses or damages. *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *see also United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947). Civil contempt is defined as "a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935, 945 (9th Cir. 2014) (citing *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). Courts may impose civil contempt sanctions for the purpose of coercing a defendant to comply with its order. *See In'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) ("[C]ivil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard."). Courts may also consider other broad remedial measures to address noncompliance. *Brown v. Plata*, 563 U.S. 493 (2011) (imposing prison population limit); *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536 (9th. Cir. 1987) (affirming appointment of a Special Master). When the least intrusive measures fail to rectify the problems, more intrusive

MOTION FOR CONTEMPT & REMEDIAL ORDER
Page 17

measures are justifiable. *Stone*, 968 F.2d at 861 (citing *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978)). While issuance of a writ pursuant to the All Writs Act is an extraordinary remedy, it is appropriate if it is "in aid of" the issuing court's jurisdiction." *Clinton v. Goldsmith*, 526 U.S. 529, 534, 119 S.Ct. 1538, 143 L.Ed.2d 720 (1999) (quoting 28 U.S.C. § 1651(a))

This Court has "wide latitude" in determining whether a party is in contempt of its orders. *Gifford v. Heckler*, 741 F.2d 263, 266 (9th Cir. 1984). As such, it is up to the court to determine whether an entity is in contempt, and that decision is subject to abuse of discretion review. *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999). The moving party has the burden of proving contempt by clear and convincing evidence. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Once this burden is met, it "then shifts to the contemnors to demonstrate why they were unable to comply." *Affordable Media*, 179 F.3d at 1239. "The contempt 'need not be willful," and there is no good faith exception to the requirement of obedience to a court order. *In re Dual-Deck Video Cassette Recorder Antitrust Lit.,* 10 F.3d 695.

A party should be found in contempt of a court order when 1) a person named in the order, or a person acting in concert with or participating with a named person, 2) violates the explicit terms of the order, 3) after having actual notice of the order. *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 877 F.2d 787, 789 (9th Cir. 1989). Civil contempt is intended to "coerce the contemnor into future compliance with the court's order." *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir.1989).

Here, the Court's order is unambiguous and requires that state hospital "admissions must be done in a reasonably timely manner and completed not later than seven days after the issuance of an order determining a criminal defendant to be unfit to proceed to trial because of mental

incapacities under ORS § 161.370(2)." (ECF. 51). Defendants' own records concede a lengthy waiting list for hospital admission has subjected dozens of people found unfit to proceed to weeks of waiting in jail. Cooper Decl. Ex. B. Defendants' waitlist data dated December 15, 2024, shows that eighty-one people were waiting in jail for transport to the state hospital. *Id.* As for notice, Defendants admitted their lack of compliance with this Court's order on November 18, 2024. Cooper Decl. Ex. A at 27. Plaintiff DRO also sent two letters to Defendants seeking additional action to avoid contempt proceedings. Cooper Decl. Ex. D and E. Since the Plaintiffs have shown a prima facie case that the substituted Defendants had notice of and violated the order, it falls to Defendants to rebut the Plaintiffs' arguments or come into compliance.

**B.    The Longstanding Nature of the Noncompliance Militates in Favor of More Intrusive Enforcement Orders and Contempt Proceedings**

While "state and local authorities have primary responsibility for curing constitutional violations," the federal court may act where "those authorities fail in their affirmative obligations." *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978). A federal court has "broad" "equitable powers" in this duty, particularly in "seeking to bring an ongoing violation to an immediate halt." *Id.* A district court that has been "overseeing a large, public institution for a long period of time" has greater leeway to address noncompliance through contempt. *Stone*, 968 F.2d at 856. "[W]hen the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable." *Id.* at 861. Courts possess "whatever powers are necessary to remedy constitutional violations." *Id.* Courts "must not shrink from their obligation to enforce the constitutional rights of all persons." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

Violations that "persist[] for years" merit particular attention and aggressive action by court. *Plata*, 563 U.S. at 499; *id*. at 514 (mass release of prisoners was appropriate after five years of *Plata* consent decree noncompliance and 12 years of noncompliance with *Coleman*

MOTION FOR CONTEMPT & REMEDIAL ORDER
Page 19

decree). A court that "patiently exhaust[s] other alternatives" may select more intrusive remedies in light of "historical failures." *Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 472 (9th Cir. 1989). In the present context, the Defendants have been largely ineffective at redressing the underlying problems. While Defendants continue to allege their lack of compliance is due to unprecedented referrals for competency restoration services, the referral rate has steadily risen over the past decade at a fairly predictable rate.



Excerpt from Oregon State Hospital Admission Dashboard December 2024. *See* Cooper Decl. Ex. C at 2. The referral rate is not the source of the problem; instead, the problem is the state's failure to fund an appropriate array of competency restoration services to respond to the demand as well as build out a robust community behavioral health system to provide services prior to a person's health deteriorating to the point of getting involved in the criminal justice system.  The state's inability to appropriately seek or spend its resources on this population provides this Court with the legal justification to increase the intrusiveness of its remedial powers including but not limited to issuing contempt sanctions, increasing the authority of the Neutral Expert, issuing a writ, and issuing a modified remedial order aimed at compelling compliance.

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

**C.    Defendants Have Not Taken Every Reasonable Step to Comply with the Injunction**

A party in violation of an injunction must show they have taken every reasonable step to comply to avoid sanction. *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986). Whether a public entity has made "good faith efforts" to comply with an injunction is "irrelevant" to the question of contempt sanctions. *Stone*, 968 F.2d at 856. A constitutional violation does not become acceptable if the governmental defendant faces "financial constraints," nor does the showing that a governmental defendant has spent millions of dollars on the problem abate the violation. *Stone*, 968 F.2d at 858 (neither city's alleged "financial crisis" nor fact city had spent $30 million on overcrowding make contempt inappropriate). Nor does it matter that part of the state's liability may arise from the failure of the state legislature to act, as long as the legislators themselves are not subject to sanction. *Spallone v. United States*, 493 U.S. 265, 277 (1990) (sanctioning city of Yonkers for failing to achieve passage of a bill was "not an abuse of discretion," but individual city council members could not be sanctioned for failure to pass a promised bill). Even an outright state legislative prohibition on expenditure of funds cannot justify noncompliance with a federal injunction. *Hook v. Arizona Dep't of Corr.*, 107 F.3d 1397, 1404 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (Apr. 22, 1997).

Here, Defendants have not taken all reasonable steps to comply with the 7-day timeline. Most notably, Defendants have failed to implement six repeated recommendations made by Dr. Pinals. *See e.g.,* Cooper Ex. J at 4 (Dr. Packer cites Dr. Pinals' reports recommending timely discharge of the Ready to Place list). In addition, Defendants have systemically failed to provide the long-term availability of adequate options for housing people with mental illness due to a lack of adequate resources. It is already the law of this case that the "[l]ack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

necessary for rehabilitation." *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003).

More than ample time has been allotted to Defendants to identify the problem and make

provision for housing for people with mental illnesses to address the recidivism of this

population and stop the revolving door to the state hospital.

 Defendant OHA have long known they lack adequate resources to support patients with

mental illnesses in the community.[20] OHA described the loss of residential programming beds in

recent years as "staggering."[21] OHA also described the acute psychiatric care system as "near the

breaking point" in 2021.[22] OHA commissioned a study, published last year, that indicated that

Oregon needed an estimated 8,103 beds for mental health and substance use treatment, of which

the state had only 4,033 beds at the time.[23] OHA quickly backtracked on both the size and timing

of this expansion, now only claiming they will have a tiny fraction of the more than 4000

required treatment beds by the end of 2026.[24] Even the state's current woeful estimate

incorporates anticipated agreements that *may* happen, rather than those actually resolved. Here,

the need to right-size the community mental health program has been obvious for more than a

decade, but Defendants have only intermittently pressed the issue; ultimately, creating a gap

---

[20] *See, e.g.*, Or. Health Auth., Behavioral Health Collaborative Report, at 4-5 (2017) ("Data shows consumers are not currently receiving sufficient or consistent behavioral health services throughout Oregon. . . .) *at* https://olis.oregonlegislature.gov/liz/2017R1/Downloads/CommitteeMeetingDocument/108723.
[21] Or. Health Auth., Behavioral Health System Update, at 4 (2022) *at* https://olis.oregonlegislature.gov/liz/2022r1/Downloads/CommitteeMeetingDocument/252360.
[22] Or. Health Auth., Update from 9-8-8 Work Group, at 16 *at* https://olis.oregonlegislature.gov/liz/2021R1/Downloads/CommitteeMeetingDocument/241438.
[23] Public Consulting Group, *Oregon Behavioral Health Residential & Facility Study—Final Report*, at 10 (June 2024) *at* https://www.oregon.gov/oha/HSD/AMH/DataReports/Behavioral-Health-Residential-Facility-Study-June-2024.pdf.
[24] Or. Health Auth., Behavioral Health Housing and Licensed Capacity Investments Dashboard ("Capacity by Quarter" tab) *at* https://www.oregon.gov/oha/hsd/amh/pages/housing-dashboard.aspx  (indicating that, between the second quarter of 2023 and the final quarter of 2026, the state will create 439 beds for mental health and substance abuse care).

riddled behavioral health system that cannot divert or discharge individuals from a beleaguered state hospital with finite capacity and resources.

For example, it is widely acknowledged that the tenuous compliance in 2024 was a result of this Court's order limiting restoration timelines at the state hospital (the "Mosman order"). The Association of Oregon Counties presentation to the legislature on the "Status of Community Restoration from July 2022 and September 2023," notes that the "implications of the Mosman order" resulted in an almost doubling of community restoration slots. Cooper Decl. Ex. F at 5. While the focus on expanding community restoration is consistent with Dr. Pinals' recommendations, this presentation notes the barriers to community restoration including insufficient staff, funding, and community placements including supported housing, long-term substance abuse disorder treatment, and independent housing. *Id.* at 6, 8. Defendants have failed to provide these resources necessary for compliance with this Court's orders and additional relief is respectfully sought.

### VI.  Requested Relief

Plaintiff Disability Rights Oregon respectfully seeks this Court's broad remedial powers to address Defendants' noncompliance including consideration of imposing contempt sanctions and modifying the remedial order to include compelling Defendants to both timely discharge patients and limiting who can come to the state hospital for competency restoration services.

1.  <u>Impose contempt sanctions against Defendants.</u>

Civil contempt penalties can take the form of per diem fines imposed for each day a contemnor fails to comply with an affirmative court order, or of fixed fines imposed and suspended pending future compliance. *See Int'l Union, United Mine Workers of Am. v. Bagwell,*

512 U.S. 821, 829 (1994). Courts have imposed incremental and substantial daily contempt sanctions when the harm to a party increases with time as does the contemnor's financial penalty. *Telenor Mobile Communications AS v. Storm LLC,* 587 F. Supp.2d 594, 621 (S.D.N.Y.2008) (approving "an initial contempt sanction of $100,000 per day, doubling to $200,000 per day thirty days thereafter, and to $400,000 per day thirty days after that, and continuing to double every thirty days until compliance is achieved, is an appropriate remedy to ensure problematic compliance with this Court's orders."). Increasing contempt sanctions is appropriate to ensure swift compliance. *Shell Offshore Inc. v. Greenpeace, Inc.* 815 F.3d 623, 627 (9th Cir. 2016) (approving sanctions structured as progressively increasing to compel compliance.). Here, Plaintiffs respectively suggest imposing daily contempt sanctions for every person waiting over 7 days for transport to the state hospital for competency restoration services.[25] That daily sanction amount could double for every person waiting over 14 days for transport to the state hospital.

2.     Order Defendants to modify admissions to and discharge from the state hospitals.

Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights. *Stone*, 968 F.2d at 861, citing *Hutto v. Finney,* 437 U.S. 678, 687 n. 9 (1978); *Milliken v. Bradley (Milliken II),* 433 U.S. 267, 280 81 (1977). When the least intrusive measures fail to rectify the problems, more intrusive measures are justifiable. *Stone*, 968 F.2d at 861 (citing *Hutto* 437 U.S. 678, 687 n.9). This Court's orders may infringe on state laws because "otherwise valid state laws or court orders cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce the scheme." *Stone*, 968 F.2d at 862.

---

[25] Plaintiffs are *not* seeking criminal contempt sanctions that punish the Defendants for past violations. Any contempt sanctions imposed should be forward-looking only and should end once the Defendants achieve sustainable compliance with the district court's injunction.

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

This Court has employed other means to help Defendants comply with its Order including establishing a Neutral Expert to assist Defendants and imposing hospital restoration timelines. Unfortunately, these efforts have not been successful in sustained compliance – especially given that Defendants have failed to take all the steps recommended by the Neutral Expert – and more intrusive measures are now required to compel compliance. Dr. Pinals' recommendations are "reasonable and consistent with national standards." Cooper Decl. Ex J at 4. Plaintiff DRO asks this Court to use its contempt powers to Order the state to:

a.   Limit misdemeanor and status offender referrals to the state hospital until compliance is achieved.

b.   Transfer or discharge all aid and assist patients on the Ready to Place list within 30 days.

c.   Discharge PSRB patients on the Ready to Place list within 60 days.

d.   To address the backlog in re-evaluating individuals in community restoration, Defendants shall hire a cadre of evaluators to conduct a re-evaluation of this backlog of patients within 60 days.

e.   Order Defendants to commission an external study by an outside group approved and lead by Dr. Pinals to a) review admissions data, b) develop a statewide process for a more centralized oversight of the forensic mental health system, c) assess projected system capacity to respond to the demand in services and d) make any other findings recommended by Dr. Pinals.

Beyond a brief period of tenuous compliance, Defendants have failed to consistently comply with this Court's orders. With the current crisis worsening by the day, this Court cannot wait to see what can be achieved in another legislative session. Previous legislative changes and funding obtained by Defendants have not sufficiently reduced the class member population or lowered wait times. Defendants have also failed to take necessary steps to avoid an admission backlog as they failed to implement all of Dr. Pinals' recommendations and do not currently have an adequate plan to address this crisis. This Court has no choice but to take more intrusive measures.

**Disability Rights Oregon**
511 SW 10th Avenue, Suite 200
Portland, OR  97205
(503) 243-2081

## VII.    CONCLUSION

Defendants have failed to provide court ordered competency restoration services within seven days in violation of this Court's orders. If Defendants fail to show cause why they have violated these court orders, Plaintiffs request the Court to use its broad authority to find Defendants in contempt, levy contempt sanctions until compliance is reached, and modify the Court's order to impose additional injunctive relief.

DATED this 7th day of January, 2025.

DISABILITY RIGHTS OREGON

/s *Emily Cooper*
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
Dave Boyer OSB # 235450
dboyer@droregon.org
511 SW 10th, Suite 200
Portland OR 97205
Telephone: (503) 243 2081
Facsimile: (503) 243 1738

*Counsel for Plaintiff*
*Disability Rights Oregon*