# IRA K. PACKER, Ph.D.

Board Certified in Forensic Psychology, ABPP
P.O. Box 469
Sharon, MA 02067
508-981-5952
forensictraining@gmail.com

December 27, 2024

Emily Cooper
Legal Director
Disability Right Oregon

Sent by email

Dear Attorney Cooper,

     This report is being submitted in response to your request that I review materials to 1) evaluate the state's efforts to comply with the *Mink* Order, 2) opine about the reasonableness of the efforts of the Oregon Health Authority and Oregon State Hospital to ensure compliance with the *Mink* order, and 3) assess whether additional resources are needed to ensure compliance, including but not limited to, further modifications of the court's injunction.

**Sources of Information relied upon**

     I have reviewed the following documents:

- Order Consolidating Cases and Appointing a Neutral Expert, dated 12/21/21;
- Judge Mosman's Order to Implement Neutral Expert's Recommendations dated September 1, 2022;
- Oregon Advocacy Center et al. v. Mink et al. Case No. 3:02-cv-00339-MO (Lead Case) Mediation Final Term Sheet (June 2023);
- Most recent Forensic Admission-Discharge Dashboard (2024-10-OSH-Forensic-Admission-Discharge-Dashboard.pdf) from the OHA website;

- Most recent Aid and assist census by county (Aid-and-assist-census-by-county-2024-12-16.pdf) from the OHA website;
- Most recent OSH Restoration limit report (2024-11-01-OSH-Restoration-Limit-Report.pdf) from the OHA website;
- Most recent forensic biweekly admission and discharge report (2024-12-02to15-OSH-Forensic-Bi-Weekly-Admission-Discharge-Report.pdf) from the OSH website;
- Most recent Aid and Assist extension motions-petitions (OSH-Aid-and-Assist-Extension-Motions-Petitions-23.07.01-24.11.30.pdf) from the OHA website;
- Review of Neutral Expert (Dr. Pinals) reports; (I have reviewed all 10 reports, with a full review of the first, second, eight, and tenth reports, and review of the recommendations sections of the other reports).

In addition, I consulted with the Neutral Expert, Dr. Pinals, on December 20, 2024, for approximately 45 minutes.

**Qualifications and Experience**

My C.V. is attached. I am a clinical psychologist and a Board-Certified Forensic Psychologist with over 45 years' experience conducting forensic evaluations, supervising forensic evaluators, directing local and statewide forensic services, training forensic practitioners, and overseeing quality assurance for forensic reports. I also have consulted to state and local jurisdictions, including both government agencies and plaintiffs, regarding forensic system issues, with a focus on the "competency crisis." I am the author or co-author of a number of articles and two books relevant to the practice of forensic psychology, including competence to stand trial, the insanity defense, and violence risk assessment.

**Context:**

Oregon is not alone in its competence-related challenges. Most U.S. states have experienced a surge in the demand for court-order Competence to Stand Trial (CST) evaluations over the past two decades.[1] In addition, a larger percentage of evaluees are being adjudicated as

---

[1] e.g., Wik A, Hollen V, Fisher WH. Forensic patients in state psychiatric hospitals: 1999–2016 (2020). *CNS Spectrums, 25*, 196-206. doi:10.1017/S1092852919001044;  Kois, L. E., Potts, H., Cox, J., & Zapf, P. (2024). Court-reported competence to proceed data across the United States. *Law and Human Behavior, 48*, 182-202.

Incompetent to Stand Trial (IST), thus vastly increasing the demand for competence restoration,[2] and requiring innovative approaches to addressing both evaluation procedures and systems issues. [3] There is a growing recognition that the solution to this national "competency crisis" requires multi-faceted approaches, including:

- attempts to divert individuals from the criminal justice system at earlier points in the process (Sequential Intercept model);
- limiting the categories of individuals who can be ordered to state hospitals for competence restoration (e.g., misdemeanants);
- developing alternative community sites for competence restoration;
- revising timelines for re-evaluation of incompetent defendants, as well as maximum timelines for restoration;
- improving training and quality assurance for forensic evaluators;
- increasing the pool of qualified forensic evaluators;
- addressing operational inefficiencies that delay evaluations and discharges;
- use of liaisons (e.g. "navigators") to coordinate discharge from State Hospitals to community programming;
- improve data collection and analysis.[4]

---

[2] e.g., Pirelli, G., Gottdiener, W. H., & Zapf, P. A. (2011). A meta-analytic review of comparative competency to stand trial research. *Psychology, Public Policy, and Law, 17*, 1–53.; Murrie, D. C., Gardner, B. O., & Torres, A. N. (2020). Competency to stand trial evaluations: A state-wide review of court-ordered reports. *Behavioral Sciences & the Law, 38*, 32-50.

[3] e.g., Murrie, D.C., Gowensmith, W.N., Kois, L.E., & Packer, I.K. (2023). Evaluations of competence to stand trial are evolving amid a national "competency crisis." *Behavioral Sciences & the Law,41,* 310-325.: https://doi.org/10.1002/bsl.2620; Kois L.E., Murrie D.C., Gowensmith W.N., & Packer, I.K.(2023). A public health perspective to reform the competence to stand trial system. *Psychiatric Services, 74*, 1289-1290.: https://doi.org/10.1176/appi.ps.20230079

[4] These recommendations are contained in Schwemer, R. (2022). Leading reform: Competence to stand trial systems. A resource for state courts (August 2021 v2*). National Judicial Task Force to Examine State Courts' Response to Mental Illness*.: https://www.ncsc.org/__data/assets/pdf_file/0019/66304/Leading_Reform-Competence_to_Stand_Trial.pdf  In addition, focus on the Sequential Intercept Model has been addressed by a number of authors, including:  Munetz, M. R., & Griffin, P. A. (2006). Use of the Sequential Intercept Model as an approach to decriminalization of people with serious mental illness. *Psychiatric Services, 57,* 544-549.: https://psychiatryonline.org/doi/10.1176/ps.2006.57.4.544; Callahan, L., & Pinals, D. A. (2020). Challenges to reforming the competence to stand trial and competence restoration system. *Psychiatric Services, 71,* 691-697.: https://psychiatryonline.org/doi/10.1176/appi.ps.201900483

It is also clear from the literature, as well as best practices, that there needs to be buy-in and coordination between state agencies, community agencies (e.g., counties), the judiciary, and the legislature in order to address this "competency crisis." This involves not only improving processes, but also requires a commitment to provide adequate funding, as many of these initiatives require additional budgetary expenditures.

**Assessment of response by OHA and OSH:**

Based on my review of the Neutral Expert's reports, it appears that all of these issues are being addressed by the Neutral Expert in collaboration with OHA and other stakeholders. There is a comprehensive approach being attempted to address the crisis across a wide range of stakeholders, and at various levels and intersections within the broader system. In my opinion, the recommendations of the Neutral Expert are reasonable and consistent with national standards. Many of the recommendations are being adhered to, or are in process, as documented in the Neutral Expert reports. However, as indicated by the continuing issues in not meeting the seven day deadline for admission required by the court order (the latest data indicated that the average wait time for individuals who were admitted to OSH in October, 2024 was 26.9 days), there are areas that OHA and OSH have not adequately addressed. In particular, there are continuing issues related to:

- backlog in re-evaluating individuals in community programs who may have either been restored to competence, or are not restorable;
- related to the above: lack of urgency in increasing the pool of qualified forensic evaluators to conduct re-evaluations of competency, both in the community and in the State Hospital;
- delays in discharging patients from the State Hospital who are deemed ready to place (RTP).

Community backlog

As of November 1, 2024, there were 292 A&A individuals in community programs who

4

were awaiting re-evaluation. This is a large number, and it is not clear (since there is currently no mechanism to assess these individuals in a timely manner) how many of those individuals would either be considered competent to stand trial or not restorable. It is my understanding that there is no statutory framework for the maximum time individuals can remain in these programs without re-evaluation. It also appears that in the current system, re-evaluations are conducted by the forensic evaluators at OSH, whose priority is to evaluate OSH inpatients. OHA has proposed hiring three additional evaluators to address this issue, but it is unclear exactly when they will be hired, and how long it would take to resolve the backlog. Dr. Pinals indicated in her tenth report that OHA estimated that it would take 4-6 months (after these individuals are on board) to complete these evaluations. I understand that Dr. Pinals has asked for more specifics, which are not yet available.

I have identified other issues with this approach. OHA is planning on hiring full-time staff, although these evaluations can be completed more expeditiously by contractors, who could be hired on a fee-for-service basis. This model has been used successfully in other states (e.g., Massachusetts and California). It has also been my experience (directing Forensic Evaluation Services) that using contractors is cost-effective.  Contractors are paid only for the amount of time required to conduct the evaluation and submit a report; full-time staff do not have 100% productivity (that is, they do not conduct evaluations 40 hours a week), and also the cost is increased by benefits (e.g., health insurance, vacation and sick time).  A qualified cadre of such evaluators could clear the backlog more expeditiously than 4-6 months. I note that California has effectively used a model of hiring contractors and also allowing state employees to conduct additional evaluations with overtime pay to rapidly re-evaluate individuals adjudicated as Incompetent to Stand Trial. Such a model can be particularly useful in a time-limited manner when there is a need for rapid reduction of waitlists.

In addition, it appears that the determination of the number of additional evaluators needed is based on the current projections for inpatient admissions. Since the Forensic Evaluation Service needs to assess both those in the hospital and those in the community; if there is an increase in hospital admissions, this would require additional resources. However, OHA/OSH is basing projected bed needs for the A&A population based on old estimates.  As is

5

evident from the data (Table 7 in Dr. Pinals' tenth report), actual new orders for restoration exceed the old projections by almost 10%. Thus, the estimate for how many more evaluators are needed, and the timeline for clearing the backlog are likely to be underestimates. **I recommend that OHA/OSH undertake a new assessment of projected A&A bed needs (this can be done by external consultants).**

Based on the above, **I recommend that OHA/OSH be directed to conduct re-evaluations of individuals in community restoration programs in a more timely manner than the current proposal.** I am not suggesting a specific time frame, leaving that up to the parties and the court. Even if a minority of these individuals can be discharged from community programs, this would free up beds for those in the hospital awaiting placement (RTP). In this context I note that Dr. Pinals (Neutral Expert third report, 9/15/22) recommended that "it will be important for the evaluators to continue to conduct their thorough A&A *evaluations but develop a method for brief reports of defendant "progress" following initial findings"* [emphasis mine]. **I strongly endorse this proposal, as it would allow for significantly quicker re-evaluation of individuals found unable to aid and assist, thus freeing up resources.**

Furthermore, it is unclear what the current mechanism is for community programs to notify OSH when individuals appear to have made adequate progress to warrant re-evaluation. It may be that such a mechanism exists, but I saw no reference to this in the materials reviewed. From a clinical perspective, treatment providers should routinely request re-evaluation whenever they deem it clinically appropriate, and OHA/OSH should then arrange to have these individuals re-evaluated in a timely manner.

<u>Delays in hospital discharge</u>

Based on the latest data in Dr. Pinals' tenth report, there were 76 RTP (ready to place) individuals from the Aid and Assist (A&A) population at OSH – or about 20% of the total A&A population - who were not discharged. (This is in addition to RTP individuals from the GEI population, but I am focusing on the A&A individuals since they are the larger group, and there are additional complications with the GEI system that are beyond the scope of my review.)

It is noted that as of 11/1/24 there were 76 individuals on the waitlist for admission to OSH (which is the same number in the hospital deemed RTP). Although it is not expected that every individual on the RTP list could be immediately placed, expedited placement of this group would have a significant impact on the waitlist.

Although there are some factors contributing to this delay beyond the control of OHA and OSH (e.g., issues related to court delays), Dr. Pinals' reports also identify issues with lack of clarity of clinical needs that interfere with placement in lower security settings, as well as delays attributable to community programs (for instance, CMHPs not responding in a timely manner). Dr. Pinals has recommended creating both incentives for counties to expedite placement, as well as disincentives for failing to do so, although it does not seem that these have been implemented. To be clear, there is no claim that counties are deliberately not accepting individuals into their programs. Rather, as is the case in many states, the counties are responsible for (and bear the cost of) community treatment, while the State bears the cost of State Hospital commitments. It is therefore important to incentivize counties to accept A&A individuals into their programs, and impose costs for delays in doing so. For instance, California has adopted such a model (California Code, Welfare and Institutions Code - WIC § 4336). I am <u>not</u> recommending this particular legislation, as it is too new to determine if it is effective, and also the specific provisions may not be appropriate for Oregon. However, it is an example of attempts to incentivize counties to minimize use of State Hospital facilities for the IST population, when not clinically necessary. **I therefore support Dr. Pinals' recommendation to develop both incentives and disincentives to encourage counties and community programs to more expeditiously place individuals who are deemed RTP.**

**Additional Recommendations**

These recommendations are not offered in response to any inadequacies in the current response of OHA/OSH, but rather are suggestions for measures that can be taken to help address the systemic problems.

1. Reducing inappropriate admissions:

    Table 10 of Dr. Pinals tenth report indicates that for the first nine months of 2024, 116

individuals were deemed by the hospital, on a 10 day review, to not require hospital level of care. This represents a substantial number of people who are filling hospital beds that could be better used to admit others waiting in jail. The data provided do not shed light on the reasons for this finding, which could include:

- they stabilized in jail awaiting placement;
- they were experiencing a drug-induced condition when initially evaluated, which resolved by the time of admission;
- they were malingering during the initial evaluation; or
- the initial community reports were not of good quality.

Knowing the reasons would provide OHA and OSH with information that could be used to develop strategies to reduce these apparently unnecessary admissions. **I therefore recommend that OHA/OSH commission a study by an outside group (to ensure objectivity) to look into the factors impacting these admissions.** Researchers at UC Davis in California , for instance, conducted a study which proved useful in identifying issues impacting quality of court-ordered competency reports. [5]

2. Improving quality control and system efficiencies

At present, the initial evaluations of competence to stand trial (Aid and Assist) are funded through the defense bar. This is not an ideal situation; not only does it have the potential for injecting bias into the evaluations, but it also means that there is no statewide oversight of quality assurance and standards for competence to stand trial reports. I recommend that serious consideration be given to developing a statewide process for more centralized oversight of the forensic evaluation system in Oregon which would allow for more standardization and quality control (as is done in Massachusetts, for example). I make this recommendation recognizing that this is a long-term proposal, and not something that will have a short-term impact (as it would require significant discussion and changes to move to this model).

---

[5] Hill, S.J., Homsey, S., Woofter, C., & McDermott, B.E. (2022). Persistent, poor quality competency to stand trial reports: Does training matter? *Psychological Services, 19*, 206-212.

      Thus, based on my review, I am offering some recommendations for enhancing OHA/OSH compliance with existing requirements per the Federal Court Order and the Neutral Expert's recommendations. In addition, I am suggesting some additional measures which I think could contribute to a more efficient and quality system with the goal of reducing the waitlist for admission to treatment for those adjudicated as Incompetent to Stand Trial in Oregon.

Respectfully submitted,

*[signature: Ira K. Packer, Ph.D.]*

Ira K. Packer, Ph.D., ABBP (Forensic)