Legacy v Patrick Allen

May 8, 2024
Oral Argument

Transcript Prepared By:



720-287-3710
3801 E. Florida Ave.
Suite 500
Denver, CO 80210

DUNS Number: 037801851
CAGE Code: 6C7D5
Tax ID #: 27-2983097

```
1  Gillette: May it please the court, my name is Michael Gillette.
2            I am here representing, uh, the hospitals in this
3            case, which involves, uh, the commitment of persons
4            suffering from mental illness to the civil, uh,
5            custody and control of the state.  Uh, my clients are
6            responsible in most instances for receiving
7            individuals who are in an acute phase of a mental
8            problem and stabilizing them so that, uh, they can
9            receive further treatment elsewhere.  And what we have
10           is a situation in which, although the Oregon Law,
11           which is quoted in our brief, directs that persons,
12           uh, who are to be -- who are stabilized be sent to the
13           Oregon Health Authority and the Oregon Health
14           Authority place them in -- in a facility which is
15           designed to further their rehabilitation and permit
16           them to return to society, the Oregon Health Authority
17           won't do it.  Uh, there are -- in- -- instead, what's
18           happened is that the individuals who have been
19           stabilized and then who have received a court hearing
20           -- and by the way, the court hearing is held while
21           they're still in the hospital.  It's one of the
22           outcomes of COVID, which you can regard as good or
23           bad, depending on how you feel about that.  But, um,
24           the hospital, which finds itself in -- in a position
25           in which someone they have stabilized is ready to be
```



Van Rysselberghe Decl. Ex. 2
Page 2 of 50

| | |
|---|---|
| 1 | taken in by OHA and placed somewhere where they can |
| 2 | receive the kind of long term care that is required in |
| 3 | order to really make them safe to return -- safe to |
| 4 | themselves, safe to the community, to return to the |
| 5 | community -- |
| 6 | McKeown: May I ask, uh -- |
| 7 | Gillette: -- won't take them. |
| 8 | McKeown: -- a clarifying question because I think the -- the |
| 9 | complaint is quite extensive in laying all of this |
| 10 | out.  Is there a financial dis- -- uh, difference if |
| 11 | someone comes in, they're in the acute care, but |
| 12 | they're now evaluated, ready for release from acute |
| 13 | care, but they can't be released because there's |
| 14 | nowhere for them to go.  Does the reimbursement to the |
| 15 | hospital change, or does it remain an acute care |
| 16 | reimbursement?  Or how does that work? |
| 17 | Gillette: Judge I've -- I've asked that question of my clients |
| 18 | and -- and their answers are -- depend on their |
| 19 | present experience.  But apparently, people who come |
| 20 | in needing acute care normally receive whatever |
| 21 | coverage for acute care they're entitled to by -- by |
| 22 | Medicare or Medicaid or by private insurance or |
| 23 | whatever.  But, uh, the, uh, recompense for putting |
| 24 | them out to another facility is -- depends upon |
| 25 | whether that particular kind of insurance also |

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 3 of 50

```
 1              provides that kind of coverage.  So, there is no flat
 2              answer.  Um, the financial consequence to my clients
 3              is just that they have someone there that they are not
 4              qualified to care for.  Let me rephrase that.  They're
 5              not qualified to provide the kind of care those
 6              persons are supposed to be getting.  Uh, there's no
 7              guarantee that there's going to be, uh, any particular
 8              payment to them after the acute phase is finished.
 9  Fletcher:   Uh, let me elaborate a little bit on Judge McKeown's
10              question.  You just said no guarantee they'll be
11              getting any payment.
12  Gillette:   My understanding is that for acute care, they get
13              paid.  If there's any source of payment, they're going
14              to get paid because they'll --
15  Fletcher:   And who are they going to -- who are they being paid
16              by?
17  Gillette:   It depends upon whether they have private insurance,
18              or whether they're in a cooperative of some kind, or
19              whether they're subject to Medicare and Medicaid.
20              But, uh, Medicare -- Medicaid, at least, isn't going
21              to pay for long term rehabilitative care.
22  Fletcher:   Right.
23  Gillette:   And I think that's true of a number of private
24              insurance arrangements as well.  So, the answer is
25              there is no answer.  It depends on the individual
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 4 of 50

```
 1              entirely.
 2    Fletcher: Thank you.
 3    McKeown:  And you're asking simply a declaration or injunctive
 4              relief.  Is that right?
 5    Gillette: That's correct.  Um, it's a situation in which this
 6              problem arose over a long period of time.  And in
 7              fact, you can trace it all the way back to the '80s
 8              when there was a complete shift in national policy
 9              concerning persons who were suffering from mental
10              illness.  And it can't be cured tomorrow.  But it's
11              not going to be cured at all until a state agency,
12              which is responsible for the cure, is told to do your
13              job.  Uh, instead, by leaving the patients with us
14              when we're not qualified to provide the kind of care
15              that they need, uh, what's happening is our resources
16              end up being dedicated in part to looking after those
17              people as best we can, and we become just that much
18              less available to those who need our care and for whom
19              we could provide appropriate care.  So, that's what
20              the case comes down to.  Um, we're harmed because we
21              can't do the work our facilities and our personnel are
22              supposed to be capable of doing, uh, for some people
23              because we've got other people we're required to hold
24              on to and -- and, uh, maintain, which I guess would be
25              the best word for it.
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 5 of 50

```
 1   McKeown:   But you also intimated, or maybe declared more
 2              clearly, that there are no facilities -- there are not
 3              sufficient facilities for long care -- longer term
 4              care patients to go to.  Is that right?
 5   Gillette:  Judge McKeown, I was responding in part to what you --
 6              uh, to your own remark.  The answer is yes.  We've --
 7              we've not just intimated that.  That's the case.  Um,
 8              there are -- and I'm going to get the numbers all
 9              wrong.  But there are 900 or 1,000 available, uh, long
10              term care beds.  Uh, and in fact, the need is much
11              greater than that, and it's going to continue to be
12              much greater than that.  It is going to require an
13              investment of time and money and thought into creating
14              a system which provides the care that the statute
15              directs these people receive.  Um, but in the
16              meantime, as hospitals, we're required to keep these
17              people because, one, they're subject to a judicial
18              order that says they're to be kept -- taken care of.
19              And secondly, because we're a hospital.  We're not
20              supposed to turn people who are still ill, whether
21              mentally or physically, back onto the street.  And so,
22              we don't do that.  Now, there's been an attempt by OHA
23              to suggest that, uh -- and frankly, by the district
24              court judge to say, well, you could just quit.  You
25              know, stop providing the care you're providing.  That
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 6 of 50

```
1              didn't strike me as being a particularly insightful
2              way to approach the problem since hospitals are part
3              of a sort of three-legged stool of -- of security for
4              -- for individuals everywhere in -- in our state and,
5              I dare say, everywhere else.  The police, the fire,
6              and the hospitals are the places for emergencies.  And
7              we provide emergency care and we're good at it.  But
8              we are not -- we are not built for, and we are not
9              staffed for, dealing with people who require the long
10             term care and the -- the special attention,
11             individualized attention that's necessary in order to
12             help these people return to society and be useful.
13             Judge Fletcher, you looked like you were going to --
14  Fletcher: Yeah.  Well, uh, I'm -- I'm -- I want to address or
15             have -- have -- have you address the Article III
16             question.  Uh, the Article III standing question.
17             This is now hospital standing on its own behalf.
18  Gillette: Yes.
19  Fletcher: Not -- not yet getting to third party standing.
20  Gillette: Understood.  Uh, the -- the judge appeared -- appeared
21             to feel that there was no satisfactory traceability
22             between, uh, any harm that the hospital was suffering
23             and anything that OHA had done.  I suppose the more
24             accurate way to put it would have been to say what OHA
25             hadn't done.
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 7 of 50

```
 1   Fletcher:  Well, the judge -- the district judge says that you
 2              guys are basically volunteers.  You signed up for this
 3              program, and now you're complaining.
 4   Gillette:  We didn't sign up for this program.  It's -- that's
 5              just false.
 6   Fletcher:  Yeah.
 7   Gillette:  We did not do that.  We signed up --
 8   Fletcher:  You signed up for a program that turns out not to be
 9              the actual reality.
10   Gillette:  Yeah.  We -- we signed -- we signed a deal to do X,
11              and now we're told, well, surprise.  You also are
12              going to have to do Y because we're telling you to.
13              Uh, in the normal administrative law context, the --
14              the OHA doesn't have the authority to delegate to us
15              something that we didn't agree to do for them.
16   Fletcher:  It seems to me that you're right with respect to
17              whether or not -- even if you did volunteer, we've got
18              case law out there that says certain volunteers -- and
19              they nonetheless have Article III standing.  Uh, the
20              question not really addressed, and maybe not yet teed
21              up, uh, you've got, uh, a takings claim and you've got
22              a due process claim.  Uh, and you may or may not
23              succeed, but the court just didn't address that.
24   Gillette:  We can't get the door open.  We -- we're not being
25              allowed to -- to come forth with our evidence and --
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 8 of 50

```
 1              and work out a solution for the problem.  Yeah.  We
 2              haven't had that shot yet.  This is a 12(b)(6) matter.
 3              Uh --
 4  McKeown:    So, let's assume the hospital -- well, like Judge
 5              Fletcher, I'm going to get later to the patients and
 6              the third party standing.  But let's assume that the
 7              district court complied with your request, and that is
 8              to issue this, um -- declare that OHA's policy
 9              violates various Oregon statutes and possibly various
10              constitutional protections.  And -- and then, where
11              would you be?  They would say, well, there's no beds.
12              I mean, we can't manufacture a bed out of thin air.
13              So --
14  Gillette:   Yeah.  The day -- the day --
15  McKeown:    -- where would you be?  I'm trying to understand the
16              practical implications.
17  Gillette:   Sure.  The day afterward, we'd be in the same position
18              we're in now.  That is to say, we'd have people with
19              us who shouldn't be with us and -- and who needed
20              another kind of care.  That can't be fixed in a day.
21              But the judge -- if the judge is willing to enter, uh,
22              an order stating that we're entitled to -- to relief,
23              then we would apply to the court for an order to OHA,
24              uh, at least convening a group.  You are -- you are
25              going to hear another case today that involved that
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 9 of 50

```
 1              same process being used in Oregon with respect to
 2              those who had been committed in the criminally, uh,
 3              uh, convicted or accused side of things.  Uh, it would
 4              be necessary for people to get together and propose a
 5              solution.  There is, in fact, a movement underway, uh,
 6              in -- in the Oregon, uh, Legislature to take another
 7              look at this problem.  But the -- the other look is
 8              going to then require weeks and months and years of --
 9              of well-intended effort in order to permanently solve
10              the problem.  In the interim, we will continue to care
11              for these people because we're a hospital and because
12              that's what we're supposed to do.  It's not a
13              satisfactory arrangement from our point of view, and
14              it -- it misapplies, uh, our re- -- our assets to a
15              degree.  But to turn them out or to say, alright, you
16              -- you folks -- uh, we've stabilized you now.  Now, go
17              out on the street again.  That's not -- that's not
18              medicine.  That's not --
19  Fletcher: You know, this --
20  Gillette: That's not performing that service.
21  Fletcher: This is a kind of a follow-on.  Uh, assume for a
22              moment that you were to -- we were to find standing,
23              and we were to say that, uh, this can go forward.
24              This is a version or a carry-on of Judge McKeown's
25              question.  What then?  Would one of the possible
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 10 of 50

1         remedies be, uh, that the state has to compensate you

2         for keeping them in this long term way?  The

3         compensation that you apparently, in some cases, are

4         not receiving.

5   Gillette: Your Honor, I don't think that would work for -- for -

6         - at least, I can't imagine it working the way things

7         stand now because we can't do this work.  The -- this

8         is not -- if they compensate us for something --

9   Fletcher: No.  No, no.  I -- no.  No.  I -- well, I understand

10        you can't do this work.

11  Gillette: Yeah.

12  Fletcher: But nonetheless, you are keeping them, uh, uh, in a

13        way that you say really is not appropriate.  But

14        you're nonetheless keeping them.  And it's at

15        considerable expense to you, apparently, in some of

16        these cases, where you're not getting reimbursement.

17  Gillette: Yes.

18  Fletcher: Well, if your takings claim succeeds -- well, what

19        takings is the government imposed an obligation upon

20        you for which it owes money but is not paying.

21  Gillette: This -- this begins to slide over toward the reason we

22        also wish to appear in a representative capacity.  We

23        don't want money.  We want to help these people.

24  Fletcher: Mm-hmm.  Yeah.

25  Gillette: And -- and the money ain't the answer.



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 11 of 50

```
1    Fletcher: Okay.
2    Gillette: And -- and if that seems a casual answer, I -- I
3              apologize.  But that's -- that's literally --
4    Fletcher: No.  It doesn't seem casual.  No.  I -- no.  I
5              appreciate the answer.  It does not appear to be a
6              casual answer at all.
7    Gillette: Yeah.  We're -- we're not in that line of work.  We're
8              not for profit.  We'd prefer to be not for profit for
9              the right people.  Unless the court has other
10             questions, uh, and -- and paying attention to the
11             judge's reminder with respect --
12   Fletcher: Oh, well, no.  I'd like you -- I'd like --
13   Gillette: -- to no penalty would be imposed.
14   Owens:    Third party standing.
15   Fletcher: I'd -- no, no.  I'd like you to address the third
16             party standing --
17   Owens:    Yeah.
18   Fletcher: -- because --
19   Gillette: Okay.  Great.
20   Fletcher: -- we're accustomed to third party standing where the
21             doctor, uh, is advocating for his or her patients, uh,
22             and the doctor wants to provide care for the patients.
23             This is an odd one.  You're advocating for the
24             patients because you don't want to provide care for
25             them, uh, which gives me pause.
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 12 of 50

```
 1   Gillette:  Well, I guess I -- I want to phrase it differently
 2              because it works out better for me.  I want to say
 3              we're advocating for our patients getting the
 4              appropriate level of care, which as it happens at the
 5              moment, we cannot provide.
 6   Fletcher:  No, no.  That -- that's -- that's another way and --
 7              and an accurate way of saying it.
 8   Gillette:  Yeah.
 9   Fletcher:  I know.  I -- I get that.
10   Gillette:  Okay.  And -- and -- and that's the way I would want
11              to go at it.  Uh, let me suggest -- and we've -- we've
12              cited cases to you, and you will find them useful or
13              not as -- as appears appropriate.  But there's a case
14              from Pennsylvania, uh, involving a, uh -- a group of
15              psychiatrists who brought what amounted to a claim
16              that's reasonably similar to the one we're bringing,
17              trying to influence the care that's being given to
18              psychiatric patients.  Uh, the idea here is that if
19              the only care we can provide is to advocate for them
20              getting care somewhere else, then that's the care
21              we're going to advocate for.  This is still part of
22              our mission.
23   Owens:     Let me ask you this.  Why couldn't someone else other
24              than the hospital represent these people?  I
25              understand these people are going to need extra help
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

```
 1              in terms of finding lawyers and -- and representation.
 2              But there are many other groups who would -- who can
 3              step up and represent them.  Why is it the hospital,
 4              which -- and I -- I appreciate you've done a very good
 5              job of articulating why there isn't a conflict.  But I
 6              could see other groups that would have an even easier
 7              time, uh, stating why there isn't a conflict.  So, why
 8              -- why can't one of those groups represent in these
 9              third party claims?
10  Gillette:  To the extent other groups exist, they haven't stepped
11             up.  They just haven't done it.  Uh, there is a group
12             that is representing, uh, again, the criminally
13             accused in Oregon, Disability Rights Oregon, which has
14             done, uh, a splendid job of representing that group.
15             Um, but it has not seriously dipped its toe in this
16             water.  It's left this to other people.  There's also
17             an organization called -- I think it's NAMI, which is
18             an organization that's made up in part of people who
19             actually have been, um, patients in this kind of
20             system and who are advocating for others who are
21             suffering from mental illness.  And they -- they are
22             an advocacy group.  They're not put together to
23             provide the service, uh, uh, and the advocacy that
24             we're providing.  They would prefer to support rather
25             than sponsor.  So, you have an amicus brief from them
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 14 of 50

| | |
|---|---|
| 1 | that says what -- what they said.  We agree with that. |
| 2 | So, the answer, Your Honor, is that there ain't many |
| 3 | folks, and none of them have stepped up.  And this has |
| 4 | been going on a long time.  This -- we didn't just |
| 5 | discover this last Tuesday.  And so we've been driven |
| 6 | to it. |
| 7 | McKeown: So, the -- the -- you have two groups of people here. |
| 8 | You have the criminally committed that you say |
| 9 | potentially the Disability Rights Organization could |
| 10 | represent.  But then you have those who come in on |
| 11 | just a regular civil commitment, right?  Um, and had - |
| 12 | - has anyone ever represented them as a group? |
| 13 | Gillette: As a group?  No. |
| 14 | McKeown: Are you aware of any individual suits?  Um -- |
| 15 | Gillette: Yes. |
| 16 | McKeown:  Okay. |
| 17 | Gillette: Yes.  There was one that was prosecuted by one of the |
| 18 | hospitals that's one of my clients.  Uh, and I'm |
| 19 | trying to remember when.  But it wasn't too awful long |
| 20 | ago.  Two or three years ago.  And they pushed the |
| 21 | lack of -- of facility and so on against OHA and won. |
| 22 | Uh, but the difficulty was that was one person, and |
| 23 | we're talking -- |
| 24 | McKeown:  Oh, it was on behalf of one patient? |
| 25 | Gillette: That was on behalf of one patient only.  Yeah.  Um, |

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 15 of 50

1       but again, that was a hospital pushing it.  Um, just -

2       - this isn't sexy with respect.  It -- it just is

3       simply something that folks are not inclined to dive

4       in on.  And when you look at the provisions of Oregon

5       Law, and I think this is true most places with respect

6       to representation, a person who is faced with civil

7       commitment is entitled to counsel.  Uh, and there is a

8       very carefully set up process by which, uh, the

9       person's mental state is judged by an appropriate

10      judicial officer.  But the minute they are committed

11      to the care and custody of -- of the hospital, uh,

12      Oregon Hospital, there is no further legal help for

13      them at all.  No -- no provision in -- in Oregon Law

14      whatsoever.  It's either OHA does its job, or they are

15      lost.  And so -- and I guess this is addressing your

16      question, Judge Fletcher.  Um, this is an honor we'd

17      just as soon have skipped.  But somebody with a

18      conscience needs to do this.  And -- and we are in --

19      we are in the business of trying to help those who

20      can't help themselves.  So, it's -- it's our job.  Um,

21      and you can imagine the time it might take for

22      somebody else to tool up, even if we could point to

23      somebody else, which would include Disability Rights

24      Oregon.  They have, uh -- they have a long standing

25      process they've gone through before this same judge,



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 16 of 50

```
 1              with respect to the care that's being given to persons
 2              who are committed in the -- in the criminal justice
 3              system.  And it's not the same kind of problem.  So
 4              then, I'm not sure that they could tool up with --
 5              with it for some period of time.  And they'd have to
 6              expand what they're doing because that's -- right now,
 7              that's all they're doing, and they're using their
 8              resources to do that.  There just isn't anybody.
 9   Fletcher: And there might even be some conflict between your
10              client -- or rather, the -- the patients that you have
11              at issue and the criminal because, as I gather, what's
12              happening is that the Oregon Hospital is giving
13              priority to the other two groups, and your -- your
14              people are at the bottom.
15   Gillette: I didn't want to say it that way because I admire what
16              DRO does.  But the truth is that whatever pot of cash
17              eventually will be used here, there is one group that
18              already is seriously invested in getting that pot of
19              cash for their particular set of clients, and they are
20              not ours.
21   Fletcher: Yeah.
22   Gillette: If the court would allow me, I would like to reserve
23              five minutes for rebuttal if I've still got it.  But
24              I, uh --
25   Owens:    Well -- well -- well, I'll -- I'll compromise.  We'll
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 17 of 50

```
 1              give you four.
 2  Gillette: That's -- that's more than -- more than fair.  And
 3              I'll get out of your way.
 4  Owens:    Alright.
 5  Gillette: Thanks very much.
 6  Buehler:  Good morning, and may it please the court, Dustin
 7              Buehler, appearing on behalf of defendants appellees
 8              in this matter.  Um, I think the key thing that
 9              opposing counsel just said, which really is essential
10              to the three issues before this court, is that this is
11              a long standing, challenging problem that Oregon
12              faces, and it doesn't face it alone.  Many other
13              states are, uh, facing similar challenges when it
14              comes to providing adequate care for civil commit- --
15              committed individuals.
16  Fletcher: You say a challenge that Oregon is facing.  It's a
17              challenge because Oregon is not stepping up to the
18              plate.  It's a challenge because Oregon is -- is -- is
19              not fulfilling its responsibility and then we're
20              trying to do -- figure out how do we deal with that.
21  Buehler:  So, they -- the -- that is what the complaint alleges.
22              Certainly, Judge.  Um, and, you know, what is key,
23              though, about that is that when you look at the
24              Article III standing question -- and I'm happy to take
25              each of the three issues before the court in order
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 18 of 50

1          unless you want to steer me in a different direction.
2          Um, but if you look at Article III standing, as you've
3          alluded to, Your Honor, uh, the question really here
4          is, well, was this voluntary, right?  And -- and that
5          is -- I mean, this court will ultimately determine
6          whether there's jurisdiction or not.  But the district
7          court concluded that notwithstanding those real
8          problems alleged in the complaint here, uh, the
9          hospital plaintiffs have known about those challenges
10         for decades, as opposing counsel just, uh, told you,
11         and they have not only, uh, sought certification to
12         provide acute care services, but they have, every two
13         years, re-upped that certification.  And at some
14         level, that is going to break the chain of causation,
15         as the case law describes, such that you don't have
16         Article III standing to seek an injury that is not
17         surprising and that you have known has existed for, um
18         -- as -- as plaintiffs say, for decades.
19  McKeown:  It seems like, uh, kind of a nugatory argument in the
20         sense that, let's say, they don't seek certification.
21         Who is going to care for the acute care people?  If
22         they get dropped into their hospital, they have to,
23         right?  So, it -- it -- that is an argument that maybe
24         has some legal legs way back, but I just -- I'm having
25         trouble getting a practical head around it.  So, maybe



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 19 of 50

```
 1              you can help me.
 2   Buehler:   Certainly, Judge.  So, um, as described, uh, in the
 3              briefing, there is this, uh, uh -- let's call it the
 4              ERs door, right?  The emergency room care.  And some
 5              of these, um, patients that the hospitals seek to
 6              represent in a third party capacity here do come in
 7              through those doors.  Um, and there are federal laws,
 8              state laws that require the provision of emer- --
 9              emergency care.  And although there was confusion, um,
10              I -- I think, frankly, the lawyers for both parties at
11              the district court hearing were not consistent in
12              their statements at times.  Um, I think when you're
13              civilly committed, you don't just get let loose.  That
14              -- that is not a choice, right?  So, just -- let --
15              let's just make that clear here.  Um, but I -- I still
16              think if you look at the moment at which they have a
17              claim that they're seeking relief for -- and that
18              moment, to be clear, is, uh, somebody has been civilly
19              committed and placed in their hospitals, and there's a
20              moment sometime after that where they then need, uh,
21              care that plaintiffs would not describe as acute care,
22              right?  So, that is the moment at which they have a --
23              uh, that they're -- that they're asserting claims.
24              And if you look at that moment, for years, they have
25              sought to provide acute care services because there is
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 20 of 50

```
1              an advantage to the hospitals in doing so, a business

2              advantage in doing so.  The record shows that.  The

3              complaint shows that, too.  And they've done that with

4              full knowledge that the bitter comes with the sweet,

5              so to speak.

6  McKeown:    No.  But under the law, you can sign up for acute

7              care, but you didn't sign up for long term care.  So,

8              it would seem to me, at that point, they have not

9              taken advantage of the system because even if they

10             signed up for acute care, it should have ended.

11             That's what they signed up for was a fixed term.  But

12             now, they're com- -- they, like some of these

13             individuals, are, like, committed for a long time.

14             So, it seems to me that, at that point, that they

15             haven't advantaged the system in some way, or they

16             haven't affirmatively invoked the system.  They'd like

17             to uninvoke the system because their argument is that

18             your client is violating the Oregon statute.  So, it

19             seems to me that -- that they would have standing.

20             And I -- I just -- I'm having trouble buying the idea,

21             well, you signed up for acute care, so in for a dime,

22             in for a dollar, in for a 100,000 dollars, or whatever

23             the case may be.

24  Buehler:   Yeah.  So, um, it is clear.  And -- and these are in

25             the documents, um, that the district court took
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 21 of 50

```
 1              judicial notice of showing what -- what boxes they
 2              checked, right, in the excerpts of record.  And -- and
 3              it's clear that they sought to provide acute care.
 4              And I would even add, uh --
 5  McKeown:    Sure.  And I -- and I just said that.  That's
 6              absolutely true.
 7  Buehler:    Right.  And -- and -- but the --
 8  McKeown:    But did they -- did they sign up to provide long term
 9              care?
10  Buehler:    So, you -- uh, so, if -- if what we're referring to
11              are the boxes for secure residential treatment
12              facilities, under Oregon regulations, hospitals --
13              they -- they can't check those boxes.  Those are
14              limited to six to, um, uh -- to -- uh, six to 16
15              patients.  So, they -- they -- they applied for the
16              care that they could, right?  And then, I -- I think
17              the key thing for Article III -- and look, it's either
18              good enough or it's not.  It's -- it's what the
19              district court thought.  Um, is that they signed up
20              for that acute care service level knowing full well
21              that the door out was not a meaningful door out given
22              the strain on the system.  And so, the question really
23              is, for Article III, is that knowledge when you re-up
24              enough?  Uh --
25  Fletcher:   So, how -- I -- I -- I understand your argument.  But
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 22 of 50

1           how do you deal with -- and there are several Supreme

2           Court cases along this line.  There's the Medgar Evers

3           case, there's the Havens -- Havens Realty case.

4           There's the more recent cruise case.  In all of those

5           circumstances, the plaintiff is coming into something

6           that he knows is going to be a problem.  He does so

7           voluntarily, and then he objects to it.  How -- how do

8           you distinguish those cases?

9    Buehler:  Right.  And -- and I will acknowledge the tension in

10          the case law, right?

11   Fletcher: Mm-hmm.

12   Buehler:  Um, certainly, I'm not going to hide from that.

13   Fletcher: Yeah.  Yeah.  Sure.

14   Buehler:  Um, I think the way I would distinguish it was

15          articulated by the 10th Circuit, um, in Fish v. Schwab

16          and Fish v. Kobach, where the court said, look,

17          there's a difference.  There's a meaningful difference

18          between cases in which you're challenging an un- --

19          unlawful regime by statute and regulation, right?  So,

20          there's, um -- let -- let's say, like the cruise case.

21          There is an allegedly unlawful federal enactment.  And

22          really, the only way you can challenge that is to

23          disobey it, right?  So, that's one category of cases.

24          What the 10th Circuit said, um, is that that's

25          different from something that is more akin to a freely

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 23 of 50

1          negotiated contractual -- con- -- con- -- contractual
2          arrangement.  Now, I will admit this is not purely a
3          contractual arrangement.  But the argument that the
4          district court seemed to find allur- -- uh, uh, uh,
5          convincing is that, uh, when you, years ago, apply for
6          certification to provide care, and for years and years
7          and years, as alleged in the complaint, you are -- are
8          not just providing that care, you're providing more
9          than that, uh, and you keep re-upping every two years,
10         that starts to look like a voluntary business
11         arrangement that, um -- that -- that in the hearing --
12         and I would direct you to pages, um, uh -- really, the
13         key pages or pages 98 to 101 of the excerpts.  This is
14         in the second volume.  Uh, it's the portion of the
15         hearing that the district court relied on, for better
16         or worse, for its Article III conclusion on standing
17         where counsel, um, said, uh, that currently, the way
18         it generally works is if you're not a certified
19         hospital, you can transfer outpatients to a certified
20         hospital.  That is -- that is how it works.  And that
21         they are choosing to certify and to take on the bitter
22         with the sweet because there is an advantage to
23         providing acute care.  And so, um --
24  Fletcher: And in the contract that they enter into with the
25         state, they agree to take for acute care, and then

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 24 of 50

```
 1              they're stuck with obligations because of their status
 2              as a hospital, but not because of the contract.  Is
 3              that -- am I understanding that correctly?
 4  Buehler:   It -- I -- I would -- I would say it's reality, right?
 5              Yeah.  That -- that is how the system is working.  And
 6              they -- they -- they know that there are certain
 7              federal laws, as you're referencing, uh, Your Honor,
 8              state laws that obligate them to continuing care for
 9              emergency room care, for example.  Um, but I think the
10              broader argument is that they -- I heard opposing
11              counsel say that this was surprising.  If -- if you
12              look at the complaint and you look at the documents
13              that are judicially noticed and you read the
14              transcript of the hearing below, this was not a
15              surprise.  And that's either good enough or not good
16              enough for Article III standing.  We would say it's,
17              uh -- it's -- it -- you know, they don't have Article
18              III standing for that.  Um --
19  Fletcher:  And you've not yet re- -- addressed in this lawsuit
20              the underlying cause of action under the antitrust --
21              uh, excuse me, under takings or under due process.
22              That -- that -- we just not -- are not -- not at that
23              stage.  Correct?
24  Buehler:   Well, so, below, um, there was a 12(b)(1) and 12(b)(6)
25              motion together.  Uh, the parties briefed both the
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 25 of 50

```
 1              jurisdictional issue but also the --
 2  Fletcher: Takings and the due process.
 3  Buehler:  Correct.
 4  McKeown:  Mm-hmm.
 5  Buehler:  And -- and -- and there is even -- you can see in the
 6            transcript the district court asked some questions
 7            about the merits, or at least on a 12(b)(6) posture.
 8            The district court did not get to that.
 9  Fletcher: Yeah.  Okay.
10  Buehler:  It -- it just concluded it didn't have standing.  And
11            -- and all -- you know, in fairness, if you read the
12            transcript, the way it reads to me is that, um -- part
13            of what was unsettling about that discussion is I
14            don't know going into that hearing if the parties
15            were, uh, aware that -- that -- that the judge -- the
16            district court judge really was interested in
17            standing.  And so, that's where you get some of the
18            inconsistencies as to who can quit or not at various
19            stages of offering care.  And I just want to be clear
20            to the court.  I think the key thing to think about
21            here is not whether you can release somebody who is
22            civilly committed because I don't think you can.  I
23            think the question is when a hospital goes into an
24            arrangement and re-ups time and time again with full
25            knowledge of what that arrangement is, uh, is that
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 26 of 50

```
 1              voluntary?  That's the question.  And -- and -- and to
 2              be clear, look, we're glad that they care for these
 3              patients.  Uh, we pay them.  We would pay them more.
 4              But for Article III, I think the question really is,
 5              is it voluntary?
 6  Fletcher:  Well, let me pause.  You would pay them more under
 7              what circumstances?  You would pay them more.  Tell me
 8              more.
 9  Buehler:   Uh, yeah.  And I don't know the details of this.  I
10              just know that the attitude -- I mean, you can see it.
11              It's said in the hearing below.  I mean, that's what
12              counsel for OHA said below is that it's not -- it's
13              not like we have animus to these hospitals.  We
14              understand the strain that this puts them under.  But
15              at some point, you know, it's kind of the Casablanca
16              shocked to find gambling, uh, scenario where they --
17              they knew about this for years.  And so, to seek
18              redress for it seems a little disingenuous.
19  McKeown:   Can -- I want to have, uh, you explain a sentence in
20              the judge's order.  It says counsel for health systems
21              confirmed that were health systems to decide not to
22              seek certification, they would no longer be required
23              to keep civilly committed patients for long term
24              stays.
25  Buehler:   Yeah.  So, um, uh, here is how I would explain that.
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 27 of 50

27

```
 1  McKeown:   Okay.
 2  Buehler:   Um, and I -- I'm not sure -- I can't put myself in the
 3             district court's mind.
 4  McKeown:   No, no.  I'm just trying to understand the fact.
 5  Buehler:   Right.  Uh, here -- here is my understanding of the
 6             facts is there was that moment during the hearing, um,
 7             where counsel for the hospital said -- and this is in
 8             the middle of page 98 of the excerpts.
 9  McKeown:   Mm-hmm.
10  Buehler:   Said, look, the way this generally works is if you're
11             not certified, uh, you transfer out the patient.  Uh,
12             you know, uh, the patient is transferred to a
13             certified hospital, right, when they come into the ER
14             or, uh, when -- when they come in the door.  And then,
15             you know, on the next page or two, counsel says, look,
16             we choose to be certified because, um, there are
17             advantages, business advantages, of providing acute
18             care.  Um, as -- as to what that --
19  McKeown:   Okay.
20  Buehler:   -- sentence means in the district court's opinion --
21  McKeown:   Well, let's say somebody comes in, like, for a 72-hour
22             hold.  We're going to have a hearing.
23  Buehler:   Right.
24  McKeown:   They don't seem to be mentally capable of being
25             released.  But they're in this -- they come in,
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 28 of 50

```
 1              usually, through the emergency room in those
 2              situations.  So, they're in the emergency room.  They
 3              got to put them in a bed.  They aren't going to be
 4              released, but they're in a place where there's no
 5              certification.  Where do they go?  Do they just stay
 6              at that facility because there's no long term care?
 7  Buehler:  So, uh, at the initial phases -- you're talking about,
 8              Judge, when they arrive at an uncertified hospital.
 9              My understanding is that when that is -- like,
10              currently, the way that is handled is they are
11              transferred out.  Like, they're, uh, uh -- they're --
12              you know, that -- Oregon Law is clear that you require
13              certification to treat civilly committed patients.
14              And so, um -- so, they are transferred to a facility
15              currently that can provide that service.  Um, and --
16              and that's my understanding is that --
17  McKeown:  And -- and how many facilities beyond the facilities
18              operated by this organization are certified to provide
19              that care?
20  Buehler:  So, I don't know offhand.  I -- I -- I -- I know what
21              they allege in the, um --
22  McKeown:  The complaint.
23  Buehler:  -- the proposed second amended complaint that they
24              have 57 percent of the, uh, acute psych- --
25              psychiatric beds statewide.  That -- that's the only
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 29 of 50

```
 1              fact that, I think, we have in the record.  Um, but I
 2              don't know the answer to --
 3   McKeown:   Thank you.
 4   Buehler:   -- your specific question.  I -- I do want to just --
 5              um, I don't want to steer the court away from this if
 6              we want to talk more about it.  But I do want to
 7              address third party standing, too.
 8   McKeown:   Well, we do, too.  So, let's --
 9   Buehler:   Oh, great.  Let's do that.
10   McKeown:   But we're not going to there if we don't get --
11   Buehler:   Yeah.  Let's do that.  And -- and --
12   McKeown:   -- but -- if we don't get here.
13   Buehler:   And like all the counsel --
14   McKeown:   But we want to hear from you.
15   Buehler:   -- before me, I'm trying to, Judge Owens, take you up
16              on your challenge to leave time on the clock, and I am
17              failing.  And so, I -- I will continue to try to do
18              that.  But, um, just briefly addressing the third
19              party standing issue.  I think what is probably the
20              best place for this court to look in the record is in
21              the supplemental excerpts of record.  There is an
22              amicus brief that was filed below that the district
23              court found quite persuasive from Disability Rights
24              Oregon.  Now, this is the organization that is
25              federally designated as the protection and advocacy
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 30 of 50

1          system for those with dis- -- disability in Oregon,

2          including, uh, those with mental illness.  And you can

3          just -- uh, I'm not going to repeat them ad nauseam

4          here.  But I mean, you can see the reasons given by

5          Disability Rights -- Rights Oregon, why it's

6          concerned, um, about the potential for a divergence in

7          incentives here.  And -- and while I greatly

8          appreciate, um, the spirit of opposing counsel's

9          comments today about their mission, the hospital's

10         mission, and while we -- we -- we are grateful for the

11         provision of service by hospitals, uh, if you look at

12         the complaint, you can see that tension.  So, um,

13         looking at the relief, uh, in the complaint that's

14         pled in the complaint -- this is on pages 254, 255 of

15         the excerpts of record.  There is both, um, a request

16         for declaratory injunctive relief to -- to have OHA

17         discontinue forcing them to provide indefinite care.

18         But then there's also, um, uh, a request for relief on

19         behalf of these patients for them to receive the best

20         available treatment in a suitable facility.  When you

21         overlay -- and -- and -- and I would cite this as

22         passim in the complaint, the number of times where

23         they point out, as they did today, that there just are

24         not enough beds.  You're left with a divergence and

25         that, either a result here or maybe even a negotiated



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 31 of 50

1          settlement, um, by prioritizing the let's get them out

2          the door, you could lead to suboptimal placements.

3          And that is just a fundamental tension here in these

4          claims.  The case law is quite clear that third party

5          standing is not the norm.  And here, um, uh, hospitals

6          that have a financial incentive to transition patients

7          out are not going to be, as DRO noted below, the best

8          advocates for the patient's interests.  And there is

9          that inherent tension here that the district court,

10         uh, based its third party standing ruling on.  The

11         other thing I'll just point out briefly is pa- -- uh,

12         paragraph 43 of the complaint.  This is on page 239 of

13         the excerpts.  Uh, notes that these hospitals are

14         losing -- ass- -- asserts that these hospitals are

15         losing tens of millions of dollars each year because

16         of this arrangement.  Uh, they are asking for just

17         compensation.  And that is a not insignificant amount

18         of, uh, funds that, if reallocated through just

19         compensation, could lead -- uh, cause suboptimal

20         placements because of the systemic effect that that

21         would have.  Um, and -- and look.  I'm not pointing

22         out anything that isn't noted in the, um, DRO briefing

23         below.  But I -- I just would urge this court to think

24         carefully about that, given that the interests of

25         patients are important here.



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 32 of 50

```
 1   McKeown:  So -- so, the upshot with no standing is that
 2             inadequate care continues apace, right?
 3   Buehler:  No.  That's -- that's not true.  Um, you know, both in
 4             the Mink case -- there are discussions in the Mink
 5             case, um, and more generally, to try to improve this
 6             care.  Um, there is -- um, and look, this is not in
 7             the record, which is why, uh, I'm not going there,
 8             except to answer your question.  Uh, you know, uh, OHA
 9             now has coordinators that meet regularly with the
10             hospitals to try to improve transfers --
11   McKeown:  Mm-hmm.
12   Buehler:  -- um, to listen to concerns around specific patients.
13             So, it -- it's not -- I just want to disabuse the
14             notion that it's lawsuit or bust.  That is not true.
15             I understand I can't point to places in the record
16             that show that because we're on a 12(b) motion.  But,
17             um, I just don't want this court to be left with the
18             impression that this lawsuit is the only way.
19   Fletcher: Well, let me understand, again, the practicalities.
20             It appears that the hospital capacity or the treatment
21             capacity for long term just doesn't exist.  Is that
22             right?  I mean, that's the basic problem.
23   Buehler:  So, uh, yeah.  I mean, I -- I think that that is --
24             uh, it -- it's alleged in the complaint.  And while,
25             you know, we could quibble with the allegations, I
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 33 of 50

```
 1              think it -- it is no secret that there is inadequate
 2              beds in the state of Oregon, um, generally, including
 3              long -- long term care.
 4  Fletcher: Uh, and is Oregon required by Oregon statute to
 5              provide such beds, and Oregon just isn't doing it?
 6  Buehler:  So, I -- I -- I will admit, Judge, I don't offhand
 7              know.  I -- I just don't know enough about -- uh, it's
 8              a very elaborate legal, you know, statutory regime.  I
 9              just don't know offhand here today.
10  Fletcher: That -- that puzzles me that you -- that you're --
11              you're -- so -- so, maybe Oregon is required to
12              provide the beds and maybe not.  That's your answer?
13  Buehler:  No, no, no.  I -- and I'm sorry about that.  So, what
14              I'm saying by that is, certainly -- so, here's where I
15              would point for that if I were, given the record and
16              the law, as I understand it.  I mean, Oregon has an
17              obligation when OHA takes civilly committed persons
18              into custody upon their commitment, um, to make an
19              appropriate placement and to, um -- you know, in
20              Chapter 426 of the Oregon Revised Statutes, there are,
21              uh, obligations on the Oregon Health Authority to --
22              to make adequate placements, uh, uh, to, uh, calibrate
23              those placements with the level of care that's
24              appropriate.  It also says that the placement decision
25              is a final decision.  Um, there is -- going back to
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 34 of 50

```
 1              the third party issue.  There is an ability by civilly
 2              committed persons to challenge those placements.  That
 3              is a procedural safeguard in the statutes.  But, um, I
 4              -- I don't want to leave you with an unsatisfactory
 5              answer.  Uh, the -- the -- that's what's coming to
 6              mind in terms of how that works and the obligation of
 7              OHA to place people appropriately, um, in facilities
 8              that are calibrated with the appropriate level of
 9              care.
10  Fletcher: Well, and the obligation to place.  Does that include
11              the obligation to provide?  Meaning does Oregon have
12              an obligation to provide suit- -- suitable facilities?
13  Buehler:  Yes.  So --
14  Fletcher: As I understand Oregon law, it does have that
15              obligation.  But you can tell me I'm wrong.
16  Buehler:  So, I -- yeah.  I -- and I just don't have that before
17              me.  So, I -- I don't -- I don't want to get that
18              wrong.
19  Fletcher: Okay.  Help me more -- some more with the third party
20              standing in terms of -- you -- you predict that if we
21              were to allow a third party standing here, some --
22              some optimal -- some suboptimal thing is going to
23              happen.  What is that suboptimal thing, and why is it
24              going to happen, in your view?
25  Buehler:  Yes.  So, I think the hospitals -- um, their complaint
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 35 of 50

```
1              is replete with allegations showing that, um, you
2              know, this is a -- it's -- it's a financial
3              disincentive for them to keep, uh, patients into long
4              term care or beyond what they would say the period of
5              acute care is.
6    Fletcher: Right.
7    Buehler:  Also, they say repeatedly that, um, there are other
8              patients they have, non-civilly committed patients,
9              that need the beds.  And so, there's a tension there
10             among their -- sorry, among their, um, categories of
11             patients where they might not have the undivided
12             loyalties to these patients.  And if the goal is to
13             transfer them out, we are in a system where, you know,
14             there just are not adequate beds, meaning where -- and
15             -- and DRO notes this in its briefing.  Uh, there's no
16             guarantee that they'll go to a place that is as good
17             as their current placement, is what I'm trying to say.
18             And DRO made that argument in its amicus brief below.
19   Fletcher: And is the hospital seeking permission to send them to
20             some sub- -- suboptimal place?  I mean, is that what
21             they're requesting in the lawsuit?
22   Buehler:  No.  That's not what their relief is in the lawsuit.
23             No.  But I -- I'm just saying --
24   Fletcher: So -- so, what makes you think that's going to be the
25             result of the lawsuit?
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 36 of 50

```
 1   Buehler:   Because I think the practical reality is, as DRO noted
 2              in its briefing below, that there is just a tension
 3              between trying to get them out as soon as you can so
 4              the beds are --
 5   Fletcher:  No.  I under- -- no.  I under- -- no.  I understand
 6              that.  But -- and that -- that exists no matter how we
 7              rule.  I mean, that -- that's -- that's been in
 8              existence for a very long time.  And they apparently -
 9              - they're keeping them.  So, how would an order from
10              our court that says, uh, Oregon has an obligation to
11              provide suitable placement for these people -- how
12              would that change the reality?  How would that then
13              allow them to send them to some suboptimal place where
14              they're not now sending them?
15   Buehler:   Yeah.
16   Fletcher:  How -- how would that change?
17   Buehler:   So, I -- I -- I mean, I -- I think -- I think the
18              point is -- and you're right.  There's an obligation
19              to place them suitably.  And thank you.  Because that
20              -- that really, I think, addresses your earlier
21              question.  That is in the statutes.  Uh, I just think
22              if you have a situation where these hospitals are
23              rendering care because they need to, um, and because
24              of the strain on the system -- you know, as they say
25              in their complaint, there just are not beds elsewhere
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

**Van Rysselberghe Decl. Ex. 2
Page 37 of 50**

1            to send them to.  And I think that that means if

2            you're trying to transition them out, you know,

3            there's an assumption that there are other beds, and

4            that's just not the case as alleged.

5    Fletcher: But as I unders- -- but I understand that -- what --

6            what I understand, the purpose of the underlying

7            lawsuit is somehow to force Oregon to start spending

8            money to provide appropriate placement that Oregon has

9            so far been unwilling to spend.  I mean, uh, uh, that

10           -- that seems to me the thrust of the lawsuit.

11   Buehler: So, I mean, and they could speak to that.  But my

12           understanding is that -- although, if you look at the

13           relief, I just want to note, it's not just that,

14           right?  Like, there is a financial aspect of this for

15           the hospitals that may converge but may diverge.  So,

16           I just want to acknowledge that.  But yes.  I think

17           that that is --

18   Fletcher: Well, then, I'm trying to understand the may converge

19           because the may converge depending on how likely there

20           is a divergence -- I mean, that's -- that's the key to

21           the third party standing analysis.

22   Buehler: Right.  Yeah.

23   Fletcher: And I'm -- and I'm having trouble still understanding

24           the nature of the divergence because I think I just

25           heard you say that if we allow them to go forward as

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 38 of 50

```
 1              third party representatives, uh, they're nonetheless
 2              going to be subject to the same obligations they have
 3              now in terms of not placing them to some suboptimal
 4              place.  But you told me they're going to do that.  And
 5              I don't get -- I -- I don't quite understand yet.
 6  Buehler:  Well, so, and this is -- Your Honor, this is where
 7              maybe the, um -- the transcript below is informative
 8              because there was a -- there was a colloquy below
 9              where, for example, the district court judge said,
10              well, what if this -- you know, what if this case went
11              into settlement, um, discussions at some point?  Like,
12              isn't there a tension between the hospitals and their
13              interests, financial or otherwise, and -- and the
14              interests of these patients in, uh, receiving a
15              placement that is suitable regardless of the financial
16              cost, right?  And so, uh, I mean -- and I understand.
17              Look, part of the challenge here is we're trying to
18              think ahead hypothetically to what could happen.  But
19              I still think, like, that exchange below is very
20              informative because the path of litigation could lead
21              to a moment, and frankly, likely would lead to a
22              moment where the hospital's, um, interests would
23              diverge from patients that -- that need the best care
24              available, regardless of cost or other considerations,
25              regardless of whether pa- -- whether patients may need
```



Van Rysselberghe Decl. Ex. 2
Page 39 of 50

```
 1              that bed in the hospital.  At some point -- and this
 2              is really the point that DRO was making below.  Um,
 3              they're just different interests.  Um, I see I'm way
 4              over my time, and I apologize for that.
 5  Owens:    No, no, no.  What --
 6  Fletcher: No, no.  (Inaudible - 00:43:39) --
 7  McKeown:  We put you there.
 8  Buehler:  Yeah.  Thank -- and thank you.  You've -- you've given
 9              me my workout.  And -- and unless there's any other
10              questions, we would urge you to affirm.
11  Owens:    Thank you, Counsel.
12  McKeown:  Counsel, I have a question.  If the court were to
13              determine that the hospital has standing but that
14              there's no third party standing, what would be the
15              difference in the outcome of the relief?
16  Gillette: I -- that's funny.  I never thought about it quite
17              that way because, um, I've assumed that there was
18              standing both ways.  Um, it seemed pretty obvious to
19              me that there was.  But that -- that's just the way I
20              was thinking about it.  I don't know there would be
21              any difference in the outcome to -- to tell you the
22              truth, Judge McKeown.  We're -- we're advocating for a
23              single thing.  We're advocating for OHA to get on the
24              -- its horse and do something.  And if it does, the
25              people that we're caring for in the interim will
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 40 of 50

```
 1              finally -- or their successors will finally have some
 2              place that they can be placed where they have a chance
 3              at rehabilitation and the ability to return to civil
 4              society.
 5   Owens:     So, let me jump in there because the complaint has
 6              certain counts as to the hospital and certain
 7              complaints as to the patients.  I take it that from a
 8              pract- -- you're saying from a practical perspective,
 9              there would be no difference.  I take it that, in the
10              complaint, there would be certain counts --
11   Gillette:  Yeah.
12   Owens:     -- that would be dropped.
13   Gillette:  Yes, sir.  I -- I beg your pardon.  Uh, uh, that's --
14              that's precisely what I'm saying because I've -- I've
15              looked at the two sides of it, and I've thought this -
16              - these guys aren't just twins.  They're the same
17              thing.  Uh --
18   Fletcher:  No.  That doesn't make any sense to me because the
19              first party claims the hospital is making, uh, one of
20              them is a due process claim.
21   Gillette:  Right.
22   Fletcher:  One of them is a federal takings claim.
23   Gillette:  Yes.
24   Fletcher:  And the other one is a state takings claim.
25   Gillette:  Yes.
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 41 of 50

```
1   Fletcher: The remedy for a takings claim is pay me money.

2   Gillette: We have --

3   Fletcher: Pay me money.

4   Gillette: We have --

5   Fletcher: The -- the remedy for a takings claim is not provide

6             suitable placement for those pa- -- patients.

7   Gillette: Judge -- Judge Fletcher, pardon me.  I didn't mean to

8             interrupt, sir.

9   Fletcher: Yeah.

10  Gillette: Uh, we have filed an amended complaint, and the judge

11            has never really indicated what he was going to do

12            with it one way or the other.  But since his basis for

13            dismissing the case and not allowing another complaint

14            was he was saying that, uh, we had volunteered for

15            this problem, I assume that I'm entitled to at least

16            bring this to your attention.

17  Fletcher: Sure.

18  Gillette: We've abandoned any suggestion we want any money.

19            That's not what we're here for.  We're -- we're

20            searching for prospective relief of injunctive form

21            that will permit our patients to get the treatment

22            that they need.  This --

23  Fletcher: So -- so, you're representing to me that you've

24            abandoned any -- any request for a judicially ordered

25            compensa- -- monetary compensation?
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 42 of 50

1   Gillette: Yes, sir.  That -- that is my representation.

2   Fletcher: Uh-huh.

3   Gillette: We ain't doing that.  Um, and I think, as we've

4              thought about it, we've decided that that was -- that

5              invited the kind of colloquy that's just gone on here.

6              And we didn't intend to do that.

7   Owens:    And just so we're clear.  Because in my materials

8              here, I have the first amended complaint.  I have the

9              second amended complaint.  You're saying there was a

10             proposed third amended complaint?

11  Gillette: No.  Um --

12  Owens:    Or are you just going to drop (inaudible - 00:46:46)?

13  Gillette: What happened was the judge wouldn't let us file an

14             amended complaint because he said we'd had the

15             opportunity to file an amended complaint, and we had.

16             We -- we had added a party.  And somehow, the judge

17             wasn't prepared to have us file a complaint that

18             spelled out the things that Judge Fletcher has been

19             talking about in part.  And so, we explained, in

20             detail, why it is certain things are true and certain

21             things are not.  And, uh, the judge -- frankly, I'm

22             not entirely clear as to how the judge handled that or

23             what he did with it, or whether he even thought about

24             it.  Uh, there's just -- the re- -- it just disappears

25             into a hole.

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 43 of 50

```
1   Owens:    Okay.  So -- so, if I'm looking at the second amended
2             complaint, which does have takings claims in it,
3             you're saying that there's a -- there was a plan to
4             file another complaint or -- that would not have the
5             takings claims or that you're just dropping the
6             takings claims?
7   Gillette: Well, if the second amended complaint you're looking
8             at is the one that added the party, there's no
9             substantive change between that and the first.  But we
10            filed a complaint, which we labeled second amended
11            complaint, uh, which spelled out in -- in a good deal
12            more detail what was going on and does not seek, uh,
13            monetary relief.
14  McKeown:  I mean, I -- the complaint I'm looking at, which is
15            second amended --
16  Owens:    Yeah.
17  McKeown:  -- said with respect to the takings, plaintiffs do not
18            seek compensatory damages for OHA's --
19  Gillette: Yeah.
20  McKeown:  -- unlawful takings.
21  Gillette: Yeah.
22  McKeown:  Is that correct?
23  Gillette: Yeah.
24  McKeown:  Okay.
25  Gillette: That's -- we -- we're not in that game.
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

**Van Rysselberghe Decl. Ex. 2
Page 44 of 50**

44

```
 1   Fletcher: Yeah.  That -- that's the one you, uh, sought to file
 2             but is not yet filed.
 3   Gillette: That's the one we sought to file.
 4   McKeown:  It's --
 5   Owens:    That last paragraph.  Okay.  Paragraph (inaudible -
 6             00:48:11).
 7   Gillette: Yeah.
 8   McKeown:  That's in the complaint.  That's in the current second
 9             amended complaint.
10   Gillette: Okay.  Well, the thing I -- I couldn't figure out was
11             -- the -- the numbers were -- were throwing me.  You
12             wouldn't think one and two would throw me, but that
13             did throw me just a little bit.
14   McKeown:  Okay.
15   Gillette: But in any event, I knew that -- I knew that we had
16             made a declaration --
17   Owens:    Yeah.
18   Gillette: -- with respect to that.
19   Fletcher: So -- so, it's a --
20   Gillette: Is the reason I asked (inaudible - 00:48:29).
21   Fletcher: So, it's a takings -- it's a takings claim, but the
22             remedy for which is quit doing the taking rather than
23             compensate me for past taking.
24   Gillette: Yes.
25   Fletcher: Okay.
```



Van Rysselberghe Decl. Ex. 2
Page 45 of 50

```
 1   Gillette: Cut that out and not pay us for it.
 2   Fletcher: Yeah.
 3   McKeown:  Thank you.
 4   Gillette: Um, I have a few seconds left.  My friend, uh, Mr.
 5             Buehler appears to argue that somehow we're estopped
 6             from bringing this action because we've put up with
 7             this nonsense for all these years, which is a sort of
 8             interesting concept when it comes to constitutional
 9             questions.  Um, we have never signed on to a
10             certificate which promises that we will do other than
11             provide acute care, in direct answer to Judge
12             Fletcher's question.  You -- you drew the line exactly
13             where the line is.  We said we would take care of
14             people suffering from acute care, and we're staffed
15             and prepared to do that.  That's the certification we
16             go through every couple of years just to keep track of
17             what hospitals are supposed to be available to do
18             certain things.  But it's got nothing to do -- nothing
19             to do with promising that, oh yeah, and by the way,
20             once we've got these people stabilized, we'll hold on
21             to them for half a year --
22   Fletcher: Yeah.
23   Gillette: -- uh, because, uh, OHA won't put them somewhere.
24   McKeown:  I don't think he's saying -- I think what he's saying
25             is every time you sign the certification, you knew
```



Van Rysselberghe Decl. Ex. 2
Page 46 of 50

```
 1              that you were going to be housing these people for
 2              longer.  So, it's like kind of beating yourself up by
 3              keeping signing the certification.  I think that's
 4              what he's saying.
 5   Gillette: I -- uh, alright.  That -- that may be true.  If -- if
 6              it was an exercise in self-flagellation, uh, we've --
 7              we've quit.
 8   Fletcher: Okay.  Well, and this is a variation on the same
 9              question.  And maybe I'm not going to get, uh, a
10              further elaboration.  Why -- if it's well known to you
11              that while you undertake contractually the obligation
12              to provide the acute care as a practical de facto
13              matter, you're undertaking an obligation to keep these
14              people for a very long time, and you're losing money
15              at it, why are you doing this?  When you -- the -- the
16              -- apparently, some hospitals in Oregon don't sign up.
17              Why is your -- why are your clients signing up for
18              this if it's --
19   Gillette: We've been --
20   Fletcher: -- if it's a money loser?
21   Gillette: We've been doing it because when patients present to
22              us in need of emergency services and acute care, we
23              have to take them.  EMTALA requires us to take them
24              and treat them.  We can't just say no.  We -- we're
25              not going to deal with you guys because there's no
```



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 47 of 50

```
 1              (inaudible - 00:50:44) --
 2   Fletcher: So, what about the other -- what about the other
 3             hospitals in Oregon that are not signing up for this
 4             program?  Why don't they have the same obligation that
 5             you people do?
 6   Gillette: I -- I think what happens with them is EMTALA requires
 7             them to provide at least emergency treatment, and to
 8             try to find a hospital that's certified to provide the
 9             acute care and get them transferred to that.  But that
10             has to do with acute care.  That has to do with just
11             stabilizing them.  It is not a matter of -- of long
12             term care.
13   Fletcher: But -- but those -- but -- but the -- but the reason
14             you gave me as to why your clients sign up for this
15             program, it would seem to me, would apply to every
16             hospital in Oregon.  But they're -- but that's not
17             true.
18   Gillette: You know, Judge Fletcher, I don't know the answer to
19             how many have not.  Um, and I apologize for not
20             knowing, but I don't.  I -- I -- I'm assuming that
21             there are some.  I'm representing the folks who
22             regularly sign on because that's the kind of staffing
23             they do.  That's what their hospitals are set up for.
24   Fletcher: Okay.
25   Owens:    Thank you very much, Counsel.  Thanks to --
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 48 of 50

```
 1   Gillette: Uh, if -- if --

 2   Owens:    We're -- we're way over, so if you've got --

 3   Gillette: I -- I beg your pardon.  Yes.  Yes, you are.  And I

 4             appreciate the courtesy.  Thanks very much.

 5   Owens:    Very well.  Thank you both for outstanding advocacy

 6             today and excellent briefing.  We really appreciate

 7             it.  And a very interesting and challenging case.  Uh,

 8             this matter is submitted and we are done for the day.

 9   Female:   All rise.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 49 of 50

1                    TRANSCRIBER'S CERTIFICATE

2

3          I, Amanda Brundige, do hereby certify that I have

4    listened to the recording of the foregoing; further that the

5    foregoing transcript, Pages 1 through 48, was reduced to

6    typewritten form from a digital recording of the proceedings

7    held May 8, 2024, in this matter; and that the foregoing is an

8    accurate record of the proceedings as above transcribed in this

9    matter on the date set forth.

10         DATED this 21st day of May, 2024.

11

12

13

14                                      

15                        Amanda Brundige

16                        Ditto Transcripts
                          3801 E. Florida Ave.
17                        Suite 500
                          Denver, CO 80210
18                        Tel: 720-287-3710
                          Fax: 720-952-9897
19

20                        DUNS Number: 037801851
                          CAGE Code: 6C7D5
21                        Tax ID #: 27-2983097

22

23

24

25



OFFICE 720-287-3710 | FAX 303-952-9897 | WEB www.dittotranscripts.com
3801 E. Florida Ave., Suite 500, Denver, CO 80210

Van Rysselberghe Decl. Ex. 2
Page 50 of 50