

January 13, 2025

City of Ashland Planning Commission
20 E. Main Street
Ashland, OR 97520

**Letter Re Application PA-T1-2024-00255, Subject Property : 110 Terrace Street**

Chair Verner, Vice-Chair Knauer, and Members of the Planning Commission:

On behalf of Disability Rights Oregon, I submit the attached letter as a comment regarding the discussion of the proposed development of the above-captioned proceeding at 110 Terrace Street in Ashland. I am the Deputy Legal Director for Disability Rights Oregon, a federally-designated nonprofit that represents the rights of people with disabilities throughout Oregon, protecting them from abuse and neglect. The housing development at issue here is designed to promote independent living for people with mental illness, by allowing respite housing with peer supports.

Disability Rights Oregon does not have any kind of representation agreement with any of the prospective residents of the respite housing program. DRO instead writes at this time as a nonprofit designated by the federal government to promote the rights of people with disabilities. *See Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1113-1116(9th Cir. 2003) slate(holding DRO, formerly known as the Oregon Advocacy Center, had standing to seek  judicial relief on behalf of class of individuals with mental illness).

Across the state and within Jackson County, people with mental illness find limited access to housing an enormous barrier to living in the community, often forcing them to remain in institutional settings or, alternately, to live without any housing at all. Ashland's own self-analysis of barriers to fair housing specifically identified land use rules as a source of discrimination and a barrier to housing.[1] The review found "In Ashland, discrimination appears to primarily impact peoples who experience a physical or mental disability." *Id.* at 31. Ashland reports that the "majority of fair housing issues reported are issues pertaining to peoples with disabilities." *Id.* at 12.  People with mental illness should not be denied the right to live in the community based on discriminatory attitudes and prejudice.

***Backdrop of Federal Nondiscrimination Law***

Many state and federal laws promote equal access to housing and prohibit discrimination on the basis of a person's disability. Their history and the ways courts have interpreted them are important to understand the current matter.

The federal Fair Housing Act prohibits disability-related discrimination in housing matters,

---

[1] City of Ashland, *2020-2024 Fair Housing Analysis of Impediments to Fair Housing Choice, Update for the City of Ashland*, June 1, 2020, at 34 *available at* https://ashlandoregon.gov/DocumentCenter/View/1472/2020-2024-Analysis-of-Impediments-Update-PDF

511 SW 10th Avenue, Suite 200 / Portland, OR 97205
Voice: 503-243-2081 or 1-800-452-1694 / Fax: 503-243-1738 / www.droregon.org
Disability Rights Oregon is the Protection and Advocacy System for Oregon

including the zoning and land use process. 42 U.S.C. § 3604. In *Pacific Shores Properties, LLC v. City of Newport Beach*, the Ninth Circuit denied a motion to dismiss a challenge to local ordinances that, while not prohibiting group homes outright, permitted land use hearing officers to find "plenty of . . . hooks and standards  . . . to deny an application" for a group home. 730 F.3d 1142, 1152 (9th Cir. 2013). Evidence of either an intent to discriminate against people with disabilities or an effect of preventing people with disabilities from getting housing gives rise to a claim under the Fair Housing Act. *Id.* at 1162-63.

Title II of the Americans with Disabilities Act also prohibits a government agency from discriminating against people with disabilities. 42 U.S.C. § 12132. In *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, the Ninth Circuit ordered a trial court to enjoin a city's efforts through its zoning processes to halt the establishment of a methadone clinic within the city. 179 F.3d 725, 730 (9th Cir. 1999). The Second Circuit affirmed a preliminary injunction granting a permit to a drug clinic, where the only reason for permit denial was "the need to alleviate the intense political pressure from the surrounding community brought on by the prospect of drug- and alcohol-addicted neighbors." *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997). "Although the City certainly may consider legitimate safety concerns in its zoning decisions, it may not base its decisions on the perceived harm from such stereotypes and generalized fears." *Id.*

In addition to prohibitions of intentional discrimination and disparate impact discrimination, both the ADA and the Fair Housing Act require public bodies, such as a land use board or planning commission, to make reasonable accommodations to people with disabilities and homes designed for people with disabilities. *City of Edmonds v. Washington State Bldg. Code Council*, 18 F.3d 802, 806 (9th Cir. 1994), *aff'd sub nom. City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725 (1995); *Pac. Shores Properties*, 730 F.3d at 1157 n.15. People with disabilities have the right to "live in the residence of their choice in the community" and to end the "unnecessary exclusion" of people with disabilities. *City of Edmonds*, 18 F.3d at 806.

Other anti-discrimination laws apply to this matter. The Rehabilitation Act prohibits any entity that receives federal funds from discrimination against people with disabilities. 29 U.S.C. § 794. The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination because of irrational bias. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) (requiring a special use permit for a home for people with disabilities where other residential uses would not was based only in irrational bias and violated the Fourteenth Amendment). Oregon state law also prohibits making distinctions in the availability of real property based on whether the person intended to occupy the property has a disability. ORS 659A.145(2)(c).

### *General Principles of Non-Discrimination Law in Zoning and Land Use Decisions*

Decisions of courts interpreting zoning laws and land use decisions, as understood in light of the nondiscrimination laws described above, distill down to three simple requirements: 1) local governments cannot impose restrictions or conditions on housing for group homes and other housing for people with disabilities that are not imposed on conventional residential housing, 2) local governments must offer reasonable accommodations to people with disabilities  in the zoning and land use process, and 3) local governments may not rely on broad, generic negative stereotypes about people with disabilities. *City of Cleburne*, 473 U.S. at 449; *Innovative Health Sys.,* 117 F.3d at 47; *Bay Area Addiction*, 179 F.3d at 735; *Pacific Shores Properties*, 730 F.3d at

2

1165. The government cannot deny a permit in an act of public discrimination, and it may not incorporate private discrimination—especially that received through public testimony—in its decision-making process. *Innovative Health Sys.,* 117 F.3d at 49 (describing as evidence of discrimination public testimony "replete with discriminatory comments about drug- and alcohol-dependent persons based on stereotypes and general, unsupported fears"). To deny this application on the basis of generalized "fears of jeopardized safety and falling property values" would put local zoning ordinances above the federal nondiscrimination laws that apply. *Innovative Health Sys.,* 117 F.3d at 42.[2]

### *Placing the Proposal in the Context of the Ashland Code*

The petitioner is seeking approval for development of a home for people with mental illnesses. The home would serve four to six people at a time. The home would offer respite services, a "homelike setting" living in a common environment for people with mental illnesses over a time period of up to 14 days at a time. ORS 473.275. The residents would receive services from peer supports. The proposed site is located in a low density RR-.5 rural residential single family residential zone.

A "dwelling" is a "structure conforming to the definition of a dwelling under applicable building codes and providing complete, independent living facilities for one family, including permanent provisions for living, sleeping, eating, cooking, and sanitation." Ashland Muni. Code 18.6.1.030. A "single-family dwelling" is a "detached or attached structure containing one dwelling unit located on one lot." *Id.* A "family" is an "individual or two more persons related by blood, marriage, legal adoption, or guardianship; or not more than five persons who are not related by blood, marriage, legal adoption, or guardianship." *Id.* "Group living" is "characterized by the long-term residential occupancy of a structure by a group of people. . . typically larger than the average size of a household" with common areas for dining and other functions. *Id.* A "residential care home" is a "residential treatment or training or adult foster home" regulated by the state, providing care "alone or in conjunction with treatment or training or a combination there of for five or fewer people who need not be related." *Id.*

Under Table 18.2.2.030, the only permitted uses in an RR zone are agriculture, a single-family dwelling, a park or other recreational facility, a public school, and a residential care home. Other uses fall under the special or conditional use provisions, or are outright prohibited. A peer support respite care setting is not defined in the code. The first question appears to be whether the proposed use constitutes or strongly resembles another characteristic permitted use in the RR zone.

### The Proposed Use Should Be Compared to a Single-Family Dwelling

---

[2] Disability Rights Oregon views any limitation of federal law on the Ashland Municipal Code as mandated by the Supremacy Clause of the United States Constitution, which makes federal statutes "the supreme law of the land." U.S. Const., Art. VI. State laws and local ordinances should be interpreted in a manner that does not conflict with federal law. In the alternative, DRO would propose that the City of Ashland should grant a reasonable accommodation or reasonable modification of policy to ensure that private discrimination does not keep people with disabilities from finding housing, by declining to enforce those municipal law provisions in this instance. 42 U.S.C. § 3604(f)(3)(B); 28 C.F.R. § 35.130(b)(7).

Here, the proposed use appears to qualify, with one possible exception, as a single-family dwelling. The proposed use involves placement of 4-6 people in a common dwelling equipped with provisions for cooking, living, sleeping, and sanitation. Although the staff report discusses the meaning of "long-term" residency at length in the report, the definition of "dwelling," "single-family dwelling," and "family" nowhere require long-term cohabitation. Indeed, it would be bizarre if the city of Ashland began policing single family residences to ensure that children coming home to visit their parents always stayed for at least 30 days.

The sole definitional problem potentially challenging the use as a single family dwelling would be those instances where all six beds were taken up. However, under the federal Fair Housing Act, a definition of family that allows any number of related people to live in the same household, while restricting the number of unrelated people who live in the same household may tend to discriminate against people with disabilities and reasonable accommodations to such a requirement under this provision may be necessary. *City of Edmonds*, 18 F.3d at 807. Here, because the proposed respite site would not always exceed the limitation on more than five unrelated people in any "family," and on those occasions that it would, it would at maximum hold only six unrelated people, rather than five, offering to treat the respite home as a single-family home for zoning purposes would be at best a mild tweak to a condition for occupancy which, one assumes, is rarely enforced. *Children's All. v. City of Bellevue*, 950 F. Supp. 1491, 1499 (W.D. Wash. 1997) (invalidating occupancy requirements that treated people with disabilities differently than dwellings comprised solely of relatives); *ReMed Recovery Care Centers v. Twp. of Willistown*, 36 F. Supp. 2d 676, 688 (E.D. Pa. 1999) (expanding zoning restriction of 5 unrelated residents to 8 was reasonable and would not defeat purposes of occupancy requirement).

DRO assumes that numerous cohabiting and hybrid families occupy single family residences in Ashland and greatly doubts that the city of Ashland routinely checks marriage licenses and birth certificates to review familial ties among residents. Technically, Ashland's policies appear to make it illegal for, say, an unmarried couple to reside in a single family home, each with two children from other relationships, or for a cohabiting unmarried couple to have four foster children. DRO also assumes that numerous single family homes in Ashland's residential districts, like most other areas, have frequent guests and visitors that periodically tip the occupancy requirements outlined for a single family home. If Ashland is prepared to deny this reasonable accommodation, it should be prepared to show that it routinely polices the requirements of familial relationships by checking marriage licenses and birth certificates. Ashland is unlikely to prevail in showing a nondiscriminatory purpose or that the proposed accommodation is unreasonable, if Ashland only polices the details of this occupancy requirement for homes for people with disabilities.

**The Proposed Use Could Also Be Compared to Group Living**

The Ashland City Code does permit group living in one context in the RR zone: a residential care home. Table 18.2.2.030, Ashland Municipal Code. In response to the petitioner's request to treat the respite home like a group living setting, Ashland's planning staff has object that group living must be "long-term residential occupancy." Ashland has refused either to treat the respite home as a permitted group living arrangement or to offer a reasonable accommodation to waive the "long-term" element. "Long-term" occupancy indicates occupancy for 30 days or more.

Ashland's response on this point does not explain why the long-term element is so essential that it

4

cannot be waived. Many other permitted uses in the RR zone involve short-term use or periodic high rates of use. For instance, schools and parks are permitted in the RR zone, both of which have times of very high use, as anyone who has lived across from an elementary school at 8 AM on a weekday or across from a municipal park on a Saturday afternoon in the spring could say. "If anything, it will subject the neighborhood to less traffic, fewer parking problems and fewer disruptions to the neighborhood that any or all of the uses specially referred to." *Judy B. v. Borough of Tioga*, 889 F. Supp. 792, 800 (M.D. Pa. 1995). For that matter, even the city's definition of a single-family dwelling does not require a long-term occupancy. Nothing in the code clearly prevents homeowners from leasing or subleasing their home for short periods of time. A quick review of VRBO and AirBnB postings shows dozens of homes for rent for short periods of time in residential zones of Ashland, either where traveler's accommodations are prohibited or where conditional use permits are required but are not listed in the advertisement.[3] Taking steps to enforce a short-term occupancy requirement selectively against homes for people with disabilities violates the FHA. *Pac. Shores Properties*, 730 F.3d at 1164.

Further, the area in question is carved up virtually block-by-block into numerous small zones, close together. This is not some large, homogenous residential zone. The Terrace Street location lies in the immediate vicinity of Lithia Park, a heavily traveled central tourist attraction for the city. The site in question is a few blocks away from dedicated bed and breakfasts and a very short distance from the main downtown zone of Ashland.

In fact, the *only* context of the "long-term" requirement that has any effect in the Ashland Municipal Code is on the "group living" definition, which largely regulates homes for people with disabilities. Ashland may not impose on homes for people with disabilities a long-term use requirement that the code does not impose on other people, nor does Ashland actively enforce such a requirement against people without disabilities.

The staff report and legal memorandum describes "long-term residential occupancy" as a "key component" of the zoning law but provides no explanation as to what municipal interests lie with temporary residency as opposed to long-term residency. A temporary resident will, presumably, use the streets, sewers, utilities, and other common resources of the community to more or less the same extent as a long-term resident, especially to the extent that "long-term" residency includes renters for periods of only 30 days. Residents staying for 30 or 60 days are not particularly more likely to forge a community, to plant trees, or to make capital investments in their homes than residents staying for 14 days. Nor does the staff report or legal memorandum explain why short-term residency is incompatible with other permitted uses of the space, like parks and schools, nor why the permitted use of a single-family dwelling does not require long-term occupancy.

Ordinarily, the short-term occupancy of a residence is not at odds with the long-term occupancy requirements in a residential area, such that the short-term occupancy or respite usage is inconsistent with the residential character of a neighborhood. *Step By Step, Inc. v. City of Ogdensburg*, 176 F. Supp. 3d 112, 126 (N.D.N.Y. 2016) (housing for "respite/hospital diversion" constituted a "dwelling" for Fair Housing Act purposes); *Connecticut Hosp. v. City of New London*, 129 F. Supp. 2d 123, 134 (D. Conn. 2001) (short-term shelter residents with disabilities "are not transient guests" for FHA purposes); *Corp. of Episcopal Church in Utah v. W. Valley City,* 119 F.

---

[3] City of Ashland, FAQ: Can I Operate a Traveler's Accommodation in a Residential Area, *at* https://www.ashlandoregon.gov/FAQ.aspx?QID=76.

Supp. 2d 1215, 1222 (D. Utah 2000) (city was required to engage in interactive process to determine reasonable accommodation, even while city asserted short-term shelter would be "essentially a hotel" not permitted in the zone). Short-term placements and shelters have often found substantial support in the Fair Housing Act, and Ashland presents no evidence or theory for why short-term residency is dramatically worse in the present setting—indeed, it has presented no argument for why short-term residency is particularly bad at all, other than treating short-term residency as somehow an evil in itself.

***Requirements to Make Reasonable Accommodations***

The City of Ashland states baldly that its "commitment to providing reasonable accommodations" is "distinct from the proposal to fundamentally alter zoning regulations to accommodate a specific use that does not conform to existing definitions." Legal Memo, Jan. 3, 2025. To the extent that the city understands the application to require the city to *amend* its ordinance, I believe the city misunderstands both the proposal of the applicant and the scope of the reasonable accommodation. However, the city never explains what about its zoning requirements, either around the "long-term" requirement or the occupancy standards are so essential that they cannot be waived in this instance. The city states, without explanation, that "interpretation of zoning regulations must remain consistent with established definitions." In short, the city's response indicates that no reasonable accommodation is possible that would require result in an outcome at odds with its zoning laws. The city fundamentally misunderstands the applicable law which prohibits "refusal to make reasonable accommodations in rules, policies, practices, or services. . . ." 42 U.S.C. 3604(f)(3)(B).

In passing the Fair Housing Act, Congress made it "illegal to refuse to make reasonable accommodation . . . if necessary to permit a person with handicaps equal opportunity to use and enjoy a dwelling." *Giebeler v. M & B Assocs*., 343 F.3d 1143, 1148 (9th Cir. 2003) *quoting* H.R. Rep. No. 100–711, at 25 (1988), reprinted in 1988 U.S.C.C.A.N. 2173, 2186. "It is well-settled that 42 U.S.C. § 3604(f)(3)(B) imposes an 'affirmative duty' on public agencies to reasonably accommodate disabled individuals by modifying administrative rules and policies." *McGary v. City of Portland*, 386 F.3d 1259, 1264 (9th Cir. 2004). This requirement extends to municipal zoning ordinances. *Id.* This obligation to provide reasonable accommodations in zoning likewise stems from the ADA as well. *Id.* at 1269. The city's apparent determination that its zoning laws cannot possibly bear any exception in order to accommodate the needs of people with disabilities is unlawful.

Instead, once a person makes a reasonable accommodation request and demonstrates that the accommodation is possible, the burden of proof then *shifts* to the municipality to "produce rebuttal evidence that the requested accommodation is not reasonable. *Giebeler*, 343 F.3d at 1156. The City has produced no evidence that the proposed accommodation—to allow development of a respite care home for 4-6 people in an RR-zoned location—is not reasonable, beyond stating that it can make no exceptions to its zoning laws. The City's refusal to respond meaningfully and to engage in an interactive process violates the ADA and the Rehab Act. *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).

Although hardly essential to this analysis, this writer notes that no such integrity of the zoning ordinances is at stake. A peer respite group home is not specially described anywhere in the zoning ordinances of the city. The city's position relies, not on a specific determination of the city council

6

that a peer respite group home is unsuitable in this zone, but upon a fairly strained comparison between the proposed usage and the definition of "traveler's accommodations," even though the individuals in question are not travelers, and the rooms are not "rented or kept for rent." The staff analysis elevates the duration of the stay as the single determinative factor, without explaining why that element is essential. The staff analysis asserts somehow that Ashland's focus is on "permanent" housing, without reconciling this supposed interest in Ashland's willingness to accept stays of 30 days or more—hardly "permanent housing." The gulf between a 14-day stay and a 30-day stay is not so enormous or self-evident as the analysis suggests.

An ordinary person cannot reserve a room at this group home. Instead, the home is heavily regulated by the Oregon Health Authority, and the residency of the group home will be determined by the clinical decision-making. Residents will not be engaged in tourism, but using the home as a residence.  Perhaps most importantly, the home is being used for a specific statewide benefit, to ensure that people with disabilities can live in a home-like environment, be stabilized and find respite before moving on to their next home. The state legislature required the creation of those "home-like" environments, particularly requiring one in Southern Oregon.

The city council adopted a Homeless Services Masterplan in 2024 that included in its proposal that the city could "establish medical respite beds (step down housing after hospitalization/treatment)," "explore the need for more transitional housing," "make zoning changes to facilitate innovation around service provision," "establish a housing-focused transitional shelter," or a "short-term shelter, typically 1-4 weeks, with case management."[4] The proposed respite group home would benefit all of Ashland and all of Southern Oregon. If the city abuses the law to pass on this opportunity, it would prove Ashland—like so many other communities—wants services and supports to happen someday, somewhere else, in someone else's town, in someone else's backyard. Throughout Oregon, we hear the constant demand for someone else to do the work we don't want to do, that someone else's community should support the work we know we need. These refrains make it sure that we never get what we need. Someday is now. Somewhere is here.

Sincerely,


_____/s/_____
Thomas Stenson
Deputy Legal Director
Disability Rights Oregon

---

[4] City of Ashland, 2024 Homeless Services Masterplan Report, at 25, 60, 78 *at* https://or-ashland.civicplus.com/DocumentCenter/View/2244/Homeless-Services-Masterplan-Report-PDF.

 Outlook

---

## RE: Discriminatory Zoning in Ashland re an OHA-funded home

**From** Potter Sheila H <Sheila.Potter@doj.oregon.gov>

**Date** Wed 1/8/2025 9:39 AM

**To** Tom Stenson <tstenson@droregon.org>

**Cc** Emily Cooper <ecooper@droregon.org>; Dave Boyer <dboyer@droregon.org>

Thanks, Tom – I am discussing this with OHA.

### Sheila H. Potter
Oregon Department of Justice
C: 503.269.1737

---

**From:** Tom Stenson <tstenson@droregon.org>
**Sent:** Tuesday, January 7, 2025 4:30 PM
**To:** Potter Sheila H <Sheila.Potter@doj.oregon.gov>
**Cc:** Emily Cooper <ecooper@droregon.org>; Dave Boyer <dboyer@droregon.org>
**Subject:** Discriminatory Zoning in Ashland re an OHA-funded home

> **\*CAUTION EXTERNAL EMAIL\*** This email originated from outside of DOJ. Treat attachments and links with caution.
> **\*CAUTION EXTERNAL EMAIL\***

Sheila --

I wanted to bring this issue to your attention, in connection with the continued issues around OHA's support for behavioral health placements around the state. For a long time, a substantial barrier to establishing new community mental health resources has been local zoning laws that make it hard and expensive to develop community placements. Local land use laws frequently violate the Fair Housing Act by discriminating against homes for people with disabilities. Even neutral land use laws are frequently applied in a discriminatory manner to prohibit or to make expensive the development of homes for people with disabilities.

OHA has a specific mandate from the legislature to develop four respite homes in four regions of the state for people experiencing mental illness. ORS 430.275; ORS 430.274. These services are specifically intended to divert people away from psychiatric hospitalization. ORS 430.275(1)(a)(A).

One of the four grantees engaged by OHA has been trying to develop a peer-supported respite home in Ashland, Oregon. Ashland has told the grantee that they cannot develop the program because its proposed site is in a residential zoned area. The city of Ashland is specifically citing, in part, the absence of rulemaking from OHA regarding the siting or classification of peer-supported respite homes to justify rejecting the application.

A land use hearing in this case is scheduled for January 14 before the Planning Commission for the City of Ashland. https://ashlandor.portal.civicclerk.com/event/212/overview

OHA and the DOJ should provide advocacy to advance the services the agency is bound by law to provide. In the past, I have frequently asked OHA, DHS, and the DOJ in similar cases to oppose such municipal efforts to use zoning laws to discriminatory effect. I have never received any assistance from the state in nine years of these efforts.  I hope this time will be different.

Sincerely,

Tom Stenson
Disability Rights Oregon


***** CONFIDENTIALITY NOTICE ***** This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this e-mail in error, please advise me immediately by reply e-mail, keep the contents confidential, and immediately delete the message and any attachments from your system. ************************************

DRO EX B, P. 2 of 2

**D e b r a  A.  P i n a l s,  M. D.**

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Fourth Report**
**Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** 12/21/22
**Neutral Expert:** Debra A. Pinals, M.D.

**Background and Context of this Report**

On 12/21/21, the Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as a Neutral Expert in granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case. Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman's order stipulates further that OHA enter into a contract with the Neutral Expert and provide any needed information to her. The Court ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)." The Court further ordered a second report by the Neutral Expert to include "a short report and recommendations for a proposed long-term compliance plan for OSH."

I submitted my First Report (dated 1/30/22) and my Second Report (dated 6/5/22) to the Court, with a series of recommendations. On 6/7/22 the Court ordered my ongoing appointment and stated, "Beginning on September 7, 2022, Dr. Pinals will provide brief quarterly reports to update the Court regarding compliance status and any needed additional recommendations to address any barriers to achieving compliance." I submitted my Third Report on 9/15/22. This report represents my Fourth Report as the appointed Neutral Expert in this matter.

**Background and Summary of the Two Consolidated Cases**

As reviewed in my prior reports, the following background is provided for context in this matter. In 2002, Oregon Advocacy Center, now known as Disability Rights Oregon (DRO) filed a civil rights lawsuit against the state of Oregon alleging that the state was failing to timely admit individuals found incompetent to stand trial (Unable to Aid and Assist) who were ordered to Oregon State Hospital (OSH) for competence to stand trial restoration. The ruling out of the Ninth Circuit (*OAC v. Mink*) found on behalf of plaintiffs that the state was out of compliance and must admit these individuals within seven

(7) days. In June 2019, after the state had fallen out of compliance, the Court compelled the state to get in compliance with *Mink* within 90 days. Although the state met its burden at the time, compliance with became challenging once again with the pandemic creating other barriers. The state filed a motion requesting greater latitude in admitting individuals found Unable to Aid and Assist to mitigate the spread of COVID-19. That motion was granted, and DRO appealed to the Ninth Circuit Court of Appeals. The Ninth Circuit issued an order vacating the modification but also sought review by the District Court Judge. In December 2021, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide recommendations.

In November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after the Honorable Nan Waller had ordered them to OSH for treatment, without unreasonable delay. The plaintiffs remained, however at the Multnomah County Detention Center for months (plaintiff Bowman for nearly eight months, and plaintiff Douglas-Simpson for nearly six months) after the commitment order was issued. Plaintiffs alleged a violation of their substantive due process rights and filed a motion for a Temporary Restraining Order asking for plaintiffs to be transported to OSH within seven days of the order. The defendants argued that a lack of space at OSH, in part related to the need to timely admit individuals in the Aid and Assist process, contributed to the delays in admitting the patients. The Court granted the plaintiffs' motion for a Temporary Restraining Order, noting that "The *Mink* injunction does not address the relative priority of aid-and-assist patients and GEI patients…" noting that "any prioritization stems from Defendant's failure to provide the funds, staff, and facilities necessary to satisfy the *constitutional rights* of both groups. When satisfying constitutional guarantees, Defendants cannot rob Peter to pay Paul." In that opinion, The Honorable Marco A. Hernandez, United States District Court Judge, did agree with the defendants that a consolidation of the *Mink* and *Bowman* cases may make sense. As noted above, after the decision about the Temporary Restraining Order regarding the two specific plaintiffs, and at the time of the appointment of the Neutral Expert, the parties entered an interim agreement that no individuals found GEI would wait longer than four months for admission to OSH.

**Qualifications to Perform this Consultation**

My qualifications to render opinions as the Neutral Expert were described in my first report. In summary of that experience, I have worked for almost twenty-five years as a clinical and academic and forensic psychiatrist, and over twenty years functioning in state and local level administrative leadership, management, policy development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions.

**Sources**

Background documents I have reviewed for this matter include:

1. *Mink* 0339 Court Order Granting Motion for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;
2. Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21;

DRO EX C, P. 2 of 22

3. Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21;
4. Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20;
5. *Mink* and *Bowman* Interim Agreement, Filed 12/17/21;
6. *Bowman* 1637 PLD Plaintiffs 1st Amended Complaint #22;
7. Order on Joint Stipulation to Continue Appointment of Neutral Expert, signed by the Honorable Michael W. Mosman, 6/7/22;
8. January 30, 2022, Neutral Expert First Report, dated 1/30/22;
9. June 5, 2022, Neutral Expert Second Report, dated 6/5/22;
10. September 15, 2022, Neutral Expert Third Report, dated 9/15/22;
11. *Bowman* Opinion and Order, Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), signed by Judge Mosman 8/16/22; and
12. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 9/1/22.

It is acknowledged that the volume of material reviewed may mean that some more substantive items may have been inadvertently omitted from the list below. Apart from those caveats, to understand the scope of my activities, In addition, documents I have reviewed in the interim between this report and my prior report include (but are not necessarily limited to):

1. OSH Forensic Admissions and Discharge Bi-Weekly Reports;
2. OSH Forensic Admission and Discharge monthly data dashboards September to December 2022;
3. Average Wait Time Prior to Admission Progress Metrics for Benchmark Goals;
4. *Mink & Bowman* Monthly Progress Reports from OHA from October 3, 2022, November 3, 2022, and December 3, 2022;
5. OHA Community Restoration Resources, last updated 1/30/20;
6. Community Restoration Resource List by County, last updated 1/30/20;
7. Slide deck drafts regarding recommendation timeline shifts;
8. Agenda and Minutes from Aid and Assist Workgroups 9/16/22;
   a. Aid and Assist Workgroup Agenda
   b. Aid and Assist Workgroup Minutes from 8/19/22;
   c. OSH Data for A&A Workgroup;
   d. Judge Mosman 9/1/22 Order;
   e. *Mink/Bowman* Neutral Expert Second Report;
9. Aid and Assist workgroup Bike Rack Order Groupings, 5/17/22, and Bike Rack Survey Results April 2022;
10. *State of Oregon v. Givens*, 2022;
11. Amicus Brief Regarding Judicial Authority Filed by Marion and Washington Counties, filed 9/28/22
12. Legacy Emanuel Hospital & Health Center d/b/a Unity Center for Behavioral Health; Legacy Health System; PeaceHealth; and Providence Health & Services- Oregon vs. Patrick Allen, Complaint for Declaratory and Injunctive Relief, filed 9/28/22
13. Motion Intervene by Putative Intervenors, Legacy et al., filed 9/28/22

DRO EX C, P. 3 of 22

14. Motion to dissolve the August 16, 2022 Injunction, and Dissolve or modify the September 1, 2022 Injunction, by Intervenors Legacy et al., filed 9/28/22

15. OSH Update PowerPoint 11/15/22

16. "Far From Recovery" report and videos released by DRO 11/16/22;

17. Email from Ms. Emily Cooper to OSH and OHA Leadership dated 11/17/22 with attachments including:
    a. Letter to Governor Brown and Mr. Pat Allen from DRO, 9/27/21;
    b. Email Concerns Communicated from DRO's Ms. Cooper to OSH and OHA leadership dated 1/20/22;
    c. Letter from KC Lewis to Ms. Micky Logan dated 8/11/22
    d. Letter to KC Lewis from Ms. Micky Logan, 8/15/22;

18. Declarations of Ron Lagergren and Robin Henderson, in Support of Intervenors' Motion to Dissolve or Modify the September 1, 2022 Injunction, By Intervenors and Plaintiffs Legacy Emanuel Hospital & Health Center d/b/a Unity Center for Behavior Health, Legacy Health System, PeaceHealth, and Providence Health & Services – Oregon for Oral Argument 11/21/22

19. Reply in Support of Motion to Dissolve or Modify the September 1, 2022 Injunction by Intervenors and Plaintiffs Legacy Emanuel Hospital & Health Center d/b/a Unity Center for Behavior Health, Legacy Health System, PeaceHealth, and Providence Health & Services – Oregon for Oral Argument 11/21/22, dated 11/17/22

20. Plaintiffs' Response in Opposition to Judges' Motion for Limited Intervention, 10/7/22

21. Plaintiffs' Response to Counties' Amicus Brief, 10/11/22;

22. Plaintiffs' Response in Opposition to Hospitals' Motion for Intervention, 10/12/22;

23. *Mink/Bowman* Briefing for Governor Kate Brown 10/10/22;

24. Declaration of Derek Wehr, filed 8/26/22;

25. Defendants' Motion to Consolidate Pursuant to FRCP 42 (consideration of consolidating *Mink* and Legacy cases). Filed by Patrick Allen and Dolores Matteucci, filed 10/14/22;

26. Impacts Grant Program presentation 10/27/22 and OHSU IMPACTS Grantee perspectives presented by the Criminal Justice Commission to the parties and the neutral expert, 10/27/22

27. Aid and Assist RFA slide deck, received 11/3/22

28. Draft training plan submitted by DRO for community training regarding diversion options, dated 11/14/22;

29. Miscellaneous letters between DRO and OHA/OSH leadership 2021 and 2022;

30. GAINS workgroup evaluation models packet, received 11/22/22 from Debra Maryanov, Senior Assistant General Counsel, OJD;

31. Legislative Concept 520, filed by OHA with explanatory notes;

32. Sheriff Pat Garrett Letter to Judge Proctor, 12/2/22;

33. Press release regarding OSH back in "substantial" compliance with CMS, 12/9/22;

34. Funding allocated to community restoration services each year since it was initiated, received 12/7/22;

35. 221206 Order re Fitness Status Hearing and 221129 Order re Unfit to Proceed Engage in Services in Washington County Jail, order signed by Judge Erwin, 11/29/22;

36. Letters from Steve Allen for CHOICE, Civil, and Aid and Assist clarifications;

37. Information on provider fee increases as available at:
    https://www.oregon.gov/oha/HSD/OHP/Pages/BH-Rate-Increase.aspx

DRO EX C, P. 4 of 22

38. *Mink/Bowman* Progress Update Meeting PowerPoint
   a. "12.15.22 Neutral Expert Task Updates – Final Presentation"
   b. "12.15.22 Neutral Expert Task Updates – Final Appendices"
39. Community Navigator Program Comparisons produced by OHA
40. AA Placement analysis sent by OJD to Mr. Gabel, and AA Locus Analysis by OSH.


Regular/semi-regular meetings during this interim period from my prior report including the following meetings and discussions:

1. Periodic meetings with Judge Mosman and Judge Beckerman;
2. Periodic meetings with OHA staff Mr. Cody Gabel for coordination of my activities and with staff from OSH including Mr. Scott Hillier regarding data requests;
3. Weekly or bi-weekly meetings with OHA, OSH, DRO and MPD representatives and leaders both separately and together.  In addition, I met with staff from these agencies at various points in this interval period.
   a. From OHA, OSH, the weekly/bi-weekly leadership meetings have largely included:
      i. Steve Allen, Director of Behavioral Health, OHA
      ii. Dawn Jagger, Chief of Staff, OHA
      iii. Dolores Matteucci, OSH Superintendent-CEO
   b. From Oregon Department of Justice (DOJ):
      i. Carla Scott, DOJ Special Litigation Unit Counsel
      ii. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
   c. From Disability Rights Oregon (DRO), Emily Cooper, Legal Director, and Dave Boyer, recently onboarded at DRO as Managing Attorney
   d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC
4. Periodic meetings with OJD leadership including:
   a. State Court Administrator Nancy Cozine
   b. Judge Nan Waller, Multnomah County
   c. Debra Maryanov, Senior Assistant General Counsel


I spoke with individuals and participated in meetings regarding a number of topics. Such meetings included:
1. Meeting with Governor Kate Brown and staff on 10/10/22 with Director Pat Allen;
2. Meeting with Forensic Evaluation Services staff 9/14/22;
3. Presentation regarding IMPACTS grants by Kaysea Beck and Ken Sanchagrin from CJC, on 10/27/22;
4. Meeting with OSH Professional staff, 11/1/22;
5. Multnomah County Jail Review lead by Judge Waller, 11/22/22;
6. Legislative testimony presented by OHA and DRO, 12/8/22
7. Meeting organized by Mr. Eric Neiman with representatives from Legacy, PeaceHealth, Unity, St. Charles, and Providence, along with various attorneys who requested to listen to the discussion, 12/13/22;
8. Listening session that included district attorneys for the counties and other stakeholders, 12/14/22;

DRO EX C, P. 5 of 22

9.  Meeting with Washington County Sheriff and members of the Mental Health Response Team, 12/15/22;

I observed one Court hearing that took place to hear the representations of the private hospitals and the county district attorneys as well as the plaintiffs and the defendants.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
FES: Forensic Evaluation Services
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
ISU: Intensive Services Unit
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
MPD: Metropolitan Public Defender
OCBH: Oregon Council for Behavioral Health
OCDLA: Oregon Criminal Defense Lawyers Association
OHA: Oregon Health Authority
ORPA: Oregon Residential Provider Association
OSH: Oregon State Hospital
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities Since the Third Neutral Expert Report**

I have continued to meet with the state and the plaintiffs regularly to discuss progress and the implementation of my recommendations. The state has continued to also produce a monthly progress report to me in this matter. The work since my last report also included monitoring of progress toward the benchmarks set forth in my Second Report in June 2022. To help inform progress toward compliance and my work, I requested and reviewed data regularly. The first section of this report therefore presents some of the data utilized in order provide the Court with some of the information that I have considered.

**Data Summaries**

*Background Data*: Data received shows ongoing concern vis a vis compliance. Though certain trend lines appear to show some progress, with increasing orders for restoration to OSH, trends may be headed in a worse direction in the next few months. **Figure 1** and **Table 1** show increasing numbers of people waiting for admission, with a slight trend downward in days waiting, though this may be an immediate

Oregon Neutral Expert Fourth Report Regarding *Mink/Bowman*
12/21/22

relief due to the 9/1/22 Court Order. There is a slight decrease in OSH bed capacity and census (see **Table 2** and **Table 3**) due to seven beds taken offline to address patient needs temporarily until early 2023. When those beds open additional patients will be able to be admitted. Overall, there are growing concerns about worsening compliance that is forthcoming given the increased demands on admissions (See **Table 4** and **Figure 2**). **Figure 3** shows progress toward benchmarks toward compliance set forth in my June 2022 report. Again, although trends appear to be positive, compliance benchmarks have not been achieved, and increases in admissions will likely result in waitlist trend lines going up in the next few months.

**Figure 1. Data Dashboad Charts Reflecting Progress in *Mink/Bowman* as of November 30, 2022**



**Table 1. Individuals awaiting admission**

| 1. Regarding individuals on OSH admission list with signed and received A&A court order | | | | | |
|---|---|---|---|---|---|
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* |
| Total Number of individuals | 46 | 93* | 67 | 70 | 104 |
| Average days current individuals have been waiting | 15.8 days | 22.5 days | 16.2 days | 19.8 days | 20.7 |

DRO EX C, P. 7 of 22

| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days | 3-34 days | 1-36 days |
|---|---|---|---|---|---|
| **2. Regarding individuals found GEI and ordered to OSH** | | | | | |
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* |
| Total number of individuals | 15 | 4 | 3 | 4 | 0 |
| Average days waiting | 45.6 days | 23 days | 18 days | 13.0 days | N/A |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days | 3-20 days | N/A |

*The marked increase in numbers awaiting admission was most likely a residual of the pauses in admissions due to COVID-19

**Table 2: OSH Bed Capacities as of 12/1/22***

| Site | Licensed Capacity | Active Capacity |
|---|---|---|
| Salem Main Campus HLOC | 502 | 467 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **554** |
| Junction City HLOC | 76 | 73 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | 151 | 145 |
| **OSH Total** | **743** | **699** |

* Seven Salem HLOC are currently offline until 2023

**Table 3**. OSH Census as of 12/1/22

| Date | Aid & Assist | PSRB | Civil Commitment | Other | Total |
|---|---|---|---|---|---|
| 9/1/2022 | 410 | 275 | 14 | 1 | 700 |
| 12/1/2022 | 396 | 279 | 13 | 0 | 688 |

**Table 4. Aid and Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|---|---|---|
| December 2021 | 76 | 8 (5 standard/ 3 revocations) |
| January 2022 | 76 | 7 (4 standard/ 3 revocations) |
| February 2022 | 56 | 5 (2 standard/ 3 revocations) |
| March 2022 | 85 | 4 (3 standard/ 1 revocation) |
| April 2022 | 80 | 7 (4 standard/ 3 revocations) |
| May 2022 | 77 | 7 (4 standard / 3 revocations) |
| June 2022 | 75 | 6 (4 standard / 2 revocations) |
| July 2022 | 65 | 5 (3 standard / 2 revocations) |
| August 2022 | 74 | 7 (4 standard / 3 revocations) |
| September 2022 | 84 | 6 (5 standard / 1 revocation) |

DRO EX C, P. 8 of 22

| October 2022 | 95 | 3 (3 standard / 0 revocations) |
| November 2022 | 95 | 6 (2 standard / 4 revocations) |

**Figure 2. Aid & Assist Admissions/Orders Trends through November 2022**



**Figure 3. Admission Wait Time Projections Compared to Benchmarks Set in Second Report based on data as of 12/1/22**



**Figure 5** below shows data related to the order by Judge Mosman. Although there are many concerns that the "Mosman Order" is creating massive changes, at this time, only approximately 29 patients have been discharged to places around the state in accordance with the new restoration timelines who might otherwise have waited longer in the hospital for restoration. **Table 5** is data from OJD indicating that the same percentage of individuals found unfit to proceed are being referred to OSH for their initial commitment, but the baseline of referrals has increased. Once admitted for restoration, most hospital discharges are occurring as they have over years, unimpacted by the

9

"Mosman Order." Also, many of the hospital discharges are being discharged to community restoration (See **Table 6**) , and given my recommendations that total restoration time should be the same for the community and the hospital, this could create further increase demand on community restoration services as well as backlog on discharges from OSH when the system, public safety and clinically the individual defendants may not benefit from further restoration efforts.

**Figure 5. Discharge Data Related to the 9/1/22 Order by Judge Mosman**

- **Cohort 1:** Patients at OSH at the time of the Federal Court Order
- **Cohort 2:** Patients admitted to OSH after the issuance of the Federal Court Order on 9/1/22

| Cohort 1 | At OSH as of 9/1/2022 | At OSH as of 12/1/2022 | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | Total Discharged |
| Misdemeanor | 85 | 12 | 51 | 23 | 16 | 18 | 2 | 27 | 7 | 16 | 3 | | 73 |
| Felony | 217 | 94 | 36 | 13 | 13 | 56 | 12 | 38 | 4 | 13 | | | 123 |
| Violent Felony | 107 | 73 | | | | 20 | 12 | | 1 | | 1 | | 34 |
| **Total** | **409** | **179** | **87** | **36** | **29** | **94** | **26** | **65** | **12** | **29** | **4** | **0** | **230** |

| Cohort 2 | Admitted since 9/1/2022 | At OSH as of 12/1/2022 | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | Total Discharged |
| Misdemeanor | 79 | 65 | 15 | 1 | | 5 | 1 | 6 | 1 | | | | 14 |
| Felony | 139 | 124 | | | | 12 | 2 | 1 | | | | | 15 |
| Violent Felony | 29 | 28 | | | | 1 | | | | | 1 | | 1 |
| **Total** | **247** | **217** | **15** | **1** | **0** | **18** | **3** | **7** | **1** | **0** | **1** | **0** | **30** |

**Table 5. OJD Data Regarding Number and Percentage of Defendants Referred to OSH for Restoration**

| Year | Number of Defendants found Unfit to Proceed | % for whom OSH was ordered as initial placement |
|---|---|---|
| 2020 | 772 | 75% |
| 2021 | 992 | 77% |
| 2022 | 1059 | 77% |

**Table 6. Legal Status of AA Discharges in November 2022**

**November 2022 A&A Discharges**

| Reason | Cohort 1 | Cohort 2 | Total |
|---|---|---|---|
| Able | 19 | 15 | **34** |
| Never Able | 7 | 3 | **10** |
| Community Restoration | 14 | 5 | **19** |
| Dismissed | 1 | 1 | **2** |
| Restoration Limit | 19 | 0 | **19** |
| **Total** | **60** | **24** | **84** |

**Table 7** below shows that although the order related to length of restoration has allowed for the increase in discharges, with the actual numbers of admission orders far exceeding those that were

DRO EX C, P. 10 of 22

originally projected, the chance of achieving compliance with *Mink*'s seven-day admission provision by March 2023 is much less likely.

**Table 7. Projections vs. Actuals Admissions, Discharges, and New Restoration Orders**

Projections vs Actuals

| Month | Projected | | | | Actuals | | | |
|---|---|---|---|---|---|---|---|---|
| | Discharges | Admissions | New Orders | Admit List | Discharges | Admissions | New Orders | Admit List |
| Sep-22 | 67 | 67 | 74 | 77 | 85 | 76 | 84 | 86 |
| Oct-22 | 90 | 90 | 74 | 61 | 90 | 91 | 95 | 90 |
| Nov-22 | 90 | 90 | 74 | 45 | 85 | 81 | 95 | 104 |
| Dec-22 | 95 | 95 | 74 | 24 | | | | |
| Jan-23 | 97 | 97 | 74 | 10 | | | | |
| Feb-23 | 97 | 97 | 74 | 10 | | | | |
| Mar-23 | 107 | 107 | 79 | 10 | | | | |

The red and green "Admit List" numbers in the "Projected" section indicate compliance with Mink. When we can get the admit list down to the 10-15 range, we should be admitting patients to OSH within 7 days of the signed order.

Restoration in the community is complex and was part of my recommendations in June 2022 in terms of limiting duration of this process. Data shown in **Table 8** shows that 125 community restoration episodes lasted for over one year (873-748), despite the fact that misdemeanant defendants are the ones who are in community restoration.

**Table 8. CMHP Reported Completed Community Restoration Data 1/1/2019-6/30/2022**

| # of Completed Community Restoration Episodes** | | 875 |
|---|---|---|
| # of Days Minimum | | 0 |
| # of Days Maximum | | 1221 |
| # of Days Mean | | 201 |
| # of Days Median | | 147 |
| Days in Community Restoration | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** |
| 0-90 | 270 | 30.9% |
| 0-180 | 511 | 58.4% |
| 0-365 | 748 | 85.5% |
| 0-730 | 861 | 98.4% |
| 0-1095 | 873 | 99.8% |

*Missing Curry County Data for 4/1/2022-6/30/2022
** Completed does not reference success of restoration, but rather indicates that the community restoration episode

**Updates Since my September 2022 Third Report:**

**Meeting with Governor Brown:**

On 10/10/22 I had a meeting with Governor Kate Brown to discuss issues related to the federal Court Order as well as the *Mink/Bowman* matters generally. It is hoped that from this meeting information about the import of this case will be conveyed to the incoming administration including the Governor-Elect Tina Kotek.

**Updates from OHA:**

The largest issues looming on the horizon are the impending leadership changes with the transition to a new Governor. Director Pat Allen and Behavioral Health Director Steve Allen have given their notice to depart at the turn of the year and new appointments have not been formally made at the time of this writing. I have appreciated working with both of them and have conveyed the importance of this work continuing across administrations, with which they have agreed. I have been told that efforts to provide briefings on these matters are being attempted.

Some additional highlights include that The Aid and Assist RFA #5389 generated and distributed approximately $15M dollars to reduce the number of individuals found unfit to proceed via diversion efforts and also decrease numbers admitted to OSH for restoration, as well as reduce the lengths of stay for those at OSH. Dollars were allocated to urban, rural and sub-rural/remote regions of the state. Funds were distributed for staff support, client assistance, housing, transportation, and forensic evaluation services. In addition, 17 new beds and approximately 64 staff were brought online through this RFA. Behavioral Health Director Allen's team met with the CMHPs regarding the AA funds through the RFA and reported some positive feedback regarding how the dollars are being spent. The OHA staff have also been able to consider adjustments as needed with the new Federal Order.

I was also told that there is a SAMHSA grant pilot program in Washington County for peers with CADCs for community restoration that may ultimately align closely with community navigators. There will also be a forensic psychiatry fellow now placed at NWRRC to help with treatment provision. OHA staff continue to participate in the Multnomah County Jail review and continue to try to work toward action-oriented case discussions to effect change through that process, which is still evolving.

Several discussions across this quarter centered around activities within community-based settings, including advances in certified community behavioral health clinics, the roll out of increased crisis services, and allocations of funding to address substance use disorder and housing. In addition, specific programs designed to address the behavioral health/justice involved population have been slowly coming online, although with staffing shortages and COVID-19 issues still surfacing this has been a major challenge. In October, letters were written by Behavioral Health Director Steve Allen and Interim Medicaid Director Dana Hittle to Choice Providers to clarify roles and responsibilities including working to "remove barriers and facilitate access to community-based treatment for its clients" including those in the AA process. The OHA team also compiled information about various models that could be explored for community navigators.

**Oregon State Hospital Updates:**

OSH has increased its pace of admissions and discharges as noted in the data reflected above and in response to the 9/1/22 order by the Court. On a positive note, the hospital administration received word in early December that it was back in "substantial" compliance with CMS after facing several challenges in meeting the federal requirements. The issues from CMS had stemmed from an inquiry into the supervision of a patient who went on unauthorized leave during an outing in Lane County, and then surveyors broadened the scope of their review. Over this last quarter the hospital leadership and staff have been working diligently to remedy the situation and were proud to receive the notification that they had turned the concerns around.

At the same time, an exposé report from DRO was recently released detailing problems within OSH services including concerns about increasing restrictions for patients. With the increased pressures upon the staff, morale has been challenged. That said, it appears from leadership and the professional staff with whom I met that they are committed to their patients and working diligently to expedite admissions and a discussion with OSH leadership ensured a commitment to address the concerns raised by DRO.  Recommendations to examine HLOC needs at the 10-day period were piloted. Though data suggested that there were enough people admitted who did not meet the HLOC criteria warranted the continuation of the pilot, there seemed to be a sense that courts would be increasingly challenged by ready to place notices. Nonetheless, it is important that if clinically appropriate, movement toward discharge should be advanced. Over time as staffing is bolstered, there may be additional need to further expedite these reviews and to carefully examine who needs to be in the hospital and to work in partnership with community systems to develop safe plans for more timely discharge when appropriate, which can then be presented to the courts.

During the discussion with the private hospitals, there was concern that no patients were being admitted through civil processes, and that there were policies not allowing a patient to remain at OSH when needed. I was provided information that there were four expedited civil commit admissions in 2021 and eight expedited civil commit admissions in 2022. Also, as clarified by OSH, in the Wehr Declaration, paragraph 7, Mr. Wehr described a case of a problematic discharge and then noted, "in the future, when OSH has facts sufficient to warrant civil commitment and facts satisfying the expedited admissions policy, OSH will take steps to have the patient civilly committed prior to discharge and will cause the patient to remain admitted pursuant to its expedited admission policy."

It should be noted that requests for additional staffing to address growing demand for services in part related to the Court's 9/1/22 order were recently approved.

**Funding Updates:**

As part of this work and in accordance with prior recommendations, a website was established by OHA to communicate funding advances for the state's behavioral health system. The website is available at: https://www.oregon.gov/oha/HSD/AMH/Pages/index.aspx.

**Additional Community Initiatives:**

During one of the parties meetings at the end of October we were provided a presentation from the criminal justice commission on the IMPACTS grant program that is administered by the Criminal Justice

Commission. This program was designed to establish evidence-based and tribal-based programs to provide supports for individuals with frequent criminal justice and emergency services involvement. There had been an appropriation of $10M in the 2021-2021 biennium for these grants, and this program has gained interest. Although it was difficult to launch the services in the height of early pandemic context, there is another request for $20M to continue this funding to bolster existing programs and allow for new programs/jurisdictions to pilot other activities. It would be useful for this program to be examined for its alignment with the RFA that distributed money for the AA populations and to see if future work within IMPACTS can track individuals in the AA system as part of their focus.

**Community Restoration:**

In October, Behavioral Health Director Steve Allen and Interim Medicaid Director Dana Hittle wrote a letter to the CMHPs providing guidance for written assignment orders for individuals both civilly committed and in restoration services.

In *State v. Givens*, the Court of Appeals noted that charges are not required to be dismissed pursuant to ORS 161.370(13) solely because a defendant remains unfit for trial and had been previously committed for the maximum period of time allowable under ORS 161.370(10). This ruling therefore essentially can leave a defendant in indefinite commitment in the community for restoration purposes, even for minor charges. As seen in the data produced by OHA, this is happening, requiring resources for restoration in the community, which further has the potential to create backlogs in referrals from the hospital to the community. In essence, without a shift in the duration of community restoration, the backlog for discharges may worsen. As noted in my Second Report, I recommended restoration periods the equivalent for the community and the hospital, with the total restoration period across both systems being the same. This has generated much discussion and pushback particularly from prosecutors.

Community restoration also has raised questions about the role of jails. Washington County Judge Andrew Erwin ordered a defendant deemed still unfit to proceed into restoration services at the Washington County Jail in collaboration with the CMHP (so called "Gear Order").  In Washington County, Sheriff Garratt responded with a letter indicating his concern that restoration of fitness within a jail is "unsupported by statute."  He noted "It is difficult to reconcile the above statutory language requiring the court to release the defendant for community restoration services [underlined] with an order for the defendant to remain in custody to receive restoration services that the jail cannot provide." The Sheriff further cited the *Givens* case as well as the *Mink* decision itself in this matter to indicate that jails would not be the appropriate venue for restoration.

In testimony with Judge Mosman, there was also a question about some of the FAQs related to how the state will respond to the Court Order. One of the FAQ questions and responses reads as follows:

> 24**. If someone is released and placed on community restoration and ends up needing to go back up again to a higher level of care does the clock restart**? No. The federal court order limits the maximum lengths of inpatient restoration at OSH to 90 days (misdemeanors), 6 months (non-BM 11 felonies), and 1 year (B M11 felonies). Thus, after that length of inpatient restoration at OSH has run, the court may not recommit the person to OSH. Instead, the court could place the person in a higher level of community placement. For instance, if the person was in the community at home or at a residential treatment home but needed a higher level of care,

the court could place the person at an SRTF.
(see https://www.oregon.gov/oha/OSH/Documents/OSH-mink-mosman-FAQ.pdf)

In the Judge Mosman order of 9/1/22 there is language that states, "For purposes of this Order, restoration across multiple charges shall be consolidated and contiguous consecutive periods of restoration should be eliminated unless there are new charges incurred after an initial period of restoration has ended."   It appears there are different interpretations of what is allowable for total restoration across community and hospital stays. For example, if someone recompensates and is restored, and then decompensates, that would not be "contiguous", but if someone remains unfit, then in my opinion, returns to the hospital would represent a means of allowing longer OSH stays than permitted by the Federal Order.

**Input from Private Hospital Representatives:**

On 12/13/22 I was able to meet with representatives from private hospitals that included PeaceHealth, St. Charles, Unity Center for Behavioral Health (UCBH) Portland, Legacy Health System and Providence Health & Services, Oregon. I appreciated Mr. Eric Neiman's help in facilitating that meeting. The following describes some of the themes, generally written generically so as to not ascribe a statement to a particular program or hospital.

There was a robust discussion in explaining my role and asking for input on how these hospitals are experiencing the impact of the 9/1/22 order. Themes that emerged from their perspectives included issues that began in 2019 when OSH changed its policy to meet the demand for services to AA patients to shift admissions away from civil commitment and toward moving people out of jail. Many noted that there have been longstanding challenges with getting civil commitment patients admitted. There were statements that "no civil hospital patient has been admitted since 2019." (See contradictory data provided above in the OSH update section). They noted that in September 2020 there were exceptions made during the fires in Oregon when 10 patients had to be moved from hospital affected by the fire. When I asked for further clarifications, others stated that the issue was more about the challenges of the expedited admission protocol that they felt required too high of a bar to get patients admitted. They discussed extreme workforce shortages and felt that the community hospitals "have had to absorb people the state hospital has not had to take." They described that "people stay in our care for months." They described the difficulty providing long term care when they were set up for shorter term lengths of stays (about a week on average). They described patients found Never Able being admitted with a Magistrate hold. They spoke about boarding in the emergency departments, having to downsize capacity due to staffing limitations. They described changes in 2020 related to payment structures by the CCOs that causes them to lose money and "use profit in other areas to prop up behavioral health services." There had been meetings with state leadership prior to 2020, but those were felt not to be fruitful so the people I spoke with indicated they did not feel they were needed at that time. There were issues with counties assigning patients to the hospitals, and "higher recidivism" of patients discharged from the acute system with several hospitals speaking about discharging and re-admitting patients repeatedly increasingly (dozens if not more times), though even prior to any of the changes in the competency restoration timeframes.

In addition in the Legacy Reply Brief, the statement "Each year, more than 500 civilly committed individuals require treatment in Oregon….these patients suffer ongoing constitutional harm, as do the

DRO EX C, P. 15 of 22

community hospitals that are forced by the State to care for those patients. In short, the Oregon Health Authority ("OHA") has been civilly committing these patients to involuntary detention and treatment, but refusing to transfer them to the Oregon State Hospital…" A similar statement was made during the court hearing before Judge Mosman.  However, in further discussion with the private hospitals, the hospitals clarified that not all civilly committed patients at private hospitals are referred for admission to OSH. Although they stated that referrals are down because there is "no point" referring if people will not be admitted, even when admissions were at their height, only a very small percentage of patients admitted to private hospitals were referred to OSH.  Also, they agreed that they are licensed/certified to care for civilly committed patients in their facilities. There was no clear explanation of the Constitutional issues as mentioned in the briefs to the Court. Two patients were described who were physically deteriorating after a long length of stay at the private hospital, designed for short-term care. Mr. Neiman indicated that he might be able to describe the Constitutional concerns at a later meeting.

It was clear the private hospital system is under strain related to staffing and heightened demand (one hospital had received money from OHA to shore up staffing).   Yet in my discussion, the direct link of the various issues related to recidivism were broad in scope and explanation and pre-date the Court's 9/1/22 order. Much of the issues seem tied to staffing across both community and hospital systems, even if some of the issues were related to the change in policy in 2019 at OSH. At that time, there was a system shift in 2019 to expedite admissions from jails as non-therapeutic settings. Still, with the number of ties to the broader system, re-engaging in conversations with leadership at OHA and OSH separate from *Mink/Bowman* would be beneficial.

Of note, it is my understanding that the state will be filing a motion to dismiss the Legacy case, and either way the Federal Court will determine their standing in the multiple matters before the Court.

**Forensic Evaluation Models:**

According to OJD leadership, the GAINS workgroup continues to consider models for forensic evaluation services in Oregon. They have indicated that in response to my prior report more formal recommendations are still under consideration and will likely be available after January 2023.

**Input from Stakeholders including Prosecutors:**

In my last two reports I recommended that DRO work with the defendants to help develop and deliver a training regarding alternatives to hospitalization especially for restoration related to individuals charged with misdemeanants. That training was postponed twice upon conferring with me. It appeared the system was still adjusting to the 9/1/22 Order. Instead, I held a listening session in which individuals, such as Mr. Billy Williams were able to speak about some of their concerns and ask questions. It was clear that the idea of shorter community restoration time frames for prosecution brings up public safety concerns. I suggested that stakeholders examine the language of OHA's submitted legislative concept and offer amendments to it to allow the legislative process to play out. I would also welcome further suggestions from stakeholders about remedies to achieve compliance with *Mink*.

**Capacity-Boosting Solutions and Other Suggestions by the Counties:**

In the amicus brief filed by Marion and Washington counties, there were several suggestions made about less restrictive alternatives to the Judge Mosman order. It is important for the Court to be aware

that the solutions offered by the counties were either embedded already in recommendations or, in my opinion, not feasible given current circumstances. Also, most of the feasible remedies will take time. The 9/1/22 order has a chance of addressing a remedy sooner, unless the admission orders continue to rise significantly.

As for particular aspects of this amicus brief, it is also important to note that capacity at OSH was initially expanded at the outset of my recommendations with regard to fully utilizing the campuses available to the state, and with no longer pausing admissions due to COVID-19. It is further my understanding that there is not a legislative appetite (or has not been historically) for supporting the build of additional state hospital bed capacity, though Director Pat Allen suggested this might be a remedy in his legislative testimony in December. As noted above, additional SRTF beds, and additional slots at programs like Northwest Regional Reentry Center have been slowly made available, at the same time staffing shortages have created barriers to functionally increasing numbers of people served. I should note also that in discussions with plaintiffs and defendants there were considerations for whether a slot purchasing of beds with acute hospitals. This was ruled out given the pressures already faced by the private hospitals and challenges in taking on a court-involved population. Furthermore, the brief outlined a lack of housing opportunities- with the new 1115 Waiver centered on housing expansion, and the incoming Governor focused on housing, it is my understanding that this will be prioritized to make progress.

**Information from Progress Reports to the Neutral Expert**

Progress reports are submitted to me on a monthly basis, pursuant to the Court's order. A meeting to go over progress to date took place on 12/15/22. The state indicated they have completed 28 of the 75 recommendations from my Second Report. The information from October, November and December 2022 provides an overview of activities by the State. Below I provide some highlights:

- Completed items on or around September 15, 2022 through this report period:
  - Inventory of Competency Restoration Programs presented to Neutral Expert and DRO 8/15/22
  - Meeting with representatives from HSD and OSH to discuss tools for discharge assessments in addition to LOCUS to decrease reliance on LOCUS score-task listed as completed on 8/31/22
  - Development of a public facing *Mink/Bowman* website to inform stakeholders and provide public access to case related activities (recommendation I.A.4)- completed 9/16/22
- Ongoing Items Listed in Progress Reports Included:
  - OHA restructuring of CFAA to increase accountability over the next 3 to 5 years-status "remains on hold" due to other behavioral health new investment priorities
  - PDES research study underway related to Aid and Assist- data sharing agreements achieved with research underway
  - Review of contracts with CCOs and CMHPs to focus on AA and GEI population responsibilities (I.B.11 Pinals June 2022 Report)- reviews being finalized
  - OHA should ensure ongoing CCO enrollment for eligible individuals under AA for the past 2 years (II.6 Pinals June 2022 Report)- Intensive Services staff meeting with Medicaid and CCO partners to better coordinate for AA clients, and awaiting 1115

waiver approval. If that goes through, language will be added to the CCO contract to ensure engagement;

o Communication including an annual report related to outpatient competency restoration programs- status "in progress" with Intensive Services Unit staff reviewing this task

o Expansion of SRTF bed capacity- update from 10/19/22 from ColumbiaCare includes some expansion has occurred with increased capacity by late January, but workforce shortages may be a barrier

o HSD continuing to coordinate with CMHPs related to discharge and engagement expectations- letter sent out from OHA to CMHPs regarding "expectations related to coordination of care, discharge planning, and engagement expectations. Contract specialists from the intensive services team meet regularly with CMHPs to discuss ongoing needs and barriers."

o General Counsel for OSH will continue to support compliance through targeted communications with defense and prosecutors and MPD will make itself available to intervene as needed with defense lawyers to support adherence to SB 295 (1.B.9.a Pinals June 2022 report)- this work continues, however a barrier identified includes difficulty general counsel has in accessing certain records to intervene especially for Municipal Court and that "many parties/courts will still find Hospital Level of Care solely based on lack of placement."

o DOJ will continue to evaluate cases on a state-wide basis for legal intervention when it appears SB 295 is not being followed (1.B.9.b Pinals June 2022 Report)- Progress noted that as of 10/26/22 131 cases were evaluated for intervention, with 42 cases resulting in pleadings and 18 cases leading to conferring with counsel. DOJ filed motions to intervene in 19 cases, for which 10 were granted, four (4) were denied, and one was pending as of 11/3/22; work on this activity slowed in September due to efforts on the 9/1/22 order by Judge Mosman, though this intervention work resumed in mid-October.

o OHA to engage with Multnomah County Stakeholders to discuss feasibility of a jail population and 9(b) review committee- this was part of the Interim Settlement Agreement also between the parties and is reported as continuing with meetings every two weeks, and more recently includes individuals expected to be at End of Jurisdiction due to the 9/1/22 order by Judge Mosman, as well as individuals at risk of going to OSH

o Regular meetings with the parties are continuing

o Work with OJD and the Intensive Services Unit on pause related to implementation of the 9/1/22 Judge Mosman order, awaiting further data on its results

o By October 2023, OHA should enhance Outpatient Competency Restoration data reporting (II.3.b. Pinals June 2022 report)- efforts paused until June 2023, with plan for advocating for funding for this during legislative session 2023

o Discharge work related to OARs applicable to AA Ready-to-Place defendants (I.B.9.c-Pinals June 2022 Report)- not yet started but new OHA/HSD team member assigned to review

o Outpatient competency restoration program manual development- status reported that this would begin in December 2023 instead of October 2023 related to the new Court ruling

o Educational outreach to stakeholders delayed until 12/5/22 due to the implementation of the Judge Mosman order of 9/1/22

18

    o   Development of recommendations regarding evaluation practices (I.B.10 Pinals June 2022 Report)-meetings have been taking place spearheaded by OJD. A survey was administered to stakeholders that closed on 10/25/22. Work continues through OJD, and they have indicated this will now likely be done by the end of December.

Several of the recommendations were noted as "paused." These included:

- Meeting with the Office of Developmental Disabilities Services in order to assess the impact of the Federal Order
- Enhance community restoration program data reporting, paused until June 2023 with need to advocate for funding for data enhancements
- OHA exploration of means to access resources for community providers to prepare timely discharge plan development for GEI patients including evaluations by CMHPs- this work will be paused until March 2023 to account for time with the Federal Order
- Foster best practices in Community restoration paused to begin CROP manual development first in December 2023

**Legislative Activity:**

OHA filed a legislative concept LC 520 pursuant to my prior recommendations that modifies timing of progress notes for AA defendants and establishes maximum time periods authorized for restoration of defendants. The concept also directs OHA to work toward restoration services and establish recommendations regarding financial liability for defendants who lack fitness to proceed. The legislative concept also addresses issues of transportation back to court.

**Recommendations and Comments**

The parties continue to work tirelessly to meet and coordinate and to review potential strategies to help the state achieve compliance, yet, to be clear, compliance has not been achieved, benchmarks have not been reached, and more people are awaiting admission in jail than were identified in prior reports.

Over this last approximately three months, the state has faced enormous pressures related to a growing demand for competency restoration admissions, increasing forensic evaluation demands, amidst staffing challenges in community and hospital settings. The hospital has been under pressure to retool elements of care to meet CMS requirements. Numerous legal challenges related to access to OSH and issues pertaining to the plaintiffs' motion that led to the 9/1/22 Court order have required constant review and responsiveness to inquiries, motions and replies. Furthermore, barriers to progress, in my opinion, have included the number of cross litigation strategies attempted by stakeholders, which has led to the curtailment of dialogue and collaborative problem solving. Even the Aid & Assist workgroup has cancelled several meetings, with emails sent with debate and acrimonious communications. In my opinion, a major barrier is that there is not agreement despite a roadmap being set forth for the state. Yet the issues upon which there is no "consensus" have not changed (such as community restoration timelines) and many of the problems are being labeled as related to the new 9/1/22 order. It is too soon to see how that order will play out, as to date and over the future, most patients will continue to be discharged as they have over many years. To date as of the last data report, only 29 people were directly

discharged pursuant to the timelines in the Federal Order. Despite this low number, the concerns about what this might mean to the system have been voiced by many stakeholders.

Interestingly, many states continue to press forward to limit restoration of misdemeanants (Virginia and Ohio, for example, with Ohio eliminating restoration altogether for individuals charged with low level misdemeanor offenses, without discretion). Timelines for restoration are often shorter (60 days, for example, in Michigan and Ohio) for individuals with low level offenses, and community restoration is typically also time limited. Yet in Oregon, as noted in the data listed above, these cases continue to flow into OSH as the prioritized option available, despite the fact that on arrival, many individuals do not even meet hospital level of care. Once there, however, processes take place that require further waits for discharge.

Thus, in my opinion, the motion by the plaintiffs and subsequent order by the Court to limit hospital restoration time frames in accordance with prior recommendations was a well-considered reasonable approach to more expeditiously remedy the situation of individuals awaiting time in jail to access OSH and help the state achieve compliance.  I agree with the state's data analytics that this order has helped expedite discharges, but the unanticipated increase in orders to admit is likely to counter the progress and will continue to do so until the community system becomes more stabilized. Much of the build out of the services that the funding increases will develop have yet to be implemented. Stakeholders have been concerned that it took time for dollars to move from the state into the community system, but this seems now to be moving in a better direction. Increases in pay are happening as are approvals for staffing at OSH.  But staff availability remains a critical barrier.  Other remedies laid out in my Second report will continue to take time, though it will be very important that the state continue to move toward the package of recommendations as a roadmap developed in my second report.

In speaking to various people during these last few months, it is clearly notable to see the devotion to the care of persons with mental illness and other serious conditions, despite the extreme strains across systems. The many issues raised by the private hospitals, in my opinion, reflect years of underfunding a behavioral health system in dire need of support, a lack of parity in reimbursement for services, and the impact of the pandemic and other social drivers that have contributed to the substance use crisis across the United States only make the need for funding even more critical. Funding allocations provided to date are a start, but attention to housing and additional services and supports will be necessary to restabilize. Efforts to shift the landscape are underway, but they will take time to get programs and services to meet growing demand, given the complex interplay of issues. There is undoubtedly some overlap of people in the Aid and Assist process and the civil commitment process, but this also could relate to circumstances of their arrests (for example, individuals are at times arrested out of inpatient care and emergency departments (see DRO report cited in prior Neutral Expert reports). Regardless, it is my understanding that the Constitutional issue in this case is about individuals waiting in jail for access to a hospital level of care. Whether the Court determines the arguments of the private hospitals have merit remains to be seen, but it is clear that jails are not hospitals and cannot provide the same therapeutic type of environment as a hospital or a community care setting. As such, in working toward compliance with the *Mink* provisions for admissions from jails within 7 days of a restoration order, I will highlight a few comments for consideration.

1. **Ensure situational awareness of new leadership of the Mink/*Bowman* case**. I would strongly recommend that there be active discussions in the transition meetings for the new administration up to and including the Governor's transition team to quickly be informed about this case, and its pivotal role as a key driver of behavioral health system dynamics.

2. **Ongoing meetings of the parties**. It will be important with the impending leadership transitions to not lose track of ongoing meetings between the parties and the Neutral Expert to review data and to monitor progress toward the prior recommendations, as well as to develop any new recommendations as new information unfolds.

3. **Community Restoration timelines**: In my opinion, the potentially indefinite period of community restoration represents an ironic and challenging problem for the state, with over-reliance of competency services rather than other parts of the system, when that is not what restoration is intended to achieve. My recommendations about total restoration period of community and hospital restoration were laid out in my Second Report as a package. As it currently stands, defendants can spend their maximum time in hospital-based restoration, only to be discharged to indefinite community restoration, taking up slots for other individuals for whom community restoration would prove more useful. Furthermore, in my opinion, the use of the hospital for more time with a hiatus of community restoration if the individual has remained unable to aid and assist contiguously is problematic and could result in a system "work around" the Court's imposed time limits. To that end the Court may wish to consider a clarification of the order and/or an examination by the parties of community restoration as it impacts *Mink* compliance.

4. **Restoration placement determinations**: the Court may wish to attend to recent state court case ordering restoration in a jail setting, which raises significant concerns regarding the federal requirements of the *Mink* order as well as other potential risks for defendants unable to assist in their own defense.

5. **Legislative remedies**: the parties should continue to pursue legislative remedies as laid out in the LC 520 and in my prior recommendations.

6. **Focus on discharges**: Every effort should be made to examine discharge practices for both GEI and AA patients to expedite timely and safe processes. Prior recommendations covered remedies for this and these should be highlighted for more expeditious implementation (some have lead to pauses). This should be discussed further with the parties.

7. **Civil Admissions**: Although the *Mink/Bowman* case centers around Aid and Assist and GEI patients currently, for improved efficiencies and factual reporting, once the litigation is resolved, the state may wish to invite the private hospitals to begin meeting again to determine if there are improvements that can be made through collective strategic planning. With the looming number of contempt hearings and litigation toward the state, these conversations have been limited.

8. **Reconceptualization of trainings to promote diversion**: The previously recommended training has been indefinitely paused. The parties should continue to discuss what trainings or open forums might be helpful for information sharing that promotes diversion from arrest, diversion from the competency system, and diversion when appropriate from OSH and into community restoration when appropriate.

9. **Ongoing data collection and review of system dynamics**: the state should continue to review data with the plaintiffs and in joint discussions with the neutral expert pertaining to outcomes of

DRO EX C, P. 21 of 22

the 9/1/22 Federal Court Order. This information should be shared widely to inform the public and be refined to report back to the Court for the upcoming hearing in April 2023.

I would again like to acknowledge the many individuals whose perspectives and input have been invaluable in shaping my contributions to the Oregon behavioral health AA and GEI efforts and the broader behavioral health system, and whose work is laudable even under circumstances that require extra effort with strained resources and at times contentious conversations.

I would like to commend the parties again especially for their firm commitment to work together with me to help the many individuals inappropriately waiting for placements in jails and OSH when they need more timely access to the less restrictive services they deserve. I greatly appreciate the help of the leadership and staff at OHA, OSH, DRO, MPD, OJD, and the PSRB in this work. I would like to acknowledge the leaders who will be transitioning on for their public service and acknowledge the new leaders who will be onboarding to carry on the work of remedying this decades-old matter. I also acknowledge with gratitude Mr. Cody Gabel who again assisted me in coordinating meetings and tracking information I requested, and to the OSH team, including Mr. Scott Hillier for his data support used to inform these recommendations.

**Respectfully Submitted,**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*

DRO EX C, P. 22 of 22

**D e b r a   A .   P i n a l s ,   M . D .**

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Fifth Report**
**Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** 4/17/23
**Neutral Expert:** Debra A. Pinals, M.D.

**Background and Context of this Report**

On 12/21/21, the Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as a Neutral Expert in granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case. Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman's order stipulates further that OHA enter into a contract with the Neutral Expert and provide any needed information to her.  The Court ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)."  The Court further ordered a second report by the Neutral Expert to include "a short report and recommendations for a proposed long-term compliance plan for OSH."  I submitted my First Report on 1/30/22 and Second Report on 6/5/22 to the Court in accordance with those orders. Then, on 6/7/22 the Court ordered my ongoing appointment and stated, "Beginning on September 7, 2022, Dr. Pinals will provide brief quarterly reports to update the Court regarding compliance status and any needed additional recommendations to address any barriers to achieving compliance." The following reports have since been submitted: Third Report on 9/15/22 and Fourth Report on 12/21/22.

In accordance with the Court's order and given the many moving parts to this matter, this report will reflect a brief summary as my Fifth Report in this matter.

**Background and Summary of the Two Consolidated Cases**

A more detailed background to these cases is reviewed in my prior reports. In summary, state defendants were previously found by the Ninth Circuit (*OAC v. Mink, 2003*) to be out of compliance with Constitutional requirements and were ordered to admit individuals found unable to Aid and Assist to Oregon State Hospital for restoration within seven (7) days. Compliance with that order has been an ongoing challenge with some periods of improvement, but it faltered further around the COVID-19

pandemic. In December 2021, after further litigation, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide recommendations to help achieve compliance with the Ninth Circuit's seven (7) day admission requirement. Since that time, efforts toward compliance have continued but compliance has yet to be achieved.

In a separate litigation, in November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after the Honorable Nan Waller had ordered them to OSH for treatment, without unreasonable delay. After further litigation, The Honorable Marco A. Hernandez, United States District Court Judge, did agree with the defendants that a consolidation of the *Mink* and *Bowman* cases made sense. At the time of the appointment of the Neutral Expert for the consolidated cases, the parties entered an interim agreement that no individuals found GEI would wait longer than four months for admission to OSH.

The Neutral Expert First report recommended that given the much smaller number of GEI cases, and the longer waits in jail for a hospital bed for that population, that there be one waitlist for people waiting in jail for a bed at OSH, whether GEI or under the Aid and Assist process. Both those waiting times continue to be tracked as part of this consolidated litigation.

**Qualifications to Perform this Work**

My qualifications to render opinions as the Neutral Expert were described in my first report. In summary of that experience, I have worked for almost twenty-five years as a clinical and academic and forensic psychiatrist, and over twenty years functioning in state and local level behavioral health administrative leadership, management, policy and legislative development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions.

**Sources**

Background court and legal documents I have reviewed during this interim period for this matter include:

1. *Mink* 0339 Court Order Granting Motion for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;
2. Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21;
3. Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21;
4. Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20;
5. *Mink* and *Bowman* Interim Agreement, Filed 12/17/21;
6. *Bowman* 1637 PLD Plaintiffs 1st Amended Complaint #22;
7. Order on Joint Stipulation to Continue Appointment of Neutral Expert, signed by the Honorable Michael W. Mosman, 6/7/22;
8. January 30, 2022, Neutral Expert First Report, dated 1/30/22;

DRO EX D, P. 2 of 21

9. June 5, 2022, Neutral Expert Second Report, dated 6/5/22;
10. September 15, 2022, Neutral Expert Third Report, dated 9/15/22;
11. *Bowman* Opinion and Order, Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), signed by Judge Mosman 8/16/22;
12. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 9/1/22;
13. Legacy Hospital 1460 PLD Motion to Dismiss (#30);
14. Legacy Health 1460 PLD Disability Rights OR Unopposed Mtn for Amicus Brief #32 (L183147-01);
15. Activity in Case 3:02-cv-00339-MO Oregon Advocacy Center et al v. Mink et al Opinion and Order Denying Intervenor's Mtg to Modify 9.1.22 Order (#338), signed 1/9/23 by The Honorable Michael W. Mosman;
16. Intervenors' Response to Plaintiffs' Motion to Clarify Order on Intervention;
17. Plaintiffs' Response to Amicus Brief in Support of the Motion to Dismiss Plaintiffs' Amended Complaint;
18. Legacy Hospital 1460 PLD Def's Reply ISO MTD #55 (L183147-01);
19. Unopposed motion for extension of time to discharge (up to five) patients;
20. Plaintiffs' Motion for Order Requiring Marion County Sheriff to Transport Patients and Docket 360 Declaration of Derek Wehr;
21. Oral Argument Transcript of Proceedings Before The Honorable Michael W. Mosman, Case No. 6:22-cv-01460-MO, 3/31/23 (hearing 4/4/23); and
22. Mediation documents as permitted by amici, intervenors, plaintiffs and defendants.

Although some documents may have been inadvertently not included or not included in detail for confidentiality reasons, additional background documents I have reviewed in the interim between this report and my prior report include the following:

1. OSH Forensic Admissions and Discharge Bi-Weekly Reports;
2. OSH Forensic Admission and Discharge monthly data dashboards January to April 2023;
3. Monthly Average Wait Time Prior to Admission Progress Metrics for Benchmark Goals;
4. *Mink & Bowman* Monthly Progress Reports from OHA from January, February, March and April 2023;
5. Letters from Steve Allen for CHOICE, Civil, and Aid and Assist clarifications
   a. "CHOICE Letter…"
   b. "CMHP Letter…"
6. OHA Aid and Assist Legislative Concept
   a. "LC0520 DRAFT…"
   b. "LC 520 OHA Explanatory…"
7. Information on provider fee increases
   a. https://www.oregon.gov/oha/HSD/OHP/Pages/BH-Rate-Increase.aspx
8. Mink/Bowman Progress Update Meeting PowerPoint
   a. "12.15.22 Neutral Expert Task Updates – Final Presentation"
   b. "12.15.22 Neutral Expert Task Updates – Final Appendices"
9. Community Navigator Program Comparisons
   a. "CN Models Review"

DRO EX D, P. 3 of 21

10. Aid & Assist Patient LOCUS Score Analysis September 2019 through September 2022;
11. Presentation on Information Court Must Consider When Determining Appropriate Placement, prepared by Debra Maryanov, Oregon Judicial Department, 12/6/22;
12. Aid & Assist Placement Data sent to OHA from OJD received on 12/20/22;
13. Notice RE 10-day HLOC assessments and follow up letter, dated 1/10/23;
14. Email communications December 2021 regarding the OSH Notice regarding hospital level of care assessments by day 10;
15. Impacts Legislative Report 2023;
16. Introduced HB 2460;
17. Introduced SB 219;
18. Introduced SB380-01;
19. Marion County Orders ordering Sheriff not to transport a defendant until an updated progress report pursuant to ORS 161.371;
20. AOCMHP Recommendations for solutions to over-representation of Aid and Assist clients at OSH;
21. Felony Measure 11 Tracking Sheets;
22. Disability Right's Oregon Support of SB 219 draft testimony;
23. Letter to Superintendent Dolores Matteucci from The Honorable Audrey J Broyles, Marion County Circuit Judge, dated 2/22/23;
24. Two sample FES reports sent by Mr. Jesse Merrithew;
25. Legal skills curriculum for OSH (Legal Understanding, Working with Your Attorney, and Making Decisions in Your Legal Case);
26. Civil expedited admissions protocol from June 2023;
27. OHA Behavioral Health Presentation 2023 received by Ms. Carla Scott on 4/3/23;
28. Sample Continuing Care Discharge Plan documentation from OSH;
29. OSH .370 Order;
30. Behavioral Health Financial Assistance Agreement contract negation language provided by Mr. Brad Anderson, 4/11/23;
31. OJD 365 Evaluations data 3.24.23 and OJD Aid & Assist Data 2.17.22;
32. Request for Response: FCP OAR 309-090-0025 Rule Revisions and miscellaneous responses;
33. Lewis and Clark Law Student Data Analysis draft report and presentation;
34. Data on civil commitment, voluntary, and voluntary by guardian admissions, sent to me on 4/14/23 from Mr. Scott Hillier; and
35. Miscellaneous media stories, including Lund reports.

Regular/semi-regular meetings during this interim period from my prior report including the following meetings and discussions:

1. Periodic meetings and communications with Judge Mosman and Judge Beckerman;
2. Numerous meetings with OHA staff including Mr. Cody Gabel , Mr. Bill Osborne (currently OSH staff as of the time of this writing), OSH staff Mr. Scott Hillier regarding data requests, Drs. Beckman and Davies and Ms. Micky Logan regarding FES, and Dr. Sara Walker, CMO OSH, Ms. Della Hoffman, Director of Social Work, OSH and others;

3. At least Weekly or bi-weekly meetings and several ad hoc meetings with OHA, OSH, DRO and MPD representatives and leaders both separately and together.  In addition, I met with staff from these agencies at various points in this interval period.
   a. From OHA, OSH, the weekly/bi-weekly leadership meetings have included:
      i. Prior administrative leaders, Steve Allen, Director of Behavioral Health, OHA, Dawn Jagger, Chief of Staff, OHA
      ii. Prior administrative leaders including Yoni Kahn, former Chief of Staff, OHA;
      iii. Current administrative leaders including Ms. Ebony Sloan Clarke, Director of Behavioral Health, OHA; Mr. Dave Baden, Interim Director of OHA, and Dr. Dana Hargunani, recent CMO, OHA
      iv. Dolores Matteucci, OSH Superintendent-CEO
      v. Ms. Lindsey Burrows, Deputy General Counsel, Office of Governor Kotek
      vi. Ms. Annaliese Dolph, Behavioral Health Initiative Director, Office of Governor Kotek
   b. From Oregon Department of Justice (DOJ):
      i. Carla Scott, DOJ Special Litigation Unit Counsel
      ii. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
   c. From Disability Rights Oregon (DRO), Emily Cooper, Legal Director, and Dave Boyer, recently onboarded at DRO as Managing Attorney
   d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC
4. Periodic discussions with OJD representation through Judge Nan Waller, Multnomah County

I have also had numerous discussions with individuals and groups, including but not limited to:
1. Listening session hosted by former OHA Director James Schroeder and Governor Kotek's Behavioral Health Initiative Director, Ms. Dolph, on 2/9/23;
2. Meeting with Dr. Alison Bort, Director, PSRB, with then OHA leadership, on 2/16/23;
3. Meeting with Ms. Cherryl Ramirez and AOCMHP leadership, 2/23/23 as well as other discussions with Ms. Ramirez;
4. Meeting with Mr. Billy Williams, 3/2/23;
5. Meeting with Mr. Eric Neiman, 3/30/23 and several subsequent telephone conversations with him;
6. Meeting with Mr. Billy Williams and Washington County District Attorney Kevin Barton on 4/4/23;
7. Meeting with representatives of Private Hospitals including Peace Health, Unity and Providence Hospitals, 4/4/23;
8. Meeting with Washington County representatives Mr. Tom Carr and Mr. Brad Anderson, 4/10/23.

I participated in a site visit and tour of OSH Salem Campus on 3/17/23. I observed a Court hearing that took place on 4/4/23 regarding the issue of transport of Aid and Assist patients.  I also participated in two formal mediation sessions overseen by The Honorable Stacie Beckerman, one in-person on 3/16/23, and one by video on 4/10/23, involving representatives from private hospital intervenors and their counsel, as well as amici judges, county officials, and district attorneys and their counsel, as well as the parties to the Mink/Bowman case. Because of the confidential nature of that mediation further, details will not be provided in this report, though in principle the goal is to come to some agreement between

DRO EX D, P. 5 of 21

the amici and intervenors and the parties that could help move toward compliance while compromising on various positions represented by the various stakeholders in their prior court motions. I note as well that Hearings about transportation by the sheriffs and action on the state's motion to dismiss the filing by the private hospitals are still pending as of this writing.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
FES: Forensic Evaluation Services
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
ISU: Intensive Services Unit
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
MPD: Metropolitan Public Defender
OCBH: Oregon Council for Behavioral Health
OCDLA: Oregon Criminal Defense Lawyers Association
OHA: Oregon Health Authority
ORPA: Oregon Residential Provider Association
OSH: Oregon State Hospital
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities During this Reporting Period:**

I have continued to meet with the state and the plaintiffs regularly to discuss progress and the implementation of my recommendations. This has been a busy time with numerous transitions in leadership across the state. I have been reviewing data throughout this interim period to help inform progress toward compliance and my work. I made a site visit to Oregon in March 2023 for the first mediation session and a tour of OSH.

**Data Summaries**

*Background Data*: Data received shows progress being made toward compliance. That said, this may be an artifact of two cohorts (Cohort 1 and 2) being discharged in a concentrated manner simultaneously. Also, with the number of AA orders continuing to increase, the trajectory may not be sustainable. Nevertheless, it does appear preliminarily that the 9/1/22 order by the Court is achieving the desired effect toward compliance. **Figure 1** and **Table 1** show decreasing numbers of people waiting for admission, with a downward in days waiting. For the average numbers of days people are waiting in a snapshot of the waitlist, one can see that this was 11.1 days on 4/1/23 compared to 21.7 days on

12/1/22.  For individuals who were admitted the month prior (which is different from the snapshot average), defendants waited an average of 20.4 days during this reporting period, as opposed to 28.5 days noted at the end of November 2022, which is again going in a positive direction toward compliance (see also **Figure 3** for trends).  The days waiting for placement with the Ready to Place list from OSH and the numbers of people waiting for discharge is growing, as seen in **Figure 1**.  With 84 people determined by the hospital as ready to place in the community, if those individuals could be discharged, then the 51 people waiting for admission could be admitted, and the state would return to compliance. The number of GEI patients thought by the hospital to no longer need hospital level of care is also trending upward this reporting period. A concentrated effort at discharge of patients who are ready for discharge is critical.

**Figure 1. Data Dashboard Charts Reflecting Progress in *Mink/Bowman* as of March 31, 2023**



**Table 1. Individuals Awaiting Admission**

| 1. Regarding individuals on OSH admission list with signed and received A&A court order | | | | | | |
|---|---|---|---|---|---|---|
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* | *As of 4/1/23* |
| Total Number of individuals | 46 | 93* | 67 | 70 | 104 | 51 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Average days current individuals have been waiting | 15.8 days | 22.5 days | 16.2 days | 19.8 days | 20.7 days | 11.1 days |
| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days | 3-34 days | 1-36 days | 1-18 days |
| **2. Regarding individuals found GEI and ordered to OSH** | | | | | | |
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* | *As of 4/1/23* |
| Total number of individuals | 15 | 4 | 3 | 4 | 0 | 1 |
| Average days waiting | 45.6 days | 23 days | 18 days | 13.0 days | N/A | 26.0 days |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days | 3-20 days | N/A | 26 days |

*The marked increase in numbers awaiting admission was most likely a residual of the pauses in admissions due to COVID-19

**Table 2** and **Table 3** show the capacity and census at OSH, which uses an operational active capacity metric and as of 4/1/23 had a census of 691 patients, the majority of which are in the A &A process. There are some vacancies in a neuro-geriatric unit that is going back to its pre-COVID-19 capacity. Overall, the hospital is operating at about 97% active capacity.

**Table 2: OSH Bed Capacities as of 4/1/23***

| Site | Licensed Capacity | Active Capacity |
|---|---|---|
| Salem Main Campus HLOC | 502 | 472 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **559** |
| Junction City HLOC | 76 | 73 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | **151** | **145** |
| **OSH Total** | **743** | **704** |

* Two Salem HLOC beds are temporarily offline

**Table 3**. OSH Census as of 4/1/23

| Date | Aid & Assist | PSRB | Civil Commitment | Other | Total |
|---|---|---|---|---|---|
| 9/1/2022 | 410 | 275 | 14 | 1 | 700 |
| 12/1/2022 | 396 | 279 | 13 | 0 | 688 |
| 4/1/2023 | 400 | 279 | 11 | 1 | 691 |

The ever-increasing demands on admissions for restoration are striking (See **Table 4** and **Figure 2**), with record numbers in January and March of 2023. Although the reasons for this are not clear, one theory that several stakeholders told me about was that as an unintended consequence of the 9/1/22

DRO EX D, P. 8 of 21

order that more individuals are being discharged into community restoration secure settings, which in turn now may be full. Thus, OSH may be the option viewed as appropriate by the Court for new defendants who might otherwise have been diverted to community restoration. Others have speculated that the Court is catching up with criminal filings after the pandemic. These are various hypotheses and will require further analysis.  Trends for GEIs show some stability in order numbers but a slight increase in revocations in March 2023.

**Table 4. Aid and Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|---|---|---|
| April 2022 | 80 | 7 (4 standard/ 3 revocations) |
| May 2022 | 77 | 7 (4 standard / 3 revocations) |
| June 2022 | 75 | 6 (4 standard / 2 revocations) |
| July 2022 | 65 | 5 (3 standard / 2 revocations) |
| August 2022 | 74 | 7 (4 standard / 3 revocations) |
| September 2022 | 84 | 6 (5 standard / 1 revocations) |
| October 2022 | 95 | 3 (3 standard / 0 revocations) |
| November 2022 | 95 | 6 (2 standard / 4 revocations) |
| December 2022 | 73 | 4 (4 standard / 0 revocations) |
| January 2023 | 109 | 3 (3 standard / 0 revocations) |
| February 2023 | 74 | 5 (3 standard / 2 revocations) |
| March 2023 | 108 | 7 (2 standard / 5 revocations) |

**Figure 2. Aid & Assist Admissions/Orders Trends through March 2023**



**Figure 3** shows progress toward benchmarks and in the director toward compliance set forth in my June 2022 report. Again, although trends appear to be positive, compliance benchmarks have not

been achieved, and increases in admissions or other pressures could result in waitlist trend lines going up in the next few months.

**Figure 3. Admission Wait Time Projections Compared to Benchmarks Set in Second Report based on data as of 4/1/23**



**Figure 5** below shows data related to the order by Judge Mosman. At this time, of the 409 individuals who were in OSH at the time of the 9/1/22 order (so-called "Cohort 1"), only 42 were in the hospital as of 4/1/23 on their initial restoration order. It is unclear at this time how many have returned to the hospital, though this would be important to track over time. As noted further in **Figure 5** and **Table 5**, most patients are being discharged after being found able, and many are sent to community restoration. It is my understanding that the data for discharge reasons is such that those discharged prior to the end of restoration as unable and ordered to community restoration are labeled as "community restoration" discharges. Individuals discharged at the end of the Federal Court 9/1/22 restoration time may or may not be ordered to community restoration. This is not data that is depicted in the chart below, though it is something that I will be reviewing going forward. As I have noted in prior reports, increased demand on community restoration services raises several concerns, including the use of resources for restoration that may yield little restorative benefits after a period of hospitalization, while making throughput of bed utilization more challenging.

**Figure 5. Discharge Data Related to the 9/1/22 Order by Judge Mosman**

- **Cohort 1:** Patients at OSH at the time of the Federal Court Order
- **Cohort 2:** Patients admitted to OSH after the issuance of the Federal Court Order on 9/1/22

| Cohort 1 | At OSH as of 9/1/2022 | At OSH as of 4/1/2023 | Restoration Limit Notice Outcomes 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Discharge Reasons Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | Total Discharged |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Misdemeanor | 85 | 0 | 51 | 25 | 26 | 18 | 2 | 29 | 7 | 26 | 3 | | 85 |
| Felony | 217 | 10 | 100 | 28 | 62 | 68 | 13 | 54 | 10 | 62 | | | 207 |
| Violent Felony | 107 | 32 | 25 | 10 | 3 | 36 | 27 | 5 | 2 | 3 | 2 | | 75 |
| Total | 409 | 42 | 176 | 63 | 91 | 122 | 42 | 88 | 19 | 91 | 5 | 0 | 367 |

| Cohort 2 | Admitted since 9/1/2022 | At OSH as of 4/1/2023 | Restoration Limit Notice Outcomes (total since 9/1/2022) 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Discharge Reasons (total since 9/1/2022) Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | Total Discharged |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Misdemeanor | 217 | 94 | 97 | 31 | 50 | 37 | 12 | 18 | 5 | 50 | 1 | | 123 |
| Felony | 344 | 198 | 42 | 15 | 10 | 88 | 12 | 30 | 6 | 10 | | | 146 |
| Violent Felony | 100 | 68 | 1 | | | 28 | 4 | | | | | | 32 |
| Total | 661 | 360 | 140 | 46 | 60 | 153 | 28 | 48 | 11 | 60 | 1 | 0 | 301 |

**Table 5. Legal Status of AA Discharges in March 2023 based on Hospital Data and Hospital Restoration Limits**

### March 2023 A&A Discharges

| Reason | Cohort 1 | Cohort 2 | Total |
|---|---|---|---|
| Able | 0 | 45 | **45** |
| Never Able | 4 | 13 | **17** |
| Community Restoration | 4 | 21 | **25** |
| Dismissed | 1 | 1 | **1** |
| Restoration Limit | 18 | 22 | **40** |
| **Total** | **27** | **102** | **129** |

Although the 9/1/22 Court Order related to length of restoration has allowed for the increase in discharges, with the actual numbers of admission orders far exceeding those that were originally projected, compliance with *Mink*'s seven-day admission provision by March 2023 was not achieved as projected initially and as depicted in **Table 6**.

**Table 6. Projections vs. Actuals Admissions, Discharges, and New Restoration Orders**

| Month | Projected Discharges | Admissions | New Orders | Admit List | Actuals Discharges | Admissions | New Orders | Admit List |
|---|---|---|---|---|---|---|---|---|
| Sep-22 | 67 | 67 | 74 | 77 | 85 | 76 | 84 | 86 |
| Oct-22 | 90 | 90 | 74 | 61 | 90 | 91 | 95 | 90 |
| Nov-22 | 90 | 90 | 74 | 45 | 85 | 81 | 95 | 104 |
| Dec-22 | 95 | 95 | 74 | 24 | 92 | 77 | 73 | 90 |
| Jan-23 | 97 | 97 | 74 | 10 | 93 | 101 | 109 | 98 |
| Feb-23 | 97 | 97 | 74 | 10 | 94 | 107 | 74 | 70 |
| Mar-23 | 107 | 107 | 79 | 10 | 129 | 128 | 108 | 51 |

Restoration in the community is complex, and one of my earlier recommendations was to enhance data collection for this service. Data that is available is presented in **Table 7,** showing that 130 community restoration episodes lasted for over one year (987-857=130), despite the fact that defendants charged

with lower-level offenses are often the ones who are in community restoration.  The maximum duration of restoration is unlimited by statute, and according to this OHA data for the period of data collection, the maximum days in restoration was 1399, and the median was 147 days. I note that data presented in my Fourth report showed the maximum number of days was 1222 and the median was still 147 days. There were 875 completed community restoration episodes up through 6/30/22, and 991 through 9/30/22, meaning that there were an additional 116 community restoration episodes in the last three months of data.

**Table 7. CMHP Reported Completed Community Restoration Data 1/1/2019-9/30/2022**

| CMHP Reported Completed Community Restoration Data 1/1/2019-9/30/2022 | | |
|---|---|---|
| # of Completed Community Restoration Episodes** | 991 | |
| # of Days Minimum | 0 | |
| # of Days Maximum | 1399 | |
| # of Days Mean | 197 | |
| # of Days Median | 147 | |
| Days in Community Restoration | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** |
| 0-90 | 311 | 31.38% |
| 0-180 | 588 | 59.33% |
| 0-365 | 857 | 86.48% |
| 0-730 | 974 | 98.28% |
| 0-1095 | 987 | 99.60% |
| *Missing Marion County Data for 7/1/2022-9/30/2022 | | |
| ** Completed does not reference success of restoration, but rather indicates that the community restoration episode | | |

Data from an Oregon Judicial Department data analysis showed the Court cases for Aid & Assist doubled between 2020 and 2023 with 619 active cases on 1/1/20, and 1256 cases by 2/1/23 (See Figure 6).  In **Figure 7**, OJD has presented data showing the percentage of cases committed to OSH by County. They note that some numbers are very small, which may skew the impressions of the data. The reasons for higher percentage commitments to OSH are many, but it might be useful to understand the drivers of these outcomes across the state, examining local practices and availability of community resources for outpatient restoration, for example.

DRO EX D, P. 12 of 21

Oregon Neutral Expert Fifth Report Regarding *Mink/Bowman*
4/17/23

**Figure 6. Aid & Assist Caseload According to OJD Data**



**Figure 7. Percentage of Defendants Unfit to Proceed Committed to OSH by County per OJD Data**

| Of Defendants Who are Currently Unfit to Proceed, Percent Committed to OSH | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| COURT | % OSH | Current A&A Caseload | Current Placement OSH | COURT | % OSH | Current A&A Caseload | Current Placement OSH | COURT | % OSH | Current A&A Caseload | Current Placement OSH |
| Harney | 100% | <5 | <5 | Clackamas | 59% | 59 | 35 | Clatsop | 42% | 12 | 5 |
| Morrow | 100% | <5 | <5 | Multnomah | 59% | 160 | 94 | Union | 40% | 5 | 2 |
| Wallowa | 100% | <5 | <5 | Marion | 58% | 110 | 64 | Lincoln | 36% | 14 | 5 |
| Linn | 79% | 19 | 15 | Malheur | 56% | 9 | 5 | Jefferson | 33% | <5 | <5 |
| Umatilla | 79% | 19 | 15 | Deschutes | 53% | 34 | 18 | Tillamook | 33% | 15 | 5 |
| Jackson | 77% | 44 | 34 | Josephine | 53% | 17 | 9 | Klamath | 29% | 14 | 4 |
| Baker | 75% | <5 | <5 | Crook | 50% | <5 | <5 | Hood River | 0% | <5 | <5 |
| Polk | 75% | 28 | 21 | Curry | 50% | 14 | 7 | Sherman | 0% | <5 | <5 |
| Benton | 71% | 17 | 12 | Lake | 50% | <5 | <5 | Wasco | 0% | <5 | <5 |
| Lane | 68% | 105 | 71 | Douglas | 48% | 42 | 20 | Gilliam | NA | 0 | NA |
| Coos | 60% | 15 | 9 | Yamhill | 46% | 13 | 6 | Grant | NA | 0 | NA |
| Washington | 59% | 91 | 54 | Columbia | 44% | 16 | 7 | Wheeler | NA | 0 | NA |

This table shows the number of unfit defendants committed to OSH by each jurisdiction but does not explain the variations.

OJD Aid & Assist Data (data current as of 2/13/23)                    2/17/2023      8

Forensic Evaluation data is also showing increased demand for services, and the FES staff have indicated that they continue to get orders for evaluations of people outside of OSH. **Table 8** shows recent data on active cases for which FES has been assigned to evaluate, 311 of which are not currently at OSH.

**Table 8. Number of Active FES Cases as of 4/6/23**

| Type of Evaluation and Location | Number |
|---|---|
| .370 Evaluations at OSH | 394 |
| .370 Evaluations not at OSH | 197 |
| .365 Evaluations at OSH | 98 |
| .315 Evaluations not at OSH | 16 |
| Total Cases | 705 |

DRO EX D, P. 13 of 21

**Updates Since my December 2022 Fourth Report**

**Updates from OHA:**

In the period since my last report, Oregon has elected Governor Tina Kotek, and has seen the transition from OHA Director Pat Allen and Behavioral Health Director Steve Allen, as well as Chief of Staff Dawn Jagger. Each of these OHA leaders had been significantly involved in the work of *Mink/Bowman*. It was not clear in the transition how much the work was able to be briefed for Governor Kotek from Governor Brown initially. Mr. James Schroeder was named OHA director, and his Chief of Staff, Mr. Yoni Kahn was assigned to the work. In addition, Ms. Annaliese Dolph was appointed to lead behavioral health initiatives for Governor Kotek. During several meetings with them there was back and forth about SB 219 proposed legislation by OHA. When asked, I initially received unclear messages from OHA and Ms. Dolph about whether this bill would be supported by the high-level executive branch leaders, though eventually Mr. Kahn was able to receive positive word that the legislation would be supported. As this was happening, Mr. Schroeder and Ms. Dolph held a listening session town hall in which stakeholders conveyed their concerns about the 9/1/22 Federal Court order and other matters pertaining to the behavioral health system. After the listening session there was a plan to hold workgroups, but in our all-parties meetings several questions were raised about whether this plan would derail from the roadmap set forth previously. Shortly thereafter Mr. Schroeder put in his resignation, creating a need to re-orient to new leadership once again. Mr. Dave Baden was named in an interim capacity to lead OHA and Ms. Ebony Clarke came in as Behavioral Health Director. I have met with both and noted their strong investment in helping the state achieve compliance. Other transitions include the following: Mr. Kahn left his position, Mr. Bill Osborne transitioned from OHA to OSH staff, Ms. Dolph has been less involved in the all-parties meetings than previously, and Ms. Lindsey Burrows from the Governor's Office of the General Counsel has been actively participating. Ms. Clarke indicated that she has multiple vacancies on her team and is actively recruiting.

Taken together, the transition has not been as smooth as one would have hoped, but it does appear to be settling down some with the current leadership in place. I have been very appreciative that Dr. Hargunani has stayed within OHA for the time being to help ensure follow up to details and coordination with the state leaders. Ms. Carla Scott and Ms. Sheila Potter have also worked diligently to help their clients get caught up on the litigation and the recommendations to date.

While all the state leadership transitions were happening, in January as soon as she entered office, Governor Kotek declared houselessness as a state emergency and is invoking her powers to help combat this issue. This will undoubtedly help many of the individuals in forensic processes who are also houseless, and I look forward to seeing if there can be some initiative overlap in this regard.

The state's work on the recommendations for community-based services set forth in my Second Report will be reviewed in future meetings with the parties. However, during this interim period the work on these recommendations has not had the same elevated attention by the state or in the work with the parties due to the many moving parts of the system and the litigation.

**Oregon State Hospital Updates:**

Ms. Dolly Matteucci has contributed greatly to the activities related to this case, and it has been very helpful to have a steady hand helping sort through mechanisms to achieve compliance especially with all the leadership transitions for the state. The staff at OSH have been working diligently navigating record numbers of admissions and discharges to keep pace with the orders coming in, shifts in the time demands for the Hospital Level of Care (HLOC) considerations, and new restoration limits. At the end of February, I met with the professional staff at their annual meeting and listened to their concerns and ideas. There were several suggestions made, including an examination of medication practices that could be helpful. Although they feel they are doing the best they can, they reported some degree of demoralization given the number of times their work is viewed negatively, despite the fact that they are doing more with fewer resources, and are keeping pace with an onslaught of admission orders. The meeting was productive, and I look forward to hearing more from them over time.

Another issue that surfaced was when OSH sent a notice out in January about the change in HLOC determinations to day 10. This created some challenges for the CMHPs, and a clarification was issued at the request of Ms. Ramirez.

An additional ongoing concern is that the FES evaluators are finding themselves with increasing numbers of orders including for those in the community.

I met with several members of the clinical and forensic evaluation team to help review the Measure 11 cases that were due to be discharged by 3/15/23. After discussing these cases, there were five patients for whom additional time flexibility was sought and granted by the Court. This involved getting clinical updates to determine whether the individuals would meet civil commitment criteria, were not fit to stand trial, and/or would be subject to 701 commitment petitions by the district attorneys. There was a need to also identify housing or placement in the community. From conducting that review, many other patients were able to have discharge strategies catalyzed.

Dr. Walker and I met with Ms. Matteucci to review the civil expedited admission criteria. There is ongoing discussion about the existing criteria as noted in my Fourth Report, given concerns raised by the private hospitals that the criteria preclude the admission of people whose hospital course necessitates a stay at OSH. Through those discussions other needs were identified for information sharing. More work will likely be done to help achieve this.

**OSH Site Visit Meeting with Patients**

During my site visit I met with two patient groups and observed a legal skills group in process. For the two informal meetings with patients, DRO attorneys were present as was Ms. Carla Scott from DOJ. One of the patient groups I met with included about five patients, four of whom were hospitalized under a restoration order, and one was hospitalized under a 701 order. The patients varied in their length of stay, with one person at OSH for 1.5 years, and another having just arrived at the end of February. We heard the comments that it was "better than jail." One patient described that in jail he had been in segregation much of the time, had been biting his arms and had been suicidal. One woman stated that she had been staying at OSH for about three months, but at the Marion County Jail she had been in isolation for 30 days. She stated she experienced hearing a microchip in her head, but when she went before the court, the Judge did not believe her- and she stated her experience in court was painful, as a Judge had used disparaging language referring about her diagnosed mental illness of schizophrenia, and

DRO EX D, P. 15 of 21

stated in open court that she did not believe the patient. Another patient described himself as a veteran having previously had mental health support through the VA. One of the patients had been living in a carboard box on the streets. He stated he had been at OSH once before and had been admitted related to low level charges. The social worker at OSH had gotten him connected to shelter care and homelessness supports, but then he was charged with Trespassing and Harassment and his supports "dissolved."  He described a sense of dread and despair about "going back to the carboard box." The patient who was committed on the 701-commitment described how limited his options would be for placement as he had been deemed a "dangerous" person.

We also met with four patients who had been found GEI. The first had his first commitment, which was revoked about 3.5 years ago. He described that during the height of the pandemic he was restricted to the units, and he felt that he had been spending years "twiddling [his] thumbs." He stated that the PSRB was "very broken" and "very rigid," but he was looking forward to being out from under jurisdiction in 15 months. A second patient had been revoked for two years. He stated that the barriers to his success included the lack of infrastructure of community supports. He said he had not understood what it would mean to be found GEI when he agreed to make that plea in court. He said he has about five years left under PSRB jurisdiction, and although his son lives further away, he was agreeing to be conditionally released to a program in a different county so that he could get into the community.  A third patient had been at OSH for four years, and he described the limited treatment that he was receiving. He said the PSRB had to approve his placement, and that it was difficult when placed in a situation where there were also people on civil commitments as they seemed to get more priority. The fourth patient had been at OSH for 33 months. She said she had never been on conditional release and was looking at placements in a group home. She stated they were good parts and bad parts to being found GEI. She felt that you can "get out of this place [OSH] what you put into it. " She said she had been working with a peer specialist, she had also been able to attend college classes and get certificates for classes. She said that the Aid and Assist patients take up much of the staff time and so she had to advocate to get therapy for herself.

**Legislative Updates**

In the prior administration and as noted in earlier reports, OHA worked to file legislation that addressed two of my recommendations: 1) modified limits to allowable restoration timeframes; and 2) a proposal to hire a consultant to study cost sharing and cost incentives for days spent at OSH.  As the new administration took office, there were initial gaps in awareness of this bill (SB219) and its progress. This was followed by conversations to ensure alignment and ongoing support of the proposed legislation, though for a couple of weeks, the support by the state was unclear. Several meetings with the parties took place to achieve that alignment, and testimony to support the bill was being prepared, when on 3/8/23 the legislative hearing was cancelled. According to the parties, there was information that the bill had elements that were raising concerns from stakeholders.

**Additional Community Initiatives:**

The IMPACTS grant program that is administered by the Criminal Justice Commission had received additional funds to support their programs and continue to measure their progress. I will look forward to hearing of their work.

**Forensic Evaluation Models:**

I have not received the report from OJD leadership and the GAINS workgroup regarding models to consider for forensic evaluation services in Oregon. I will be meeting with representatives of OJD at the end of April for a follow up.

**Input from Stakeholders including Prosecutors and Counties:**

Much of what has been discussed has been under the cloak of mediation and will not be repeated here. However, it has been helpful to meet with District Attorney Barton and Mr. Williams outside of mediation to learn more of their perspectives. There is ongoing discussion about durations of commitment under the 9/1/22 order.

**Information from Progress Reports to the Neutral Expert**

Progress reports are submitted to me monthly, pursuant to the Court's order. They are also delineated on the state's website to help increase transparency around these matters (see: https://www.oregon.gov/oha/OSH/Pages/mink.aspx ).  The following updates are highlights of what I was provided:

- OHA restructuring CFAA to increase accountability currently halted
- PDES research study underway related to Aid and Assist
- Review of existing contracts with the CCOs and CMHPs to help expand scope to serve the AA population
- Expansion of about 16 SRTF beds in Lane County is ongoing
- Regional development and innovation investments- pending staff transitions
- Ongoing work with the SB295 hearings (though some motions to intervene by DOJ have been denied by state courts)
- Meetings with OJD leadership awaiting assignment to a particular OHA staff member
- OHA should explore means for timely discharge and development of additional resources for community providers to complete timely discharge planning documents for GEI patients
- OSH staffing continues to be a focus of attention. Nursing staff RNs and LPNs are disciplines for which there are staffing challenges

Several items were also placed on "pause" status. These included but were not limited to:

- Enhancing Community Restoration Program data collection
- Development of a Community Restoration manual and trainings
- Identifying assessment process to help facilitate discharges

The progress reports as written make it difficult to know when the items are completed in full or in concept or initiated.  I note that the progress notes will at times mark an item complete when the item is not completed in full. For example, one easy lift is the "Mink/Bowman" website, which to date remains a "Mink" website, yet is marked complete. A meeting with the parties is currently planned for the end of April to review my recommendations from my Second Report and sort out these issues.

**Recommendations and Comments**

This period can be summarized by both the major transitions within state leadership and adjustment to the contours of the 9/1/22 order of the Court. I note that this report shows progress toward compliance with a downward trend in how many people are waiting in jail, and for how long. Still, with 51 people found unable to Aid and Assist having waited, as the last day of March 2023, an average of 20.4 days prior to their OSH admission, the state remains out of compliance with the Ninth Circuit's ruling to admit them within seven days. At the current rate, it will still take many months to achieve compliance, and there are many concerns that the downward trend will not be sustained. There is also tremendous pressure from stakeholders to make exceptions to the Federal Court Order, each with some reasonable intentions (e.g., perceptions of public safety, need for the level and duration of care that OSH provides with greater frequency, and concerns that substance use, houselessness, and safety net services make OSH the least restrictive appropriate alternative for many people). That said, with the pressures to reverse any of the advances of the Order, there is significant risk for a backslide on the trajectory. The parties and numerous stakeholders have engaged in complicated discourse to try to achieve remedies that can work from various vantage points through mediation, and where this ends up remains to be seen. That said, in making my recommendations along the way, my experience managing several hospital and community frameworks where a balance is required helps guide my opinions. Overall, my opinions rest on considering the use of OSH being prioritized for people who likely have the most clinical and forensic need for a state hospital psychiatric inpatient stay. Thus, there have been choices made that have gone against compliance but, in my opinion, represent important principled exceptions. One such example was with my recommendation for the state to request flexibility on the discharge dates of certain individuals charged with Measure 11 crimes during a time of massive transition accommodating to new timelines for restoration.

In the meantime, the leadership transitions at the state, and the various political forces and settling in of the new administration, has made focus on the community-based recommendations a challenge. The stakeholder engagement has been very strong, which is ultimately a good thing, but the leadership will want to organize itself around work done to date, without duplicating effort. It is therefore hoped that the transition of new state leaders at OHA will now enable a doubling down on organizing activities to achieve more movement on the recommendations that were set forth previously, with potentially revisiting any that have become stale. The parties of the *Mink/Bowman* matter have been engaged in ongoing dialogue and discourse and will be setting new dates for milestone accomplishments through the end of April/beginning of May. The state is hiring a consultant to help ensure the recommendations are delivered, and DRO worked with law students whose work will be reviewed by the parties as it pertains to patterns for pretrial defendants.

On the hospital side, OSH staff deserve much credit for their hard work in adjusting their timelines and continuing to manage the evaluations and treatment of the population under *Mink/Bowman*. The tireless actions of the professional staff should be acknowledged. Furthermore, the courts of Oregon, and all the professionals that support the criminal case processes, as well as the community behavioral health system should also be commended for the difficult work of sustaining services given the

increased demand for these services in the face of workforce shortages and countless other challenges. The behavioral health system overall has long been underfunded across the U.S., and Oregon is no exception, and ongoing investments are necessary.

Specific to the issues of compliance with *Mink/Bowman*, in my opinion the following recommendations should also be pursued, each of which is consistent with recommendations made in prior reports.

1. **Await Any Outcome of Mediation:** At the time of this writing, mediation is taking place under the guidance of The Honorable Stacie F. Beckerman. The outcome of that mediation may require further changes in practices or policies, and as such the parties should be standing by ready to pivot as needed.

2. **Focus on Discharges**: There are too many people identified as ready for non-hospital level of care settings who are not being discharged, and too many people coming into the hospital who very early on do not appear clinically to need this level of care. This is a major concern. Barriers to discharge identified have included the purported failure of various system partners to follow the SB295 requirements, as well as gaps in coordination between OSH and the community, and a lack of options for community-based placements. These will need to be examined by the new OHA leadership and OSH together, with the parties. If discharges are realized, it could yield compliance most immediately. Community Navigators should be part of the discharge planning (as identified further below) to also help reduce the risk of recidivism.

3. **Track progress of the 9/1/22 Order and Continue to Examine Regular System Level Data**: This will include asking the state to provide information such as data examining returns to OSH of the population as well as outcomes of restoration. It will be helpful to gather information about what would define "success" or "failure" beyond compliance with the Ninth Circuit 7-day admission timeline. Shortly after the order was first issued, amici prosecutors, counties and judges, and intervenor private hospitals inserted themselves, and argued that the order would cause many problems. The Honorable Michael W. Mosman utilized the phrase summarizing their concerns as a putative "parade of horribles" that he was hoping to understand better given the number of issues that were raised before him. To date, although the order has created system shifts and more patient turnover at OSH, many of the concerns I have heard do not appear directly related to the "Mosman Order" but to problems that had existed long before the order was issued, and they seem to relate to larger problems with behavioral health services. Thus, in my opinion, any review of the outcomes of this order should be specific to the order itself. This review should seek to examine any new issues from the order and identify factors that may help explain the increase in state court orders for admission for restoration.

4. **Limit Community Restoration to its Intended Purpose and Study its Utilization**: As I have said in nearly every report since my Second Report, community restoration, in my opinion, requires a significant set of changes. This should again be a major focus of effort, and I laid out specific recommendations in my Second Report to tighten this service and limit its duration of use. Without sufficient "throughput" in any system, there can be back-up, and this back-up could impact compliance. Moreover, the data showing a median of 147 days in community

restoration, and outliers that are spending *thousands* of days in community restoration, raises major concerns about the utilization of restoration for its intended purpose, and the extended court oversight of individuals who, but for their disabilities, would not be under pre-trial supervision for that length of time. This strikes me as a potential *Olmstead* and ADA issue of significant concern. Legislation to limit the duration of restoration recently was dropped from consideration, and in my opinion, it should again be elevated. In the meantime, I recommend the parties focus on studying these issues further.

5. **Reset Expected Milestone Timelines and Review all Recommendations from Second Report with New Leadership and the Parties**: The recommendations from my prior reports must be re-reviewed with the new OHA leadership. Any that have been completed can be marked as such, but there should be agreement on what "completed" really means. New timelines should be agreed upon as part of this litigation, and these recommendations should, in my opinion, become a formal part of the settlement agreement between the parties, though completion of these recommendations has been agreed upon by the state. Any recommendations that are stale should be eliminated after considerations by the parties in consultation with the Neutral Expert. I plan to continue to work with the parties to discuss this and consider whether new recommendations are in order. Specific priority areas of focus include increasing efficiencies to GEI discharges, building out Community Navigators, and focusing on Community Restoration, as well as examining financial incentives and risks along with the range of recommendations that had to do with pulling in payors to help provide the services needed.

6. **Examine whether the Housing Emergency Declaration can be Leveraged for the AA and GEI Populations and Consider Additional Executive Orders if Appropriate**: Given the rates of houselessness among individuals found GEI and in the AA process, it would seem there is an opportunity to leverage various initiatives and funding to help solve some of the challenges identified by the persons in the forensic processes. At the same time, there should be consideration of whether any additional Executive Order would give additional funding or capacity to realize some of the recommendations timelier.

7. **Emphasize CCBHC and 988 Diversion Strategies**: The state should continue its efforts to minimize law enforcement response to behavioral health crisis and seek alternatives within the behavioral health system to reduce the penetration of individuals into criminal case processing.

8. **Pursue Legislative Remedies at the Earliest Opportunity**: The legislation of SB219 was a start, but more could be done in the direction toward my prior recommendations. The parties should work together, and some version of this legislation should be attempted again at the soonest possible available time. It would be my strong recommendation that OHA, with support of the Governor's Office, revisit this legislation as a priority but organize itself around socializing it. Although the federal order is in place, it is not a sustainable solution for the state. A legislative remedy to the appropriate use of OSH beds and community restoration slots is critical.

9. **Consolidation of Stakeholder Meetings Pertaining to *Mink/Bowman***. It will be useful to pivot from separate meetings that were being directed from the Governor's office, and from the prior

DRO EX D, P. 20 of 21

Aid and Assist workgroup, to a regular stakeholder forum that could provide updates and allow for input from various vantage points to help develop any recommendations as new information becomes available.

10. **Ongoing meetings of the parties**. I recommend ongoing meetings between the parties and the Neutral Expert to review data and to monitor progress.

I would like to acknowledge the many individuals whose perspectives and input have been invaluable in shaping my contributions to the Oregon behavioral health AA and GEI efforts and the broader behavioral health system, and whose work is noteworthy despite strained resources and staff shortages seemingly everywhere. I would like to commend the parties again for their firm commitment to help the many individuals in jails across Oregon who are waiting admission to OSH, and whose needs and rights are at the center of this litigation.

**Respectfully Submitted,**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*

DRO EX D, P. 21 of 21

**D e b r a   A .   P i n a l s ,   M . D .**

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Seventh Report
Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** October 18, 2023
**Neutral Expert:** Debra A. Pinals, M.D.

**Background and Context of this Report:**

On 12/21/21, The Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as the Neutral Expert in the *Mink/Bowman* matter, granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case. Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman's order stipulated further that OHA enter into a contract with the Neutral Expert and provide any needed information to her.  The Court ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)."  The Court further ordered a second report by the Neutral Expert to include "a short report and recommendations for a proposed long-term compliance plan for OSH."  After submitting my initial reports pursuant to these orders, on 6/7/22 the Court ordered my ongoing appointment and stated, "Beginning on September 7, 2022, Dr. Pinals will provide brief quarterly reports to update the Court regarding compliance status and any needed additional recommendations to address any barriers to achieving compliance." In total, I have produced and provided the following reports to the Court in this case:

- First Report, 1/30/22
- Second Report, 6/5/22
- Third Report, 9/15/22
- Fourth Report, 12/21/22
- Fifth Report, 4/17/23
- Sixth Report, 7/24/23

In accordance with the Court's order, this report will serve as my Seventh Report in this matter.

**Background and Summary of the Two Consolidated Cases:**

A more detailed background to these cases is reviewed in my prior reports. In summary, state defendants were previously found by the Ninth Circuit (*OAC v. Mink, 2003*) to be out of compliance with Constitutional requirements and were ordered to admit individuals found unable to Aid and Assist in their criminal cases to Oregon State Hospital for restoration within seven (7) days of receipt of an order for their commitment to OSH for restoration. In December 2021, after further litigation, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide recommendations to help achieve compliance with the Ninth Circuit's seven (7) day admission requirement as outlined above.

In a separate litigation, in November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after The Honorable Nan Waller ordered them to OSH for treatment, without unreasonable delay. After further litigation, The Honorable Marco A. Hernandez, United States District Court Judge, agreed with the defendants that a consolidation of the *Mink* and *Bowman* cases made sense.

In accordance with my First Report recommendations, there is since that time one waitlist for people waiting in jail for a bed at OSH, whether GEI or under the Aid and Assist process. Both those waiting times continue to be tracked as part of this consolidated litigation.

**Qualifications to Perform this Work:**

I have worked for almost twenty-five years as a clinical and academic and forensic psychiatrist, and over twenty years functioning in state and local level behavioral health administrative leadership, management, policy and legislative development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions. Other details are provided in my First Report.

**Sources:**

Background court and legal documents for this case upon which I continue to rely include:

1. Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21;
2. Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21;
3. Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20;
4. *Mink* and *Bowman* Interim Agreement, Filed 12/17/21;
5. *Bowman* 1637 PLD Plaintiffs 1st Amended Complaint #22;
6. *Mink* 0339 Court Order Granting Motion for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;
7. Order on Joint Stipulation to Continue Appointment of Neutral Expert, signed by the Honorable Michael W. Mosman, 6/7/22;

8. *Bowman* Opinion and Order, Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), signed by Judge Mosman 8/16/22;

9. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 9/1/22;

10. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), No. 6:22-cv-01460-MO (Member Case) Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 5/10/23;

11. Oregon Advocacy Center et al., v. Mink et al. Case No. 3:02-cv-00339-MO(Lead Case) Mediation Final Term Sheet (June 2023).

12. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Second Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 7/3/23; and

13. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order Determining Supremacy Clause Issues, signed by The Hon. Michael W. Mosman on 9/11/23;

Background court and legal documents I have reviewed during this interim period include:

1. Oregon Advocacy Center et al., v. Mink et al. Case No. 3:02-cv-00339-MO(Lead Case) Mediation Final Term Sheet (June 2023);

2. Mink 0339 PLD Plaintiffs Motion to Compel Compliance 8.10.23 #425 and supporting documents;

3. Mink 0339 PLD Declaration of Thomas Stenson 8.10.23 #426 and supporting documents;

4. Declarations related to supremacy clause issue and related communications from Marion County, Amici District Attorneys (#434), Commander Tad Larson (#430), Debra Wells MA, LPC (#433), DA Paige Clarkson (#432), and Ms. Jane Vetto (#431);

5. Amici Judges' Brief Re Plaintiffs' Motion to Compel Compliance (#435);

6. Joinder of Washington County in Support of Response Filed by Marion County (#436);

7. Complaint for Declaratory and Injunctive Relief filed by Ms. Jane E. Vetto of Marion County on 9/12/23; and

8. Disability Rights Oregon, et al., Plaintiffs, v. D. Baden et al., Defendants, and Jarod Bowman et al., Plaintiffs, v. Dolores Matteucci et al., Defendants (Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Opinion and Order, Singed by The Hon. Michael W. Mosman on 10/17/23.

I reviewed additional documents and materials separate from court filings and orders during this interim period. These include the following:

1. OHA/OSH Amended Order FAQs;

2. State of Oregon v. James Michael Frances Lopes (aka Lopez), 2014;

3. Bean v. Matteucci, 2021;

4. City of Portland v. Dollarhide, 1984;

5. Miscellaneous forensic evaluations and clinical reports sent by defendants via protective order;

6. Miscellaneous OJD uniform court order drafts;

7. Miscellaneous state court orders for extensions of commitment, non-transport of OSH defendants, results of requests for extensions, and recent orders for OSH to provide restoration services within the Marion County Jail and other relevant issues;

8. Communications from CMS and to CMS pertaining to aspects of conditions and care at OSH; and
9. Miscellaneous documents regarding GEI patients including PSRB hearing statistics, the conditional release ready lists, length of stay data, OSH/HSD/PSRB documentation.

Regular case tracking and background documents I reviewed in the interim between this report and my prior report include the following:

1. OSH Forensic Admission and Discharge monthly data dashboards August, September, and October 2023 reporting the month prior to production;
2. OSH Forensic Admissions and Discharge Bi-Weekly Reports;
3. Average Wait Time Prior to Admission Progress Metrics for Benchmark Goals;
4. *Mink & Bowman* Monthly Progress Reports from OHA from August, September, and October 2023; and
5. Miscellaneous media reports.

Regular/semi-regular meetings during this interim period from my prior report including the following meetings and discussions:

1. Periodic communications with Judge Mosman and Judge Beckerman;
2. Meetings with various OHA and OSH staff, including leadership and forensic evaluators;
3. At least Weekly or bi-weekly meetings and several ad hoc meetings with OHA, OSH, DRO and MPD representatives and leaders both separately and together.  In addition, I met with staff from these agencies at various points in this interval period.
   a. From OHA, OSH, the weekly/bi-weekly leadership meetings have included:
      i. Current administrative leaders including Ms. Ebony Sloan Clarke, Director of Behavioral Health, OHA and Mr. Dave Baden, Interim Director of OHA
      ii. Dolores Matteucci, OSH Superintendent-CEO
      iii. Ms. Lindsey Burrows, Deputy General Counsel, Office of Governor Kotek
   b. From Oregon Department of Justice (DOJ):
      i. Carla Scott, DOJ Special Litigation Unit Counsel
      ii. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
      iii. Melissa M. Chureau, Senior Assistant Attorney General, HHS, General Counsel Division
   c. From Disability Rights Oregon (DRO), Emily Cooper, Legal Director, and Dave Boyer, Managing Attorney
   d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC
4. Periodic discussions with OJD representation through Judge Nan Waller, Multnomah County
5. Presentation for and discussion with AOCMHP representatives on 7/27/23 organized by Ms. Cherryl Ramirez

I have also had discussions with individuals and groups including Amici, not limited to:

1. Mr. Billy Williams, along with elected Washington County District Attorneys Kevin Barton, and Paige Clarkson, as well as a meeting with Polk County DA and staff, and Ms. Evelyn Centeno of the Marion County DA's office;
2. County Counsel for Washington and Marion Counties, Mr. Thomas Carr and Ms. Jane Vetto, respectively;

DRO EX E, P. 4 of 27

3. Mr. Keith Garza and Judge Nan Waller and representative judges involved as Amici; and
4. Meeting and email exchanges with Mr. Jim Hargreaves, Fullbright Expert in Law, arranged through Ms. Cooper.

I observed Federal Court hearings on 7/24/23 and listened to one on 9/6/23 before The Honorable Michael W. Mosman, and I had further discussion and interaction with The Honorable Stacie Beckerman, considering mediation efforts.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
FES: Forensic Evaluation Services
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
ISU: Intensive Services Unit
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
Mosman Order: As of this report, this will refer to the July 3, 2023 Second Amended Order unless otherwise specified
MPD: Metropolitan Public Defender
OCBH: Oregon Council for Behavioral Health
OCDLA: Oregon Criminal Defense Lawyers Association
OHA: Oregon Health Authority
ORPA: Oregon Residential Provider Association
OSH: Oregon State Hospital
PDES: Program Design and Evaluation Services
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities During this Reporting Period:**

During this reporting period, my work has centered largely along three key tracks. First, I have worked with the plaintiffs and defendants to update the recommendations from my Second Report from June 2022. Given that my Second Report was drafted over a year ago, many of the recommendations required more current language endorsed by the current administration. Some of the recommendations were not as salient as crafted in 2022. In a series of intensive meetings with the parties to the case, the recommendations were reviewed, discussed, and reformatted with specific deliverables and milestones attached. This was a very productive effort, and it was important work. The state participants were fully engaged, and it was especially good to see the participation of various staff within the Governor's office in this process.

The second key activity of this interim period has been related to the numerous legal issues that continue to surface in this case. Initially there was work to be done tracking how the amended order from July 2023 was received and how many "extender" cases were sent to OSH. At the same time, there have been several state criminal cases that have called for non-transport of defendants out of OSH, and more recently orders from Marion County courts for OSH to provide restoration services within jails (though not all of those orders are still active).  My work with the parties and with amici has included tracking the state cases and the complex interplay of federal and state issues that have surfaced, especially related to Marion County.  In my meetings with some Marion County leaders, I have been told that they have a disproportionate number of challenging individuals and even fewer resources to serve them. I have also been told that the courts often have different views than the service providers and the hospitals. This has certainly been seen in the cases that were sent to Judge Mosman for review.

At our all-parties meetings, there are regular updates on where things stand with the state court cases and the Federal Court briefings that have been filed. This has taken a great deal of time for the state staff and the plaintiffs to manage.  Matters pertaining to the Supremacy clause and interpretation of the July 3, 2023 Second Amended Order have been under review in the Federal Court though Judge Mosman issued an order pertaining to this on 10/17/23. In that order, he reiterated the plain language of his Second Amended Order, gave his rationale, and issued a clear statement to Marion County that their efforts are not in sync with the rest of the state actors who are working together to carefully share tight resources.

The other legal matter that was active during this interim period was the work that was done between the state and OJD as court forms were updated to incorporate findings that would relate to the Second Amended Order and allow for further data collection. Although the discussions raised different viewpoints, more recently some of the challenges seem to have been resolved.

The third critical area of focused attention during this interim period has been my work with the state to review the data and monitor compliance with the seven (7) day admission mandate.  Although it was not clear what would happen to compliance with the July 2023 Second Amended Order, the state has continued to be in compliance with the Federal requirement for timely admissions since 7/20/23, admitting patients within seven (7) days of the state court orders.  In fact, from 7/20/23 to 10/15/23 265 out of 273 defendants were admitted within seven (7) days, and all eight (8) defendants who did not make the 7-day limit were late due to late receipt of orders or delayed transportation decisions by the counties. Thus, apart from the few outlier cases, there has been compliance with the Federal Order underlying this *Mink/Bowman* matter. This is a remarkable achievement and was preliminarily noted in my Sixth Report, yet the work and the issues pertaining to what this means continue to need sorting out.  As per the mediation agreement, there will be a more thorough review of data and feedback from Amici that will be forthcoming to understand more of the overarching impact of the Second Amended Order.

In addition to these main activities, as part of my efforts during this interim reporting period, I had the opportunity to meet with the FES evaluators. They are working diligently to try to keep up with evaluations as well as work with what seems to be increasingly contested cases and the need to testify regarding opinions. As of 8/1/23 the evaluators implemented new language consistent with the 7/3/23 Federal Order regarding opinions for restorability within the next 180 days and within the foreseeable future. There continues to be concern and questions about the "never able" determinations. According

to the evaluators with whom I spoke, the statute allows for the possibility to look into the indefinite future on community restoration, so determining that a defendant would never be able to be restored would be difficult. In essence then, opinions of final findings are more often left open, leaving people potentially in restoration services for long periods of time. In other words, with community restoration as an indefinite option, there are more cases that the evaluators are seeing leave the hospital without findings of restoration. This will be reviewed more thoroughly in my next report to the Court examining the impact of the "Mosman Order."

**Conclusions and Recommendations:**

A key finding during this reporting period is that due to the changes made from the time of the Second Amended Order of 7/3/23 and the hard work of OSH, OHA and many partners across Oregon, the state has been compliant with admitting patients for restoration services within seven (7) days since July 20, 2023, except for a few cases where there were technical delays.  Still, it remains clear from all these efforts that the Aid and Assist system is overwhelming to partners in the process, and this continues to lead to strain across systems. There has also been more flow to community restoration that will continue to require examination if it is to be sustained.

Single county concerns, especially in Marion County, have taken a great deal of time and energy in this matter. Judge Mosman's recent ruling on 10/17/23 helps sort through these recent challenges, yet given what has occurred to date and the countless unanticipated variations of how a criminal case plays out in state court, it remains to be seen as to whether individual counties actors will find other cases that attempt to put forth exceptions to the rules set forth by the Federal Court.

Nonetheless, in a future report, pursuant to the mediation agreement, I will be reporting to this Court my opinions with regard to the overall impact of the "Mosman Order" and its amendments.  I have just received briefings from Amici and will be reviewing their perspectives to inform my opinions. Thus, this current Seventh Report to the Court is limited to the above descriptions of my recent activities and providing the Court with an updated version of the recommendations from my Second Report.

The items identified below have been agreed to by the defendants, vetted by the plaintiffs, and have been reviewed by me as updates to my prior 2022 recommendations. Some have already been completed, but for the sake of clarity across my Second Report and this Seventh Report, all recommendations are included. As such, in lieu of my recommendation set forth in my June 2022 Second Report, going forward, the following reflect my updated recommendations that should be followed:

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.A.1 (1st half) | **Data dashboard:** OSH will produce and distribute data dashboards twice per month. | **Data dashboard was created and is currently uploaded twice per month. Ongoing updates will continue to get added to the data dashboard and will be uploaded to the Mink/Bowman website.** | **Ongoing** |
| 1.A.1 (2nd half) | **Data dashboard:** OHA, DRO, and MPD should begin to engage with stakeholders to | **1. Establish standard agenda using data dashboard, RTP list and hospital waitlist for OHA/OSH and county meetings** | **Completed 6/15/23** |

DRO EX E, P. 7 of 27

| | | 1.1 - The standard agenda will be used for all meetings and will be emailed out to meeting participants prior to the meeting for review and research | |
|---|---|---|---|
| | review this data and develop a process to best use this data to inform system change at local levels. | **2. Hold first meeting with Multnomah County**<br>2.1 - Completed as of 6/29/23. Data dashboard was reviewed. Mink/Bowman website was reviewed | **Completed 6/30/23** |
| | | **3. Identify pilot counties to hold monthly meetings**<br>3.1 - Define criteria for county selection (likely highest number of individuals on RTP list)<br>3.2 - Select counties<br>3.3 - Define attendee list for each meeting | **Completed 8/30/23** |
| | | **4. Implement pilot**<br>4.1 - Schedule meetings. Completed as of 9/30/23.<br>4.2 - Facilitate meetings monthly | **Ongoing** |
| | | **5. Conduct data review**<br>5.1 - Review data with Dr. Pinals and Parties | **3/31/24** |
| | | **6. Determine whether to rollout statewide (if supported by data review)**<br>6.1 - Identify required resources for statewide rollout<br>6.2 - Submit recommendation to OHA leadership regarding statewide rollout | **5/1/24** |
| 1.A.2 | **Data staff:** OHA should submit POP to legislature to fund additional Data Technician for expansion of data development. | **1. Finalize position description (PD)**<br>1.1 - Draft position description using template<br>1.2 - Have select team members review PD for content<br>1.3 - Send to management for PD review and approval | **Completed 8/31/23** |
| | | **2. Post position for hire**<br>2.1 - Send finalized and approved PD to HR for posting<br>2.2 - Review/edit as HR sees fit<br>2.3 - Upload to Workday site for required period of time | **Completed 9/30/23** |
| | | **3. Hire position.**<br>3.1 - Review submitted applications for minimum qualifications<br>3.2 - Conduct interviews<br>3.3 - Extend offer<br>3.4 - First day by on job | **11/30/23** |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.A.3 | **Data sharing:** OHA/OSH should work in partnership with OJD to examine best | **1. Data Warehouse team to run current report using data pulled from e-court and will send to OHA/OSH teams** | **Completed 7/20/23** |

DRO EX E, P. 8 of 27

|  |  | **2. OHA/OSH team to review Data Warehouse data for alignment with Neutral Expert data sharing request elements and attempt to produce reports**<br>2.1.a - If data aligns with current need, the data team will create ongoing reports to be uploaded to Mink/Bowman website<br>2.1.b - If useful data is not able to be pulled from data warehouse, this will become an agenda item for discussion with Dr. Pinals and all parties if appropriate | **Completed 11/1/23** |
|  | mechanisms to share their own data and utilize regular data reports from each entity to mutually inform practices. |  |  |
|  |  | **3. OHA/OSH to evaluate whether new codes that OJD is creating can be used (note: this goal is dependent upon OJD and OHA's ability to access court data)**<br>3.1 - OJD is creating new codes to be tracked in Odyssey system, which may make it easier to track outcomes and dispositions for Aid and Assist clients<br>3.2 - Once codes are implemented, data warehouse techs will see if reports can be run on the new codes | **Jan 2024** |
| 1.A.4 | **Data sharing:** OHA/OSH should develop and update a public-facing Mink/Bowman website to inform stakeholders, including any information that would help the public understand this matter and progress towards compliance. | **1. Website developed and updated regularly:**<br>https://www.oregon.gov/oha/OSH/Pages/mink-bowman.aspx | **Ongoing** |
|  |  | **2. Determine public funding information which will be added to the website**<br>2.1 - ISU team will review public funding information (i.e.- grants, contracts, RFA's, CFAA) and will vet with BH Leadership. This will include funds shared to each county via RFA. Completed as of 9/30/23.<br>2.2 - Check with OHSU about adding their bed capacity study to the website (i.e., whether and when it is shareable)<br>2.3 - Vetted information to be uploaded to existing Mink/Bowman website | **Ongoing** |
|  |  | **3. Provide annual updates on currently posted funding sources with additional updates as needed when new funding streams begin**<br>3.1 - Annual update to take place in July every year to align with fiscal year changes | **Annually in July** |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.1 (1st half) | **Standardized Assessments:** OHA/OSH should develop standardized assessment processes that support LOC determinations without overlying on a single score. | **1. Provide mock-up of new form to plaintiffs**<br>1.1 - Provided outline of information courts will receive in place of the LOCUS | **Completed 6/30/23** |
|  |  | **2. Complete training for OSH clinical staff involved in process** | **Completed 7/31/23** |
|  |  | **3. Implement new clinical packet process** | **Completed 8/2/23** |

DRO EX E, P. 9 of 27

| 1.B.1 (2nd half) | **Standardized Assessments:** OHA should convene key partners to review the standardized process and make final recommendations. Implement rule changes if needed. | **1. Develop form to share with courts in HLOC packet, end statutory jurisdiction packet and discharge packet** 1.1 - LOCUS score will be replaced by a narrative describing client need, along with clinical information courts can use to make a more informed decision | **Completed 8/2/23** |
|---|---|---|---|
| | | **2. Convene partners in aid and assist discharge process to assess effectiveness of the OSH clinical progress update for decision making** 2.1 - Meet with stakeholders including OJD, AOCMHP, Dr. Pinals, and parties to assess and develop needed revisions | **11/30/23** |
| | | **3. (If major revisions required) Explore OAR and/legislative changes** | **6/30/24** |
| 1.B.2 (1st half) | **Shift of court notification practice**: OHA should re-establish prior policy and discharge .370 defendants back to the committing county upon a forensic evaluation of "able." | This item is **complete** | **n/a** |
| 1.B.2 (2nd half) | **Shift of court notification practice**: Individuals opined as "never able," or "med never" should be further studied for potential process change to support direct community discharge with CMHP assistance rather than routing back to jail. | This item is currently **paused for data collection/analysis** | **n/a** |
| 1.B.3 .a | **Clinical reviews of utilization of OSH beds**: OSH should develop plans for prioritization of early referrals for evaluations of persons in Aid and Assist process at OSH. | This item is **complete** | **n/a** |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.3.b | **Clinical reviews of utilization of OSH beds:** OSH should develop plans for prioritization of earlier reviews for Hospital Level of Care (HLOC) determinations for AA patients at OSH to clinically determine readiness for stepdown or discharge as early as possible. | This item is **complete** | **n/a** |
| 1.B.4 | **Training:** Plaintiffs, OJD, and OHA should develop education for defense, prosecution, and judiciary regarding the | This item was **cancelled in agreement by All Parties** | n/a |

| | | | |
|---|---|---|---|
| | importance of maximizing the use of diversion from Aid and Assist processes for misdemeanant defendants and for those defendants for whom prosecution is not likely to be pursued. | | |
| 1.B.5 | **Coordination with ODDS:** OHA, OSH, and ODDS should meet to identify improvements for timely discharge from OSH and diversion for individuals with IDD in the Aid and Assist and GEI processes to appropriate community alternatives. | **1. Director of Social work at OSH has met with ODDS regularly to discuss improvements to discharge and diversion from OSH of clients with IDD diagnosis** | **Completed 6/30/23** |
| | | **2. Senior Leadership from OHA to have an initial level setting meeting with Senior Leadership at ODDS to identify barriers and system improvements needed to increase/improve access to DD services for individuals who are engaged in competency restoration**<br>    2.1 - OHA Senior Leadership to meet and determine a meeting time and an agenda for the meeting with ODDS | **Completed 8/4/23** |
| | | **3. Create cross agency work group to identify barriers and system improvements needed to increase/improve access to DD services for individuals who are engaged in competency restoration** | **10/31/23** |
| | | **4. Workgroup to create work plan and timeline to address needs identified in Milestone 3 meetings** | **1/1/24** |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.6 | **Development of community navigator model:** OHA should develop a model to create "community navigators" to support individuals sent for restoration as they transition from OSH into community settings. | **1. Select Community Navigator Model**<br>    1.1 - Facilitate workgroup review of CCBHC and navigator models. Completed as of 9/5/23.<br>    1.2 - Identify model that aligns with the CCBHC model. Completed as of 9/15/23.<br>    1.3 - Draft model recommendation for Dr. Pinals<br>    1.4 - Incorporate feedback from Dr. Pinals by 11/15/23 | 11/15/23 |
| | | **2. Select pilot sites for CCBHC Community Navigator pilot**<br>    2.1 - Identify current CCBHCs that are CMHPs<br>    2.2 - Schedule pilot introduction and collaboration session(s) with CCBHCs. Completed as of 8/29/23.<br>    2.3 - Review of pilot with AOCMHP and incorporate feedback<br>    2.4 - Request to OHA leadership to expand the scope of the pilot to include (1) individuals in community restoration, (2) CMHP pilot sites.<br>    2.5 - Outreach to CMHPs based on Aid & Assist caseload counts<br>    2.6 - Identify six pilot sites<br>    2.7 - Confirm pilot sites | 11/17/23 |

11

Oregon Neutral Expert Seventh Report Regarding *Mink/Bowman*
10/18/23

| | | | |
|---|---|---|---|
| | | **3. Identify and develop training materials and plan**<br>3.1 - Meet with CCBHCs and CMHPs to identify training needs for staff and navigator model<br>3.2 - Develop training materials<br>3.3 - Schedule training dates for pilot sites<br>3.4 - Complete trainings | **1/31/24** |
| | | **4. Develop data collection and reporting methods**<br>4.1 - Review data currently reported by CCBHCs and CMHPs<br>4.2 - Incorporate data elements necessary for evaluation purposes including the examination of recidivism to OSH for Aid and Assist restoration<br>4.3 - Incorporate feedback from Dr. Pinals<br>4.4 - Formalize data reporting process<br>4.5 - Communicate process to CCBHCs and CMHPs | **1/31/24** |
| | | **5. Start Implementation**<br>5.1 - Monthly or quarterly meetings and technical assistance with pilot sites<br>5.2 - Ongoing review of support and training needs | **2/1/24** |
| | | **6. Conduct mid pilot review**<br>6.1 - Conduct data review<br>6.2 - Conduct stakeholder meetings: CCBHC/CMHP listening & feedback sessions<br>6.3 - Meet with Dr. Pinals to review and obtain feedback<br>6.4 - Incorporate feedback from CCBHCs and Dr. Pinals | **Aug 2024** |
| | | **7. Conduct final data review, continuation for statewide expansion**<br>7.1 - Data review; integrate findings/recommendations with Contingency Management pilot<br>7.2 - Conduct stakeholder meetings: CCBHC/CMHP listening & feedback sessions<br>7.3 - Meet with Dr. Pinals to review and obtain feedback<br>7.4 - Incorporate feedback from CCBHCs and Dr. Pinals | **Feb 2025** |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.<br>7.a | **Consultation/Expedited admission and diversion processes:** Expedited admission service: Modify expedited admission processes to emphasize consultative availability upon request regardless of referral source. | This item was **completed** | **n/a** |

DRO EX E, P. 12 of 27

| | | | |
|---|---|---|---|
| 1.B.7.b<br><br>&<br><br>1.B.7.c | **OHA will monitor the OSH waitlist weekly**. If the waitlist exceeds 10 days, OHA will initiate jail diversion meetings with CMHP to review current symptoms and explore appropriate alternative community restoration services, if available. | **1. Develop OSH waitlist review process between OSH and ISU**<br>    1.1 - Identify OSH contact to provide a weekly report to ISU complex case coordinator (CCC)<br>    1.2 - CCC will review report weekly for individuals with wait times exceeding ten days | 11/1/23 |
| | | **2. Develop CMHP outreach process**<br>    2.1 - CCC will initiate contact with CMHP for identified individuals requesting a status update and if appropriate alternative community restoration services are available<br>    2.2 - To initiate a timely intervention OSH diversion meeting may be combined with RTP/EOC meetings | 11/1/23 |
| | | **3. Develop case tracking system**<br>    3.1 - Integrate Jail/OSH diversion data into the current RTP/EOC tracking mechanism | 11/1/23 |
| | | **4. 90-day review** | 2/1/24 |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.8.a<br><br>&<br><br>1.B.8.b | **Improvements in GEI community placement elements:** OHA should explore means to provide additional resources for community providers to prepare timely discharge plan for GEI patients including evaluations by CMHPs. This will include devising a funding mechanism to pay for evaluations by CMHPs as ordered by the PSRB. This may include a base rate for completing evaluations within 30 days.<br><br>**Improvements in GEI community placement elements:** OHA should present a plan to ensure that community evaluations are scheduled within 15 days of receipt of the order and completed within 45 days. Take all reasonable steps to implement such a plan and secure funding needed to implement it. | **1. Complete draft proposal and present to relevant parties for feedback**<br>    1.1 - Present to BHD leadership and receive feedback<br>    1.2 - Present to PSRB leadership and receive feedback | **Completed 8/31/23** |
| | | **2. Complete draft rules, standards, internal processes, and agreements**<br>    2.1 - Complete draft standards for the thoroughness of an evaluation<br>    2.2 - Complete draft data sharing agreement between OHA and PSRB<br>    2.3 - Complete draft process for HSD reviewing completed evaluations<br>    2.4 - Complete draft rule changes adjusting timeline for evaluation completion<br>    2.5 - Complete draft standards for provider communication of vacancies and establishing of waitlists | 12/31/23 |
| | | **3. Initiate processes to make identified changes to rules, contracts, and budget**<br>    3.1 - Schedule initial meeting with Behavioral Health rules coordinator<br>    3.2 - Identify budget source for evaluation completion incentive<br>    3.3 - Schedule initial meeting with contract manager | 1/31/24 |

13

| | | **4. Present draft rules, standards, processes, and agreements to relevant parties for approval**<br>4.1 - Hold community engagement sessions prior to initiating permanent rule process<br>4.2 - Present to OHA-HSD leadership for approval<br>4.3 - Present to PSRB (i.e., Dr. Bort) leadership for approval | **3/31/24** |
|---|---|---|---|

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.8.c | OSH will develop a policy/protocol that delineates categories of individuals who may be appropriate for more direct/expedient community discharges, ensuring that protocols and processes regarding decisions are made based on person-centered and least restrictive alternative options. | **1. Risk Review will continue to use a person-centered approach to make recommendations for gaining privileges and will share that approach with PSRB**<br>1.1 - OSH will revise its risk review policy to explicitly incorporate this approach | **Completed 10/17/23** |
| | | **2. OSH will develop policy/protocol that delineates categories of individuals who may be more appropriate for more direct/expedient community discharge**<br>2.1 - OSH will share its current PSRB data and Length of Stay data with parties (ongoing)<br>2.2 - OSH will revise it risk review policy to incorporate a more expedient approach to conditional release for PSRB clients who have recently been revoked or otherwise do not need to take a stepwise progression through phases of privileges | **Completed 10/17/23** |
| 1.B.8.d | Improve GEI processes to reduce reliance on OSH when not clinically appropriate. | **1. A supervising OSH Risk Review Social worker will continue to meet at least twice monthly with the PSRB Executive Director and HSD GEI/PSRB Operations and Policy Analyst Three to:**<br>•**Discuss current state of PSRB placements**<br>•**Review Community vacancies**<br>•**Problem-solve complex case and systemic issues creating barriers to discharge**<br>•**Serve as a liaison to Risk Review committee and the PSRB**<br>•**Attend Monthly statewide meetings** | **Ongoing** |
| | | **2. A supervising Risk Review Social worker and/or the Director of Social Work monitor revocations on an ongoing basis and clients reaching End of Jurisdiction (EOJ) beginning one year from EOJ to ensure appropriate planning and community engagement** | **Ongoing** |
| | | **3. Establish a series of three to five (3-5), 1.5-hour meetings to explore opportunities to improve GEI processes and to reduce reliance on OSH bed days in partnership with DRO, OSH, HSD, PSRB and the neutral expert**<br>3.1 - Complete facilitating meetings | **Jan 2024** |

14

| | | 3.2 - Set new deliverables and assign ownership and completion dates of any improvements identified | |
|---|---|---|---|
| | | | |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.9.a | **Discharge process prioritization**: Informal support. General counsel for OSH should continue efforts to support compliance with SB 295 through communications with defense lawyers and prosecutors. MPD will also make themselves available to try and intervene with defense lawyers to ensure they follow SB 295. | This work is **ongoing** and does not have planned milestones | **n/a** |
| 1.B.9.b | **Discharge process prioritization**: Advocacy. DOJ will continue evaluating cases on a state-wide basis for direct legal intervention on behalf of OSH where SB 295 is not being followed by state courts or CMHPs. | This work is **ongoing** and does not have planned milestones | **n/a** |
| 1.B.9.c | **Discharge process prioritization**: Rulemaking and Reduced Reliance on Single Solutions for Discharge. OHA shall amend the OARs applicable to AA Ready-to-Place defendants to clarify that the treating clinical team's clinical recommendations primarily guide discharge planning. Consistent with clinical best practice and existing legal standards regarding the ADA's integration mandate, level of care should be the least restrictive. CMHPs should provide information about what is available in the community including any reasonable options for a referral to a different community supportive placement when clinically appropriate, if the identified recommended "level" is not | **1. Draft OARs for revision**<br>    1.1 - Review relevant OARs and Mink/Bowman recommendations. Completed as of 8/7/23.<br>    1.2 - Create initial draft of OARs. Completed as of 8/15/23.<br>    1.3 - Obtain OHA leadership permission to move forward with permanent rule process. Completed as of 9/29/23.<br>    1.4 - Leadership review of initial draft<br>    1.5 - Incorporate leadership feedback<br>    1.6 - Review PDES report for discharge related content and incorporate changes<br>    1.7 - Review finalized CFAA as well as Draft CRP Manual from Recommendation 2.3.a for changes or other relevant rules to change during the permanent rule process<br>    1.8 - Leadership Review of Final Draft<br>    1.9 - Obtain feedback from Dr. Pinals, and Parties and finalize draft | **4/12/24** |
| | | **2. Complete permanent rule process**<br>    2.1 - Hold community engagement sessions prior to initiating permanent rule process<br>    2.2 - Work with HSD rules coordinator to complete permanent rule process | **8/31/24** |

| | | | |
|---|---|---|---|
| | available. This might include, for example, providing information about a lower level of care that could be crafted with enhanced supports to meet the individual's needs. | **3. Complete training for stakeholders on new rules and expectations**<br>    3.1 - Review relevant rule changes to inform training materials<br>    3.2 - Develop training material to present to stakeholders around clarification of new OAR<br>    3.3 - Schedule and present training | 10/31/24 |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.10 | **Forensic evaluation quality and efficiencies:** OHA/OSH should continue to support work to develop improved infrastructure and efficiencies for forensic evaluations. OJD has agreed to lead in the writing of a report, and Parties in the Mink/Bowman matter should review and refine. | This project is being completed by **OJD** | 12/29/23 |
| 1.B.11 | OHA shall draft an analysis report that reviews the current state of care coordination operations for adults under an Aid & Assist Competency Restoration order discharging from OSH to the community, and separately those discharging from OSH to jail. Requirements review shall include:<br>  &bull; Relevant OARs (i.e., 859, 309, & 410 OARs)<br>  &bull; 2024 CCO contract<br>  &bull; 2024 FFS Care Coordinator contract<br>  &bull; 2024 CMHP contract<br>  &bull; 2024 Comagine Contract<br>  &bull; 2023 IQA Audit | **1. Conduct requirements review**<br>    1.1 - Complete OAR review<br>    1.2 - Complete 2024 CCO contract review<br>    1.3 - Complete 2024 FFS Care Coordinator contract<br>    1.4 - Complete 2024 CMHP contract<br>    1.5 - Complete 2024 Comagine Contract<br>    1.6 - Review of 2023 IQA Audit & integration of Corrective Action Plan to issues related to the LSI and Comagine | 2/15/24 |
| | | **2. Circulate analysis report draft for review**<br>    2.1 - Complete OHA Medical leadership review<br>    2.2 - Complete OHA BH and Medicaid leadership review<br>    2.3 - Complete OSH Social Work leadership review<br>    2.4 - Complete PSRB review<br>    2.5 - Complete Dr. Pinals review<br>    2.6 - Incorporate feedback | 3/1/24 |
| | | **3. Final analysis report due** | 3/29/24 |
| | | **4. Submit recommendations for consideration in the 2025 CCO and FFS care coordination contracts** | 3/29/24 |

DRO EX E, P. 16 of 27

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.12.a | OHA will continue to pursue the 1115 Medicaid Demonstration waiver submitted in 2/2022 requesting the authority to provide Medicaid funding for a limited set of services in non-SUD IMD, i.e., OSH. Through the 1115 Medicaid Demonstration waiver we believe that providing the physical and behavioral health stabilization and reentry services to individuals in county or regional jails has a potential to mitigate the volume of individuals under arrest and charged with a crime that decompensate escalating to a hospital level of need under an A&A order. | **1. Conduct 1115 waiver carceral negotiations with CMS**<br>1.1 - Complete CMS negotiations<br>1.2 - Draft Standard Terms and Conditions (STC) with CMS<br>1.3 - Complete State review of draft STC<br>1.4 - Complete CMS post approval protocol submission<br>1.5 - Complete CMS post approval protocol negotiations<br>1.6 - Finalize post approval protocols between state and CMS | **Dependent on CMS** |
| | | **2. Conduct 1115 waiver carceral implementation planning**<br>2.1 - Develop a staffing and project plan<br>2.2 - Request state general funding for federal match via rebalance or legislative session<br>2.3 - Complete CCO contract amendment<br>2.4 - Complete FFS care coordination procurement<br>2.5 - Complete MMIS system changes<br>2.6 - Complete ONE system changes<br>2.7 - Complete Oregon Administrative Rule development<br>2.8 - Complete Process development | **Dependent on CMS** |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.12.b | OHA will develop a request for the 2025 legislative assembly to fund care coordination services for adults discharging from the OSH to community or jails. This may include an assessment of the CCBHC pilot currently in development under 2023 legislatively allocated resources. OHA will complete an assessment of the pre/post OSH discharge care coordination models to identify a long-term vs strategy i.e., CCO care coordination under GF via 5-year procurement versus OHA BH contract. | **1. Assess current resources**<br>1.1 - Identify related programs, resources, and pilots<br>1.2 - Draft gap analysis<br>1.3 - Circulate draft gap analysis for public engagement/comment<br>1.4 - Draft white paper with recommendations<br>1.5 - Circulate draft white paper with recommendations for public engagement/comment<br>1.6 - Present updated white paper to OHA leadership<br>1.7 - Share final draft of white paper with collaborators | 9/27/24 |
| | | **2. Submit 2025 legislative request**<br>2.1 - Conduct market research<br>2.2 - Develop budget needs<br>2.3 - Draft a policy option package (POP)<br>2.4 - Circulate the POP for feedback among partner agencies<br>2.5 - Submit the POP to Gov. Affairs<br>2.6 - Develop an engagement strategy with legislative assembly, OSH, DOC, county/regional carceral facilities, advocacy, ODHS, etc. in the form of talking points and | 1/31/25 |

| | | presentation that addresses reason, need, impact, monitoring, etc. | |
| | | **3. Develop Transition of Care (TOC) requirements for Medicaid members upon discharge from OSH**<br>3.1 - Draft TOC Oregon Administrative Rule changes<br>3.2 - Develop processes<br>3.3 - Go-live | 1/31/25 |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 1.B.13 (1st half) | **Substance use disorder treatments:** Expand access to substance use treatment including medications for addiction treatment (MAT) and contingency management in residential and community programs that serve people under AA orders. Incorporate these services into the refinements of services offered for people in Community Restoration Programs (CRPs). | **1. Implement contingency management practices**<br>1.1 - Expand training on contingency management to OSH teams<br>1.2 - Work with Dr. Pinals to develop innovative pathways to implement contingency management | 1/31/24 |
| | | **2. Include OSH teams on the statewide ASAM training** | 1/31/24 |
| | | **3. OHA to establish continuity of care for discharging patients with SUD from OSH**<br>3.1 - SUD subject matter experts engage and collaborate with discharge planning staff (at OSH and in community) to include training community providers in Aid and Assist legal processes and requirements<br>3.2 - Identify key stakeholders who need to be engaged to support effective continuity of care<br>3.3 - Identify roles and responsibilities of key stakeholders in continuity of care<br>3.4 - Develop workflow to ensure that patients with SUD discharged from OSH receive needed SUD treatment integrated or concurrent with other care needs in a timely manner<br>3.5 - Partner with OSH for community navigators to assist with discharge planning | 7/31/24 |

| # | Recommendation Summary | Milestone/Sub-tasks | Dates |
|---|---|---|---|
| 1.B.13 (2nd half) | **Substance use disorder treatments:** Similarly for the OSH population, foster greater focus on substance use treatment services for individuals in AA and GEI processes. Incorporate these services into the refinements of services offered for people in Community Restoration Programs (CRPs). | **1. OSH obtained additional training for a small group of OSH staff on SMART recovery and have increased access to this group service** | **Completed 8/1/23** |
| | | **2. Train a larger group of psychology, treatment services, and social work staff in Wellness Recovery Action Planning (WRAP).** This will increase access to both group and individual WRAP services. | **Initiated 7/1/23 and ongoing** |
| | | **3. Train non-clinicians to provide legal education to patients, which in the long-term will reduce clinician time in that work and afford more time to provide higher skilled clinical work, including SUD services.**<br>We are working to get staff who have completed | **Ongoing** |

DRO EX E, P. 18 of 27

| | | classroom training effectively paired with existing group leads to co-lead groups to complete the training process for those individuals. | |
| | | **4. Launch a RPI related to improving group-based treatment centered on the different jurisdictions of our patients and the unique barriers to discharge/transition for Aid and Assist, PSRB, and civil jurisdictions.** This will include consideration of group SUD services and the role of addiction as a barrier to discharge/transition for different jurisdictions. | **Initiated Jul 2023 and ongoing** |
| | | **5. Work toward re-initiating a CADC training academy with a tentative goal for a cohort to begin in 2024 (contingent on positions and staffing).** This program trains existing hospital staff in different positions to provide SUD services and requires that they commit to providing 2-4 hours. | **Initiate Mar 2024** |
| | | **6. Operationalize MAT protocols within OSH**<br>    6.1 - Review state and federal law and rule relating to provision of MAT<br>    6.2 - Provide education/training/resources for OSH staff around MAT<br>    6.3 - Develop workflow for patient initiation onto MAT | **Initiate Mar 2024** |
| 1.B.14 | **Community Restoration Program access:** OHA should conduct an inventory of the current status of CRPs and their statewide availability across all counties and present findings. Prioritize plans to address any gaps in these services. | **1. Review CRP survey from 2022 and make any necessary changes**<br>    1.1 - Consult HSD program staff and leadership<br>    1.2 - Consult with AOCMHP | **Completed 8/1/23** |
| | | **2. Draft and send email to CMHPs requesting completion of the CRP survey** | **Completed 10/11/23** |
| | | **3. Collate submitted data and distribute to relevant parties** | **11/6/23** |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 2.1.a | **Duration of Competence Restoration:** The parties should work jointly with willing stakeholders to propose new legislation that decreases the maximum restoration time limits. Time for both inpatient and community restoration services should be limited for misdemeanors, felonies, and serious violent felonies. | **1. OHA to establish a workgroup to include CMHP's, DAs, OHA, OSH, OJD, DRO, MPD, Forensic Evaluators**<br>    1.1 - Draft and establish work group charter, including attendee list and meeting cadence<br>    1.2 - Draft and establish communications plan | **10/31/23** |
| | | **2. OHA to establish a fully vetted legislative proposal** | **Available for next long session in 2025** |

DRO EX E, P. 19 of 27

Oregon Neutral Expert Seventh Report Regarding *Mink/Bowman*
10/18/23

| 2.1.b | **Duration of Competence Restoration:** The court in making its findings should rely upon clinical opinions, and the forensic evaluators in rendering opinions of restorability should provide compelling clinical data to support a likelihood beyond probability that the defendant shall regain their capacity to A&A at the end of restoration period. | See 2.1.a<br>Note: This is happening now within OSH due to federal court order that limits OSH length of restoration across charge categories. Will require legislative change upon federal order expiration (12/31/23). | **See 2.1.a** |
| 2.1.c | **Duration of Competence Restoration:** Restoration across multiple charges should be consolidated and contiguous consecutive periods of restoration should be eliminated unless there are new charges after an initial period of restoration. | **See 2.1.a** | **See 2.1.a** |
| 2.1.d | **Duration of Competence Restoration:** Aid and Assist progress/periodic Aid and Assist reports should be brief, relying on more complete evaluations made for the initial findings of a defendant being Unable to Aid and Assist. The brief periodic update reports should be done at intervals. Aid and Assist progress updates should be filed as soon as feasible. | See 2.1.a<br>Note: This is happening now due to federal court order. Will require legislative change upon federal order expiration (12/31/23). | **See 2.1.a** |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 2.1.e | **Duration of Competence Restoration:** Further explore opportunities for defendants found Unable to Aid and Assist or "Med Never" to ensure access to appropriate services. | **1. OHA to develop presentation overviewing opportunities and present to All Parties**<br>    1.1 - SDOH manager and her team will work on a presentation for the parties outlining how the $130 million approved by the legislature for residential services was awarded and where new facilities will be coming online<br>    1.2 - OHA/OSH will review presentation forward to leadership for approval | **Completed 7/14/23** |
| | | **2. Provide presentation to All Parties** | **11/30/23** |
| | | **3. OHA to review data currently available from the OHA data warehouse that is supplied by OJD/E-Court.** Further data sharing agreements and analysis will be considered after initial review of available data. | **1/1/24** |
| 2.2 | **Finances Regarding State Hospital Utilization:** Parties should work with legislators and | **1. OHA will engage a consultant to study county or CMHP incentive programs or other cost-sharing models to address the ready-to-place list after a** | **Oct 2025** |

DRO EX E, P. 20 of 27

Oregon Neutral Expert Seventh Report Regarding *Mink/Bowman*
10/18/23

| | | |
|---|---|---|
| others to add incentives to the proposed cost sharing program with CMHP or develop alternative similar fiscal approaches. Counties and CCOs should also share in both the risk and incentives aimed at reducing length of stay for individuals in the AA and GEI processes on the RTP list. | **determination that a patient no longer meets criteria for hospital level of care** | |
| | **2. OHA will convene impacted partners to review results of study** | **Jan 2026** |
| | **3. OHA will develop legislative proposal, rule or policy change, contract amendment or other remedy to implement the incentive or other programs. Such proposal, contract amendment or other remedy shall be based on consultant recommendation and partner feedback** | **Jan 2027** |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 2.3.a | **Community Restoration Program Refinements:** OHA should develop a CRP manual, delineate best practices across regions, engage in training, develop standard court forms. Develop standard protocols to reduce ambiguity or perceived overlap with other funded behavioral health services. | **1. Complete initial draft of community restoration manual**<br>1.1 - Review current training material<br>1.2 - Review relevant ORS and OAR<br>1.3 - Have ISU lead review initial draft<br>1.4 - Have OSH SW director review initial draft | **Completed 7/31/23** |
| | | **2. Obtain and incorporate feedback from Dr. Pinals and parties**<br>2.1 - Provide Dr. Pinals and parties an overview on the initial manual draft<br>2.2 - Review and incorporate Dr. Pinals and parties' feedback into the initial draft<br>2.3 - Review PDES Report and incorporate appropriate changes including any additional identified best practices. This may require further research<br>2.4 - Review finalized CFAA and incorporate any needed changes to align CFAA with contract | **1/31/24** |
| | | **3. Review and incorporate stakeholder feedback**<br>3.1 - Provide presentation to AOCMHP on the draft CRP manual<br>3.2 - Incorporate feedback | **3/29/24** |
| | | **4. Complete permanent rule process in alignment with 1.B.9.c**<br>4.1 - Review relevant rules and Dr. Pinals recommendations from 2.3.a and 1.B.9.c as well as PDES report and CFAA<br>4.2 - Hold community engagement sessions prior to initiating permanent rule process<br>4.3 - Work with HSD rules coordinator to complete permanent rule process<br>4.4 - Edit CRP manual to align materials with permanent rules | **9/30/24** |
| | | **5. Conduct final stakeholder review**<br>5.1 - Provide presentation to Dr. Pinals and parties on final draft version of CRP manual and incorporate their feedback | **11/30/24** |

DRO EX E, P. 21 of 27

|  |  | 5.2 - Provide presentation to AOCMHP on final draft version of CRP manual and incorporate their feedback<br>5.3 - Provide presentation to OJD on final draft version of CRP manual and incorporate their feedback |  |
|---|---|---|---|

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 2.3.b | **Community Restoration Program Refinements:** OHA should enhance CRP data reporting from quarterly to more active regular contemporaneous reporting (and fund the needed infrastructure to do so) so that reports can be generated as needed by OHA. | **1. Identify which of requested data points are already being collected by OHA, and how often they are being collected**<br>1.1 - Receive reports from data warehouse | **Completed 9/15/23** |
| | | **2. Complete first draft of changes needed to capture all requested data points on a monthly basis and submit to relevant parties for approval**<br>2.1 - Consult with Health Policy and Analytics and Datawarehouse team to ensure feasibility of draft<br>2.2 - Present to BHD leadership and incorporate feedback<br>2.3 - Present to Neutral Expert | **12/15/23** |
| | | **3. Initiate processes needed to make identified changes to CRP reporting structure**<br>3.1 - Schedule meeting with relevant contract administrator and Datawarehouse team to determine steps needed to ratify changes, as well as the timeline for ratification | **2/15/24** |
| 2.3.c | **Community Restoration Program Refinements:** OHA should produce an annual report on CRP activities for public access to inform further legislative needs for communities to best deliver CRP services, inform proposals for legislative change, resource needs, and inter-relationships of stakeholders involved with CRP participants and the courts. | **1. Onboard OHA contractor to complete annual report**<br>1.1 - Coordinate with governance team to begin contract process<br>1.2 - Review PDES Report for potential recommendations for short legislative session<br>1.3 - Define scope of annual report<br>1.4 - Complete contracting and begin work with contractor | **2/29/24** |
| | | **2. Complete initial annual report**<br>2.1 - Collaborate with contractor to provide required information and subject matter expertise required for them to draft report<br>2.2 - Review report drafts and get leadership approval<br>2.3 - Present annual report to Dr. Pinals and parties | **9/1/24** |
| 2.3.d | **Community Restoration Program Refinements:** OHA should foster best practices in CRP through collaborative training opportunities across counties and in consultation with OJD, municipal courts, defense, and prosecution, by | **1. Develop training materials and plan - (aligns with completion date of the CRP manual from recommendation 2.3.a. that needs to be completed before this training can move forward)**<br>1.1 - Review finalized CRP manual<br>1.2 - Meet with stakeholders including OJD, AOCMHP, Dr. Pinals, and parties to develop training materials, objectives, and plan | **1/17/25** |

DRO EX E, P. 22 of 27

| | offering trainings/community of practice opportunities. | **2. Conduct provider required training**<br>2.1 - Schedule training dates<br>2.2 - Complete training requirements | 2/28/25 |
|---|---|---|---|
| **#** | **Recommendation Summary** | **Milestones / Sub-tasks** | **Dates** |
| 2.4 | **Alternative Pathways for Misdemeanant Defendants:** With regard to defendants charged with misdemeanors in the AA process, OHA/OJD/DRO/MPD should make every effort to work collaboratively with stakeholders to identify alternatives that no longer utilize OSH when there is no real Government interest in pursuing prosecution and work to pursue avenues for alternative community plans for these individuals. Beyond training, analyze data trends for individuals charged with misdemeanors sent OSH to allow for further recommendations in this matter including legislative fixes that may provide pathways to alternative access to treatments for these populations. | **See 2.1.a**<br>Note: This is happening now due to federal court order that limits OSH admission to those charged with a "person misdemeanor." Will require legislative change upon federal order expiration (12/31/23). | **See 2.1.a** |
| 2.5 | **OSH Patient Care Improvement and Community Engagement:** OHA should explore all available means to obtain funding for one OSH data analyst and two OSH data integration specialist positions to support Mink/Bowman treatment discharge approaches, community connections, and data reporting. | **1. Submit request to the legislature prior to 2023 legislative session via POP 402**<br>1.1 - POP 402 was not supported by the legislature; however, OSH did receive approval for 10 positions, one of which is a research analyst 3 | **Completed 6/30/23** |
| | | **2. OSH to bring staff on**<br>2.1 - Continue to move the 10 positions approved by the legislature through classification and compensation stage of recruitment 2.2 - Positions likely to start | **1/1/24** |
| 2.6 | OHA shall expand Home CCO enrollment to align with the 2 years of continuous eligibility for individuals under an AA competency restoration order under the following scenarios:<br>• Community restoration (no OSH stay)<br>• OSH discharge to community restoration<br>• OSH discharge to jail and with monitoring for release to reinstate Medicaid eligibility and CCO enrollment or FFS care coordination<br>Additionally, OHA shall provide a warm handoff for individuals who meet Medicaid eligibility but not eligible for CCO enrollment (i.e., | **1. Complete 1115 waiver CE negotiations with CMS**<br>1.1 - Complete CMS post protocol negotiations<br>1.2 - Finalize post approval protocols between state and CMS | **Completed** |
| | | **2. Complete expansion of Home CCO enrollment to individuals on community competency restoration service orders and OSH to jail prior to release**<br>2.1 - Assess OSH pilot with Lane co. and Springfield jails<br>2.2 - Assess CCBHC pilot<br>2.3 - Complete workload assessment<br>2.4 - Develop staffing plan<br>2.5 - Rebalance staffing request<br>2.6 - Complete Oregon Administrative Rule change<br>2.7 - Complete process development<br>2.8 - Go-live (Date TBD) | **8/30/24** |

| | | | |
|---|---|---|---|
| | youth w/ private health insurance), or choose not to enroll into a CCO (I.e., dual Medicaid/Medicare or Native American/Alaska Native) to a Fee for Service care coordinator. | | |

| # | Recommendation Summary | Milestones / Sub-tasks | Dates |
|---|---|---|---|
| 3.B (1st half) | **Tracking legislatively appropriated funding:** The State should continue to update website to provide information about behavioral health spending. | This work is **ongoing** and does not have planned milestones | n/a |
| 3.B (2nd half) | **Tracking legislatively appropriated funding:** OHA should continue in regular meetings to discuss implementation of legislatively appropriated funds that have the potential to help OHA achieve compliance, to address remaining questions about prior spending decisions and to foster planning for ongoing support of the above recommendations to achieve compliance. | This work is **ongoing** and does not have planned milestones | n/a |

**Appendix**

| # | Previous Recommendation Summary | Revised Recommendation Language |
|---|---|---|
| 1.B. 7.b | Court-lead "Jail Review": Support OJD's efforts to expand the Multnomah County "jail review" initiative and prioritize AA assessments of individuals in jail who have appeared to have positive changes that would yield a finding of Able to Aid and Assist prior to OSH admission. | Due to current compliance with the Mink-Bowman order, this recommendation is paused. Instead of the original recommendation, OHA will monitor the OSH waitlist weekly. If the waitlist exceeds 10 days, OHA will initiate jail diversion meetings with CMHP to review current symptoms and explore appropriate alternative community restoration services, if available. |
| 1.B. 7.c | Community Jail In-Reach and Diversion from OSH Admissions List: OHA should engage stakeholders to develop a process for real-time ongoing local in-jail review/consultation of all currently detained defendants in the Aid and Assist process ordered for restoration, and leverage resources expended on jail diversion programs in the community to conduct these reviews. | |
| 1.B. 8.c | n/a | OSH will develop a policy/protocol that delineates categories of individuals who may be appropriate for more direct/expedient |

DRO EX E, P. 24 of 27

| | | community discharges. Ensuring that protocols and processes regarding decisions are made based on person-centered and least restrictive alternative options. |
|---|---|---|
| 1.B. 8.d | n/a | Improve GEI processes to reduce reliance on OSH when not clinically appropriate. |
| 1.B. 11 | Contractual requirement reviews: In consultation with the Neutral Expert and the plaintiffs and in an ongoing manner, OHA should review existing contracts with the CCOs and CMHP's to determine the scope of the existing contractual obligations to serve the Aid and Assist and GEI population. I understand these discussions are also happening in the legislative workgroups, but a focus on this population in particular is imperative and urgent. For example, OHA should explain to both CCOs and CMHPs that transport back to community from OSH through Non-Emergency Transport Provider (NEMT) is a Medicaid funded service, and OHA should work further with OJD to review this option given OJDs interest in this as a potentially helpful addition to increase timely transports from OSH. OHA should provide monthly updates on this in its regular progress reports to the Neutral Expert. | OHA shall draft an analysis report that reviews the current state of care coordination operations for adults under an Aid & Assist Competency Restoration order discharging from OSH to the community, and separately those discharging from OSH to jail. Requirements review shall include: <br>• Relevant OARs (i.e., 859, 309, & 410 OARs) <br>• 2024 CCO contract <br>• 2024 FFS Care Coordinator contract <br>• 2024 CMHP contract <br>• 2024 Comagine Contract <br>• 2023 IQA Audit <br>The outcome of which will be shared with CCOs, FFS care coordination contractor, CMHPs, and the court. The report will include the steps that OHA is taking to bring operations in line with the requirements set forth in the OARs and 2024 contracts analyzed. The report will include acknowledgement of gaps or redundancies identified that complicate effective care coordination for adults discharging to community, and separately discharging to jail. It will also make recommendations to remediate existing gaps or redundancies with identification of immediate, annual contract reinstatements, and contract procurement cycles as applicable. |

| # | Previous Recommendation Summary | Revised Recommendation Language |
|---|---|---|
| 1.B. 12 | The OHA Medicaid team will continue working on the 1115 waiver, which would continue limited Medicaid coverage and for individuals at OSH under .370 orders 6 months prior to discharge. If the waiver is accepted, OHA will amend the CCO contract in 2023 to require Intensive Care Coordination for all clients currently at OSH under 370 orders in preparation for community placement. Should this occur, such ICC should be coordinated and take into account the Community Navigators, and OHA should evaluate whether the new ICC services or other available programs (such as ACT Teams) are sufficient to perform the desired functions of Community Navigators. | *Recommend decoupling the 1115 waiver effort from the care coordination effort as CMS is unlikely to approve the 1115 waiver for IMD/OSH:* <br>**1.B.12.a.** OHA will continue to pursue the 1115 Medicaid Demonstration waiver submitted in 2/2022 requesting the authority to provide Medicaid funding for a limited set of services in non-SUD IMD, i.e., OSH. Through the 1115 Medicaid Demonstration waiver we believe that providing the physical and behavioral health stabilization and reentry services to individuals in county or regional jails has a potential to mitigate the volume of individuals under arrest and charged with a crime that decompensate escalating to a hospital level of need under an A&A order. |

25

DRO EX E, P. 25 of 27

| " " | " " | **1.B.12.b.** OHA will develop a request for the 2025 legislative assembly to fund care coordination services for adults discharging from the OSH to community or jails. This may include an assessment of the CCBHC pilot currently in development under 2023 legislatively allocated resources. |
|---|---|---|
| | | OHA will complete an assessment of the pre/post OSH discharge care coordination models to identify a long-term vs strategy, i.e., CCO care coordination under GF via 5-year procurement versus OHA BH contract |
| | | The care coordination services will be centered on ensuring continuity of care and coordination in preparation for discharging to the community. It will not be a payer for physical, behavioral, or oral health services. The care coordination services will be designed to establish the relationships and relay of information with the receiving PHI, CCO, or FFS care coordinator upon receipt of OHP eligibility. |

| # | Previous Recommendation Summary | Revised Recommendation Language |
|---|---|---|
| 2.6 | OHA should require counties to ensure ongoing CCO enrollment for all eligible individuals who have been under an Aid and Assist order within the past two years. | OHA shall expand Home CCO enrollment to align with the 2 years of continuous eligibility for individuals under an aid and assist competency restoration order under all the following scenarios:<br>    A. Community restoration (no OSH stay)<br>    B. OSH discharge to community restoration<br>    C. OSH discharge to jail and with monitoring for release to reinstate Medicaid eligibility and CCO enrollment or FFS care coordination<br>Additionally, OHA shall provide a warm handoff for individuals who meet Medicaid eligibility but not eligible for CCO enrollment (i.e., youth w/ private health insurance), or choose not to enroll into a CCO (i.e., dual Medicaid/Medicare or Native American/Alaska Native) to a Fee for Service care coordinator<br>This does not change the current Medicaid eligibility requirements, nor prevent suspension or termination if no longer eligible, i.e., move out of state, arrested, deceased, adult w/ private health insurance, etc. |
| 2.2 | **(Previously tagged as 2.1) The parties should work with legislators and others to add incentives to the proposed cost sharing a program with CMHP. Counties and CCOs should also share in both the risk and incentives aimed at reducing stay for individuals in the AA and GEI processes on the RTP list.** | (Now tagged as 2.2) The Parties should work with legislators and others to add incentives to the proposed cost sharing program with CMHP or develop alternative similar fiscal approaches. Counties and CCOs should also share in both the risk and incentives aimed at reducing length of stay for individuals in the AA and GEI processes on the RTP list. |

DRO EX E, P. 26 of 27

During the mediation process with Judge Beckerman the state agreed to recommit to renewed recommendations, and they have done so through the above items. I have therefore advised the state to post to the *Mink/Bowman* website a copy of these agreed upon recommendations as an indication of their plans to pursue the above system improvements. In my opinion these recommendations and related actions have the potential to promote sustained compliance regarding the *Mink/Bowman* matter.

In closing, I would like to acknowledge the many individuals whose perspectives and input once again have been invaluable in shaping my contributions to the Oregon behavioral health AA and GEI efforts and the broader behavioral health system, and I once again commend the efforts of the Parties, and the work of the amici including the elected and other officials, as well as the active participation of the Governor's staff, who have each contributed to the discourse with regard to *Mink/Bowman* and related behavioral health systems issues. I am especially grateful for the efforts of the multi-system partners who are working diligently on behalf of the class members for whom timely access to appropriate treatment settings is so critical.

**Respectfully Submitted,**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*

**D e b r a  A .  P i n a l s ,  M . D .**

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Eighth Report**
**Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** December 18, 2023
**Neutral Expert:** Debra A. Pinals, M.D.

**Background and Context of this Report:**

On 12/21/21, The Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as the Neutral Expert in the *Mink/Bowman* matter, granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case. Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)."  The Court further ordered a second report by the Neutral Expert to include "a short report and recommendations for a proposed long-term compliance plan for OSH." After submitting my initial reports, on 6/7/22 the Court ordered my ongoing appointment and stated, "Beginning on September 7, 2022, Dr. Pinals will provide brief quarterly reports to update the Court regarding compliance status and any needed additional recommendations to address any barriers to achieving compliance." In total, I have produced and provided the following reports to the Court in this case:

- First Report, 1/30/22
- Second Report, 6/5/22
- Third Report, 9/15/22
- Fourth Report, 12/21/22
- Fifth Report, 4/17/23
- Sixth Report, 7/24/23
- Seventh Report 10/18/23

On 5/10/23 Judge Mosman issued an Amended Order, followed by his 7/3/23 Second Amended Order in this matter.  The Second Amended Order contained the following language:

*This order shall terminate upon the Neutral Expert reporting to this Court that OSH/OHA has timely admitted A&A and GEI patients for at least three consecutive months, and that the termination of this order would not cause the Defendants to fall back out of compliance. For purposes of this order "timely admission" means within seven days of a State Court order delivered to OSH ordering that the patient be admitted.*

As part of the backdrop to the Second Amended Order, the parties and recognized amici entered into mediation, and a Mediation Final Term Sheet (June 2023) delineated the following:

*Review of September Order Efficacy. On or before October 2, 2023, OSH, OHA, plaintiffs, and Dr. Pinals will review the efficacy of the September order with regard to achieving compliance, factoring in any unintended negative consequences. OSH will prepare a report of their findings, and Dr. Pinals will incorporate that review and her opinions about the efficacy of the order into a report to the Court on or before November 15, 2023. Amici agree also to submit their perspectives in writing to OSH, OHA, and Dr. Pinals on or before October 2, 2023.*

I provided a report on 10/18/23 that articulated a new set of recommendations that were updated since my Second Report. In addition, in a separate communication with Judge Mosman, the timing of my next report was shifted to December 2023, to allow time to gather and review data that was being collected by the state, and to allow time to begin work on the specific plans developed in my October 2023 report. This Eighth Report now reflects my opinions "about the efficacy of the order", which is set to expire on 12/31/23 unless Judge Mosman extends it.

**Background and Summary of the Two Consolidated Cases:**

A more detailed background to these cases is reviewed in my prior reports. In summary, state defendants were previously found by the Ninth Circuit (*OAC v. Mink, 2003*) to be out of compliance with Constitutional requirements and were ordered to admit individuals found unable to Aid and Assist in their criminal cases to Oregon State Hospital for restoration within seven (7) days of receipt of an order for their commitment to OSH for restoration. In December 2021, after further litigation, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide recommendations to help achieve compliance with the Ninth Circuit's seven (7) day admission requirement as outlined above.

In a separate litigation, in November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after The Honorable Nan Waller ordered them to OSH for treatment, without unreasonable delay. After further litigation, The Honorable Marco A. Hernandez, United States District Court Judge, agreed with the defendants that a consolidation of the *Mink* and *Bowman* cases made sense.

In accordance with my First Report recommendations, there is since that time one waitlist for people waiting in jail for a bed at OSH, whether GEI or under the Aid and Assist process. Both those waiting times continue to be tracked as part of this consolidated litigation.

2

**Qualifications to Perform this Work:**

I have worked for almost twenty-five years as a clinical and academic and forensic psychiatrist, and over twenty years functioning in state and local level behavioral health administrative leadership, management, policy and legislative development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions. Other details are provided in my First Report.

**Sources:**

Background court and legal documents for this case upon which I continue to rely include:

1. Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21;
2. Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21;
3. Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20;
4. *Mink* and *Bowman* Interim Agreement, Filed 12/17/21;
5. *Bowman* 1637 PLD Plaintiffs 1st Amended Complaint #22;
6. *Mink* 0339 Court Order Granting Motion for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;
7. Order on Joint Stipulation to Continue Appointment of Neutral Expert, signed by the Honorable Michael W. Mosman, 6/7/22;
8. *Bowman* Opinion and Order, Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), signed by Judge Mosman 8/16/22;
9. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 9/1/22;
10. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), No. 6:22-cv-01460-MO (Member Case) Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 5/10/23;
11. Oregon Advocacy Center et al., v. Mink et al. Case No. 3:02-cv-00339-MO(Lead Case) Mediation Final Term Sheet (June 2023).
12. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Second Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 7/3/23; and
13. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order Determining Supremacy Clause Issues, signed by The Hon. Michael W. Mosman on 9/11/23; and
14. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Opinion and Order: Defendants' Petition for Expedited Ruling on Supremacy Clause, signed on 10/17/23 by Judge Michael W. Mosman.

Additional documents I reviewed during this period of reporting included:

1. Email summary of written perspectives on the efficacy of the September order, received 10/12/23 from Mr. Keith Garza, along with report entitled: Fitness Findings and New Charges for Defendants After Commitment to the Oregon State Hospital is Terminated, data prepared

3

9/28/23, produced by Oregon Judicial Department and a draft article by Judge Nan Waller and Ms. Debra Maryanov;

2. Oregon Advocacy Center Et al. v. Mink et al. amici district attorneys written perspectives pursuant to Mediation Final Term Sheet (June 2023), dated 10/16/23 from Kevin Barton, Washington County District Attorney, Paige Clarkson, Marion County District Attorney, John Wentworth, Clackamus County District Attorney;

3. ODAA Proposals to Address the Crisis at OSH and in our communities, dated 3/2/23 from Amanda Dalton on behalf of the OR District Attorneys Association and ODAA Behavioral Health Legislative Subcommittee to Senator Kate Lieber;

4. Marion County HHS Issue Brief regarding Aid and Assist, 12/19/23;

5. Washington County comments, sent via email, 10/4/23;

6. OHA/OSH data and considerations regarding impacts of the Mosman orders;

7. Mink/Bowman Comprehensive Plan drafts;

8. Information to clinicians regarding documentation and charting developed by OSH;

9. OSH Guilty Except for Insanity PowerPoint received 10/27/23;

10. OSH GEI Patient Average Length of Stay Analysis;

11. PSRB-HSD Strategic Roadmap (Plan for 2023-25 biennium);

12. A Mixed Methods Study of Competency Restoration in Oregon, by Program Design and Evaluation Services (PDES) of OHA, September 2023;

13. Community Restoration Manual Draft from OHA;

14. Miscellaneous emails and background information from DA Barton;

15. GEI Flow diagrams and admission to discharge protocol information, updated 12/7/23; and

16. Hospital Level of Care Categories/Stages Post CRR Approval.

Background documents I reviewed between this report and my prior report include the following:

1. OSH Forensic Admission and Discharge monthly data dashboards November and December 2023 reporting the month prior to production;

2. OSH Forensic Admissions and Discharge Bi-Weekly Reports;

3. Average Wait Time Prior to Admission Progress Metrics for Benchmark Goals, produced by OSH monthly;

4. *Mink & Bowman* Monthly Progress Reports from OHA from November and December 2023; and

5. Miscellaneous media reports.

Relevant meetings during this interim period from my prior report including the following meetings and discussions:

1. Periodic communications with Judge Mosman and Judge Beckerman;

2. Meetings with various OHA and OSH staff, including leadership and forensic evaluators;

3. Regular meetings (mostly biweekly) and several ad hoc meetings with OHA, OSH, DRO and MPD representatives and leaders both separately and together.  In addition, I met with staff from these agencies at various points in this interval period.
    a. From OHA, OSH, the weekly/bi-weekly leadership meetings have included:
        i. Current administrative leaders including Ms. Ebony Sloan Clarke, Director of Behavioral Health, OHA and Mr. Dave Baden, Interim Director of OHA, along with Samantha Byers, Lisa Nichols and Bonnie Cappa from OHA HSD/ISU
        ii. Dolores Matteucci, OSH Superintendent-CEO

        iii.   Ms. Lindsey Burrows, Deputy General Counsel, Office of Governor Kotek
- b. From Oregon Department of Justice (DOJ):
  - i. Carla Scott, DOJ Special Litigation Unit Counsel
  - ii. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
  - iii. Melissa M. Chureau, Senior Assistant Attorney General, HHS, General Counsel Division
- c. From Disability Rights Oregon (DRO):
  - i. Emily Cooper, Legal Director
  - ii. Dave Boyer, Managing Attorney
- d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC
4. Monthly meetings with the parties to this case along with Amici representatives and their attorneys including:
   - a. Mr. Billy Williams, along with elected Washington County District Attorneys Kevin Barton, and Paige Clarkson;
   - b. County Counsel for Washington and Marion Counties, Mr. Thomas Carr and Ms. Jane Vetto, respectively, or their representatives; and
   - c. Mr. Keith Garza and Judge Waller, Judge Proctor, and Judge Hill as involved Amici.
5. Meetings on 10/27/23, 11/7/2, and 12/7/23 related to GEI patients attended by Dr. Alison Bort, PSRB Director, Dave Boyer of DRO, OSH and OHA leadership including Dolly Matteucci and Lisa Nichols and other representative staff; and
6. Attendance at the Local Government Advisory Committee for Health and Human Services on 12/15/23.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
FES: Forensic Evaluation Services
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
ISU: Intensive Services Unit
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
Mosman Order: As of this report, this will refer to the July 3, 2023 Second Amended Order unless otherwise specified
MPD: Metropolitan Public Defender
OCBH: Oregon Council for Behavioral Health
OCDLA: Oregon Criminal Defense Lawyers Association
OHA: Oregon Health Authority
ORPA: Oregon Residential Provider Association
OSH: Oregon State Hospital
PDES: Program Design and Evaluation Services

DRO EX F, P. 5 of 24

PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities and Updates During this Reporting Period:**

This reporting period was focused on monitoring the state's progress toward compliance with the 7-day admission timeframe requirement and participation in work that helped initiate and advance the recommendations that I delineated in my Seventh Report (10/18/23). I attended meetings and had conversations with the parties as well as members of the amici to gather their perspectives. I also reviewed the feedback received regarding the impact of the Mosman Order and its amendments on compliance and other aspects of the system.

Some of the initiatives that I participated in included discussions on community navigators and competency restoration practices.  Specifically, the state has begun several activities of note, including advancing community navigator pilots, selecting pilot sites and developing models for how community navigators might work within the CCBHC framework.

I have also had meetings and discussed community restoration practices in other states and have reviewed initial drafts of a competency restoration program manual for the community. There is also work toward a survey examining community competency restoration practices and an early report regarding the competency population that was produced through PDES. The initial report attempted to address four main questions including: 1) What has happened in the lives of people in competency restoration? 2) What did restoration look like for people? 3) What happened in people's lives after going through the restoration process? and 4) What can be learned from other states about people in competency restoration and their restoration process in general?  Although the PDES effort will require more time to fully digest, preliminary summary findings are like observations I have previously made, including a "revolving door" for many people in the competency system and a lack of agreement on the purpose of restoration. The PDES evaluators noted that uneven service delivery across the state making this more complicated.  I have discussed with OHA the plan to continue to review this recent report and bring forward any valuable lessons learned.

The focus on the GEI population and increasing efficiencies to reduce reliance upon OSH for beds also began in earnest. Although originally slated to be completed by 12/31/23 in my recommendations, it will now carry over into January and possibly February of 2024, due to scheduling issues and time needed to complete tasks and gather data. That said, the first three meetings occurred, and issues that were discussed ranged from examining the flow of discharge processes between OSH and PSRB to ensuring that community movement is robust to allow for appropriate discharge options from OSH.

I have also been involved in discussions about developing a legislative package that would codify restoration timeframes, and the state is working on a charter to best engage partners in this work. I have reviewed draft plans for this activity, and my understanding is that it will be launched sometime around the new year.

I also was involved in discussions with the Forensic Evaluation Services and OSH Clinical leadership about key aspects of their work together. The first related to medication practices and the ways in which medication can be administered when an individual is objecting, and clarifying practices related to the

"informed consent" and the "*Sell* Order" pathways. There was largely agreement that these decisions and processes could be more efficient and strengthened to ensure that people at OSH are receiving needed medication treatment timely and at proper doses to alleviate symptomatology to the extent possible. This corresponds to the feedback provided by the elected District Attorney amici in this case. At the hospital, this can be a complicated area of practice in psychiatry given that there are not bright lines between treating risky behavior and treating symptoms to the point of rendering an individual fit to proceed, and the legal mechanism of medication administration over objection may be read to only allow for the former and not the latter at times.  This is an area that will continue to be discussed and refined. With shorter restoration time periods for some people, and more emphasis on moving through restoration more efficiently, this is an important activity for the state.

Another aspect of my work in this period has included examining the language within the FES evaluations regarding restorability opinions.  I have received examples from the elected District Attorneys and had conversations with evaluators and amici judges about how the opinions are formed and what it means for someone to be able to be fit "within the foreseeable future." This topic has come up previously and became a subject of consideration during mediation. The evaluators are currently offering two opinions for relevant cases, one regarding the likelihood of restorability during the OSH commitment period, or within the "foreseeable future" in accordance with statutory language. Work on clarifying these two issues continues.

The state has also been developing a live web-based ldashboard that shows in greater detail where funding has gone and the increased number settings such as SRTFs across the state.  This dashboard will be useful for the public to see the product of legislative appropriations and state investments. There has been great growth across the state in these areas, which is a positive, yet concerns about limited resources continue.

From other meetings and conversations, the plaintiffs and the district attorneys have agreed to resume the idea of developing a training regarding these matters, which appears as another positive step forward. There is data sharing that has begun between OJD and OSH that will be helpful in examining practices across systems.  In addition, in my work during this period, OSH/OHA and the Governor's Office have been fully engaged in helping shape system improvements.

**Data Summaries**

*Background Data*: Data received shows the state has been maintaining compliance with the 7-day admission since my last report, but the numbers are hovering near non-compliance at times. **Figure 1** and **Table 1** show decreasing numbers of people waiting for admission, with a downward in days waiting. For the average numbers of days people ordered for restoration are waiting, one can see that this was 2.9 days by 11/30/23, 11.1 days by 3/31/23 compared to 21.7 days on 11/30/22.  For individuals who were admitted the month prior (which is different from the snapshot average), defendants waited an average of 6.6 days days during this reporting period, as opposed to 28.5 days noted at the end of November 2022. This is remarkable, yet again, 6.6 days is very near to 7 days, and thus it remains to be seen whether compliance can be sustained. The number of people ready to place into the community also decreased, but continues, at 59 people by 11/30/23 on the AA list and 45 people on the GEI list, and with those numbers there is ongoing concern about silting into the hospital people who may not need that resource for their care for their mental illness. It should be noted,

DRO EX F, P. 7 of 24

however, that the PSRB has indicated that this metric may have some limitations as it does not consider PSRB decision steps required before someone is ready for discharge.

**Figure 1. Data Dashboard Charts Reflecting Progress in *Mink/Bowman* as of November 30, 2023**





**Table 1. Individuals Awaiting Admission**

| 1. Regarding individuals on OSH admission list with signed and received A&A court order | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* | *As of 4/1/23* | *As of 7/1/23* | *As of 11/1/23* |
| Total Number of individuals | 46 | 93* | 67 | 70 | 104 | 51 | 42 | 24 |
| Average days current individuals have been waiting | 15.8 days | 22.5 days | 16.2 days | 19.8 days | 20.7 days | 11.1 days | 9.3 days | 3.5 days |

| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days | 3-34 days | 1-36 days | 1-18 days | 1-17 days | 1-9 days |
|---|---|---|---|---|---|---|---|---|
| **2. Regarding individuals found GEI and ordered to OSH** | | | | | | | | |
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* | *As of 4/1/23* | *As of 7/1/23* | *As of 11/1/23* |
| Total number of individuals | 15 | 4 | 3 | 4 | 0 | 1 | 1 | 1 |
| Average days waiting | 45.6 days | 23 days | 18 days | 13.0 days | N/A | 26.0 days | 10.0 days | 1.0 days |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days | 3-20 days | N/A | 26 days | 10 days | 1 day |

*The marked increase in numbers awaiting admission was most likely a residual of the pauses in admissions due to COVID-19

**Table 2** and **Table 3** show the capacity and census at OSH, which uses an operational active capacity metric and has not shown any significant changes since my prior report. Overall, the hospital is operating at nearly full active capacity at all times.

**Table 2: OSH Bed Capacities as of 11/1/23***

| Site | Licensed Capacity | Active Capacity |
|---|---|---|
| Salem Main Campus HLOC | 502 | 472 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **559** |
| Junction City HLOC | 76 | 73 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | 151 | 145 |
| **OSH Total** | **743** | **704** |

* Two Salem HLOC beds are temporarily offline

**Table 3**. OSH Census as of 11/1/23

| Date | Aid & Assist | PSRB | Civil Commitment | Other | Total |
|---|---|---|---|---|---|
| 9/1/2022 | 410 | 275 | 14 | 1 | 700 |
| 12/1/2022 | 396 | 279 | 13 | 0 | 688 |
| 4/1/2023 | 400 | 279 | 11 | 1 | 691 |
| 7/1/2023 | 389 | 281 | 13 | 1 | 684 |
| 11/1/2023 | 366 | 291 | 17 | 1 | 675 |

The ongoing high numbers of new orders for restoration continue to be notable, with no real downward trend to date (See **Table 4** and **Figure 2**). GEI admissions do not show significant variability.

Oregon Neutral Expert Eighth Report Regarding *Mink/Bowman*
12/18/23

**Table 4. Aid & Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|---|---|---|
| April 2022 | 80 | 7 (4 standard / 3 revocation) |
| May 2022 | 77 | 7 (4 standard / 3 revocation) |
| June 2022 | 75 | 6 (4 standard / 2 revocation) |
| July 2022 | 65 | 5 (3 standard / 2 revocation) |
| August 2022 | 74 | 7 (4 standard / 3 revocation) |
| September 2022 | 84 | 6 (5 standard / 1 revocation) |
| October 2022 | 95 | 3 (3 standard / 0 revocation) |
| November 2022 | 95 | 6 (2 standard / 4 revocation) |
| December 2022 | 73 | 4 (4 standard / 0 revocation) |
| January 2023 | 109 | 3 (3 standard / 0 revocation) |
| February 2023 | 74 | 5 (3 standard / 2 revocation) |
| March 2023 | 108 | 7 (2 standard / 5 revocation) |
| April 2023 | 100 | 5 (2 standard / 3 revocation) |
| May 2023 | 95 | 7 (3 standard / 4 revocation) |
| June 2023 | 83 | 1 (1 standard / 0 revocation) |
| July 2023 | 73 | 3 (0 standard / 3 revocation) |
| August 2023 | 103 | 5 (3 standard / 2 revocation) |
| September 2023 | 91 | 7 (6 standard / 1 revocation) |
| October 2023 | 96 | 3 (2 standard / 1 revocation) |

**Figure 2. Aid & Assist Admissions/Orders Trends through October 2023**



**Figure 3** shows progress toward benchmarks set forth in my June 2022 report and more recent compliance with the overarching 7-day admission time as updated through November 2023. Of the 108 admissions in November 2023, 93.5% (101 people) were admitted within the 7-day Mink requirement. Of the 7 people not admitted within 7 days, 5 were due to a county decision (an OSH

DRO EX F, P. 10 of 24

bed was offered but the county decided to transport the person on a later date), and the other 2 were due to the order being received late. Although as of this report date, the hospital has been admitting within 7 days except for technical delays, the trend line again is hovering very close to the 7-day mark and appears to be easily able to go above the 7 days depending on order numbers and discharges.

**Figure 3. Admission Wait Time Projections Compared to Benchmarks Set in Second Report based on data as of 11/30/23**



**Table 4** below shows data related to the order by Judge Mosman. Of the 409 individuals who were in OSH at the time of the 9/1/22 order (so-called "Cohort 1"), only 8 were in the hospital as of 12/1/23 on their initial restoration order. As can be seen in **Table 4** and **Table 6**, most patients are being discharged after being found able, and many are sent to community restoration. It is my understanding that the data for discharge reasons is such that those discharged prior to the end of restoration as unable and ordered to community restoration are labeled as "community restoration" discharges. As per my prior reports, the demand for community restoration services is a significant issue to be addressed.

**Table 4. Discharge Data Related to the 9/1/22 Order by Judge Mosman, compiled as of 12/1/23**

- **Cohort 1:** Patients at OSH at the time of the Federal Court Order
- **Cohort 2:** Patients admitted to OSH after the issuance of the Federal Court Order on 9/1/22

DRO EX F, P. 11 of 24

Oregon Neutral Expert Eighth Report Regarding *Mink/Bowman*
12/18/23

**OSH Restoration Limit Report**
(data are current as of 12/01/2023)

| Cohort 1 | At OSH as of 9/1/2022 | At OSH as of 12/1/2023 | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | Total Discharged |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | |
| Misdemeanor | 85 | 0 | 51 | 25 | 26 | 18 | 2 | 29 | 7 | 26 | 3 | | 85 |
| Felony | 217 | 0 | 100 | 30 | 70 | 68 | 13 | 57 | 9 | 70 | | | 217 |
| Violent Felony | 107 | 8 | 42 | 17 | 17 | 40 | 29 | 6 | 3 | 17 | 2 | 2 | 99 |
| **Total** | **409** | **8** | **193** | **72** | **113** | **126** | **44** | **92** | **19** | **113** | **5** | **2** | **401** |

| Cohort 2 | Admitted since 9/1/2022 | At OSH as of 12/1/2023 | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | Total Discharged |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | |
| Misdemeanor | 487 | 67 | 396 | 177 | 183 | 103 | 25 | 86 | 20 | 183 | 3 | | 420 |
| Felony | 744 | 195 | 231 | 106 | 95 | 264 | 37 | 128 | 24 | 95 | | 1 | 549 |
| Violent Felony | 222 | 108 | 23 | 7 | 2 | 93 | 14 | 1 | 1 | 2 | 1 | 2 | 114 |
| **Total** | **1453** | **370** | **650** | **290** | **280** | **460** | **76** | **215** | **45** | **280** | **4** | **3** | **1083** |

**Table 6. Legal Status of AA Discharges in October 2023 based on Hospital Data and Hospital Restoration Limits**

### October 2023 A&A Discharges

| Reason | Cohort 1 | Cohort 2 | Total |
|---|---|---|---|
| Able | | 38 | **38** |
| Never Able | | 10 | **10** |
| Community Restoration | | 13 | **13** |
| Dismissed | | 9 | **9** |
| End of Statutory Jurisdiction | | | **0** |
| Other | | 1 | **1** |
| Restoration Limit | | 27 | **27** |
| **Total** | **0** | **98** | **98** |

Note – One of the 98 discharges listed above (in the "Other" category) was a patient who converted from an A&A to a Civil-PSRB (426.701) patient and did not physically discharge from OSH

The numbers of admission orders continue to exceed those that were originally projected upon the initial Mosman Order and as depicted in **Table 7**. This table shows the actual admissions compared to the projected admissions that were calculated making certain assumptions regarding rates of orders that might be received.

DRO EX F, P. 12 of 24

**Table 7. Projections vs. Actuals Admissions, Discharges, and New Restoration Orders**

| Month | Projected | | | | Actuals | | | |
|---|---|---|---|---|---|---|---|---|
| | Discharges | Admissions | New Orders | Admit List | Discharges | Admissions | New Orders | Admit List |
| Sep-22 | 67 | 67 | 74 | 77 | 85 | 76 | 84 | 86 |
| Oct-22 | 90 | 90 | 74 | 61 | 90 | 91 | 95 | 90 |
| Nov-22 | 90 | 90 | 74 | 45 | 85 | 81 | 95 | 104 |
| Dec-22 | 95 | 95 | 74 | 24 | 92 | 77 | 73 | 90 |
| Jan-23 | 97 | 97 | 74 | 10 | 93 | 101 | 109 | 98 |
| Feb-23 | 97 | 97 | 74 | 10 | 94 | 107 | 74 | 70 |
| Mar-23 | 107 | 107 | 79 | 10 | 129 | 128 | 108 | 51 |
| Apr-23 | 89 | 89 | 79 | 10 | 108 | 107 | 100 | 46 |
| May-23 | 89 | 89 | 79 | 10 | 88 | 87 | 95 | 57 |
| Jun-23 | 89 | 89 | 79 | 10 | 101 | 97 | 83 | 42 |
| Jul-23 | 87 | 87 | 79 | 10 | 103 | 104 | 73 | 14 |
| Aug-23 | 87 | 87 | 79 | 10 | 112 | 100 | 103 | 17 |
| Sep-23 | 90 | 90 | 84 | 10 | 102 | 95 | 91 | 19 |
| Oct-23 | 91 | 91 | 84 | 10 | 97 | 93 | 96 | 24 |

Community restoration is depicted in **Table 8,** showing that community restoration episodes for the first six months of 2023 numbered 274, compared to a total of 375 throughout 2022. If the trend were to continue, then there would be 548 community restoration episodes in 2023 (274x2). Of the total community restoration episodes, 174 have lasted for over one year (1345-1171=174), with 30 of those in 2023's first six months compared with 46 for 2022. Thus, trends for increased numbers of community restoration episodes are clear, and longer duration may also be occurring for some number of individuals. Because elements of the data lack specificity and given that it is hand collected in many ways, the data is not as readily conclusive as hospital restoration data.

**Table 8. CMHP Reported Completed Community Restoration Data 1/1/2019-6/30/2023**

| CMHP Reported Completed Community Restoration Data | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | | 2022 | | 2023 (January-June Only)* | | 2019-2023 | |
| # of Completed Community Restoration Episodes* | 173 | | 247 | | 277 | | 375 | | 274 | | 1350 | |
| # of Days Minimum | 1 | | 0 | | 0 | | 0 | | 2 | | 0 | |
| # of Days Maximum | 1056 | | 840 | | 931 | | 1399 | | 1161 | | 1399 | |
| # of Days Mean | 166 | | 210 | | 201 | | 205 | | 182 | | 196 | |
| # of Days Median | 126 | | 162 | | 142 | | 152 | | 120 | | 145 | |
| Days in Community Restoration | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** |
| 0-90 | 64 | 37.00% | 65 | 26.30% | 90 | 32.50% | 108 | 28.80% | 100 | 36.50% | 428 | 31.70% |
| 0-180 | 116 | 67.10% | 132 | 53.40% | 167 | 60.30% | 214 | 57.10% | 186 | 67.90% | 818 | 60.60% |
| 0-365 | 160 | 92.50% | 207 | 83.80% | 233 | 84.10% | 325 | 86.70% | 243 | 88.70% | 1171 | 86.70% |
| 0-730 | 172 | 99.40% | 242 | 98.00% | 274 | 98.90% | 365 | 97.30% | 267 | 97.40% | 1324 | 98.10% |
| 0-1095 | 173 | 100.00% | 247 | 100.00% | 277 | 100.00% | 371 | 98.90% | 273 | 99.60% | 1345 | 99.60% |
| *Missing data from Curry, Malheur, Multnomah, Polk and Wallawa Counties from 1/1/23-3/31/21; Missing data from Baker, Benton, Curry, Multnomah, Polk and Wallawa Counties for 4/1/23-6/30/23) | | | | | | | | | | | | |
| **Completed does not reference success of restoration, but rather indicates that the community restoration episode ended. | | | | | | | | | | | | |

Forensic Evaluation data continues to show high numbers of evaluations conducted by FES staff, including requests for evaluations of individuals outside of OSH. **Table 9** shows recent data on active cases for which FES has been assigned to evaluate, 361 of which are not currently at OSH.

DRO EX F, P. 13 of 24

**Table 9. Number of Active FES Cases as of 11/1/23**

| Type of Evaluation and Location | Number |
|---|---|
| .370 Evaluations at OSH | 366 |
| .370 Evaluations not at OSH | 277 |
| .365 Evaluations not at OSH | 62 |
| .315 Evaluations not at OSH | 22 |
| Total Cases | 727 |

**Additional Data to Inform this Report:**

For this report examining any larger impacts of the orders and amendments by Judge Mosman, I asked for specific additional data. In addition, OHA/OSH produced their report to me about their views of the impact of these orders. Data was provided at my request, for example, related to SB295 and discharges. OHA was able to provide a one-week snapshot of hand counted information. **Table 10** shows this information illustrating various reasons for SB295 barriers and placement/discharge challenges. For example, higher locus scores show barriers to placement. In addition, during the week of data examined, 17 placement requests were not responded to by counties. Often there is more than one RTP notice being sent. In 7 cases, clients did not agree to the placement conditions. Cross system placement was an issue for one case. Medication compliance related issues were barriers in two of the cases.

**Table 10. One Week Snapshot on Ready to Place Issues 10/23/23-10/27/23**

| RTP Case Data Snapshot (10/23/2023-10/27/2023) | |
|---|---|
| One or More RTP Notice | 73 |
| Client Refusal to Conditions | 7 |
| County Seeking Civil Commitment | 0 |
| Cross System Placement Needed | 1 |
| Lack of Appropriate Placement | 7 |
| Lack of Appropriate Placement - SRTF* | 8 |
| No Referrals Made | 11 |
| No Response from County | 17 |
| Court Continued Commitment** | 10 |

| *Locus Scores for Cases Lacking SRTF Placement | |
|---|---|
| 6 | 0 |
| 5 | 8 |
| 4 | 3 |

| **Reasons for Court Continued Commitment | |
|---|---|
| Involuntary Medications | 1 |
| Lack of appropriate Placement | 3 |
| Lack of SRTF* | 3 |
| Medication Compliance | 1 |
| No Placcement Idenfied | 3 |
| No Placcement Idenfied/Waitlisted | 2 |
| Symptoms/Behavior | 1 |

DRO EX F, P. 14 of 24

The mediation that resulted in the Second Amended order from 7/3/23 offered exceptions to the original restoration duration limits. From 8/1/23 to 11/1/23 there were seven requests and all of those were granted (see **Table 11**). As of 11/1/23, those 180-day extended cases accounted for 349 additional bed days used at the hospital, and the 30-day extension cases accounted for an additional 229 OSH bed days.

**Table 11**. **Number of 180-day and 30-day Requests to Extend Restoration Duration**

| *Data 8/1/23-11/1/23* | Number of Requests | Number of Granted Requests |
|---|---|---|
| 180-day violent felony extension requests | 7 | 7 |
| 30-day discharge-related extension requests | 11 | 11* |

*Only 6 of the 11 cases for which the extension were granted met the criteria delineated by the mediation term sheet and Judge Mosman's order, per DOJ.

In addition, civil expedited admission requests and admissions were also examined. The data produced by OSH indicated is in **Table 12**.

**Table 12. Civil Expedited Admissions 9/1/22 to 11/1/22**

| *OSH Civil Expedited Admissions 9/1/22 to 11/1/23* | |
|---|---|
| Number of requests | 19 |
| Number of Denials | 8 |
| Number Accepted | 11 |

**Information Obtained from OSH/OHA Regarding the Impacts of the Mosman Order**

I consulted with OHA and OSH to ask specific questions related to the impact of the federal orders, and received their report that included data elements noted above as well as what is described in this section. A summary of their report findings is included.

Regarding data comparing percentage found able, never able, med. never, or left prior to a finding, both pre and post the new federal order:

- *Prior to the federal order (2021 data), a little under a third of A&A patients admitted to OSH were discharged prior to receiving a "dischargeable finding" (Able, Never Able, Med. Never)*
  - *Discharged prior to reaching a dischargeable finding – 31.3%*
  - *Found Able at the time of discharge – 56.9%*
  - *Found Never Able at the time of discharge – 8.1%*
  - *Found Med. Never at the time of discharge – 3.7%*

DRO EX F, P. 15 of 24

- *Since the implementation of the federal order (Sep 2022 through Oct 2023), a little over half of A&A patients admitted to OSH have been discharged prior to receiving a dischargeable finding (Able, Never Able, Med. Never)*
  - *Discharged prior to reaching a dischargeable finding – 52.6%*
  - *Found Able at the time of discharge – 39.4%*
  - *Found Never Able at the time of discharge – 5.4%*
  - *Found Med. Never at the time of discharge – 2.6%*

According to the OHA/OSH report, "prior to the federal order, the reasons for leaving OSH prior to receiving a dischargeable finding were for the patient to continue restoration in the community, the patient's charges were dropped or the case dismissed, or the patient reached the end of their jurisdiction" and "since the implementation of the federal order, the reasons for leaving OSH prior to receiving a dischargeable finding are the same as before with the addition of leaving due to reaching the end of a restoration limit." The defendant report goes on to state, "without the restoration limits, and the increase in patients leaving OSH prior to receiving a dischargeable finding, OSH would most likely not have been able to get back into compliance with Mink."

Analyses by OSH indicated that barriers to findings of able/not able or non-dischargeable findings included persons at OSH "not meeting criteria for involuntary medications and therefore not being able to be started on medication prior to the evaluation", "Lack of discussion/documentation around delusions related to the specific legal charges/situation, hence lack of improvement in those symptoms", "people just needing more time for treatments to reach maximum benefit and fully manage symptoms that are impeding capacity to stand trial." There was also a comment that more people were leaving the hospital prior to being restored rather than reaching a finding of Never Able, in part because, "a finding of Never Able typically takes either a lot of historical information or consistent charting over a longer period of time to show that there will never be improvement." As a result, it appeared that many people are being ordered to community restoration due to reaching their restoration limit prior to being found able, certainly many more than prior to the federal order."

Given that medication issues continued to arise in my reviews and discussion, I asked for OHA/OSH to include information about specific aspects of medication administration in their report to me. They produced the following information:

- *Sell Orders*
  - *Prior to the federal order (Nov 21 – Aug 22), Sell orders were being received at a rate of 0.018 per admission (13 orders out of 728 admissions)*
  - *Since the federal order (Sep 22 – Oct 23), Sell orders are being received at a rate of 0.017 per admission (23 orders out of 1,344 admissions)*
  - *The 0.001 per admission difference represents a 5.6% decrease*
    - *In other words, the rate at which OSH is receiving Sell orders has decreased slightly since the federal order was implemented*
- *Involuntary Medications*
  - *Prior to the federal order (Jan 22 – Aug 22), Involuntary Med requests (submissions of Form 1B) were being received at a rate of 0.691 per admission (388 requests out of 561 admissions)*

- ○ *Since the federal order (Sep 22 – Oct 23), Involuntary Med requests (submissions of Form 1B) are being received at a rate of 0.519 per admission (698 requests out of 1,344 admissions)*
- ○ *The 0.172 per admission difference represents a 25.0% decrease*
  - ▪ *In other words, the rate at which OSH is receiving Involuntary Med requests has decreased by a quarter since the federal order was implemented*
- • *Med. Never Findings*
  - ○ *Prior to the federal order (Aug 21 – Aug 22), Med. Never findings accounted for 5.2% (34 out of 654) of all dischargeable findings (Able, Never Able, Med. Never)*
  - ○ *Since the federal order (Sep 22 – Sep 23), Med. Never findings have accounted for 7.1% (47 out of 666) of all dischargeable findings (Able, Never Able, Med. Never)*
  - ○ *The 1.9% difference represents a 36.4% increase*
    - ▪ *In other words, the percentage of dischargeable findings that result in a Med. Never finding has increased by a little over a third since the federal order was implemented*

I asked OHA/OSH to produce findings in their report indicating their views of any serious adverse outcomes, or the so-called "parade of horribles" as referenced by Judge Mosman in an earlier hearing as something he would want to review. The OHA/OSH report indicated that they did not view the outcomes as a "parade of horribles" though the above findings showed some significant impacts. They summarized their views as follows:

- • *OSH has not seen a significant percentage of A&A patients discharge solely for reaching their restoration limit*
  - ○ *Prior to the implementation of the restoration limits, OSH estimated no more than 30% of the A&A population would be impacted*
  - ○ *Through October 2023, the actual percentage of patients who have discharged solely for reaching a restoration limit has been 26.6%*
- • *OSH has not seen a significant number of patients readmit to OSH after being discharged for reaching their restoration limit*
  - ○ *The overall readmit rate for A&A patients at OSH has gone down since the federal order was signed*
    - ▪ *Prior to the federal order the OSH A&A readmit rate within 90 days was 5.1%*
    - ▪ *Since the federal order restoration limits went into effect, and through October 2023, the OSH A&A readmit rate within 90 days has been 3.9%*
  - ○ *Specifically related to the patients who discharged due to reaching their restoration limit, the readmit rate has been 2.7%*
    - ▪ *Through October 2023, out of 367 patients discharged for reaching their restoration limit, 10 have been readmitted within 90 days*

Finally, I asked that OHA/OSH include in their report their views of what might happen if the federal order is lifted. The below summarizes their response to me:

- • *With both the federal order restoration limits based on the patient's highest charge and the admission restrictions for patients with only non-person misdemeanors crimes in place, OSH has*

DRO EX F, P. 17 of 24

*seen the average number of discharges and new admissions per month increase from around 70 per month to roughly 97 per month*
- o *The limits and restrictions imposed by the federal order have worked to increase the flow of Aid & Assist patients in and out of OSH more quickly*
- *The difference of +27 more discharges/admissions per month has allowed OSH to slightly outpace the rate at which new orders are being received (which has increased from 74.0 per month to 91.4 per month since the federal order was implemented)*
- *With discharges and admissions slightly outpacing the rate at which new orders are being received, OSH has been able to decrease the number of patients on the admission list waiting to be admitted from 75 to 24, and decrease the average waitlist time from 35.3 days to 6.2 days*
- o *Both of which have allowed OSH to finally get back into compliance with the 7-day admission requirement of Mink (as of July 20, 2023)*
- *As a result of the federal order limits and restrictions OSH has also seen the Aid & Assist patient average length of stay decrease from 161.9 days to 95.5 days (based on Cohort 2)*
- *If the federal order limits and restrictions were to end, OSH would be projected to see the Aid & Assist patient average length of stay return to the pre-federal order average of about 162 days per patient*
- *With the limited number of OSH beds being occupied for roughly 66 more days per patient (on average), this would decrease the number of discharges and new admissions per month from the current 97 per month back to the pre-federal order averages of about 70 per month*
- *Assuming the rate at which new orders are being received would not suddenly start to decrease at the same time the federal order limits and restrictions were rescinded, this would result in a difference of about 22 more new orders per month than could be admitted, which would result in an instant increase in the number of people on the admission list and the wait times they endure*
- *With the current admission list count at 24, and the current average wait time at 6.2 days, it is projected OSH would fall back out of compliance with the 7-day admission requirement of Mink within one month of the federal order limits and restrictions being rescinded*

**Comments from the Amici Judges Regarding the Impact of the Mosman Order:**

According to the amici Judges,

*"…while it is good that defendants found unable to aid and assist are committed to OSH are no longer waiting more than seven days for transport, the consequences of the actions ordered to achieve this outcome are significant. The orders currently in place have created more pinch points and delays in the competency process. The lack of appropriate housing and treatment for individuals in need of community restoration has only been further stretched as the federal orders have restricted the use of OSH. This outcome was predictable given that the restrictions for use of OSH were not accompanied by an adequate increase in community resources. We hope that steps will be taken at the state and local levels to rectify the criminal justice being the primary "reprieve" for people with mental illness in our communities and for providing those individuals with appropriate care while they are there…"*

In addition, OJD produced data that showed (a) outcomes upon termination of an aid and assist commitment in the year before the September 2022 order and the year after, and (b) the number of new criminal cases filed against defendants within six months after termination of an aid and assist

DRO EX F, P. 18 of 24

commitment, also in the year before and the year after entry of the first remedial order (See **Figure 4** and **Table 13).**

**Figure 4.** Fitness Findings and New Charges per OJD Data

### Fitness Findings and New Charges for Defendants After Commitment to the Oregon State Hospital Is Terminated
#### Oregon Judicial Department

This document shows circuit court data on the number of defendants found fit to proceed when commitment to the Oregon State Hospital (OSH) is terminated, and the number of new criminal cases filed within six months of commitment, for the twelve months before and after Judge Michael Mosman's remedial order in the federal *Mink/Bowman* case.

Comparing data from September 2021 through August 2022 with data from September 2022 through August 2023 shows that, in the latter period:

- The percent of defendants who were found fit at the end their commitment to OSH decreased from 59% to 39%

- The number of defendants with commitment terminated without regaining fitness more than doubled (from 334 to 695)

- The number of new felony cases filed within six months of a defendant's commitment being terminated increased 15% (from 66 to 76)

- The number of new misdemeanor cases filed within six months of a defendant's commitment being terminated increased 46% (from 125 to 182)

**Table 13.** A&A State Hospital Commitments Terminated in Oregon Circuit Courts (9/1/21 to 8/31/23)

| Table 1: Aid & Assist State Hospital Commitments Terminated *In Oregon Circuit Courts* *Between September 1, 2021 through August 31, 2023* | | | |
|---|---|---|---|
| | **Commitment Termination Date** | | **Change** |
| | **September 2021 – August 2022** | **September 2022 – August 2023** | |
| Total Commitments Terminated | 817 | 1148 | **+41%** |
| Commitments Terminated - Defendant Found Fit | 483 | 453 | **-6%** |
| Commitments Terminated - Defendant Not Found Fit | 334 | 695 | **+108%** |
| Commitments Terminated - Percent of Defendants Found Fit | 59% | 39% | **-20 percentage points** |

The amici judges also requested some data dashboard improvements regarding specific county data showing the number of instances in which a defendant has been held longer than seven days after the commitment order before admission to OSH.

DRO EX F, P. 19 of 24

**Perspectives of the District Attorney Amici Regarding the Mosman Order:**

I received reports from the District Attorney amici that also informed this analysis. Their report included an acknowledgement for positive work and an "atmosphere of collaboration" amongst the participants in the litigation and the amici. That said, they expressed ongoing frustration "at the current failure of Oregon's mental health system." Although they recognized that compliance has been achieved, they noted that this has come at a "great cost to defendants/patients, victims of crimes, and local communities."

Based on those considerations, they noted several areas that require ongoing attention, including: civil commitment; multiple charges challenges (disagreeing with concurrent restoration periods for all circumstances), increased capacity needs at "all levels, including OSH, SRTFs, and local community capacity"; reexamination to expand the ORS 426.701 Extremely Dangerous Person statute limitations; jail-based restoration; *Sell* order limitations; increased numbers of people discharging from OSH as unrestored, the growing demand for community restoration and difficulties with its implementation (along with a recommendation to individually determine when someone could return to OSH for restoration), and the need for increased resources at "all levels," including funding rapid and dedicated fitness to proceed dockets.

Regarding medications, the comments included the idea that an individual should be allowed to return to OSH if the *Sell* order is unable to be enforced in the community.

Specific ideas related to community restoration included the perspective that the push to move people through OSH has resulted in a "burden to local communities that are ill-equipped to manage the numbers." The report stated,

> *Challenges include lack of community restoration time limits, inadequate tools to require compliance with community restoration program rules, insufficient community resources and funding, excessive wait times for .365 evaluations completed by the OSH, addressing multiple co-occurring issues of homelessness, mental health, and addiction, and lack of treatment infrastructure (including secure treatment settings) for patients/defendants, and a total lack of consequences for defendants who simply refuse to engage.*

In a memorandum to Senator Lieber dated 3/2/23, proposals by the Oregon District Attorneys Association were delineated. These suggestions included, among many ideas, increased funding for certified forensic evaluators, increased pay for OSH staff to improve treatment, increasing funding for the Office of the Public Guardian with special funding earmarked for the AA population. They also recommended increased SRTF capacity with new programs for individuals who present a public safety risk or will not adhere to medications. They also proposed legislation to require OSH to provide .365 and .370 evaluations in the community, as well as improving the content of evaluations. Other legislative strategies included codifying that restoration within the foreseeable future would be based on treatment prognosis, that commitment statutes for people with IDD be allowed to improve diversion options out of the AA process, and expanding capacity at OSH.

**Perspectives of the Counties:**

*Washington County comments*:  There were comments regarding SRTFs in Junction City not taking people who were prescribed more than one antipsychotic medication, which was seen as an important issue since those SRTFs were a key resource for the competency restoration community beds. There was a comment also about CMHPs needing access to OSH electronic medical records to facilitate discharge planning. It was also recommended that there be a significant increase in access to state-licensed residential programs for individuals in community restoration, and that there be a change in how the housing continuum is managed and maintained. For example, the licensed mental health treatment homes (SRTF's, RTFs, and RTHs) were on the "residential wiki" but that website "rarely shows any vacancies." There were also access barriers as many beds were saved for individuals under PSRB supervision. Movement through residential placements was identified as slow. There was a suggestion that OHA develop a "residential oversight team", modeled after the Extended Care Management Unit (ECMU) that existed in the early 2000s to maintain efficiencies in placement and residential program length of stay. The idea was that the team would collaborate with CCOs, providers, clients, and CMHPs to identify appropriate residential program openings. As an alternative, Washington County suggested providing funding to CMHPs to do the work of tracking and collaborating for these efficiencies. Finally, there was a recommendation that there be meaningful court hearings "to discuss all five (5) possible "actions" when a defendant is considered "unable" (dismissal, CR, civil commitment, guardianship, OSH) and there is disagreement as to the best path forward.  By default, the person is sent to OSH."

*Maron County comments*: Marion County noted in its Health and Human Services Aid & Assist document that there was a need to look at behavioral health system capacity issues. This brief noted the significant burden on providers now in the counties. They remarked that "many outpatient providers are closed for referrals or dealing with high caseloads and staffing shortages." This results in the need for crisis services to support individuals. The brief also included information about the problems with the number of people being assessed as needing level 5 or 6 residential supports, meaning still needing a hospital or an SRTF, and yet the county indicated that there is insufficient capacity to meet that demand. Because of this, the county felt it puts providers at greater risk for negative outcomes as they serve people in settings that do not provide the level of support needed. The county also raised concerns about how this could compromise staff safety in the community. At the time of the briefing, they noted they had 8 individuals waiting for an SRTF level of care. This required additional staff to support each other in going to meet with those clients who were not at the right level of care needed.

Marion County also reported needing more housing supports, though the County increased its bed capacity for transitional beds to 35 total, but this was much lower than the number needed for individuals on community restoration. They also were concerned about mixing populations when someone in the AA process needed a higher level of care that might include 24-hour staffing or medication administration.  The report noted that there is insufficient residential capacity across the state, and that providers are not properly funded for these services, resulting in disincentives to developing and maintaining these levels of care.

Finally, the brief noted that there is a limited pool of certified forensic evaluators that can assure timely decisions are made about fitness to proceed. Long waitlists for evaluations create delays that significantly impact the community. They gave as an example an individual who will need to wait 9 months for an evaluation, especially as the priority of the FES is to evaluate people at OSH. There was a suggestion of increasing the efficiencies and tighter timelines for the evaluations.

DRO EX F, P. 21 of 24

**Conclusions and Recommendations:**

In summarizing my conclusions and recommendations, it is important to acknowledge the incredibly difficult and tireless work of the defendants within OHA and OSH, the Governor's Office, the plaintiffs, as well as the amici District Attorneys, Judges and County officials, the PSRB staff, the CMHPs, the providers, the residential programs, and countless others, who are daily facing increasing pressures and ongoing demands that this Mink/Bowman situation reflects. Their contributions are to be commended even for just trying to make their respective pieces of the puzzle function better for the many people served with mental illnesses, intellectual and other developmental disabilities, substance use challenges and other conditions, along with criminal legal involvement. The work is also to be commended in the collaborative engagement and dialogue I have seen in these last several months, even when collaboration seems fraught.

Regarding the impact of the Mosman Order, in my opinion, it is meeting its intended purpose-- to help the state achieve compliance with a 7-day admission rule. Whether the 7-day admission rule is the "right" rule, is not under consideration at this time, as Constitutional issues were considered in developing that rule, and this has been the flagship metric for this case.  Although the order has been "working" for compliance since mid-July 2023, there have been downstream consequences that are significant. It appears that fewer people are being restored in the hospital, and people are silting up in the community restoration system from OSH. This has put increasing strain on community systems, and raised concerns for judges, prosecutors and counties, albeit different types of concerns. Although these are very significant issues, in my opinion, more time is needed for the system to adjust, rebuild itself after the pandemic, and equilibrate to the Mosman order to understand whether these downstream effects can be improved. To go backwards and rescind the order now would create even more disruption, and run the risk of putting the state further back from compliance rather than continuing the momentum toward system expansion/refinement. Furthermore, since the large majority of people entering OSH are still leaving as restored, the system is overall still continuing to work. Remedies for addressing what problems are now more apparent have begun to be addressed

With that in mind, in my role as the Neutral Expert in this matter, I offer the following recommendations considering the impact of the Mosman Order.

1) The Mosman Order should be extended for another year, unless something significant shifts in the trends of restoration orders or GEI population needs or OSH discharge efficiencies. This continuation should take place in the context of ongoing dialogue and discussion for any further pivots that might be needed. Again, in my opinion the Order in its most recent form is and has been necessary for the state to maintain or come close to compliance. Even with the Order in place, compliance appears to be hovering in the balance with just a few higher orders potentially tipping the state out of compliance.

2) With more people leaving OSH unrestored, community restoration time limits and delineated components and processes are increasingly critical to reduce the system's reliance on restoration as an avenue to treatment, and to reduce the likelihood of community restoration beds being filled with people who may benefit more from other services. I noted in my Second Report that both hospital and community restoration should be limited in duration, and I provided parameters for this. This recommendation was raised in several other reports as well. The feedback was consistent that the strains on the community are ongoing and heightened

with more restoration taking place in community settings. Limits to restoration services would serve the public, with the understanding that more general mental health services increasingly are available.  The state's legislative strategy for this important activity will be critical in moving this forward.

3)  There is a need to continue to examine the treatment practices at OSH with regard to medication of individuals found unable to Aid and Assist to maximize efficiencies of decisions and engagement in medication adherence, and the use of legal mechanisms for medication over objection when needed to increase the likelihood that individuals can be restored whenever possible. There should also be ongoing exploration of medication issues (e.g., individual consent, voluntariness, orders that remain from OSH at the time of community placement, and multiple medications such as was raised about the Junction City beds) and their impact on community restoration issues as well, to ensure that residents are receiving proper care and admission criteria are not too restrictive.

4)  The State's efforts to increase the infrastructure of behavioral health supports generally, as well as build out system structures outlined in my October 2023 report are imperative to help further the system's ability to support individual in forensic processes. Almost every representative of the amici group recognized the need for more services at all levels of care. In my view, a focus on strengthening and expanding community settings and placements is the most critical over and above more beds at OSH.  In addition, the projected initiatives and recommendations refined in my October 2023 report should continue in earnest.

5)  Efforts to examine utilization management of all community resources, including those for GEIs and AA, need to continue and increase in earnest. There should also be exploration of how to ensure record sharing and even access to the OSH EMR for community programs taking people out of OSH. Record sharing can help foster this utilization management goal.

6)  Amici and the parties have discussed and agreed to resume an initiative to help train partners in diversion efforts and processes to increase efficiencies across the AA system and reduce reliance on restoration as a wholistic "treatment" option. This is an important endeavor and the timing appears ripe at this moment.

7)  Data dashboards should include numbers of people who waited beyond the 7-day limit, and should re-examine the GEI metric of "ready to place" as currently depicted.

8)  There should be strong consideration for taking on more community forensic competency evaluations and expanding staff at OSH to do so. Evaluations for community restoration should consider language that indicates likely timing of restorability that is more specific than in the "foreseeable future", which for the community could mean at any time in the future.

9)  There should continue to be regular meetings with amici and others as needed to inform ongoing review of the AA and GEI processes, including any future recommendations for revisions of future court orders. At the same time, rather than emphasizing federal court remedies, each of the amici and the parties have offered suggestions about system reform, legislative changes and other matters with many consistent themes. Their suggestions have

DRO EX F, P. 23 of 24

been quite helpful and should continue to be discussed at the amici/all party meetings and in other venues.

I again commend the work of all the people reflected in this report and recognize how much more growth across the system has occurred over the last year. I encourage the partners in these efforts to continue to be hopeful that together their work can improve outcomes for those class members at the intersection of behavioral health and criminal systems.

**Respectfully Submitted,**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*

**D e b r a  A.  P i n a l s, M.D.**

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Ninth (9th) Report**
**Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** May 20, 2024
**Neutral Expert:** Debra A. Pinals, M.D.

**Background and Context of this Report:**

On 12/21/21, The Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as the Neutral Expert in the *Mink/Bowman* matter, granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case. Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)." The Court further ordered a second report by the Neutral Expert to include "a short report and recommendations for a proposed long-term compliance plan for OSH." After submitting my initial reports, on 6/7/22 the Court ordered my ongoing appointment and stated, "Beginning on September 7, 2022, Dr. Pinals will provide brief quarterly reports to update the Court regarding compliance status and any needed additional recommendations to address any barriers to achieving compliance." In total, I have produced and provided the following reports to the Court in this case:

- First Report, 1/30/22
- Second Report, 6/5/22
- Third Report, 9/15/22
- Fourth Report, 12/21/22
- Fifth Report, 4/17/23
- Sixth Report, 7/24/23
- Seventh Report, 10/18/23
- Eighth Report, 12/18/23

On 5/10/23 Judge Mosman issued an Amended Order, followed by his 7/3/23 Second Amended Order in this matter. The Second Amended Order contained the following language:

DRO EX G, P. 1 of 40

*This order shall terminate upon the Neutral Expert reporting to this Court that OSH/OHA has timely admitted A&A and GEI patients for at least three consecutive months, and that the termination of this order would not cause the Defendants to fall back out of compliance. For purposes of this order "timely admission" means within seven days of a State Court order delivered to OSH ordering that the patient be admitted.*

As part of the backdrop to the Second Amended Order, the parties and recognized amici entered into mediation, and a Mediation Final Term Sheet (June 2023) delineated that a report to the Court should be submitted reviewing the efficacy of the September Order, taking in input from the parties and the amici as follows:

*Review of September Order Efficacy. On or before October 2, 2023, OSH, OHA, plaintiffs, and Dr. Pinals will review the efficacy of the September order with regard to achieving compliance, factoring in any unintended negative consequences. OSH will prepare a report of their findings, and Dr. Pinals will incorporate that review and her opinions about the efficacy of the order into a report to the Court on or before November 15, 2023. Amici agree also to submit their perspectives in writing to OSH, OHA, and Dr. Pinals on or before October 2, 2023.*

I provided my Seventh report on 10/18/23, articulating a new set of recommendations that were updated since my Second Report. In an Eighth Report I offered my opinions "about the efficacy of the order", which was set to expire on 12/31/23. I recommended that the order be extended for one year, and this was subsequently ordered by Judge Mosman. There were several threads of litigation since that time, most especially related to Supremacy Clause considerations. Judge Mosman ruled on 3/6/24 noting that the Supremacy Clause applied regarding a case out of Marion County. That same day, the *Mink/Bowman* case was re-assigned to Judge Adrienne Nelson. She has issued two rulings related to this matter as of this writing.

**Background and Summary of the Two Consolidated Cases:**

A more detailed background to these cases is reviewed in my prior reports. In summary, state defendants were previously found by the Ninth Circuit (*OAC v. Mink, 2003*) to be out of compliance with Constitutional requirements and were ordered to admit individuals found unable to Aid and Assist in their criminal cases to Oregon State Hospital for restoration within seven (7) days of receipt of an order for their commitment to OSH for restoration. In December 2021, after further litigation, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide recommendations to help achieve compliance with the Ninth Circuit's seven (7) day admission requirement as outlined above.

In a separate litigation, in November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after The Honorable Nan Waller ordered them to OSH for treatment, without unreasonable delay. After further litigation, The Honorable Marco A. Hernandez, United States District Court Judge, agreed with the defendants that a consolidation of the *Mink* and *Bowman* cases made sense.

In accordance with my First Report recommendations, there is since that time one waitlist for people waiting in jail for a bed at OSH, whether GEI or under the Aid and Assist process. Both those waiting times continue to be tracked as part of this consolidated litigation.

**Qualifications to Perform this Work:**

I have worked for over twenty-five years as a clinical and academic and forensic psychiatrist, and over twenty years functioning in state and local level behavioral health administrative leadership, management, policy and legislative development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions. Other details are provided in my First Report.

**Sources:**

Background court and legal documents for this case upon which I continue to rely include:

1. Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21;
2. Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21;
3. Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20;
4. *Mink* and *Bowman* Interim Agreement, Filed 12/17/21;
5. *Bowman* 1637 PLD Plaintiffs 1st Amended Complaint #22;
6. *Mink* 0339 Court Order Granting Motion for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;
7. Order on Joint Stipulation to Continue Appointment of Neutral Expert, signed by the Honorable Michael W. Mosman, 6/7/22;
8. *Bowman* Opinion and Order, Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), signed by Judge Mosman 8/16/22;
9. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 9/1/22;
10. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), No. 6:22-cv-01460-MO (Member Case) Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 5/10/23;
11. Oregon Advocacy Center et al., v. Mink et al. Case No. 3:02-cv-00339-MO(Lead Case) Mediation Final Term Sheet (June 2023); and
12. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Second Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 7/3/23.

Additional recent case activity that I have reviewed since my last report includes:

1. Case Number: 3:21-cv-01637-MO, Unopposed Motion by Plaintiffs to Extend Remedial Order, submitted 12/20/23;
2. Case Number: 3:21-cv-01637-MO, Order granting plaintiffs unopposed motion to extend remedial order, issued by Judge Michael W. Mosman on 12/24/23;

DRO EX G, P. 3 of 40

3. Case Number: 3:21-cv-01637-MO, Motion to withdraw Judge Proctor as Amici Curiae and Order Granting said motion, 1/2/24;

4. Case No. 23CV37155, Marion County v. Dave Baden and Dolores Matteucci, Marion County's Response to Defendants' Rule 21 Motions, dated 1/16/24;

5. Case No. 23CV37155, Marion County v. Dave Baden and Dolores Matteucci, Declaration of Jane Vetto in Support of Marion County's Response to Defendants' Rule 21 Motions, dated 1/16/24;

6. Case No. 23CV37155, Marion County v. Dave Baden and Dolores Matteucci, Declaration of Ryan Matthews in Support of Marion County's Response to Defendants' Rule 21 Motions, dated 1/16/24;

7. Circuit Court for the County of Marion, No. 20CR08901/21CR46350/22CR35776/23CR28431, State of Oregon vs. Charly Josh Velasquez-Sanchez, Ordered by Judge Audrey Broyles, 2/9/24;

8. State of Oregon vs. Charly Josh Velasquez-Sanchez, transcript;

9. Case No. 3:02-cv-00339-MO (Lead Case), Petition for Expedited Ruling on Supremacy Clause Issue, dated 2/15/24;

10. Case No. 23CV37155, Crime Victims Motion to Intervene, dated 2/21/24;

11. Case No. 3:02-cv-00339-MO (Lead Case), Response to Defendants' Petition for Expedited Ruling on Supremacy Clause Issue, filed by Mr. Billy J. Williams on behalf of Washington, Clackamas, and Marion County District Attorneys as Amicus Curiae, dated 2/21/24;

12. Case Number: 3:21-cv-01637-MO, Document No. 259, Opinion and Order: Defendants' Petition for Expedited Ruling on Supremacy Clause, signed on 3/6/24 by Judge Michael W. Mosman;

13. Case Number: 3:21-cv-01637-MO, Notice of Case Reassignment to Judge Adrienne Nelson, 3/6/24;

14. Case No. 24CN00829, Order to Show Cause re Contempt, Marion County Circuit Court, dated 3/7/24, signed by Judge Audrey Broyles;

15. Case No. 3:02-cv-00339-MO (Lead Case), Opinion and Order: Intervenors' Motion to Intervene, entered by Judge Adrienne Nelson, 4/4/24;

16. Case No. 3:02-cv-00339-MO (Lead Case), Opinion and Order: Amicus Curiae Marion County's Motion to Expedite or Accelerate Ruling and its Second Motion to Intervene, entered by Judge Adrienne Nelson, 4/4/24;

17. Legacy Health System; Peacehealth; Providence Health & Services-Oregon; Legacy Emanuel Hospital & Health Center, DBA Unity Center for Behavioral Health; St. Charles Health System, Inc. v. v. Allen (OHA) appeal documents, Appeal No. 23-35511, including Plaintiffs-Appellants' Opening Brief, Appellee's Brief and Legacy Health Reply; and

18. State of Oregon v. Charly Josh Velasquez-Sanchez Mandamus Proceeding Motion to Intervene by Audrey J. Broyles, Circuit Court Judge, Marion County Circuit Court, 5/10/24 and related cases.

Documents I reviewed since my prior report include the following:

1. OSH Forensic Admission and Discharge monthly data dashboards November and December 2023 reporting the month prior to production;

2. OSH Forensic Admissions and Discharge Bi-Weekly Reports;

3. Average Wait Time Prior to Admission Progress Metrics for Benchmark Goals, produced by OSH monthly;

4. *Mink & Bowman* Monthly Progress Reports from OHA from January through May 2024;

5. Miscellaneous case information sent under protective order;

6. Youth evaluation flow diagram, sent for review 4/18/24;

7. Miscellaneous media reports;
8. Mink/Bowman Comprehensive Plan drafts;
9. 1915i GEI PowerPoint;
10. Oregon Health Authority (OHA) Medicaid program requested the Independent and Qualified Agent (IQA) Contract Administration internal audit; and
11. A Mixed Methods Study of Competency Restoration in Oregon, by Program Design and Evaluation Services (PDES) of OHA, September 2023.

Relevant meetings during this interim period from my prior report including the following meetings and discussions:

1. Periodic communications with Judge Mosman and Judge Beckerman, as well as an introductory meeting with Judge Nelson on 4/9/24;
2. Meetings with various OHA and OSH staff, including leadership and forensic evaluators;
3. Regular meetings (mostly biweekly) and several ad hoc meetings with OHA, OSH, DRO and MPD representatives and leaders both separately and together as well as email communications. In addition, I met with staff from these agencies at various points in this interval period.
    a. From OHA, OSH, the weekly/bi-weekly leadership meetings have included:
        i. Current administrative leaders including Ms. Ebony Sloan Clarke, Director of Behavioral Health, OHA, along with Samantha Byers, Lisa Nichols and Bonnie Cappa from OHA HSD/ISU
        ii. Dolores Matteucci, OSH Superintendent-CEO
        iii. Ms. Lindsey Burrows, Deputy General Counsel, Office of Governor Kotek
        iv. Meeting with Dr. Seja Hathi, OHA Director, on 2/9/24
    b. From Oregon Department of Justice (DOJ):
        i. Carla Scott, DOJ Special Litigation Unit Counsel
        ii. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
        iii. Melissa M. Chureau, Senior Assistant Attorney General, HHS, General Counsel Division
    c. From Disability Rights Oregon (DRO):
        i. Emily Cooper, Legal Director
        ii. Dave Boyer, Managing Attorney
    d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC
4. Monthly meetings with the parties to this case along with Amici representatives and their attorneys including:
    a. Mr. Billy Williams, along with elected Washington County District Attorneys Kevin Barton, and Paige Clarkson;
    b. County Counsel for Washington and Marion Counties, Mr. Thomas Carr and Ms. Jane Vetto, respectively, or their representatives;
    c. Mr. Keith Garza and Judge Waller, Judge Proctor (through end of December 2023), and Judge Hill as involved Amici;
    d. Mr. Eric Neiman, as representative of the Private Hospitals as Amici.
5. Meetings on 1/11/24 and 3/8/24 related to GEI patients attended by Dr. Alison Bort, PSRB Director, Dave Boyer of DRO, OSH and OHA leadership including Dolly Matteucci and Lisa Nichols and other representative staff;
6. Meeting with Ms. Evelyn Centeno of the Marion County District Attorney's Office, on 2/1/24, and follow up emails;

7. Attendance and Presentation at the Oregon District Attorneys Association Presentation 1/26/24 for monthly scheduled CLE;

8. Meetings with Ms. Cherryl Ramirez, Director AOCMHP, and representatives of CMHPs across Oregon as well as attendance at the AOCMHP quarterly meeting on 2/22/24;

9. Meeting with Mr. Eric Neiman and Dr. Robin Henderson as representatives from Private Hospitals;

10. Meeting with Ms. Janea Mark from MPD, on 5/8/24; and

11. Meetings with Kevin Neely and representative system partners to examine potential legislation related to restoration time limits and exceptions workgroup 1/26/24, 3/22/24 and 4/26/24, and review of associated documents.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
FES: Forensic Evaluation Services
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
ISU: Intensive Services Unit
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
Mosman Order: As of this report, this will refer to the July 3, 2023 Second Amended Order unless otherwise specified
MPD: Metropolitan Public Defender
OCBH: Oregon Council for Behavioral Health
OCDLA: Oregon Criminal Defense Lawyers Association
OHA: Oregon Health Authority
ORPA: Oregon Residential Provider Association
OSH: Oregon State Hospital
PDES: Program Design and Evaluation Services
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities and Updates During this Reporting Period:**

My prior report was issued in December 2023, and since that time most of my efforts have been focused on helping review the plan that was issued in my Seventh Report (10/18/23). Several of the deadlines had passed and the project deliverable dates needed to be updated. This required numerous meetings with leaders within OHA. It is encouraging to see the enthusiasm with which the leadership is taking on the challenges of the project plan. As noted in my prior reports, the project plan sets the stage for

DRO EX G, P. 6 of 40

infrastructure that can support ongoing services to hopefully reduce the reliance upon OSH for AA process.

There have been several meetings reviewing the GEI processes, per my earlier recommendations. This work has been more difficult in some ways as the GEI processes involve both the PSRB and OSH working on differing elements of the GEI systems and with different vantage points. That said, those meetings continue, and the workgroup is actively reviewing ways to help shape GEI processes to again reduce reliance upon OSH unless needed. There has been that "throughput" through the community system is as relevant to the GEI population as it is to the AA system.

Dialogues with the Amici group have continued monthly. There continues to be a collaborative tone to these conversations. The Amici are quite knowledgeable and provide helpful input. Although some of the focus is on compliance with the 7-day admission Mink/Bowman rule, there is also ongoing concerns about the increased strains on the community system, especially regarding increasing numbers of people being ordered to community restoration after the Mosman order was issued. There has been preliminary discussion of returning to mediation also to widen the ability of OSH to work with people in AA processes, while at the same time recognizing that this may work against the 7-day compliance requirement.

I have met more regularly with the AOCMHP leadership. These meetings, spearheaded by AOCMHP Executive Director Ms. Cherryl Ramirez, have been particularly helpful. Information that they have shared includes challenges with the numbers of individuals on community restoration as well as difficulties again with the throughput of these individuals through the system. There remain concerns about people with co-occurring substance use as well as intellectual and developmental disabilities that are not as well-served by the community restoration services. A major theme is also the lack of forensic evaluators for community evaluations to provide the courts with opinions that may allow cases in the community restoration process to be resolved. Community navigator pilots are still in the planning phases and more updates on this will be forthcoming in future reports. AOCMHP continues to work with OHA to advocate on issues such as impending rule changes about OSH discharge processes. Given the content of the meetings with AOCMHP, it has been determined that it will be helpful going forward for the meetings I have with AOCMHP and their representatives to include leadership from OHA. This combined dialogue has already started to occur.

Of note, in my regular meetings with the parties, I am especially appreciative of the assistance of Ms. Carla Scott of DOJ who continues to be a key contact for me with OHA and Ms. Dolly Matteucci from OSH. Ms. Matteucci retired from state service during this interim reporting period, and Dr. Sara Walker has taken on the role of Interim Superintendent and Chief Medical Officer of OSH in the interim. Ms. Matteucci will continue to assist with the legislative workgroup convened by Mr. Neely. Ms. Lindsey Burrows, of the Governor's Office, also recently left her position to move back into her former litigation and appellate practice. She was incredibly helpful and instrumental in aligning various state leaders to help produce the workplan with the plaintiffs and help with the Amici. I am encouraged by the work she did and the collaborative opportunities that are derivatives of her effort. Plaintiffs, through Ms. Emily Cooper and Mr. Dave Boyer, and Mr. Merrithew from MPD, continue to work with the state in regular meetings, reviewing and approving plans that are embedded in this report.

Several state cases have been raised for mandamus rulings and even to the Federal Court for determinations related to the Supremacy Clause. Some of the state court rulings in these cases are still

pending. These cases stem from Marion County. Newer cases are emerging from other counties, such as Washington County, that examine timing of medication orders. Litigation with the private hospitals also continues. These cases will continue to be tracked.

There have been regular meetings organized by Mr. Kevin Neely to help establish a legislative proposal pertaining to restoration time frames, possibly evaluation practices, and other elements that the workgroup is still discussing. This work is ongoing. With Ms. Lindsey Burrows leaving her position in the Governor's office, Ms. Matteucci will continue to be a state liaison for this work.

**Data Summaries**

*Background Data*: Data received shows the state has largely maintained compliance with the 7-day admission since my last report, except for two time periods (12/23/23 to 1/24/24 and briefly for three admissions during April 2024). In April 2024, 87 of the 96 admissions were admitted within 7 days of the court order. Of the 9 patients who were not admitted within 7 days, 4 were due to county transportation decision and 2 were due to the order being received late, and 3 were due to late admissions by OSH (and these reflect strict interpretation of non-compliance). The metrics that are tracked continue to hover on the edges of compliance. **Figure 1** and **Table 1** show a slight recent increase in numbers of people waiting for admission, and the average numbers of days people ordered for restoration are waiting, one can see that this was 2.9 days by 11/30/23 but 3.4 days by 4/30/24. For individuals who were admitted the month prior (which is different from the snapshot average), defendants waited an average of 6.6 days days during the prior reporting period, as opposed to 28.5 days noted at the end of November 2022, but they waited 7.0 days during this latest data. Given that the state has already dipped out of compliance twice since achieving it, it remains to be seen whether and how long future compliance can be sustained. The number of people ready to place into the community also has not significantly decreased, at 71 people by 4/30/24 on the AA list and 44 people on the GEI list, and with those numbers there is ongoing concern about silting into the hospital people who may not need that resource for their care for their mental illness. It should be noted, however, that the PSRB has indicated that the metric tracked on the data dashboard has some limitations as it does not consider PSRB decision steps required before someone is ready for discharge. The GEI workgroup is examining whether there are alternative metrics that may help shed better light on GEI discharge processes.

[INTENTIONALLY LEFT BLANK]

DRO EX G, P. 8 of 40

Oregon Neutral Expert Ninth Report Regarding *Mink/Bowman*
5/20/24

**Figure 1. Data Dashboard Charts Reflecting Progress in *Mink/Bowman* as of May 1, 2024**



OSH Forensic Admission and Discharge Dashboard
April 2024

**Aid & Assist Admission List**

| | Count | Avg Days |
|---|---|---|
| On the Admission List as of the last day of the month | 22 | 3.4 |
| Admitted During the Month | 96 | 7.0 |

**PSRB / GEI Admission List**

| | Count | Avg Days |
|---|---|---|
| On the Admission List as of the last day of the month | 0 | N/A |
| Admitted During the Month | 1 | 7.0 |

**Aid & Assist No Longer Needing HLOC**

| | Count | Avg Days |
|---|---|---|
| No Longer Needs Hospital Level of Care (as of the last day of the month) | 71 | 45.7 |
| Discharged for Community Restoration After Having Been Assessed to No Longer Need HLOC | 12 | 54.2 |
| Total Discharged During the Month | 84 | |

**PSRB / GEI No Longer Needing HLOC**

| | Count | Avg Days |
|---|---|---|
| No Longer Needs Hospital Level of Care (as of the last day of the month) | 44 | 191.3 |
| Conditionally Released to the PSRB After Having Been Assessed to No Longer Need HLOC | 6 | 228.8 |
| Total Discharged During the Month | 9 | |

OSH Quality Management – Data and Analysis
*'Informing the Pursuit of Excellence'*

Page 1 of 4
5/6/2024

**Table 1. Individuals Awaiting Admission**

| | As of 1/5/22 | As of 1/28/22 | As of 5/1/22 | As of 9/1/22 | As of 12/1/22 | As of 4/1/23 | As of 7/1/23 | As of 11/1/23 | As of 4/1/24 |
|---|---|---|---|---|---|---|---|---|---|
| **1. Regarding individuals on OSH admission list with signed and received A&A court order** | | | | | | | | | |
| Total Number of individuals | 46 | 93* | 67 | 70 | 104 | 51 | 42 | 24 | 11 |
| Average days current individuals have been waiting | 15.8 days | 22.5 days | 16.2 days | 19.8 days | 20.7 days | 11.1 days | 9.3 days | 3.5 days | 5.4 days |
| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days | 3-34 days | 1-36 days | 1-18 days | 1-17 days | 1-9 days | 3-10 days |
| **2. Regarding individuals found GEI and ordered to OSH** | | | | | | | | | |

DRO EX G, P. 9 of 40

|  | As of 1/5/22 | As of 1/28/22 | As of 5/1/22 | As of 9/1/22 | As of 12/1/22 | As of 4/1/23 | As of 7/1/23 | As of 11/1/23 | As of 4/1/24 |
|---|---|---|---|---|---|---|---|---|---|
| Total number of individuals | 15 | 4 | 3 | 4 | 0 | 1 | 1 | 1 | 0 |
| Average days waiting | 45.6 days | 23 days | 18 days | 13.0 days | N/A | 26.0 days | 10.0 days | 1.0 days | N/A |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days | 3-20 days | N/A | 26 days | 10 days | 1 day | N/A |

*The marked increase in numbers awaiting admission was most likely a residual of the pauses in admissions due to COVID-19

**Table 2** and **Table 3** show the capacity and census at OSH, which uses an operational active capacity metric and has not shown any significant changes since my prior report. There has been a slight increase in active capacity from 703 to 705 as temporarily offline beds were brought back online. Overall, the hospital is always operating at nearly full active capacity.

**Table 2: OSH Bed Capacities as of 4/1/24**

| Site | Licensed Capacity | Active Capacity |
|---|---|---|
| Salem Main Campus HLOC | 502 | 474 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **561** |
| Junction City HLOC | 75 | 72 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | 150 | 144 |
| **OSH Total** | **742** | **705** |

**Table 3**. OSH Census as of 4/1/24

| Date | Aid & Assist | PSRB | Civil Commitment | Other | Total |
|---|---|---|---|---|---|
| 9/1/2022 | 410 | 275 | 14 | 1 | 700 |
| 12/1/2022 | 396 | 279 | 13 | 0 | 688 |
| 4/1/2023 | 400 | 279 | 11 | 1 | 691 |
| 7/1/2023 | 389 | 281 | 13 | 1 | 684 |
| 11/1/2023 | 366 | 291 | 17 | 1 | 675 |
| 4/1/2024 | 360 | 288 | 30 | 0 | 678 |

The ongoing high numbers of new orders for restoration continue to be notable (See **Table 4** and **Figure 2**). GEI admissions do not show significant variability.

DRO EX G, P. 10 of 40

**Table 4. Aid and Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|---|---|---|
| April 2022 | 80 | 7 (4 standard / 3 revocation) |
| May 2022 | 77 | 7 (4 standard / 3 revocation) |
| June 2022 | 75 | 6 (4 standard / 2 revocation) |
| July 2022 | 65 | 5 (3 standard / 2 revocation) |
| August 2022 | 74 | 7 (4 standard / 3 revocation) |
| September 2022 | 84 | 6 (5 standard / 1 revocation) |
| October 2022 | 95 | 3 (3 standard / 0 revocation) |
| November 2022 | 95 | 6 (2 standard / 4 revocation) |
| December 2022 | 73 | 4 (4 standard / 0 revocation) |
| January 2023 | 109 | 3 (3 standard / 0 revocation) |
| February 2023 | 74 | 5 (3 standard / 2 revocation) |
| March 2023 | 108 | 7 (2 standard / 5 revocation) |
| April 2023 | 100 | 5 (2 standard / 3 revocation) |
| May 2023 | 95 | 7 (3 standard / 4 revocation) |
| June 2023 | 83 | 1 (1 standard / 0 revocation) |
| July 2023 | 73 | 3 (0 standard / 3 revocation) |
| August 2023 | 103 | 5 (3 standard / 2 revocation) |
| September 2023 | 91 | 7 (6 standard / 1 revocation) |
| October 2023 | 96 | 3 (2 standard / 1 revocation) |
| November 2023 | 97 | 3 (2 standard / 1 revocation) |
| December 2023 | 93 | 3 (2 standard / 1 revocation) |
| January 2024 | 84 | 4 (4 standard / 0 revocation) |
| February 2024 | 73 | 9 (3 standard / 6 revocation) |
| March 2024 | 82 | 2 (2 standard / 0 revocation) |

**Figure 2. Aid & Assist Admissions/Orders Trends through March 2024**



**Figure 3** shows trends relative to benchmarks set forth in my June 2022 report and progress metrics in relation to the timing of the first Mosman order in September 2022 and the amended order in July 2023, as well as trends in more recent compliance with 7-day admissions as updated through 5/1/24. As noted elsewhere in this report, for the most part the state has remained in compliance though numbers hover near compliance limits, and sustained compliance for six months has not been achieved.

**Figure 3. Admission Wait Time Projections Compared to Benchmarks Set in Second Report based on data as of 5/1/24**



**Table 4** below shows data related to the order by Judge Mosman. Of the 409 individuals who were in OSH at the time of the 9/1/22 order (so-called "Cohort 1"), only 6 were in the hospital as of 4/1/24 on their initial restoration order. As can be seen in **Table 4** and **Table 5**, most patients are being discharged after being found able, and many are sent to community restoration. It is my understanding that the data for discharge reasons is such that those discharged prior to the end of restoration as unable and ordered to community restoration are labeled as "community restoration" discharges. As per my prior reports, the demand for community restoration services is a significant issue to be addressed.

DRO EX G, P. 12 of 40

Oregon Neutral Expert Ninth Report Regarding *Mink/Bowman*
5/20/24

**Table 4. Discharge Data Related to the 9/1/22 Order by Judge Mosman**

- **Cohort 1:** Patients at OSH at the time of the Federal Court Order
- **Cohort 2:** Patients admitted to OSH after the issuance of the Federal Court Order on 9/1/22

| Cohort 1 | At OSH as of 9/1/2022 | At OSH as of 4/1/2024 | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | Total Discharged |
| Misdemeanor | 85 | 0 | 51 | 25 | 26 | 18 | 2 | 29 | 7 | 26 | 3 | | | 85 |
| Felony | 217 | 0 | 100 | 30 | 70 | 68 | 13 | 57 | 9 | 70 | | | | 217 |
| Violent Felony | 107 | 6 | 42 | 19 | 17 | 41 | 29 | 6 | 3 | 17 | 2 | | 3 | 101 |
| **Total** | **409** | **6** | **193** | **74** | **113** | **127** | **44** | **92** | **19** | **113** | **5** | | **3** | **403** |

| Cohort 2 | Admitted since 9/1/2022 | At OSH as of 4/1/2024 | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | Total Discharged |
| Misdemeanor | 586 | 61 | 497 | 238 | 222 | 134 | 29 | 111 | 26 | 222 | 3 | | | 525 |
| Felony | 933 | 206 | 335 | 147 | 133 | 343 | 49 | 166 | 35 | 133 | | | 1 | 727 |
| Violent Felony | 266 | 100 | 46 | 19 | 9 | 126 | 21 | 5 | 2 | 9 | 1 | | 2 | 166 |
| **Total** | **1785** | **367** | **878** | **404** | **364** | **603** | **99** | **282** | **63** | **364** | **4** | | **3** | **1418** |

**Table 5. Legal Status of AA Discharges in March 2024 based on Hospital Data and Hospital**

| March 2024 A&A Discharges | | | |
|---|---|---|---|
| Reason | Cohort 1 | Cohort 2 | Total |
| Able | | 31 | 31 |
| Never Able | | 8 | 8 |
| Community Restoration | | 18 | 18 |
| Dismissed | | 3 | 3 |
| End of Statutory Jurisdiction | | | 0 |
| Other | | | 0 |
| Restoration Limit | | 19 | 19 |
| **Total** | **0** | **79** | **79** |

The numbers of admission orders in January, February and March were not as high as in some months and some months were lower than those that were originally projected upon the initial Mosman Order as depicted in **Table 6**. This table shows the actual admissions compared to the projected admissions that were calculated making certain assumptions regarding rates of orders that might be received.

DRO EX G, P. 13 of 40

Table 6. Projections vs. Actuals Admissions, Discharges, and New Restoration Orders

| Month | Projected | | | | Actuals | | | |
|---|---|---|---|---|---|---|---|---|
| | Discharges | Admissions | New Orders | Admit List | Discharges | Admissions | New Orders | Admit List |
| Sep-22 | 67 | 67 | 74 | 77 | 85 | 76 | 84 | 86 |
| Oct-22 | 90 | 90 | 74 | 61 | 90 | 91 | 95 | 90 |
| Nov-22 | 90 | 90 | 74 | 45 | 85 | 81 | 95 | 104 |
| Dec-22 | 95 | 95 | 74 | 24 | 92 | 77 | 73 | 90 |
| Jan-23 | 97 | 97 | 74 | 10 | 93 | 101 | 109 | 98 |
| Feb-23 | 97 | 97 | 74 | 10 | 94 | 107 | 74 | 70 |
| Mar-23 | 107 | 107 | 79 | 10 | 129 | 128 | 108 | 51 |
| Apr-23 | 89 | 89 | 79 | 10 | 108 | 107 | 100 | 46 |
| May-23 | 89 | 89 | 79 | 10 | 88 | 87 | 95 | 57 |
| Jun-23 | 89 | 89 | 79 | 10 | 101 | 97 | 83 | 42 |
| Jul-23 | 87 | 87 | 79 | 10 | 103 | 104 | 73 | 14 |
| Aug-23 | 87 | 87 | 79 | 10 | 112 | 100 | 103 | 17 |
| Sep-23 | 90 | 90 | 84 | 10 | 102 | 95 | 91 | 19 |
| Oct-23 | 91 | 91 | 84 | 10 | 97 | 93 | 96 | 24 |
| Nov-23 | 91 | 91 | 84 | 10 | 103 | 108 | 97 | 14 |
| Dec-23 | 92 | 92 | 84 | 10 | 64 | 83 | 93 | 23 |
| Jan-24 | 92 | 92 | 84 | 10 | 96 | 82 | 84 | 22 |
| Feb-24 | 92 | 92 | 84 | 10 | 97 | 81 | 73 | 14 |
| Mar-24 | 92 | 92 | 89 | 10 | 79 | 85 | 82 | 11 |

Community restoration is depicted in **Table 7,** showing that community restoration episodes for the first nine months of 2023 numbered 344, compared to a total of 375 for the full year of 2022. The mean number of days in community restoration was 182 days, with a range of from 0 to 1161 days total within the first nine months of 2023. As noted in prior reports, the community restoration data lacks timeliness and specificity in many ways. It is hand collected only periodically and is not as readily conclusive as hospital restoration data. I have been speaking to OHA leadership about data improvement for community restorations. This work has become part of the project plan.

**Table 7. CMHP Reported Completed Community Restoration Data 1/1/2019-9/30/2023**

| CMHP Reported Completed Community Restoration Data 1/1/2019-9/30/2023** | | |
|---|---|---|
| # of Completed Community Restoration Episodes* | 1419 | |
| # of Days Minimum | 0 | |
| # of Days Maximum | 1399 | |
| # of Days Mean | 194 | |
| # of Days Median | 143 | |
| Days in Community Restoration | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* |
| 0-90 | 457 | 32.21% |
| 0-180 | 863 | 60.82% |
| 0-365 | 1229 | 86.61% |
| 0-730 | 1393 | 98.17% |
| 0-1095 | 1414 | 99.65% |
| *Completed does not reference success of restoration, but rather indicates that the community restoration episode | | |
| **Missing data from Curry, Malheur, and Wallawa Counties from 1/1/23-3/31/23; Missing data from Baker, Benton, Curry, and Wallawa Counties for 4/1/23-6/30/23; Missing data from Baker, Benton, Coos, Crook, Curry, Douglas, Jackson, Lincoln, Malheur, Wallawa, and Washington Counties from 7/1/23-9/30/23 | | |

| CMHP Reported Completed Community Restoration Data | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | | 2022 | | 2023 (January-September Only)** | | 2019-2023 |
| # of Completed Community Restoration Episodes* | 173 | | 247 | | 275 | | 379 | | 344 | | 1419 |
| # of Days Minimum | 1 | | 0 | | 0 | | 0 | | 0 | | 0 |
| # of Days Maximum | 1056 | | 840 | | 931 | | 1399 | | 1161 | | 1399 |
| # of Days Mean | 165 | | 210 | | 202 | | 203 | | 182 | | 194 |
| # of Days Median | 121 | | 164 | | 141 | | 147 | | 124 | | 143 |
| Days in Community R | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** |
| 0-90 | 65 | 37.60% | 64 | 25.90% | 90 | 32.70% | 117 | 30.90% | 121 | 35.20% | 457 | 32.20% |
| 0-180 | 116 | 67.10% | 132 | 53.40% | 166 | 60.40% | 219 | 57.80% | 229 | 66.60% | 863 | 60.80% |
| 0-365 | 160 | 92.50% | 207 | 83.80% | 230 | 83.60% | 329 | 86.80% | 302 | 87.80% | 1229 | 86.60% |
| 0-730 | 172 | 99.40% | 242 | 98.00% | 272 | 98.90% | 369 | 97.40% | 337 | 98.00% | 1393 | 98.20% |
| 0-1095 | 173 | 100.00% | 247 | 100.00% | 275 | 100.00% | 375 | 98.90% | 343 | 99.70% | 1414 | 99.60% |
| *Completed does not reference success of restoration, but rather indicates that the community restoration episode ended. | | | | | | | | | | | |
| **Missing data from Curry, Malheur, and Wallawa Counties from 1/1/23-3/31/23; Missing data from Baker, Benton, Curry, and Wallawa Counties for 4/1/23-6/30/23; Missing data from Baker, Benton, Coos, Crook, Curry, Douglas, Jackson, Lincoln, Malheur, Wallawa, and Washington Counties from 7/1/23-9/30/23 | | | | | | | | | | | |

Forensic Evaluation data is reported in **Table 8** below. High numbers of evaluations are conducted by FES staff, including evaluations of individuals outside of OSH. I have been told by OSH FES leadership that new staff have been hired and it is hoped that evaluations will be able to be more timely, including more evaluations in the community. **Table 8** shows recent data on active cases for which FES has been assigned to evaluate, 388 of which are not currently at OSH.

DRO EX G, P. 15 of 40

**Table 8. Number of Active FES Cases as of 3/1/24**

| Type of Evaluation and Location | Number |
|---|---|
| .370 Evaluations at OSH | 358 |
| .370 Evaluations not at OSH | 306 |
| .365 Evaluations not at OSH | 62 |
| .315 Evaluations not at OSH | 20 |
| Total Cases | 746 |

*Additional Data to Inform this Report:*

**Table 9. Ready to Place Information from 2022 to 2024**

| Period | 10-Day RTP Assessments | Patients Found RTP | Percent Found RTP |
|---|---|---|---|
| 2022 (Aug-Dec) | 205 | 87 | 42.4% |
| 2023 | 648 | 250 | 38.6% |
| 2024 (Jan-Feb) | 83 | 23 | 27.7% |
| **Total** | **936** | **360** | **38.5%** |

**Table 9** above shows how many Aid & Assist patients had a 10-Day Ready to Place (RTP) assessment performed and how many of those assessments led to the patient being placed on the RTP list by their 10th day. The data shows how many A&A patients admitted to OSH did not need hospital level of care. Some of these individuals could have likely been sent directly to receive community restoration.

The mediation that resulted in the Second Amended order from 7/3/23 offered exceptions to the original "Mosman" restoration duration limits. From 8/1/23 to 11/1/23 there were seven requests and all of those were granted (see **Table 10**). From 11/2/23 to 3/31/24 there were 12 180-day extensions cases granted and 10 30-day discharge extensions. None of the requests appear to have been denied by the courts once requested.

**Table 10. Number of 180-day and 30-day Requests to Extend Restoration Duration**

| Period | 180-day violent felony extension requests (Requests / Granted) | 30-day discharge-related extension requests (Requests / Granted) |
|---|---|---|
| 8/1/23 – 11/1/23 | 7 / 7 | 11 / 11* |
| 11/2/23 – 3/31/2024 | 12 / 12 | 10 / 10 |
| **Total** | **19 / 19** | **21 / 21** |

*During the 8/1/23 – 11/1/23 period, only 6 of the 11 30-day extension requests met the criteria delineated by the mediation term sheet and Judge Mosman's order, per DOJ, but all were granted.*

DRO EX G, P. 16 of 40

Civil expedited admission requests and admissions are also tracked. The data produced by OSH indicated is in **Table 11** through the end of March 2024.

**Table 11. Civil Expedited Admissions 9/1/22 to 3/31/24**

| Period | Requests | Accepted | Denied |
|---|---|---|---|
| 9/1/22 – 11/1/23 | 19 | 11 | 8 |
| 11/2/23 – 3/31/24 | 18 | 15 | 3 |
| **Total** | **37** | **26** | **11** |

**Additional Information During this Interim Period**

Progress reports from the defendants have been completed monthly, the details of which can be found on the state's OHA Mink/Bowman website and will not be summarized here. I am encouraged by the active involvement of Medicaid in helping think through funding and policy strategies to continue to pay for services when feasible. As part of that progress, several items in my recommendations have begun to be tackled, such as rolling out the community navigator pilot as well as developing a more robust approach to community restoration with a companion manual. In addition, the finalized updated work plan was developed and is provided below as part of the concluding recommendations.

**Conclusions and Recommendations:**

Given the ongoing concerns about the strain on community systems serving the AA population especially in the aftermath of the Mosman order, it will be increasingly important to shore up the infrastructure and orientation of services and programs to best meet the needs of people in community settings. With that in mind, I highlight the following recommendations:

1. *Community Restoration*: I recommended in my Second Report that there be limits to timeframes to community restoration, and I continue to offer that recommendation. This would mean disentangling people's need for services from AA processes and utilize AA processes when that serves a government interest toward prosecution, rather than as a holding pattern for pretrial court oversight. Other services can and should be put in place to help provide the long term support needs for individuals outside of AA processes. I am encouraged by the workgroup facilitated by Mr. Neely to see what inroads can be made about legislative fixes to some of these system challenges.

2. *Partnerships across state agencies and entities*: I am encouraged that Medicaid staff have increased their involvement as a strong partner in the *Mink/Bowman* discussions and I recommend that this continue. It will also be important to further dialogue with Developmental Disability Services.

3. *GEI process improvement*: GEI process and data improvement activities are being discussed in regular meetings, and I look forward to reviewing ideas from the PSRB and OSH about these opportunities.

4. *Monitoring Litigation and ongoing discussions with Amici*: It will be important for the state to continue actively monitoring state litigation to and any trends that could impact compliance with Mink/Bowman's federal mandate, especially considering recent federal Supremacy Clause determinations. Also, with regard to the Amici group and the parties, if there is to be future mediation, it will be important that ideas are informed by data that can be examined for impact with regard to compliance and any other agreed upon factors..

5. *Updated Workplan*: The state continues to focus efforts on responding to the workplan and recommendations that were set forth in my Seventh Report. In this report, the updated workplan is codified as formal recommendations and is enumerated below. Once my report is released to the public, I would recommend that the state place these updated plans on the public facing website. I would also recommend that the parties review progress on the workplan regularly, and report out on any delays and the reasons for them. The updated workplan follows here:

## ISU

### 1.A.1, 2nd half

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.A.1 (2nd Half) | OHA, DRO, and MPD should begin to engage with stakeholders to review this data from the OSH data dashboard and develop a process to best use this data to inform system change at local levels. | **1. Establish standard agenda using data dashboard, RTP list and hospital waitlist for OHA/OSH and county meetings** | Complete | 6/15/23 | N/A | |
| | | **2. Hold first meeting with Multnomah County** | Complete | 6/30/23 | N/A | |
| | | **3. Identify pilot counties to hold monthly meetings**<br>3.1 – Define criteria for county selection<br>3.2 – Select counties (with leadership approval)<br>3.3 – Define attendee list for each meeting | Complete | 8/29/23 | N/A | |
| | | **4. Implement pilot**<br>4.1 – Schedule meeting<br>4.2 – Facilitate meetings monthly | Ongoing | 9/30/23 | N/A | |
| | | **5. Conduct data review**<br>5.1 – Review data with Dr. Pinals | Complete | 3/31/24 | N/A | |

18

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | **6. Integrate RTP Process into CFAA Resolution Process**<br>6.1 – Draft Resolution Process -Complete<br>6.2 – Draft OSH/OHA reconciliation process and submit to leadership for approval<br>6.3 – Implement Resolution Process with Counties and begin data collection | **In Progress** | 5/01/24 | 7/01/24 | Needed to revise plan to include CFAA Resolution Process to avoid increasing CMHP administrative burden. |
| | | **7. Conduct Final Data Review**<br>7.1 – Present Data to Dr. Pinals | **Not Started** | N/A | 2/1/25 | |

## 1.A.2

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.A.2 | **Data staff:** OHA should submit POP to legislature to fund additional Data Technician for expansion of data development. | **1. Finalize position description (PD)**<br>1.1 - Draft position description using template.<br>1.2 - Have select team members review PD for content.<br>1.3 - Send to management for PD review and approval | Complete | 8/31/23 | 2/27/24 | Intensive Services Unit currently has eight open positions that required new or revised position descriptions. Additionally, seven of the positions require approval/establishment though Department of Administrative Services (DAS). There is no current estimate on how long this review process will take. |
| | | **2. Post position for hire**<br>2.1 - Send finalized and approved PD to HR for posting.<br>2.2 - Review/edit as HR sees fit<br>2.3 - HR to forward to DAS for review<br>2.4 - DAS approves | Complete | 9/30/23 | 4/1/24 | |

DRO EX G, P. 19 of 40

Oregon Neutral Expert Ninth Report Regarding *Mink/Bowman*
5/20/24

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | 2.5 - Upload to Workday site for required period of time | | | | |
| | | **3. Hire position** <br> 3.1 - Post to Workday for recruitment <br> 3.2 - Review submitted applications for minimum qualifications <br> 3.3 - Conduct interviews <br> 3.4 - Extend offer <br> 3.5 - First day by on job | **In Progress** | 11/30/23 | 7/01/24 | |

## 1.B.6

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.B.6 | **Development of community navigator model:** OHA should develop a model to create "community navigators" to support individuals sent for restoration as they transition from OSH into community settings. | **1. Select Community Navigator Model** <br> 1.1 - Facilitate workgroup review of navigator models. <br> 1.2 - Identify model that aligns with the intent of community navigators. <br> 1.3 - Draft model recommendation for Dr. Pinals. <br> 1.4 - Incorporate feedback from Dr. Pinals. | **Complete** | 11/15/23 | N/A | N/A |
| | | **2. Select pilot sites for Community Navigator pilot** <br> 2.1 – Identify potential pilot sites. <br> 2.2 - Schedule pilot introduction and collaboration session(s) with pilot sites <br> 2.3 - Review of pilot with AOCMHP and incorporate feedback. <br> 2.4 - Request to OHA leadership to expand the scope of the pilot to include (1) individuals in | **Complete** | 11/17/23 | N/A | N/A |

DRO EX G, P. 20 of 40

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | community restoration, (2) pilot sites.<br>2.5 - Outreach to CMHPs based on Aid & Assist caseload counts.<br>2.6 - Identify six pilot sites.<br>2.7 - Confirm pilot sites. | | | | |
| | | **3. Identify and develop training materials and plan**<br>3.1 - Meet with pilot sites to identify training needs for staff and navigator model. *Completed as of 2/6/24.*<br>3.2 - Develop training materials. *Completed as of 2/6/24.*<br>3.3 - Schedule training dates for pilot sites<br>3.4 - Complete initial trainings | **In Progress** | 1/31/24 | 4/30/24 | The delays in distributing funding were due to the extended CFAA negotiations.<br><br>The team has identified a need for follow up trainings because hiring will be staggered. |
| | | **4. Develop data collection and reporting methods**<br>4.1 - Review data currently reported by pilot sites.<br>4.2 - Incorporate data elements necessary for evaluation purposes including the examination of recidivism to OSH for Aid and Assist restoration.<br>4.3 - Incorporate feedback from Dr. Pinals.<br>4.4 - Formalize data reporting process.<br>4.5 - Communicate process to pilot sites | **Complete** | 1/31/24 | **N/A** | **N/A** |
| | | **5. Start Implementation**<br>5.1 - Monthly or quarterly meetings and technical assistance with pilot sites<br>5.2 - Ongoing review of support and training needs | **Complete** | 3/1/24 | **Ongoing** | **N/A** |
| | | **6. Conduct 6-month pilot review**<br>6.1 - Conduct data review<br>6.2 - Conduct partner/collaborator meetings: Pilot site listening & feedback sessions | **Not Started** | **Aug 2024** | 9/30/24 | The milestone is delayed due to the additional time needed to incorporate partner/collaborator feedback.<br>Language added to |

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | 6.3 - Meet with Dr. Pinals to review and obtain feedback<br>6.4 - Incorporate feedback from pilot sites and Dr. Pinals | | | | the milestone to state "6-month" pilot. |
| | | **7. Conduct final data review, continuation for statewide expansion**<br>7.1 - Data review; integrate findings/recommendations with Contingency Management MH Block Grant Pilot<br>7.2 - Conduct partner/collaborator meetings: Pilot site listening & feedback sessions<br>7.3 - Meet with Dr. Pinals to review and obtain feedback<br>7.4 - Incorporate feedback from pilot sites and Dr. Pinals | **Not Started** | **Mar 2025** | **3/31/25** | Please note: There is no delay. Language was added to specify the block grant project in 7.1 (MH block grant project) |

## 1.B.9.c

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Update Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.B.9.c | **Discharge process prioritization**: Rulemaking and Reduced Reliance on Single Solutions for Discharge. OHA shall amend the OARs applicable to AA Ready-to-Place defendants to clarify that the treating clinical team's clinical recommendations primarily guide | **1. Draft OARs for revision**<br>1.1 - Review relevant OARs and Mink/Bowman recommendations<br>1.2 - Create initial draft of OARs<br>1.3 - Obtain OHA leadership permission to move forward with permanent rule process<br>1.4 - Leadership review of initial draft<br>1.5 - Incorporate leadership feedback<br>1.6 - Review PDES report for discharge | In Progress | 4/12/24 | 5/1/24 | Due to the volume of feedback received during community engagement, more time is needed to incorporate feedback prior to presenting final draft to leadership and Dr. Pinals. This delay will not cause a delay for completing Milestone 2. |

22

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Update Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | discharge planning. | related content and incorporate changes 1.7 - Review finalized CFAA as well as Draft CRP Manual from Recommendation 2.3.a for changes or other relevant rules to change during the permanent rule process 1.8 - Leadership Review of Final Draft 1.9 - Obtain feedback from Dr. Pinals, and Parties and finalize draft | | | | |
| | | **2. Complete permanent rule process** 2.1 - Hold community engagement sessions prior to initiating permanent rule process 2.2 - Work with HSD rules coordinator to complete permanent rule process | **In Progress** | **8/31/24** | **No Delay Anticipated** | **N/A** |
| | | **3. Complete training for stakeholders on new rules and expectations** 3.1 - Review relevant rule changes to inform training materials 3.2 - Develop training material to present to stakeholders around clarification of new OAR 3.3 - Schedule and present training | **Not Started** | **10/31/24** | **No Delay Anticipated** | **N/A** |

## 2.3.c

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|

DRO EX G, P. 23 of 40

| 2.3.c | **Community Restoration Program Refinements:** OHA should produce an annual report on CRP activities for public access to inform further legislative needs for communities to best deliver CRP services, inform proposals for legislative change, resource needs, and inter-relationships of partners/collaborators involved with CRP participants and the courts. | **1. Onboard OHA contractor to complete annual report**<br>1.1 - Coordinate with governance team to begin contract process. *Completed as of 11/7/23.*<br>1.2 - Review PDES Report for potential recommendations for short legislative session. *Completed as of 11/14/23.*<br>1.3 - Define scope of annual report. *Completed as of 1/9/24.*<br>1.4 - Complete contracting and begin work with contractor | In Progress | 2/29/24 | 4/30/24 | The project plan underestimated the length of time needed for the contract negotiation process. Currently, OHA is in final stages of contract negotiations and budget approval. This delay is not anticipated to impact the milestone 2. |
| | | **2. Complete initial annual report**<br>2.1 - Collaborate with contractor to provide required information and subject matter expertise required for them to draft report<br>2.2 - Review report drafts and get leadership approval<br>2.3 - Present annual report to Dr. Pinals and parties | Not Started | 9/1/24 | No Delay Anticipated | N/A |

## ISU / OSH

### 1.B.13, 1st half

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.B.13 (1st half) | **Substance use disorder treatments:** Expand access to substance use treatment including medications for addiction treatment (MAT) and contingency management in residential and community programs that serve people under AA orders. Incorporate these services into the refinements of services offered for people in Community Restoration Programs (CRPs). | **1. Train on contingency management (CM) practices and consider relevance for use at OSH** 1.1 – OSH trainings begin on CM 1.2 – OSH trainings completed on CM/recap discussion with workgroup – feedback, comments, suggestions for future directions 1.3 – OSH to consider if CM programming has relevance for use at OSH, based on training feedback | **In Progress** | **1/31/24** | **6/15/24** | |
| | | **2. Implement CM practices in community settings** 2.1 – Continue providing CM in 6 community agencies via existing initiative 2.2 – Evaluate successes/barriers based on existing services and make recommendations for improvements 2.3 – Discuss with OHA M110 staff opportunity to include CM in Behavioral Health Resource Networks (BHRNs) 2.4 – Discuss with Medicaid leadership a timeline for billing pathways to be set up with CM 2.5 – Recruit providers for fall CM training cohort with Northwest ATCC | **In Progress** | **N/A** | **9/1/24** | Note that CM has already being implemented in select community settings via ongoing initiative, as mentioned in 2.1. |

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | **3. Include OSH teams on the statewide ASAM training** | **Complete** | **1/31/24** | **2/26/24** | This item was complete as of 2/26 with Online on-demand Training links made available to OSH teams. |
| | | **4. OHA to establish continuity of care for discharging patients with SUD from OSH**<br>3.1 - SUD subject matter experts engage and collaborate with discharge planning staff (at OSH and in community) to include training community providers in Aid and Assist legal processes and requirements<br>3.2 - Identify key partners/collaborators who need to be engaged to support effective continuity of care<br>3.3 - Identify roles and responsibilities of key partners/collaborators in continuity of care<br>3.4 - Develop draft workflow to ensure that patients with SUD discharged from OSH receive needed SUD treatment integrated or concurrent with other care needs in a timely manner | **In Progress** | **7/31/24** | **No Delay Anticipated** | **N/A** |

26

## OSH  1.B.1, 2nd half

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.B.1 (2nd half) | **Standardized Assessments:** OHA should convene key partners to review the standardized process and make final recommendations. Implement rule changes if needed. | **1. Develop form to share with courts in HLOC packet, end statutory jurisdiction packet and discharge packet**<br>1.1 - LOCUS score will be replaced by a narrative describing client need, along with clinical information courts can use to make a more informed decision | Complete | 8/2/23 | N/A | N/A |
| | | **2. Convene partners in aid and assist discharge process to assess effectiveness of the OSH clinical progress update for decision making**<br>2.1 - Meet with partners/collaborators including OJD, AOCMHP, Dr. Pinals, and parties to assess and develop needed revisions | In Progress | 11/30/23 | 5/30/24 | Survey has been sent out to judges and the judges will need time to respond. The team will then review and consolidate survey responses. |
| | | **3. (If major revisions required) Explore OAR and/legislative changes** | Not Started | 6/30/24 | No Delay Anticipated | N/A |

## 1.B.8.d

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.B. 8.d | **Improve GEI processes** to reduce reliance on OSH when not clinically appropriate. | **1. A supervising OSH Risk Review Social worker will continue to meet at least twice monthly with the PSRB Executive Director and HSD GEI/PSRB Operations and Policy Analyst Three to:** | Ongoing | Ongoing | No Delay Anticipated | N/A |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | • Discuss current state of PSRB placements<br>• Review Community vacancies<br>• Problem-solve complex case and systemic issues creating barriers to discharge<br>• Serve as a liaison to Risk Review committee and the PSRB Attend Monthly statewide meetings | | | | |
| | | **2. A supervising Risk Review Social worker and/or the Director of Social Work monitor revocations on an ongoing basis and clients reaching End of Jurisdiction (EOJ) beginning one year from EOJ to ensure appropriate planning and community engagement** | **Ongoing** | **Ongoing** | **No Delay Anticipated** | **N/A** |
| | | **3. Establish a series of three to five (3-5), 1.5-hour meetings to explore opportunities to improve GEI processes and to reduce reliance on OSH bed days in partnership with DRO, OSH, HSD, PSRB and the neutral expert**<br>3.1 - Complete facilitating meetings.<br>3.2 - Set new deliverables and assign ownership and completion dates of any improvements identified | **In Progress** | **Jan 2024** | **6/30/24** | Scheduling availability pushed out the meeting dates. OSH held at least 5 meetings as required by the work plan.<br><br>These meetings identified a new data dashboard as the deliverable. The dashboard is set to go-live in April. |

Oregon Neutral Expert Ninth Report Regarding *Mink/Bowman*
5/20/24

## 1.B.13, 2nd half

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.B.13 (2nd half) | **Substance use disorder treatments:** Similarly for the OSH population, foster greater focus on substance use treatment services for individuals in AA and GEI processes. Incorporate these services into the refinements of services offered for people in Community Restoration Programs (CRPs). | **1. OSH obtained additional training for a small group of OSH staff on SMART recovery and have increased access to this group service** | Complete | 8/1/23 | N/A | N/A |
| | | **2. Train a larger group of psychology, treatment services, and social work staff in Wellness Recovery Action Planning (WRAP).** This will increase access to both group and individual WRAP services. | Complete | Initiate July 2023 | N/A | N/A |
| | | **3. Train non-clinicians to provide legal education to patients, which in the long-term will reduce clinician time in that work and afford more time to provide higher skilled clinical work, including SUD services.** We are working to get staff who have completed classroom training effectively paired with existing group leads to co-lead groups to complete the training process for those individuals. | Paused | Initiate July 2023 | 9/30/24 | This project was initiated, launched, and has paused due to the loss of key staff trained as trainers. During the same time period, the jurisdictional treatment RPI (noted in number 4) started. The jurisdictional treatment RPI will impact how legal education services will be provided and who may be providing those services at OSH. This has a significant impact on how we provide additional training and who should be targeted for training. We will work to identify a new process for training staff to provide legal education as part of the jurisdictional treatment Rapid Process Improvement (RPI). |

29

Oregon Neutral Expert Ninth Report Regarding *Mink/Bowman*
5/20/24

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | **4. Launch a RPI related to improving group-based treatment centered on the different jurisdictions of our patients and the unique barriers to discharge/transition for Aid and Assist, PSRB, and civil jurisdictions.** This will include consideration of group SUD services and the role of addiction as a barrier to discharge/transition for different jurisdictions. | **In Progress** | **Initiate July 2023 ; Go live October 2024** | **1/31/2025** | The hospital is in the process of a reorganization and the RPI needed the reorganization decision to settle on space use. Please note that the RPI is progressing and is now anticipating the go-live to now be in the new year. |
| | | **5. Work toward re-initiating a CADC training academy with a tentative goal for a cohort to begin in 2024 (contingent on positions and staffing).** This program trains existing hospital staff in different positions to provide SUD services and requires that they commit to providing 2-4 hours.<br>5.1 – Initiate training academy planning (*Completed*)<br>5.2 – Re-launch next CADC cohort | **In Progress** | **Initiate Mar 2024** | **10/1/24** | Please note there is no delay in the initiation of this milestone. Planning for a relaunch of the CADC training program began in February 2024 and there are regular cadenced meetings to move that project forward; This item is In Progress. The projected go live for the next training academy to begin is October 2024. Regular cohorts will then be launched on an annual basis ongoing.<br><br>Each training cohort will include a minimum of 8 staff. |

30

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | **6. Operationalize MAT protocols within OSH** <br> 6.1 - Review state and federal law and rule relating to provision of MAT *Completed* <br> 6.2 - Provide education/training/resources for OSH staff around MAT <br> 6.3 - Develop workflow for patient initiation onto MAT *Completed* | **In Progress** | **Initiate Mar 2024** | **No Delay Anticipated** | **N/A** |

31

Oregon Neutral Expert Ninth Report Regarding *Mink/Bowman*
5/20/24

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.A.3 | **Data sharing:** OHA/OSH should work in partnership with OJD to examine best mechanisms to share their own data and utilize regular data reports from each entity to mutually inform practices. | **1. Data Warehouse team to run current report using data pulled from e-court and will send to OHA/OSH teams.** | **Complete** | **7/20/23** | **N/A** | **N/A** |
| | | **2. OHA/OSH team to review Data Warehouse data for alignment with Neutral Expert data sharing request elements and attempt to produce reports** 2.1.a - If data aligns with current need, the data team will create ongoing reports to be uploaded to Mink/Bowman website. 2.1.b - If useful data is not able to be pulled from data warehouse, this will become an agenda item for discussion with Dr. Pinals and all parties if appropriate. | **Complete** | **11/1/23** | **N/A** | **N/A** |
| | | **3. OHA/OSH to evaluate whether new codes that OJD is creating can be used.** (Note: this goal is dependent upon OJD and OHA's ability to access ECourts data.) 3.1 OHA and OJD to update DUA based on additional fields needed. 3.2 Create workable and repeatable reports from ECourts to be used by BH Staff and aggregated to be used on the Mink-Bowman website | **In Progress** | **Jan 2024** | **6/30/24** | The team has received original set of codes from OJD. Since the Data Use Agreement (DUA) was executed, more codes have been added. This recommendation is contingent on OJD. Milestone is delayed due to issues complexities in the Data Warehouse of related to cross-system data matching (Primary Client Index (PCI) functionality), overall data environment indexing functionality, and reporting tool capacity issues. |
| | | **4. OHA to review data currently available from the OHA data warehouse that is supplied by OJD/E-Courts. Further data sharing** | **In Progress** | **Jan 2024** | **6/30/24** | The team has received original set of codes from OJD. Since the DUA was executed, more |

32

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | **agreements and analysis will be considered after initial review of available data** 4.1 - OJD is creating new codes to be tracked in Ecourts, which may make it easier to track outcomes and dispositions for Aid and Assist clients. *Completed as of 1/11/24.* 4.2 Analysis of new codes to be completed to determine any additional data needs for new codes. *Completed 3/7/2024* 4.3 - Once codes are implemented, data warehouse techs will begin building reports on the new codes | | | | codes have been added. This modification to the DUA for the community restoration codes is in review by the OJD legal team. This recommendation is contingent on OJD. |

2.5

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 2.5 | **OSH Patient Care Improvement and Community Engagement:** OHA should explore all available means to obtain funding for one OSH data analyst and two OSH data integration specialist positions to support Mink/Bowman treatment discharge approaches, community connections, and data reporting. | **1. Submit request to the legislature prior to 2023 legislative session via POP 402** 1.1 - POP 402 was not supported by the legislature; however, OSH did receive approval for 10 positions, one of which is a research analyst 3 | **Complete** | 6/30/23 | N/A | N/A |
| | | **2. OSH to bring staff on** 2.1 - Continue to move the 10 positions approved by the legislature through classification and compensation stage of recruitment *(Completed as of 3/2024)* 2.2 - Initiate recruitment for the manager position in partnership with Equity and Inclusion Division. (Manager will recruit and hire team members with leadership support) | **In Progress** | 1/1/24 | 9/01/24 | Since the milestone is contingent on state HR processes, there is not an exact due date available. |

33

| | | 2.3 - Positions likely to start | | | | |
|---|---|---|---|---|---|---|

## Data 1.A.3

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.A.3 | **Data sharing:** OHA/OSH should work in partnership with OJD to examine best mechanisms to share their own data and utilize regular data reports from each entity to mutually inform practices. | **1. Data Warehouse team to run current report using data pulled from e-court and will send to OHA/OSH teams.** | **Complete** | 7/20/23 | **N/A** | **N/A** |
| | | **2. OHA/OSH team to review Data Warehouse data for alignment with Neutral Expert data sharing request elements and attempt to produce reports**<br>2.1.a - If data aligns with current need, the data team will create ongoing reports to be uploaded to Mink/Bowman website.<br>2.1.b - If useful data is not able to be pulled from data warehouse, this will become an agenda item for discussion with Dr. Pinals and all parties if appropriate. | **Complete** | 11/1/23 | **N/A** | **N/A** |
| | | **3. OHA/OSH to evaluate whether new codes that OJD is creating can be used.**<br>(Note: this goal is dependent upon OJD and OHA's ability to access ECourts data.)<br>3.1 OHA and OJD to update DUA based on additional fields needed.<br>3.2 Create workable and repeatable reports from ECourts to be used by BH Staff and aggregated to be used on the Mink-Bowman website | **In Progress** | **Jan 2024** | **6/30/24** | The team has received original set of codes from OJD. Since the Data Use Agreement (DUA) was executed, more codes have been added. This recommendation is contingent on OJD. Milestone is delayed due to issues complexities in the Data Warehouse of related to cross-system data matching (Primary Client Index (PCI) functionality), overall data environment indexing |

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | | | | | functionality, and reporting tool capacity issues. |
| | | **4. OHA to review data currently available from the OHA data warehouse that is supplied by OJD/E-Courts. Further data sharing agreements and analysis will be considered after initial review of available data** 4.1 - OJD is creating new codes to be tracked in Ecourts, which may make it easier to track outcomes and dispositions for Aid and Assist clients. *Completed as of 1/11/24.* 4.2 Analysis of new codes to be completed to determine any additional data needs for new codes. *Completed 3/7/2024* 4.3 - Once codes are implemented, data warehouse techs will begin building reports on the new codes | **In Progress** | **Jan 2024** | **6/30/24** | The team has received original set of codes from OJD. Since the DUA was executed, more codes have been added. This modification to the DUA for the community restoration codes is in review by the OJD legal team. This recommendation is contingent on OJD. |

## 2.3.b

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 2.3.b | **Community Restoration Program Refinements:** OHA should enhance CRP data reporting from quarterly to more active regular contemporaneous reporting (and fund the needed infrastructure to do so) so that reports can be generated | **1. Identify which of requested data points are already being collected by OHA, and how often they are being collected** 1.1 - Receive reports from data warehouse | **Complete** | 9/15/23 | **N/A** | **N/A** |
| | | **2. Complete first draft of changes needed to capture all requested data points on a monthly basis and submit to relevant parties for approval** 2.1 - Consult with Health Policy and Analytics and Datawarehouse team to ensure feasibility of draft. | **In Progress** | 12/15/23 | 8/31/24 | Milestone is delayed due to issues in the Data Warehouse of cross-system data matching (PCI functionality), overall data environment indexing functionality, and |

35

DRO EX G, P. 35 of 40

| | | | | | |
|---|---|---|---|---|---|
| as needed by OHA. | *Completed as of 11/1/23.*<br>2.2 - Draft reports from the Data Warehouse in consultation with Health Policy and Analytics.<br>2.3 - Present to BHD leadership and Neutral Expert incorporate feedback<br>2.4 - Present finalized report to the parties and Neutral Expert | | | | reporting tool capacity issues. The ODE team is also still waiting on OJD legal team to review DUA to be able to receive community restoration codes |
| | **3. Initiate processes needed to make identified changes to CRP reporting structure**<br>3.1 - Create draft reports for use by Behavioral Health staff and aggregated for use on the Mink-Bowman website<br>3.2 - Schedule meeting with relevant contract administrator and Datawarehouse team to determine steps needed to ratify changes, as well as the timeline for ratification | **In Progress** | 2/15/24 | 2/28/25 | The team is working on a gap plan to pull data from OJD once community restoration codes are included in the data feed to OHA. Once ROADS implementation occurs, OHA will review reports developed during the gap plan to see if there is additional information that would need to be included. |

## Medicaid

### 1.B.11

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.B.11 | OHA shall draft an analysis report that reviews the current state of care coordination operations for adults under an Aid & Assist Competency Restoration order discharging from OSH to the community, and separately those discharging from OSH to jail. | **1. Conduct requirements review**<br>1.1 - Complete OAR review<br>1.2 - Complete 2024 CCO contract review<br>1.3 - Complete 2024 FFS Care Coordinator contract review<br>1.4 - Complete 2024 CMHP contract review<br>1.5 - Complete 2024 Comagine Contract review<br>1.6 - Draft Analysis Report | **In Progress** | 2/15/24 | 7/30/24 | Milestone is in progress, as Medicaid policy analyst has been hired and onboarded and is in progress with requirements review. Milestone was initially delayed due to hiring and onboarding of dedicated staff. |

DRO EX G, P. 36 of 40

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | 1.7 - Review of 2023 IQA Audit & integration of Corrective Action Plan to issues related to the LSI and Comagin**e** | | | | |
| | | **2. Circulate analysis report draft for review** 2.1 - Circulate analysis report for review 2.2 - Complete OHA Medical leadership review 2.3 - Complete OHA BH and Medicaid leadership review 2.4 - Complete OSH Social Work leadership review 2.5 - Complete PSRB review 2.6 - Complete Dr. Pinals review 2.7 - Incorporate feedback from reviews | **Not Started** | 3/1/24 | 10/31/24 | Milestone was initially delayed due to hiring and onboarding of dedicated staff. |
| | | **3. Final analysis report due** | **Not Started** | 3/29/24 | 11/1/24 | Milestone was initially delayed due to hiring and onboarding of dedicated staff. |
| | | **4. Submit recommendations for consideration in the CCO, FFS care coordination, and Transition of Care (TOC) rules** 4.1 – Submit recommendations for consideration in the CCO rules 4.2 – Submit recommendations for consideration in the FFS care coordination rules | **Not Started** | 3/29/24 | 1/31/25 | Milestone was initially delayed due to hiring and onboarding of dedicated staff. |

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| | | 4.3 – Submit recommendations for consideration in the TOC Oregon Administrative Rules | | | | |

## 1.B.12.b

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 1.B.12.b | OHA will develop a request for the 2025 legislative assembly to fund care coordination services for adults discharging from the OSH to community or jails. This may include an assessment of the Community Navigator pilot currently in development under 2023 legislatively allocated resources. | **1. Submit 2025 legislative request**<br>1.1 - Develop high level Policy Option Package (POP) concept<br>1.2 - Develop budget needs<br>1.3 - Draft a POP<br>1.4 - Circulate the POP for feedback among partner agencies<br>1.5 - Submit the POP | **In Progress** | 1/31/25 | 6/31/24 | Policy Option Package language and concept development are in progress. Please note: there is no delay for milestone. The finalized language for the POP is due to 6/31/24. |
| | | **2. Develop an engagement strategy with legislative assembly, OSH, DOC, OYA county/regional adult & youth carceral facilities, advocacy, ODHS, etc. in the form of talking points and presentation that addresses reason, need, impact, monitoring, etc.** | **Not Started** | **N/A** | **12/31/24** | This milestone will begin in the fall and engagement strategy will end in December |

## 2.6

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|
| 2.6 | OHA shall expand Home CCO eligibility to align with the 2 years of continuous | **1. Complete 1115 waiver CE negotiations with CMS regarding 2 years of continuous eligibility**<br>1.1 - Complete CMS post protocol negotiations | **Complete** | 8/30/24 | 7/01/23 | **N/A** |

DRO EX G, P. 38 of 40

| | | | | | |
|---|---|---|---|---|---|
| eligibility for individuals under an AA competency restoration order under the following scenarios:<br>• Community restoration (no OSH stay)<br>• OSH discharge to community restoration<br>• OSH discharge to jail and with monitoring for release to reinstate Medicaid eligibility and CCO eligibility or FFS care coordination<br><br>Additionally, OHA shall provide a warm handoff to Fee for Service care coordination for individuals who meet Medicaid eligibility but either not eligible for CCO enrollment or choose not to enroll into a CCO. | 1.2 - Finalize post approval protocols between state and CMS | | | | |
| | **2. Develop enrollment processes for eligible individuals who are exiting OSH/carceral systems**<br>2.1 - Assess OSH CCO enrollment pilot with Lane co. and Springfield jails<br>2.2 – Complete process development based on analysis report developed in recommendation 1.B.11<br>2.3 - Develop a process for a warm handoff for individuals who meet Medicaid eligibility but either not eligible for CCO enrollment or choose not to enroll into a CCO. | **Not Started** | 8/30/24 | 6/31/25 | Additional time needed due to coordinating with each organization in every step of the process including OSH, Jails, ODHS, and other collaborators. |

## OJD

### 1.B.10

| # | Recommendation Summary | Milestones / Sub-tasks | Status | Original Due Date | Updated Due Date | Reason for Delay |
|---|---|---|---|---|---|---|

39

| 1.B.10 | Forensic evaluation quality and efficiencies: OHA/OSH should continue to support work to develop improved infrastructure and efficiencies for forensic evaluations. OJD has agreed to lead in the writing of a report, and Parties in the Mink/Bowman matter should review and refine.<br><br>The Mink Restoration Limits and Exceptions Workgroup sponsored by OHA should take on the opportunity to improve evaluation services through legislative remedies or other strategies. | 1. | OJD to develop GAINS Workgroup report to inform Legislative workgroup | In Progress | 12/29/23 | 8/15/24 | OJD hopes to complete the GAINS Workgroup report that evaluates Oregon's forensic evaluation system by mid-August.<br><br>They are experiencing some staffing issues on their behavioral health team that have slowed them down in the midst of facilitating OJD's statewide civil commitment workgroup and other behavioral health priorities. However, they will complete the report as soon as possible, get final review from the GAINS Workgroup, and share with OHA. |
|---|---|---|---|---|---|---|---|
| | | 2. | Evaluation system improvements recommendations will be finalized based on charter for Mink Restoration Limits and Exceptions Workgroup | In Progress | N/A | 1/01/25 | New milestone added to the recommendation. |

The above project plan updates were constructed with the approval of the plaintiffs for each item. There was tremendous collaboration among various parties within OHA, including the state Medicaid office and the work between leadership in the substance use services and other aspects of behavioral health services.

In conclusion for this report, I would like to acknowledge the many individuals and perspectives that helped inform the work during this interim period. I appreciate the time and attention that multiple partners across sectors have devoted to addressing the challenges in best serving the populations of persons under AA and GEI mandates. I once again commend the efforts of the Parties, and the work of the Amici including the elected and other officials regarding *Mink/Bowman* on behalf of the class members.

**Respectfully Submitted,**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*

DRO EX G, P. 40 of 40

**D e b r a  A.  P i n a l s,  M.D.**

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Tenth (10th) Report**
**Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** November 12, 2024
**Neutral Expert:** Debra A. Pinals, M.D.

**Background and Context of this Report:**

On 12/21/21, The Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as the Neutral Expert in the *Mink/Bowman* matter, granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case (see below for summary). Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)." The Court further ordered a second report by the Neutral Expert to include "a short report and recommendations for a proposed long-term compliance plan for OSH." After submitting my initial reports, on 6/7/22 the Court ordered my ongoing appointment and stated, "Beginning on September 7, 2022, Dr. Pinals will provide brief quarterly reports to update the Court regarding compliance status and any needed additional recommendations to address any barriers to achieving compliance." In total, I have produced and provided the following reports to the Court in this case:

- First Report, 1/30/22
- Second Report, 6/5/22
- Third Report, 9/15/22
- Fourth Report, 12/21/22
- Fifth Report, 4/17/23
- Sixth Report, 7/24/23
- Seventh Report, 10/18/23
- Eighth Report, 12/18/23
- Ninth Report, 5/20/24

On 5/10/23 Judge Mosman issued an Amended Order, followed by his 7/3/23 Second Amended Order in this matter. The Second Amended Order contained the following language:

> *This order shall terminate upon the Neutral Expert reporting to this Court that OSH/OHA has timely admitted A&A and GEI patients for at least three consecutive months, and that the termination of this order would not cause the Defendants to fall back out of compliance. For purposes of this order "timely admission" means within seven days of a State Court order delivered to OSH ordering that the patient be admitted.*

As part of the backdrop to the Second Amended Order, the parties and recognized amici entered into mediation, and a Mediation Final Term Sheet (June 2023) delineated that a report to the Court should be submitted reviewing the efficacy of the September Order, taking in input from the parties and the amici as follows:

> *Review of September Order Efficacy. On or before October 2, 2023, OSH, OHA, plaintiffs, and Dr. Pinals will review the efficacy of the September order with regard to achieving compliance, factoring in any unintended negative consequences. OSH will prepare a report of their findings, and Dr. Pinals will incorporate that review and her opinions about the efficacy of the order into a report to the Court on or before November 15, 2023. Amici agree also to submit their perspectives in writing to OSH, OHA, and Dr. Pinals on or before October 2, 2023.*

Prior report highlights include my Seventh report on 10/18/23, articulating a new set of recommendations that updated the recommendations in my Second Report. In my Eighth Report I offered my opinions "about the efficacy of the order", which was set to expire on 12/31/23. I recommended that the order be extended for one year, and this was subsequently ordered by Judge Mosman. There were several threads of litigation since that time, most especially related to Supremacy Clause considerations. Judge Mosman ruled on 3/6/24 noting that the Supremacy Clause applied regarding a case out of Marion County. That same day, the *Mink/Bowman* case was re-assigned to Judge Adrienne Nelson.

The Honorable Adrienne Nelson issued two rulings related to this matter on 4/4/24 denying motions to intervene by Marion County and by a group of other Intervenors. An order on 6/20/24 for mediation set for 8/26/24 was entered by Magistrate Judge Stacie F. Beckerman. On 6/27/24 Judge Nelson granted Oregon Crime Victims Law Center's motion to appear as amicus curiae. Judge Nelson also granted orders related to the matter pertaining to the Legacy Health System case, which is yet unsettled.

Given the work being done since mediation and by the parties, Judge Nelson granted an extension of the timeline for this report, to be submitted on or before 11/12/24.

**Background and Summary of the Two Consolidated Cases:**

A more detailed background to these cases is reviewed in my prior reports. In summary, state defendants were previously found by the Ninth Circuit (*OAC v. Mink, 2003*) to be out of compliance with Constitutional requirements and were ordered to admit individuals found unable to Aid and Assist in their criminal cases to Oregon State Hospital for restoration within seven (7) days of receipt of an order for their commitment to OSH for restoration. In December 2021, after further litigation, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide

DRO EX H, P. 2 of 35

recommendations to help achieve compliance with the Ninth Circuit's seven (7) day admission requirement as outlined above.

In a separate litigation, in November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after The Honorable Nan Waller ordered them to OSH for treatment, without unreasonable delay. After further litigation, The Honorable Marco A. Hernandez, United States District Court Judge, agreed with the defendants that a consolidation of the *Mink* and *Bowman* cases made sense.

In accordance with and in response to my First Report recommendations, the has been a single waitlist for people waiting in jail for a bed at OSH, whether GEI or under the Aid and Assist process. Waiting times for individuals on the GEI track and on the AA restoration track are still reviewed separately as part of this consolidated litigation.

**Qualifications to Perform this Work:**

I have worked for over twenty-five years as a clinical and academic and forensic psychiatrist, and have functioned for over twenty years in state and local level behavioral health administrative leadership, management, policy and legislative development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions. Other details are provided in my First Report.

**Sources:**

Background court and legal documents for this case upon which I continue to rely include:

1. Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21;
2. Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21;
3. Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20;
4. *Mink* and *Bowman* Interim Agreement, Filed 12/17/21;
5. *Bowman* 1637 PLD Plaintiffs 1st Amended Complaint #22;
6. *Mink* 0339 Court Order Granting Motion for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;
7. Order on Joint Stipulation to Continue Appointment of Neutral Expert, signed by the Honorable Michael W. Mosman, 6/7/22;
8. *Bowman* Opinion and Order, Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), signed by Judge Mosman 8/16/22;
9. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 9/1/22;
10. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), No. 6:22-cv-01460-MO (Member Case) Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 5/10/23;

11. Oregon Advocacy Center et al., v. Mink et al. Case No. 3:02-cv-00339-MO (Lead Case) Mediation Final Term Sheet (June 2023); and
12. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Second Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 7/3/23.

Additional recent court case activity that I have reviewed since my last report includes:

1. Number: 3:21-cv-01637-MO, Document No. 259, Opinion and Order: Defendants' Petition for Expedited Ruling on Supremacy Clause, signed on 3/6/24 by Judge Michael W. Mosman;
2. Case Number: 3:21-cv-01637-MO, Notice of Case Reassignment to Judge Adrienne Nelson, 3/6/24;
3. Case No. 24CN00829, Order to Show Cause re Contempt, Marion County Circuit Court, dated 3/7/24, signed by Judge Audrey Broyles;
4. Case No. 3:02-cv-00339-MO (Lead Case), Opinion and Order: Intervenors' Motion to Intervene, entered by Judge Adrienne Nelson, 4/4/24;
5. Case No. 3:02-cv-00339-MO (Lead Case), Opinion and Order: Amicus Curiae Marion County's Motion to Expedite or Accelerate Ruling and its Second Motion to Intervene, entered by Judge Adrienne Nelson, 4/4/24;
6. Legacy Health System; Peacehealth; Providence Health & Services-Oregon; Legacy Emanuel Hospital & Health Center, DBA Unity Center for Behavioral Health; St. Charles Health System, Inc. v. v. Allen (OHA) appeal documents, Appeal No. 23-35511, including Plaintiffs-Appellants' Opening Brief, Appellee's Brief and Closing Health Reply;
7. State of Oregon v. Charly Josh Velasquez-Sanchez Mandamus Proceeding Motion to Intervene by Audrey J. Broyles, Circuit Court Judge, Marion County Circuit Court, 5/10/24 and related cases;
8. Velasquez-Sanchez Mandamus Proceeding, Intervenor's Memorandum, dated 5/20/24, signed by Marion County Circuit Court Judge Audrey J. Broyles;
9. State of Oregon, Plaintiff-Adverse Party, v. Charly Josh Velasquez-Sanchez, Defendant-Relator, Marion County Circuit Court, 20CR08901, 21CR46350, 22CR35776, 23CR28431, Peremptory Writ of Mandamus and Appellate Judgment S071004, issued 5/21/24;
10. State of Oregon, Plaintiff-Adverse Party, v. Charly Josh Velasquez-Sanchez, Defendant-Relator, Marion County Circuit Court, 20CR08901, 21CR46350, 22CR35776, 23CR28431, Order Allowing Petition for Alternative Writ of Mandamus and Directing State Court Administrator to Issue Peremptory Writ of Mandamus S071004, dated 5/21/24;
11. Legacy Health System et al. v. Sejal Hathi, in her official capacity as Director of Oregon Health Authority, Memorandum, submitted 5/8/24;
12. State of Oregon vs. Charly Josh Velasquez-Sanchez, Case No.: 20CR08901, 21CR46350, 22CR35776, 23CR28431, Order by Judge Audrey Broyles, 6/13/24;
13. Oregon Crime Victims Law Center's Motion to Appear as Amicus Curiae, ECF 498, Associated Cases: 3:02-cv-00339-AN, 3:21-cv-01637-AN, ordered on 6/27/24;
14. Suspension of Supremacy Clause dispute mediations, Ordered by Magistrate Judge Stacie F. Beckerman, entered on 7/15/24;
15. Legacy Emanuel Hospital and Health Center, Legacy Health System, Peace Health, Providence Health & Services-Oregon, St. Charles Health System, Inc. filing for Unopposed Motion for Leave to File Amended Complaint/Petition, filed 10/1/24, and associated declarations.

DRO EX H, P. 4 of 35

16. Plaintiffs' Unopposed Motion for Leave to File Second Amended Complaint, ECF 511, ordered by Judge Adrienne Nelson on 10/3/24;

17. Notice of Inability to Comply with Second Amended Order to Implement Neutral Expert's Recommendations, Case No. 3:02-cv-00339-AN (Lead Case), Case No. 3:21-cv-01637-AN (Member Case), Case No. 6:22-CV-01460-AN (Member Case), submitted by Carla A. Scott, on 10/4/24;

18. Proposed Intervenor-Plaintiff National Alliance on Mental Illness-Oregon's Unopposed Motion to Intervene, Legacy Emanuel Hospital et al v. Sejal Hathi MD, Case No. 6:22-cv-01460-AN, filed 10/15/24; and

19. Defendant Sejal Hathi's Unopposed Motion for Extension of Time, ECF 519, Ordered by Judge Adrienne Nelson on 10/28/24. Associated Cases: 3:02-cv-00339-AN, 3:21-cv-01637-AN, 6:22-cv-01460-AN.

Documents I reviewed since my prior report include the following:

1. OSH Forensic Admission and Discharge Dashboard and Restoration Limit Report produced monthly and reporting date reflecting the month prior to report production;

2. OSH Forensic Admissions and Discharge Bi-Weekly Reports;

3. Average Wait Time Prior to Admission Progress Metrics for Benchmark Goals, produced by OSH monthly;

4. GEI dashboard drafts;

5. OSH-PSRB Conditional Release Data Dashboard, released on 10/22/24 with cover memorandum from Dr. Sara Walker, Interim Superintendent and Chief Medical Officer, OSH;

6. *Mink & Bowman* Monthly Progress Reports from OHA from June through November 2024;

7. Miscellaneous case information sent under protective order;

8. Miscellaneous media reports;

9. Mink/Bowman Comprehensive Plan drafts;

10. Draft Memorandum regarding Processes for Medication Administered by the Oregon State Hospital to Aid and Assist Patients

11. Documents associated with the Mink Restoration Time Limits and Exceptions Workgroup, led by Kevin Neely;

12. LOCUS guidance and Clinical Progress Update;

13. Request for Information (RFI) regarding Community Service Needs for the AA and GEI populations, issued 8/29/24;

14. ACR Hospital Civil Commitment Length of Stay >60 days data;

15. Mink/Bowman OHA Project Progress Summary as of 7/29/24;

16. OHA 2025-27 Policy Package, Package 552 related to House Bill 5024(2021), Senate Bill 606 (2023);

17. Ideas for Potential Opportunities submitted by Washington County Representatives with cost estimates;

18. Mink Restoration Time Limits and Exceptions Workgroup Report, dated 10/3/24, workgroup convened by Kevin Neely and Eric B. Lindauer;

19. OHA RTP Analysis and Written Summary provided 10/10/24;

20. RTP Report Summary PowerPoint presented by OHA regarding 10/7/24-10/11/24;

21. Appeal of PSRB Dangerousness Rule filed as DRO v. PSRB No.1-2024; 3-2023, filed 5/24/24;

22. Capacity Report as of 7/16/24 produced by OHA outlining HB 5024 capacity expansion;

23. Behavioral Health Housing and Residential Treatment Investments for Aid and Assist PowerPoint by OHA, dated 6/12/24;
24. Medication, Informed Consent, and Sell Order Data for Mink/Bowman, produced September 2024;
25. LGAC CCBHCs PowerPoint provided by OHA;
26. Preliminary Community Navigator Data; and
27. Housing capacity expansion summary data.

Relevant meetings during this interim period since my prior report included the following meetings and discussions:

1. Periodic communications with Judge Nelson and Judge Beckerman;
2. Meetings with various OHA and OSH staff, including leadership and forensic evaluators;
3. Regular meetings and several ad hoc meetings with OHA, OSH, DRO and MPD representatives and leaders both separately and together as well as email communications.  In addition, I met with staff from these agencies at various points in this interval period.
    a. From OHA, OSH, the weekly/bi-weekly leadership meetings have included:
        i. Current administrative leaders including OHA Director Dr. Sejal Hathi, Kristine Kautz, OHA Deputy Director, Ms. Ebony Sloan Clarke, Director of Behavioral Health, OHA, along with Samantha Byers, Lisa Nichols and Bonnie Cappa from OHA HSD/ISU and OSH Interim Superintendent and Chief Medical Officer Dr. Sara Walker, as well as Dr. Morgyn Beckman and Dr. Andy Butros of the Forensic Evaluation Services
    b. From Oregon Department of Justice (DOJ):
        i. Carla Scott, DOJ Special Litigation Unit Counsel
        ii. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
    c. From Disability Rights Oregon (DRO):
        i. Dave Boyer, Managing Attorney
    d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC
4. Meetings with the parties to this case along with Amici representatives and their attorneys including:
    a. Mr. Billy Williams, along with elected Washington County District Attorneys Kevin Barton, and Paige Clarkson;
    b. County Counsel for Washington and Marion Counties;
    c. Mr. Keith Garza, Judge Waller, and Judge Hill as involved Amici;
    d. Mr. Eric Neiman, as representative of the Private Hospitals as Amici.
5. Meetings related to GEI patients attended by Dr. Alison Bort, PSRB Director, Dave Boyer of DRO, OSH and OHA leadership including Dolly Matteucci and Lisa Nichols and other representative staff;
6. Meetings with Ms. Cherryl Ramirez, Director AOCMHP, and representatives of CMHPs across Oregon;
7. Meetings with Kevin Neely and representative system partners to examine potential legislation related to restoration time limits and exceptions workgroup 1/26/24, 3/22/24, 4/26/24, 5/31/24, 6/12/24, 7/26/24, 8/16/24, and 9/20/24 and review of associated documents;
8. Visit to Northwest Regional Reentry Center on 8/27/24, attended by Ms. Bonnie Cappa from OHA and NWRRC staff including:
    a. Brian Martinek, Executive Director

DRO EX H, P. 6 of 35

      b.   Jeff Spencer, Operations Manager
      c.   Renn Salkind, A&A Case Manager
      d.   Ben Chittock, A&A Case Manager
9.  Meeting with Washington County representatives on 8/27/24, including:
      a.   Kevin Barton, District Attorney
      b.   Jeff Maclane, DDA
      c.   John Koch, Undersheriff, Washington County Sheriff's Office
      d.   Joel Peterson, DDA
      e.   Eaman McMahan, County Counsel
      f.   Mjere Simantel, Director Washington County HHS
      g.   Chance Wooley, HHS

10.  Tour of Hawthorne Center, Washington County region, on 8/27/24
11.  Tour of OSH Junction City Campus on 8/28/24; and
12.  Meeting with the MAHPS OSH Executive team on 11/5/24.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
FES: Forensic Evaluation Services
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
ISU: Intensive Services Unit
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
Mosman Order: As of this report, this will refer to the July 3, 2023 Second Amended Order unless otherwise specified
MPD: Metropolitan Public Defender
OCBH: Oregon Council for Behavioral Health
OCDLA: Oregon Criminal Defense Lawyers Association
OHA: Oregon Health Authority
OPDS: Oregon Public Defenders Services
ORPA: Oregon Residential Provider Association
OSH: Oregon State Hospital
PDES: Program Design and Evaluation Services
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

DRO EX H, P. 7 of 35

**Summary of Activities and Updates During this Reporting Period:**

The reporting period between this report and my prior report spanned just over 5 months. In part this is related to the numbers of turns this case has taken since my last report. As I noted in my prior report, the state appeared to be nearly moving toward losing ground with compliance. Two heavy admissions months at OSH then tipped the state out of compliance. With the state once again out of compliance with the seven-day admissions limit, the work needed has once again ramped up. Mediation took place at the end of August and there were many meetings and conversations with amici and with the parties in anticipation of the mediation and after it took place. Although mediation did not result in a specific new agreement to date and is currently on pause per Judge Beckerman, the conversations outside of mediation have helped further catalyze movement on the part of the state. The most intensive work therefore continued to be to work with the state on the activities that would be needed to return to compliance.

In addition to ongoing work with the parties to develop remedies and identify barriers to compliance, an area of significant activity in which I have also engaged during this interim reporting period has involved reviewing individual cases sent to me under the Protective Order for informational purposes and several cases that have been brought to my attention for consultation as they do not fit neatly within the parameters of the Mosman Order. I have spoken with DOJ attorneys regularly about cases that they are working on related to potential contempt findings based on state court judges' rulings.

**Data Summaries**

*Background Data*: In my last report dated 5/20/24, I reported that "the state has been maintaining compliance with the 7-day admission…but the numbers are hovering near non-compliance at times." Because May and July concluded with record numbers of restoration orders (127 and 128, respectively), OSH quickly went out of compliance. As of the time of this writing, since monthly orders have not exceeded 100 in August, September and October, the state's data shows some trends back toward compliance, but overall the state has been severely out of compliance for almost six months. **Figure 1** and **Table 1** show the current trends. As of 10/31/24, the average numbers of days people ordered for restoration were waiting for admission was 12.6 days, and the average days a person waited prior to admission was 26.9 days. The number of people ready to place into the community increased, with 76 individuals on the identified list as no longer needing hospital level of care (HLOC) by 10/31/24 among those in the AA system. There were 52 people found GEI waiting an average of 223.7 days who were thought by the hospital to no longer need HLOC.

*[INTENTIONALLY LEFT BLANK]*

**Figure 1. Data Dashboard Charts Reflecting Progress in *Mink/Bowman* as of November 1, 2024**

OSH Forensic Admission and Discharge Dashboard
October 2024





OSH Quality Management – Data and Analysis
*'Informing the Pursuit of Excellence'*

Page 1 of 5
11/4/2024

**Table 1. Individuals Awaiting Admission**

| 1. Regarding individuals on OSH admission list with signed and received A&A court order | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* | *As of 4/1/23* | *As of 7/1/23* | *As of 11/1/23* | *As of 4/1/24* | *As of 11/1/24* |
| Total Number of individuals | 46 | 93* | 67 | 70 | 104 | 51 | 42 | 24 | 11 | 76 |
| Average days current individuals have been waiting | 15.8 days | 22.5 days | 16.2 days | 19.8 days | 20.7 days | 11.1 days | 9.3 days | 3.5 days | 5.4 days | 12.6 Days |
| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days | 3-34 days | 1-36 days | 1-18 days | 1-17 days | 1-9 days | 3-10 days | 1-28 days |
| 2. Regarding individuals found GEI and ordered to OSH | | | | | | | | | | |

9

Oregon Neutral Expert Tenth Report Regarding *Mink/Bowman*
11/12/24

|  | As of 1/5/22 | As of 1/28/22 | As of 5/1/22 | As of 9/1/22 | As of 12/1/22 | As of 4/1/23 | As of 7/1/23 | As of 11/1/23 | As of 4/1/24 | As of 11/1/24 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total number of individuals | 15 | 4 | 3 | 4 | 0 | 1 | 1 | 1 | 0 | 2 |
| Average days waiting | 45.6 days | 23 days | 18 days | 13.0 days | N/A | 26.0 days | 10.0 days | 1.0 days | N/A | 13.0 days |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days | 3-20 days | N/A | 26 days | 10 days | 1 day | N/A | 9-17 days |

*The marked increase in numbers awaiting admission was most likely a residual of the pauses in admissions due to COVID-19

**Figure 2** represents a new dashboard that was developed between the state, the PSRB leadership as well as DRO and the neutral expert, in response to my earlier recommendation that there be a review of PSRB processes with recommendations. Metrics from this work demonstrate that for the most part (i.e., in approximately 93% of cases), the PSRB does approve community placement in accordance with recommendations from community evaluations.

**Figure 2. OSH/PSRB Conditional Release Dashboard**





DRO EX H, P. 10 of 35

**Table 2** and **Table 3** show the capacity and census at OSH, which uses an operational active capacity metric and has not shown any significant changes since my prior report. Overall, the hospital continues to always operate at nearly full active capacity.

**Table 2: OSH Bed Capacities as of 11/1/24**

| Site | Licensed Capacity | Active Capacity |
|------|------|------|
| Salem Main Campus HLOC | 502 | 474 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **561** |
| Junction City HLOC | 75 | 72 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | 150 | 144 |
| **OSH Total** | **742** | **705** |

**Table 3**. OSH Census as of 11/1/24

| Date | Aid & Assist | PSRB | Civil Commitment | Other | Total |
|------|------|------|------|------|------|
| 9/1/2022 | 410 | 275 | 14 | 1 | 700 |
| 12/1/2022 | 396 | 279 | 13 | 0 | 688 |
| 4/1/2023 | 400 | 279 | 11 | 1 | 691 |
| 7/1/2023 | 389 | 281 | 13 | 1 | 684 |
| 11/1/2023 | 366 | 291 | 17 | 1 | 675 |
| 4/1/2024 | 360 | 288 | 30 | 0 | 678 |
| 11/1/2024 | 375 | 270 | 27 | 8 | 680 |

One year's worth of detailed data (see Table 4) shows consistently high numbers of new orders for restoration at OSH, with record numbers in May and July 2024. Looking back to 2012, one can see an ever-increasing trend for new orders (See **Table 4** and **Figure 3**). GEI admissions do not show significant variability.

**Table 4. Aid and Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|------|------|------|
| October 2023 | 97 | 3 (2 standard / 1 revocation) |
| November 2023 | 98 | 3 (2 standard / 1 revocation) |
| December 2023 | 92 | 3 (2 standard / 1 revocation) |
| January 2024 | 83 | 4 (4 standard / 0 revocation) |
| February 2024 | 73 | 9 (3 standard / 6 revocation) |
| March 2024 | 87 | 2 (2 standard / 0 revocation) |
| April 2024 | 99 | 1 (1 standard / 0 revocation) |
| May 2024 | 127 | 7 (3 standard / 4 revocation) |
| June 2024 | 90 | 2 (0 standard / 2 revocation) |
| July 2024 | 128 | 3 (0 standard / 3 revocation) |
| August 2024 | 99 | 4 (3 standard / 1 revocation) |
| September 2024 | 91 | 6 (6 standard / 0 revocation) |
| October 2024 | 100 | 6 (3 standard / 3 revocation) |

DRO EX H, P. 11 of 35

Oregon Neutral Expert Tenth Report Regarding *Mink/Bowman*
11/12/24

**Figure 3. Aid & Assist Admissions/Orders Trends through October 2024**



Figure 4 shows data related to benchmarks that had previously been set to attain compliance when wait times significantly increased toward winter of 2021. This trend line shows the significant increase in days waiting around May 2024, the first month with a record number of AA orders for restoration at OSH.  Since that increase, the state has not returned to compliance, though the trend line appears to be flattening and perhaps leading in the direction toward compliance especially since order numbers have not been as high as they were in the record-setting months.

**Figure 4. Admission Wait Time Projections Compared to Benchmarks Set in Second Report based on data as of 11/1/24**



Table 4 below shows data related to the order by Judge Mosman. Of the 409 individuals who were in OSH at the time of the 9/1/22 order (so-called "Cohort 1"), only 2 were in the hospital as of 11/1/24. As can be seen in **Table 4** and **Table 6**, most patients continue to be discharged after being found able or are sent to community restoration. It is my understanding that the data for discharge reasons is such that those discharged prior to the end of restoration as unable and ordered to community restoration are labeled as "community restoration" discharges. Of the total discharges for October 2024, 25 out of 109 people discharged reached the end of the restoration time limit. As per my prior reports, the demand for community restoration services is a significant issue to be addressed.

DRO EX H, P. 12 of 35

Oregon Neutral Expert Tenth Report Regarding *Mink/Bowman*
11/12/24

**Table 4. Discharge Data Related to the 9/1/22 Order by Judge Mosman**

- **Cohort 1:** Patients at OSH at the time of the Federal Court Order
- **Cohort 2:** Patients admitted to OSH after the issuance of the Federal Court Order on 9/1/22

| Cohort 1 | At OSH as of 9/1/2022 | At OSH as of 11/1/2024 | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | Total Discharged |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | |
| Misdemeanor | 85 | 0 | 51 | 25 | 26 | 18 | 2 | 29 | 7 | 26 | 3 | | 85 |
| Felony | 217 | 0 | 101 | 31 | 70 | 68 | 13 | 57 | 9 | 70 | | | 217 |
| Violent Felony | 107 | 2 | 43 | 24 | 17 | 45 | 29 | 6 | 3 | 17 | 2 | 3 | 105 |
| **Total** | **409** | **2** | **195** | **80** | **113** | **131** | **44** | **92** | **19** | **113** | **5** | **3** | **407** |

| Cohort 2 | Admitted since 9/1/2022 | At OSH as of 11/1/2024 | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | Total Discharged |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | |
| Misdemeanor | 799 | 77 | 701 | 363 | 293 | 185 | 33 | 164 | 43 | 293 | | 1 | 722 |
| Felony | 1285 | 202 | 504 | 257 | 200 | 504 | 75 | 250 | 50 | 200 | | 4 | 1083 |
| Violent Felony | 369 | 109 | 90 | 48 | 16 | 188 | 30 | 15 | 4 | 16 | 1 | 6 | 260 |
| **Total** | **2453** | **388** | **1295** | **668** | **509** | **877** | **138** | **429** | **97** | **509** | **4** | **11** | **2065** |

**Table 6. Legal Status of AA Discharges in October 2024 based on Hospital Data**
**October 2024 A&A Discharges**

| Reason | Cohort 1 | Cohort 2 | Total |
|---|---|---|---|
| Able | | 37 | 37 |
| Never Able | | 4 | 4 |
| Community Restoration | | 39 | 39 |
| Dismissed | | 2 | 2 |
| End of Statutory Jurisdiction | | | 0 |
| Other | | 2 | 2 |
| Restoration Limit | | 25 | 25 |
| **Total** | **0** | **109** | **109** |

The numbers of admission orders continue to exceed those that were originally projected upon the initial Mosman Order and as depicted in **Table 7**. The calculations shown in this table utilize certain assumptions regarding rates of orders that might be received, which were based on prior averages. It should be noted that increased rates of orders have not been predictable when there are months that reflect significant fluctuations in the numbers.

*[INTENTIONALLY LEFT BLANK]*

DRO EX H, P. 13 of 35

**Table 7. Projections vs. Actuals Admissions, Discharges, and New Restoration Orders**

| Month | Original Projections (Pre-Federal Order Implementation) | | | | Actuals *(with Current Projections)* | | | |
|---|---|---|---|---|---|---|---|---|
| | Discharges | Admissions | New Orders | Admit List | Discharges | Admissions | New Orders | Admit List |
| Sep-22 | 67 | 67 | 74 | 77 | 85 | 76 | 84 | 86 |
| Oct-22 | 90 | 90 | 74 | 61 | 90 | 91 | 95 | 90 |
| Nov-22 | 90 | 90 | 74 | 45 | 85 | 81 | 89 | 104 |
| Dec-22 | 95 | 95 | 74 | 24 | 92 | 77 | 74 | 90 |
| Jan-23 | 97 | 97 | 74 | 10 | 93 | 101 | 107 | 98 |
| Feb-23 | 97 | 97 | 74 | 10 | 94 | 107 | 78 | 70 |
| Mar-23 | 107 | 107 | 79 | 10 | 129 | 128 | 109 | 51 |
| Apr-23 | 89 | 89 | 79 | 10 | 108 | 107 | 103 | 46 |
| May-23 | 89 | 89 | 79 | 10 | 88 | 87 | 94 | 57 |
| Jun-23 | 89 | 89 | 79 | 10 | 101 | 97 | 86 | 42 |
| Jul-23 | 87 | 87 | 79 | 10 | 103 | 104 | 73 | 14 |
| Aug-23 | 87 | 87 | 79 | 10 | 112 | 100 | 109 | 17 |
| Sep-23 | 90 | 90 | 84 | 10 | 102 | 95 | 93 | 19 |
| Oct-23 | 91 | 91 | 84 | 10 | 97 | 93 | 97 | 24 |
| Nov-23 | 91 | 91 | 84 | 10 | 103 | 108 | 98 | 14 |
| Dec-23 | 92 | 92 | 84 | 10 | 64 | 83 | 92 | 23 |
| Jan-24 | 92 | 92 | 84 | 10 | 96 | 82 | 83 | 22 |
| Feb-24 | 92 | 92 | 84 | 10 | 97 | 81 | 73 | 14 |
| Mar-24 | 92 | 92 | 89 | 10 | 79 | 85 | 87 | 11 |
| Apr-24 | 92 | 92 | 89 | 10 | 84 | 96 | 99 | 22 |
| May-24 | 92 | 92 | 89 | 10 | 93 | 108 | 127 | 34 |
| Jun-24 | 92 | 92 | 89 | 10 | 79 | 74 | 90 | 58 |
| Jul-24 | 92 | 92 | 89 | 10 | 102 | 103 | 128 | 79 |
| Aug-24 | 92 | 92 | 89 | 10 | 95 | 95 | 99 | 79 |
| Sep-24 | 92 | 92 | 94 | 12 | 86 | 84 | 91 | 85 |
| Oct-24 | 92 | 92 | 94 | 14 | 109 | 107 | 100 | 76 |
| Nov-24 | 92 | 92 | 94 | 16 | 92 | 92 | 98 | 82 |
| Dec-24 | 92 | 92 | 94 | 18 | 92 | 92 | 98 | 88 |

Community restoration is depicted in **Table 8,** showing that community restoration episodes through June 2024. For the first time there appears to have been some decrease in community restoration episodes, as for the first six months of 2024 there were 240 episodes compared to 684 for the full year in 2023 (meaning that if 2024 extrapolates to a year, there would be only 480). In the first six months of 2024, 39 people had more than one year of community restoration, and two had more than two years. The mean and median days in restoration exceeded 150, but the maximum number of days was 889 for the most recent six months of data, a marked difference from prior years. It may be that a few people who had been in long-term community restoration were discharged from this and that may have caused the significant drop in numbers. On the other hand, the data on community restoration is not as accurate as other data given how it is collected, so it is difficult to know how to interpret this shift in these findings. The state continues to work on improving data reporting on community restoration.

DRO EX H, P. 14 of 35

Oregon Neutral Expert Tenth Report Regarding *Mink/Bowman*
11/12/24

**Table 8. CMHP Reported Completed Community Restoration Data 1/1/2019-6/30/2024**

| CMHP Reported Completed Community Restoration Data 1/1/2019-6/30/2024 | | |
|---|---|---|
| # of Completed Community Restoration Episodes* | 1831 | |
| # of Days Minimum | 0 | |
| # of Days Maximum | 1660 | |
| # of Days Mean | 192 | |
| # of Days Median | 143 | |
| Days in Community Restoration | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* |
| 0-90 | 592 | 32.33% |
| 0-180 | 1104 | 60.29% |
| 0-365 | 1587 | 86.67% |
| 0-730 | 1801 | 98.36% |
| 0-1095 | 1825 | 99.67% |
| *Completed does not reference success of restoration, but rather indicates the community restoration episode. It includes ongoing community restoration episodes. | | |

| CMHP Reported Completed Community Restoration Data by Year 1/1/2019-6/30/2024 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 (through June 2024) | |
| # of Completed Community Restoration Episodes* | 342 | | 389 | | 452 | | 608 | | 674 | | 240 | |
| # of Days Minimum | 1 | | 0 | | 0 | | 0 | | 0 | | 1 | |
| # of Days Maximum | 1660 | | 1660 | | 1660 | | 1660 | | 1660 | | 889 | |
| # of Days Mean | 278 | | 302 | | 278 | | 250 | | 155 | | 187 | |
| # of Days Median | 201 | | 222 | | 195 | | 184 | | 119 | | 151 | |
| Days in Community Restoration | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* |
| 0-90 | 74 | 21.64% | 66 | 16.97% | 100 | 22.12% | 133 | 21.88% | 189 | 28.04% | 88 | 36.67% |
| 0-180 | 156 | 45.61% | 157 | 40.36% | 203 | 44.91% | 291 | 47.86% | 390 | 57.86% | 141 | 58.75% |
| 0-365 | 252 | 73.68% | 274 | 70.44% | 334 | 73.89% | 485 | 79.77% | 578 | 85.76% | 201 | 83.75% |
| 0-730 | 324 | 94.74% | 364 | 93.57% | 429 | 94.91% | 587 | 96.55% | 663 | 98.37% | 238 | 99.17% |
| 0-1095 | 337 | 98.54% | 383 | 98.46% | 446 | 98.67% | 602 | 99.01% | 672 | 99.70% | 240 | 100.00% |

Forensic evaluation data continues to show high numbers of evaluations conducted by FES staff, including requests for evaluations of individuals outside of OSH. **Table 9** shows recent data on active cases for which FES has been assigned to evaluate as of 10/1/24, 341 of which are not currently at OSH.

**Table 9. Number of Active FES Cases as of 10/1/24**

| Type of Evaluation and Location | Number |
|---|---|
| .370 Evaluations at OSH | 377 |
| .370 Evaluations not at OSH | 341 |
| .365 Evaluations not at OSH | 65 |
| .315 Evaluations not at OSH | 22 |
| **Total Cases** | **805** |

Ready to Place (RTP) assessments done 10-days at OSH showed about a quarter of people who were thought to be ready to place (See **Table 10**). The data shows how many A&A patients admitted to OSH did not need hospital level of care and could have been sent directly to community restoration instead.

DRO EX H, P. 15 of 35

**Table 10. RTP 10-day assessments**

| Period | 10-Day RTP Assessments | Patients Found RTP | Percent Found RTP |
|---|---|---|---|
| 2022 (Aug-Dec | 205 | 87 | 42.4% |
| 2023 | 648 | 250 | 38.6% |
| 2024 (Jan-Sep) | 432 | 116 | 26.9% |
| **Total** | **1285** | **453** | **35.3%** |

The mediation that resulted in the Second Amended order from 7/3/23 offered exceptions to the original Mosman restoration duration limits. From 7/3/23 to 9/30/24 there were 77 requests granted out of 78 requests for the 180-day violent felony extensions, and 83 out of 83 requests granted for 30-day discharge related extension requests. However, it was noteworthy in discussions and review of data that many of the 30-day discharge-related extension requests did not appear to meet the requirements laid out in the amended order derived from the mediation.

**Table 11**. **Number of 180-day and 30-day Requests to Extend Restoration Duration**

| Period | 180-day violent felony extension requests (Requests / Granted) | 30-day discharge-related extension requests (Requests / Granted) |
|---|---|---|
| 7/3/23 – 9/30/24 | 78 / 77 | 83 / 83* |

In addition, civil expedited admission requests and admissions were also examined. The data produced by OSH indicated is in **Table 12**.

**Table 12. Civil Expedited Admissions 9/1/22 to 9/30/24**

| Period | Requests | Accepted | Denied |
|---|---|---|---|
| 9/1/22 – 11/1/23 | 19 | 11 | 8 |
| 11/2/23 – 9/30/24 | 52 | 35 | 17 |
| **Total** | **71** | **46** | **25** |

**Medication Data Report:**

After several discussions with Amici and other interested partners who raised questions pertaining to the work being done at OSH, at my request OHA produced a data report related to timeliness to medication administration for patients at OSH. The following **Table 13** presents the number and percentage of patients in the hospital with orders for antipsychotic, mood stabilizer or benzodiazepine medications at the following points after admission: 3 days, 7 days, 30 days, 60 days, and 90 days.

*[INTENTIONALLY LEFT BLANK]*

16

DRO EX H, P. 16 of 35

**Table 13. Data on Number, Percent and Time to Medication Orders following Admission**

| Date | A&A Pts | Count | | | | | | Percent | | | | | | Avg Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 3d | 7d | 30d | 60d | 90d | 91+d | 3d | 7d | 30d | 60d | 90d | 91+d | |
| 12/1/2021 | 399 | 283 | 312 | 356 | 368 | 373 | 385 | 70.9% | 78.2% | 89.2% | 92.2% | 93.5% | 96.5% | 10.6 |
| 3/1/2022 | 349 | 249 | 271 | 309 | 324 | 328 | 338 | 71.3% | 77.7% | 88.5% | 92.8% | 94.0% | 96.8% | 9.5 |
| 6/1/2022 | 398 | 295 | 324 | 365 | 377 | 379 | 388 | 74.1% | 81.4% | 91.7% | 94.7% | 95.2% | 97.5% | 7.5 |
| 9/1/2022 | 409 | 303 | 340 | 375 | 385 | 388 | 395 | 74.1% | 83.1% | 91.7% | 94.1% | 94.9% | 96.6% | 6.2 |
| 12/1/2022 | 394 | 298 | 321 | 356 | 366 | 369 | 376 | 75.6% | 81.5% | 90.4% | 92.9% | 93.7% | 95.4% | 6.0 |
| 3/1/2023 | 395 | 309 | 333 | 357 | 371 | 377 | 382 | 78.2% | 84.3% | 90.4% | 93.9% | 95.4% | 96.7% | 5.8 |
| 6/1/2023 | 389 | 309 | 334 | 361 | 374 | 379 | 384 | 79.4% | 85.9% | 92.8% | 96.1% | 97.4% | 98.7% | 5.8 |
| 9/1/2023 | 374 | 284 | 300 | 335 | 346 | 354 | 361 | 75.9% | 80.2% | 89.6% | 92.5% | 94.7% | 96.5% | 7.2 |
| 12/1/2023 | 366 | 297 | 317 | 344 | 352 | 358 | 363 | 81.1% | 86.6% | 94.0% | 96.2% | 97.8% | 99.2% | 5.4 |
| 3/1/2024 | 353 | 293 | 307 | 333 | 342 | 346 | 351 | 83.0% | 87.0% | 94.3% | 96.9% | 98.0% | 99.4% | 5.2 |
| 6/1/2024 | 384 | 317 | 330 | 351 | 367 | 370 | 377 | 82.6% | 85.9% | 91.4% | 95.6% | 96.4% | 98.2% | 5.7 |
| 9/1/2024 | 379 | 321 | 339 | 357 | 365 | 368 | 373 | 84.7% | 89.4% | 94.2% | 96.3% | 97.1% | 98.4% | 4.2 |
| **Pre-Federal Order** | **1555** | **1130** | **1247** | **1405** | **1454** | **1468** | **1506** | **72.7%** | **80.2%** | **90.4%** | **93.5%** | **94.4%** | **96.8%** | **8.4** |
| **Post-Federal Order** | **3034** | **2428** | **2581** | **2794** | **2883** | **2921** | **2967** | **80.0%** | **85.1%** | **92.1%** | **95.0%** | **96.3%** | **97.8%** | **5.7** |

According to this analysis, since the federal order was implemented, higher rates of patients are on these medications for all post-admission time frames, and the average time to receive the first medication order has decreased from 8.4 days to 5.7 days.

Given that medication refusals can be overridden when certain legal parameters are met, either through a consent override process or via a Sell order, OSH also produced data examining the timing of these overrides. For the consent override process, before the Mosman Order, 58.5% of the AA patients were on a consent override, while that percentage has increased to 62.8% in the Post-Federal Order period.

There was a rule change recently implemented to allow a broader interpretation of medication used and purposes in the consent override processes, given findings that made it more difficult to pursue consent overrides in situations where patients were not actively aggressive. It will be important to track how this rule change helps ensure timely access to medications for people who need them but do not have the capacity to consent to the medications.

For Sell orders, after the federal order was implemented, there have been lower rates of Sell letters and testimony resulting in hearings and Sell orders (See **Table 14**). This may be related to an increased number of people for whom medications have been administered in the informed consent override process.

**Table 14. Data on Number of Sell Letters Sent vs. Number of Hearings**

| Year | Letters Sent/Testimony | Hearings/Sell Order Issued | Rate |
|---|---|---|---|
| 2021 | 16 | 12 | 75.0% |
| 2022 | 28 | 18 | 64.3% |
| 2023 | 34 | 18 | 52.9% |
| 2024 YTD | 29 | 15 | 51.7% |
| **Pre-Federal Order** | **35** | **23** | **65.7%** |
| **Post-Federal Order** | **72** | **40** | **55.6%** |

DRO EX H, P. 17 of 35

**Summary of Site Visits**:

At the end of August, I visited Oregon and attended the mediation session at the Federal Court House. Over the subsequent two days, I conducted site visits and tours. These included touring the units on the Junction City Campus. Although the building is one that is architecturally appealing, one thing that was made clearer during the site visit was that the SRTF beds in Junction City cannot meet the current Joint Commission standards for a hospital. There are certain architectural features such as size of rooms and other factors that make this a reality for the state of Oregon, and thus there is less flexibility in the use of those beds. At the same time, it does make those beds "different" from other SRTF beds in Oregon in that they are more able to access clinical services akin to a hospital including elements related to medication administration and activities.

During my site visits I toured the Northwest Regional Reentry Center (NWRRC), the site of an independent contracted service for people ordered to community restoration under the AA provisions. The facility serves federal inmates who are returning to Oregon and others who are reentering after being in carceral settings. The facility has staff that monitor all entrances and egress points. There is some programming available. The program has a clinical lead and contract manager that are very devoted to making it a success and very knowledgeable about the needs of individuals with criminal justice histories. Its prior work did not involve serving individuals primarily with mental illnesses or behavioral health challenges (though many of the inmates did have those challenges). Still, the focus of community restoration on individuals who largely have serious mental illness or developmental disabilities, with and without co-occurring substance use conditions, remains new to the NWRRC. There was work with psychiatry trainees, but that linkage was temporary. There were efforts and discussions about ensuring access to psychiatric consultation. Although the program provides restoration and support-type services, the clinical services were not as robust as one might see in an SRTF or Medicaid funded service. In addition, we were told that there were people there who the staff thought were competent to stand trial, and yet there was no clear mechanism to refer them for evaluation, so they were waiting for this to be ordered by the court. After visiting the site, it became clear that there needed to be more active utilization management to ensure that people are not remaining there unnecessarily. Several cases were able to be evaluated after that visit with work between OHA and OSH FES and the CMHPs.

**Select Updates from OHA and OSH:**

I have discussed processes related to discharges from the RTP list with a variety of partners and especially with the defendants and the CMHP leaders as well as with the plaintiffs in the all-parties meetings. To assist with discharges, the defendants updated guidance pertaining to Clinical Progress Notes for the courts to better understand the needs of defendants leaving OSH. Some of this work came about through intensive discussions with the amici and with the input of the judges involved in mediation. In addition, the state has provided documents to help guide the field on the LOCUS evaluations and what they mean since we have been discussing that one of the barriers to discharge appears to be that communities see LOCUS scores in discharge packets and then attempt to find placements to match the scores, rather than looking at the LOCUS as a tool to guide placement decisions and with the idea that additional supports can help individuals do well in different settings.

In addition, the OHA leadership reported on an analysis of the RTP list, conducted primarily by DOJ General Counselors who did a thorough review of barriers noted based on court findings. In this review

there appeared to be numerous cases in which the documentation suggested non-compliance with ORS 161.371 that fell into two basic categories including (1) court providing no written statutory findings to justify continued commitment; and (2) delays in statutory process such that RTP notices were not being resolved. Specifically, according to the OHA analysis, "in 336 RTP cases (167 misdemeanor cases; 169 felony cases), the court either made no required written findings after holding the mandatory statutory hearing or made insufficient findings to support the patient's continued OSH commitment. In 43 RTP cases, the court found that the patient did not require HLOC [hospital level of care] but continued the patient's commitment in direct violation of the statute." Furthermore, the analysis showed, "in 119 RTP cases, the court continued the RTP hearing past the 10 judicial day timeframe required by the statute." Separately, "in 102 RTP cases, the court ordered continued commitment for a defendant because of the lack of an SRTF when OSH was recommending a lower level of care."  Additionally, there were several cases where the work with the CMHPs appeared to be a barrier, including 180 RTP cases in which the CMHP was recorded as not responding to OSH's request for an update.

As a result of the review by DOJ General Counselors, DOJ trial attorneys have begun to submit letters to courts where it appears that the statutes have not been followed. From October 2024 to date, DOJ Trial has filed 27 letters to courts who they determined had not followed the statutory ready to place process in some way or another. Given that each day an individual waits at OSH outside of the restoration requirements limits the admission of other people, this work is critical. In forthcoming work with the parties, the DOJ will report data about what happened after these letters were filed and whether it has had an impact on compliance.

I was given a summary of capacity expansion of community-based residential facilities and homes as well as supportive housing settings specifically for persons with serious mental illness, utilizing an appropriation of $130 million under HB5024, which provided $65 million from the General Fund and $65 million from the American Rescue Plan Act funding. According to this summary, between 2/29/24 and 12/31/25, 284 residential slots would be available through new grant agreements across the state. Although this represents significant potential expansion, staffing would still be required for these sites and vacancy rates for staff are not known at this time.  In addition, the state provided updates on projected capacity increases by Calendar Quarter (see **Table 15**).

*[INTENTIONALLY LEFT BLANK]*

19

**Table 15. Projected Capacity Increase by Calendar Quarter for Licensed Housing & Facilities and Non-Licensed Housing\***

| Licensed Housing & Facilities | | *Non-Licensed Housing | |
| --- | --- | --- | --- |
| Quarter | Capacity | Quarter | Capacity |
| Quarter 4 2022 | 5 | Quarter 4 2022 | 7 |
| Quarter 1 2023 | - | Quarter 1 2023 | 12 |
| Quarter 2 2023 | 8 | Quarter 2 2023 | - |
| Quarter 3 2023 | 10 | Quarter 3 2023 | 25 |
| Quarter 4 2023 | 5 | Quarter 4 2023 | 20 |
| Quarter 1 2024 | 11 | Quarter 1 2024 | 13 |
| Quarter 2 2024 | 47 | Quarter 2 2024 | 20 |
| Quarter 3 2024 | 26 | Quarter 3 2024 | 76 |
| Quarter 4 2024 | 67 | Quarter 4 2024 | 26 |
| Quarter 1 2025 | 103 | Quarter 1 2025 | 58 |
| Quarter 2 2025 | 141 | Quarter 2 2025 | 61 |
| Quarter 3 2025 | 96 | Quarter 3 2025 | 14 |
| Quarter 4 2025 | 52 | Quarter 4 2025 | 54 |
| Quarter 1 2026 | 67 | Quarter 1 2026 | - |
| Quarter 4 2026 | 72 | Quarter 4 2026 | 26 |
| TBD | 100 | TBD | 339 |
| **TOTAL** | **810** | **TOTAL** | **731** |

\*Non-Licensed Housing includes transitional housing, supportive housing and recovery housing

Data discrepancies between reports describing residential services development likely reflect different funding sources and different time frames for snapshot estimates. To help increase clarity and transparency, OHA has launched a website that provides information regarding behavioral health housing and licensed capacity investments (see https://www.oregon.gov/oha/HSD/AMH/Pages/Housing-Dashboard.aspx).

Based on discussions with OHA, work has progressed to allow for the recent expansion of NWRRC by 5 additional beds, for a total of 35 slots at the site. In addition, OSH FES leadership have met with Judge Waller and with other forensic evaluation leaders in other states to discuss options for shorter reports to help expedite their completion.

OSH has recently regained its CMS certification after work done on corrective action plans.

In addition to the above, OHA has developed resources related to Certified Community Behavioral Health Centers (CCBHCs). These are special types of clinical services with Medicaid funding that allows for more flexible dollars to pay for a broader range of services for individuals not on a fee-for-service basis. There are 12 demonstration clinics that cover 21 sites across 14 counties. Nine of the 12 clinics are CMHPs. There are plans to expand CCBHC clinics, with a plan for about eight clinics joining by April 2026 and six more by April 2027 and OHA must make efforts to achieve statewide coverage for these types of clinics. This work includes jail diversion and community partnerships to enhance opportunities for mobile crisis and same-day access to behavioral health services.

OHA also reported on the pilot of the community navigator initiative that stemmed from the recommendations I made in my earlier reports. The state indicated that formal reports were due into OHA by 11/15/24, with more comprehensive data review in February 2025. The pilot sites included Cascadia/Multnomah (contract executed 7/12/24), Deschutes (contract executed 7/12/24), Lane County (contract executed 7/16/24), Marion (contract executed 8/9/24) and Polaris/Washington (contract executed 7/22/24). Caseloads to date have been smaller than they are designed to be, ranging from 14

DRO EX H, P. 20 of 35

(split across people at OSH and the community) to eight in total. The Community Navigators incorporate a peer support specialist and case manager team. Preliminary analysis showed some positive feedback. Initial anecdotal feedback included:

- Engagement with client at OSH led to a successful step down in level of care, and now they are seeking long term housing and employment. Additionally, this client has reconnected to their family supports.
- Due to OSH in-reach and rapport building, one client has engaged in SUD treatment.
- CMHP was able to maintain a housing placement for a client due to the Community Navigator team intervention with emergency medication and transportation.
- CMHPs reports they find that face to face contact has been crucial to building and maintaining rapport.
- CMHPs are assisting with phones, groceries, transportation, interventions and helping individuals apply for benefits (e.g. food cards).

**Summary of the Mink Restoration Time Limits and Exceptions Workgroup:**

I participated in approximately seven regular meetings with Mr. Kevin Neely and a variety of partners who met regularly at the request of OHA in the "Mink Restoration Time Limits and Exceptions Workgroup" (henceforth the Mink Workgroup) that began convening in December 2023.  The purpose of the group was to sort through potential legislative principles for restoration time limits as well as other legislative concepts for proposal for the 2025 legislative session. Membership of the workgroup consisted of court personnel including a judge, a district attorney and a defense attorney, as well as representatives from DRO, CMHPs, Forensic Evaluation Services and two people with lived experience. Former Superintendent of OSH, Ms. Dolores Matteucci assisted in the group process on behalf of OHA. At the conclusion of this meeting, the consensus was reached that there should be community restoration time limits, but consensus was not reached as to what those time limits should be or when they should start. There was strong sentiment that access to forensic evaluators for community evaluations was critical and a major barrier to resolving cases at present. There was general enthusiasm also for deflection programs such as those approved by HB 4002 (2024). Alternative pathways for people to be supported outside of AA process were thought important but it was also recognized that it would require further investment by the legislature.

The OHA Mink Workgroup delineated elements of a forthcoming report by OJD known as the GAINS report that looks at evaluation system re-design as discussed and requested in my prior reports. The elements outlined by the Mink Workgroup included:

- Administrative centralization
- Blend of state staff and independent evaluators
- Centralized rules
- Centralized training
- Centralized funding (not through the Oregon Public Defense Services Fund and with state investments to support increasing the number of forensic evaluators)

Ultimately, there were three consensus recommendations that were delivered through the Mink Workgroup that included the following:
1. Enact admissions requirements at OSH that are more restrictive

than current statute, but slightly broader than the terms of the Mosman Order (principally expanding the potential for a limited number of non-person misdemeanant defendants to be restored at OSH based on specific factors including public safety, state interest in pursuing criminal charges, prior performance on community restoration, and impact of restoration at OSH on Mink compliance statewide)
2.  Alternate Pathway Pilot Programs / Deflection
3.  Forensic Evaluation Access and Expansion, with support of the forthcoming GAINS report and its currently outlined elements.

In the all-parties meeting, there were many conversations about what might be helpful for communities to better serve people in the AA and GEI systems.  As a result of many facets of these discussions the State issued a Request for Information regarding Community Service Needs for the AA and GEI populations.  I worked with the state as they analyzed the results and helped prepare a response to me based on some broad recommendations I had made to the parties.

**Legal Issues in this Matter in this Interim Reporting Period:**

Several court filings have been presented related to this matter since my last report. Jurisdictional contempt proceedings continue, and the state is spending time focusing on those matters. In addition, crime victim representatives argued in court and filed a motion to appear as amicus curiae. As a result of those court filings, Judge Nelson has allowed representatives of victims to appear as Amici. Separately, on 7/15/24 Judge Beckerman entered a ruling noting that due to the numerous conflicts between the Second Amended Federal Order and committing jurisdiction orders, and due to the "futility of prior Supremacy Clause mediation efforts and pending contempt proceedings" mediation options with respect to the Supremacy Clause disputes were suspended and would need to be individually litigated in Federal Court. In addition, Mediation between the Amici, the plaintiffs and the defendants took place on 8/26/24 in Oregon at the Federal Courthouse, with Judge Beckerman presiding over the mediation.  A status conference was held in front of Judge Nelson on 7/11/24, with a plan for a follow up status conference set for 11/18/24.

The case filed by the Legacy Health System and other private hospitals is also continuing to move forward, with a motion to file a second amended complaint granted by Judge Nelson on 10/3/24 with an expected response due 11/27/24.

In addition, the National Alliance on Mental Illness-Oregon filed a motion to intervene in the matter at hand as well, with a deadline of defendants to respond of 11/18/24.

**Forensic Evaluation Services:**

Several new staff were hired and began working for OSH Forensic Evaluation Services.  As a result of new staff, there has been greater ability to catch up on the demand for evaluations. In addition, during this interim reporting period, OSH FES issued a memorandum indicating the availability of staff to begin to conduct more community evaluations. Some placements were holding people pending these evaluations. For example, on the tour of NWRRC, we were told that several individuals had been placed there for over a year but were thought to be Able to Aid and Assist but no evaluations had been completed on them. As a result, OHA facilitated the necessary referral processes and scheduled to complete these evaluations to open slots at the site for other defendants on CR.

**Additional Information During this Interim Period:**

Progress reports from the defendants have been completed monthly, the details of which can be found on the state's OHA Mink/Bowman website and will not be summarized here. I remain encouraged by the work done on the prior recommendations, but many of the tasks are still in progress. In addition, the finalized updated work plan was developed and is provided below as part of the concluding recommendations.

**Conclusions and Recommendations:**

Over the course of the interim period between my last report and this report, compliance with the seven-day admission requirement has yet again seriously faltered. In large part this was due to two particularly challenging months of record orders for Aid and Assist restoration services at OSH. Because of that, there were large increases in the numbers of people waiting for admission from jails around Oregon and increases in the days people waited prior to admission. Because most defendants are discharged within the 90- to 180-day range separate from the Federal Court's prior orders, there is now a downward trend toward compliance.  Still, defendants are waiting in jail over 25-days to get into the state hospital, and this is too long and violates the Constitutional requirements set forth by the Ninth Circuit in this legal mater. Moreover, the state has remained very close to non-compliance even in the best of months since my work with this matter began and before.

That record numbers of restoration orders have so greatly tipped the balance away from compliance is concerning.  Recidivism of the population remains too high, and the effectiveness of community restoration remains uncertain overall.  In addition, although OSH is getting people on medication orders sooner than prior to the Mosman order, there remain a significant number of people are discharged unrestored. Whether this is a factor related to how opinions are delivered, the shortened time period for restoration, or the idea that community restoration will always be available is still unclear. Regardless, the state must continue to work diligently and more so to return to compliance and to sustain compliance with the Federal Court Order. Deflection of people from arrest and criminal case processing is an imperative, and the state has several promising initiatives in this regard, such as the development and expansion of CCBHCs and mobile crisis services. At the same time, people deemed ready for discharge either from the AA or GEI process are waiting far too long for discharges to occur.

Pathways to achieve compliance include reduction in the number of arrests of people with mental health, IDD and substance use disorders in the first place, and to ensure that people within jails receive adequate and required behavioral health care. Additional means would be to decrease the number of orders to OSH for restoration and enhance community services and infrastructure, and to increase discharges. Solutions will require improving along all of those dimensions and more. As I have said in prior reports, the seven-day mandate is one based on the Constitutional requirement set forth in the Ninth Circuit. Other states do not have the obligation to follow this time-frame either statutorily or because of their relevant federal jurisdiction. There is nothing magic about seven days, and many of the amici and other partners have stated that a sole focus on this one metric has the unintended consequence of creating other problems in a larger system where all the parts are interconnected. Nonetheless, this requirement remains for Oregon, and this has also helped focus the state on areas of priority interests.

With all this in mind, the rest of this report sets forth my current recommendations for the Court's review and consideration.

1. **Implement State Proposed Remedies**: Given the recent trends that show the state to be out of compliance with the seven-day admission order, I have worked closely with the state and with the plaintiffs to vet a series of recommendations that should be implemented within agreed upon timelines to maximize the potential to return to compliance as soon as possible. It should be noted that several of these items are those that can be executed within current staffing, budget and statutory schemes, and others will require the Governor's sign off as well as legislative appropriations. Specifically, of the below list, Items 1, 3, 4, and 5 can begin implementation immediately. The specifics for some of these items also will depend on other partners that will need to execute contracts and sort through any regulatory barriers to achieve these goals. The legislative proposal in addition will obviously require legislative buy-in. As such, in recommending adoption of the below remedies, I am also recommending that there be some flexibility in adopting them, Specifically, should new barriers develop or become more apparent, the recommendations should pivot toward new plans. I have indicated to the state that commitment to their proposed remedies is reasonable, with any shifts from the agreed upon deliverables requiring input from the plaintiffs and review by the Neutral Expert. In this way, the realities of system development can allow for unforeseen vicissitudes without changing the intent and commitment of the state to deliver on its commitments. The proposed and agreed upon state remedies are as follows:

*State Proposed Remedies as Vetted by the Neutral Expert and the Plaintiffs:*

*The Aid and Assist GEI/PSRB Request for Information (RFI) responses indicate clear gaps in health services, some of which OHA can address directly, while others require a collaborative approach. OHA has developed a set of recommendations in response to the RFI and discussions with the state's neutral expert Dr. Pinals, focusing on strategies to address funding, training and education, housing capacity, coordination efforts, community navigators and forensic evaluations. These recommendations, with statements of likely impact, are detailed below.*

### RECOMMENDATIONS

1. ***Expand Oregon State Hospital (OSH) Forensic Evaluation Service by Hiring Three (3) Full-Time Equivalent Forensic Evaluators: $85,734 – 4-6 month timeline.***

    *There is no statutory requirement for defendants in community-based competency restoration to be re-evaluated for competency to stand trial under ORS 161.370. In the absence of statute, most courts order Oregon State Hospital's (OSH) Forensic Evaluation Service (FES) to complete these evaluations.*

    *OSH FES prioritizes evaluation of OSH inpatients; therefore, evaluations for defendants in Community Restoration (CR) are completed as evaluator resources permit. OSH FES receives an average of 35 new orders per month for individuals in CR. While OSH FES is currently able to complete this monthly volume of evaluations, there is a backlog of 292 evaluations for individuals in CR that have accumulated over time which OSH has not been able to address due to lack of capacity; for much of 2024, OSH FES had vacancies in several*

DRO EX H, P. 24 of 35

*evaluator positions. Evaluators have been hired to fill these vacancies, with the last evaluators beginning work by the end of December 2024.*

*Once all current vacancies are filled, OSH FES's projected capacity to complete evaluations for individuals in CR will be 40-55 per month. At that rate, it will take more than a year to clear the backlog. OSH therefore proposes to hire three (3) additional full-time evaluators to begin work in March 2025. This will increase FES's capacity to complete evaluations for individuals in CR by another 25-30 evaluations per month. With this additional capacity, assuming no increase in the average number of new orders, OSH FES will be able to clear the backlog in 4-6 months.*

*Impact statement: The anticipated impact on compliance with the Mink injunction is related to improved flow, by placing individuals at the appropriate level of care in a timelier manner. Completing all evaluations in the queue, and then completing evaluations promptly as new orders come in, can free up CR resources (since individuals who are either able or never able to aid and assist no longer require them). This may permit OSH patients who have been designated Ready to Place (RTP) to be discharged to CR, opening OSH beds for individuals who require a hospital level of care for restoration.*

*While it is difficult to predict how many individuals in CR are presently able or never able, there are typically 65-75 OSH patients designated RTP, and an average of 15 patients are discharged to CR each month. As OSH completes the evaluations in its backlog, assuming the monthly volume of newly ordered evaluations does not increase, it is hoped that more OSH patients will be able to discharge to CR. Still, as previously discussed, OSH cannot be required to perform all CR evaluations without commensurate increases in funding over time. Adding only 3 FES evaluators, therefore, is not a permanent solution. But it is a stopgap that may be able to loosen current bottlenecks in a system that, over time, deserves a larger overhaul. A number of different issues require discussion for long-term community restoration evaluations, including when evaluation should be done (at what intervals), who is eligible for evaluations, and where a community evaluation program should reside. While in the short term the hospital is adding more evaluation capacity, the preferred model (in use in other states) would move community restoration evaluations to the Behavioral Health Division as a centralized hub, with an appropriate plus-up in funding.*

*Estimated Cost: $85,734 (requesting funds in 2023-25 OSH rebalance)*

2. **Establish an Aid & Assist Flexible BH Housing Funds Resource: $3.5M – 2-3 months from receipt of funds with prioritization by contracts**

*Flexible housing funds support individuals by providing immediate and long-term stability. These supports include items such as rental assistance, application fees, moving costs, storage fees, repair and maintenance fees, eviction avoidance, and utilities. OHA BH estimated the flexible funding range for each county to be between $75,000 and $300,000, totaling up to $3.5 million for flexible housing funds.*

*This funding would be administered via a partnership between OHA and OHCS to incorporate lessons learned from OHCS' existing behavioral health pilot being administered as part of the homelessness emergency in the State of Oregon. Resources should be administered in a way that builds effective coordination between counties and housing/homeless service providers to promote the housing stability of people experiencing homelessness who have a behavioral health need. Assistance can also be structured to support people in accessing vouchers from their local housing authority.*

*Impact Statement: In OHA's most recent Aid & Assist RFI, requested by Dr. Pinals and shared with the Governor's Office, Community Mental Health Programs (CMHPs) identified housing as a significant barrier to stability and a driver of recidivism. While this recommendation does not have a direct impact on compliance with the Mink injunction, keeping individuals housed and/or creating access to housing could keep them engaged in CR. We know from the literature that housing stability is a protective factor against legal/criminal involvement due to behavioral health concerns.*

*Estimated Cost: $3.5 million (in partnership with OHCS)*

3. ***Aid & Assist SRTF Expansion:  $9.4 million HB 5024 (funding already identified) – Up to 6-month timeline until contract execution***

*OHA's 2023-2025 budget includes a onetime only appropriation of $9.4 million from HB 5024. The Intensive Service Unit within OHA BH will use these funds for Secured Residential Treatment Facility (SRTF) and Residential Treatment Facility/Housing (RTF/H) expansion projects in order to increase bed capacity throughout the state of Oregon and improve access to services. Priority service populations for expansion have been identified as the Aid & Assist (A&A) and Guilty Except for Insanity (GEI)/Psychiatric Security Review Board (PSRB) populations with a goal to compete contract amendments within 90-days of approval (January 31, 2025).*

*Multiple funding requests were received and assessed for project appropriateness and feasibility. Of those requests, the following projects are in the final stage of review, one of which (Lifeways PSRB RTH) is still being evaluated for potential Institution for Mental Disorder exclusion:*

       i. *Jackson House (Multnomah County) requested $750,000 of one-time only gap funding to complete their project. The completed project will be a 16-bed facility with a focus on the Aid and Assist population.  Anticipated completion timeline of this project is 14 months.  The facility will also be able to support individuals with medical needs by creating medical appropriate beds, which will add seven months to the project.*

      ii. *[TBD funding request for $3 million to create an RTH with capacity for GEI populations to be completed within 24 months upon receipt of confirmed*

DRO EX H, P. 26 of 35

*funding, or the allocation of these funds for alternative types of housing opportunities with equivalent capacity in a rural area].[1]*

 iii. *Northwest Regional Reentry Center (NWRRC, Multnomah County) has requested <u>$4.2 million</u> to remodel an existing building for residential placement for the Aid and Assist population. The remodel incudes adding 44,000 sq ft for approximately 20-24 beds. NWRRC is estimating that they will be able to get to 38 beds, barring significant construction challenges. The project is expected to be complete in <u>12-18 months</u> once construction begins. OHA staff are working with NWRRC to identify a construction start date.*

 iv. *Sequoia has requested $400,000 to convert a Room and Board facility to a dedicated Aid and Assist SRTF in Aloha (10 beds). The anticipated completion date is the end of 2025.*

 v. *Lifeworks has requested a total of $1.5 million, to convert a vacant home to a dedicated Aid and Assist RTH in Hillsboro (10 beds) and for a 5 bed SRTF to serve individuals with severe and persistent mental illness (SPMI). Both projects are anticipated to be complete by the end of 2025.*

*Impact Statement: There were 72 individuals on the RTP list as of October 31, 2024. If partners are able to add these new beds, they should create additional placement opportunities for OSH discharges. This could in turn help shorten the waitlist for OSH admissions, and thereby facilitate compliance with the Mink injunction.*

*Estimated Cost: The $9.4 million in funding to support these projects has been identified. Combined, these proposals would result in an increase of 47-67 residential beds across the state.*

**4. Provide Specific Training and Education to Oregon Judicial Department (OJD), District Attorneys, and Community Mental Health Providers (CMHPs) – Initial training provided in Q1 2025**

*To improve shared understanding of contractual roles, level of care determinations, and competency restoration and evaluation, the following training topics will be offered to the audiences noted below:*

 • *<u>Curriculum development on community placement services and supports, levels of care, and OSH's Ready to Place determination will be completed by Dec. 15, 2024. The trainings will occur in the first quarter of 2025. Annual refresher trainings will begin in the first quarter of 2026</u>*

  o *Education for Courts, District Attorneys, defense attorneys, and County CMHP Commissioners on the contractual responsibilities of the CMHP, OHA and OSH as it relates to services for A&A and GEI/PSRB populations.*

---

[1] It should be noted that as this report was being completed, the state learned of a new barrier to supporting the build of a five-bed RTH in a particular rural county. As such, the state has committed to looking for a similar project to fund or to re-allocating the funds with input from the Neutral Expert and others after vetting with OHA leadership and Governor's office.

> *This will be a collaborative training offered by OSH and the Behavioral Health Department.*
> - o *OSH will lead the creation of materials and provide training to Courts, District Attorneys, defense attorneys, and CMHPs on Level of Care Utilization System (LOCUS) scores and OSH's use of medical criteria for "Ready to Place" determination.*
> - *Curriculum development on the legal process of A&A and GEI/PSRB will be completed by Dec. 15,2024. The trainings will occur in the second quarter of 2025. Annual refresher trainings will begin in the second quarter of 2026*
>   - o *A collaborative training for substance use disorder (SUD) providers, provided with the DOJ and a judge/District Attorney (DA)/defense attorney, on 1) the legal process of A&A and GEI/PSRB populations, and 2) service delivery models that improve outcomes as identified by OHA Behavioral Health. This will include minimum standards of service delivery for all the behavioral health needs of this population.*
> - *Curriculum development on competency restoration and forensic evaluation will be completed by January 17, 2025. Trainings will be delivered in the first and second quarter of 2025 with annual refresher trainings beginning in the first quarter of 2026.*
>   - o *OSH will lead the creation of materials and provide training to Courts, Attorneys, and CMHPs about competency restoration, focusing on effective treatments and therapeutic approaches to address barriers to competency, how psychotropic medications work and what to expect from them, the difference between capacity and willingness to engage in treatment, and how to read a forensic report.*

*Impact Statement:  There is an under-reliance on placements to less restrictive levels of care that are likely more clinically appropriate for the individual, which creates a lengthy waitlist for residential services in general. While there are many factors that contribute to this, including prioritized safety needs, it is clear that education about LOCUS scores, levels of care, and role clarity is needed to impact placement decisions. Greater awareness of these issues could lead to growing acceptance of lower levels of care for OSH discharges; because these lower levels of care have shorter waiting lists than SRTFs, it is possible that this shift could expedite OSH discharges.*

*Estimated Cost: There are no expected costs. Trainings will be developed and delivered by OHA Behavioral Health and Oregon State Hospital staff. Continuing Legal Education credit will be offered wherever possible to incentivize attendance.*

5. ***Oregon Health Authority Behavioral Health (OHA BH) Coordination Integration: Phased Approach to Reinstitute Extended Care Management Unit (ECMU) – over 3-to-4-month timeline, with full implementation likely by February 2025***

*Until 2015-2016, OHA had a work unit called the ECMU which managed bed flow, maintained oversight of the residential system and service delivery within the system.  This resulted in more individuals flowing through different levels of care due to OHA having a state-wide scope of bed availability. Through this work unit, OHA provided technical*

DRO EX H, P. 28 of 35

*assistance to smaller community agencies to guide them on how to eliminate barriers for individuals.*

*OHA BH supports the recommendation brought forward by the Washington County CMHP to pilot bringing back the ECMU within OHA. Phase 1 would include oversight of placement beds in Washington, Lane, and Multnomah Counties. Program staff would work with CMHP coordinator(s) to ensure that all individuals receive appropriate referrals to living facilities and therapeutic interventions that lead to lower levels of care. A full team for this pilot would require five staff and one dedicated staff at OSH. OHA currently has five positions that may be repurposed for this team and is sufficient to support the work of moving individuals off the RTP List and into community.*

*Implementation Timeline beginning November 1, 2024:*
- *The following activities would take place in the first 90 days of implementation:*
  - *OHA positions would be re-purposed, and staff trained to work with CMHP coordinators to provide oversight on individual placements.*
  - *Communication plan development*
  - *Partner and community engagement*
- *The following activities would take place in the first 120 days of implementation:*
  - *Contract development with residential providers who do not currently contract with OHA within the identified pilot counties*
  - *Policy and procedure development*

*Although there would be a need to reflect the role of this unit within the County Financial Assistance Agreement (CFAA), no rules or legislative authority is necessary for this work to begin. Statutory changes would be needed if OHA determined the unit needed more authority to oversee residential waitlists and care coordination. The county positions would work in the field to facilitate placements, oversee facility conditions and person-centered care. Policy and contract changes would be necessary as residential services would move "in house." Rule changes may be needed depending on the authority of the ECMU.*

*Impact Statement: Reviving the ECMU would proactively facilitate placement for individuals ready to discharge from OSH by increasing and improving communication and resource identification. While the courts ultimately approve the discharge and transition plan, the ECMU program would work with Multnomah, Washington and Lane counties that make up 35% of all individuals on the RTP list to ensure timely transition to the appropriate level of care. Our goal is to reduce the amount of time an individual spends on the RTP list.*

*Estimated Cost: There are no expected costs. Five (5) existing positions can be repurposed to form the team. The existing adult mental health manager would oversee the team.*

6. **Community Navigator Pilot Expansion - $ 2.9M - 6 months from receipt of funding timeline**

*The Community Navigator pilot supports case management for individuals discharging from OSH. Currently there are five pilot sites that began in March 2024, with in-reach to*

DRO EX H, P. 29 of 35

*OSH which started in July 2024. The current pilot was funded by SB525 for $6,000,000. Initial feedback from CMHPs indicates successful client engagement and positive impact on care transitions, housing stability, and participation in SUD treatment. The primary goal of this pilot is to reduce rates of recidivism for individuals, especially those at risk of houselessness, on A&A orders from involuntary state hospitalization.*

*Dr. Pinals' recommendation is to expand this model. Given OHA's understanding of need across the state, we would use a regional approach for this expansion, expanding to two regions (Southern Oregon and North Coast) chosen based on the number of individuals at OSH. Expansion would occur six months after receipt of funding.*

*Impact Statement: The first set of reports from the pilot are due on November 15, 2024, and OHA's Health        Policy and Analytics Division is scheduled to conduct the first data review in February 2025 to identify if programs are meeting expected outcomes. Already, however, CMHPs have expressed appreciation for the pilot and a desire for it to continue – initial anecdotes include:*

- *Engagement with client at OSH led to a successful step down in level of care, and now they are seeking long term housing and employment. Additionally, this client has reconnected to their family supports.*
- *Due to OSH in-reach and rapport building, one client has engaged in SUD treatment.*
- *CMHP was able to maintain a housing placement for a client due to the Community Navigator team intervention with emergency medication and transportation.*
- *CMHPs report that face to face contact has been crucial to building and maintaining rapport.*
- *CMHPs are assisting with phones, groceries, transportation, interventions and helping individuals apply for benefits (e.g. food cards).*

*In her second report, Dr. Pinals had specifically tasked OHA with submitting a legislative proposal to fund care coordination services for adults discharging from the OSH to community or jails – referencing an evaluation and expansion of the Community Navigator pilot as a potential beneficiary of these funds. This legislative proposal meets this recommendation.*

*Estimated Programmatic Cost: $1 million for each site spanning two years. (Total of $2 Million).*

*Estimated Staffing Cost: 2.0 FTE Program Analyst 1 positions and 1.0 FTE Operations Policy Analyst 3 position would be needed (OSH 2.0 FTE and OHA 1.0 FTE).*
- *Classification: Program Analyst 1: $531,308/biennium.*
- *Classification: Operations & Policy Analyst 3: $364,794/biennium.*

*Estimated Total Cost is $2.9 million (requesting as a new policy option package)*

### RELEVANT RULES

Relevant to the proposed capital projects, Oregon Administrative Rule (OAR) 09-035-0163 (10)(b) states that a provider may not deny an individual admission due to county of origin, responsibility, or residency. The rule requires that facilities must be open to accept individuals from around the State of Oregon to ensure equity for residential placements across the state. However, with the implementation of the ECMU (see recommendation number 5), using a phased approach, OHA will develop contracts for increased oversight over mental health residential placements starting with bed management for the Aid and Assist and GEI/PSRB population across the three identified counties. During this phase, OHA will evaluate the impact of the current waitlist rule (OAR 09-035-0163 (12)) to determine if rule change is needed under this new model.

Additionally, the following information has been confirmed by the Department of Justice (DOJ) and Medicaid regarding residential treatment, priority populations and payment: There is no federal language that prohibits facilities specifying the population that they will serve and that for Medicaid to pay, medical necessity, other federal settings, and payment requirements must be met. Therefore, facilities that are proposing capital projects for Aid and Assist and/or GEI/PSRB individuals can develop such facilities and be paid by Medicaid for services as long as medical necessity is met. Oregon's State Medicaid Plan provides for Home and Community Based Services (HCBS) protections for residents in non-SRTF residential facilities, which means residents have protection against eviction substantially equivalent to Oregon's landlord-tenant laws. The protection outlines that a resident cannot be immediately evicted from a placement because they are terminated from a particular court's jurisdiction. OHA will continue to evaluate the feasibility of either changing this rule or in educating providers about how best to work within this rule to maximize the appropriate use of slots for residents who need them based on appropriate criteria (e.g., medical necessity).

### LEGISLATIVE CHANGE NEEDED

OHA is obligated under the federal court order to make recommendations for legislative change based on Dr. Pinals' reports. There are three primary proposals for legislative change to ORS 161.370 which OSH must therefore make, which will support compliance with the *Mink/Bowman* injunction and impact provision of restoration services at the Oregon State Hospital (OSH) and in Community Restoration (CR).

**Restoration Limits at OSH and in Community Restoration**

The federal court issued an order in September 2022, limiting the duration of inpatient hospital restoration to competency at OSH to return to compliance with the *Mink* injunction. A legislative workgroup was formed to make recommendations about restoration limits at OSH and in the community. That workgroup did not achieve consensus.

Dr. Pinals' second report recommended the limits which are currently applied to OSH restoration; her recommendation at the time was that those limits apply to OSH and CR restoration concurrently. After subsequent input from all parties and amici and given the

DRO EX H, P. 31 of 35

*lack of a consensus recommendation from the legislative workgroup, Dr. Pinals will revise her recommendation in her upcoming November report. To meet its court-ordered obligation, OHA will therefore be submitting the following legislative concept for restoration limits:*

- *Modify statutory language to limit restoration at OSH to the limits imposed by the May 2023 federal order.*
- *Individuals whose most serious charge is a non-person misdemeanor are not eligible for restoration at OSH.*
- *If a patient is admitted to OSH for restoration, the limit for further restoration in the community for patients whose most serious charge is a felony is half the maximum duration of OSH restoration. For those whose most serious charge is a misdemeanor, the limit for CR is equivalent to the duration of OSH restoration. If an individual is placed in community restoration directly, the restoration limit is the same as the maximum duration of OSH restoration.*
- *A patient at OSH may be placed in community restoration following OSH admission only if a forensic evaluation indicates there is a substantial probability that additional restoration efforts will restore the patient.*

*Restoration limits for OSH and CR are therefore proposed as follows[2]:*

| Most Serious Charge | OSH restoration limit | CR limit if OSH restoration first | Total restoration limit if OSH + CR | CR restoration limit if no OSH |
|---|---|---|---|---|
| Non-person misdemeanor | N/A | N/A | N/A | 90 days |
| Person misdemeanor | 90 days | 90 days | 180 days | 90 days |
| Non-violent felony | 180 days | 90 days | 9 months | 180 days |
| Violent felony | 1 year | 180 days | 18 months | 1 year |

**Required Evaluations for Individuals in Community Restoration**

*There is currently no statutory requirement for individuals in CR to be evaluated for competency to stand trial. Dr. Pinals will recommend establishing requirements equivalent to the existing requirements for evaluation for OSH inpatients. OHA will propose change to the .370 statute to require that evaluations must be provided to the court at specified intervals following either admission to OSH or initiation of community restoration services.*

---

[2] The proposed timelines differ from those delineated in my Second Report in that they allow for extended time in community restoration and a sequential framework for community restoration following OSH restoration. The rationale for this change includes data on current restoration rates as well as expressed views of many participants in the Mink Time Limits workgroup regarding the potential for some individuals to become able to Aid and Assist with additional community restoration periods following an OSH hospitalization.

DRO EX H, P. 32 of 35

*Those intervals are: evaluation due by 90 days, 180 days, 360 days, and then every 180 days thereafter if restoration continues past one year.*

***Clarification of Restoration Likelihood***

*Currently, the statute requires that a forensic evaluator opine on whether an individual can be restored in "the foreseeable future." This is generally interpreted so broadly as to be the indefinite future, leading to repeated forensic opinions that the individual is not presently able to aid and assist their attorney, even for individuals who have not substantially responded to treatment or are unlikely to respond more substantially given more time or a different treatment. In an earlier report, Dr. Pinals has already recommended a change to the statutory language such that evaluators are required to opine about whether the defendant can be restored within the time available for restoration. OHA will therefore be submitting this legislative concept.*

*Impact statement: taken together, these changes to ORS 161.370 will allow individuals to receive treatment and restoration services for a duration that is clinically appropriate and preserves the state's interest in prosecution, while facilitating a timely resolution to the individual's case and ensuring that restoration services are available to a greater number of individuals each year.*

*POLICY OPTION PACKAGES*

***Policy Option Package (POP) 552: $55M***
*OHA submitted a Behavioral Health Investment 2025-2027 Policy Option Package to address the housing gaps identified in the Res+ Facilities Study. OHA proposes expanding behavioral health residential treatment and support services to address insufficient infrastructure for substance use disorders, psychiatric treatment, and co-occurring needs across the state. The plan includes purchasing, constructing, or renovating facilities, stabilizing current providers, and supporting culturally and linguistically diverse services. While the POP highlights youth facilities it also outlines improvements addressing the adult population. It will improve access to developmentally responsive licensed residential and SUD treatment and housing, emphasizing equitable distribution of funds to smaller, culturally specific providers, and providers that serve the A&A population.*

*This policy package aims to enhance intensive behavioral health services using three overall strategies:*

1. *Expand capacity for residential psychiatric and SUD treatment services for youth and families, particularly in smaller home-like settings where possible, with greater regional diversity, and a focus on serving mandated individuals.*
2. *Improve current method of disbursing funding across the system in addition to expanding capacity of licensed residential and SUD treatment and housing for adults. This includes providing community coordination and technical support to culturally and linguistically diverse and smaller organizations serving marginalized communities.*

33

3. *Increase access to residential treatment facilities and community-based SUD treatment, including community-based supports for court mandated populations as they transition into the community. Increasing access to community-based services will help ensure that individuals under court orders are served in the least restrictive setting possible.*

*For the adult behavioral health system, this package will provide funding for multiple capital development projects to purchase, build, or renovate existing licensed residential and SUD treatment and housing for adults. The package will prioritize culturally and linguistically diverse services and supports as well as services for the mandated population. Funding disbursements will be aligned with the 5-year plan for increasing statewide capacity as outlined in the Res+ Facility Study. Historical data from House Bill 5024 (2021) project development costs has shown the average cost per bed is approximately $230,428. Based on this data, we anticipate a total increase in capacity of approximately 642 beds/units from the funding through this policy package. Considering the restricted number of data points and the substantial ranges, these figures are subject to change as more data on facility costs becomes available.*

*IMPACT STATEMENT*

*The above recommendations will let people move from residential placements to independent housing, thus opening community spaces for people discharging from OSH, creating positive long-term benefits for the system as whole.*

*Flexible housing funds allow for quick access to resources that support individuals urgent housing needs. Without funding, CMHPs will be limited in their ability to provide flexible housing supports resulting in increased risk for houselessness, further destabilization and increase in risk for further criminal/legal system exposure and need for higher levels of care.*

2. **Re-exploration and Clarification of the Mosman Order for admissions limits to OSH**. There have been a number of cases involving questions about youth competency restoration commitments, commitments for individuals charged with crimes such as Fugitive from Justice when the defendant is to be extradited to other jurisdictions, among others. I recommend that the plaintiffs and the state work together to examine the impact of these types of cases on compliance balanced by need within the state and pursue a new federal order to clarify these issues.

3. **Socialization of legislative proposals and policy option packages**. More than just drafting requests for funding or possible legislation, it is imperative that the state socialize the legislative proposals outlined above as well as the requests for new funding. This will require the gathering of information and potential presentations to legislators and meetings with them to review strategies delineated in this matter. It will be most helpful if the parties can work together to help socialize these initiatives with relevant partners.

DRO EX H, P. 34 of 35

4. **Ongoing meetings between the parties and with Amici**. I recommend ongoing dialogue amongst the parties to ensure timely updates on state activities to move toward compliance. In addition, periodic meetings with Amici will be important on at least a quarterly or bi-monthly basis if they are willing to continue to engage in dialogue and share their perspectives.

5. **Ongoing review of the cost for a centralized OHA forensic evaluation capacity or combined OHA/OSH forensic evaluation service**. I have previously recommended and continued to support the potential establishment of an office for forensic services at OHA that is also touched upon in the above state recommendations.

6. **Review of implementation status of prior and current recommendations**: During the next reporting period, the state should be prepared to discuss and review progress on prior and current recommendations. Although there are written regular reports, it will be important to discuss any barriers among the parties and with the Neutral Experts to determine how best to overcome them.

7. **Increase in GEI discharge efficiencies**: The new data dashboard pertaining to GEIs reveals a number of stages with delays. From initiation of a discharge request up until the time an individual is discharged from OSH far surpasses the 171-day total requirement. This is not acceptable, and flies in the face of *Olmstead* requirements and must be remedied. Some discharge delays are related to PSRB processes and definitions (some of which are currently being litigated by DRO), but per the dashboard, many if not most of them also pertain to OHA and OSH responsibilities. As such, to make room and space for those who need the OSH resource, I recommend that the state work toward the development of solutions to gain efficiency and ultimately consider rule changes shortening discharge processes overall.

In conclusion, there has been notable hard work by the parties and all the partners with whom I have met and spoken who have provided meaningful input into this report. The court personnel and others that can impact outcomes for people within the AA and GEI systems are to be commended for continuing to help work within a system that is under-resourced and demanding. The collective efforts of the partners help support the recovery of the individuals in the AA and GEI processes as well as any potential victims of their conduct.  I appreciate the attention that this *Mink/Bowman* matter receives across state and local government leaders and by the community at large. For the *Mink/Bowman* class members, it is important that the partners across the state continue to work together to achieve promising solutions to ensure timely access to appropriate restoration and therapeutic services outside a carceral setting in accordance with this case and the Constitution.

**Respectfully Submitted,**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*

DRO EX H, P. 35 of 35