Keith M. Garza, OSB No. 940773
Law Office of Keith M. Garza
P.O. Box 68106
Oak Grove, Oregon  97268
(503) 344-4766
keithgarza@comcast.net

Attorney for *Amici* Judges Matthew
Donohue, Jonathan Hill, and Nan Waller

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | | |
|---|---|---|
| DISABILITY RIGHTS OREGON, | ) | Case No. 3:02-cv-00339-AN (Lead Case) |
| METROPOLITAN PUBLIC DEFENDER | ) | Case No. 3:21-cv-01637-AN (Member Case) |
| SERVICES, INC., and A.J. MADISON, | ) | Case No. 6:22-cv-01460-AN (Member Case) |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | *AMICI* JUDGES' MARCH 2025 |
| | ) | EVIDENTIARY HEARING |
| SAJEL HATHI, in her official capacity | ) | MEMORANDUM |
| as head of the Oregon Health Authority, | ) | |
| and SARA WALKER, in her official | ) | |
| capacity as Interim Superintendent of the | ) | |
| Oregon State Hospital, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| JAROD BOWMAN and JOSHAWN | ) | Case No. 3:21-cv-01637-AN (Member Case) |
| DOUGLAS-SIMPSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |

1 – *AMICI* JUDGES' MARCH 2025 EVIDENTIARY HEARING MEMORANDUM



SARA WALKER, Interim Superintendent
of the Oregon State Hospital, in her
official capacity, DOLORES MATTEUCCI,
in her individual capacity, SAJEL HATHI,
Director of the Oregon Health Authority, in
her official capacity, and PATRICK ALLEN,
in his individual capacity,

      Defendants.

LEGACY EMANUEL HOSPITAL &
HEALTH CENTER d/b/a UNITY CENTER
FOR BEHAVIORAL HEALTH, LEGACY
HEALTH SYSTEM; PEACEHELATH; and
PROVIDENCE HEALTH AND SERVICES
OREGON,

      Plaintiffs,

      v.

SAJEL HATHI, in her official capacity as
Director of the Oregon Health Authority,

      Defendant.

Case No. 6:22-cv-01460-AN (Member Case)

## I.    INTRODUCTION

Presiding Judge Matthew Donohue (Benton County), Presiding Judge Jonathan Hill (Tillamook County), and Judge Nan Waller (Multnomah County) ("*Amici* Judges") submit the following supplementary data and brief memorandum in advance of the Court's March 12-13, 2025, evidentiary hearing in these consolidated matters.

## II.    SUPPLEMENTARY DATA

As the Court may be aware, the legislature earlier this year established the Forensic Behavioral Health Workgroup, led by Oregon state Representative Jason Kropf, charged with proposing legislation to address the aid and assist and civil commitment crises.  The workgroup's

2 – *AMICI* JUDGES' MARCH 2025 EVIDENTIARY HEARING MEMORANDUM

meetings are ongoing, and the Oregon Judicial Department generally, and Judge Waller and Presiding Judge Hill specifically, have been active participants.  Attached to this memo are two sets of materials OJD has provided the workgroup.

First is a compilation of statistics across more than a dozen metrics.  Some of those are similar to data the *Amici* Judges submitted in advance of last two status conferences (numbers of defendants found unfit to proceed, case filings, restoration success, etc. (*see* Dkts. 525, 554)); other data is new (fitness evaluations, CMHP consultations, involuntary medication, etc.).  Below are a few excerpts from the analyses – all of which are consistent with the data the judges provided earlier:

> "The number of defendants found to lack fitness to proceed has increased steadily since the first months of the COVID-19 pandemic, and the 377 defendants found unfit in 2024 Q[uarter]3 is a 65% increase over the number found unfit in the first quarter of 2020.
>
> "Since the first quarter of 2022, the number of defendants for whom fitness issues were raised has increased 34%, while the number found unfit has increased 44%."

(*See* appended Aid & Assist and Civil Commitment Data at 3 (bracketed text added).)

> "[T]he increase in aid & assist cases has *not* been driven by an increase in cases filed."

(*Id*. at 4 (emphasis in original).)

> "Between 2020 Q1 and 2024 Q3, the total number of orders initiating evaluations prior to the court's initial fitness determination—including orders for .365 evaluations and orders to release records for rapid evaluations—increased 51%.
>
> "During this time, the number of courts with rapid evaluation dockets increased from three to ten, and the number of orders to release records for rapid evaluations more than tripled, from 66 in 2020 Q1 to 210 in 2024 Q3.
>
> "Orders for state hospital evaluations under ORS 161.365, meanwhile, decreased 39% between 2020 Q1 and 2024 Q3."

(*Id*. at 6.)

> "The number of CMHP consultation reports filed with the court has more than tripled since the first quarter of 2020, with the number of consultations following RTP notices increasing nine-fold (from 26 to 240) and the number of other consultation reports filed more than doubling (from 235 to 526)."

(*Id*. at 9.)

In addition, OJD provided the workgroup with a different recidivism metric than the one the judges provided the Court in November 2024 and January 2025, which calculated the number of new criminal cases filed per month for defendants who had an aid & assist commitment to OSH that had been terminated in the previous ***six months***.  (*See* Dkts. 525 at 24 and 554 at 20.) That data, as updated through the end of 2024 and as the Court may recall, showed a 46% increase in new felony and 96% increase in new misdemeanor cases.

Last month, OJD provided Representative Kropf's workgroup with information regarding the percentage of unfit defendants who had new charges filed within ***one year*** of either regaining fitness or having all cases dismissed.  That data also is attached to this memorandum and shows, as to those defendants whose fitness was ***restored***, a steady "recidivism" rate (charges, not convictions, were measured) of around 25% from 2021 to 2023.  (*See* appended Aid & Assist Data: New Charges for Defendants Who Lacked Fitness to Proceed at 2.)  However, 38% of defendants with all cases dismissed after commitment to OSH— ***nearly a 40% "recidivism" rate***—and 31% of defendants with all cases dismissed without being committed to OSH (restoration attempted in the community) had new charges filed within the year.  That was an eight percentage point increase for both categories between 2021 and 2023.

Finally, earlier today, Judge Waller testified before the Oregon House Committee on the Judiciary regarding the –3 amendments to HB 3051—amendments proposed by OHA and set for an expedited hearing, and perhaps motivated more by litigative than legislative considerations (*see* https://olis.oregonlegislature.gov/liz/2025R1/Downloads/ProposedAmendment/26731, last accessed 3/9/25)—and provided legislators with the following data respecting the daily population at OSH over time compared to Oregon's population:

| Table 1: Oregon Population | | |
|---|---|---|
| **2000**<br>*(US Census Bureau)* | **2024**<br>*(Portland State University Certified Population Estimate)* | **Percent Change** |
| 3,421,399 | 4,263,385 | **+ 25%** |

| Table 2: Oregon State Hospital Average Daily Population<br>*Data Provided by the Oregon State Hospital* | | |
|---|---|---|
| **January 2000** | **January 2025** | **Percent Change** |
| 789.0 | 685.8 | **- 13%** |

| Table 3: Oregon State Hospital Average Daily Population Per 100,000 People *Based on Average Daily Population from the Oregon State Hospital and Population Data from the US Census Bureau and Portland State University Population Research Center* | | |
|---|---|---|
| **January 2000** | **January 2025** | **Percent Change** |
| 23.1 | 16.1 | **- 30%** |

Plainly stated, and even setting aside the disturbing fact that OSH's service rate is declining at a greater rate than Oregon's population is increasing, the data continues to show the overwhelming toll the Court's September 2022 and July 2023 remedial orders have taken and continue to inflict upon the Oregon criminal justice system at all levels, and only begins to hint at the downstream consequences forced upon crime victims, defendants, their families, and the communities in which they live.

## III.    BRIEF DISCUSSION

Dr. Pinals issued her first Neutral Expert report in January 2022. Three years and two months ago.  (Dkt. 262-1.)  Seven months later—more than two and a half years ago and advocating for an ***unopposed*** motion to implement the "approximately 75 discrete recommendations from Dr. Pinals[,]"—plaintiffs' collectively wrote:

> "Even if the legislature decided to appropriate money to expand capacity at the state hospital, ***which it almost certainly will not, new construction would take years to implement***.  The legislature's policy choice to expand capacity, ***which***

> ***the Plaintiffs strongly support***, is to invest in community mental health treatment. In 2021, the legislature made historic investments to begin to rebuild our communities' capacities to deliver mental health services where they are needed—locally."

(Dkt. 260 at 5, 8 (emphasis added).)  On November 21, 2022, OSH/OHA's counsel told the

Court:

> "[T]he legislature gave us $1.3 billion for this biennium.  90 percent of that will have been spent by the end of this calendar year.  [Stated differently, $1.17 billion purportedly was spent by December 31, **2022**, more than two years ago.]  OHA is continuing to move heaven and earth. We are not opposed - - we did not oppose the motion this time because ***we have run out of the ability to tell you we have a plan for coming back into compliance*** under the system as it is now."

(Dkt. 321 at 62 (emphasis and bracketed text added).)

Actively, tacitly, neutrally, this was THE PARTIES' plan.  Ninth Circuit authority

regarding the sequencing of remedial measures in the structural injunction setting

notwithstanding, contempt won't work.  Demographic data aside, deliver mental health services

where ***we*** say they are needed.  More than two years after more than a billion of the State of

Oregon's dollars purportedly were spent in exactly the way the parties wanted, what do we have?

Average admission wait times of 29.0 days for January 2025 and 31.7 days for February

(according to OHA's *Mink-Bowman* compliance dashboard), the latter of which is almost exactly

the wait times with which Judge Panner was confronted in 2001 and 2002 (31.98 days; *see* Dkt.

525 at 8).  They own those numbers and, respectfully, their plan has both failed to work and

caused harm in the process.[1]

---

[1]      As for responsibility, the time for the parties and others to attempt to focus attention elsewhere—over-zealous prosecutors, risk-averse judges, inefficient local providers, and self-interested hospitals—has long since passed.  OHA is wholly statutorily responsible for ensuring treatment for the Aid & Assist, GEI, and civil commitment populations. *See generally* ORS

7 – *AMICI* JUDGES' MARCH 2025 EVIDENTIARY HEARING MEMORANDUM

## IV.     CONCLUSION

This Court finds itself in an unenviable position of inheriting litigation for which the proper sequencing of ratcheted federal measures for remedying state constitutional violations was not followed. Even if plaintiffs' estimations were correct and new construction "would [have taken] years to implement," query where Oregon would be if a contempt citation had

---

Chapters 161, 426, 431. (To be clear, *Amici* Judges stand ready to respond on short notice to any inquiry from the Court regarding DOJ's letter-writing campaign to judges in the ready-to-place context (*see* Tenth Neutral Expert Report at 19) or their important statutorily defined role regarding the same (*id*. at 18; Dkt. 540 at 25 (DRO's contempt motion); Dkt. 557 at 6-8 (MPD's partial joinder)). Suffice it to say, the *Amici* Judges agree with defendants—based on considerations of federalism, comity, and facts and experience—that the Court should not further overwrite state law to wrest from judges the decision-making authority the Legislative Assembly for good reason has placed in them with respect to deciding whether a particular defendant is ready to step down from restoration at OSH and into the community. (*See* Dkt. 563 at 18.)

As for why the parties got it wrong, most likely there are myriad reasons. As one example, and as Dr. Pinals noted last November:

> "What I'm hearing from the clinicians is that what we are seeing is a different kind of clinical patient, and unfortunately, there is no fast solution to serving those people. We're seeing people with more complex co-occurring conditions of substance use and mental illness ***that don't respond easily to medication, that do have a high proportion that relapse***, and hospitalization is not the only solution, especially if it's hospitalization for restoration purposes.

> "So I do think that we have this revolving door of a very, very different, biologically different population that raises a whole host of challenges."

(Dkt. 530 at 37-38 (emphasis added).) As another example, as the OJD data demonstrates, the parties failed to accurately gauge the effect shortened OSH time limits would have on both restoration success and recidivism, the former of which Dr. Pinals specifically acknowledged in her eighth Neutral Expert report: "It appears that fewer people are being restored in the hospital and people are silting up in the community restoration system * * * [, and] these are very significant issues, in my opinion[.]" (https://www.oregon.gov/oha/OSH/reports/Oregon-Mink-Bowman-8th-Neutral-Expert-Pinals-Report.pdf at 22.)

issued in 2022? And query where it will be in 2027? In the end, keeping more criminal defendants out of OSH, discharging those individuals sooner even though not restored, prioritizing the forensic population over civil commitments, and the like all are efforts that, frankly, merely will continue to rearrange and then recycle a largely interlaced population of Oregonians desperately in need of mental health treatment to their specific and our collective detriments.

Stepping back, most of the *amici* the Court has before it became involved in this litigation late in the summer of 2022 when it appeared the Court was poised to act in response to unopposed motion practice for which there appeared to be little adversity between the parties. Later this week, unless the Court acts favorably on Marion County's pending motion, the Court again will have before it only DRO, MPD, OSH, OHA, and Dr. Pinals for the purpose of collecting evidence (and twenty minutes of argument from the hospital associations (Dkt. 576)). As between them, and much like two and a half years ago, there is not much daylight as to what they want to happen (excepting contempt): further overwriting otherwise neutral, valid, and constitutional state laws in the face of significant concerns raised by DAs, counties, judges, and

crime victims.  Suffice it to say, if the Court is inclined to impose those kinds of measures, the judges hope it will engage all the *amici* before doing so.

Respectfully submitted March 10, 2025.


_____/s/ Keith M. Garza_____
Keith M. Garza, OSB No. 940773

Law Office of Keith M. Garza
P.O. Box 68106
Oak Grove, Oregon 97268
(503) 344-4766
keithgarza@comcast.net

Attorney for *Amici* Judges

# Aid & Assist and Civil Commitment Data

## Oregon Judicial Department
*Data Prepared*
*December 20, 2024*



# Table of Contents

Introduction ........................................................................................................... 1

About the Data ...................................................................................................... 1

Aid & Assist Statistics .......................................................................................... 2

   Defendants Found Unfit to Proceed ................................................................. 3

   Changes in Case Filings ................................................................................... 4

   Fitness Evaluations .......................................................................................... 5

      Evaluation Orders Prior to Initial Fitness Determination ............................. 5

      Fitness Evaluations Filed Prior to Initial Fitness Determination ................. 6

   Community Mental Health Program Consultations ............................................ 8

   Placement of Defendants Lacking Fitness to Proceed ...................................... 9

   Involuntary Medication ................................................................................... 10

   Regaining Fitness .......................................................................................... 11

Civil Commitment Statistics ............................................................................... 14

   Extremely Dangerous Person Commitment .................................................... 14

   Mental Illness Commitment ........................................................................... 15

      Cases Filed ................................................................................................ 15

      Diversion ................................................................................................... 16

      Commitment Hearings and Commitments ................................................. 17

      Commitment, By Court .............................................................................. 18

      Continued Commitment ............................................................................ 20

   Intellectual Disability Commitment ................................................................. 21

Conclusion ......................................................................................................... 22

# Introduction

This document presents Oregon Judicial Department (OJD) data on two types of cases involving people with serious mental health issues: aid & assist cases and civil commitment cases.

The *Aid & Assist Statistics* section includes data on criminal cases where there was a question as to whether the defendant lacked fitness to proceed with the case due to a qualifying mental disorder. These cases are commonly referred to as aid & assist cases because they involve defendants who may not be able to aid & assist in their own defense.

The *Civil Commitment Statistics* section shows data on civil commitment cases, which are civil cases in which a court may order a person with a mental illness or intellectual disability to receive involuntary treatment if the court finds that they are dangerous to themself or others or are unable to provide for their basic needs.

# About the Data

All data in this document are drawn from OJD's Odyssey case management system, except for the population data used to calculate per capita civil commitment rates, which are from Portland State University's 2023 certified population estimates.

The statistics drawn from Odyssey include only data from Oregon's circuit courts and only information that was entered on or before December 19, 2024. The numbers do not include data from Oregon's municipal courts—some of which handle aid & assist cases, but because they are not part of the state court system, the data are unavailable—or data from Oregon Health Authority (OHA), Oregon State Hospital (OSH), or community mental health program case management systems.

All years and quarters in this document refer to calendar years (January through December) rather than fiscal years. Most charts in the *Aid & Assist Statistics* section report data by quarter so that readers can see changes within years. Charts that show quarterly numbers have data through the end of 2024 Quarter 3 (Q3), as that was the most recent quarter with complete statistics when the numbers were compiled.

Data on civil commitment cases and on aid & assist involuntary medication orders are shown by year because numbers of rare events like involuntary medication orders, intellectual disability commitments, and extremely dangerous person commitments can fluctuate widely from quarter to quarter, which can make it difficult to identify trends. Charts that show data by year have data through November 30, 2024.

The start dates for the charts vary between 2020 and 2022 depending on how far back OJD has reliable data to report. For example, the charts on civil commitment cases start

in 2022 because OJD implemented processes to differentiate between the three types of civil commitment cases—mental illness commitment, intellectual disability commitment, and extremely dangerous person commitment—in January 2022, but cannot reliably break out data for prior years by commitment type.

Finally, readers should be aware that the accuracy of the statistics in this document depends on accurate data entry by court staff, both in correctly entering orders and other documents and in ensuring that defendants with multiple aid & assist cases have a single Odyssey party record.

OJD attempts to minimize the number of duplicate records in its system, but defendants who were found unfit in multiple cases and have duplicate party records in Odyssey may be overcounted in the aid & assist numbers.

## Aid & Assist Statistics

If a court finds that a defendant in a criminal case cannot, due to a qualifying mental disorder, understand the nature of the proceedings against them, assist and cooperate with their attorney, or participate in their own defense, the court must either suspend the case until the defendant is fit to proceed or dismiss the charges.

Cases in which a defendant lacks or may lack fitness to proceed are known as aid & assist cases, since they concern a defendant's ability to aid & assist in their own defense.

Defendants frequently have multiple aid & assist cases, and the charts in this section show numbers of defendants rather than cases. The same defendant, however, may be counted more than once in a chart if the same event happens on multiple occasions.

For example, if a defendant was found unfit to proceed in multiple cases, and then either regained fitness to proceed or had their cases dismissed, and was later again found unfit to proceed, that defendant would count twice in the statistics on defendants found unfit to proceed.

Unless otherwise noted, statistics on defendants found unfit to proceed and defendants exiting pending fitness status after being found unfit include all defendants found unfit to proceed in Oregon's circuit courts, and are *not* limited to defendants committed to OSH.

Statistics on orders for fitness evaluations and community mental health program consultations count a report that is filed on multiple cases for the same defendant on the same day as a single report.

Charts that present data by quarter have gray shading to highlight the quarter (2022 Q3) when Judge Michael Mosman's remedial order (hereafter referred to as the Mosman

order) in the federal *Mink/Bowman* case[2] was issued, as that order imposed shorter timelines on aid & assist restoration at OSH that had ripple effects on other parts of the aid & assist system.

## Defendants Found Unfit to Proceed

Chart 1 (below) shows the number of defendants found to lack fitness to proceed (dark blue line), by quarter, for 2020 Q1 through 2024 Q3.

OJD began tracking the number of defendants about whom a fitness concern was raised in January 2022, and the yellow line in Chart 1 shows the number of defendants with a fitness issue raised for 2022 Q1 through 2024 Q3.

The number of defendants found to lack fitness to proceed has increased steadily since the first months of the COVID-19 pandemic, and the 377 defendants found unfit in 2024 Q3 is a 65% increase over the number found unfit in the first quarter of 2020.

Since the first quarter of 2022, the number of defendants for whom fitness issues were raised has increased 34%, while the number found unfit has increased 44%.



**Note:** The *Defendants Found Unfit* numbers include all defendants found unfit to proceed in Oregon's circuit courts, and are not limited to defendants committed to OSH.

The gray shading highlights the quarter (2022 Q3) during which the Mosman order was issued.

---

[2] *Disability Rights Oregon et al. v. Allen et al.*, USDC Oregon Case No. 02-cv-00039-MO (lead case).

## Changes in Case Filings

A common question about the increase in defendants found unfit to proceed is whether it is driven by an increase in new cases filed.

Chart 2 (below) compares the year-to-year change in felony and misdemeanor cases filed with the change in the number of defendants found unfit to proceed. It shows that the increase in aid & assist cases has *not* been driven by an increase in cases filed.

Between 2020 and 2022, the number of defendants found unfit to proceed increased by 45% even as the number of new felony and misdemeanor cases filed decreased by nine percent. In 2023, the increase in defendants found unfit (24%) far exceeded the three percent increase in new felony and misdemeanor cases.

In the first nine months of 2024, however, new felony and misdemeanor cases increased by nine percent compared with the first nine months of 2023, whereas the number of defendants found unfit to proceed increased by just one percent.



**Chart 2: Change in Felony & Misdemeanor Cases Filed Compared with Change in Defendants Found Unfit to Proceed**

**Note:** The *Defendants Found Unfit* numbers include all defendants found unfit to proceed in Oregon's circuit courts, and are not limited to defendants committed to OSH.

## Fitness Evaluations

When a defendant may lack fitness to proceed, the court may order, or a party may provide, a fitness to proceed evaluation with a recommendation from a certified evaluator as to whether the defendant is fit to proceed.

The following two subsections of this document provide information on fitness evaluations that inform courts' initial determinations on whether defendants are fit to proceed.

The next subsection shows data on orders initiating evaluations prior to the court's initial fitness determination. The following subsection shows the number of evaluation reports filed with the court prior to its initial fitness determination, including those that were not initiated via a court order.

Courts also receive fitness evaluations, known as .370 evaluations, to assist with determining whether a defendant who is receiving restoration services has regained fitness to proceed. Ninety percent of .370 evaluations filed in 2023 were conducted by OSH, but those evaluations are not included in the data below.

An important piece of context to the evaluation data, however, is that the increase in defendants lacking fitness led to an increase in the number of .370 evaluations needed. This caused delays in OSH providing evaluations for defendants who had not yet been found unfit, and led to OSH implementing new procedures in June 2023 to prioritize .370 evaluations for OSH patients over other fitness evaluations.

### *Evaluation Orders Prior to Initial Fitness Determination*

Chart 3 (next page), shows the number of court orders to initiate three types of fitness evaluations prior to the court's initial fitness finding:

**State Hospital .365 Evaluations** are conducted by OSH pursuant to a court order under ORS 161.365.

**Private Evaluator .365 Evaluations** are conducted by a private certified evaluator pursuant to a court order under ORS 161.365.

**Rapid Fitness Evaluations** are conducted by a private certified evaluator as part of a rapid evaluation program.

Rapid evaluation programs are programs developed by individual courts and their community partners to facilitate timely fitness evaluations, primarily for in-custody defendants. While the exact procedures vary from court to court, rapid evaluation programs involve certified evaluators holding time on their schedules to complete evaluations quickly, and the court issuing orders for treatment providers to release records to the evaluator.



**Note:** The gray shading highlights the quarter (2022 Q3) during which the Mosman order was issued.

Chart 3 (above) shows the number of orders to initiate evaluations prior to the court's initial fitness determination. The dark blue and yellow bars show numbers of orders for evaluations under ORS 161.365, and the light blue bars show orders to release records for rapid evaluations.

Between 2020 Q1 and 2024 Q3, the total number of orders initiating evaluations prior to the court's initial fitness determination—including orders for .365 evaluations and orders to release records for rapid evaluations—increased 51%.

During this time, the number of courts with rapid evaluation dockets increased from three to ten, and the number of orders to release records for rapid evaluations more than tripled, from 66 in 2020 Q1 to 210 in 2024 Q3.

Orders for state hospital evaluations under ORS 161.365, meanwhile, decreased 39% between 2020 Q1 and 2024 Q3.

### *Fitness Evaluations Filed Prior to Initial Fitness Determination*

Looking only at evaluation orders does not provide a full picture of the evaluations conducted prior to the court's initial fitness finding, as there is a fourth path to obtaining a fitness evaluation, which is the defense obtaining its own evaluation without court involvement.

Chart 4 (below) shows the total number of evaluation reports filed with the court prior to the court's initial fitness finding, with the orange bars showing the number of evaluations filed in cases where the court had not issued an order for an evaluation under ORS 161.365 or an order for the release of records for a rapid evaluation.

During the first three quarters of 2024, 56% of evaluations filed prior to the court's initial fitness determination were obtained by the defense without court involvement. Between 2020 Q1 and 2024 Q3, the number of defense-obtained evaluations filed prior to the court's initial fitness finding increased 72%, whereas the number of OSH .365 evaluations filed decreased by 75%.

In considering the data in Charts 3 and 4, it is important to be aware that the number of evaluation orders (Chart 3), the number of reports filed with the court (Chart 4), and the number of evaluations actually conducted (which OJD does not have data on), are likely to differ.

One reason for this is that, after the court issues an order initiating an evaluation, that evaluation might not occur if the defendant refuses to participate, the defendant's circumstances change, or another type of evaluation becomes available more quickly.

For example, the number of state hospital .365 evaluations ordered in 2023 far exceeded the number of state hospital .365 reports filed, likely due to the long wait times for such evaluations causing the court or defense to find a private evaluator to conduct the evaluation rather than waiting for the OSH evaluation.



**Chart 4: Evaluation Reports Filed Prior to Fitness Finding**

**Note:** The gray shading highlights the quarter (2022 Q3) during which the Mosman order was issued.

Evaluations obtained through rapid dockets or by defense attorneys without court involvement are also often not filed with the court.

For these reasons, neither the number of orders initiating evaluations nor the number of evaluation reports filed reflect all of the evaluations conducted for circuit court defendants prior to the court's determination on whether the defendant is fit to proceed.

## Community Mental Health Program Consultations

In addition to receiving fitness evaluations to help determine whether a defendant lacks fitness to proceed, courts also receive consultation reports from community mental health programs (CMHPs) with information on whether the services necessary for the defendant to regain fitness are available in the community.

Depending on the charges on the case, the court is either required to or has the option of ordering a CMHP consultation when the court has reason to doubt the defendant's fitness to proceed. Courts are also required to order a CMHP consultation when OSH files a notice—known as a ready-to-place (RTP) notice—that a defendant committed to OSH for restoration services no longer requires hospital level of care.

Courts also often order a CMHP consultation after receiving notice from OSH that a defendant will be discharged under the timelines in the Mosman order.

Chart 5 (below) shows the number of CMHP consultation reports filed over time, with the yellow bars showing consultations filed after an RTP notice, and the dark blue bars showing the number of CMHP consultation reports that were not filed after an RTP notice.



**Note:** The gray shading highlights the quarter (2022 Q3) during which the Mosman order was issued.

The number of CMHP consultation reports filed with the court has more than tripled since the first quarter of 2020, with the number of consultations following RTP notices increasing nine-fold (from 26 to 240) and the number of other consultation reports filed more than doubling (from 235 to 526).

## Placement of Defendants Lacking Fitness to Proceed

After a court determines that a defendant lacks fitness to proceed in a criminal case, it must determine an appropriate action. Two common actions are commitment of the defendant to OSH for restoration services or ordering the defendant to participate in community restoration services.

Chart 6 (below) shows the number of new commitments to OSH (dark blue line) each quarter since the beginning of 2021, along with the number of defendants lacking fitness to proceed whom the court ordered into community restoration or allowed to be out of custody while the court either determined an appropriate action or waited for services to become available (yellow line).

The second category—*Defendants Released*—includes a variety of circumstances, including defendants ordered to participate in community restoration in a custodial setting such as secure residential treatment facility, defendants participating in community restoration in a noncustodial setting, and any defendants who were released without an order to participate in services and did not immediately have their cases dismissed.



**Chart 6: Commitment to OSH and Release from Custody for Defendants Who Lack Fitness to Proceed**

**Note:** The gray shading highlights the quarter (2022 Q3) during which the Mosman order was issued.

Chart 6 shows that both commitments to OSH and releases of defendants who lacked fitness to proceed have increased since the first quarter of 2021, which is not surprising given that the number of defendants found unfit has also increased.

The number of new commitments increased 57% between 2021 Q1 and 2024 Q3. The number of defendants released while unfit to proceed more than tripled during the same time period, although more aid & assist defendants are still committed each quarter than are released.

## Involuntary Medication

If a defendant committed to OSH is refusing to take recommended medication, OSH can, in some circumstances, involuntarily medicate the patient without a court order. If OSH does not have statutory authority to involuntarily medicate the defendant, OSH is required to file a report with the court, and the district attorney may file a motion asking the court to authorize involuntary medication of the defendant.

The court can order involuntary medication if it is permissible under state statute (ORS 161.372) and federal law (*Sell v. United States*, 539 U.S. 166 (2003)).

Chart 7 (below) shows the number of involuntary medication orders issued in aid & assist cases by Oregon's circuit courts in 2022, 2023, and the first eleven months of 2024. The number of involuntary medication orders issued each year is small compared with the number of defendants committed to OSH, but such orders have increased from nine in all of 2022 to seventeen in the first eleven months of 2024.

In interpreting Chart 7, it is important to be aware that it does not include defendants involuntarily medicated without a court order under OSH's administrative authority, and so does not provide a comprehensive count of defendants involuntarily medicated each year.



**Note:** This chart shows the number of involuntary medication orders issued by Oregon circuit courts in aid & assist cases. OSH can, in some circumstances, involuntarily medicate patients without a court order, but such defendants are not included in this chart.

## Regaining Fitness

When a court finds that a defendant lacks fitness to proceed, the case is suspended until the defendant regains fitness or the case is dismissed.

Dismissal may be due to a finding that there is no substantial probability that the defendant will regain fitness in the foreseeable future, or for other reasons, such as the district attorney choosing not to proceed with the case. Dismissal can occur when the defendant is initially found to lack fitness or after a period of restoration services.

Chart 8 (below) shows the number of defendants exiting pending fitness status each quarter. The dark blue bars show defendants exiting because they regained fitness to proceed, and yellow bars show defendants who did not regain fitness, and instead had their cases dismissed.

The yellow bars include both defendants who did not regain fitness after being ordered into restoration services *and* defendants who were not ordered into restoration services because services were unavailable or were unlikely to restore the defendant's fitness to proceed.



**Chart 8: Defendants Exiting Pending Fitness to Proceed Status, by Whether the Defendant Regained Fitness**

**Note:** The numbers in this chart include all defendants exiting pending fitness to proceed status after being found unfit in Oregon's circuit courts, and are not limited to defendants committed to OSH.

The gray shading highlights the quarter (2022 Q3) during which the Mosman order was issued.

From 2020 Q1 through the last full quarter prior to the Mosman order (2022 Q2), the number of defendants regaining fitness increased 50%, compared with an 8% increase in the number of defendants who did not regain fitness and had their cases dismissed.

Between 2022 Q2 and 2024 Q3, however, the number of defendants who did not regain fitness and had their cases dismissed more than tripled, from 57 in 2022 Q2 to 173 in 2024 Q3.

To better understand the three-fold increase in defendants who did not regain fitness and had their cases dismissed, Chart 9 (below) shows the number of those defendants who were committed to OSH at some point while they lacked fitness (blue bars) and the number who were not committed to OSH (yellow bars).

Chart 9 shows that the increase in defendants who did not regain fitness and had their cases dismissed included increases in *both* the number of defendants who did not regain fitness after being committed to OSH (up 163% between 2022 Q2 and 2024 Q3) *and* an increase in the number of defendants who did not regain fitness and were not committed to OSH (up 284% between 2022 Q2 and 2024 Q3).



**Chart 9: Defendants Who Did Not Regain Fitness and Had Their Cases Dismissed, By Whether Defendant Had Been Committed to OSH**

**Note:** The numbers in this chart include all defendants exiting pending fitness to proceed status without regaining fitness to proceed after being found unfit in Oregon's circuit courts, and are not limited to defendants committed to OSH.

The **gray shading** highlights the quarter (2022 Q3) during which the Mosman order was issued.

Chart 10 (below) shows change over time in the percentage of defendants who regained fitness to proceed by the time they exited pending fitness status.

This measure of the aid & assist system's ability to restore defendants' fitness to proceed decreased 22 percentage points between 2022 Q2 and 2024 Q3.

In 2022 Q2, 75% of defendants who exited pending fitness to proceed status did so because they regained fitness, whereas the other 25% did not regain fitness and had their cases dismissed. By 2024 Q3, the percent of exiting defendants who regained fitness dropped to 53%, and the percent who did not regain fitness and had their cases dismissed increased to 47%.



**Chart 10: Percent of Defendants Regaining Fitness to Proceed by the Time They Exit Pending Fitness to Proceed Status**

**Note:** The numbers in this chart include all defendants exiting pending fitness to proceed status after being found unfit in Oregon's circuit courts, and are not limited to defendants committed to OSH.

The **gray shading** highlights the quarter (2022 Q3) during which the Mosman order was issued.

# Civil Commitment Statistics

Civil commitment is a process by which a court may order a person with a mental illness or intellectual disability to receive involuntary treatment if the court finds that they are dangerous to themself or others or are unable to provide for their basic needs.

There are three types of civil commitment cases, each covered in a separate subsection below:

- Extremely dangerous person commitments under ORS 426.701;
- Mental illness commitments under ORS 426.130; and
- Intellectually disabled person commitments under ORS chapter 427.

## Extremely Dangerous Person Commitment

Extremely dangerous person (EDP) commitment cases allege that there is an extreme risk that a person, because of a qualifying mental disorder, will inflict grave or potentially lethal physical injury on other people.

Because committing a person under the EDP statutes requires a finding that the person has a qualifying mental disorder that is resistant to treatment *and* caused the person to commit one of a list of serious acts, such as causing the death of another person, such cases are generally related to an aid & assist case where the defendant is charged with a serious crime and is unlikely to regain fitness to proceed.

Chart 11 (below) shows the number of EDP cases filed, EDP commitment hearings held, and EDP commitments, in 2022, 2023, and the first eleven months of 2024.

Although EDP commitment cases are rare—only 17 were filed statewide in 2023—they are occurring more frequently. The first eleven months of 2024 had twice as many EDP cases filed (18), more than twice as many cases with commitment hearings held (17), and twice as many EDP commitments (10) as there were in all of 2022.



Comparing the numbers in Chart 11 with those in Chart 8 (page 11), however, shows that most aid & assist defendants who do not regain fitness to proceed do *not* have EDP cases filed.

## Mental Illness Commitment

While EDP commitment cases usually relate directly to aid & assist cases, there are two other types of commitment—mental illness commitment and intellectual disability commitment—that can occur in situations where a person has not been accused of a crime, but where their mental health disorder or intellectual disability makes them a danger to themself or others or they are unable to meet their basic needs.

Mental illness commitment cases commonly begin with a physician's hold placed on a person at a hospital, but may also begin when a local health officer, judge, or any two persons notify the CMHP that a person with a mental illness is in need of treatment, care, or custody.

The person alleged to be mentally ill (PAMI) can be committed to OHA for up to six months if the court finds that the person, because of a qualifying mental disorder, is dangerous to themself or others or unable to provide for basic needs that are necessary to avoid serious physical harm.

A person may also be committed to OHA under the mental illness commitment statutes if they have been committed multiple times in the past three years due to a chronic mental illness and their condition, if they do not receive treatment, is likely to deteriorate to the point that they are dangerous to themself or others or are unable to meet their basic needs.

### Cases Filed

Over 7,000 mental illness commitment cases have been filed in Oregon's circuit courts in each of the past three years (see Chart 12, below). Filings are trending slightly downward, with case filings in first eleven months of 2024 decreasing 2.4% compared with the same period in 2022.



Chart 12: Mental Illness Commitment Cases Filed

## *Diversion*

Many mental illness commitment cases are dismissed due either to the person stabilizing and being discharged or to the CMHP investigating and recommending that the court find that there is not probable cause to believe that the person meets the criteria for commitment.

If the CMHP believes that the person meets the criteria for commitment, however, one option that also often leads to dismissal is a process commonly known as "diversion," where the PAMI consents to a 14-day period of intensive treatment. If the PAMI is either ready to discharge during the 14-day period, or agrees to voluntary treatment, the case is dismissed.

Chart 13 (below) shows the number of mental illness commitment cases diverted in 2022, 2023, and the first eleven months of 2024, along with the number of those cases that were ultimately dismissed.

Over 1,000 civil commitment diversions occur each year, and 91% of the cases that were diverted between January 2022 and November 2024 have been dismissed.



### *Commitment Hearings and Commitments*

If the court finds probable cause to believe that the PAMI meets the criteria for commitment, it issues a citation for the PAMI to appear for a hearing.

If the court subsequently determines that the PAMI does meet the criteria for commitment, and that dismissal or conditional release to a relative or friend would not be in their best interests, it can commit the person to OHA for up to 180 days.

Chart 14 (below) shows the number of cases with commitment hearings held, and the number of commitments, for 2022, 2023, and the first eleven months of 2024.

The number of mental illness commitment hearings and commitments decreased in 2023, but the number of commitments in the first eleven months of 2024 was only slightly lower than in the same period in 2022.

A comparison of Chart 14 with Chart 12 (page 15) shows that the number of cases that hold a commitment hearing or result in commitment are a small fraction of the more than 7,000 mental illness commitment cases filed each year.

This means that most mental illness commitment cases are dismissed without a hearing. Reasons for dismissal without a hearing include the PAMI stabilizing and being discharged, the court adopting a recommendation from the CMHP that there is not probable cause to believe that the PAMI meets the criteria for commitment, or the PAMI successfully completing diversion or agreeing to engage in voluntary treatment.



## *Commitment, By Court*

Chart 15 (below) shows the number of mental illness commitments in each circuit court in 2023.

Multnomah County had the most mental illness commitments in 2023 (141), followed by Clackamas and Lane Counties, which had 49 and 33 commitments, respectively. Seven counties—Crook, Gilliam, Grant, Lake, Sherman, Wallowa, and Wheeler—had no mental illness commitments in 2023.



Chart 16 (below) uses the data from Chart 15 and the Portland State University Population Research Center's 2023 certified population estimates to show the number of commitments for each county per 1,000 people in the county's population.

The per capita numbers show that, while Multnomah County has a higher commitment rate than most counties even when we consider its population, it committed fewer people per capita in 2023 than three other counties (Morrow, Curry, and Tillamook).



**Note:** The population numbers used to calculate commitments per 1,000 people are from the Portland State University Population Research Center's 2023 certified population estimates.

In considering the per capita commitment data, it is important to note that, as many mental illness civil commitment cases are filed by hospitals, the presence of hospitals, psychiatric wards, and other treatment facilities that treat people from other counties or states may affect per capita commitment rates.

For example, if Multnomah County hospitals frequently treat patients experiencing psychiatric crises who are from neighboring counties, that could cause Multnomah County to have a higher per capita commitment rate than other counties in the state.

## *Continued Commitment*

If a person with a mental illness has not been discharged prior to the end of the commitment period, OHA or the director of the treating facility may certify to the court that the person remains a person with a mental illness and needs further treatment.

If the person protests the continued commitment, the court holds a hearing and determines whether the commitment should be continued.

Chart 17 (below) shows the number of certificates of continued commitment filed with the court in mental illness commitment cases in 2022, 2023, and the first eleven months of 2024. Although the number of certificates of continued commitment decreased 14% in 2023, the number of certificates filed in the first eleven months of 2024 nearly equaled the number filed in all of 2022.

Some people with a mental illness have their commitments extended multiple times, and so are counted multiple times in the chart below. Of the 416 mental illness commitments in 2023, thirteen percent (55) subsequently had a certificate of continued commitment filed.



## Intellectual Disability Commitment

A third way for an individual to be committed for involuntary treatment outside of a criminal case is through an intellectually disabled person (IDP) commitment case.

In such cases, a court may commit a person to the Oregon Department of Human Services if the person is eligible for developmental disability services and is either dangerous to themself or others or is unable to provide for their basic needs and not receiving care necessary for their health, safety, or habilitation.

Like EDP commitments, IDP commitment cases are rare, with only 24 filed statewide in 2023. Unlike EDP commitment cases, however, the number of IDP commitment cases has declined in recent years (see Chart 18, below).

In the first eleven months of 2024, IDP cases filed were down 28%, commitment hearings were down 48%, and new commitments were down 40% compared with the same period in 2022.



Chart 18: Intellectual Disability Commitment Cases Filed, Commitment Hearings Held, and Commitments

## Conclusion

The number of defendants found unfit to proceed in Oregon's circuit courts has increased 65% since the first quarter of 2020. The increase has not been driven by an increase in criminal cases filed, but has, since at least 2022, occurred alongside a large increase in the number of defendants for whom fitness concerns are raised.

The increase in defendants lacking fitness has strained Oregon's aid & assist system and resulted in more defendants committed to OSH for restoration services and more aid & assist defendants released into the community.

The increase in defendants committed to OSH occurred amidst ongoing issues with delays in admission to OSH, and those delays led to Judge Mosman's remedial order in the federal *Mink/Bowman* case. That order was followed by an increase in the number of defendants exiting the aid & assist system without regaining fitness, and a decrease in the percentage of aid & assist defendants who *do* regain fitness.

The increase in aid & assist defendants not regaining fitness has coincided with an increase in the small number of extremely dangerous person commitments each year, but only a small percentage of defendants who do not regain fitness are committed under the EDP statutes.

The two types of civil commitment that are not directly linked to criminal cases—mental illness commitment and intellectual disability commitment—have seen decreases in filings since 2022, although through the end of November the number of mental illness commitments in 2024 was on track to be similar to 2022.

# Aid & Assist Data:
# New Charges for Defendants Who Lacked Fitness to Proceed

## Oregon Judicial Department
*Data Prepared*
*February 18, 2025*



# Background

If a defendant in a criminal case cannot, due to a qualifying mental disorder, understand the nature of the proceedings against them, assist and cooperate with their attorney, or participate in their own defense, they lack fitness to proceed with their case.

If the court finds that a defendant lacks fitness to proceed, it must either suspend the case until the defendant is fit to proceed or dismiss the charges. Dismissal can occur when the defendant is initially found to lack fitness or after a period of restoration services.

This document contains data on whether defendants who are found to lack fitness to proceed with a criminal case have a new criminal case filed within a year after they are either found fit to proceed or after the case(s) on which the defendant was found unfit are dismissed without the defendant regaining fitness.

# About the Data

The statistics in this document are drawn entirely from the Oregon Judicial Department's Odyssey case management system and include only data from Oregon's circuit courts.

The numbers do not include data from Oregon's municipal courts or data from Oregon Health Authority, Oregon State Hospital (OSH), or community mental health program case management systems.

Defendants who lack fitness to proceed on multiple cases at the same time are counted once, based on the date by which all cases on which the defendant was found to lack fitness had been dismissed or had a finding that the defendant regained fitness to proceed. The same defendant, however, may be counted multiple times if they regained fitness to proceed or had their cases dismissed, and were found to lack fitness proceed again at a later date.

The chart on the following page shows data on new charges filed within a year of dismissal or within a year of regaining fitness to proceed for three groups of defendants who were found to lack fitness to proceed:

- Defendants who regained fitness to proceed, regardless of whether they were committed to OSH for restoration services;

- Defendants who did not regain fitness to proceed, and had their cases dismissed following commitment to OSH for restoration services; and

- Defendants who did not regain fitness to proceed and had their cases dismissed but were not committed to OSH at any time while they lacked fitness to proceed.

Defendants in the second group—those who were committed to OSH, did not regain fitness, and had their cases dismissed—include both defendants who were ordered into community restoration after discharge from OSH but did not regain fitness, and defendants who were not ordered into community restoration after discharge due to lack of an appropriate community placement or to there being no substantial likelihood that the defendant would regain fitness in a reasonable amount of time.

New criminal cases include felony and misdemeanor cases filed in Oregon's circuit courts where:

- The defendant had the same first name, last name, and at least one other matching identifier (date of birth, state identification number, social security number, or driver license number) as a defendant who was previously found to lack fitness to proceed.

- The defendant, in the 12 months prior to the new case being filed, either regained fitness to proceed or had all the cases on which they lacked fitness to proceed dismissed.

- At least one of the offenses on the new case was alleged to have occurred after the defendant regained fitness to proceed or had all the cases on which they lacked fitness dismissed.



**Percent of Defendants Who Lacked Fitness to Proceed Who Had New Charges Filed Within One Year of Regaining Fitness or Having All Cases Dismissed**
*For Defendants Regaining Fitness to Proceed or Having All Fitness Cases Dismissed Between January 2021 and December 2023*

The percent of defendants with new felony or misdemeanor charges filed in Oregon's circuit courts within a year of regaining fitness to proceed decreased from 25 percent for defendants regaining fitness in 2021 to 24 percent for defendants regaining fitness in 2023.

The percent of defendants with new charges filed within a year of having their cases dismissed without regaining fitness, however, increased during the same time period.

Thirty-eight percent of defendants who had their cases dismissed in 2023 after being committed to OSH and not regaining fitness had a new felony or misdemeanor charge within a year of dismissal.  This was an 8-percentage point increase over the 30 percent of such defendants with cases dismissed in 2021 who had a new felony or misdemeanor case filed within a year of dismissal.

The percent of defendants with new charges within a year of having all their cases dismissed without being committed to OSH or regaining fitness to proceed increased from 23 percent for defendants with cases dismissed in 2021 to 31 percent for defendants with cases dismissed in 2023.