# HOUSE COMMITTEE ON EDUCATION

**January 22, 2025**                                                                 **Hearing Room B**
**03:00 PM**

| | |
|---|---|
| **MEMBERS PRESENT:** | **Rep. Courtney Neron, Chair** |
| | **Rep. April Dobson, Vice-Chair** |
| | **Rep. Emily McIntire, Vice-Chair** |
| | **Rep. Darin Harbick** |
| | **Rep. Zach Hudson** |
| | **Rep. Hoa Nguyen** |
| | **Rep. Ricki Ruiz** |
| | **Rep. Boomer Wright** |

| | |
|---|---|
| **MEMBER(S) EXCUSED:** | **Rep. Ricki Ruiz** |

| | |
|---|---|
| **STAFF PRESENT:** | **Lisa Gezelter, LPRO Analyst** |
| | **Shane Gaffikin, Committee Assistant** |

| | |
|---|---|
| **EXHIBITS:** | **Exhibits from this meeting are available here** |

| | |
|---|---|
| **MEASURES/ISSUES:** | **Introduction of Members – Organizational Meeting** |
| | **Adoption of Committee Rules – Organizational Meeting** |
| | **Agency Director of Introductions – Informational Meeting** |

| | |
|---|---|
| **00:00:04** | Meeting Called to Order |
| **00:00:05** | Chair Neron |
| | |
| **00:01:35** | **Introduction of Members - Organizational Meeting** |
| **00:01:36** | Chair Courtney Neron, House District 26 |
| **00:02:40** | Rep. Darin Harbick, House District 12 |
| **00:03:45** | Vice-Chair April Dobson, House District 39 |
| **00:05:22** | Rep. Hoa Nguyen, House District 48 |
| **00:07:00** | Rep. Boomer Wright, House District 9 |
| **00:08:43** | Rep. Zach Hudson, House District 49 |
| **00:09:22** | Vice-Chair Emily McIntire, House District 56 |
| | |
| **00:12:03** | **Adoption of Committee Rules - Organizational Meeting** |
| **00:12:04** | Chair Neron |
| **00:12:12** | MOTION: VICE-CHAIR MCINTIRE MOVES ADOPTION OF COMMITTEE RULES |
| **00:12:45** | VOTE: 7-0-1 |
| | AYE: HARBICK, HUDSON, H. NGUYEN, WRIGHT, DOBSON, MCINTIRE, |

This recording log is in compliance with Senate and House Rules.  For complete contents, refer to the digital audio recording.

NERON
EXCUSED: RUIZ

| | |
|---|---|
| **00:13:20** | **Agency Director Introductions - Informational Meeting** |
| **00:13:21** | Chair Neron |
| **00:14:42** | Charlene Williams, PhD; Director, Oregon Department of Education |
| **00:28:26** | Rep. Wright |
| **00:28:57** | Melissa Goff, Interim Director, Teacher Standards and Practices Commission |
| **00:44:16** | Rep. Hudson |
| **00:46:41** | Vice-Chair McIntire |
| **00:48:23** | Vice-Chair Dobson |
| **00:53:44** | Karen Perez, PhD; Director, Educator Advancement Council |
| **01:02:14** | Alyssa Chatterjee, Executive Director, Department of Early Learning and Care |
| **01:16:47** | Sejal Hathi, MD; Director, Oregon Health Authority |
| **01:35:54** | Meeting Adjourned |

This recording log is in compliance with Senate and House Rules. For complete contents, refer to the digital audio recording.

Stenson Decl., Ex. Q
P. 2 of 2



# Ways & Means Presentation
# OHA Budget Overview

Presented to
Joint Ways & Means Subcommittee on Human Services
January 28, 2025

Sejal Hathi, MD MBA, Director

Stenson Decl., Ex. R
P. 1 of 28

1

# Overview

- Agency background
  - Mission, historical context and strategic plan
  - OHA's work and organizational overview
  - Partnerships
- Key successes
- Budget overview
  - Major budget drivers and agency changes
  - Governor's Recommended Budget for OHA
  - 2025-27 Focus areas and priorities

# OHA's Strategic Plan



Vision: A Healthy Oregon

**Strategic Goal**
Eliminate health inequities in Oregon by 2030

**Values**
- Health Equity
- Innovation
- Partnership
- Service Excellence
- Integrity
- Transparency
- Leadership

**Mission**
Ensuring all people and communities can achieve optimum physical, mental, and social well-being through partnerships, prevention, and access to quality affordable health care.

**Strategic goal pillars**

| Transforming behavioral health | Strengthening access to affordable care for all | Fostering healthy families and environments | Achieving healthy Tribal communities | Building OHA's internal capacity and commitment to eliminate health inequities |

# Oregon Health Forward

*Eliminating health inequities by 2030*

**Strategic Plan**
OHA envisions a healthy Oregon where everyone has the opportunity to thrive. To realize this vision, OHA has set an ambitious yet achievable goal of eliminating health inequities by 2030, as outlined in its strategic plan.

**Transparency, Accountability, and Belonging (TAB) Initiative**
To fuel progress toward its strategic plan goal, OHA will enact systems, policy, and operational changes to more effectively and accountably meet customer needs, strengthen partner relationships, and improve staff engagement and satisfaction.

**Call to Action**
Recognizing that collaboration is key to success, OHA will enlist health system partners, nonprofits, and private sector entities – both in and out of health care – to bolster statewide commitment and progress toward its strategic plan goal.

# Health Equity Definition

Oregon will have established a health system that creates health equity when all people can reach their full health potential and well-being and are not disadvantaged by their race, ethnicity, language, disability, age, gender, gender identity, sexual orientation, social class, intersections among these communities or identities, or other socially determined circumstances.

Achieving health equity requires the ongoing collaboration of all regions and sectors of the state, including Tribal governments to address:

• The equitable distribution or redistribution of resources and power; and

• Recognizing, reconciling and rectifying historical and contemporary injustices.

# Organizational Overview



# More than four in ten people in Oregon get their health care coverage via OHA



**7.19%  PEBB/OEBB**

**Non-OHA covered population***  **56.05%**

**33.66%  Oregon Health Plan**

**3.10%  Oregon Health Insurance Marketplace**

\*  includes Medicare, group and individual coverage outside of the marketplace, and uninsured
\*\*  this chart combines administrative data from various sources and time points within 2024

# Oregon Health Plan covers about one third of Oregon's population

OHP enrollment by county in 2024



# Oregon State Hospital admits patients from across all of Oregon

Patients per county in CY 2024



# OHA supports a statewide system of integrated behavioral health care

| Prevention, Screening, Early Intervention | Community Based Treatment & Services | Crisis & Stabilization Services | Day Treatment & Residential | Acute Care & Oregon State Hospital | Recovery Supports |

# OHA ensures every person living in Oregon has access to basic public health services



# OHA Partnerships





# Key Successes

# 2023-25 Key successes

## Transforming behavioral health

✓ More Oregonians are engaging with behavioral health providers through Measure 110-funded Behavioral Health Resource Networks
  - Most recent data reported demonstrates BHRNs help Oregonians engage and stay in treatment

✓ Expanded capacity of behavioral health residential facilities and increased transparency around how OHA is supporting these facilities
  - Launched the bed capacity dashboard, completed the Residential Bed+ Study

✓ Strengthened the behavioral health workforce to ensure quality care is available when Oregonians need it most
  - Healthcare provider initiatives supported hiring of peer support specialists, relocation costs for new employees, recruitment and retention bonuses
  - These initiatives make peer-run, rural and culturally and linguistically specific treatment options available and accessible

# 2023-25 Key successes

## Strengthening access to affordable care

✓ OHA achieved the lowest rate in the nation of Medicaid enrollees losing health coverage during the unwinding of the public health emergency

✓ Launched Oregon Health Plan (OHP) Bridge

✓ Protected and expanded health care coverage through Healthier Oregon

✓ Implemented continued eligibility for children through age 6 and for two years for everyone else

✓ Implemented access to nutrition, housing and climate change benefits as part of Oregon's 1115 Medicaid Waiver

# 2023-25 Key successes

## Fostering healthy families and communities

✓ Tested and mitigated domestic wells in Eastern Oregon

✓ Provided air filtration devices, air conditioners and clean water to individuals and communities at higher risk of climate-related health impacts

✓ Expanded universally offered home visiting to support the health of new families

✓ Expanded Public Health Modernization partners across the state (Community-Based Organizations) to mitigate health inequities related to communicable disease, chronic disease, and emergency preparedness

✓ Worked with community and local partners to address reproductive health care access

✓ Contained a measles outbreak

# 2023-25 Key success

**Achieving healthy Tribal communities**

✓ CMS approved Traditional Healing Practices

✓ Created Indian Managed Care Entities to improve tribal care coordination

✓ Additional Behavioral Health Funding to Tribal Health Programs

# 2023-25 Key success

## Building OHA's internal capacity and commitment to eliminate health inequities

- ✓ Launched Oregon Health Forward – including the strategic plan, call to action, and the transparency, accountability and belonging campaign
- ✓ Rebuilt most of leadership team
- ✓ Developed a framework for community and partner engagement
- ✓ Empowered community members to address health inequities with the Regional Health Equity Coalition Model
- ✓ Focused on embedding equity in all new initiatives



# Budget Overview

# Major Budget Drivers

- Due to the success in keeping people covered under the Oregon Health Plan during the ending of the Public Health Emergency and redetermination efforts, the overall caseload has sustained to a higher level than ever before and a need for increased funding to cover the OHP caseload

- The success of enrolling eligible people in the Healthier Oregon Program

- Continued growth in behavioral health spending to meet demand for mental health and substance use treatment and prevention efforts across the state

- Need for appropriate staffing and support at the Oregon State Hospital drive additional need for general funds to meet the demand for treatment and to try to stay in federal CMS compliance

- Fee increases are needed to keep up with customer service demand in many public health programs

# Major Agency Program Changes

**Some significant changes occurring in the last three biennia**

## Additions:

- Expanded Medicaid benefits:
  - Health-Related Social Needs
  - OHP Bridge
  - Healthier Oregon
  - SUD Waiver
- Measure 110 and Behavioral Health Resource Networks
- Well water safety in the Lower Umatilla Basin Groundwater Management Area
- Opioid Settlement Grant Funds
- Public Health Modernization
- State Based Marketplace

## Reductions:

- Federal public health emergency pandemic funding
- Measure 110 Other Agency Savings

# 2025-27 Governor's Budget, by Fund Type



**$39,640 million Total Funds**

$6,226 million
16%
General Fund

$43 million
<1%
Lottery Funds

$11,671.8 million
29%
Other Funds

$21,700 million
55%
Federal Funds

# 2025-27 Governor's Budget, by Program



$39,640 million Total Funds

- $1,641 million 4% Behavioral Health
- $289 million 1% Health Policy & Analytics
- $2,743 million 7% Public Employees Benefit Board
- $2,169 million 5% Oregon Educators Benefit Board
- $1,246 million 3% Public Health
- $1,026 million 3% Oregon State Hospital
- $896 million 2% Central & Shared Services and Assessments
- Medicaid $29,629 75%

# 2025-27 Focus areas and priorities

## Transforming behavioral health

- Strengthen staffing, security and patient monitoring capacity at the state hospital, $44M GF

- Continue to expand residential treatment beds across the state, $100M GF

- Sustain and continue to strengthen and expand the behavioral health workforce, $24.8M GF

- Expand the Save Lives Oregon Harm Reduction Clearing house to combat overdose, $10.4M GF

- Sustain and expand Medicaid Certified Community Behavioral Health Clinics, which integrate behavioral health with physical health care, $14.1M GF

- Continue to invest in community mental health programs for deflection and diversion, $14.7M GF

- Strengthen community based behavioral health and substance use disorder treatment for youth, $18M GF

# 2025-27 Focus areas and priorities

## Strengthening access to affordable care for all

- Provide medical benefits for incarcerated individuals and ensure a safer and healthier transition back to the community, $14.3M GF

- Stand up a State-Based Marketplace Eligibility and Enrollment Platform that will provide greater choice and flexibility to people seeking health coverage, $25M OF

- Continue to invest in the PEBB/OEBB benefits management systems replacement, $6.2M OF

- Strengthen PEBB and OEBB program integrity and development, $5.3M OF

- Increase Medicaid reimbursement for maternity services across all Oregon hospitals, $25M GF

- Ensure high-quality and affordable care in Oregon hospitals, $2.6M GF

# 2025-27 Focus areas and priorities

## Fostering healthy families and environments

- Modernize Oregon's public health systems and continue to support community partners and local public health authorities in building capacity to meet public health foundational capabilities, $2M GF

- Enhance drinking water safety in domestic wells, $3.2M GF

- Close the regulatory gap for synthetic nicotine and strengthen retail licensing to protect youth from tobacco's health harms, -$8.4M GF

- Support patient navigation for and safeguard reproductive health care services, $5M GF

- Strengthen school and community-based primary prevention, $7M GF

# 2025-27 Focus areas and priorities

## Achieving healthy Tribal communities

- Support Native services at Oregon State Hospital, $0.2M GF
- Continue the Tribal traditional health worker program, $0.14M GF
- Strengthen Tribal behavioral health services and supports, set-asides TBD

## Building capacity and commitment to eliminate health inequities

- Strengthen staff training, civil rights unit, and universal accessibility programs, $0.6M GF
- Expand the Regional Health Equity Coalition program, $3.6M GF

# Thank you

You can get this document in other languages, large print, braille or a format you prefer free of charge. Contact Matthew Green at matthew.green@oha.oregon.gov or 503-983-8257. We accept all relay calls.



OREGON
**HEALTH**
AUTHORITY



# 2025-27 Budget Review

## Oregon Health Authority

|  | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| General Fund | 3,229,382,026 | 5,631,218,070 | 8,098,770,085 | 6,225,920,768 |
| Lottery Funds | 18,685,848 | 29,624,256 | 42,528,319 | 42,788,778 |
| Other Funds | 10,001,913,037 | 10,355,539,826 | 8,988,052,916 | 11,631,812,721 |
| Other Funds (NL) | 25,661,390 | 40,000,000 | 40,000,000 | 40,000,000 |
| Federal Funds | 17,532,852,359 | 19,765,182,045 | 19,804,278,713 | 21,581,593,126 |
| Federal Funds (NL) | 75,407,236 | 102,729,051 | 118,138,409 | 118,138,409 |
| **Total Funds** | **30,883,901,896** | **35,924,293,248** | **37,091,768,442** | **39,640,253,802** |
| Positions | 5,331 | 5,750 | 5,689 | 6,020 |
| FTE | 5,090.86 | 5,604.33 | 5,671.54 | 5,982.23 |

* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

The Oregon Health Authority (OHA) is the state's primary institution enabling the delivery of publicly funded physical and mental health care in Oregon. The agency manages the state's implementation of Medicaid and other state-sponsored health care coverage, coordinates and oversees federally-supported public health initiatives implemented through partnerships between the state and local public health authorities, partners with local mental health authorities and community-based organizations for the delivery of mental health and substance use disorder programs, provides administration for health benefit programs for public employees, operates the state institutions for mental health, oversees Oregon's health insurance marketplace, develops health care policy, and provides health care market oversight.

OHA's published mission is to ensure all people and communities can achieve optimum physical, mental, and social well-being through partnerships, prevention, and access to quality, affordable health care. The agency's strategy for reforming health care is framed around its goals of improving the lifelong health of Oregonians, increasing the quality and availability of health care, and lowering the cost of care.

The agency's budget is organized into the following seven program areas:

**Health Systems Division** - Supports the delivery of health care through the Medicaid and Behavioral Health programs. The Medicaid program contains the state's implementation of the federal Medicaid program: the Oregon Health Plan (OHP). OHP and state-sponsored programs that include the Healthier Oregon Program (HOP) and the Basic Health Plan, also known as OHP Bridge, enable physical, behavioral, and oral health care coverage for lower-income individuals. The Behavioral Health program

provides funding and policy support for Oregon's community behavioral health system. The Behavioral Health program includes the budgets for the Alcohol and Drug Policy Commission (ADPC), the Systems of Care Advisory Council (SOCAC), the Opioid Settlement Prevention, Treatment, and Recovery Board (OSPTR), the Measure 110 Oversight and Accountability Council (OAC), and the Behavioral Health Crisis System Advisory Committee. There are 687 positions (677.25 FTE) budgeted within the Medicaid and Behavioral Health programs at the current service level.

**Health Policy and Analytics** - Provides policy support, technical assistance, and access to health information statistics and tools to all organizations participating in Oregon's health system. Within this division, the agency budgets administrative support for the Public Employees' Benefit Board (PEBB), providing health insurance for state and university employees, and the Oregon Educators Benefit Board (OEBB), providing health insurance for K-12 school districts, education service districts, and community colleges. The benefit payment costs for PEBB and OEBB are budgeted within their own division. There are 283 positions (276.01 FTE) budgeted within the Health Policy and Analytics program at the current service level.

**Public Health** - Addresses the social and behavioral drivers of health through programs involving community health, environmental public health, family health, and disease prevention and epidemiology. The program manages the federal Women, Infant, and Children (WIC) supplemental nutrition program, and coordinates federal and state funding with local public health authorities. There are 997 positions (993.71 FTE) budgeted within the Public Health program at the current service level.

**Oregon State Hospital** - Provides psychiatric care, including secure residential care, for adults from across the state at campuses in Salem, Junction City, and Pendleton. There are 2,772 positions (2,772.00 FTE) budgeted within the Oregon State Hospital program at the current service level.

**Central Services, Shared Services, and State Assessments and Enterprise-wide Costs** - Supports the administrative functions of the agency. There are 950 positions (950.00 FTE) budgeted within these programs.

Stenson Decl., Ex. S
P. 2 of 73

2025-27 Budget Review - Oregon Health Authority

## Funding supporting OHA programs



**2025-27 Current Service Level Budget**

$37.1 billion
Total Funds
3.2% Increase from 2023-25
Approved Budget

Federal Funds NL | 0.3%
Federal Funds | 53.4%
General Fund | 21.8%
Lottery Funds | 0.1%
Other Funds | 24.2%
Other Funds NL | 0.1%

**General Fund** - General Fund is used as state match for several Federal Funds supported programs, particularly the Oregon Health Plan (OHP). General Fund is also used to fund programs not eligible for Federal Funds match, such as the Healthier Oregon Program, and is the primary funding source for the Oregon State Hospital. The current service level budget includes $63.1 million of General Fund revenues to support debt service payments.

**Lottery Funds** - Allocations of Lottery Funds are made from the Veterans' Services Fund to support physical and behavioral health programs specifically for veteran beneficiaries, and from the Administrative Services Economic Development Fund to support gambling addiction prevention programs. The current service level budget includes $16.5 million of Lottery Funds revenues to support debt service payments.

**Federal Funds** - In addition to Medicaid, Federal Funds revenue is received by the agency for the Community Mental Health Services (CMHS) block grant, Maternal and Child Health grant, and nutrition and health screening for the Women, Infants and Children (WIC) programs. The Public Health Division receives over 70 categorical federal grants targeting specific activities. Other large grants enhance substance abuse prevention programs and health reform and transformation activities. The Oregon State Hospital (OSH) receives Federal Funds through the Disproportionate Share Hospital entitlement, which grants Federal Funds to hospitals that serve a large percentage of patients that are unable to meet their expenses through any other source. OSH also receives Medicaid revenue for the 16-bed secure residential treatment facility in Pendleton, as it is not subject to the exclusion that limits revenue from Medicaid at the other OSH campuses. Federal Funds redirected from subsidies provided to offset the cost of health insurance premium costs for health insurance coverage purchased through the health insurance exchange, support Oregon's Basic Health Plan (OHP Bridge) that provides Medicaid-like coverage for eligible individuals with household income between 138% and 200% of the federal poverty level.

Stenson Decl., Ex. S
P. 3 of 73

**Other Funds** - The Oregon Health Authority receives revenues from a variety of taxes, fees, and other sources that support programs across the agency, including providing state match for the Oregon Health Plan.

There are two primary types of provider-based tax assessments that are used primarily in the OHA budget to provide state resources to match federal Medicaid funds: hospital provider taxes and insurance provider taxes.

Hospitals are assessed a tax of 6% on net patient revenues. The assessment applies to both the larger Diagnostic Related Group (DRG) hospitals and the smaller Type A and Type B rural hospitals. Assuming the renewal of these taxes that are currently set to expire at the end of September 2025, current service level revenues from the hospital provider tax are anticipated to be $1.7 billion in the 2025-27 biennium. Of that total, $1.1 billion is slated to support the Oregon Health Plan. Most of the remaining funding is matched with federal Medicaid funds that together are returned to hospitals in an amount that, in the aggregate, is equal to the amount of taxes paid.

The insurance provider tax is assessed on net premiums, or premium equivalents for both commercial health plans and publicly funded health plans including the Oregon Health Plan, Healthier Oregon Plan, the Basic Health Plan, and plans managed by the Oregon Employees and Public Employees Benefit Boards. Similar to the hospital assessment, the insurance assessment is set to expire at the end of calendar year 2026. Assuming the extension of the statutory sunset, insurance assessments are anticipated to produce $638.5 million at the 2025-27 current service level. Tax revenues help fund a reinsurance program for eligible health benefit plans that is intended to keep rates for those plans 6% lower than would be realized without the program. Remaining estimated assessment revenues of $530.9 million support the Oregon Health Plan.

The Oregon Health and Science University (OHSU) intergovernmental transfer (IGT) agreement) was created as an alternative to the hospital assessment. The IGT agreement between the state and OHSU maximizes federal funding to support the Oregon Health Plan and other programs, while ensuring that OHSU receives net reimbursement from all sources of at least 87% for Medicaid-related services provided. The OHSU IGT is estimated to produce $515.8 million to support the Oregon Health Plan in the 2023-25 biennium.

Taxes on tobacco products sold in Oregon support multiple programs across the agency. As of December 2024, forecasted tobacco tax revenues allocated to OHA programs total $625.3 million in the 2023-25 biennium. $50.5 million is budgeted in the Public Health Division for smoking deterrent and cessation programs, $24.6 million supports behavioral health programs, and $548.9 million is used in the Medicaid program to support the Oregon Health Plan.

Tobacco Master Settlement Agreement (TMSA) revenues are payments made to settling states in perpetuity beginning in 2000, and a portion of the settlement funds programs at OHA. Budgeted 2023-25 biennium expenditures are $121.7 million for the Oregon Health Plan and $14.2 million for Behavioral Health programs.

Ballot Measure 110 (modified by SB 755 (2021) and HB 4056 (2022)) redistributed a significant portion of marijuana tax revenue to fund Behavioral Health Resource Networks (BHRNs) and Access to Care grants through the Drug Treatment and Recovery Services Fund (DTRSF). Revenues for the DTRSF are estimated to be $230.9 million in the 2023-25 biennium and $200.7 million in the 2025-27 biennium. In

addition to revenues transferred to the DTRSF, retail recreational marijuana taxes fund community mental health and substance use disorder services, and early intervention and treatment services. Biennial funding for these programs is estimated to be $25.5 million in 2023-25 and $27.1 million in 2025-27.

Beer and wine taxes are collected by the Oregon Liquor and Cannabis Commission (OLCC) with a portion of the funding distributed to OHA. Fall 2024 estimates for the 2023-25 biennium indicate revenues of $18.3 million for state and local government alcohol and drug programs. OHA retains 60% of this revenue with the remaining 40% transferred to counties.

The Public Employee's Benefit Board (PEBB) and Oregon Educators Benefit Board (OEBB) are budgeted entirely with Other Funds to support the cost of public employee health benefits, with revenue received from premium payments and cost-sharing from participating employers and covered employees. Combined current service level expenditures for PEBB and OEBB of $4.9 billion represents 54.4% of total Other Funds expenditures for the agency.

Included in the overall Other Funds and Federal Funds amounts discussed above are certain expenditures designated as nonlimited, which can be increased administratively if the revenue is available. All nonlimited expenditures in OHA's budget support the Women, Infants and Children (WIC) program in the Public Health Division. For the 2023-25 biennium this includes $40 million in Nonlimited Other Funds revenue from rebates from manufacturers of infant formula provided to WIC participants and $102.7 million in Nonlimited Federal Funds from payments to support program services.

## BUDGET ENVIRONMENT

OHA operates within a complex and dynamic budget environment. Caseload changes are expressed in the number of enrolled individuals in the various health plans administered by the agency, and the demand for publicly funded behavioral health and public health services are greatly impacted by demographics and economics. Health care cost inflation, utilization, state and federal policies, and stakeholder interests greatly influence this budget.

Oregon receives federal financial assistance for its implementation of Medicaid in the state. The Federal Medical Assistance Percentage (FMAP) that determines the amount of Federal Funds the state receives for most Medicaid caseloads is calculated using the relative strength of Oregon's economy to the rest of the country. When Oregon's per capita personal income increases relative to the national average, Oregon's FMAP decreases, meaning additional state funds are needed to support the same level of Medicaid services. Likewise, when Oregon's per capita personal income decreases relative to the national average, Oregon's FMAP increases and saves state dollars. The federal government calculates each state's FMAP by using income trends from the three most recent calendar years of available data, which is nearly three years removed from the effective date of a state's FMAP. For instance, the federal fiscal year 2024 FMAPs were calculated using calendar year 2019-2021 income data. Consequently, a state's FMAP could decrease when its economy and tax collections are declining. Because Oregon's per capita income has outpaced the national average for the past several years, the state's FMAP has mostly declined since 2017, which has significantly increased the share of General Fund and other state revenue needed to support Medicaid programs.

Stenson Decl., Ex. S
P. 5 of 73

The federal revenue OHA receives is tied to a significant body of federal law and administrative rules. This is particularly true with Medicaid, which is governed by waivers of certain federal regulations that allow Oregon to tailor its Medicaid services to the unique needs of the state. Medicaid waivers and corresponding amendments must be approved by the federal Centers for Medicare and Medicaid Services (CMS). Most of OHA's General Fund budget is used to match federal revenue as part of these agreements. Consequently, General Fund reductions typically result in the loss of federal revenue and might not be possible to implement without reducing Medicaid eligibility and/or services.

In 2022, OHA received approval for a five-year Section 1115 Demonstration Waiver that included significant enhancements (Section 1115 refers to the authorizing section of the Social Security Act). The waiver established continuous eligibility for children under age six and increased the eligibility redetermination period for adults from annually to every two years, which reduces the number of OHP members who cycle in and out of eligibility due to income fluctuations. The waiver also includes authorization to apply FMAP to total costs of providing programs addressing social determinants of health (also called health-related social needs, or HRSN) as Medicaid benefits, including housing, food support, and items like air conditioners. HRSN benefits are mostly federally funded through 2027 but will then require a state match that could be considerable if the program continues beyond the waiver period.

The change in the federal administration following the 2024 elections may result in a shift of policy at the Centers for Medicare and Medicaid Services regarding the renewal of state waivers. Although the current 1115 waiver runs through the upcoming 2025-27 state fiscal biennium, the development of the next waiver period is anticipated to begin in fall 2025. Changes in federal legislation could also impact the funding and authorization for Medicaid programs, generally.

Health care inflation has typically outpaced general economic inflation, resulting in health care continuing to consume a larger share of the state's current service level budget. In 2012, the state began to cap Medicaid cost increases to contain spending and create more predictable budget environments. This approach led to a fixed Medicaid growth cap of 3.4% per member per year, which represented two percentage points below the national trend at the time. Although the national health care cost trend has fluctuated since then, the state has maintained the annual 3.4% cap and extended it to PEBB and OEBB.

The strengthening of the Oregon economy is often expressed in a tight labor market.  OHA has experienced, and is likely to continue to experience, challenges in filling authorized positions with qualified candidates. This has been particularly problematic in public funded behavioral health programs including the Oregon State Hospital and Community Mental Health Programs (CMHPs).

## CURRENT SERVICE LEVEL

OHA's current service level budget for the 2025-27 biennium is $37.1 billion total funds and 5,689 positions (5,671.54 FTE), which represents a 3.2% increase from the 2023-25 legislatively approved budget. The most notable budgetary change from the 2023-25 biennium is the reduction of $1.7 billion in Other Funds expenditures due to the statutory expiration of hospital and insurer provider taxes. These revenues leverage federal Medicaid dollars to support enhanced provider reimbursements and the Oregon Health Plan. This change shifts the portion of those revenues used to support the Oregon Health Plan, $1.1 billion, to General Fund. After applying inflationary factors, adding roll-up costs of new

Stenson Decl., Ex. S
P. 6 of 73

programs, and adjusting for caseload and revenue forecasts, the total change in General Fund is an increase of $2.5 billion, or 43.8%, from the prior biennium.

Beginning with the legislatively approved budget (LAB) spending amounts authorized for the Oregon Health Authority following the end of the 2024 session, multiple adjustments are made to authorized expenditure levels to arrive at the upcoming biennium's current service level. These adjustments are categorized by the general function of each adjustment, including base budget adjustments, personal services adjustments not included in base budget adjustments, phase-ins, phase-outs, mandated and non-mandated caseload changes, fund shifts, and technical adjustments.

The LAB is adjusted for projected personal services growth and debt service payments to develop the base budget, and starting point for CSL development. Personal services cost changes, including adjusting for compensation plan changes, increasing permanent positions that were budgeted for a portion of the prior biennium to 24 months, and removing limited duration positions are the most significant base adjustment for OHA. Base budget adjustments for the 2025-27 biennium total $121.3 million General Fund, $212.3 million total funds, and eliminate 58 positions, but increase total FTE by 74.94.

Additional position-related adjustments are made to account for changes not captured in the position budgeting system. For OHA these include an increase of $8 million General Fund, $11.1 million total funds for changes to costs due to use of temporary employees, overtime pay, shift differential payments, and position-related equipment. Pension bond obligation adjustments reduce General Fund by $1.4 million, $2.3 million total funds. The application of standard vacancy savings factors to the adjusted personal services budget result in an increase of $20.3 million General Fund, $20.9 million total funds. Part of this increase is due to the elimination of non-standard vacancy savings that was applied in the 2023-25 biennium.

## Budget Phase-Ins

Expenditure authority at the current service level is increased by $43.2 million General Fund, $1.6 billion total funds, to phase-in non-personal services program costs for authorized programs established in the prior biennium and continuing into the 2025-27 biennium. For those items in the following table that are denoted with an asterisk, the program has funding that is phased-out of the base budget in package 022 and the ongoing costs are expressed in this phase-in package. The single largest phase-in adjustment for General Fund is the addition of $32 million to reverse one-time expenditure reductions that were taken in the 2023-25 biennium. Detailed review of individual phase-ins is included in the relevant program sections.

Stenson Decl., Ex. S
P. 7 of 73

2025-27 Budget Review - Oregon Health Authority

| Package 021 - Phase-Ins | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds |
|---|---|---|---|---|---|
| Reversal of One-time Reductions to 2023-25 budget | $31,977,335 | - | - | - | $31,977,335 |
| HB 4052 - Mobile Health Units* | $1,935,809 | - | - | $310,691 | $2,246,500 |
| HB 4129 - Agency with Choice | $1,124,311 | - | - | $1,803,181 | $2,927,492 |
| Mobile Crisis Response Rates | $1,867,250 | - | - | $6,945,022 | $8,812,272 |
| 1115 Waiver Implementation | $2,889,570 | - | - | $3,039,467 | $5,929,037 |
| Position Related S&S Costs | $1,010,302 | - | $289,892 | $538,203 | $1,838,397 |
| PEBB/OEBB Increased Enrollment Medical Costs | - | - | $118,930,045 | - | $118,930,045 |
| Basic Health Plan - OHP Bridge | - | - | - | $708,879,600 | $708,879,600 |
| Basic Health Plan - OHP Bridge Medicaid | - | - | - | $7,484,400 | $7,484,400 |
| Behavioral Health Housing Incentive Funds Carry Forward* | - | - | $19,218,109 | - | $19,218,109 |
| Community Acute Psychiatric Facility Capacity Carry Forward* | - | - | $25,000,000 | - | $25,000,000 |
| DSHP - Health Related Social Needs | - | - | $110,125,323 | $413,755,995 | $523,881,318 |
| All Other Phase-Ins | $2,393,141 | $1,501,074 | $96,589,104 | $32,665 | $100,515,984 |
| **Total** | **$43,197,718** | **$1,501,074** | **$370,152,473** | **$1,142,789,224** | **$1,557,640,489** |

## Budget Phase-Outs

Reductions of $401.8 million General Fund, $3.6 billion total funds, are included in the budget at the 2025-27 current service level to phase-out expenditures that were authorized in the 2023-25 biennium. These include the removal of one-time funded programs or program enhancements, General Fund monies used to capitalize statutory funds that will be expended as Other Funds in subsequent biennia, one-time capital expenditures, removal of excess expenditure authority for federal programs, changes to Other Funds revenue projections, and the removal of expenditure authority for personal services-related services and supplies expenditures for positions not continuing into the 2025-27 biennium. For those items in the following table that are denoted with an asterisk, the program has funding that is phased-out of the base budget in package 022 and the ongoing costs are expressed in the phase-in package 021.  Detailed review of phase-outs is included in the relevant program sections.

Stenson Decl., Ex. S
P. 8 of 73

2025-27 Budget Review - Oregon Health Authority

| Package 022 - Phase-Outs | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds |
|---|---|---|---|---|---|
| Community Mental Health Deflection Programs | -$9,800,000 | - | - | - | -$9,800,000 |
| Adult Intensive Services & Diversion | -$6,445,520 | - | -$21,333 | -$3,350,397 | -$9,817,250 |
| Behavioral Health Investments from Prior Biennia | -$51,188,348 | - | -$86,645,156 | - | -$137,833,504 |
| HB 3396 - Clinical Education Grants and Professional Development Training Trust | -$25,077,464 | - | - | -$7,232,117 | -$32,309,581 |
| Healthy Homes Fund Capitalization | -$15,250,000 | - | - | - | -$15,250,000 |
| Long-Term Care Healthcare Employee Support | -$20,000,000 | - | - | -$30,000,000 | -$50,000,000 |
| Temporary Medicaid Expansion and Continuous Eligibility | -$202,892,576 | - | -$118,754 | -$437,889,001 | -$640,900,331 |
| HB 4035 (2021) BHP and Redeterminations | -$27,423,798 | - | -$966,738 | - | -$28,390,536 |
| SB 1530 Recovery Homes and Air Conditioners | -$21,500,000 | - | - | - | -$21,500,000 |
| REALD & SOGI One-Time Funds | -$10,100,000 | - | -$883,750 | -$1,641,250 | -$12,625,000 |
| Nurse Family Partnership Local Share | -$3,155,147 | - | - | - | -$3,155,147 |
| HB 4052 - Mobile Health Units* | -$2,072,130 | - | - | - | -$2,072,130 |
| Behavioral Health Housing Incentive Fund* | - | - | -$20,000,000 | - | -$20,000,000 |
| Community Acute Psychiatric Facility Capacity* | - | - | -$50,000,000 | - | -$50,000,000 |
| Provider Tax Expiration | - | - | -$539,173,466 | -$1,375,647,458 | -$1,914,820,924 |
| All Other Phase-Outs | -$6,941,361 | - | -$157,913,957 | -$436,756,906 | -$601,612,224 |
| **Total** | **-$401,846,344** | **-** | **-$855,723,154** | **-$2,292,517,129** | **-$3,550,086,627** |

## Inflation Adjustments

There are three essential budget packages that are used to adjust the budget at the current service level to account for assumed cost increases related to inflation in the 2025-27 biennium. These are: package 031 standard inflation, package 032 above standard inflation, and package 033 exceptional inflation.

A standard inflation factor of 4.2% is applied to base budget expenditures for most services and supplies, capital outlay, and certain special payment expenditure categories in package 031. This is in addition to changes to authorized expenditures for personal services costs that are adjusted in the base budget. Additionally, this package includes adjustments for published rental rates when state agencies occupy Department of Administrative Services (DAS) owned buildings, and adjustments for State Government Service Charges, including assessments and charges by DAS, the Secretary of State, Oregon Certification Office for Business Inclusion and Diversity, Public Records Advocate, and Government Ethics Commission, among others.

There are certain expenditure categories for which allowable inflation adjustments greater than the standard inflation factor of 4.2% are allowed. For medical cost increases, increased costs of non-state

Stenson Decl., Ex. S
P. 9 of 73

employee personal services contracts, and certain usage-based goods and services where the allowable inflation factor is greater than 4.2%, the first 4.2% is recognized in the standard inflation package 031, with the remaining portion of the increase recognized in subsequent 030 series packages. For example, the medical inflation for Oregon Health Plan, Public Employees Benefit Board, and Oregon Educators Benefit Board are limited to 3.4% annually, or a compound biennial increase of 6.92%, of which up to 4.2% is in the standard inflation package, 1.4% is in the above standard inflation package, and the remaining 1.32% is in the exceptional inflation package.

For the Oregon Health Authority, the current service level budget includes the following adjustments for standard inflation, by program:

**Package 031 -**

| Standard Inflation | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds |
|---|---|---|---|---|---|
| Central Services | $1,821,224 | $10,078 | $77,038 | $887,289 | $2,795,629 |
| Shared Services | - | - | $2,321,588 | - | $2,321,588 |
| SAEC | $30,990,660 | $21,866 | $2,251,863 | $4,816,886 | $38,081,275 |
| HSD | $155,086,593 | $931,578 | $171,647,642 | $707,318,520 | $1,034,984,333 |
| HP&A | $2,129,046 | $1,137 | $4,182,969 | $1,748,652 | $8,061,804 |
| Public Health | $8,983,769 | - | $12,779,562 | $184,747 | $21,948,078 |
| PEBB | - | - | $103,680,830 | - | $103,680,830 |
| OEBB | - | - | $83,789,477 | - | $83,789,477 |
| State Hospital | $4,462,324 | - | $536,697 | $200,513 | $5,199,534 |
| **Total** | **$203,473,616** | **$964,659** | **$381,267,666** | **$715,156,607** | **$1,300,862,548** |

As noted above, there are certain expenditure categories for which allowable inflation adjustments greater than the standard inflation factor of 4.2% is allowed. The 032 package includes adjustments for medical services inflation of 1.4% in addition to the standard inflation, for total of up to 5.6%. Special payment expenditures for non-state employee personal services inflation costs above the standard inflation rate to a maximum of 6.8% are also captured in the 032 package.

| Package 032 - Above Standard Inflation | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds |
|---|---|---|---|---|---|
| HSD | $44,363,553 | $31,861 | $54,374,930 | $229,903,910 | $328,674,254 |
| PEBB | - | - | $34,432,915 | - | $34,432,915 |
| OEBB | - | - | $27,929,826 | - | $27,929,826 |
| State Hospital | $1,021,208 | - | - | - | $1,021,208 |
| **Total** | **$45,384,761** | **$31,861** | **$116,737,671** | **$229,903,910** | **$392,058,203** |

Any remaining medical inflation costs that exceed the 5.6% accounted for in the 031 and 032 packages are budgeted in the exceptional inflation package 033. Also included in the exceptional inflation package are adjustments that fall outside of the standard inflationary factors when granted an exception by the

Stenson Decl., Ex. S
P. 10 of 73

DAS Chief Financial Office. These exceptional inflationary adjustments are discussed in detail in the relevant program sections.

| Pkg 033 - Exceptional Inflation | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds |
|---|---|---|---|---|---|
| Central Services | $2,108,285 | - | - | $586,862 | $2,695,147 |
| SAEC | $3,823,238 | $7,242 | $551,578 | $1,604,484 | $5,986,542 |
| HSD | $41,928,922 | $30,040 | $51,267,791 | $217,083,411 | $310,310,164 |
| PEBB | - | - | $32,465,319 | - | $32,465,319 |
| OEBB | - | - | $26,333,835 | - | $26,333,835 |
| **Total** | **$47,860,445** | **$37,282** | **$110,618,523** | **$219,274,757** | **$377,791,007** |

## Mandated Caseload Costs

Mandated caseloads costs are those costs associated with OHA's comprehensive medical assistance programs delivered in accordance with the state's Medicaid waiver under Title XIX of the Social Security Act, and the Children's Health Insurance Program (CHIP) under Title XXI of the Social Security Act. Caseload cost adjustments are calculated by Medicaid eligibility category as there are significant variations in per-member expenditures across categories.

The current service level includes an increase from the base budget of $176.8 million General Fund, $343.8 million total funds, for changes to mandated caseloads for Medicaid programs administered by OHA. These adjustments result in a mandated caseload budget of $20.9 billion total funds at the current service level.

## Statutory Caseload Costs

The Healthier Oregon Program (HOP) is an Oregon Health Plan (OHP), non-Medicaid program that covers members who meet eligibility requirements for OHP except for their citizenship status. Established in HB 3352 (2021), the Legislature initially appropriated $100 million to provide coverage for the first year of HOP, effective July 1, 2022. The funds necessary to implement HOP pertained only to coverage for the adult HOP caseload because children were already covered as a part of the Cover All Kids program that became part of HOP. HB 3352 authorized OHA to limit HOP enrollment during its first year due to the $100 million capped budget. During this implementation period, only those from age 19-25 and over 55 were enrolled in the program. Starting July 1, 2023, all age groups became eligible for enrollment. The 2023-25 budget for OHA included full implementation, at a cost of $725.5 million General Fund and $136 million Federal Funds, for a total funds budget of $861.5 million as of spring 2024.

The current service level includes an increase from the base budget of $486.7 million General Fund, $518.7 million total funds, for changes to statutory caseloads for the Healthier Oregon program. These adjustments result in a program budget of $1.1 billion General Fund, $1.3 billion total funds, at CSL.

Stenson Decl., Ex. S
P. 11 of 73

2025-27 Budget Review - Oregon Health Authority

## Funding Changes

The current service level budget for OHA shifts $1.7 billion of budgeted expenditure to the General Fund from Other Funds and Federal Funds. The majority of this change is resultant from the sunset of hospital and provider taxes that support the Oregon Health Plan. The following table summarizes these funding changes:

**Package 050 –**

| Fund Shifts | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds |
|---|---|---|---|---|---|
| Provider Tax Sunset | $1,129,276,292 | - | -$1,129,276,292 | - | - |
| Marijuana Tax Forecast Changes | -$1,769,394 | - | $1,769,394 | - | - |
| Tobacco Tax Revenue Changes | $64,432,138 | - | -$64,432,138 | - | - |
| DSHP/HSRN Fund Shift | $62,081,206 | - | -$62,081,206 | - | - |
| Federal Medicaid Assistance Percentage (FMAP) Changes | $219,439,630 | - | $13,672,914 | -$233,112,544 | - |
| Inflation-related Unrealizable Revenue Adjustments | $231,692,651 | - | -$227,519,580 | -$4,173,071 | - |
| Oregon Psilocybin Services Budget Adjustment | -$3,690,394 | - | $3,690,394 | - | - |
| Tobacco Master Settlement Agreement Forecast Change | $20,941,666 | - | -$20,941,666 | - | - |
| **Total** | **$1,722,403,795** | **-** | **-$1,485,118,180** | **-$237,285,615** | **-** |

The $62.1 million shift in funding for Designated State Health Programs that support the Section 1115 waiver expenditures for Health Related Social Needs (HSRN) is included to align total program expenditures with the federal agreement that calls for at least $71 million of the total spending on HSRN services to come from state resources.

Changes to Federal Medical Assistance Percentage move a net of $219.4 million in budgeted expenditures from Federal Funds to General Fund. $67.8 million of this total is due to the reduction of enhanced FMAP that was provided due to the COVID-19 public health emergency.

Adjustments totaling $231.7 million are included to move inflation-related costs for budgeted expenditures that would have otherwise been paid for using Other Funds or Federal Funds revenues, but are backfilled with General Fund due to limitations on the availability of revenues.

## Technical Adjustments

A budget reorganization for OHA is effected through a series of technical adjustments. The 2023-25 biennium budget organized the Health Systems Division (HSD) into three primary components; Medicaid, Non-Medicaid, and HSD Administration. The budget structure for the 2025-27 biennium includes two major programs; Medicaid and Behavioral Health, with associated sub programs as follows:

Stenson Decl., Ex. S
P. 12 of 73

**Medicaid**

- Medicaid Administration
- Medicaid Programs

**Behavioral Health**

- Behavioral Health Administration
- Behavioral Health Programs
- Behavioral Health – Systems of Care Advisory Council
- Behavioral Health – Alcohol and Drug Policy Council

The technical adjustments redistribute funding between the 2023-25 budget structure and the 2025-27 budget structure with a net-zero impact to the budget overall.

## GOVERNOR'S BUDGET SUMMARY

The Governor's budget assumes revenues of $2.3 billion that require legislative action, including statutory changes, to realize. Of this revenue, $1.5 billion would supplant General Fund expenditures. These revenues include:

- Renewal of the Hospital Provider Tax on both Diagnostic Related Group (DRG) hospitals and A&B type hospitals. This is assumed to produce an additional $1.7 billion Other Funds revenue supplanting $1.1 billion General Fund.
- Change in calculation of DRG Hospital Provider Tax to an effective 6% of net patient revenues that is inclusive of OHSU revenues. This change is assumed to produce an additional $401 million Other Funds revenue supplanting $281 million General Fund.
- Renewal of the Insurer Tax that is assumed to produce an additional $170.2 million Other Funds revenue supplanting $133.9 million General Fund.
- A new tax on synthetic tobacco products, which would require a change to statute. The Governor's budget assumes total new tax revenues of $9.3 million, including $8.4 million in the Medicaid program that supplants General Fund, and $900,000 in the Public Health Division to enhance tobacco retail sales enforcement activities, tobacco use prevention, and tobacco cessation programs. The introduced version of HB 2528 contains amendments to the current statutory definition of tobacco products to include these synthetic tobacco products.
- Increased Health Insurance Marketplace assessed per-member, per-month fees for insurance carriers to support transition from federally facilitated marketplace to a state-based Marketplace, which would generate $25 million Other Funds.
- Increased hospital licensing fees totaling $1.7 million Other Funds.  As introduced, SB 842 would make a five-fold increase in hospital licensing fees.

Additional programmatic General Fund savings totaling $700 million in the Governor's budget include:

- Projected applicability of Federal Medical Assistance Percentage (FMAP) funding for Healthier Oregon emergent caseload costs is estimated to shift program costs by $120.1 million from General Fund to Federal Funds (POP 095).

Stenson Decl., Ex. S
P. 13 of 73

- Decreased expenditures of $289 million General Fund, $335.6 million total funds, in the Healthier Oregon Program (HOP) due to projected lower medical utilization rates (PKG 095).
- An increase of $291 million in IGT payments from OHSU that is anticipated to supplant $100.5 million General Fund supporting the Oregon Health Plan (PKG 095).
- An additional "placeholder" $60 million General Fund reduction in HOP expenditures for anticipated 2024 risk corridor payments (PKG 090).
- A shift in planned expenditures for Health Related Social Needs that moves $25.3 million General Fund, $212.2 million total funds, from the 2025-27 biennium to the 2027-29 biennium (PKG 095).
- The reversal of inflation factors applied to expenditures for the Oregon Health Plan, Fee For Service (FFS) or "open card" program that reduces budgeted expenditures by $16 million General Fund, $41 million total funds (PKG 090).
- A negotiated reduction in Quality Incentive Pool funding for Oregon Health Plan Coordinated Care Organizations that assumes a $44 million General Fund, $148 million total funds, savings (PKG 090).
- An assumed shift of eligible caseload from the Healthier Oregon Program to the Basic Health Plan that moves $42.8 million of General Fund expenditures to Federal Funds.

## Carryforward Expenditure Authority

The Governor's budget adds back $25 million Other Funds expenditure limitation that was phased out at the current service level, reestablishing expenditure limitation in the Community Acute Psychiatric Facility Capacity Program for the entire $50 million of net bond proceeds from 2023-25 biennium issuances.

Expenditure limitation for the remaining, unexpended balance of $19.3 million from the original $20 million in net bond proceeds deposited in the Behavioral Health Housing Incentive Fund (HB 2316, 2021) during the prior biennium is carried forward in the 2025-27 CSL. The Governor's budget includes a $2.9 million upward adjustment of this expenditure limitation to account for accrued interest earnings in the fund.

Increased expenditure limitation of $32.8 million Other Funds is included in the Governor's budget for expenditure of existing, allocated funding in the Opioid Settlement Prevention Treatment and Recovery (OSPTR) Fund and a portion of the anticipated new settlement revenue in the 2025-27 biennium under the Opioid Settlement agreement.

## Significant Investments

In addition to policy packages that were brought forward by the agency and supported in the Governor's budget, several directed investments, totaling $160.7 million General Fund, $436.3 million total funds, are included in the Governor's budget.

- $2.5 million General Fund is included for a grant to Seeding Justice, a 501(c)(3) nonprofit charitable organization that operates multiple social-change grant programs, including the Reproductive Health Equity Fund. An additional $2.5 million General Fund is included for

Stenson Decl., Ex. S
P. 14 of 73

Case 6:22-cv-01460-AN    Document 196-1    Filed 03/11/25    Page 45 of 218

2025-27 Budget Review - Oregon Health Authority

reproductive health provider response to changes or reductions to federal reproductive health funding.

- A one-time General Fund investment of $6 for school-based health centers to expand mental health services, SUD screenings, and prevention services, and an additional $1 million to expand culturally responsive youth suicide prevention work.
- $7 million General Fund for distribution to community mental health programs to expand the existing intensive in-home behavioral health services program for youth with substance use disorders and to recruit providers to work under the new model.
- $35 million General Fund, $125 million total funds, for enhanced reimbursement rates to support maternity services in hospitals.
- $25 million General Fund to be used as state matching funds leveraging an additional $27 million in Federal Funds for the Disproportionate Share Hospital (DSH) program.
- A one-time investment of $4 million General Fund leveraging an additional $5 million Federal Funds to support graduate medical education (GME) programs.
- A one-time General Fund investment of $5 million that is anticipated to be matched with $7.5 million federal Medicaid funds that OHA will use to make supplemental payments to long-term care employers participating in the Oregon Essential Workforce Health Care Program.
- $10.4 million General Fund, $20.3 million total funds, to support Behavioral Rehabilitation Services (BRS) for youth with severe behavioral challenges. These services have been primarily used in foster care settings by Oregon Department of Human Services (DHS) and the juvenile justice system by Oregon Youth Authority. BRS outside of these settings are limited. The funding includes support for the establishment of 10 positions (7.50 FTE).
- $21.8 million General Fund to address identified operational deficiencies at the State Hospital that require corrective actions for the hospital remain in compliance with CMS requirements.
- $11.7 million General Fund to support the addition of 136 mental health technician positions (136.00 FTE) at the Oregon State Hospital.
- $5.8 million General Fund for enhanced contracted security services at both the Salem campus and the Junction City facilities.
- $3 million General Fund for the purchase of technology hardware and software systems for patient vital signs monitoring at the Oregon State Hospital.
- $2.9 million to help people on Aid and Assist orders at the Oregon State Hospital navigate their transition back to the community.

## Significant policy packages

**POP 406 Equity and Inclusion Office Expansion** - $1.9 million General Fund, $2.4 million total funds, for the conversion of five unbudgeted positions (5.00 FTE) to budgeted positions and addition of enhanced funding in the Civil Rights, Learning, and Inclusion section of the Equity and Inclusion.

**POP 407 Health Care Market Oversight** - This package addresses a shortfall in fee revenues; amending the program's budget to add $2.6 million General Fund, $466,688 Other Funds, restoring the reduced position authority from package 070, and adding another two positions (2.00 FTE). The net result of both packages is an increase of $2.6 million General Fund, a reduction of $538,041 Other Funds, and an increase of two positions (2.00 FTE).

Stenson Decl., Ex. S
P. 15 of 73

**POP 408 Medicaid Benefits for Incarcerated Persons -** $14.3 million General Fund, $49.7 million Federal Funds, and the authorization to establish seven new positions (5.75 FTE) to provide Medicaid coverage to incarcerated individuals up to 90 days prior to release.

**POP 409 AVATAR Upgrade** – An increased General Fund appropriation of $3.1 million, and the addition of four limited duration positions (1.89 FTE), is included in the Governor's budget for the upgrade of the Oregon State Hospital's electronic health record (EHR) system.

**POP 410 Public Health Modernization -** Following on 2023-25 biennium increased funding of $50 million General Fund to support public health modernization efforts as outlined in HB 3100 (2015), the package includes an additional $2 million General Fund to implement key priorities identified by the Public Health Advisory Board to specifically address health inequities.

**POP 411 Regional Health Equity Coalition Expansion -** $3.6 million General Fund, $3.8 million total funds, and the addition of two positions (1.38 FTE) within the Equity and Inclusion program to expand the Regional Health Equity Coalition (RHEC) program.

**POP 415 Domestic Well Safety -** $3.2 million General Fund and the addition of eight positions (8.00 FTE) for the Domestic Well Safety program.

**POP 417 Healthy Oregon Program Enhancements -** $22.7 million General Fund to extend Health Related Social Needs (HRSN) and Youth with Special Health Care Needs (YSHCN) benefits to Heathier Oregon Program participants.

**POP 556 Certified Community Behavioral Health Clinic Expansion -** Increased General Fund of $14.1 million and $33.7 million Federal Funds is included for a statewide expansion of the Certified Community Behavioral Health Clinic system.

**POP 551 Harm Reduction Clearinghouse -** $10.4 million General Fund to continue support for the harm reduction clearinghouse.

**POP 552 Behavioral Health Residential Programs -** $100 million General Fund to expand behavioral health residential treatment and support services that is in addition to the $50 million in bond proceeds for behavioral health housing carried forward from the prior biennium. The funding is intended to increase the capacity of residential programs by adding new psychiatric residential treatment facilities and substance use disorder (SUD) treatment beds.

**POP 424 State-Based Marketplace -** Increased Other Funds expenditure limitation of $23.6 million and the addition of nine positions (6.75 FTE) is requested to continue the development of a state-based eligibility and enrollment platform and call center for Oregon's health insurance exchange.

## Information Technology Projects

Two policy packages were included in the Governor's budget dealing with ongoing or enhanced information technology projects. Revenue to support the work comes from indirect and direct charges to operating programs at both OHA and DHS.

**POP 201 Mainframe Modernization -** The Governor has recommended an increase of $5.8 million Other Funds expenditure limitation to continue work that was begun in the 2023-25 biennium to migrate

Stenson Decl., Ex. S
P. 16 of 73

certain benefit eligibility programs and provider payment processing from older mainframe computer systems to more modern platforms, including cloud-based platforms.

**POP 202 IT Privacy and Security** - Increased Other Funds expenditure limitation of $3.8 million and authorization for the establishment of four new positions (2.00 FTE) within the Information Security and Privacy Office of the Office of Information Technology to provide enhanced cybersecurity threat identification and prevention, risk mitigation, and data security.

## General Obligation Bond Requests

The Governor's budget includes requests for general obligation bond proceeds to support improvements to the air handler return equipment at the Oregon State Hospital Junction City campus and for the addition of a second floor within the Vocational Services area at the Oregon State Hospital Salem campus, creating 2,700 square feet of office space and approximately 32 additional work spaces.

## OTHER SIGNIFICANT ISSUES

The primary budget bill for OHA in the 2023-25 biennium, SB 5525 (2023), included funding in two policy packages that also requested the agency to report on specific activities or outcomes related to the funding provided.

**Behavioral Health Facility Investments** - A budget note accompanying policy option package 801 requires OHA to submit a report on investments made to increase behavioral health facility capacity in Oregon during the 2021-23 and 2023-25 biennia. This report should include the number and types of beds provided or anticipated, how investments are balanced between supporting the new capacity on an on-going basis and building additional beds, and data demonstrating how the medical and mental health system outcomes are impacted by the investments. This report is to be presented no later than February 1, 2025, to the Human Services Subcommittee of the Joint Committee on Ways and Means.

**Certified Community Behavioral Health Clinics** - A budget note accompanying policy option package 803 requires OHA to continue to administer the certified community behavioral health clinic (CCBHC) demonstration program and submit a report to the Human Services Subcommittee of the Joint Committee on Ways and Means no later than February 1,2025, that details specific investments and categorized spending in the 2021-23 biennium, the number of people served, barriers to having fully utilized available funds, specifics on health outcomes based on individual participant's results, reduced costs resulting from the program, recommendations on the whether to redirect funding from non-CCBHC programs to increase this program funding, and the impact of ending the pilot and discontinuing funding beyond the 2023-25 biennium. Although the text of the budget note requested specific investments and categorized spending in the 2021-23 biennium, it is anticipated that the agency will report on the program and these specified issues using the most up-to-date information available at the time of the report.

A statutorily required report to the Legislative Fiscal Office from the Public Health Division will also be submitted during the 2025 session:

**Public Health Modernization Funding** – As required by ORS 431.380(2), an update of the estimated costs to implement foundational capabilities and programs by local public health agencies is anticipated

Stenson Decl., Ex. S
P. 17 of 73

2025-27 Budget Review - Oregon Health Authority

to be finalized in January 2025. This report will be pivotal in assessing the use and effectiveness of current funding, including increased funding for public health modernization, and should provide a starting place for discussion of ongoing funding and fiscal policy for the division. The Public Health Advisory Board paused the use of previously adopted metrics and began the process of revising public health accountability metrics. Updated metrics were adopted in 2023 and the agency has indicated that the January 2025 report will include reporting on these metrics.

## KEY PERFORMANCE MEASURES

A copy of the Oregon Health Authority Annual Performance Progress Report can be found on the LFO website: KPM - View Report

2025-27 Budget Review - Oregon Health Authority

# Health Systems Division

| | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| General Fund | 2,261,544,411 | 4,083,589,523 | - | - |
| Lottery Funds | 17,974,926 | 22,644,595 | - | - |
| Other Funds | 4,115,139,974 | 5,092,367,608 | - | - |
| Federal Funds | 16,940,392,743 | 18,785,526,464 | - | - |
| **Total Funds** | **23,335,052,054** | **27,984,128,190** | - | - |
| Positions | 560 | 707 | - | - |
| FTE | 494.46 | 656.83 | - | - |

\* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

Although technically still unified in the budget reporting structure for the Oregon Health Authority, the Health Systems Division (HSD) has been reorganized around its two major program budgets: Medicaid and Behavioral Health. The table above is included in this review to illustrate the historical budget information for HSD as a whole, but the following sections provide the budgetary detail at the budget at the current service level and beyond for the Medicaid and Behavioral Health programs as stand-alone budgets.

# Medicaid

| | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| General Fund | - | - | 5,804,951,116 | 3,722,928,739 |
| Lottery Funds | - | - | 2,684,169 | 3,519,334 |
| Other Funds | - | - | 2,754,243,107 | 5,283,962,566 |
| Federal Funds | - | - | 18,836,769,035 | 20,618,566,327 |
| **Total Funds** | - | - | **27,398,647,427** | **29,628,976,966** |
| Positions | - | - | 462 | 488 |
| FTE | - | - | 455.46 | 475.46 |

\* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

The Medicaid program contains the state's implementation of the federal Medicaid program: the Oregon Health Plan (OHP). OHP and state-sponsored programs that include the Healthier Oregon Program (HOP) and the Basic Health Plan, also known as OHP Bridge, enable physical, behavioral, and oral health care coverage for lower-income individuals.

Stenson Decl., Ex. S
P. 19 of 73

## Funding Supporting Medicaid Programs

General Fund supports roughly 21.2% of total expenditures for the Medicaid program at the current service level.

Allocations of Lottery Funds are made from the Veterans' Services Fund to support physical and behavioral health programs specifically for veteran beneficiaries. The current service level Lottery Funds expenditures include $2.7 million for veterans' dental services in the Medicaid program.

Federal Funds provide the primary financial support for the Medicaid system in Oregon; accounting for roughly 68.8% of total funding at the current service level. In addition to direct costs of Medicaid health services caseload, federal Medicaid funding supports program administration, policy development, and information technology needs, including data acquisition and reporting. Although the term Federal Medical Assistance Percentage (FMAP), or Medicaid funding, is used generically, there are discrete programs within this umbra that are subject to their own specific eligibility criteria and funding mechanisms that often include tailored FMAP rates. The following budget environment section provides additional information on the calculation of the Federal Medical Assistance Percentage and its application, as well as the fiscal impacts of federal mandates.

Redirected Federal Funds that would have otherwise been used to subsidize the cost of health insurance premiums for health insurance coverage purchased through the health insurance exchange, support Oregon's Basic Health Plan (OHP Bridge) that provides Medicaid-like coverage for eligible individuals with household income between 138% and 200% of the federal poverty level. The current service level includes $1.4 billion Federal Funds expenditure limitation for the program, but more current caseload forecasts estimate Federal Funds expenditure need of $942.8 million, a reduction of $475 million.

The Oregon Health Authority receives Other Funds revenues from a variety of taxes, fees, and other sources that support programs across the agency, including providing matching state funding for Federal Funds supporting the Oregon Health Plan.

There are two primary types of provider-based tax assessments that are used in the OHA budget to primarily provide state resources to match federal Medicaid funds.  These are hospital provider taxes and insurance provider taxes.

Hospitals are assessed a tax of 6% on net patient revenues. The assessment applies to both the larger Diagnostic Related Group (DRG) hospitals and the smaller Type A and Type B rural hospitals.  Assuming the renewal of these taxes that are set to expire at the end of September 2025, current service level revenues from the hospital provider tax are anticipated to be $1.7 billion in the 2025-27 biennium. Of that total, $1.1 billion is slated to support the Oregon Health Plan. The remaining funding is used to provide enhanced reimbursements to DRG hospitals and qualified directed payments to Type A and Type B rural hospitals to maintain quality and access.

The insurance provider tax is assessed on net premiums, or premium equivalent for both commercial health plans and publicly funded health plans including the Oregon Health Plan, Healthier Oregon Plan, the Basic Health Plan, and plans managed by the Oregon Employees and Public Employees Benefit Boards. Similar to the hospital assessment, the insurance assessment is set to expire at the end of calendar year 2026. Assuming the extension of the statutory sunset, insurance assessments are anticipated to produce $638.5 million at the 2025-27 current service level. Tax revenues help fund a

reinsurance program for eligible health benefit plans that is intended to keep rates for those plans 6% lower than would be realized without the program. Remaining estimated assessment revenues of $530.9 million support the Oregon Health Plan.

The Oregon Health and Science University (OHSU) intergovernmental transfer (IGT) agreement was created as an alternative to the hospital assessment. The IGT agreement between the state and OHSU maximizes federal funding supporting the Oregon Health Plan and other programs, while ensuring that OHSU receives net reimbursement from all sources of at least 87% for Medicaid-related services provided. The OHSU IGT is estimated to produce $515.8 million to support the Oregon Health Plan in the 2023-25 biennium.

Taxes on tobacco products sold in Oregon support multiple programs across the agency. As of December 2024, forecasted tobacco tax revenues allocated to OHA programs total $625.3 million in the 2023-25 biennium. $548.9 million is used in the Medicaid program to support the Oregon Health Plan.

The Tobacco Master Settlement Agreement (TMSA) revenues are payments made to settling states in perpetuity beginning in 2000. Estimated TMSA revenues available in the 2025-27 biennium are $102.9 million for the Oregon Health Plan.

## BUDGET ENVIRONMENT

The federal revenue OHA receives is tied to a significant body of federal law and administrative rules. This is particularly true with Medicaid, which is governed by waivers of certain federal regulations that allow Oregon to tailor its Medicaid services to the unique needs of the state. Medicaid waivers and corresponding amendments must be approved by the federal Centers for Medicare and Medicaid Services (CMS). Most of OHA's General Fund budget is used to match federal revenue as part of these agreements. Consequently, General Fund reductions typically result in the loss of federal revenue and might not be possible to implement without reducing Medicaid eligibility and/or services.

Federal mandates also have a significant influence on the priorities and programs that are undertaken by the agency. Some of the top federal mandates identified by OHA that have a direct impact on Medicaid program budget requests and operations include: Medical Enterprise Service Modernization, Medicaid Enterprise Services Interoperability, and Race, Ethnicity, and Language, Disability (REALD) and Sexual Orientation, Gender Identity (SOGI) data practices.

Oregon receives federal financial assistance for its implementation of Medicaid in the state. The Federal Medical Assistance Percentage (FMAP) that determines the amount of Federal Funds the state receives for most Medicaid caseloads is calculated using the relative strength of Oregon's economy to the rest of the country. When Oregon's per capita personal income increases relative to the national average, Oregon's FMAP decreases, meaning additional state funds are needed to support the same level of Medicaid services. Likewise, when Oregon's per capita personal income decreases relative to the national average, Oregon's FMAP increases and saves state dollars. The federal government calculates each state's FMAP by using income trends from the three most recent calendar years of available data, which is nearly three years removed from the effective date of a state's FMAP. For instance, the federal fiscal year 2024 FMAPs were calculated using calendar year 2019-2021 income data. Consequently, a state's FMAP could decrease when its economy and tax collections are declining. Because Oregon's per capita income has outpaced the national average for the past several years, the state's FMAP has mostly

declined since 2017, which has significantly increased the share of General Fund and other state revenue needed to support Medicaid programs.

In 2022, OHA received approval for a five-year Section 1115 Demonstration Waiver that included significant enhancements (Section 1115 refers to the authorizing section of the Social Security Act). The waiver established continuous eligibility for children under age six and increased the eligibility redetermination period for adults from annually to every two years, which reduces the number of OHP members who cycle in and out of eligibility due to income fluctuations. The waiver also includes authorization to apply FMAP to total costs of providing programs addressing social determinates of health (also called health-related social needs, or HRSN) as Medicaid benefits, including housing, food support, and items like air conditioners. HRSN benefits are mostly federally funded through 2027 but will then require a state match that could be considerable if the program continues beyond the waiver period.

The change in the federal administration following the 2024 elections may result in a shift of policy at the Centers for Medicare and Medicaid Services regarding the renewal of state waivers.  Although the current 1115 waiver runs through the upcoming 2025-27 state fiscal biennium, the development of the next waiver period is anticipated to begin in fall 2025.  Changes in federal legislation could also impact the funding and authorization for Medicaid programs, generally.

## CURRENT SERVICE LEVEL

Direct comparison of expenditures between the 2023-25 legislatively approved budget and the 2025-27 current service level budget are imprecise due to the structural changes in the budget. The budgetary adjustments to the base budget that ultimately result in the current service level for the Medicaid program that are described in this section are intended to illustrate that change as accurately as possible, but may contain non-substantive differences.

The current service level budget for the Medicaid program is $5.8 billion General Fund, $27.4 billion total funds, and includes 462 positions (455.46 FTE).

The current service level General Fund budget for the Medicaid program is significantly impacted by the sunset of both the Hospital and Insurer provider taxes that support the Oregon Health Plan and increases in forecasted caseloads for both Affordable Care Act (ACA) adult Medicaid expansion population and the Healthier Oregon program. At the current service level, the sunset of provider taxes requires increased General Fund support of $1.1 billion to backfill lost revenue from these sources. Caseload adjustments alone account for an increase in General Fund expenditures of $663.5 million. Some of these costs are moderated in the Governor's proposed budget as the agency has indicated potential reductions in caseload costs, particularly in the Healthier Oregon population due to pending changes to the FMAP and lower than anticipated medical services utilization. Although the phase out of provider tax revenues supporting the Oregon Health Plan is included in the current service level, the renewal of these taxes is assumed in the Governor's budget.

### Program Phase-Ins

**Basic Health Plan** - Policy Option Package 202 that was adopted as part of the agency's 2023-25 budget included $533.5 million Federal Funds limitation for expenditures in the HSD Medicaid program for the

Medicaid bridge basic health plan. An additional $136.5 million Federal Funds expenditure limitation was added in SB 5701 (2024) as part of the agency's first budget rebalance.  Package 021 phases-in another $716.5 million Federal Funds expenditure limitation in two separate actions to bring the total Federal Funds expenditure limitation to $1.4 billion, including inflation for the 2025-27 biennium at the current service level, for OHP Bridge health benefit coverage.

**Designated State Health Program Funding for Health-Related Social Needs (1115 Waiver)** - To support planned expenditures from available federal revenues for Health-Related Social Needs, expenditure limitation for both Federal Funds and Other Funds is increased from the base budget in multiple programs. In the Behavioral Health program, Federal Funds expenditure limitation of $42.9 million is phased in to account for allowable FMAP. These claimed funds are then expended in the Medicaid program as Other Funds and matched again with FMAP. Therefore, additional expenditure limitation of $110.5 million Other Funds and $371.3 million Federal Funds is phased in to accommodate this spending in the HSD Medicaid Program. The difference between the expenditure limitation for claimed funding and spent funding is due to the application of inflationary factors applied in the 030 series packages and a fund-shift of $62.1 million from Other Funds to General Fund in package 050.

In addition to these costs, the 2023-25 adopted budget included POP 201 that authorized the establishment of 29 positions of varying start dates throughout the biennium to support the 1115 waiver implantation in the Health Policy and Analytics program. The 2025-27 current service level includes an increase of $2.9 million General Fund and $3 million Federal Funds the full 24-month cost of the position-related services and supplies.

**Agency with Choice (HB 4129)** - The current service level budget phases in $1.1 million General Fund and $1.8 million Federal Funds to recognize the full biennial cost of non-personal services expenditures for the agency with choice (AWC) in-home services for individuals with behavioral health needs as required under HB 4129 (2024). Total program funding at CSL is estimated to be $2.5 million General Fund and $3.3 million Federal Funds.

**Mobile Crisis Response Rates** - The 2023-25 adopted budget for OHA included policy option package 404 that included increased mobile crisis reimbursement rates beginning in calendar year 2024. The current service level increases General Fund by $1.9 million and Federal Funds expenditure limitation by $7 million for the full 24-month cost of these increased rates.

## Program Phase-Outs

**Hospital Tax Sunset - Qualified Directed Payment Program for A&B Hospitals** - Hospital provider tax on A&B hospitals statutorily expires on September 30, 2025, one quarter into the 2025-27 biennium. A portion of the revenue that would have been collected, but for the expiration of the tax, matched with federal Medicaid funds would have been used to fund qualified directed payments (QDP) to hospitals to support services provided to Medicaid patients in an amount equal to the aggregate hospital taxes collected. The remaining tax collected, after the portion used for QDP, would have been used to support the Oregon Health Plan. Package 022 phases out $210.9 million Federal Funds and $83.5 million Other Funds expenditure limitation for the qualified directed payments. These amounts are inclusive of inflation amounts that are in the 030 series packages. The portion of the tax that would have been used to fund the Oregon Health Plan, $209.1 million Other Funds, is replaced by General Fund in the current service level in the 050 series packages.

Stenson Decl., Ex. S
P. 23 of 73

**Hospital Tax Sunset - Diagnostic Related Group Hospital Programs** - Hospital provider tax on Diagnostic Related Group (DRG) hospitals statutorily expires on September 30, 2025, one quarter into the 2025-27 biennium. A portion of the revenue that would have been collected, but for the expiration of the tax, matched with federal Medicaid funds would have been used to fund programs that include:

- Qualified directed payments (QDP) to hospitals to support services provided to Medicaid patients in an amount equal to the aggregate hospital taxes collected.
- State share of the Disproportionate Share Hospital (DSH3) program.
- Enhanced hospital provider rate reimbursements.

The remaining tax collected, after the portion used for the programs above, would have been used to support the Oregon Health Plan. Package 022 phases out the expenditure limitation for the programs above; $1.1 billion Federal Funds and $433.2 million Other Funds. These amounts are inclusive of inflation amounts that are in the 030 series packages. The portion of the tax that would have been used to fund the Oregon Health Plan, $737.7 million Other Funds, is replaced by General Fund at the current service level in the 050 series packages.

**Insurer Tax Sunset** - The tax assessed on the premiums of managed care organizations is set to statutorily expire on December 31, 2026, 18 months into the 2025-27 biennium. A portion of the revenue that would have been collected, but for the expiration of the tax, matched with federal Medicaid funds would have been returned to the managed care organizations to offset premium costs. The remaining tax collected, matched with federal Medicaid funds, would have been used to support the Oregon Health Plan. Package 022 phases out the expenditure limitation for the portion of the foregone tax revenue and federal matching funds used to offset premium costs; $51.6 million Federal Funds and $22.5 million Other Funds. The portion of the tax that would have been used to fund the Oregon Health Plan, $186.5 million Other Funds, is replaced by General Fund at the current service level in the 050 series packages.

**Continuous Eligibility Funding** - As part of Oregon's section 1115 Medicaid Waiver, funding to support the implementation of two-year continuous eligibility was included in the budget for OHA separate from the standard caseload cost. For the 2025-27 biennium, these costs are included in the budget for Medicaid caseload cost estimates and the duplicative funding carried through to the base budget is removed. The current service level phases out $66.8 million General Fund and $241.2 million Federal Funds expenditure limitation for these costs.

**Temporary Medicaid Expansion Funding** - General Fund and Federal Funds expenditure limitation was provided in the 2023-25 biennium to allow for the temporary expansion of Oregon Health Plan coverage to adults with income between 138% and 200% of the federal poverty level. For the 2025-27 biennium, eligible caseloads are moved to the Basic Health Plan, with the exception of a small number of individuals that will continue on the Medicaid caseload due to continuous eligibility. $125.7 million General Fund and $186 million Federal Funds expenditure limitation is phased out of the budget in the Medicaid program at current service level.

**Oregon Essential Worker Healthcare Trust** - The Oregon Essential Workforce Health Care Program was established by SB 800 (2021) as a mechanism to leverage federal Medicaid assistance funding to support the Essential Worker Healthcare Trust in providing long-term care workers access to health insurance. The program received a $20 million General Fund appropriation matched with $30 million Federal Funds

Stenson Decl., Ex. S
P. 24 of 73

expenditure limitation in SB 5525 (2023) allowing OHA to make supplemental payments to long-term care employers participating in the program. This one-time support in the 2023-25 biennium is phased out at the current service level for the 2025-27 biennium.

**Nurse-Family Partnership** - One-time funding of $3.2 million General Fund that was appropriated to OHA in the 2023-25 biennium to supplant local matching funds for services provided under the Nurse-Family Partnership program are phased out of the budget at the current service level.

**Health Care Professionals Development (HB 3396)** - Two one-time appropriations made in HB 3396 (2023) are phased out of the current service level budget for the Medicaid program. $15 million General Fund was appropriated for OHA to provide grants to support clinical education at hospitals and health care facilities. Another $5 million General Fund was appropriated to OHA to provide grants to employers participating in a labor-management training trust to provide on the job training, apprenticeships, and other programs to develop health care professionals. The General Fund for support of the labor-management training trust was matched with federal Medicaid assistance funding of $7.2 million, which is also phased out.

**Agency with Choice (HB 4129)** - HB 4129 (2024) established agency with choice (AWC) in-home services for individuals with behavioral health needs. Funding for administrative costs were erroneously included in the HSD Medicaid program rather than the HSD Administration program in the 2023-25 biennium. Package 022 phases out $337,705 General Fund and $408,353 Federal Funds from the Medicaid program for these personal services costs which are included in the Administration program at the current service level.

**Home and Community Based Services Enhanced FMAP** - Excess Federal Funds expenditure limitation of $28.9 million is phased out of the Medicaid program budget at the current service level to account for the retraction of enhanced FMAP rates associated with one-time funding for qualifying expenditures for Home and Community Based Services (HCBS) under section 9817 of the American Rescue Plan Act.

**Health Care Interpreters Transfer** - Prior to the SB 5701 (2024) repeal of a $2 million General Fund appropriation made to OHA, Central Services division, in SB 5506 (2023), to supplement health care interpreter rates, OHA had transferred the $2 million General Fund appropriation from its Central Services division to the Medicaid division for expenditure in that program as part of the agency's biennial rebalance. The repeal of the original funding resulted in an error in the agency's budget due to the transfer of expenditure authority between the divisions, leaving the base budget for the Central Services program short by $2 million and the Medicaid program over-appropriated by $2 million. Package 021 phases in the missing $2 million in the Central Services program and Package 022 phases out the excess $2 million from the Medicaid program.

**OHSU Intergovernmental Transfer Inflation** - A technical adjustment is made to phase out $26.7 million Other Funds and $63.9 million Federal Funds calculated inflation for the OHSU IGT in the 030 series inflation packages. Changes to the available program funding is tracked and budgeted separately from the current service level inflation process.

## Inflation Factors

Inflation factors applied to the base budget result in additional expenditures at the current service level in the Medicaid program of $213.5 million General Fund, $308.8 million total funds. The majority of this

Stenson Decl., Ex. S
P. 25 of 73

increase is attributable to allowable inflation on medical expenditures. Medical inflation is calculated at a compounding rate of 3.4% per year, or 6.9% for the biennium.

## Mandated Caseload Costs

Mandated caseloads costs are those costs associated with OHA's comprehensive medical assistance programs delivered in accordance with the state's Medicaid waiver under Title XIX of the Social Security Act, and the Children's Health Insurance Program (CHIP) under Title XXI of the Social Security Act. Caseload cost adjustments are calculated by Medicaid eligibility category as there are significant variations in per-member expenditures and Federal Medical Assistance Percentage rates across categories.

The current service level includes an increase from the base budget of $176.8 million General Fund, $343.8 million total funds, for changes to mandated caseloads for Medicaid programs administered by OHA. These adjustments result in a mandated caseload budget of $20.9 billion total funds at the current service level. This is the compound result of forecasted cost changes for two forecast periods: Fall 2023 to Spring 2024 and Spring 2024 to Fall 2024.

The total caseload change as of the Spring 2024 forecast was a decrease of 20,319 individuals. The total change in cost was a net reduction of $378.7 million total funds, inclusive of a funding shift that moved a portion of caseload cost from Other Funds to General Fund due to the phase out of provider tax revenues. The reduction in overall caseload, combined with the cost shift to General Fund, resulted in a net increase of $6.9 million General Fund. In addition, General Fund was increased by $35.2 million for Healthier Oregon member emergent care costs, which are eligible for Medicaid funding, for a total $42.1 million General Fund increase.

In a bit of a reversal, the mandated caseload increased by 42,893 individuals between the Spring 2024 and Fall 2024 Forecasts. Part of the reason for this change is due to the Temporary Medicaid Expansion caseload, which was originally assumed to move entirely to the Basic Health Plan. However, there is a residual average caseload that continues on OHP due to the extension of the redetermination process and the application of continuing eligibility rules, preventing the move of certain individuals to the Basic Health Plan. The single largest forecast change to Medicaid caseload was in the Affordable Care Act (ACA) adult population. This category also received individuals from the Temporary Medicaid Expansion program that became eligible due to income changes and remained in the ACA adult population due to continuing eligibility rules. It is also notable that while the Spring 2024 adjustment included emergent Medicare eligible costs for the Healthier Oregon caseload, the Fall 2024 forecast adjustment does not. Those costs are captured in the statutory caseload adjustments instead. The fiscal impact of the Fall 2024 mandated caseload forecast is an increase of $134.7 million General Fund, $722.5 million total funds.

## Statutory Caseload Costs

The Healthier Oregon Program (HOP) is a non-Medicaid program that covers members who meet eligibility requirements for the Oregon Health Plan (OHP) except for their citizenship status. Established in HB 3352 (2021), the Legislature initially appropriated $100 million to provide coverage for the first year of HOP, effective July 1, 2022. The funds necessary to implement HOP pertained only to coverage for the adult HOP caseload because children were already covered as a part of the Cover All Kids

Stenson Decl., Ex. S
P. 26 of 73

program that that later became part of HOP. HB 3352 authorized OHA to limit HOP enrollment during its first year due to the $100 million capped budget. During this implementation period, only those from age 19-25 and over 55 were enrolled in the program. Starting July 1, 2023, all age groups became eligible for enrollment. The 2023-25 budget for OHA included full implementation, at a cost of $725.5 million General Fund and $136 million Federal Funds, for a total funds budget of $861.5 million as of spring 2024.

In addition to the application of medical inflationary factors, the current service level for the 2025-27 biennium includes an increase from the base budget of $486.7 million General Fund, $518.7 million total funds, for changes to statutory caseloads for the Healthier Oregon program. These adjustments result in a program budget of $1.3 billion General Fund, $1.5 billion total funds, at CSL. Of the total General Fund budget for the Medicaid program at the current service level, the HOP General Fund budget accounts for roughly 22.4%. This is the compound result of forecasted caseload cost changes for two forecast periods: Fall 2023 to Spring 2024 and Spring 2024 to Fall 2024.

The total caseload change between the Fall 2023 and Spring 2024 forecast was an increase of 37,360 individuals, for a total of 99,543 individuals anticipated for the 2025-27 biennium on average. The total change in cost is an increase of $439.8 million General Fund; however, a downward adjustment to both the base costs and to the caseload change amount were applied, reducing ongoing expenditures by 6.3% to adjust for lower than anticipated service utilization by the adult caseload (19- to 64-year-olds). This reduction of $60.1 million produced a net caseload cost increase of $379.7 million as of the Spring 2024 forecast. As noted in the mandated caseload section above, this caseload cost increase does not include $35.2 million General Fund, $53.5 million total funds, for HOP caseload costs that are Medicaid eligible. These costs are included in the mandated caseload cost package.

Between the Spring and Fall 2024 forecasts, the caseload increased by an additional 8,634 individuals to 108,177 at a cost of $107 million General Fund, $138.9 million total funds. These amounts are inclusive of $25.4 million total funds, for the Medicaid eligible caseload. The prior forecast period had included these costs within the mandated Medicaid caseload.

## Funding Changes

The current service level budget for the Medicaid program shifts $1.7 billion of budgeted expenditure from Other and Federal Funds to the General Fund. The majority of this change is resultant from the sunset of hospital and provider taxes that support the Oregon Health Plan. The following table summarizes these funding changes:

Stenson Decl., Ex. S
P. 27 of 73

2025-27 Budget Review - Oregon Health Authority

**Package 050 –**

| Fund Shifts | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds |
|---|---|---|---|---|---|
| Provider Tax Sunset | $1,129,276,292 | - | -$1,129,276,292 | - | - |
| Tobacco Tax Revenue Changes | $62,282,755 | - | -$62,282,755 | - | - |
| DSHP/HSRN Fund Shift | $62,081,206 | - | -$62,081,206 | - | - |
| Federal Medicaid Assistance Percentage (FMAP) Changes | $219,439,630 | - | $13,672,914 | -$233,112,544 | - |
| Inflation-related Unrealizable Revenue Adjustments | $221,793,111 | - | -$221,793,111 | - | - |
| Tobacco Master Settlement Agreement Forecast Change | $18,759,558 | - | -$18,759,558 | - | - |
| **Total** | **$1,713,632,552** | **-** | **-$1,480,520,008** | **-$233,112,544** | **-** |

The $62.1 million shift in funding for Designated State Health Programs that support the Section 1115 waiver expenditures for Health Related Social Needs (HSRN) is included to align total program expenditures with the federal agreement that calls for at least $71 million of the total spending on HSRN services to come from state resources. The difference between the fund shift in this package and the minimum $71 million in state resources is made up from existing program budgeted expenditures from General Fund.

FMAP changes move a net of $219.4 million in currently budgeted expenditures from Federal Funds to General Fund. $67.8 million of this total is resultant from the reduction of enhanced FMAP that was provided due to the COVID-19 public health emergency.

Adjustments totaling $231.7 million are included to move inflation-related costs for budgeted expenditures that would have otherwise been paid for using Other Funds or Federal Funds revenues, but are backfilled with General Fund due to limitations on the availability of those revenues.

## GOVERNOR'S BUDGET SUMMARY

| | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds | Positions | FTE |
|---|---|---|---|---|---|---|---|
| Current Service Level | 5,804,951,116 | 2,684,169 | 2,754,243,107 | 18,836,769,035 | **27,398,647,427** | 462 | 455.46 |
| Governor's Budget | 3,722,928,739 | 3,519,334 | 5,283,962,566 | 20,618,566,327 | **29,628,976,966** | 488 | 475.46 |
| Change | (2,082,022,377) | 835,165 | 2,529,719,459 | 1,781,797,292 | **2,230,329,539** | 26 | 20 |
| | -35.9% | 31.1% | 91.8% | 9.5% | **8.1%** | 5.6% | 4.4% |

Stenson Decl., Ex. S
P. 28 of 73

The Governor's budget for the Medicaid program of $29.6 billion total funds is a $2.2 billion, or 8.1%, increase from the current service level. General Fund decreases $2.1 billion, or 35.9%, in the Governor's budget due primarily to the assumption that provider taxes on hospitals and insurers are renewed. The proposed budget adds 26 positions (20.00 FTE) for a total of 488 positions (475.46 FTE) in the Medicaid program.

## Revenue Changes

The Governor's Budget includes the following revenue changes that result in reduced General Fund expenditures totaling $1.5 billion the Medicaid program:

- Renewal of the Hospital Provider Tax on both Diagnostic Related Group (DRG) hospitals and A&B type hospitals. This is assumed to produce an additional $1.7 billion Other Funds revenue supplanting $1.1 billion General Fund (POP 421).
- Change in calculation of DRG Hospital Provider Tax to an effective 6% of net patient revenues that is inclusive of OHSU revenues. The budget proposes two scenarios. The first of these is to apply the change beginning January 1, 2026, which is assumed to produce an additional $308 million Other Funds revenue supplanting $216 million General Fund. The second scenario assumes the application of the effective 6% calculation for DRG hospitals as of July 1, 2025. This change is assumed to produce $93 million Other Funds revenue supplanting $65 million General Fund, which is in addition to the amount assumed by the application of the effective 6% calculation beginning in 2026, for total General Fund savings of $281 million.
- Renewal of the Insurer Tax that is assumed to produce an additional $170.2 million Other Funds revenue supplanting $133.9 million General Fund (POP 422).
- Expansion of tobacco taxes to include assessments on synthetic tobacco products is assumed to provide $8.4 million in new revenue offsetting General Fund expenditures for the Oregon Health Plan (POP 427 and HB 2528).

## Programmatic Savings

Additional programmatic General Fund savings totaling $700 million in the Governor's budget include:

- Projected applicable FMAP for Healthier Oregon emergent caseload costs is estimated to shift program costs by $120.1 million from General Fund to Federal Funds revenues (PKG 095).
- Decreased expenditures of $289 million General Fund, $335.6 million total funds, in HOP due to projected lower medical utilization rates (PKG 095).
- An increase of $291 million in IGT payments from OHSU that is anticipated to supplant $100.5 million General Fund supporting the Oregon Health Plan (PKG 095).
- An additional "placeholder" $60 million General Fund reduction in HOP expenditures for anticipated 2024 risk corridor payments (PKG 090).
- A shift in planned expenditures for Health Related Social Needs that moves $25.3 million General Fund, $212.2 million total funds, from the 2025-27 biennium to the 2027-29 biennium (PKG 095).

- The reversal of inflation factors applied to expenditures for the Oregon Health Plan, Fee For Service (FFS) or "open card" program reduces budgeted expenditures by $16 million General Fund, $41 million total funds (PKG 090).
- A negotiated reduction in Quality Incentive Pool funding for Oregon Health Plan Coordinated Care Organizations that assumes $44 million General Fund, $148 million total funds, savings (PKG 090).
- An assumed shift of eligible caseload from the Healthy Oregon Program to the Basic Health Plan that moves $42.8 million of General Fund expenditures to Federal Funds.
- The Governor's budget assumes that $17.5 million Other Funds revenues from 9-8-8 Telecom Taxes will be available in excess of crisis call center operational costs to supplant current service level General Fund budgeted activities related to behavioral health crisis intervention and response.

The Governor reduced expenditures in most OHA programs for Attorney General costs, statewide service charges, and unspecified General Fund-supported services and supplies. These reductions total $1.6 million General Fund, $5,408 Other Funds, and $198,241 Federal Funds in the Medicaid program.

## Significant Investments

**Maternity Services in Hospitals** - One-time funding of $35 million General Fund, $125 million total funds is included in the Governor's budget as a short-term enhancement to help stabilize maternity services statewide.

**Essential Healthcare Worker Trust** - A follow-on, one-time General Fund investment of $5 million that is anticipated to be matched with $7.5 million federal Medicaid funds for OHA to make supplemental payments to long-term care employers participating in the Oregon Essential Workforce Health Care Program established by SB 800 (2021) providing long-term care workers access to health insurance.

**Disproportionate Share Hospital (DSH3) Program** - An increase of $25 million General Fund to be used as state matching funds leveraging an additional $27 million in Federal Funds for the Disproportionate Share Hospital (DSH) program.

**Graduate Medical Education** - A one-time investment of $4 million General Fund leveraging an additional $5 million Federal Funds is included to support graduate medical education (GME) programs outside of the Oregon Health and Sciences University. Additionally, expenditure limitation of $40.1 million Other Funds and $55.5 million Federal Funds is included in the Governor's budget to support leveraged payments for graduate medical education programs at OHSU.

**Behavioral Rehabilitation Services** - $10.4 million General Fund, $20.3 million total funds to support Behavioral Rehabilitation Services (BRS); a Medicaid service for youth with severe behavioral challenges. These services have been primarily used in foster care settings by Oregon Department of Human Services and the juvenile justice system by Oregon Youth Authority. BRS outside of these settings are limited. The funding includes support for the establishment of 10 positions (7.50 FTE) for the initial implementation and administration of the program. $3 million General Fund is earmarked for start-up grants for providers. The services would be made available statewide to OHP eligible members through age 20. This is a "Medicaid direct" service that would be realized via the fee for service (FFS) program rather than being included in the capitation model for coordinated care organizations (CCOs).

Stenson Decl., Ex. S
P. 30 of 73

## Policy Option Packages

**POP 408 Medicaid Benefits for Incarcerated Persons** - In July 2024, the Centers for Medicare and Medicaid Services (CMS) approved a request by OHA to provide Medicaid coverage to incarcerated individuals up to 90 days prior to release as part of the state's 1115 Medicaid waiver. Requested funding of $14.3 million General Fund, $49.7 million Federal Funds, and the authority to establish seven positions (5.75 FTE) is included in the Governor's budget for the program that is slated to begin in January 2026. Current Oregon statute prohibits incarcerated individuals from coverage under Medicaid. As introduced, SB 844 includes a revision to statute that would require enrollment of a person eligible for pre-release medical assistance benefits under the federal waiver to be enrolled.

**POP 417 Healthy Oregon Program Enhancements** - The Governor proposes to add $22.7 million General Fund to extend Health Related Social Needs (HRSN) and Youth with Special Health Care Needs (YSHCN) benefits to Heathier Oregon Program participants. The HRSN benefits that include assistance with climate-related challenges, housing assistance, and nutritional assistance are provided to Oregon Health Plan (Medicaid) participants under the state's 1115 Medicaid waiver. The YSHCN benefit provides early and periodic screening, diagnostic and treatment coverage, enhanced vision and dental benefits, and enhanced care coordination and monitoring for youth between 19 and 25 years old that live with or are at risk of having a chronic health condition or unmet health care needs including: physical, intellectual and developmental disabilities; long-standing physical health conditions like asthma, diabetes, or spina bifida; and behavioral or mental health conditions like depression or substance use disorder. This package also includes an additional $2 million General Fund to make modifications to the state's Medicaid eligibility system to accommodate this extension of benefits.

**POP 556 Certified Community Behavioral Health Clinic Expansion** - Increased General Fund of $14.1 million and Federal Funds expenditure limitation of $33.7 million is included for a statewide expansion of the Certified Community Behavioral Health Clinic system. The current funding supports 12 clinics as a part of a federal demonstration waiver. The funding would allow for the integration of an additional 15 clinics and the addition of two supporting positions (1.50 FTE) at OHA. This statewide expansion is intended to be integral to securing federal approval for a state plan amendment to secure ongoing program funding.

Stenson Decl., Ex. S
P. 31 of 73

2025-27 Budget Review - Oregon Health Authority

# Behavioral Health

| | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| General Fund | - | - | 586,595,192 | 732,434,368 |
| Lottery Funds | - | - | 22,497,136 | 21,922,430 |
| Other Funds | - | - | 519,228,691 | 581,774,720 |
| Federal Funds | - | - | 309,115,519 | 304,478,920 |
| **Total Funds** | **-** | **-** | **1,437,436,538** | **1,640,610,438** |
| Positions | - | - | 225 | 249 |
| FTE | - | - | 221.79 | 245.79 |

* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

The Behavioral Health program includes the budgets for the Alcohol and Drug Policy Commission (ADPC), the Systems of Care Advisory Council (SOCAC), the Opioid Settlement Prevention, Treatment, and Recovery Board (OSPTR), the Measure 110 Oversight and Accountability Council (OAC), and the Behavioral Health Crisis System Advisory Committee. The division manages the 988 behavioral health crisis line, and programs addressing behavioral health housing, behavioral health workforce development, alcohol and drug addiction prevention, and aid and assist program funding for individuals found not mentally competent to aid in their own defense in a criminal proceeding.

The budget is comprised of two main components: community mental health services (including suicide prevention, intervention, and post-suicide response) and addiction services (including substance use disorder and problem gambling prevention and treatment).

The Behavioral Health program administers contracts and agreements with community mental health programs, non-profit providers, and tribes to develop and administer behavioral health services. Services are delivered in outpatient and residential facilities, schools, hospitals, and other community settings. The goal of these programs is to deliver evidence-based services in the least restrictive and most integrated setting and restore individuals to the highest level of functioning possible. They employ peer support specialists, qualified mental health professionals, psychologists, psychiatrists, psychiatric nurse practitioners, qualified health service providers, other independently licensed providers, certified alcohol, drug, and gambling addiction counselors, and personal care providers.

State law establishes the framework for publicly funded mental health services, which are largely administered by community mental health programs (CMHPs). Each of Oregon's 36 counties has either a county-run CMHP or contracts with a separate organization to serve as its CMHP. Subject to available funds, CMHPs offer an array of mental health and addiction services, such as outpatient and residential care, aftercare for persons released from hospitals, screening and evaluation, crisis stabilization, and medication monitoring. A key role of CMHPs is providing pre-commitment services that help prevent individuals from being admitted to the Oregon State Hospital. Like community mental health services, addiction treatment, recovery, and prevention services are offered throughout the state by CMHPs, tribes, CCOs, hospitals, and residential and non-residential treatment facilities. Some of these entities

Stenson Decl., Ex. S
P. 32 of 73

also receive funding as members of Behavioral Health Resource Networks through grant allocations from Marijuana Tax revenue.

## Funding Supporting Behavioral Health Programs

General Fund supports roughly 40.8% of total expenditures for the Behavioral Health program at the current service level. The largest share of this funding supports mental health services, primarily through the CMHP system. A smaller amount is budgeted for addiction services and is used as maintenance-of-effort for the state's Temporary Assistance for Needy Families block grant administered by the Oregon Department of Human Services.

Allocations of Lottery Funds are made from the Veterans' Services Fund to support physical and behavioral health programs specifically for veteran beneficiaries, and from the Administrative Services Economic Development Fund to support gambling addiction prevention programs. The current service level Lottery Funds expenditures include $2.8 million for veterans' services and $19.7 million for gambling addiction programs.

Federal Funds revenue supports $138.5 million, or 21.5%, of the current service level budget for the 2025-27 biennium. These revenues include the Mental Health Block Grant (MHBG), Substance Abuse Prevention and Treatment (SAPT) Block Grant, and State Opioid Response Grant programs.

**Other Funds**

Taxes on tobacco products sold in Oregon support multiple programs across the agency. As of the December 2024 revenue forecast, $24.6 million will be available to support behavioral health programs in the 2025-27 biennium.

The Tobacco Master Settlement Agreement (TMSA) revenues are payments made to settling states in perpetuity beginning in 2000. A portion of the settlement funds programs at OHA. TMSA revenues support Behavioral Health program expenditures of $14.2 million in the 2023-25 approved budget and $12 million in the 2025-27 current service level.

Retail recreational marijuana taxes continue to fund community mental health and substance use disorder services, and early intervention and treatment services. Biennial funding for these programs is estimated to be $25.5 million in 2023-25 and $27.1 million in 2025-27.  Ballot Measure 110 (modified by SB 755 (2021) and HB 4056 (2022)) redistributed a significant portion of marijuana tax revenue to fund the Behavioral Health Resource Networks (BHRNs) and Access to Care grants for drug treatment and recovery services through the Drug Treatment and Recovery Services Fund (DTRSF). Revenues for the DTRSF are estimated to be $230.9 million in the 2023-25 biennium and $200.7 million in the 2025-27 biennium.

Opioid settlement revenues of roughly $22 million are anticipated to be available in the 2025-27 biennium due to unexpended allocations to the Behavioral Health program in the 2023-25 biennium. Additional settlement revenues of $36.2 million are anticipated in the 2025-27 biennium for prevention, recovery, and treatment programs.

Beer and wine taxes are collected by the Oregon Liquor and Cannabis Commission (OLCC). Based on the December 2024 forecast, revenue for the 2025-27 biennium is includes an estimated $18.3 million for

Stenson Decl., Ex. S
P. 33 of 73

state and local government alcohol and drug programs. OHA retains 60% of this revenue ($11 million) with the remaining 40% ($7.3 million) transferred to counties.

HB 2757 (2023) established the 9-8-8 Trust Fund to enhance the statewide coordinated crisis system, including maintaining and improving the 9-8-8 suicide prevention and behavioral health crisis hotline. The measure introduced a monthly tax of 40 cents per line for consumers and retail subscribers with telecommunications or interconnected Voice over Internet Protocol (VoIP) services, and 40 cents per transaction for prepaid telecommunications services. The tax is projected to generate approximately $53.8 million for the 2025-27 biennium.

## BUDGET ENVIRONMENT

Since 2021, the Legislature has invested an additional $824.4 million General Fund, $2.35 billion total funds, into the behavioral healthcare system. Some of these were one-time investments in infrastructure and capacity, but many persist as part of the agency's ongoing budget. These include the 988 Behavioral Health Crisis line, increased behavioral health provider reimbursement rates, the Behavioral Health Resource Network and associated funding from Marijuana Taxes, and support for mobile crisis teams.

Substance use disorder remains prevalent in Oregon. Need for additional capacity, licensed councilors and facilities continue to be part of the budget discussion for the program as well as co-occurring SUD and mental health issues.

Oregon began a more holistic approach to behavioral health services with the pilot and expansion of Certified Community Behavioral Health Clinics (CCBHCs) to move toward integrated physical and behavioral healthcare. The majority of these clinics are within the Community Mental Health Programs (CMHPs). Funding for these programs has increased since 2021 and additional program funding has been requested by the agency for the 2025-27 biennium.

Capacity issues at the Oregon State Hospital continue to shift service demands to community restoration services, including aid and assist services. This may be expressed as requests for expanded local government grants for operations or infrastructure.

The recently proposed OHA rule that would stop Medicaid reimbursements to behavioral health associate therapists and social workers who practice independently of an in-network clinic may have indeterminate impacts on the Behavioral Health division budget. Ostensibly, the rule change is intended to encourage associate therapists to practice in a clinical setting that sees a larger number of Medicaid patients, and patients with higher acuity needs.

The delivery and financing of publicly funded behavioral health services is dependent on the relationship between the Oregon Health Authority, Coordinated Care Organizations, and Community Mental Health Programs, and the behavioral health workforce. Each of these entities may share certain goals pertaining to outcomes, but may diverge on strategies and motivations in achieving those outcomes. This tension is likely to be expressed in competing budgetary proposals in the upcoming legislative session.

## CURRENT SERVICE LEVEL

Direct comparison of expenditures between the legislatively approved budget for the 2023-25 biennium and the current service level budget are imprecise due to the structural changes in the budget. The budgetary adjustments to the base budget that ultimately result in the current service level for the Behavioral Health program that are described in this section are intended to illustrate that change as accurately as possible, but non-substantive errors may exist.

The current service level budget for the Behavioral Health Division of $586.6 million General Fund, $1.4 billion total funds, and 249 positions (245.79 FTE). CSL includes $2.1 million General Fund for the Alcohol and Drug Policy Commission and $7.8 million General Fund for the Systems of Care Advisory Council.

### Program Phase-Ins

**988 Program** - A limited duration Operations and Policy Analyst 2 position is proposed to be phased in to the current service level in the HSD Administration program. The agency states that the position was funded via a federal grant award for 16 months in the 2023-25 biennium. The federal grant has been extended for an additional 24 months; the entire 2025-27 biennium. There is no net change to expenditure limitation resultant from the addition of the position as the agency will reduce services and supplies expenditures from the federal grant funds to accommodate the $236,422 personal services cost for the position.

**ADPC Limited Duration Positions** - A study related to the barriers and best practices for youth accessing opioid use disorder treatments, and increasing access to opioid use disorder medications was required to be undertaken by the Alcohol and Drug Policy Commission in HB 4002 (2024). Three limited duration positions were authorized to be established to address this work in the 2023-25 biennium. The current service level phases in these positions for an additional six months in the 2025-27 biennium at a cost of $200,970 total funds to complete the work.

**Behavioral Health Housing Incentive Fund** - The Behavioral Health Housing Incentive Fund was established by HB 2316 (2021) to provide funding for the development of community-based housing, including licensed residential treatment facilities, for individuals with mental illness and individuals with substance use disorders; and crisis intervention services, rental subsidies, and other housing related services to help keep individuals with mental illness and individuals with substance use disorders safe and healthy in their communities. The monies in the fund are from the proceeds of bond issuances and subsequent interest earnings, including amounts transferred to the fund from the repealed Housing for Mental Health Fund. $20 million in net proceeds from lottery revenue bonds issued late in the 2021-23 biennium were deposited in the fund. Package 021 carries forward $19.2 million Other Funds expenditure limitation from 2023-25 biennium to the 2025-27 biennium for the expenditure of these monies.

**Community Acute Psychiatric Facility Capacity** - The Community Acute Psychiatric Facility Capacity Program Fund was established in HB 5030 (2023) for the purpose of depositing $50 million in net lottery revenue bond proceeds to increase community acute psychiatric facility capacity. $25 million in bonds were issued in May 2024, but the remaining $25 million in bonds are scheduled to be issued in spring 2025. The expenditure limitation for the spring 2025 issuance is phased in to the current service level to

Stenson Decl., Ex. S
P. 35 of 73

allow for the expenditure of those bond proceeds in the 2025-27 biennium. There is a companion item in package 022 that phases out the original $50 million limitation provided in 2023-25.

**Clinical Supervision and Behavioral Workforce Development** - HB 2949 (2021) provided an $80 million Other Funds expenditure limitation for one-time American Rescue Plan Act (ARPA) State Fiscal Recovery Funds received by the Oregon Department of Administrative Services (DAS) and transferred to OHA for two behavioral health grant programs established by the measure. Expenditure limitation for the remaining ARPA funding of $10.7 million is re-established at the current service level. Notably, HB 2949 authorized the establishment of 14 permanent, full-time positions to administer the program. With the remaining funding anticipated to be fully expended in the 2025-27 biennium, continuation of these positions beyond the upcoming biennium merits evaluation.

**Regional Development and Innovation -** HB 5024 (2021) included an appropriation of $65 million General Fund and $65 million Other Funds for ARPA State Fiscal Recovery Funds received by DAS and transferred to OHA to increase statewide capacity of licensed residential facilities serving people with behavioral health conditions. Of the $65 million in ARPA funding allocated, OHA has expended $204,090 to date, but has contracted commitments for the remaining funds that it anticipates distributing prior to January 1, 2027. Other Funds expenditure limitation of $64.8 million is phased in to CSL budget for the 2025-27 biennium to facilitate these disbursements.

**Culturally and Linguistically Specific Mobile Health Unit Pilot Program -** HB 4052 (2022) established a pilot grant program at OHA for the operation of two culturally and linguistically specific mobile health units. The pilot program was assumed to continue through the 2023-25 biennium and wrap-up in the 2025-27 biennium. A feasibility study on expanding mobile health units statewide is required, as well as final reports on implementation of the pilot program by the end of June 2026. Limited duration positions in the Behavioral Health Administration program that were eliminated in the base budget are phased in for 24 months in the 2025-27 biennium at a cost of $627,130 total funds. Behavioral Health Programs funding for operational grants of $1.6 million is phased in to support 18 months of mobile health unit operations.

**Drug Treatment and Recovery Services Fund** - Other Funds expenditure limitation of $20.6 million is added to the base budget to align expenditure authority with Marijuana Tax revenues anticipated to be available from the Drug Treatment and Recovery Services Fund during the 2025-27 biennium as of the May 2024 forecast.

**Lottery Funds Revenue Forecast**  - Lottery Funds expenditure limitation is increased by $1.5 million in accord with the June 2024 revenue forecast. Funding is used to support gambling addiction prevention programs.

## Program Phase-Outs

**Adult Intensive Services and Diversion** - The 2023-25 legislatively adopted budget included a one-time increase of $4.9 million General Fund, $8,631 Other Funds, $1.6 million Federal Funds, and seven positions (5.25 FTE), for a total of $6.5 million in SB 5506 (2023), to improve mental health programs by strategically investing in jail diversion and civil commitment programs. Package 022 removes both the funding and the position authority from the current service level budget.

Stenson Decl., Ex. S
P. 36 of 73

**Behavioral Health Housing Incentive Fund** - The Behavioral Health Housing Incentive Fund was established by HB 2316 (2021) to provide funding for the development of community-based housing, including licensed residential treatment facilities, for individuals with mental illness and individuals with substance use disorders; and crisis intervention services, rental subsidies, and other housing related services to help keep individuals with mental illness and individuals with substance use disorders safe and healthy in their communities. The monies in the fund are from the proceeds of bond issuances and subsequent interest earnings, including amounts transferred to the fund from the repealed Housing for Mental Health Fund. $20 million in net lottery revenue bond proceeds issued late in the 2021-23 biennium were deposited in the fund. Expenditure limitation for the entire $20 million was established in the 2023-25 biennium and carried forward into the base budget for the 2025-27 biennium. Package 022 phases out that $20 million Other Funds expenditure limitation, but as noted in the discussion of budget phase-ins, Other Funds expenditure limitation for the remaining, unexpended balance of $19.3 million is re-established in package 021.

**Prior Biennia Behavioral Health Investments** - Behavioral Health Investments that were carried-forward from the 2021-23 biennium to the 2023-25 biennium in the budget are being phased out of the current service level budget for the 2025-27 biennium. These include:

- $51.2 million General Fund and $29.9 million Other Funds expenditure limitation for an allocation of ARPA State Fiscal Recovery Funds for regional behavioral health facility investments that were made in the 2021-23 biennium, but were not able to be fully expended in that biennium.
- $56.7 million Other Funds expenditure limitation for an allocation of ARPA State Fiscal Recovery Funds authorized in HB 2949 (2021) for the Health Care Provider Incentive Fund.

**Opioid Harm Reduction Clearinghouse** - The budget includes a reduction of $40 million Other Funds expenditure limitation to phase out expenditure authority that was provided in the 2023-25 biennium for an allocation of opioid settlement proceeds that was used to fund the harm reduction clearinghouse, which provides naloxone and other harm reduction supplies to organizations in the community to reduce the risk of overdose.

**Community Mental Health Deflection Programs** - One-time funding of $9.8 million General Fund for Community Mental Health Deflection Programs as outlined in HB 4002 (2024) and provided in HB 5204 (2024) is phased out in package 022. Restoration of this funding is included in the Governor's budget proposal.

**Community Acute Psychiatric Facility Capacity** - The Community Acute Psychiatric Facility Capacity Program Fund was established in HB 5030 (2023) for the purpose of depositing $50 million in net lottery revenue bond proceeds to increase community acute psychiatric facility capacity. Package 022 phases out the original $50 million in Other Funds expenditure limitation provided in the 2023-25 biennium. Package 021 re-establishes $25 million Other Funds expenditure limitation to allow the program to expend the remaining bond proceeds in the upcoming biennium.

**Recovery Housing Funding** - One-time funding of $18 million General Fund for 27 recovery housing projects that was provided in SB 1530 (2024) is phased out of the budget at the current service level.

Stenson Decl., Ex. S
P. 37 of 73

**Air Conditioner and Air Filter Deployment Program** - One-time funding of $3.5 million General Fund for the Air Conditioner and Air Filter Deployment program as outlined in ORS 431A.430 that was provided in SB 1530 (2024) is phased-out in package 022.

**Drug Treatment and Recovery Services Fund** - A reduction in expenditure limitation of $17.5 million Other Funds is included in the current service level to adjust expenditure levels in accord with anticipated 2025-27 Marijuana Tax revenues and the balance of unexpended 2023-25 revenues in the Drug Treatment and Recovery Services Fund (DTRSF). Total current service level expenditures from the fund in the 2025-27 biennium are $219.3 million.

**Non-Measure 110 Marijuana Tax Expenditures** - A $3.6 million Other Funds expenditure limitation reduction is included in CSL to adjust expenditure levels in accord with anticipated 2025-27 revenues and the balance of unexpended 2023-25 revenues for non-Measure 110 drug abuse prevention, intervention, and treatment prevention services. Total current service level expenditures from Marijuana Tax revenues allocated for these purposes in the 2025-27 biennium are $25.5 million.

**Beer, Wine, and Cider Tax Revenue** - An adjustment to phase out excess expenditure limitation of $1.3 million Other Funds is made to align CSL expenditures with anticipated revenues transferred to OHA from taxes on beer, wine, and cider that support substance use disorder treatment and addiction preventions programs.

**Criminal Fines Transfer to the Drug Treatment and Recovery Services Fund** - Recriminalization of certain drug-related offences and the repeal of Class E violations in HB 4002 (2024) negated the need for potential criminal justice system savings and Criminal Fines Account revenues generated from Class E violations to be transferred to the DTRSF. $39.3 million Other Funds expenditure limitation from the DTRSF that was included in the 2025-27 base budget, for expenditure of these transferred funds, is phased out of the OHA budget at the current service level.

**Culturally and Linguistically Specific Mobile Health Unit Pilot Program** - HB 4052 (2022) established a pilot grant program at OHA for the operation of two culturally and linguistically specific mobile health units. The pilot program was assumed to continue through the 2023-25 biennium and wrap-up in the 2025-27 biennium. A feasibility study on expanding mobile health units statewide is required, as well as final reports on implementation of the pilot program by the end of June 2026. Package 022 phases out $2.1 million General Fund that was authorized in the 2023-25 biennium for operational grants. A portion of this funding is re-established in package 021 to support operational grants for 18 months in the 2025-27 Biennium.

**Alcohol and Drug Policy Commission Study (HB 4002)** - Funding and position authority for limited duration positions to support the Alcohol and Drug Policy Commission in conducting a study of barriers and best practices for youth accessing opioid use disorder treatment and increasing access to opioid use disorder medications as directed in HB 4002 (2024) was provided in HB 5204 (2024). The timeline to produce the required reports resulting from the study required carrying a portion of the authorized funding and the limited duration positions forward into the 2025-27 for a period of six months, with the excess $468,237 General Fund and $3,219 Federal Funds being phased out at the current service level.

**Behavioral Health Services Cost Studies** - HB 4092 (2024) directed OHA to conduct studies to determine the funding required for counties and community mental health programs to provide statutorily mandated behavioral health services related to populations adjudicated to receive service at the Oregon

Stenson Decl., Ex. S
P. 38 of 73

2025-27 Budget Review - Oregon Health Authority

State Hospital or in a community setting, and behavioral health treatment and prevention services, generally. Of the $1.5 million General Fund, $301,051 Other Funds, and $106,143 Federal Funds provided to support this work in the 2023-25 biennium, $879,339 General Fund and $154,980 Other Funds are phased out of the budget at the current service level in the HSD Administration program with the remaining amounts carried forward to the 2025-27 budget for the completion of the studies.

**Youth Behavioral Health Professions Study** - A General Fund appropriation of $196,253 was made to OHA in HB 4151 (2024). The measure directed the System of Care Advisory Council (SOCAC) to develop a report on options to create state-issued professional authorization for existing and emerging behavioral health professions and for determining the structures and supports needed to sustain the youth behavioral health workforce. A final report on the study is to be completed by December 15, 2025. Contracted facilitation services funding of $120,997 General Fund is phased out of the base budget, with the remaining necessary funding to complete the study and report of $75,256 continuing in the 2025-27 biennium.

**Drug Endangered Children** - The current service level phases out a one-time appropriation of $750,000 General Fund that was made in HB 5204 (2024) for the Oregon Health Authority to permit the Systems of Care Advisory Council to partner with, and financially support via grants or other payments to, an established national organization that focuses on education and training regarding drug endangered children.

## Inflation Factors

Inflation factors applied to the Behavioral Health program base budget result in additional expenditures at the current service level of $27.9 million General Fund, $55.2 million total funds. Most of this increase is attributable to standard inflationary factors. Roughly $6 million is due to allowable inflation on medical expenditures. Medical inflation is calculated at a compounding rate of 3.4% per year, or 6.9% for the biennium.

## Funding Changes

The current service level budget for the Behavioral Health program shifts $6.9 million of budgeted expenditure from Other Funds to the General Fund, net of a reduction in General Fund resultant from a forecasted increase in Marijuana Tax revenues. The following table summarizes these funding changes:

Package 050 –

| Fund Shifts | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds |
|---|---|---|---|---|---|
| Marijuana Tax Forecast Changes | -$1,769,394 | - | $1,769,394 | - | - |
| Tobacco Tax Revenue Changes | $2,149,383 | - | -$2,149,383 | - | - |
| Inflation-related Unrealizable Revenue Adjustments | $4,378,772 | - | -$4,378,772 | - | - |
| Tobacco Master Settlement Agreement Forecast Change | $2,182,108 | - | -$2,182,108 | - | - |
| **Total** | **$6,940,869** | **-** | **-$6,940,869** | **-** | **-** |

Stenson Decl., Ex. S
P. 39 of 73

Reductions in forecasted revenues from Tobacco Product taxes and the Tobacco Master Settlement Agreement require the backfill of General Fund to continue supported programs at the current service level.

Adjustments totaling $4.4 million are included to move inflation-related costs for budgeted expenditures that would have otherwise been paid for using Other or Federal Funds revenues, but are backfilled with General Fund in the budget at the current service level due to limitations on the availability of those revenues.

## GOVERNOR'S BUDGET SUMMARY

|  | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds | Positions | FTE |
|---|---|---|---|---|---|---|---|
| Current Service Level | 586,595,192 | 22,497,136 | 519,228,691 | 309,115,519 | **1,437,436,538** | 225 | 221.79 |
| Governor's Budget | 732,434,368 | 21,922,430 | 581,774,720 | 304,478,920 | **1,640,610,438** | 249 | 245.79 |
| Change | 145,839,176 | (574,706) | 62,546,029 | (4,636,599) | **203,173,900** | 24 | 24.00 |
|  | 24.9% | -2.6% | 12.0% | -1.5% | **14.1%** | 10.7% | 10.8% |

The Governor's budget for the Behavioral Health program is an increase of $145.8 million General Fund, $203.2 million total funds, from the current service level (CSL). The total budget of $1.6 billion is a 14.1% increase from CSL and includes the addition of 24 positions (24.00 FTE).

The Governor reduced expenditures in most OHA programs for Attorney General costs, statewide service charges, and unspecified General Fund-supported services and supplies. For the Behavioral Health program, these reductions total $933,778 General Fund, $996,738 total funds.

## Revenue changes

The Governor's budget assumes that $17.5 million Other Funds revenues from 9-8-8 Telecom Taxes will be available in excess of crisis call center operational costs to supplant current service level General Fund budgeted activities related to behavioral health crisis intervention and response (PKG 090).

A reduction in projected available funding from the Department of Justice, Criminal Fines Account, necessitates an increase in General Fund expenditures of $1.5 million to maintain the Intoxicated Driver Program (IDP) at the current service level. The IDP provides screening, education, and substance use disorder treatment services for individuals under diversion agreements, or who have been convicted of driving while under the influence of intoxicants (PKG 090).

A reduction in Marijuana Tax revenues supporting expenditures from the Drug Treatment and Recovery Services Fund (DTRSF) of $11.9 million is assumed due to changes in forecasted revenue as of December 2024. This reduction is in addition to the $17.5 million reduction that is included in the current service level due to prior revenue forecasts. This reduction impacts the available funding for statewide Behavioral Health Resource Networks (BHRNs) (PKG 090 and 095).

Stenson Decl., Ex. S
P. 40 of 73

## Carryforward Expenditure Authority

Community Acute Psychiatric Facility Capacity Program was funded with net lottery bond proceeds for grants to increase community acute psychiatric facility capacity. The CSL budget includes two expenditure limitation adjustments related to this funding. The 022 package phases-out the original $50 million in Other Funds expenditure limitation provided in the 2023-25 biennium. Package 021 re-establishes $25 million Other Funds expenditure limitation to allow the program to expend the remaining bond proceeds in the upcoming biennium, as those bonds are anticipated to be issued in spring 2025. The Governor's budget adds back in the $25 million that was phased out at CSL, re-establishing expenditure limitation for the entire $50 million of net bond proceeds in the 2025-27 biennium. OHA has reported that $48.4 million of this total has been awarded, including a tribal set-aside of $5 million. Nine non-tribal entities have been awarded funding of between $1.1 million and $15 million. $1.6 million has yet to have been awarded and the agency notes that prior to awarding additional funding, it plans on tracking the progress of existing awardees to address possible project cost overruns.

Expenditure limitation for the remaining, unexpended balance of $19.3 million from $20 million in net lottery bond proceeds deposited in the Behavioral Health Housing Incentive Fund established by HB 2316 (2021) during the prior biennium was carried forward to the 2025-27 biennium as part of the current service level. This funding is for the development of community-based housing, including licensed residential treatment facilities, for individuals with mental illness and individuals with substance use disorders; and crisis intervention services, rental subsidies, and other housing related services to help keep individuals with mental illness and individuals with substance use disorders safe and healthy in their communities. The Governor's budget includes a $2.9 million upward adjustment of this expenditure limitation to account for accrued interest earnings in the fund.

## Significant Investments

**Intensive In-home Behavioral Health Services** – The Governor's budget includes $7 million General Fund for distribution to community mental health programs to expand the existing intensive in-home behavioral health services program for youth to youth with substance use disorders and to recruit providers to work under the new model. This program helps children, youth, and young adults through age 20, and their families, who have complex and intensive behavioral health symptoms, and multisystem needs who require more frequent and intensive mental health treatment to help them back into the community from residential care or hospitalization.

**Behavioral Health Community Navigators** - The Governor's budget adds $2.9 million General Fund to the $6 million General Fund included in CSL from the investments in prior biennium to help people on Aid and Assist orders at the Oregon State Hospital (OSH) navigate their transition back to the community. Of the total increase, $2.4 million is budgeted in the Behavioral Health Program and includes the addition of an Operations and Policy Analyst position (1.00 FTE) to provide statewide coordination, reporting, and program administration, and $2 million for distribution to community mental health programs (CMHPs). The remaining $531,308 is in the Oregon State Hospital program supporting the addition of two Resource Coordination positions (2.00 FTE) to assist in connecting OSH discharges with local and community services and resources appropriate for individualized transition plans. The original $6 million was included in SB 5525 (2023), policy package 803, to pilot the program.

Stenson Decl., Ex. S
P. 41 of 73

The added $2 million General Fund for distribution to CMHPs is to expand the program to the Southern Oregon and the North Coast regions.

**Statewide Civil Commitment Coordinators** - A one-time investment of $4.9 million General Fund, $6.5 million total funds, to support expansion of jail diversion through CMHP adult intensive services programs was included in the agency's 2023-25 budget, but phased out at CSL. The Governor's budget seeks to reestablish a portion of this funding; $1.5 million General Fund, $3.3 million total funds, and the authorization for seven positions (7.00 FTE) to coordinate services statewide for people going through the civil commitment process.

**Community Mental Health Program Deflection and Diversion Programs** - The Governor's budget requests $14.7 million General Fund, $16.3 million total funds, for distribution to CMHPs to restore and expand funding that was phased out of the agency's CSL budget for two related purposes. The first of these includes the full $4.9 million General Fund for adult intensive services and diversion programs that had been phased out of CSL even though the prior biennium funding provided in SB 5506 (2023) was inclusive of position costs, which are the subject of a separate funding request for statewide civil commitment coordinators in the current biennium.  The second component is $9.8 million General Fund that had been provided on a one-time basis to OHA for distribution to CMHPs to support coordination and provision of services for deflection programs that assist individuals who may have substance use or other behavioral health disorders to access treatment, recovery support, housing, case management, or other services to prevent interactions with law enforcement, lead to conviction and incarceration, or any other engagement with the criminal justice system.

**Opioid Settlement Funds** - Increased expenditure limitation of $32.8 million Other Funds is included in the Governor's budget for expenditure of existing, allocated funding in the Opioid Settlement Prevention Treatment and Recovery (OSPTR) Fund and anticipated new payments of $15.4 million in the 2025-27 biennium under the Opioid Settlement agreement. This brings total biennial expenditure authority from the fund to $77.1 million.

## Policy option packages

**POP 550 Behavioral Health Workforce** - The current service level includes expenditure limitation for $10.7 million of unexpended ARPA State Fiscal Recovery Funds from an allocation that was orginally made in HB 2949 (2021) for two behavioral health workforce grant programs established by the measure. Notably, HB 2949 authorized the establishment of 14 permanent, full-time positions to administer the program although the original funding was one-time only. POP 550 swaps funding for the program administration positions, decreasing Other Funds, and increasing General Fund by $588,542 and Federal Funds by $838,673.  Additionally, the package invests an additional $24.3 million General Fund into the program for ongoing grants.

 **POP 551 Harm Reduction Clearinghouse** - The Governor has included $10.4 million General Fund to continue support for the harm reduction clearinghouse. This program enables the low-cost acquisition of essential harm reduction supplies by community-based organizations and expands access to medications like naloxone, supporting safer substance use practices that prevent overdose, infections, and injuries. Funding in the package includes support for two new program administration positions (1.50 FTE).

Stenson Decl., Ex. S
P. 42 of 73

**POP 552 Behavioral Health Residential Programs** - In addition to the $50 million in lottery bond proceeds carried forward for behavioral health housing, the Governor is seeking $100 million General Fund to expand behavioral health residential treatment and support services. The funding is intended to increase the capacity of residential programs by adding new psychiatric residential treatment facilities and substance use disorder (SUD) treatment beds, focusing on mandated populations as well as regional and cultural diversity. Use of the requested funding includes purchasing, constructing, or renovating facilities, stabilizing current providers, and supporting culturally and linguistically diverse services.

**POP 557 Alcohol and Drug Policy Commission** - This package requests $750,181 General Fund and $92,682 Federal Funds to continue three limited duration positions (2.25 FTE) for 18 months each in the 2025-27 biennium that were authorized in the prior biennium to conduct a study of barriers and best practices for youth accessing opioid use disorder treatment and increasing access to opioid use disorder medications as directed in HB 4002 (2024). The total funding requested also includes an ongoing increase of $225,000 General Fund for strategic plan contracts.

**POP 559 System of Care Advisory Council** - This package requests an additional $571,098 General Fund for the addition of three new administrative support positions (2.25 FTE) for the System of Care Advisory Council (SOCAC). Established by Senate Bill 1 in 2019, SOCAC is a 25-member council tasked with improving state and local youth service systems through centralized policy development and planning.

## OTHER SIGNIFICANT ISSUES

The primary budget bill for OHA, SB 5525 (2023), included funding in two policy packages that also requested that the agency report on specific activities or outcomes related to the funding provided.

**Behavioral Health Facility Investments** - A budget note accompanying policy option package 801 requires OHA to submit a report on investments made to increase behavioral health facility capacity in Oregon during the 2021-23 and 2023-25 biennia. This report should include the number and types of beds provided or anticipated, how investments are balanced between supporting the new capacity on an on-going basis and building additional beds, and data demonstrating how the medical and mental health system outcomes are impacted by the investments. This report is to be presented no later than February 1, 2025, to the Human Services Subcommittee of the Joint Committee on Ways and Means.

**Certified Community Behavioral Health Clinics** - A budget note accompanying policy option package 803 requires OHA to continue to administer the certified community behavioral health clinic (CCBHC) demonstration program and submit a report to the Human Services Subcommittee of the Joint Committee on Ways and Means no later than February 1,2025, that details specific investments and categorized spending in the 2021-23 biennium, the number of people served, barriers to having fully utilized available funds, specifics on health outcomes based on individual participant's results, reduced costs resulting from the program, recommendations on the whether to redirect funding from non-CCBHC programs to increase this program funding, and the impact of ending the pilot and discontinuing funding beyond the 2023-25 biennium.

Although the text of the budget note requested specific investments and categorized spending in the 2021-23 biennium, it is anticipated that the agency will report on the program and these specified issues using the most up-to-date information available at the time of the report.

# Health Policy and Analytics

|  | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| General Fund | 56,477,058 | 110,935,894 | 89,196,168 | 91,347,132 |
| Lottery Funds | 21,520 | 27,074 | 28,211 | 28,211 |
| Other Funds | 41,689,129 | 105,768,281 | 105,393,982 | 139,751,845 |
| Federal Funds | 31,144,514 | 49,651,820 | 57,523,862 | 57,636,319 |
| **Total Funds** | **129,332,221** | **266,383,069** | **252,142,223** | **288,763,507** |
| Positions | 218 | 311 | 283 | 298 |
| FTE | 202.40 | 286.79 | 278.58 | 289.95 |

* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

The Health Policy and Analytics (HPA) Division provides policy support, technical assistance, and access to health information statistics and tools for OHA programs, outside organizations, and providers participating in Oregon's health system. HPA includes the following offices:

- Office of Health Policy – supports the Oregon Health Policy Board, Medicaid Advisory Council, OHA programs, and other health care stakeholders. The office conducts policy analysis and development and provides technical assistance on primary care workforce development, resource leveraging, health system transformation grant development, and other topics.
- Office of Health Analytics – collects and analyzes utilization, quality, and financial data to evaluate OHA program performance; provides data for health system planning; analyzes trends across all payers and claims data; and performs actuarial analysis to support rate development and benefit design.
- Office of Delivery Systems Innovation – integrates clinical resources and policies to support implementation of the coordinated care model throughout OHA and all provider and payer organizations in the state.
- Office of Health Information Technology – coordinates policy development to achieve state and federal health reforms through the integration of health information technologies; leverages federal and other health IT funding opportunities; and collaborates across programs for planning and shared decision making, IT purchases, and service delivery.
- Office of Business Operations – partners with Shared Services offices and acts as a liaison to internal and external stakeholders related to operational functions.
- Oregon Health Insurance Marketplace – oversees and provides enrollment assistance for the health insurance products sold in Oregon through HealthCare.gov.
- Public Employees' Benefits Board (PEBB) / Oregon Educators Benefit Board (OEBB) – administers health care insurance and other employment benefits, such as short-term and long-term disability, for employees in state government, universities, and the K-12 system.

Program Funding

HPA is mostly supported by Other Funds revenue (41.8%). Other Fund revenues are derived from, and support, the All Payer All Claims system, Oregon Prescription Drug Program, Oregon Health Insurance Exchange, Health Care Incentive Fund, health care workforce data, ambulatory surgical data, inpatient data, and the Physician (or "J-1") Visa Waiver Program. Administrative expenses of the Public Employees Benefit Board and the Oregon Educators Benefit Board are also paid from Other Fund revenues from administrative assessments applied to monthly premiums paid by public entities.

General Fund, accounting for 35.4% of total program funding, is matched with federal Medicaid administrative dollars. The federal match rates vary depending on the type of work being performed.

HPA also receives federal grants through the Health Resources and Services Administration related to primary care and oral health workforce.

## BUDGET ENVIRONMENT

The work of the Health Policy and Analytics is supportive and derivative of programs throughout the agency. Therefore, the budget environment for HPA is shares many of the same issues and challenges of those programs.

The federal revenue OHA receives is tied to a significant body of federal law and administrative rules. This is particularly true with Medicaid, which is governed by waivers of certain federal regulations that allow Oregon to tailor its Medicaid services to the unique needs of the state. Medicaid waivers and corresponding amendments must be approved by the federal Centers for Medicare and Medicaid Services (CMS).

The change in the federal administration following the 2024 elections may result in a shift of policy at CMS regarding the renewal of state waivers.  Although the current 1115 waiver runs through the upcoming 2025-27 state biennium, the development of the next waiver period is anticipated to begin in the fall of 2025. HPA will be significantly involved with the waiver development for the next waiver period.

The Basic Health Plan that went live in July 2024 is subject to a Section 1331 Waiver that was approved by CMS in March 2024.  This program was initiated by HB 4035 (2022) with an implementation blueprint developed and submitted to CMS in 2023. Funding for the program planning and development were phased out of the 2025-27 CSL budget, but the funding and position authority for the associated administrative and policy development positions for the program were continued.

The implementation of the Basic Health Plan, including the move of individuals that were previously covered by the Oregon Health Plan due to temporary Medicaid expansion and the move of individuals from the Health Insurance Marketplace, changes the dynamics for insurers providing health care coverage through the marketplace, and is thought to result in increased policy premiums for plans sold through the marketplace. To address this issue, the state has embarked on a project to establish a state-based marketplace managed through the Oregon Health Insurance Marketplace program within the Health Policy and Analytics division. The Oregon state-based marketplace is intended to be fully implemented and ready to enroll participants for the 2026 calendar year by the end of September 2025.

Stenson Decl., Ex. S
P. 45 of 73

The initial procurement for the state-based system was cancelled due to claims of an undisclosed conflict of interest. It's not clear if this will result in a delay in the implementation timeline.

## CURRENT SERVICE LEVEL

The current service level budget for the Health Policy and Analytics division includes $89.2 million General Fund, $252.1 million total funds. The General Fund budget is a net decrease of $21.7 million from the 2023-25 legislatively approved budget due to the phase out of several one-time funding packages as detailed in the phase-outs section below. Roll-up costs for ongoing positions and programs authorized in the 2023-25 biennium total $2.9 million General Fund, $3.5 million Total Funds. A reversal of one-time reductions to the program's budget in the 2023-25 biennium increase expenditures at the current service level by $2.9 million General Fund.

### Program Phase-Ins

**Basic Health Plan Administration** - Although not typically anticipated in a phase-in package, OHA included the establishment of a project manager position in the Health Policy and Analytics program as part of the administration of the Basic Health Plan in package 021. The program proposes to "self-fund" the position by decreasing budgeted services and supplies expenditures by the same amount as the personal services costs for the new position; $236,337 General Fund.

**Universal Health Plan** - SB 1089 (2023) established a nine-member Universal Health Plan Governance Board within the Department of Consumer and Business Services (DCBS). The Board is charged with creating a comprehensive plan to finance and administer a Universal Health Plan by September 15, 2026. To aid in the Board's work, two limited duration positions were authorized in the Health Policy and Analytics program to provide subject matter expertise on federal Medicaid waivers, and to assist with interagency coordination and policy development. Package 021 phases in $72,066 General Fund and reauthorizes the limited duration positions for three months of the 2025-27 biennium.

### Program Phase-Outs

**Designated State Health Program funding for Health-Related Social Needs (1115 Waiver)** - $276,076 Other Funds and $276,076 Federal Funds supporting Health-Related Social Needs (1115 Waiver) activities is phased out of the current service level budget for the Health Policy and Analytics program to adjust the 2025-27 biennium budget to anticipated expenditures.

**Oregon Center for Nursing (HB 3396)** - A one-time, $5 million General Fund appropriation was made to OHA for distribution to the Oregon Center for Nursing in HB 3396 (2023). This funding and position-related services and supplies of $29,512 for two limited duration positions that were established by the bill are phased out in package 022 for the Health Policy and Analytics program.

**Quality Incentive Program Study** - A portion of the one-time funding that was provided in SB 966 (2023) to produce a study on the Quality Incentive Program for coordinated care organizations is phased out of the Health Policy and Analytics program budget at the current service level. Although the estimated total one-time costs of consulting services and production of the study were estimated to be $175,000 General Fund and $175,000 Federal Funds, the phase-out includes reductions of $159,456 General Fund

Stenson Decl., Ex. S
P. 46 of 73

and $173,456 Federal Funds as funding for contracted consulting services are carried forward into the 2025-27 biennium.

**PEBB / OEBB Benefits Management System Replacement** - A portion of the $6.6 million Other Funds expenditure limitation that was provided in SB 5525 (2023) to begin the implementation of for a benefit management system for both the Public Employees' Benefit Board (PEBB) and the Oregon Educators' Benefit Board (OEBB) is phased out at the current service level. This $6.2 million reduction includes certain services and supplies expenditure authority but retains funding for personal services expenditures in the budget. Policy option package 425 was included in the Governor's budget to renew the $6.2 million Other Funds expenditure limitation for the continuation of the project in the 2025-27 biennium.

**Basic Health Plan and Redeterminations** - Funding of $30.1 million General Fund and authorization for 16 positions (15.29 FTE) to continue policy development of the Basic Health Plan and Oregon Health Plan eligibility redeterminations following the end of the public health emergency was provided in SB 5525 (2023) for the Health Policy and Analytics program. The majority of this funding was for one-time activities, including contracted call center costs. Package 022 phases out $27.4 million General Fund for these one-time expenses but the current service level carries forward position authority and associated funding.

## GOVERNOR'S BUDGET SUMMARY

|  | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds | Positions | FTE |
|---|---|---|---|---|---|---|---|
| Current Service Level | 89,196,168 | 28,211 | 105,393,982 | 57,523,862 | **252,142,223** | 283 | 278.58 |
| Governor's Budget | 91,347,132 | 28,211 | 139,751,845 | 57,636,319 | **288,763,507** | 298 | 289.95 |
| Change | 2,150,964 | - | 34,357,863 | 112,457 | **36,621,284** | 15 | 11.37 |
|  | 2.4% | - | 32.6% | 0.2% | **14.5%** | 5.3% | 4.1% |

The Governor's budget for the Health Policy and Analytics (HPA) program is an increase of $2.2 million General Fund, $34.4 million Other Funds, and $112,457 Federal Funds from the current service level. The total budget of $36.6 million is a 14.5% increase from CSL and includes the addition of 15 positions (11.37 FTE).

The Governor reduced expenditures in most OHA programs for Attorney General costs, statewide service charges, and unspecified General Fund-supported services and supplies. For the HPA program, these reductions total $633,177 General Fund, $158,254 Other Funds, and $23,119 Federal Funds.

As requested by the agency as part of the 2025-27 budget reshoot, the Governor's budget includes the transfer of a Research Analyst position working on policy development and implementation for the Certified Community Behavioral Health Center program from the Medicaid program to the Health Policy and Analytics program.

Stenson Decl., Ex. S
P. 47 of 73

## Policy Option Packages

**POP 70 / POP 407 Health Care Market Oversight** - An expenditure limitation reduction of $1 million Other Funds and the reduction of position authority by 2.54 FTE is included in package 70 to address projected revenue shortfalls in the Health Care Market Oversight program. Package 407 amends the program's budget to add $2.6 million General Fund, $466,688 Other Funds, restores the reduced position authority from package 70, and adds another two positions (2.00 FTE).  The net result of both packages is an increase of $2.6 million General Fund, a reduction of $538,041 Other Funds, and an increase of two positions (2.00 FTE).

The composition of package 407 is notable in that not only does it add $1.3 million in new General Fund expenditures for the added positions, but it also shifts $501,022 in existing Other Funds expenditures for personal services to General Fund. The package includes significant increases in professional services contract expenditures ($1.5 million total funds) that are funded partially through reductions to other services and supplies expenditures. Professional services contracts are allowed to inflate at a rate that is higher than standard services and supplies expenditures. The 2025-27 biennial inflation rate for professional services is 6.8% whereas the inflation rate for most other services and supplies expenditure categories is 4.2%.

**POP 424 State-Based Marketplace** - Increased expenditure limitation of $23.6 million Other Funds and the addition of nine positions (6.75 FTE) is requested to continue the development of a state-based eligibility and enrollment platform and call center for Oregon's health insurance exchange. Personal services expenditures of $4.4 million Other Funds assume a phase in of the new positions for 18 months in the upcoming biennium. Full biennial position costs would be $5.9 million. The package requests $16 million in information technology professional services costs and another $2.4 million for professional services contract costs, generally. Funding for the increased expenditures is ostensibly from per-member, per-month (PMPM) fees charged to insurers for health insurance policies sold through the exchange. The current (2025) PMPM fees are $5.50 for health insurance plans and $0.36 for dental plans. Additional package components are in the Shared Services program where an additional six positions (3.99 FTE) are requested.

**POP 423 PEBB/OEBB Consultant Services** - The Governor's budget includes a request to increase expenditure limitation by $5.3 million Other Funds to allow the Boards to jointly contract for professional consulting services supporting joint workgroups, claims audits, clinical audits, and RFP development. Funding for the additional consulting services would be derived from premium assessments to member entities. The current administrative fee for both PEBB and OEBB is 1.3% of premiums.

**POP 425 PEBB/OEBB Benefits Management Systems Replacement** - Expenditure limitation of $6.2 million Other Funds is requested to continue the Benefits Management Systems (BMS) replacement project for PEBB and OEBB.  The new system is intended as a single unified platform to replace the antiquated individual BMS of both Boards, which were introduced in 2008 and 2003. Vendor support for the existing platforms expires in 2026. Expenditure limitation of $6.6 million and three positions were authorized for the program in the 2023-25 biennium. The current service level phased out $6.2 million of that funding, but continued $400,000 in expenditure limitation supporting the three positions. The

Stenson Decl., Ex. S
P. 48 of 73

current request adds three new positions (1.62 FTE) and $5.9 million for software licenses and configuration.

2025-27 Budget Review - Oregon Health Authority

# Public Employees' Benefit Board – Oregon Educators Benefit Board Benefits

|  | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| General Fund | 8,076 | - | - | - |
| Other Funds | 4,184,526,051 | 4,483,148,740 | 4,911,532,927 | 4,911,532,927 |
| **Total Funds** | **4,184,534,127** | **4,483,148,740** | **4,911,532,927** | **4,911,532,927** |
| Positions | 40 | - | - | - |
| FTE | 39.50 | - | - | - |

\* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

The Public Employees' Benefits Board (PEBB) designs, contracts for, and administers health plans, group insurance policies, and flexible spending accounts for state agencies, universities, the Oregon State Lottery, semi-independent state agencies, and participating local governments and special districts. More than 140,000 members are enrolled in PEBB coverage. Members include active employees, retirees, spouse and domestic partner dependents, child dependents up to age 26, and adult children with disabilities over age 26. The Board itself is comprised of eight voting members – four representing labor and four representing management. The Board also has two non-voting advisory members from the Legislature.

The Oregon Educators Benefit Board (OEBB) administers medical, dental, vision, and other benefits for over 155,000 employees, retirees, and their family members in Oregon's K-12 school districts, education service districts, and community colleges, as well as some charter schools and local governments. The Board is comprised of 10 members appointed by the Governor and confirmed by the Senate. Members represent district boards (two) and management (two); non-management district employees from the large labor organization representing district employees (two); non-management district employees from the second largest labor organization representing district employees (one); and non-management district employees who are not represented by labor organizations (one). Also appointed are two members with expertise in health policy or risk management.

The budget for PEBB and OEBB operations was moved to the Health Policy and Analytics Division in the previous biennium, including support for 20 positions (19.50 FTE) associated with PEBB, and 20 positions (20.00 FTE) associated with OEBB. Total combined operational costs for both boards are roughly $38 million Other Funds.

The expenditure limitation remaining in the PEBB and OEBB budget structures support member benefits. The executive director of PEBB also serves as OEBB's executive director; this dual role was formalized upon the passage of Senate Bill 1067 (2019).

Stenson Decl., Ex. S
P. 50 of 73

2025-27 Budget Review - Oregon Health Authority

## Program Funding

PEBB and OEBB are budgeted entirely with Other Funds. Revenue is derived from premium payments associated with insured individuals. The resources to pay for state employee health insurance are budgeted in state agency budgets according to how each agency pays for employee salaries and benefits, be it from the General Fund, Lottery Funds, Other Funds, or Federal Funds. Once the resources are transferred to PEBB, they are accounted for as Other Funds.

OEBB is funded with Other Funds revenue received from premium payments for all insured individuals.

## BUDGET ENVIRONMENT

The inflation rate applied for both the Public Employees Benefit Board and the Oregon Educators Benefit Board continues to be held to 3.4% per person per year, consistent with the Medicaid budget. SB 1067 (2017) codified the 3.4% annual inflationary target for PEBB and OEBB. The cost containment strategy for both PEBB and OEBB is largely focused on controlling premium costs as opposed to shifting costs to members through higher deductibles, copayments, or increased premium share, although member cost increases do occur. The Boards encourage the use of high-value services, such as value-based prescription drug formularies, waived copayments for office visits related to chronic conditions, and no-cost tobacco use cessation programs, among others.

In addition to inflationary pressures, the budget is significantly dependent on the caseload. Changes in total number of PEBB and OEBB enrollees are driven by budget needs of individual agencies. While small incremental changes are unlikely to impact per-person costs, substantial changes to enrollments can impact the risk pools due to shifts in demographics and acuity.

## CURRENT SERVICE LEVEL

The current service level budget for PEBB and OEBB medical benefit payments is $4.9 billion Other Funds. This $428.4 million, 9.6% increase from the prior biennium. Of the total, $308.6 million, or 6.9% is due to medical inflation. The remaining $119.8 million is due to the phase-in of additional expenditure authority related to increased enrollment.

## GOVERNOR'S BUDGET SUMMARY

The Governor's budget continues funding for PEBB and OEBB benefits at the current service level.

Stenson Decl., Ex. S
P. 51 of 73

2025-27 Budget Review - Oregon Health Authority

# Public Health

| | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| General Fund | 221,127,873 | 261,366,329 | 260,113,729 | 276,197,530 |
| Other Funds | 1,108,866,549 | 350,623,589 | 355,734,097 | 354,737,049 |
| Other Funds (NL) | 25,661,390 | 40,000,000 | 40,000,000 | 40,000,000 |
| Federal Funds | 451,184,016 | 783,545,548 | 455,967,583 | 456,879,966 |
| Federal Funds (NL) | 75,407,236 | 102,729,051 | 118,138,409 | 118,138,409 |
| **Total Funds** | **1,882,247,064** | **1,538,264,517** | **1,229,953,818** | **1,245,952,954** |
| Positions | 892 | 1,000 | 997 | 1,015 |
| FTE | 868.12 | 953.95 | 993.71 | 1,011.71 |

* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

The Public Health Division's (PHD) mission is to promote health and prevent the leading causes of death, disease, and injury in Oregon through the administration a variety of programs addressing the behavioral and social drivers of health. The division directly manages, and partners with local public health authorities and other entities to implement, more than 100 prevention-related programs that halt the spread of disease, protect against environmental hazards, and promote healthy behaviors.

Oregon's public health system includes federal, state, county, and local agencies, tribal communities, community-based organizations, and other diverse partners working together to protect and promote the health of Oregonians. Public health services in Oregon are delivered directly by PHD or through contracts with local and tribal public health authorities, nonprofit organizations, and clinics.

Subsequent to recommendations from the Task Force on the Future of Public Health Services and the passage of HB 3100 (2015), local public health authorities must, at a minimum, meet the following seven foundational capabilities: assessment and epidemiology; emergency preparedness and response; communications; policy and planning; leadership and organizational competencies; health equity and cultural responsiveness; and community partnership development. The authorities must also establish foundational programs in communicable disease control, environmental public health, prevention of injury and diseases, and promotion of health.

The Public Health Division has four general program areas:

**Office of the State Public Health Director** – responsible for guiding the strategy, operations, scientific activities, communications, and policies of public health programs. The office also oversees county health plans and the division's fiscal and policy responsibilities.

**Center for Prevention and Health Promotion** – helps communities and residents achieve lifelong health, wellness, and safety through the prevention of chronic diseases, child developmental delays, injuries and unsafe relationships, and physical and behavioral problems. The center has the following five sections: Adolescent, Genetics and Reproductive Health; Health Promotion and Chronic Disease

Stenson Decl., Ex. S
P. 52 of 73

Prevention; Injury and Violence Prevention; Maternal and Child Health; and Nutrition and Health Screening.

**Center for Health Protection** – protects the health of individuals and communities by ensuring compliance with regulatory and health-based standards. The center's seven sections include: Radiation Protection Services; Drinking Water Services; Environmental Public Health; Oregon Medical Marijuana Program; Oregon Psilocybin Services; Health Care Regulatory and Quality Improvement; and the Health Licensing Office.

**Center for Public Health Practice** – protects the health of individuals and communities through infectious disease control and prevention; integrated care and treatment for persons living with HIV; vital records; population health monitoring; and emergency public health services. The center has the following six sections: Center for Health Statistics (vital records); Acute and Communicable Disease Prevention; State Public Health Laboratory; HIV, Sexually Transmitted Diseases and Tuberculosis Prevention; Immunizations; and Health Security, Preparedness and Response.

## Program Funding

The division is funded primarily through Federal Funds (46.7% at CSL), including grant funding categorically dedicated to specific programs, such as emergency and hospital preparedness, cancer prevention and control, and safe drinking water. Federal Medicaid matching funds are used by the division to support reproductive health and universal nurse home visitation programs. The Federal Funds budget also includes funding designated as nonlimited, which represents federal payments to support the Women, Infants, and Children program.

Other Fund revenues are derived through various fee-based programs, including newborn screening tests, licensing of hospital and inpatient care facilities, registration and inspection of x-ray equipment, testing and certification of emergency medical technicians, registration of medical marijuana cardholders, growers and dispensaries, and fees for issuing certified vital records. Additional Other funds revenue includes a portion of tobacco taxes dedicated to tobacco cessation and prevention activities, hospital and inpatient care licensing fees, vital record fees, and fees for the inspection of public places (e.g., food, pool, and lodging).

The main programs funded with General Fund support local public health authorities, school-based health centers, contraceptive care, and the breast and cervical cancer screening program.

The division's General Fund appropriation has significantly grown over the past three biennia. The 2023-25 legislatively approved budget included $261.4 million General Fund, representing 17% of the total funds budget. This is a four-fold increase from the General Fund amount appropriated in 2017-19. Most of this growth is from investments in Public Health Modernization, accounting for roughly $110 million General Fund at the current service level. Other contributing factors include appropriations to backfill declining medical marijuana revenue that had been budgeted in non-medical marijuana programs; expansion of reproductive health services authorized in HB 3391 (2017); support for the new Healthy Homes Repair Fund established in HB 2842 (2021); and funding of the universally offered home visiting program established in SB 526 (2019).

Stenson Decl., Ex. S
P. 53 of 73

## BUDGET ENVIRONMENT

Continued funding and operational challenges at local public health authorities, including the ability to meet the minimum fundamental capabilities outlined in statute, will remain an issue for the Public Health Division in the 2025-27 biennium. Additionally, competing policy priorities between fulfilling statutory requirements and achieving health equity goals through financial support of community-based organizations is anticipated to continue into the upcoming biennium.

Changes in federal administration is likely to change funding priorities for certain federally mandated or federally supported grant programs. This may mean a reduction in existing funding, additional reporting requirements, or changes in program scope. Additionally, federal policy changes regarding funding for reproductive health services may put pressure on the division to backfill or buttress existing funding streams with General Fund.

An update of the estimated costs as required by ORS 431.380(2) to implement foundational capabilities and programs by local public health agencies is anticipated to be finalized in January 2025. This report will be pivotal in assessing the use and effectiveness of current funding, including increased funding for public health modernization, and should provide a starting place for discussion of ongoing funding and fiscal policy for the division. The Public Health Advisory Board paused the use of previously adopted metrics and began the process of revising public health accountability metrics. Updated metrics were adopted in 2023 and the agency has indicated that the January 2025 report will include reporting on these metrics.

## CURRENT SERVICE LEVEL

The current service level budget for the Public Health Division of $260.1 million General Fund, $1.2 billion total funds, represents a 20% decrease in overall expenditure authority for the program. The budget includes 1,015 authorized positions comprising 1,011.71 FTE. While the majority of funding remains unchanged, an administrative increase of $15 million Federal Funds Nonlimited is included for the Women, Infants, and Children (WIC) program. This is offset by a reduction of $327.6 million Federal Funds to remove accumulated excess expenditure limitation from prior biennia, and for the phase out of Federal Funds expenditure limitation for one-time grant funding.

### Program Phase-Ins

Expenditure authority of $234,065 General Fund, $368,920 total funds, is phased in to the current service level for services and supplies costs related to positions that were authorized throughout the prior biennium, but were budgeted at less than a full FTE due their establishment date. These adjustments represent the difference in the cost of funding the position-related services and supplies for the entire biennium, including inflation.

Unspecified reductions to General Fund budgets were included in the 2023-25 biennium to achieve statewide budget targets. For the Public Health Division, $489,740 General Fund is phased in to the 2025-27 biennium current service level to restore programmatic budgets to original funding levels, including inflation.

Stenson Decl., Ex. S
P. 54 of 73

2025-27 Budget Review - Oregon Health Authority

## Program Phase-Outs

**Excess Federal Funds Expenditure Limitation** - Existing Federal Funds expenditure limitation in the Public Health division significantly exceeds anticipated federal revenues for the upcoming biennium.  An adjustment is included in package 022 to phase out $324 million Federal Funds expenditure limitation for unspecified, previously approved federal grant funds to align the program's budget with currently anticipated revenues.

A specific reduction in Federal Funds expenditure of $100,289 is made to remove limitation provided in the agency's first 2023-25 biennium rebalance that was carried forward from the 2021-23 biennium for the Harold Rogers Prescription Drug Monitoring Program (PDMP). These funds are anticipated to be completely expended in the 2023-25 biennium, therefore no expenditure limitation is needed to carry forward to the 2025-27 biennium.

**Public Health Division Indirect Cost Rate Program** - A technical adjustment to phase out unused expenditure limitation is included in package 022 for the division. OHA had established a budgetary subdivision within the program to account for indirect cost allocations for the myriad of state and federally funded programs overseen by the Public Health Division. While the structure and associated expenditure limitation were established in the prior biennium, the actual program has not been initiated. Both the structure and $19.6 million Other Funds and $18.8 million Federal Funds expenditure limitation is phased out of the current service level budget in package 022.

**State Partnerships Improving Nutrition and Equity** - One-time Other Funds expenditure limitation of $100,000 provided in the 2023-25 biennium for the expenditure of awarded grant funding from the National Association of Chronic Disease Directors, a partnership funded partially by the U.S. Centers for Disease Control and Prevention is phased out of the Public Health Division, Center for Advancing Healthy Communities, budget. This funding was provided to support state activities related to equitable food and nutrition security.

**Prescription Drug Monitoring Program** – A one-time $1.5 million General Fund appropriation was included in SB 5506 (2023) for integration of the Prescription Drug Monitoring Program (PDMP) with provider electronic health records systems is phased out of the Public Health division budget at the current service level.

**Healthy Homes Repair Fund Capitalization** - One-time funding of $15 million General Fund for the capitalization of the Healthy Homes Fund provided in SB 1530 (2024) is phased out of the Public Health division budget at the current service level.

**Newborn Screening Fees for Metabolic Diseases** - Statute allows for the waiving of fees for screening newborns for metabolic diseases if the parent is unable to pay the fee. SB 5701 (2024) provided a one-time appropriation of $250,000 General Fund to support program operations due to fee waivers that is phased out of the Public Health division budget at the current service level.

**Sign Language Interpreter Licensing Program** - HB 2696 (2023) established the state Board of Sign Language Interpreters and a licensing program for qualified practitioners within the Health Licensing Office program. $100,100 Other Funds expenditure limitation was provided for the operations of the Board from anticipated licensing fees, including $21,000 for start-up costs such as legal consultation,

Stenson Decl., Ex. S
P. 55 of 73

supplies and equipment, and professional services. The current service level phases out expenditure limitation for these start-up costs.

## Inflationary Factors

The current service level budget for the Public Health Division includes increased expenditure authority of $9 million General Fund, $21.9 million total funds, for a 4.2% standard inflation factor applied to base budget expenditures for most services and supplies, capital outlay, and certain special payment expenditure categories in package. This is in addition to changes to authorized expenditures for personal services costs that are adjusted in the base budget.

## Funding Changes

The current service level budget recognizes increased fee revenues for the Oregon Psilocybin Services program of $3.7 million, which offsets General Fund in the base budget.

## GOVERNOR'S BUDGET SUMMARY

|  | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds | Positions | FTE |
|---|---|---|---|---|---|---|---|
| Current Service Level | 260,113,729 | - | 395,734,097 | 574,105,992 | **1,229,953,818** | 997 | 993.71 |
| Governor's Budget | 276,197,530 | - | 394,737,049 | 575,018,375 | **1,245,952,954** | 1,015 | 1,011.71 |
| Change | 16,083,801 | - | (997,048) | 912,383 | **15,999,136** | 18 | 18.00 |
|  | 6.2% | - | -0.2% | 0.2% | **1.2%** | 1.8% | 1.8% |

The Governor's proposed budget of $1.2 billion total funds for the Public Health Division includes an increase in expenditures of $16.1 million General Fund, $16 million total funds. This is a 6.2% increase in General Fund and 1.2% increase in total funds from the 2025-27 current service level.

The Governor reduced expenditures in most OHA programs for Attorney General costs, statewide government service charges, and unspecified General Fund-supported services and supplies. For the Public Health Division, these reductions total $1.1 million General Fund, $294,987 Other Funds, and $52,188 Federal Funds.

As requested by the agency as part of the 2025-27 budget reshoot, the Governor's budget includes increased expenditure limitation of $2.5 million Other Funds, $990,000 Federal Funds, and the addition of two limited-duration positions (2.00 FTE) for anticipated 2025-27 biennium grants. Position authority is provided for two positions (2.00 FTE) for the Women, Infant, and Children (WIC) program funded with a net-zero reduction in services and supplies expenditures.

Other Funds supported expenditures in the Public Health Division are reduced by $5.2 million in the Governor's budget due to changes in forecasted revenues from tobacco taxes, tobacco retail license fees, beer/wine/cider taxes, and psilocybin program fees.

## Significant Investments

The Governor's budget makes two one-time investments in reproductive health services through the Public Health Division. $2.5 million General Fund is included for a grant to Seeding Justice, a 501(c)(3) nonprofit charitable organization that operates multiple social-change grant programs, including the Reproductive Health Equity Fund. An additional $2.5 million General Fund is added for reproductive health provider response to changes or reductions to federal reproductive health funding,

A one-time General Fund investment of $6 million for school-based health centers to expand mental health services, SUD screenings, and prevention services, and an additional $1 million to expand culturally responsive youth suicide prevention work.

## Policy Option Packages

**POP 410 Public Health Modernization** - Following on 2023-25 biennium increased funding of $50 million General Fund to support public health modernization efforts as outlined in HB 3100 (2015), the Governor's budget includes an additional $2 million General Fund to implement key priorities identified by the Public Health Advisory Board to specifically address health inequities.

**POP 415 Domestic Well Safety** - The package requests an increase of $3.2 million General Fund and the addition of eight positions (8.00 FTE) for the Domestic Well Safety program. This is in addition to the program's existing four positions (4.00 FTE) and funding of $3.1 million General Fund. In addition to the new personal services expenditures of $1.9 million, the requested funding includes $450,000 for contaminant testing and kitchen-tap treatment systems, and $775,000 for contract costs for Oregon Department of Human Services field operations to collect and transport water samples for laboratory testing, paid media expenses, development and maintenance of case management data systems, and costs of contracts with local public health authorities and community based organizations to support residents in accessing safe water services.

**POP 426 Hospital License Regulation** - The Governor's budget supports increased expenditure limitation of $1.7 million Other Funds from revenues derived from a proposed fee increase in the Health Care Facilities Licensing and Certification program, which will require a statutory change. OHA estimates an increase of $2.8 million in revenues from the proposed fee increases. The proposed expenditure increase and requested establishment of six positions (6.00 FTE) are intended to address increased workload due to complaints received and investigated by the program, address public inquires, allow for consulting on regulatory solutions, and to address complexities of licensees.

**POP 427 Synthetic Tobacco Tax** - An increase in Tobacco Tax revenue is recognized in the Governor's budget. This change is dependent on substantive legislation to expand the tax to synthetic tobacco products. The Governor's budget assumes total new tax revenues of $9.3 million. $900,000 of that amount would be used in the Public Health Division to enhance tobacco retail sales enforcement activities, tobacco use prevention, and tobacco cessation programs.

## OTHER SIGNIFICANT ISSUES

The Public Health program administers the state's special supplemental nutrition program for Women, Infants, and Children (WIC). OHA is engaged in the process of upgrading the information management

Stenson Decl., Ex. S
P. 57 of 73

system used for WIC to a web-based system. The contracted transfer and implementation (T&I) vender informed OHA that the current underlying code base is not viable and will not be supported past 2030. This has led the contracted quality assurance firm to assess that the project's current implementation approach, timeline, and plan are untenable. The T&I vendor was instructed to stop work on the project in November 2024. The next steps for the project are currently being evaluated, but the cost and timeline for completion of the project may increase significantly.

# Oregon State Hospital

| | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| General Fund | 394,251,012 | 800,411,957 | 924,849,350 | 971,942,780 |
| Other Funds | 315,950,885 | 18,700,707 | 16,767,424 | 21,555,424 |
| Federal Funds | 25,004,495 | 42,979,854 | 32,441,418 | 32,441,064 |
| **Total Funds** | **735,206,392** | **862,092,518** | **974,058,192** | **1,025,939,268** |
| Positions | 2,754 | 2,772 | 2,772 | 2,996 |
| FTE | 2,642.63 | 2,768.75 | 2,772.00 | 2,990.82 |

* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

The Oregon State Hospital (OSH) provides psychiatric care for adults admitted to OSH under court orders. OSH is budgeted to serve up to 758 individuals, with 592 beds in Salem, 150 beds in Junction City, and 16 beds at a secure residential treatment facility operated by OSH in Pendleton. The hospital's services include 24-hour nursing, psychiatric care, treatment planning, pharmacy, laboratory, food and nutritional services, and vocational and educational services. By leveraging these resources, OSH's main role is to treat individuals and prepare them to safely return to their communities.

### Program Funding

OSH's budget is supported almost entirely with General Fund, with limited amounts of Other Funds and Federal Funds revenues available for the hospital's services.

The hospital receives ongoing Other Funds revenue from insurance reimbursements and settlements for billable services for covered patients, principally through Medicare and, to a lesser extent, commercial insurance. Lower numbers of patients on Medicare admitted to OSH has reduced the collection of Medicare revenue resulting in the need for additional General Fund support.

Federal revenue is from limited Medicaid reimbursements for services and federal Disproportionate Share Hospital (DSH) payments made available to eligible psychiatric institutions to defray the cost of providing uncompensated care. Federal law prohibits Medicaid reimbursement for patients aged 21 through 64 who are in mental health residential treatment facilities with more than 16 beds.

## BUDGET ENVIRONMENT

The 2022 U.S. District Court order issued by Judge Mosman set up specific time limitations for individuals that were subject to a criminal proceeding, but were not psychologically able to aid in their own defense, to be treated and discharged from the State Hospital. This order was intended to address prior unmet court orders (Mink, 2003) to admit these individuals within seven days of being remanded to the State Hospital. The Oregon State Hospital has had varying levels of success in complying with the court order over the past two years. The current order is set to expire at the end of the year and it's not clear if it will be extended again. There is tension between the services that are able to be provided in

Stenson Decl., Ex. S
P. 59 of 73

local settings and the State Hospital. Achieving the deadlines set in court orders may help alleviate jail capacity issues, including the ability to provide forensic evaluation service for communities and prevent individuals needing mental health services from languishing in jail, but limitation on time spent at the State Hospital may not afford appropriate care for individuals and may push potentially unready patients back to community settings that are lacking in capacity, expertise, and funding. Capacity issues at the State Hospital that result from the aid and assist population increase also results in a lack of capacity for civil commitment and guilty except for insanity (GEI) beds.

Recent surveys by the Centers for Medicare and Medicaid Services (CMS) identified operational deficiencies at the State Hospital that required corrective actions to remain in compliance with CMS requirements to receive federal Medicaid assistance payments. The agency has requested the establishment of eleven new positions: five nurse positions addressing medical emergencies, and six incident review and data analysis positions to address identified deficiencies. These positions are in addition to contracted mental health security positions and equipment that OSH has already brought on to immediately address the identified issues at a cost of $5.2 million in the 2023-25 biennium. In the 2025-27 biennium, OSH plans to discontinue the use of contracted employees and has requested an additional 65 positions, for a total of 76 positions added in response to the CMS findings. The projected cost in the upcoming biennium is $21.8 million General Fund.

Fluctuations in available federal revenue can impact the hospital's biennial budget. Similar to the Medicaid Division budget, the hospital must account for changes in the Medicaid match rate in terms of both the limited Medicaid reimbursement available for patient care and the federal Disproportionate Share Hospital payments, which are impacted by the same federal match rate. During years when the match rate increases, General Fund can be saved; conversely, General Fund must be increased when the match decreases to maintain patient services.

## CURRENT SERVICE LEVEL

The current service level budget for the Oregon State Hospital includes $924.8 million General Fund, $974.1 million total funds. The $124.4 million, or 15.5%, increase in General Fund from the 2023-25 legislatively approved budget is slightly offset by reductions of $1.9 million Other Funds and $10.5 million Federal Funds, resulting in a total budget that increases by $112 million. The budget supports 2,996 authorized positions comprising 2,990.82 FTE.

The majority of the General Fund increase results from changes to expenditure levels for the cost of authorized positions continuing into the 2025-27 biennium that were budgeted for less than an entire biennium in the 2023-25 budget, as well as compensation plan changes. Base budget adjustments for the 2025-27 biennium total $85.5 million General Fund, $89 million total funds, and increase total FTE by 3.25.

Additional position-related adjustments are made to account for changes not captured in the position budgeting system. For OSH these include an increase of $8 million General Fund for changes in costs due to use of temporary employees, overtime pay, shift differential payments, and position-related equipment. Pension bond obligation adjustments reduce General Fund by $1.1 million, $1.2 million total funds. The application of standard vacancy savings factors to the adjusted personal services budget

result in an increase of $21.1 million General Fund, $22.5 million total funds. Part of this increase is due to the elimination of non-standard vacancy savings that was applied in the 2023-25 biennium.

## Program Phase-Outs

**Capital Improvements and Deferred Maintenance** - Expenditure limitation of $1.4 million Other Funds for capital improvement projects that was provided in the 2023-25 biennium as part of the agency's first biennial rebalance package will not be needed in the upcoming biennium and is phased out of the State Hospital budget in the current service level. Additionally, $565,661 Other Funds expenditure limitation for American Rescue Plan Act funds allocated to OHA for deferred maintenance projects at the State Hospital is phased out at the current service level.

**DEI Program Start-Up Costs** - $69,300 General Fund is phased out of the State Hospital budget at the current service level. The funding, provided as part of a package in SB 5506 (2023), was used in the 2023-25 biennium to support one-time services and supplies expenditures for the establishment of the diversity and equity program within the Oregon State Hospital division.

## GOVERNOR'S BUDGET SUMMARY

|  | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds | Positions | FTE |
|---|---|---|---|---|---|---|---|
| Current Service Level | 924,849,350 | - | 16,767,424 | 32,441,418 | 974,058,192 | 2,772 | 2,772.00 |
| Governor's Budget | 971,942,780 | - | 21,555,424 | 32,441,064 | 1,025,939,268 | 2,996 | 2,990.82 |
| Change | 47,093,430 | - | 4,788,000 | (354) | 51,881,076 | 224 | 218.82 |
|  | 5.1% | - | 28.6% | 0.0% | 5.3% | 8.1% | 7.9% |

The Governor's proposed budget of $1 billion total fund, for the Oregon State Hospital includes an increase in expenditures of $47.1 million General Fund and $4.8 million Other Funds. This is a 5.1% increase in General Fund, 5.3% increase in total funds, from the 2025-27 current service level and adds 224 new positions (218.82 FTE)

The Governor reduced expenditures in most OHA programs for Attorney General costs and statewide government service charges. For the Oregon State Hospital, these reductions total $222,369 Other Funds, and $354 Federal Funds.

## Significant Investments

**State Hospital Operations** - As requested by the agency as part of its 2025-27 budget reshoot, the Governor's budget includes $21.8 million General Fund to address identified operational deficiencies at the State Hospital that require corrective actions for the hospital remain in compliance CMS requirements. This increase in funding is a follow-on to funding requested by OSH in its 2023-25 biennium budget second rebalance. The rebalance requested the establishment of eleven new

Stenson Decl., Ex. S
P. 61 of 73

positions: five nurse positions addressing medical emergencies and six incident review and data analysis positions. These positions are in addition to contracted mental health security positions and equipment that OSH had previously engaged to immediately address the identified issues. For the 2025-27 biennium, OSH will discontinue the use of contracted employees and use the funding included in the Governor's budget to establish an additional 65 positions for a total of 76 positions (76.00 FTE) added in response to the CMS findings.

**State Hospital Staffing** - An $11.7 million General Fund increase is included in the Governor's budget to support the addition of 136 mental health technician positions (136.00 FTE). Regular personnel scheduling accounts for population and assumed acuity needs, but does not fully account for non-delivered events such as unanticipated sick days, unscheduled leave, vacation days, or other protected leave taken. When these events occur, OSH resorts to the use of overtime or contracted, on-call positions; both at a higher rate than standard, budgeted positions. OSH believes that, in a significant number of these cases, it can use an enhanced level of staffing of Mental Health Technicians to address the care needs of its population. The total cost of the new positions is estimated to be $26.1 million; however, the package assumes that a reduction in overtime and contracted services will offset the additional expenditures for the new positions by $14.4 million, leaving a net expense of $11.7 million. Whether or not the savings would materialize is indeterminant as the State Hospital has acknowledged that the reduction in nursing overtime may not be achievable while meeting staffing minimums.

**Enhanced Security Contracts** - In response to Centers for Medicare and Medicaid Services survey findings that required corrective action by the Oregon State Hospital, the requested budget includes $5.8 million General Fund for contracted security services at both the Salem campus and the Junction City facility.

**Patient Vitals Monitoring** - A request for $3 million General Fund is included in the Governor's budget to address CMS survey findings following the untimely discovery of patient that had died while in the State Hospital's care. This package includes various biometric sensors, software, information technology hardware, communication, and information technology services. Roughly $1 million of the total is for one-time equipment costs. Ongoing costs for software licenses and cloud services are estimated to be $1.5 million per year.

**Forensic Evaluation Services** - The Governor's budget adds $685,782 to extend four current contracts providing 20 hours per week of forensic evaluation services. These services evaluate the ability of individuals remanded to the State Hospital or community restoration to aid in their own defense. This work addresses the continued compliance with constitutional requirements that individuals found unable to aid and assist in their own defense be admitted to OSH for restoration within seven days of an order for their commitment. Current staffing at OSH doing this work included 21 Clinical Psychologists, a Supervising Psychiatrist, a Psychology Manager, two administrative specialists, and seven contractors. These evaluative services are required for patients remanded to the State Hospital, but OSH is also providing these services at no charge for certain individuals in community restoration settings.

**Behavioral Health Community Navigators** - The Governor's budget adds $2.9 million General Fund to the $6 million General Fund included in CSL from the investments in prior biennium to help people on Aid and Assist orders at the Oregon State Hospital navigate their transition back to the community. Of the total increase, $2.4 million is budged in the Behavioral Health Program and includes the addition of an Operations and Policy Analyst position (1.00 FTE) to provide statewide coordination, reporting, and

program administration, and $2 million for distribution to community mental health programs. The remaining $531,308 is in the Oregon State Hospital program supporting the addition of two resource coordination positions (2.00 FTE) to assist in connecting OSH discharges with local and community services and resources appropriate for individualized transition plans. The original $6 million was included in SB 5525 (2023), policy package 803, to pilot the program. The added $2 million General Fund in this package for distribution CMHPs is to expand the program to the Southern Oregon and the North Coast regions.

**Position Reclassifications** - The budget proposes an increase of $531,504 General Fund to provide the budgetary capacity to convert four Licensed Practical Nurse positions to Registered Nurse positions. This aligns the budget to the required staffing needs of the State Hospital.

## Policy Option Packages

**POP 409 AVATAR Upgrade** - A General Fund appropriation of $3.1 million and the addition of four limited duration positions (1.89 FTE) is included in the Governor's budget for the upgrade of the Oregon State Hospital's electronic health record (EHR) system and enhancements to the hospital's workforce staffing software. The current version of the EHR system will no longer be supported in 2025. For the update to the ERH system, the requested funding includes $534,609 for the limited duration positions and $442,000 for two additional contracted positions, both of these are one-time costs in the 2025-27 biennium. One-time software and contracted vendor implementation costs are estimated to be $1.3 million. Annual vendor support costs are estimated at $60,000 per year beginning in 2026.

The additional software modules for the workforce staffing system are needed to ensure compliance and provide additional reporting capabilities. The purchase and implementation of the new modules are anticipated to cost $742,033 in the upcoming biennium, with ongoing licensing and support of $300,788 in subsequent biennia.

**POP 414 Native Services** -The Governor has included $211,729 General Fund to establish a permanent Native Services program by establishing six positions (2.93 FTE) that would provide native services spiritual and recovery practices at OSH on both the Salem and Junction City campuses.

**POP 419 Facility Conservation and Development** - Increased capital improvement expenditure limitation of $4.8 million Other Funds is included in the Governor's budget for improvements to the air handler return equipment at the Junction City campus in order to properly address air quality in the event of environmental air concerns, such as forest fires. The underlying source of funding for this project is the net proceeds of a proposed general obligation bond issuance. Additional funding of $2.7 million in this package is included in the Capital Construction program.

Stenson Decl., Ex. S
P. 63 of 73

# Capital Construction (Oregon State Hospital)

| | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| Other Funds | 7,992,750 | 8,000,000 | - | 2,675,000 |
| **Total Funds** | **7,992,750** | **8,000,000** | **-** | **2,675,000** |

## PROGRAM DESCRIPTION

The Capital Construction program for the Oregon Health Authority is simply a budgetary function that allows for the segregation and tracking of funding approved through the capital construction budget process that supports planning, design, and construction activities for facility projects with a cost of more than $1 million. Expenditure limitation provided for capital construction projects continues to be authorized for a six-year period from the original authorization, but is not tracked or displayed as part of the current service level.

## CURRENT SERVICE LEVEL

There are no expenditures for capital construction budgeted at the current service level.

OHA's 2023-25 Capital Construction budget included two projects at the Oregon State Hospital (OSH) approved in the 2023 session.

- Replacement of the programmable logic controller (PLC) that integrates camera and door control systems to maintain safe and secure operations; $3 million.
- Construction of a new unit at the Junction City location to accommodate the needs of a patient that presents a danger to himself, other patients, and staff; $5 million.

Both projects were funded with proceeds from the issuance of general obligation bonds authorized under Article XI-Q of Oregon's Constitution.

HB 5006 (2023) provided six-year Other Funds expenditure limitation for the projects; however, as noted in the program description section above, that limitation is not tracked or displayed as part of the current service level.

## GOVERNOR'S BUDGET SUMMARY

**POP 419 Facility Conservation and Development** - Capital Construction expenditure limitation of $2.7 million Other Funds is included in the Governor's budget for the addition of a second floor within the Vocational Services area at the Oregon State Hospital, Salem campus, creating 2,700 square feet of office space and approximately 32 additional work spaces. The underlying source of funding for this project is the net proceeds of a proposed general obligation bond issuance.

2025-27 Budget Review - Oregon Health Authority

# Central Services

| | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| General Fund | 62,652,125 | 100,181,860 | 116,555,568 | 120,932,570 |
| Lottery Funds | 184,532 | 239,926 | 250,004 | 250,004 |
| Other Funds | 4,599,161 | 6,694,109 | 6,764,732 | 6,944,611 |
| Federal Funds | 19,066,944 | 34,958,025 | 37,356,639 | 37,509,947 |
| **Total Funds** | **86,502,762** | **142,073,920** | **160,926,943** | **165,637,132** |
| Positions | 246 | 296 | 291 | 305 |
| FTE | 231.43 | 286.64 | 291.00 | 303.51 |

* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

Central Services budget houses the agency-wide administrative functions of the agency. This budget structure supports the following programs:

- Director's Office – responsible for overall leadership, policy development and administrative oversight for the agency.
- External Relations Division – manages external communications and policy with the public, media, Legislature, and other agencies at the state and federal levels.
- Agency Operations Division – provides operational support and human resources services through two sub-programs: Central Operations and Human Resources.
- Fiscal Division – manages implementation and oversight of financial policies, coordinates budget development and execution, and provides accounting services for the agency.
- Equity and Inclusion Division – Develops and manages implementation of equity and inclusivity policies and programs within the agency and promotes equity and inclusivity policy throughout the healthcare system in Oregon, generally.

### Program Funding

Central Services is funded based on a federally approved cost allocation plan where operating programs are charged according to their respective state and federal funding sources for the support they receive from Central Services. The transfer of programs into or out of OHA, as well as the enhancement or reduction of existing OHA programs, can impact the model's cost allocation statistics and result in changes to the amount of General Fund, Other Funds, or Federal Funds supporting Central Services.

## BUDGET ENVIRONMENT

The Central Services program is sensitive to large programmatic changes and new agency-wide investments as the division is often asked to absorb additional workload from these changes without additional resources. The issue is more acutely realized in the human resources, budgeting, and accounting programs where changes in policies and staffing in other operating programs must be

Stenson Decl., Ex. S
P. 65 of 73

supported by these administrative functions. Additionally, compounding programmatic, policy or budgetary changes that, individually, are not perceived to have a substantive impact on the administrative workload, may, in the aggregate, result in workload challenges for the division.

As with other programs at OHA, the Central Services program funding is at risk due to the agency's exposure to changes in federal funding and policies.

## CURRENT SERVICE LEVEL

The current service level budget of $116.6 million General Fund, $160.9 million total funds, is a 13.3% increase from the 2023-25 legislatively approved budget. The $16.4 million General Fund increase is primarily due to roll-up costs of positions and programs authorized in the 2023-25 biennium, and the reversal of one-time reductions to the General Fund budgets of most OHA divisions that was taken in the 2023-25 biennium.

### Program Phase-Ins

**Reversal of One-Time Reductions** - An unspecified reduction of $11.9 million General Fund was included in the 2023-25 biennium budget to achieve statewide budget targets. This amount is phased in to the 2025-27 biennium current service level to restore programmatic budgets to original funding levels, including inflation.

**Health Care Interpreters Transfer Unwinding** - Prior to the repeal in SB 5701 (2024) of a $2 million General Fund appropriation made to OHA, Central Services division, in SB 5506 (2023) to supplement health care interpreter rates, OHA had transferred the $2 million General Fund appropriation from its Central Services division to the Medicaid division for expenditure in that program as part of the agency's biennial rebalance. The repeal of the original funding resulted in an error in the agency's budget due to the transfer of expenditure authority between the divisions, leaving the base budget for the Central Services program short by $2 million and the Medicaid program over-appropriated by $2 million. Package 021 phases in the missing $2 million in the Central Services program and Package 022 phases out the excess $2 million from the Medicaid program.

### Program Phase-Outs

**REALD and SOGI Implementation** - HB 3159 (2021) directed OHA to collect patient demographic data from health care providers and insurers, including data on a patient's race, ethnicity, language, disability, sexual orientation, and gender identity (REALD and SOGI). HB 3159 provided a $9.8 million General Fund appropriation and $2.8 million Federal Funds expenditure limitation for the program, including support for 43 positions. Policy option package 403 that was included in SB 5525 (2023) for the Central Services program provided an additional $12.4 million General Fund and $2 million Federal Funds expenditure limitation for the program, including an additional eight positions. Subsequent to these funding packages, OHA received permission to use enhanced Medicaid assistance funding for certain costs, reducing the need for General Fund. The reduction in General Fund resultant from that change is captured in the agency's second rebalance for the 2023-25 biennium. That change and the phase out of one-time program expenditures are carried into the 2025-27 biennium through a reduction

Stenson Decl., Ex. S
P. 66 of 73

of $10.1 million General Fund, $883,750 Other Funds expenditure limitation, and $1.6 million Federal Funds expenditure limitation.

## Inflationary Factors

In addition to the $1.8 million General Fund, $2.8 million total funds, increase for standard inflationary factors, the current service level includes an increase of $2.1 million General Fund, $2.7 million total funds, for extraordinary inflation for shared services (Office of Information Services) costs that are charged to the Equity and Inclusion Division. This funding supports OIS work on REALD and SOGI information technology systems.

## GOVERNOR'S BUDGET SUMMARY

|  | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds | Positions | FTE |
|---|---|---|---|---|---|---|---|
| Current Service Level | 116,555,568 | 250,004 | 6,764,732 | 37,356,639 | **160,926,943** | 291 | 291.00 |
| Governor's Budget | 120,932,570 | 250,004 | 6,944,611 | 37,509,947 | **165,637,132** | 305 | 303.51 |
| Change | 4,377,002 | - | 179,879 | 153,308 | **4,710,189** | 14 | 12.51 |
|  | 3.8% | 0.0% | 2.7% | 0.4% | **2.9%** | 4.8% | 4.3% |

The Governor's budget for the Central Services program includes $120.9 million General Fund, $165.6 million total funds, and 305 positions (303.51 FTE). This is an increase of $4.4 million, or 3.8%, General Fund, $4.7 million, or 2.9%, total funds, and 14 positions (12.51 FTE).

The Governor reduced expenditures in most OHA programs for Attorney General costs, statewide government service charges, and unspecified General Fund-supported services and supplies. For the Central Services program, these reductions total $1.2 million General Fund, $6,920 Other Funds, and $14,185 Federal Funds.

As requested by the agency as part of the 2025-27 budget reshoot, the Governor's budget recognizes an additional $400,000 reduction in General Fund expenditures for HB 3159 (2021) that directed OHA to collect patient demographic data from health care providers and insurers, a transfer of a communications position for the 988 program from the Central Services program to the Behavioral Health division, and savings of $194,376 General Fund and $179,424 Federal Funds from work on a health care interpreter portal as directed by SB 1578 (2024).

Additional significant packages recommended in the Governor's budget include:

**PKG 090 Position Actions** - A position (1.00 FTE) that is intended to be a liaison with the Governor's office and to provide administrative support for the Governor's behavioral health initiative is proposed in the Central Services program at a biennial cost of $255,242. Within the Director's office, four new managerial positions (3.75 FTE) are proposed to be established. These positions are: a second Deputy Director for policy and programs; a budgeting and outcomes manager; a Tribal Affairs program manager;

Stenson Decl., Ex. S
P. 67 of 73

and a project manager for agency-wide contracting. The $1.5 million cost of these positions are self-funded by the program through a reduction in budgeted services and supplies expenditures of $1.2 million General Fund, $104,313 Other Funds, and $193,724 Federal Funds.

**POP 406 Equity and Inclusion Office Expansion** - The conversion of five unbudgeted positions (5.00 FTE) to budgeted positions and addition of enhanced funding in the Civil Rights, Learning, and Inclusion section of the Equity and Inclusion program is included in the Governor's budget at a cost of $1.9 million General Fund, $2.4 million total funds. The positions are intended to develop and implement policies and procedures related to inclusivity, position classification, accessibility, and civil rights compliance. This work is primarily internally focused; however, OHA indicates that the work impacts volunteers, board and commission members, and partner and providers delivering healthcare services.

**POP 411 Regional Health Equity Coalition Expansion** - The Governor's budget includes $3.6 million General Fund, $3.8 million total funds, and the addition of two positions (1.38 FTE) within the Equity and Inclusion program to expand the Regional Health Equity Coalition (RHEC) program. Currently, there are nine RHECs in Oregon covering 20 counties. In addition to the roughly $562,000 total funds cost for the new RHEC systems strategist and program coordinator positions in the Equity and Inclusion program, the package includes a $3.2 million General Fund increase in professional services contract expenditures that the agency indicates will support an additional two positions at each of the existing RHECs and provide support for the addition of three new RHECs. It's notable that the package uses the professional services expenditure category for the funding support to RHECs as that expenditure category inflates at a rate of 6.8% per biennium rather than the standard 4.2% for most services and supplies categories.

**POP 412 Traditional Health Worker Program** - This $588,118 General Fund package expands the Traditional Health Worker program within the Equity and Inclusion program by adding three positions (2.38 FTE): a traditional health worker program coordinator, a CCO innovation and implementation strategist, and a health equity workforce administrative specialist. The positions are intended to provide programmatic support to community health workers, doulas, personal health navigators, addiction and mental health specialists, family support specialists, youth support specialists, and tribal traditional health workers.

Stenson Decl., Ex. S
P. 68 of 73

2025-27 Budget Review - Oregon Health Authority

# Statewide Assessments and Enterprise Costs

|  | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| General Fund | 233,321,471 | 274,732,507 | 316,508,962 | 310,137,649 |
| Lottery Funds | 504,870 | 6,712,661 | 17,068,799 | 17,068,799 |
| Other Funds | 22,240,777 | 38,160,730 | 40,357,281 | 39,888,597 |
| Federal Funds | 66,059,647 | 68,520,334 | 75,104,657 | 74,080,583 |
| **Total Funds** | **322,126,765** | **388,126,232** | **449,039,699** | **441,175,628** |
| Positions | - | - | - | - |
| FTE | - | - | - | - |

\* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

State Assessments and Enterprise-wide Costs (SAEC) is a budget structure for aggregating, managing, and reporting on assessments and other expenses applied agencywide. The SAEC budget does not include any staff. The program budget includes central government assessments and usage charges, such as state government service charges, risk assessments, State Data Center usage charges, Secretary of State audit charges, mass transit charges, and information technology direct charges. This budget also includes all facility costs, including rent, maintenance, and utilities, debt service payments, and funding to pay for shared services provided by both OHA and the Department of Human Services (DHS) that are not directly charged to individual programs.

## BUDGET ENVIRONMENT

Assessments and usage charges are paid to other state agencies, in particular the Department of Administrative Services, Department of Justice, and Secretary of State. As those budgets are adjusted by the Legislature, the SAEC budget is also adjusted to reflect those changes. Similar to the Central Services budget, the transfer of programs into or out of OHA, as well as the enhancement or reduction of existing OHA programs, can impact the model's cost allocation statistics and result in changes to the amount of General Fund, Other Funds, or Federal Funds supporting SAEC.

## CURRENT SERVICE LEVEL

The current service level budget of $316.5 million General Fund, $449 million total funds, is a 15.7% increase in total funding from the 2023-25 legislatively approved budget. Debt service increases by $1.1 million General Fund for general obligation bonds issued to support capital projects at the Junction City State Hospital facility, and $10.3 million Lottery Funds for lottery revenue bonds authorized to support investments in expanded community acute psychiatric facility capacity.

The budget phases in $6 million General Fund to reverse one-time General Fund budget reductions that were taken in the 2023-25 biennium.

Stenson Decl., Ex. S
P. 69 of 73

The current service level budget includes standard inflationary increases of $31 million General Fund, $38.1 million total funds, and exceptional inflation of $3.8 million General Fund, $6 million total funds. Exceptional inflation increases were authorized by the Department of Administrative Services for the program because a portion of the funding passes-through to the Office of Information Services within the Shared Services program to support personal services expenditures that inflate at a higher rate than standard inflation.

## GOVERNOR'S BUDGET SUMMARY

|  | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds | Positions | FTE |
|---|---|---|---|---|---|---|---|
| Current Service Level | 316,508,962 | 17,068,799 | 40,357,281 | 75,104,657 | **449,039,699** | - | - |
| Governor's Budget | 310,137,649 | 17,068,799 | 39,888,597 | 74,080,583 | **441,175,628** | - | - |
| Change | (6,371,313) | - | (468,684) | (1,024,074) | **(7,864,071)** | - | - |
|  | -2.0% | 0.0% | -1.2% | -1.4% | **-1.8%** | - | - |

The Governor's budget for the Statewide Assessments and Enterprise-wide Costs (SAEC) program includes $310.1 million General Fund, $441.2 million total funds. This is a decrease of $6.4 million, or 2% General Fund and $7.9 million, or 1.8%, total funds.

Neary the entirety of the reduction is due to the application of reduced rates by the Governor for Attorney General costs and Department of Administrative Services (DAS) Statewide Government Service Charges. For SAEC, these reductions total $9.7 million General Fund, $820,699 Other Funds, and $1.6 million Federal Funds.

Offsetting these reductions are increased expenditures of $1.6 million General Fund, $2.4 million total funds for OHA program assessments to fund OHA's share of two information technology packages implemented in the shared services programs of both OHA and DHS: POP 201 – Mainframe Modernization, and POP 202 – IT Privacy and Security.

Further offsetting the General Fund reductions recommended by the Governor is an increase of $1.7 million General Fund for debt service related to proposed bond issuance supporting Oregon State Hospital facility improvements in POP 419.

2025-27 Budget Review - Oregon Health Authority

# Shared Services

|  | 2021-23 Actual | 2023-25 Legislatively Approved * | 2025-27 Current Service Level | 2025-27 Governor's Budget |
|---|---|---|---|---|
| Other Funds | 200,907,761 | 252,076,062 | 278,030,675 | 288,989,982 |
| **Total Funds** | **200,907,761** | **252,076,062** | **278,030,675** | **288,989,982** |
| Positions | 621 | 664 | 659 | 669 |
| FTE | 612.32 | 651.37 | 659.00 | 664.99 |

\* Includes legislative and administrative actions through December 2024.

## PROGRAM DESCRIPTION

The Shared Services program houses business functions used by both OHA and the Department of Human Services (DHS) under a joint governance agreement. Both agencies have a Shared Services budget structure to support the coordinated administrative services available to all OHA and DHS programs. The only OHA operated program in OHA's Shared Services budget is the Office of Information Services (OIS). This program deploys and maintains the information technology hardware and software needed by OHA and DHS employees to do their jobs; oversees the implementation of enterprise-wide technology solutions; ensures the back-up and integrity of data used by agency employees and partners; and provides the information infrastructure and technical support necessary to maintain key business services, such as payroll distribution, vendor payments, and personnel actions.

Whereas OIS is budgeted within OHA's Shared Services structure, this budget also supports OHA's use of the following services budgeted within DHS's Shared Services structure: the Office of Forecasting, Research, and Analysis; Office of Financial Services; Facilities; Office of Imaging and Records Management; Office of Payment, Accuracy, and Recovery; and Internal Audit.

### Program Revenues

Shared Services expenditures are allocated based on a federally approved cost allocation plan. The distribution of expenditures through the cost allocation process determines the payments received from both DHS and other OHA programs for purchased services. Ongoing allocated assessments to OHA programs are shown in the State Assessments and Enterprise-wide Costs budget as General Fund, Lottery Funds, Other Funds, and Federal Funds, but when passed-though (expended) to the Shared Services program, those funds are then budgeted by the Shared Services program as Other Funds. This accounting treatment "double-counts" these funds, once in the SAEC budget and again in the Shared Services budget. Shared Services also direct-charges OHA and DHS operating programs for specific services or projects that are provided solely to those operating programs. These funds are doubled-counted in the same way as funding passing through the SAEC budget.

## CURRENT SERVICE LEVEL

The current service level budget for the Shared Services program of $278 million Other Funds is a $26 million, or 10.3% increase, from the 2023-25 legislatively adopted budget. The budget supports 669

positions (664.99 FTE). The budget increase for the 2025-27 biennium is due to the roll-up costs of positions and programs authorized in the 2023-25 biennium, reductions in vacancy savings, and standard inflationary factors.

## GOVERNOR'S BUDGET SUMMARY

|  | General Fund | Lottery Funds | Other Funds | Federal Funds | Total Funds | Positions | FTE |
|---|---|---|---|---|---|---|---|
| Current Service Level | - | - | 278,030,675 | - | **278,030,675** | 659 | 659.00 |
| Governor's Budget |  |  | 288,989,982 | - | **288,989,982** | 669 | 664.99 |
| Change | - | - | 10,959,307 | - | **10,959,307** | 10 | 5.99 |
|  | - | - | 3.9% | - | **3.9%** | 1.5% | 0.9% |

The Governor's budget for the Shared Services program totals $289 million Other Funds. This is an increase of $11 million, or 3.9%, Other Funds and includes the addition of 10 positions (5.99 FTE) from the current service level.

## Policy Option Packages

**POP 201 Mainframe Modernization** - The Governor has recommended an increase of $5.8 million Other Funds expenditure limitation to continue work that was begun in the 2023-25 biennium to migrate certain benefit eligibility programs and provider payment processing from older mainframe computer systems to more modern platforms, including cloud-based platforms. Prior biennium funding included an increase of $3.6 million Other Funds expenditure limitation and the authorization to establish 19 new positions that are carried forward to the 2025-27 budget in the current service level. The expenditure limitation in this package is additive to that funding. Revenue to support the work comes from indirect and direct charges to operating programs at both OHA and DHS programs.

**POP 202 IT Privacy and Security** - This package increases Other Funds expenditure limitation by $3.8 million and authorizes the establishment of four new positions (2.00 FTE) within the Information Security and Privacy Office of the Office of Information Technology. The program intends to use the funding and positions to provide enhanced cybersecurity threat identification and prevention, risk mitigation, and data security. The request includes $783,024 for new staff costs, and $3 million for archiving, auditing, and monitoring software. Revenue to support the work comes from indirect and direct charges to operating programs at both OHA and DHS programs.

**POP 424 State-Based Marketplace** - The Governor has included a $1.4 million Other Funds expenditure limitation increase and the authorization to establish six new positions (3.99 FTE) in the Office of Information Services to support the implementation of a state-based health insurance marketplace platform. Most of the revenue support the OIS work is from a direct charge to the Health Insurance Marketplace program within the Health Policy and Analytics division. The role of the OIS is to provide

technology project management, vendor management, solutions planning, systems security, user acceptance testing management, interface systems development, and data analysis.

**Contact Information**
Matt Stayner, Principal Legislative Analyst

**Legislative Fiscal Office**
900 Court Street NE, Room H-178, Salem, Oregon 97301
Oregon State Capitol | (503) 986-1828 | www.oregonlegislature.gov/lfo

## JOINT COMMITTEE ON WAYS AND MEANS
## SUBCOMMITTEE ON HUMAN SERVICES

**January 28, 2025**                                         **Hearing Room H-170**
**01:00 PM**

**MEMBERS PRESENT:**

    **Sen. Wlnsvey Campos, Co-Chair**        **Rep. Andrea Valderrama, Co-Chair**
    **Sen. Sara Gelser Blouin**                **Rep. Ed Diehl**
    **Sen. Cedric Hayden**                    **Rep. Travis Nelson**
                                        **Rep. Hai Pham**
                                        **Rep. Anna Scharf**

**STAFF PRESENT:**            **Matt Stayner, Legislative Fiscal Office**
                                **Nathan Messmer, Committee Assistant**

**EXHIBITS:**                **Exhibits from this meeting are available [here](#)**

| | |
|---|---|
| **00:00:11** | **Meeting Called to Order** |
| **00:00:12** | Senator Campos, Presiding Co-Chair |
| **00:00:32** | Matt Stayner, Legislative Fiscal Office |
| | |
| **00:01:39** | **HB 5025 - Oregon Health Authority** |
| **00:01:40** | Patrick Heath, Chief Financial Office, Department of Administrative Services |
| **00:05:13** | Jason Trombley, Chief Financial Office, Department of Administrative Services |
| **00:07:44** | Mr. Heath |
| **00:10:14** | Co-Chair Campos |
| **00:10:20** | Rep. Nelson |
| **00:10:46** | Mr. Heath |
| **00:11:12** | Mr. Heath |
| **00:11:59** | Sen. Gelser Blouin |
| **00:13:27** | Mr. Heath |
| **00:16:33** | Rep. Diehl |
| **00:16:55** | Mr. Heath |
| **00:18:05** | Rep. Diehl |
| **00:18:59** | Rep. Nelson |
| **00:19:35** | Rep. Nelson |
| **00:19:40** | Co-Chair Campos |
| **00:20:35** | Sejal Hathi, Director, Oregon Health Authority |
| **00:32:15** | Rep. Nelson |

This recording log is in compliance with Senate and House Rules.  For complete contents, refer to the digital audio recording.

| 00:32:51 | Ms. Hathi |
| 00:36:47 | Rep. Nelson |
| 00:37:30 | Ms. Hathi |
| 00:48:20 | Rep. Nelson |
| 00:48:34 | Ms. Hathi |
| 00:49:37 | Rep. Nelson |
| 00:50:03 | Ms. Hathi |
| 00:51:26 | Co-Chair Valderrama |
| 00:52:02 | Ms. Hathi |
| 00:52:31 | Co-Chair Valderrama |
| 00:52:46 | Ms. Hathi |
| 00:53:14 | Sen. Hayden |
| 00:53:43 | Ms. Hathi |
| 00:54:55 | Sen. Gelser Blouin |
| 00:55:27 | Ms. Hathi |
| 00:55:52 | Sen. Gelser Blouin |
| 00:56:04 | Ms. Hathi |
| 00:56:32 | Co-Chair Campos |
| 00:56:37 | Rep. Scharf |
| 00:57:10 | Ms. Hathi |
| 00:58:34 | Rep. Scharf |
| 00:59:00 | Ms. Hathi |
| 00:59:19 | Co-Chair Campos |
| 01:00:10 | Ms. Hathi |
| 01:11:46 | Rep. Nelson |
| 01:12:18 | Ms. Hathi |
| 01:15:43 | Rep. Pham |
| 01:16:00 | Ms. Hathi |
| 01:18:02 | Rep. Nelson |
| 01:18:51 | Ms. Hathi |
| 01:20:08 | Co-Chair Campos |
| 01:21:16 | Ms. Hathi |
| 01:21:30 | Co-Chair Campos |
| 01:21:40 | Rep. Nelson |
| 01:22:00 | Ms. Hathi |
| 01:22:10 | Co-Chair Campos |
| 01:22:16 | Mr. Stayner |
| | |
| 01:23:28 | **Meeting Adjourned** |

This recording log is in compliance with Senate and House Rules.  For complete contents, refer to the digital audio recording.

Stenson Decl., Ex. T
P. 2 of 2

## JOINT COMMITTEE ON WAYS AND MEANS
## SUBCOMMITTEE ON HUMAN SERVICES

**February 20, 2025**                                          **Hearing Room H-170**
**01:00 PM**

**MEMBERS PRESENT:**

    **Sen. Wlnsvey Campos, Co-Chair**      **Rep. Andrea Valderrama, Co-Chair**
    **Sen. Sara Gelser Blouin**           **Rep. Ed Diehl**
    **Sen. Cedric Hayden**              **Rep. Travis Nelson**
                                   **Rep. Hai Pham**

**MEMBER(S) EXCUSED:**

                                   **Rep. Anna Scharf**

**STAFF PRESENT:**             **Gregory Jolivette, Legislative Fiscal Office**
                                   **Nathan Messmer, Committee Assistant**

**EXHIBITS:**                 **Exhibits from this meeting are available here**

| Time | |
|------|---|
| **00:00:14** | **Meeting Called to Order** |
| 00:00:15 | Senator Campos, Presiding Co-Chair |
| **00:00:35** | **HB 5025 Oregon Health Authority** |
| 00:01:04 | Kristine Kautz, Deputy Director for Administration, Oregon Health Authority |
| 00:06:10 | Sen. Gelser Blouin |
| 00:07:57 | Ms. Kautz |
| 00:09:19 | Sen. Gelser Blouin |
| 00:09:32 | Ms. Kautz |
| 00:11:04 | Rep. Diehl |
| 00:11:29 | Ms. Kautz |
| 00:11:54 | Rep. Diehl |
| 00:12:04 | Ms. Kautz |
| 00:16:29 | Rep. Nelson |
| 00:16:45 | Ms. Kautz |
| 00:16:53 | Rep. Nelson |
| 00:16:58 | Ms. Kautz |

This recording log is in compliance with Senate and House Rules.  For complete contents, refer to the digital audio recording.

| 00:19:35 | Co-Chair Campos |
| 00:19:52 | Ms. Kautz |
| 00:20:01 | Sejal Hathi, Director, Oregon Health Authority |
| 00:24:56 | Co-Chair Campos |
| 00:25:07 | Rep. Nelson |
| 00:25:07 | Co-Chair Campos |
| 00:25:16 | Rep. Pham |
| 00:25:42 | Ms. Hathi |
| 00:27:39 | Co-Chair Campos |
| 00:27:59 | Ms. Hathi |
| 00:28:01 | Rep. Nelson |
| 00:28:50 | Ms. Hathi |
| 00:30:01 | Rep. Nelson |
| 00:30:04 | Ms. Hathi |
| 00:31:16 | Co-Chair Campos |
| 00:31:27 | Sen. Hayden |
| 00:32:49 | Ms. Hathi |
| 00:34:11 | Sen. Hayden |
| 00:34:47 | Ms. Hathi |
| 00:35:23 | Sen. Hayden |
| 00:35:30 | Ms. Hathi |
| 00:35:40 | Co-Chair Campos |
| 00:35:53 | Ms. Hathi |
| 00:41:31 | Co-Chair Campos |
| 00:41:55 | Rep. Nelson |
| 00:42:15 | Ms. Hathi |
| 00:43:01 | Co-Chair Campos |
| 00:43:08 | Rep. Diehl |
| 00:43:25 | Ms. Hathi |
| 00:44:27 | Sen. Hayden |
| 00:44:41 | Ms. Hathi |
| 00:45:29 | Co-Chair Campos |
| | |
| 00:45:51 | **Meeting Adjourned** |

Stenson Decl., Ex. U
P. 2 of 2



# Ways & Means Presentation OHA Budget Wrap-Up

Presented to
Joint Ways & Means Subcommittee on Human Services
February 20, 2025

Sejal Hathi, MD MBA, Director

Stenson Decl., Ex. V
P. 1 of 11

1

# OHA's Strategic Plan



Vision: A Healthy Oregon

**Strategic Goal**
Eliminate health inequities in Oregon by 2030

**Values**
- Health Equity
- Innovation
- Partnership
- Service Excellence
- Integrity
- Transparency
- Leadership

**Mission**
Ensuring all people and communities can achieve optimum physical, mental, and social well-being through partnerships, prevention, and access to quality affordable health care.

**Strategic goal pillars**

| Transforming behavioral health | Strengthening access to affordable care for all | Fostering healthy families and environments | Achieving healthy Tribal communities | Building OHA's internal capacity and commitment to eliminate health inequities |

# Oregon Health Forward

*Eliminating health inequities by 2030*

**Strategic Plan**
OHA envisions a healthy Oregon where everyone has the opportunity to thrive. To realize this vision, OHA has set an ambitious yet achievable goal of eliminating health inequities by 2030, as outlined in its strategic plan.

**Transparency, Accountability, and Belonging (TAB) Initiative**
To fuel progress toward its strategic plan goal, OHA will enact systems, policy, and operational changes to more effectively and accountably meet customer needs, strengthen partner relationships, and improve staff engagement and satisfaction.

**Call to Action**
Recognizing that collaboration is key to success, OHA will enlist health system partners, nonprofits, and private sector entities – both in and out of health care – to bolster statewide commitment and progress toward its strategic plan goal.

# 2025-27 Focus areas and priorities

## Transforming behavioral health

- Strengthen staffing, security and patient monitoring capacity at the state hospital, $44M GF

- Continue to expand residential treatment beds across the state, $100M GF

- Sustain and continue to strengthen and expand the behavioral health workforce, $24.8M GF

- Expand the Save Lives Oregon Harm Reduction Clearing house to combat overdose, $10.4M GF

- Sustain and expand Medicaid Certified Community Behavioral Health Clinics, which integrate behavioral health with physical health care, $14.1M GF

- Continue to invest in community mental health programs for deflection and diversion, $14.7M GF

- Strengthen community based behavioral health and substance use disorder treatment for youth, including in schools, $25.0M GF

# 2025-27 Focus areas and priorities

## Strengthening access to affordable care for all

- Provide medical benefits for incarcerated individuals and ensure a safer and healthier transition back to the community, $14.3M GF

- Stand up a State-Based Marketplace Eligibility and Enrollment Platform that will provide greater choice and flexibility to people seeking health coverage, $25M OF

- Continue to invest in the PEBB/OEBB benefits management systems replacement, $6.2M OF

- Maintain the Cost Growth Target and strengthen PEBB/OEBB programs and services, $5.3M OF

- Increase Medicaid reimbursement for maternity services across all Oregon hospitals, $25M GF

- Ensure high-quality and affordable care in Oregon hospitals, $2.6M GF

# 2025-27 Focus areas and priorities

## Fostering healthy families and environments

- Modernize Oregon's public health systems and continue to support community partners and local public health authorities in building capacity to meet public health foundational capabilities, $2M GF

- Enhance drinking water safety in domestic wells, $3.2M GF

- Close the regulatory gap for synthetic nicotine and strengthen retail licensing to protect youth from tobacco's health harms, -$8.4M GF

- Support patient navigation for and safeguard reproductive health care services, $5M GF

- Strengthen school and community-based primary prevention, $7M GF

# 2025-27 Focus areas and priorities

## Achieving healthy Tribal communities

- Support Native services at Oregon State Hospital, $0.2M GF

- Continue the Tribal traditional health worker program, $0.140M GF

- Strengthen Tribal behavioral health services and supports, set-asides TBD

## Building capacity and commitment to eliminate health inequities

- Strengthen staff training, civil rights unit, and universal accessibility programs, $0.6M GF
- Expand the Regional Health Equity Coalition program, $3.6M GF

# Thank you

You can get this document in other languages, large print, braille or a format you prefer free of charge. Contact Matthew Green at matthew.green@oha.oregon.gov or 503-983-8257. We accept all relay calls.





# **Appendix**

# 2025-27 Governor's Budget, by Fund Type



**$39,640 million Total Funds**

$6,226 million
16%
General Fund

$43 million
<1%
Lottery Funds

$21,700 million
<1%
Federal Funds

$11,671.8 million
<1%
Other Funds

# 2025-27 Governor's Budget, by Program



$39,640 million Total Funds

$1,641 million
4%
Behavioral Health

$289 million
1%
Health Policy & Analytics

$2,743 million
7%
Public Employees Benefit Board

$2,169 million
5%
Oregon Educators Benefit Board

$1,246 million
3%
Public Health

$1,026 million
3%
Oregon State Hospital

$896 million
2%
Central & Shared Services and Assessments

Medicaid
$29,629
75%



OFFICE OF THE DIRECTOR
Patrick Allen

Kate Brown, Governor

500 Summer Street NE. E20
Salem, OR 97301
Voice: 503-947-2340
Fax: 503-947-2341
www.Oregon.Gov/OHA
www.health.oregon.gov

## Memorandum

**To:**     Margie Cooper Stanton, Director, Health Systems
Steve Allen, Behavioral Health Director, Health Systems
Dolly Matteucci, Superintendent/Chief Executive Officer, Oregon State Hospital
Derek Wehr, Deputy Superintendent, Oregon State Hospital

**From:**   Patrick Allen, Director, Oregon Health Authority

**Date:**   June 7, 2019

**Subject:**   Directive to continue addressing the statewide Aid and Assist crisis

Oregon continues to experience increasing numbers of defendants who have been deemed unable to aid and assist in their own defense. Currently, most of these defendants receive competency restoration services at Oregon State Hospital. However, Oregon State Hospital cannot continue to absorb patients at the rates that they are being sent by local courts and jails. We cannot compromise the health, safety and civil rights of our current patients by going above our managed capacity. This has created a statewide crisis that is impacting our local communities, judicial systems, county jails and community mental health programs.

While this is a statewide issue, the Oregon Health Authority must continue doing all it can to mitigate the amount of time defendants are waiting to receive the treatment they need. This directive outlines the steps and associated deadlines Health Systems and Oregon State Hospital will take over the next few weeks. Most of these efforts are already underway. Please report back on your progress and findings no later than Friday, Aug. 9, 2019.

1. **Reduce the amount of time people are waiting for admission.**
   a. Prioritize Aid and Assist admissions within the OSH admission process. Due: July 19.
   b. Ensure counties know how to expedite admissions for people with the highest need for immediate psychiatric treatment. Due: Aug. 2.

2. **Reduce the length of stay for current patients to make room for new admissions.**
   a. Speed up the discharge process for patients who are not yet able to Aid and Assist but who no longer need hospital-level care. Due: Aug. 2.
   b. Determine if additional full-time forensic evaluator positions are needed. Due: July 19.

Stenson Decl., Ex. W

3. **Increase community services for those who do not need hospital-level care to divert them from the hospital.**

   a. Establish plans to increase the state's capacity for community restoration services through $7.6 million received through the Aid and Assist Policy Option Package, if approved. Due: Aug. 2.

   b. Establish plans to implement SB 24 and 25, if passed, to support community restoration and improve process efficiencies. Due: Aug. 2.

   c. Assess the feasibility of using the Northwest Regional Re-entry Center and other regional residential centers to provide community restoration services. Due: July 26.

   d. Explore other funding options for community restoration and diversion services, including funds left from the decommissioning of Dammasch State Hospital. Due: July 26.

   e. Ensure existing community mental health program contracts support community restoration and diversion services. Due: Aug. 2.



Stenson Decl., Ex. W

# Secretary of State
## Oregon Audits Division



Oregon Health Authority

# Chronic and Systemic Issues in Oregon's Mental Health Treatment System Leave Children and Their Families in Crisis

September 2020
**Report 2020-32**

Secretary of State **Bev Clarno**
Audits Division Director **Kip Memmott**

Stenson Decl., Ex. X
P. 1 of 82

**Secretary of State**
**Oregon Audits Division**

# Executive Summary

## Why This Audit is Important

» Nearly one million people rely on mental health services received through the Oregon Health Plan. OHP serves low-income families, including many of the most vulnerable children in the state.

» Mental health and mental illness impact virtually every aspect of life, including homelessness, suicidal ideation, educational difficulties, and reduced workplace production.

» The Oregon Health Authority (OHA) estimates it will spend $3.2 billion on behavioral health services for the 2019-21 period.

» The state recognizes Oregon's behavioral health system for children is in crisis and is failing to serve children, youth, and families who are involved with multiple systems and have complex needs.

» Reports dating back 19 years identify state agencies and systems as fragmented, siloed, and not adequately serving the continuum of care.

**Oregon Health Authority**

## Chronic and Systemic Issues in Oregon's Mental Health Treatment System Leave Children and Their Families in Crisis

### What We Found

1. Data shortfalls and a lack of performance measurement prevent OHA from monitoring mental health treatment capacity, community needs, and outcomes to identify service gaps and improve the system. (pg. 16)

2. Chronic workforce shortages throughout the mental health system increase system strain and trauma for vulnerable children and youth in residential treatment facilities and COVID-19 budget impacts may prevent workforce supplementation. (pg. 21)

3. Weakness and limitations of state statutes have contributed to Oregon's fragmented delivery of mental health services and de-prioritized funding for care. The statutes do not fully support effective and efficient delivery of mental health treatment. (pg. 25)

4. OHA does not adequately monitor General Fund dollars disbursed to counties for community mental health programs. (pg. 28)

5. A lack of consistent leadership, strategic vision, and governance contributes to system disarray. For the past decade agency leadership has frequently turned over and no guiding strategic plan is in place to provide a foundation for consistent direction. (pg. 31)

### What We Recommend

We make 22 recommendations to OHA that address the agency's data shortfalls, workforce recruitment and retention, statutory impediments, county fund monitoring, and governance challenges. These recommendations are consistent with recommendations in a joint report from OHA and the Department of Human Services published in March 2018.

OHA agreed with all of our recommendations. Their response can be found at the end of the report.

*The Oregon Secretary of State Audits Division is an independent, nonpartisan organization that conducts audits based on objective, reliable information to help state government operate more efficiently and effectively. The summary above should be considered in connection with a careful review of the full report.*

# Introduction

Mental health treatment services in Oregon have changed dramatically over decades. These changes have been largely the result of federal legislation, such as the Affordable Care Act, as well as the increasing demands for services resulting from a growing population. The Oregon Health Authority (OHA) is charged with overseeing a large mental health system with numerous players; OHA does this through its Behavioral Health division within the Health Systems Division.



OHA contracts with 15 Coordinated Care Organizations (CCOs), 36 counties, and manages 257 behavioral health contracts to provide mental health care to the approximately 1 million Oregonians who participate in the Oregon Health Plan (OHP). The OHP is Oregon's state Medicaid program that serves low-income families, including some of the most vulnerable children in the state. In order to deliver services statewide, each of the 15 CCOs is responsible for managing OHP members' health benefits in their region. CCOs subcontract with counties to provide behavioral health services.

**Behavioral health** refers to both mental health and substance use for the purposes of this audit.

OHA primarily manages services through its Behavioral Health Division, which operates with a budget of $36.4 million for the 2019-21 biennium funding a staff of 66 Full Time Equivalent positions. The Behavioral Health budget represents 0.16% of the $23.1 billion OHA 2019-21 Legislatively Adopted Budget. The division includes four distinct units that manage different behavioral health programs: Adult Behavioral Health & Housing, Child & Family Behavioral Health, Licensing & Certification, and Addiction, Recovery, and Prevention services.

Each of these units is responsible for coordinating its own programs. For example, the Licensing & Certification unit regulates provider compliance with state laws related to residential and outpatient behavioral health facilities and programs. OHA's mental health services are interdependent with social services provided by other state and local entities, such as the Oregon Youth Authority, the Department of Human Services (DHS), and county health departments.

Stenson Decl., Ex. X
P. 3 of 82

**Figure 1: Oregon's 15 CCOs manage Oregon Health Plan delivery across the state**



Source: Oregon Health Authority

### *Oregon's behavioral health system is based on a continuum of care model*

Mental health services offered vary depending on the needs of the individual and are represented in what is known as the "continuum of care." Within children and family mental health, this continuum includes a range of services that become increasingly restrictive as the patient's needs increase in complexity, such as outpatient care, intensive in-home care, residential treatment, and secure residential treatment. The highest levels of care, secure residential for children and the Oregon State Hospital for adults, are reserved for the most acute, complex needs.

**Figure 2: The continuum of care ranges from services with more community integration to services that are more restrictive**

Less restrictive, more community integration →  More restrictive, less community integration



Outpatient    Intensive Outpatient Services and Supports    Non-Secure Residential    Secure Residential    Hospital

The Child & Family Behavioral Health unit within OHA's Behavioral Health Division implements and manages Medicaid and other publicly funded mental health, suicide prevention, and substance use disorder services for children, adolescents, young adults, and their families. The unit works with other state agencies and OHA divisions to develop policy and guidance for delivering children and family services statewide. In addition, the unit coordinates with CCOs,

Stenson Decl., Ex. X
P. 4 of 82

health providers, counties, external agencies, and other contractors to ensure the continuum of care adequately meets the needs of OHP children and families.

Providers, most often contracted by either the state, CCOs, or counties, serve to perform the majority of interactions with patients. The term provider may be used to refer to individual physicians, clinicians, residential treatment facilities, or whole hospitals. Within the continuum of care, direct care workers provide the first line of interaction with many children. The primary function of these individuals is to care for individuals who have disabilities, chronic illness, or other health care needs. Direct care workers may provide assistance in any setting on the continuum of care, from unrestricted outpatient to highly restricted hospitalization.

### Oregon's behavioral health system relies on a mix of funding sources, many of which will likely be impacted by COVID-19 budget reductions

Oregon's behavioral health system uses federal, state, and local dollars to provide mental health services. The outbreak of COVID-19 in 2020 is expected to have significant impacts to the behavioral health system. One of those impacts is economic. In May 2020, at the Governor's request, OHA and other agencies proposed cuts for the fiscal year absent COVID-19 assistance from the federal government and use of state reserve funds. OHA outlined $167 million in cuts to its Health Systems, Public Health, and Health Policy and Analytics Divisions, many of which impact behavioral health programs.

As a result of these budget cuts, services that were already struggling to meet the needs of Oregonians may be put on hold. The current budget situation is exacerbated since over the past six years, the state's capacity to meet high-acuity needs at children's non-secure and secure residential treatment programs has been declining. A joint OHA and DHS report in 2018 noted these declines have burdened the entire mental health system.[1] The report also called for an increase in Intensive Outpatient Services and Supports to support children in a less restrictive environment and for funding the services through CCOs. As the report notes, intensive outpatient services were more accessible prior to the CCO implementation and need to be reinvested in to meet substantial unmet needs. However, as a result of the COVID-19 pandemic, many of these new services may be put on hold.

## Oregon's mental health treatment service delivery model, as well as medical practices regarding mental health, has shifted substantially over decades

As the field of mental health and the regulation surrounding it has evolved, so too have the services provided to patients. Through the course of these changes, Oregon has struggled to improve its fragmented mental health service delivery. The cost of ineffective mental health services is high and impacts not only individuals, but entire communities. In systems not created to equitably and effectively deliver services, some individuals and communities may continually receive ineffective mental health care. A likely increased need for mental health services should be a critical consideration as the state works to address impacts resulting from the COVID-19 crisis.

### Oregon has made many legislative efforts to improve delivery of mental health services

As demonstrated in figure 3, the state has undertaken several legislative efforts in an attempt to establish an effective mental health services system. For example, in 2009, Oregon passed House Bill 2144, which created the System of Care Wraparound Initiative for children. The law, codified in Oregon Revised Statute (ORS) 418, required DHS, the Department of Education, the Oregon

---

[1] Oregon's Child, Youth & Family Continuum of Care a System in Crisis – Proposed Systemic Solutions.

Stenson Decl., Ex. X
P. 5 of 82

Youth Authority, and the Oregon Commission on Children and Families to develop an integrated System of Care for children. The legislation's intent was to establish a coordinated system that charged agencies to work with local communities and improve care for children and families. The statute also established a Wraparound program to deliver coordinated services and supports to children through teams of health providers who worked with the parents and children to identify their strengths and needs. The statute required OHA and DHS report biennially on the progress toward implementing the wraparound initiative and the selection of performance measures for the initiative.[2]

**Figure 3: Oregon's mental health system has undergone many changes spanning several decades**



**1961** The Mental Health Division of DHS is established to promote the development of community mental health programs.

**1993** The Oregon Health Plan launches to manage Medicaid and indigent patients.

**2001** The Governor-appointed Mental Health Alignment Workgroup releases a report that identifies a fragmented mental health system with a lack of resources.

**2003** The Children's Mental Health System Change Initiative Budget Note HS-3 directs DHS/AMH to substantially increase the availability and quality of individualized, intensive, and culturally competent home- and community-based services so the use of institutional care is minimized.

**2009** Oregon House Bill 2009 establishes OHA as a separate entity from DHS to oversee health-related programs, including mental health treatment services. Oregon House Bill 2144 is enacted to provide statutory direction for the System of Care Wraparound Initiative.

**2012** Oregon Senate Bill 1580 is signed into law to implement CCOs intended to oversee integration of physical, mental, and dental health for Oregon Health Plan members. In November, Oregon and the U.S. Department of Justice enter into a four-year agreement that creates framework, timeline, and milestones to address gaps in the adult mental health system.

**2013** OHA director Bruce Goldberg departs to lead Cover Oregon. Tina Edlund begins as OHA acting director.

**2014** OHA exercises its options to expand the Medicaid program through the Oregon Health Plan. In May, Suzanne Hoffman takes over as acting OHA director.

**2015** Governor John Kitzhaber resigns amid a criminal investigation. Lynne Saxton begins her role as OHA director and is confirmed in March. The Addictions and Mental Health Division is reorganized into the Health Systems Division.

**2016** OHA launches the Behavioral Health Collaborative to develop recommendations to improve behavioral health systems in Oregon.

**2017** OHA director Lynne Saxton resigns. Pat Allen is appointed OHA director. Governor Kate Brown submits a letter to OHPB recommending a focus on social determinants, equity, and improving the behavioral health system.

**2018** OHA and DHS issue a joint report denoting Oregon's Child, Youth, and Family Continuum of Care as a system in crisis.

---

[2] Wraparound is a model of care that puts the child or youth and family at its center. It is defined as a comprehensive, holistic, youth- and family-driven way of responding when children or youth experience serious mental health or behavioral challenges.

In 2012, Senate Bill 1580 served to change the system structure once again by creating the CCOs, which transformed the state's mental health treatment services. Generally, CCOs are locally governed, accountable for access, quality, and health spending, and emphasize primary care medical homes. In addition, CCOs are required to integrate financing and delivery of physical and mental health, addiction services, and dental care.

In 2017, the state changed how it captured Wraparound participation and outcomes by shifting from a web-based system to Child and Adolescent Needs and Strengths (CANS) Comprehensive Assessments that may be paper-based or rely on computer software such as Microsoft Excel. The CANS tool uses a rating system documented by the wraparound coordinator to assess the strengths and needs of each youth participating in wraparound and inform the team in designing a care plan. OHA has made several unsuccessful efforts to obtain an upgraded web-based reporting system known as eCANS to use CANS data to measure outcomes across Wraparound and children's intensive services and allow for real time analytics at the individual, provider and CCO levels. Without a web-based system, the agency requires each Wraparound site to maintain its own informal system for tracking CANS data and continues to manually collect and record CANS spreadsheets. At the same time, OHA separately collects information via the Measurements and Outcomes Tracking System (MOTS). MOTS data includes: patient demographic, behavioral health, addictions, and mental health crisis information. The system was intended to be a comprehensive data solution used to: improve care, control costs, and allow OHA to focus on outcomes and services provided.

In September 2018, OHA requested to discontinue reporting on Wraparound to the Legislature after the program's expansion to all CCOs marked completion of its implementation and the agency could no longer track program participation. In 2019, the Legislature removed Wraparound data tracking requirements when ORS 418.985 was repealed by Senate Bill 1. As a result of that bill, Oregon revised Statute 418.981 was established and requires OHA, along with the Oregon Youth Authority and DHS, to track data such as the number of youth served by all agencies and the outcomes of those services. The shift from Wraparound specific reporting to broad System of Care reporting underscores a fundamental understanding of the need for data-informed decision making.

In recent years, the System of Care Wraparound Initiative and the CCOs underwent additional changes. For example, Senate Bill 1 replaced the Children's Wraparound Initiative Advisory Committee[3] with a System of Care Advisory Council. The new council is tasked with creating policy to improve the state and local systems that provide services to youth in two or more systems of state care, such as services provided by OHA and DHS. In late 2019, OHA renegotiated contracts with CCOs during a process known as CCO 2.0.[4] The new contracts changed some CCO requirements, such as their ability to shift the risk of covering high-cost mental health care to counties.

### *Mental health affects both individuals and communities and ineffective mental health services may lead to a costly cycle of poor outcomes*

Changes to the government delivery of mental health treatment services have occurred based on an increased understanding by medical professionals, and people in general, of the importance of mental health in terms of quality of life and societal outcomes.

---

[3] The Children's Wraparound Initiative Advisory Committee was established by House Bill 2144 in 2009.
[4] CCO 2.0 is a new five-year contract period for CCOs with new requirements and reward structures from OHA.

Stenson Decl., Ex. X
P. 7 of 82

**Distinctions between mental health and mental ill-health**

The World Health Organization defines **mental health** as a state of well-being in which every individual realizes his or her own potential, can cope with the normal stresses of life, can work productively and fruitfully, and is able to make a contribution to her or his community.

**Mental ill-health** refers to mental health problems, symptoms and disorders, including mental health strain and symptoms related to temporary or persistent distress.

The cost of ineffective mental health services is high. In addition to quantifiable health care and social service costs, there are also quantitative costs, such as reduced productivity, negative family impacts, and increased levels of crime. The economic impact of major depressive disorder in adults in the U.S. was estimated to be $210 billion in 2010.

Individuals experiencing mental health challenges may receive poor mental health care services due to the cyclical nature of what experts call Social Determinants of Health. The cycle, based on factors such as poverty, education levels, substance abuse, gender, and ethnicity, decrease the likelihood of receiving effective treatment. The consequences of ineffective treatment resulting from these factors further reduce the likelihood of the individual receiving effective care, perpetuating the cycle, as demonstrated in Figure 4.

**Figure 4: The social determinants and mental health can often create a negative feedback loop**



Source: Oxford Textbook of Public Mental Health, 2018

The COVID-19 pandemic has also had an effect on mental health. A report by the United Nations issued in May 2020 underscores the need for increased mental health services in the face of the COVID-19 crisis.[5] According to the report, the pandemic has severely impacted the mental health of populations with many people in distress due to social isolation and fear of contagion and loss of family members. This distress is worsened by the economic turmoil for those experiencing

---

[5] United Nations Policy Brief: COVID-19 and the Need for Action on Mental Health.

Stenson Decl., Ex. X
P. 8 of 82

loss of income and employment. The report notes a potential long-term increase in the number and severity of mental health problems.

***Mental health experts increasingly recognize the importance of trauma-informed care***

The need to address underlying trauma is increasingly considered a crucial part of mental health service delivery. Research has established that exposure to trauma is pervasive in society and an almost universal experience for people with mental and substance use disorders.

Examples of traumatic experiences include domestic violence, sexual abuse, or a serious accident. With appropriate support, people can overcome trauma. However, many public systems can be trauma-inducing themselves. For example, seclusion and restraint[6] in behavioral health settings and harsh disciplinary practices in school systems can be re-traumatizing for individuals with a history of trauma. Organizations can shift to a more effective, trauma-informed approach that emphasizes what happened to individuals, not what is "wrong" with them.

> **Trauma** results from an event, series of events, or set of circumstances that is experienced by an individual as physically or emotionally harmful or threatening and that has lasting adverse effects on the individual's functioning and physical, social, emotional, or spiritual well-being.
> - *Substance Abuse and Mental Health Services Administration*

In 2014, OHA contracted with Portland State University to form Trauma Informed Oregon, an organization devoted to promoting and sustaining trauma-informed care in physical and behavioral health. OHA's policy for Trauma Informed Services, also developed in 2014, recognizes trauma as a hidden epidemic and emphasizes the importance of a trauma-informed services across Oregon's behavioral health system.

## Oregon outpaces the increasing national mental illness rate, yet ranks almost last in its efforts to treat mental health illness

The number of individuals diagnosed with any mental illness, including youth who have suffered from a major depressive episode, increased from 2004 to 2017 in the United States. The rate of increase for individuals in Oregon, specifically for youth aged 12 to 17, has outpaced the national and regional rate, particularly in recent years.[7]

**Figure 5: The rate of Oregon youth aged 12 to 17 who suffered from a major depressive episode has outpaced the national and regional rate**



Source: SAMHSA Behavioral Health Barometer: Oregon, Volume 5

---

[6] Any method that immobilizes or reduces the ability of a patient to move their arms, legs, body, or head freely.
[7] Oregon is within SAMHSA Region 10: Alaska, Idaho, Oregon, and Washington.

Stenson Decl., Ex. X
P. 9 of 82

As illustrated in Figure 5, the number of youth in Oregon with major depressive episodes increased 86% over this time. This increase far outpaces the 57% that occurred regionally and 44% nationwide over the same time. The increase in major depressive episodes among youth also increases the cost and effort required to serve them.

The 111-year old, nonprofit group Mental Health America annually issues a State of Mental Health in America report that provides a ranking of states' effectiveness at addressing issues related to mental health and substance use.[8] The rankings include 15 mental health measures, such as adults with any mental illness, youth with severe major depressive episodes, and mental health workforce availability, provide a foundation for understanding mental health concerns across states. As shown in Figure 6, Oregon is among the lowest ranked of states and the District of Columbia for overall mental health. The state ranks last for adult mental health and 47th for youth mental health.

**Figure 6: Oregon ranks among the lowest in its effectiveness at addressing mental health and substance use**



Source: Mental Health America

***Recent lawsuits and public scrutiny have spurred action targeting psychiatric residential treatment services for children and youth***

In 2019, Disability Rights Oregon filed a lawsuit against DHS that brought attention to the state's practice of sending some foster children out-of-state for care. Legislators also focused on aspects of care for children in out-of-state facilities during the 2020 legislative session. The attention prompted additional scrutiny of foster care management, including reviews, legislative attention, and media coverage.

As a result of the scrutiny, it became clear that part of the problem was shortfalls in intensive residential treatment beds in Oregon, managed by OHA, which limits DHS options for children and youth. Mechanisms, like the Child Welfare Oversight Board, were put into place to hold DHS

---

[8] Mental Health America, The State of Mental Health in America.

Stenson Decl., Ex. X
P. 10 of 82

accountable for outcomes; however, less attention was paid to the capacity of the OHA-managed system.

Our 2018 audit of the Oregon foster care system[9] found the impact of reductions in DHS behavioral residential capacity was even more pronounced when considering OHA's additional 30% to 40% reduction in bed capacity in Children's Mental Health Services program for high-level psychiatric conditions.

As noted in that report: "With increasingly limited options available, children with acute needs may end up in foster placements that are not equipped to handle their specific issues. They may be placed with foster families or relatives that have no experience in providing the appropriate level of care and have little training and inadequate guidance and support from the agency. In these cases, children tend to burn out of placements, often repeatedly, and may never achieve permanency with a family or stability in a foster home placement."

---

[9] Report 2018-05: "DHS Child Welfare System Foster Care in Oregon Chronic Management Failures and High Caseloads Jeopardize the Safety of Some of the State's Most Vulnerable Children."

# Audit Results

The state system responsible for delivering mental health treatment services to roughly 1 million Oregonians, including vulnerable children, is vast and complex. It is made up of numerous stakeholders, including state agencies, counties, health care providers, and nonprofit organizations. Oregon's fragmented and siloed structure hinders the state from coordinating and effectively addressing mental health challenges faced by Oregonians. The severe mental health impacts from the COVID-19 pandemic will likely place additional duress on the system.

**Figure 8: The complex, fragmented, and siloed children's mental health system**



Exacerbating fragmentation issues is the unavailability of accurate and comprehensive data needed to adequately monitor and plan mental health treatment for children and families. Existing OHA data systems, built for Medicaid purposes, are not designed to collect information needed to assess the quality of services being provided.

We also found children are served by overworked direct care workers who are leaving the mental health system in high numbers. The issue of excessive direct care worker turnover has also been noted in previous reports such as the 2001 report to the Governor from the Mental Health Alignment Workgroup.[10]

---

[10] Report to the Governor from the Mental Health Alignment Workgroup, 2001.

Stenson Decl., Ex. X
P. 12 of 82

In addition, flawed statutory requirements and a lack of monitoring of county mental health services funding further limit the state's ability to effectively oversee and manage mental health treatment services. Without a clear understanding and analysis of how mental health treatment funds are spent, millions of dollars are at risk of being ineffectively used and efforts to engage in strategic planning are hampered.

For nearly two decades, the state legislature and OHA management's response to poor state outcomes has been to reorganize the system; however, these efforts have not resolved the underlying issues. OHA does not have a comprehensive strategic plan, nor does the Behavioral Health Division. Leadership turnover in the previous decade has been high and the lack of a guiding strategy has added to confusion about roles and responsibilities within the system.

These problems are interrelated. In the sections below, we detail data shortfalls, statutory weaknesses, workforce capacity and high employee turnover challenges, poor county oversight practices, and foundational governance issues. We provide recommendations intended to assist the state to enhance its mental health services delivery model.

## Oregon's fragmented and siloed mental health system hinders the provision of effective mental health treatment services

In its 2001 report to the Governor, the Mental Health Alignment Workgroup[11] stated that insufficient access to mental health services was compounded by the lack of a clear mental health system, especially for children. The report went on to note fragmentation in many areas, including funding, risk, management of services at the state and local levels, and in responsibility for delivering necessary services in many communities. The report also noted fragmentation among state agencies and between local, state and federal levels of government and identified the state was lacking a systematic approach for planning and providing mental health services.

These issues, first identified in 2001, have persisted. At least six more recent assessments have reiterated many of these points. For example, nearly 17 years later, a joint 2018 report by OHA and DHS found state agencies service systems are fragmented, isolated from each other, and do not effectively manage the continuum of care for children. While auditors found no other states have completely streamlined mental health service delivery some, such as New Jersey, are further along at reducing overall system fragmentation.

### *Multiple studies found roles, responsibilities, and accountability requirements for the Oregon's mental health system are unclear in a highly complex and fragmented system*

Many system stakeholders report that accountability and transparency efforts are insufficient, ineffective, or both. Per audit interviews, there remains a wide consensus among stakeholders, including providers, state agencies, counties, and community health organizations, that roles and responsibilities are frequently unclear. This lack of clarity exists on a foundational level, including a lack of clarity about which agencies or organizations are required to provide which mental health services. This situation undermines accountability and transparency efforts, as well as the consistency and quality of services.

As illustrated in Figure 8, the entire system involves federal, state, and local government, four state agencies, CCOs, health care providers, patients on and off Medicaid, the Governor, the

---

[11] Governor John Kitzhaber established the Mental Health Alignment Workgroup in January 2000 to recommend strategies to better align state mental health services for Oregon children and adults. The workgroup received testimony from experts and stakeholders and gathered input from 750 Oregonians through 38 community forums.

Stenson Decl., Ex. X
P. 13 of 82

Legislature, and numerous councils and advisory bodies. Several recent studies and assessments have identified a number of issues regarding the Oregon mental health system, including:

- Fragmentation among state agencies and within the behavioral health system;
- Confusion between the role of CCOs and counties;
- Inadequate behavioral health services; and
- The overall lack of accountability in the behavioral health system and across child serving agencies.

For example, a 2018 assessment of Multnomah County's mental health system highlighted how fragmentation at the state level affects counties and local communities. The assessment was performed with input from over 100 county stakeholders and reported a number of concerns with the system, including challenges with access and coordination of services, especially for individuals without Medicaid. In the assessment, stakeholders depicted Oregon's behavioral health system as convoluted and characterized by role confusion. The assessment reiterated "in this multilayered and complex system, no single entity is accountable for the well-being of the whole population, and overseeing the big picture."

In addition to these reports, in audit interviews, county behavioral health managers identified a lack of role clarity between OHA, CCOs, and local mental health authorities. They said they did not know how to engage the local CCO or whether certain responsibilities belong to CCOs or the local authority. A CCO administrator told auditors that OHA's oversight role of county providers should be clarified. For example, OHA licenses providers, yet allows CCOs to tighten oversight of any underperforming county they may subcontract with, resulting in confusion about who is ultimately responsible for ensuring federal and state monies are properly accounted for and effectively used by county governments.

### Fragmentation underscores the need for effective planning and oversight from OHA

The fragmented nature of the behavioral health system and its many stakeholders, such as providers, consumers, and CCOs, make the need for effective planning and oversight from OHA even more critical. Effective OHA involvement is particularly important for children with intensive needs who face service shortages and are especially harmed by the fragmentation and disarray in the system.

**Emergency department visits on the rise**
According to an emergency room physician, emergency department visits for children in mental health crisis **has almost tripled since 2013.**

A 2016 Juvenile Justice Taskforce Report maintained that no single system is accountable for children, leaving many youth programs without services needed to be successful.[12] Insufficient information sharing about planning and treatment resulted in lack of continuity of care. The report described how a shortage of psychiatric services, residential beds, and crisis placements has led to youth with severe mental health needs and histories of trauma being held in expensive settings, such as detention or hospitals, which can exacerbate underlying trauma and do not support positive outcomes.

Stakeholders have attributed a rise in psychiatric emergency department boarding in part to inadequacies in the mental health service continuum. In some cases, children may even be admitted through emergency departments and into hospitals not licensed for pediatric mental health care. According to the Juvenile Justice Taskforce report, Oregon hospitals experienced an increased number of children with behavioral health challenges inappropriately waiting in emergency departments due to a lack of alternative care options. In addition, one physician interviewed concurred emergency department visits for

[12] Oregon State Court Juvenile Justice Mental Health Task Force Report and Recommendations, January 2016.

Stenson Decl., Ex. X
P. 14 of 82

children in mental health crisis has almost tripled since 2013, which he attributed to the mental health care continuum not being robust enough to allow children to move up or down. He explained that residential services have closed and the state has far too few beds available. At the same time, he said, Oregon has failed to adequately develop intensive community support for children and youth with mental health needs or mental health treatment settings.

Following the Juvenile Justice Taskforce Report and other assessments noting a lack of cross-system coordination and inadequate services for youth with complex needs, the Legislature passed Senate Bill 1 to create a System of Care Advisory Council. The Council is tasked with creating policy to improve the state and local systems that provide services to youth in two or more systems of state care, such as services provided by OHA and DHS. However, as of the time of this report, the advisory council has not yet been established. The council will have to determine clear guidance for improving service coordination; it is not yet clear who will be held responsible if coordination does not improve.

According to the National Association of State Mental Health Program Directors: "A robust System of Care for individuals with serious mental illness must look beyond beds and offer comprehensive and quality treatment and services before, during, and after acute illness episodes." The National Technical Assistance Center for Children's Mental Health advocates for Systems of Care that address the needs of children and their families and incorporate early intervention, prevention, and mental health promotion. Systems of Care should also focus on accountability and continuous quality improvement. OHA should work to incorporate these underlying principles in its approach to the newly formed System of Care Advisory Council.

### *New Jersey restructured its System of Care to improve care coordination and outcomes*

While Oregon has struggled to meet these standards, New Jersey has made significant strides. To improve outcomes for children and youth and promote system coordination, New Jersey restructured its System of Care in 2000. The system would ultimately deliver universal access to behavioral health care for any child in need, regardless of their insurance coverage. With its reforms, anyone in New Jersey can call the single point of access number as an entry point to learn about options for connecting to and accessing the state's full range of coordinated services.

Unlike Oregon, New Jersey statutes require the state's Department of Children and Families to assess whether sufficient inpatient, outpatient, and residential services are available in each service area of the state in order to ensure timely access to appropriate behavioral health services. Services available through the System of Care are authorized without regard to income, private health insurance, or eligibility for Medicaid or other health benefits programs.

New Jersey is further distinguished from Oregon's behavioral health system by its 15 independent, community-based Care Management Organizations, which are separate from the state's five Managed Care Organizations. New Jersey's entire behavioral health benefit for children is a carve-out delivered through the Care Management Organization. The organization's sole responsibility is to work with children and families using the Wraparound model to provide overall service planning and coordinate care across multiple service systems at the local level.

By consolidating authority for the children and family System of Care to a single entity, New Jersey has streamlined the coordination necessary for its management. As Oregon continues to face chronic fragmentation within its mental health system, especially for children and families, the state may consider some of the steps taken by New Jersey in its path forward.

Stenson Decl., Ex. X
P. 15 of 82

**Figure 9: Unlike Oregon, the New Jersey Children's System of Care concentrates accountability**



Source: New Jersey Department of Children and Families

### *Fragmentation and disarray present children and families with numerous challenges when navigating Oregon's mental health system*

The fragmentation within the mental health system presents a substantial challenge for children and families when attempting to obtain services. As a result, some of Oregon's most vulnerable children are left without the adequate services to treat their mental health. Without addressing the challenges presented from this fragmentation, children will continue to face higher health risks and an increased likelihood of adverse health outcomes into adulthood. The following case examples illustrate types of challenges faced by children in need of mental health treatment services.

**Boy, age 9,** had been in Child Welfare custody due to aggression toward people in the home. While waiting for recommended intensive mental health services, the boy stayed in a hotel for over 100 days, was treated in the emergency department several times, and did not have regular access to needed services and supports.

During that time, his CCO had authorized him unsecured residential treatment, also called Psychiatric Residential Treatment Services, but he was denied by all in-network providers because of his behaviors, the discharge plan, and medical concerns. By the time OHA approved him for secure inpatient care in consultation with a child psychiatrist, the estimated wait time was over six weeks. He ultimately did not receive any residential care. An out-of-network provider located far from the youth's care team and resources denied him care, because his care team had not agreed to it. He was eventually returned to a foster family setting due to a plan by the youth's Wraparound team involving family supports and outpatient services.

**Girl, age 16,** had been involved in Child Welfare and juvenile justice systems and had a history of sexual exploitation and drug use. After being stabilized at an acute care facility and discharged, she faced a delay in care and ran away to use heavy drugs, which gave her psychotic-like symptoms. As a fee-for-service member with an upcoming CCO enrollment, she suffered a delay in care resulting from the hospital not making a referral to psychiatric residential treatment in a timely fashion.

After she was found by Child Welfare, she was treated at five facilities, including twice at the emergency department, but was not able to access Medicaid-funded psychiatric services. She was approved for out-of-state residential placement for specific treatment with her complex needs, but the providers denied her care due to the severity of her problems. Child Welfare worked with OHA and a CCO to have her treated at an emergency department to detoxify from drugs.

After a five-day stay in the emergency department, she was discharged to a DHS-funded crisis facility for stabilization and assessment of need. From there, she was admitted to an OHA-funded program for young women who are victims of sexual exploitation. However, due to extreme self-harm while at the program, she was taken back to the emergency department. She fled, and though she had residential treatment service approval from a CCO, was denied by providers due to her acuity and the risk of her leaving the facility without permission. She was placed in a DHS-funded setting for mental health and substance use needs.

## Data shortfalls prevent OHA from consistently identifying and understanding mental health treatment availability, need, and outcomes

OHA lacks basic data to help the agency not only identify the mental health services children and youth receive, but also to understand the specific needs of this population. Existing data systems do not include critical information and contain unusable and incomplete data. OHA has not defined performance measures for children's mental health services and identified what data would be necessary to meet such measures.

Without defining performance measures and implementing adequate data management practices, OHA cannot ensure its data systems will meet data collection needs. The agency also cannot effectively communicate requirements for data collection to the providers and CCOs. As a result, agency staff are unable to use existing data sources to answer important questions about services provided and the adequacy of children's mental health care.

### Key mental health information systems lack consistent and complete data

Data on mental health services is fundamentally flawed and spread over multiple systems — such as Medicaid Management Information System, MOTS, and CANS — that do not interface. Key data systems, such as MOTS and CANS, have incomplete or unusable data, while Medicaid claims data can be highly variable due to inconsistent inputs. As a result, OHA is unable to assess the level of participation or need in mental health services, and is at risk of failing to effectively comply with new legislative requirements for reporting on the System of Care.[13]

As noted in the introduction section, OHA's MOTS was intended to be a comprehensive electronic data system that allowed the agency to track and report on behavioral health outcomes reported by providers; however, its data is unusable for much of its intended purpose. Specifically, the system is not usable for tracking outcomes for either the adult or child population or for reporting on children's mental health services.

According to a September 2019 legislative report,[14] problems with MOTS data usability have been exacerbated since 2012 by OHA reorganizations and leadership turnover. According to the report, OHA has largely not achieved the system's reporting functionality, has not established a feasible validation process for providers, and does not have sufficient resources to oversee

---

[13] ORS 418.976 defines System of Care as a coordinated network of services and supports to youth. For more information, see: National Technical Assistance Center for Children's Mental Health Updating the System of Care Concept and Philosophy, 2010.
[14] Oregon Criminal Justice Commission Analysis of Oregon's Publicly Funded Substance Abuse Treatment System: Report and Findings for Senate Bill 1041, September 2019.

Stenson Decl., Ex. X
P. 17 of 82

submission timeliness and accuracy. The report further notes incomplete provider submissions may be worsened by time-consuming data entry requirements, MOTS's incompatibility with provider systems, and some providers' reliance on third-party vendors to digitally convert their hardcopy data.

OHA management acknowledged the MOTS system was not implemented fully or effectively. In its response to a 2020 internal audit report examining behavioral health residential systems and the Oregon State Hospital, OHA reported: "Due to budget constraints, the MOTS system that was developed and implemented was a truncated version of what was fully needed. Implementation and data quality issues have plagued the system." Additionally, OHA managers noted that providers' inputs into the system have been incomplete. One manager specifically reported challenges with ensuring that providers routinely submit complete and timely data.

Another key data system, CANS, the Child and Adolescent Needs and Strengths assessment, also contains incomplete data. CCOs are required by their contracts with OHA to submit quarterly spreadsheets to the agency with CANS data such as the date the child entered Wraparound and information about the child and family's experiences. These submissions are recorded and retained by the Child and Family Behavioral Health unit. However, oversight to ensure their timely and complete submission is limited, with CCOs not always submitting required CANS information.

OHA program staff told auditors CANS data can be used to estimate the number of children participating in Wraparound services. However, due to incomplete data, they are unable to assess the level of program participation statewide since discontinuing their former web-based system in 2017. When the audit team compiled the CANS spreadsheets, we found estimated participation had fallen from 945 individuals in the second quarter of 2016 to 563 individuals in the second quarter of 2018; this information was unknown to OHA.

The lower number of estimated wraparound participants may have been due to under-reporting and inadequate record keeping by CCOs, according to OHA staff. For that quarter, OHA was also missing CANS information from five CCOs. Current and past staff working on Wraparound acknowledged that not all CCOs have submitted the CANS as required. Staff also acknowledged that providers may not submit CANS for Wraparound participants to CCOs as required.

In addition to preventing the agency from understanding the mental health service continuum, these data issues and those described for Medicaid data below leave OHA unprepared to meet the new statewide Children's System Data Dashboard requirements required by Senate Bill 1. Under the bill, the agency must contribute data, along with the Oregon Youth Authority and DHS, to report on such information as the number of youth the agencies serve, children and youth experiencing emergency department boarding, the length of time they wait to access services or appropriate placements, and the outcomes of those services. It does not appear that the agency can provide information that will meaningfully inform these topics with existing data sources.

### *Medicaid data gaps inhibit its usability for examining mental health system performance*

Medicaid claims and encounter data contain a potential wealth of information useful for examining mental health system performance.[15] This Medicaid data provides information about health care services provided to Medicaid clients through inpatient and outpatient care. Some states use this data to measure provider performance. OHA has previously made some efforts to use Medicaid data for this purpose, with mixed results. Should OHA decide to use Medicaid data

---

[15] For more information about Oregon's Medicaid program, including claims and encounters, see Audits Division report: Oregon Health Authority Should Improve Efforts to Detect and Prevent Improper Medicaid Payments, November 2017.

Stenson Decl., Ex. X
P. 18 of 82

for developing performance measures for children and youth mental health services, significant gaps must be addressed.

OHA cannot currently identify intensive services and supports using its Medicaid data. While the state of Washington provides a robust set of instructions to health care organizations and providers, OHA has no equivalent set of instructions. While OHA management believes Medicaid data can be used for certain purposes, such as actuarial use, they are not clear on the extent to which it can be used for assessing specific mental health services. According to management, the Medicaid data can present these challenges because the data was not designed for these purposes.

OHA did attempt to use Medicaid data to examine other aspects of mental health service delivery; however, the information was incomplete and unreliable. For example, claims and encounter data was too incomplete and inconsistent to be used to accurately determine statewide participation in the Wraparound program. The Health Analytics unit at OHA attempted to use the information to calculate the number of Wraparound participants served by each CCO, but found the data incomplete, despite its use by actuaries to calculate rates for CCOs. According to OHA staff, while the data may indicate a child participates in certain services under Wraparound, it does not accurately reflect actual Wraparound program participation.

Claims and encounter data are also not adequate to determine the length of stay in residential services or emergency departments. A 2020 internal audit report examining behavioral health residential systems found significant disparities between the admission and discharge dates for residential care in Medicaid claims and client case files. In addition, as part of this audit, we found Medicaid data could not be accurately used to estimate how long children spend in the emergency department, because of the way services are billed. Staff were also unable to explain apparent errors found in the data.

These gaps must be addressed should OHA decide to leverage Medicaid claims and encounter data to better track and monitor participation in mental health services.

### OHA lacks meaningful indicators and strategies for children and youth mental health services

According to the World Health Organization (WHO), a mental health information system should be used to inform all aspects of the mental health system. However, OHA is not only lacking the necessary data, the agency has not identified the performance measures for child and youth mental health services that would lead to the collecting and gathering of necessary data. The agency has neither connected metrics to specific goals to support decision-making, nor defined its desired outcomes for serving the population.

> **Mental Health Information System**
> According to the WHO, a mental health information system is a system for action: it should not exist simply for gathering data, but for also enabling well-informed decision making across all aspects of the mental health system.

To design effective mechanisms for collecting data, OHA must first establish indicators for assessing needs and outcomes. Well-designed indicators should:

- draw on specific policy and planning goals to help measure the extent to which these goals are being met;

- assess how well resources are being used to support securing appropriate levels of funding; and

- support equity in service provision by measuring needs among different groups, including education level, racial and ethnic groups, and children with disabilities. These indicators can help address a central challenge facing mental health service: providing effective and equitable care with scarce resources.

Without information about the various types of services, OHA is limited in its capacity to understand how the overall mental health system is functioning. For many children, timely and appropriate interventions can mean avoiding more intensive services and hospitalization later. A failure to intervene early negatively affects children and families. Multiple reports have described Oregon's how inadequate mental health services for children have resulted in children languishing at inappropriate levels of care.[16] As noted earlier in this report, this may result in re-traumatization with lasting adverse effects on a child.

Without goals connected to performance measures traced over time, OHA's ability to improve the system is limited. OHA also cannot know whether efforts to improve mental health services benefit the population being served.

For example, without meaningful indicators for residential care, OHA cannot effectively assess the impacts of the state's recent decision to add beds to the system and whether those beds meet the needs of Oregon's children. The agency conducted a year-long study from February 2018 to 2019 to estimate the need for care in the face of what has been recognized as a crisis. As part of the study, OHA found only 25% of OHP children referred were admitted, and it took those children twice as long to get approved as it did for those with private insurance. Despite these findings, and the effort to increase residential treatment capacity by 30 additional beds by June 2020, the agency no longer tracks information necessary to determine if its efforts are successful in improving access.

### *Limited coordination and lack of data analysts within the Children and Family unit impedes development of shared guidance to support performance measures*

Identifying and implementing useful performance measures requires adequate resources, expertise, and coordination across multiple workgroups within and outside of OHA. OHA faces challenges in these areas.

At the time of this audit, OHA and DHS had different methods for estimating Oregon's child and youth needs for residential care, the demand for which is highly affected by the Child Welfare system. Internal coordination and communication between OHA's Children and Family unit, Medicaid team, and Health Analytics team has also been largely ineffective. For example, the Child and Family unit manager was not aware of OHA's recent efforts to develop a way to track emergency department boarding[17] until auditors informed the manager of the effort during the audit.

Given the complexity of Medicaid data and Oregon's web of service delivery, OHA staff do not have an appropriate mix of expertise to develop a shared understanding of the data analysis guidelines for children and youth mental health services. While Health Analytics staff have met with Behavioral Health unit staff to discuss potential data tracking, those meetings have not resulted in agreed upon procedures. A Health Analytics manager questioned whether OHA

---

[16] Children's Mental Health Increased Department Visits Crisis Workgroup Recommendations, November 2014. See pages 50-54. Oregon State Court Juvenile Justice Mental Health Task Force Report and Recommendations, January 2016. Oregon's Child, Youth & Family Continuum of Care, March 2018.
[17] There is no standard definition of emergency department boarding; however, OHA referred to the following two definitions to evaluate the issue in a 2017 legislative report: (1) A stay in an emergency department for longer than six hours. This definition was used in a national survey of hospitals regarding emergency department boarding. (2) A stay in an emergency department longer than 24 hours. This definition was used in a survey of hospitals in Arizona.

Stenson Decl., Ex. X
P. 20 of 82

Behavioral Health staff have the data expertise needed to support them in developing methodologies for data analysis. The Children and Family Unit does not have a staff member with expertise in both mental health service delivery and data analysis who can support the effort or coordinate efforts across multiple departments and agencies.

Auditors also found OHA staff involved in data analysis were not familiar enough with mental health services to avoid inaccuracies in pulling data from the system. One staff member told the team she was the only person who could answer the team's questions for performing analysis, due to her expertise with the data source, yet could not answer important questions about the data for the analysis. Additionally, data supplied to the audit team on two occasions contained errors that prevented analysis. Specifically, staff sent auditors data for analysis with incorrect dates and was not aware of errors until the auditors inquired about illogical dates. Further, staff provided auditors with incomplete patient address information for use in identifying the distance patients' travel for services because they were unfamiliar with the necessary fields. Staff were also unable to definitively explain numerous potential data errors. This lack of understanding, coupled with lack of coordination and documented procedures for mental health data analysis, presents challenges for effectively transferring institutional knowledge as staff leave the agency, and calls into question whether staff have adequate expertise in both data and children's mental health services to develop performance metrics using existing data.

### *Oregon can look to the promising practices of other states for assessing mental health service needs, adequacy, and outcomes*

New Jersey and Washington both demonstrate promising practices in identifying performance measures and monitoring mental health services data for children and youth. New Jersey uses real-time data to inform its efforts for building residential capacity. Washington draws from multiple data sources to track service needs for Medicaid-eligible youth and reports on metrics tied to benchmarks for its Wraparound with Intensive Services (WISe) program. In addition, while OHA's Children's unit does not have a data expert and has faced coordination challenges, Washington's Health Care Authority staffs an expert who coordinates data efforts within and outside the agency and maintains the state's quality plan for WISe.



New Jersey uses a bed tracking system to monitor real-time data on residential service utilization for children and youth. The state monitors information on the number of children waiting, and the time those children wait, in considering whether to expand programming. Residential providers input information into the children's behavioral health electronic medical record system. At any time, the system can be used to monitor where higher intensity services are available and to match youth with particular programs. It provides information such as length of stay for individuals and in aggregate. A dashboard shows both statewide and program level utilization.

Washington assesses mental health needs, services and outcomes for Medicaid and WISe-eligible children and youth using multiple data sources. The state's Health Care Authority maintains an up-to-date WISe Quality Plan that describes the goals, objectives, tools, resources, and processes used to assess and improve the quality of home and community-based intensive mental health services provided. The plan includes a matrix with over 40 indicators to track system performance to promote a common understanding of the outcomes of key service 
processes. Washington also has performance measures with benchmarks for assessing system capacity, service intensity, and child and family team meeting frequency. These metrics are tracked over time, and regularly reported on the state's website. According to Washington staff,

Stenson Decl., Ex. X
P. 21 of 82

having WISe and associated data efforts in place has allowed the state to identify service gaps in the mental health system to inform legislative requests aimed at improving access for under-served populations.

Washington also relies on internal and external coordination to execute its efforts. A researcher in the Health Care Authority's children's unit acts as the data expert and liaison with the Medicaid department and the Research and Data Analysis unit in a separate state agency, the Department of Social and Health Services. Coordination is also supported by a contract between the Health Care Authority and the Research and Data Analysis unit, with the two groups jointly developing performance measures.

## Workforce shortages and chronically high turnover throughout the mental health treatment system adds to system strain and may further traumatize patients and staff

Working with children who need mental health services is stressful. The difficulty inherent in the job, coupled with low pay and a lack of adequate support from supervisors and OHA leadership, have led to a high level of turnover. This turnover exacerbates existing system service delivery challenges. While OHA is aware of the turnover problem, its efforts to reduce it have been ineffective.

### Direct Care workers face challenges in a complex, trauma-filled system

The environment in which direct care staff work is, by its very nature, highly stressful. Children vary in the acuity of their need, from low-acuity needs such as minor depressive episodes to high-acuity needs like suicidal ideation. Children may be traumatized by their experiences and develop attachment issues with staff. In some cases, staff may be physically harmed by children who lash out. Navigating the needs of these children requires in-depth familiarity with children's mental health, trauma-informed care, and the mental health system. Throughout the audit, direct care workers, supervisors, and managers across the state stressed the increasing difficulty — and critical role — of the direct care workers' jobs.

According to direct care staff, a lack of support from supervisors only compounds this problem. Both direct care workers and supervisors told us there are instances where workers are unable to take vacations, periodic breaks, or, in cases where children need constant supervision, even have lunch away from their responsibilities. Management, some workers told us, sometimes makes it clear they are "replaceable." Direct care workers told us they routinely have to handle unsafe situations with little training and busy supervisors are not always able or trained to support them. In one case, a direct care worker recalled an event where a colleague was attempting to restrain an agitated patient; however, due to lack of support the worker was unable to do so and the patient attacked the staff member, causing severe injury and sending them to the hospital. Several staff shared with auditors that the job had taken a toll on their personal lives.

In 2018, a DHS and OHA workgroup developed an overview of the continuum of care that recommended state agencies become "trauma-informed." According to the report: "A Trauma-Informed System realizes the widespread impact of trauma and understands potential paths for recovery; recognizes the signs and symptoms of trauma in client's families, staff, and others involved with the system; and responds by fully integrating knowledge about trauma into policies, procedures, and practices and seeks to actively resist re-traumatization." While OHA has worked to make inroads on this recommendation, they have not yet achieved a Trauma Informed System.

Stenson Decl., Ex. X
P. 22 of 82

To address some direct worker issues, OHA is collaborating with Trauma Informed Oregon to deliver training on trauma-informed practices to direct care providers. During an auditor-attended conference, held by Trauma Informed Oregon, presenters made clear that organizations must serve the needs of staff in order to serve the needs of the children. By recognizing the toll direct care work takes on the workers and adapting organizational policy and culture, organizations are better situated to provide for the vulnerable children in their care.

Without adequately addressing these issues, the state compromises the ability of even the most experienced direct care staff to effectively serve this vulnerable population. During audit interviews, direct care staff and supervisors repeatedly voiced concern that turnover, workforce shortages, and work environment all contribute to stress that may re-traumatize clients.

**Direct Care Worker Turnover**
Turnover rates at two psychiatric residential treatment providers of **more than 40%** in the two years from 2018 to 2019.

All of these factors can increase turnover, adding to the workload for direct care workers who remain. During the audit, we found direct care staff turnover rates at two psychiatric residential treatment providers of more than 40% in the two years from 2018 to 2019. These rates of turnover are in line with nationwide turnover in publicly-funded mental health settings which range from 30% to 60% annually. This is indicative of the systemic issue of staffing and capacity within the behavioral health workforce. Many of the remaining staff are relatively new, but taking on full responsibilities, sometimes in high-acuity, complex environments, even though many have not completed robust training programs.

Direct care staff described often having to deal with unsafe situations and people when out in the field. Many felt they did not receive enough training or enough support from supervisory staff, as their supervisors were as busy and overwhelmed as they were.

**Secondary Traumatic Stress**
Also called compassion fatigue, secondary traumatic stress is a by-product of working with traumatized clients.

Its symptoms mirror those of post-traumatic stress disorder and are preventable and treatable. If unaddressed, they can affect mental and physical health, personal relationships, and work performance.

Even navigating the needs of relatively lower-acuity children requires a training and understanding of the system. However, due to systemic staffing challenges, newer and less experienced direct care workers may also be assigned to high-acuity, complex children. Supervisors, also facing the same challenges, may not be able to lend as much support in handling those scenarios.

For example, one direct care worker told us of a situation where, partly due to a lack of training on the worker's part, a high-acuity child assaulted a direct care worker, sending that employee to the hospital. Aside from the immediate impact such an event can have on the physical health of a direct care worker, as well as the child, there are a related psychological impacts to all parties, including other staff and children at the facility. Additional trauma may occur for those who either witnessed, or were told, about the event. This trauma can make recovery and support for the children all the more difficult for an already encumbered system.

High turnover can negatively affect children, especially those who suffer from attachment-related trauma, as direct care staff try to build relationships with children and their support network. When the Mental Health Alignment Workgroup issued their report to the Governor in 2001, the group reported 75% of staff in residential treatment programs turn over each year. The theme of direct care workforce challenges would later be echoed through reports such as the 2016 Behavioral Health Collaborative, which highlights the need for an experienced workforce with a high rate of retention to reduce system strain and cost.

***While OHA leadership acknowledges turnover is a problem, efforts to mitigate the issue over two decades have been ineffective; COVID-19 impacts may inhibit further progress***

OHA leadership acknowledged high turnover is problematic. The issue of direct care worker turnover has been cited since at least the 2001 Mental Health Alignment Workgroup report, yet efforts to abate the problem appear to have been ineffective.

In 2019, OHA acknowledged the critical shortage of qualified behavioral health workers at all levels throughout the state. In response, the Behavioral Health Division has begun development of a recruitment and retention strategy. The division director provided a presentation to the Oregon Legislature in November 2019 detailing the workforce plan goals.

It is crucial a comprehensive strategy be developed in collaboration with system stakeholders. Once developed, that strategy should be documented and accepted by OHA leadership and the Oregon Health Policy Board so that it may continue regardless of future turnover.

## "I hear kids ask, 'Are you leaving too?'"

*In December 2019, the audit team sat down with a direct care supervisor of a Secure Adolescent Inpatient Program to discuss, at length, her role, its impact on her life, and her observation of clients and coworkers. Due to the sensitive nature of her work, she wished to remain anonymous and provided the following comments:*

People stay in this job because they love what they do. I love coming to work and seeing the kids every day, but the pay isn't worth it if you don't like the kids. People that stay know they're making a difference, and feel gratification about that, especially for children under state custody. We have access to each child's trauma history, and can see they have often experienced trauma in their own family systems. We ask, "Since they don't have a family, how can we become that for them and help them get better?"

At the Secure Adolescent Inpatient Program level of care, many kids are really tough. Some are very aggressive, while others self-harm, even with suicidal attempts. There are challenges with clients being aggressive toward staff who are working to keep kids safe and prevent them from harming themselves or others. We constantly have to work to keep kids safest. I consistently see kids go after staff physically, and often threaten staff before doing it. A kid will say, "I'm going to punch you in the face," and then walk or run toward you. You hope that other staff in the room will intervene to help.

There is a lot of turnover for direct care supervisors due to lack of training within the first six months to a year, but the facility has been working on changes to allow for more training. It is not an easy job, and becomes even harder when the direct care workers are not enjoying it. I have a long tenure as direct care worker and a lot of experience in the unit and love sharing my knowledge and helping to guide others across campus. I see myself staying in the position for now. I have a perfect schedule and team. I'm very fortunate each member of my team has been at the facility over a year — they are all bonded and connected.

When I started as a supervisor, many of the supervisors had between two and seven years of experience, but they all left. Staff that have been with the agency over three years have experienced turnover at its worst. Those who stay will form close bonds with their coworkers. But if you're not working with people you know and trust, it puts kids in danger.

Kids living here, say for seven months at a time, form bonds with staff, and most have preferred staff they are willing to confide in and work with. When they experience a lot of turnover, staff have to figure out how to gain the kids' trust and it's a lot of work to build rapport. I hear kids, both those who have been here a while and for only a week, ask "Are you leaving too?" They may have to say goodbye to their favorite staff member. Turnover definitely affects them.

The facility has raised the entry level pay for direct care workers to $14 an hour, which is higher than most others, and can be slightly higher than that depending on experience and degree. Secure Adolescent Inpatient Program staff are paid an additional 50 cents an hour to put themselves at increased risk, and overnight staff are paid an extra 75 cents an hour. The difference between the entry level pay for direct care workers and supervisors used to be larger when I became a supervisor, and has since narrowed. Staff now question, "Why would I want to take on extra duties for such a small bump in pay?" The facility is considering how they can give direct care workers a better bump when they transition to supervisors.

Overall, it's unfortunate, because we have a lot of great direct care workers on campus who would do well as a supervisor, but are reluctant because the pay doesn't seem to be worth the responsibility. We need to retain supervisors to provide much needed support, but how do we improve retention? Until we figure it out, we won't be able to retain direct care staff either.

## Oregon statutes do not fully support effective delivery of mental health treatment services

The state's current mental health statutory framework is flawed in several areas which hinders effective service delivery. Critical statutory guidelines for providing mental health services are dispersed in disparate sections of code and have been implemented piecemeal over time and not in a compressive or coordinated manner. The statutes often have vague requirements and include language that may nullify guidelines for service delivery and oversight. For example, within the statute that establishes the obligations of OHA and other entities for many mental health programs, the phrase "subject to the availability of funds" is used nine times. The use of this phrase allows an opportunity for a loophole to deprioritize these programs in favor of others that might use the same funds.

Important statutory roles and responsibilities for critical mental health system stakeholders are unclear, meaning essential reporting and oversight may not be occurring, and there are gaps in the array of available services. Statutes have also not established accountability for a coordinated System of Care for children and youth.

**Figure 10: An ideal future state for behavioral healthcare delivery in Oregon is hindered by statutes**



Source: OHA presentation to Senate Interim Committee on Mental Health

### *Some statutory provisions deprioritize mental health service delivery and prevention*

ORS 430 was enacted in 1961 to establish the obligations for many mental health programs and has been amended to include OHA as a responsible party. Key provisions of the law for local mental health services have not been updated since 2013, shortly after CCOs were established and since information about outcomes of the new health care system has become available. Specifically, sections 430.620 and 430.630, outlining the roles and responsibilities for Local Mental Health Authorities and the Community Mental Health Program, have not been revised; nor have OHA's duties in assisting and supervising Community Mental Health Programs under ORS 430.640.

ORS 430 may limit the ability of counties to engage in mental health treatment services, as mandated services are subject to the availability of funds. Making these services subject to the

Stenson Decl., Ex. X
P. 26 of 82

availability of funds affords the opportunity to deprioritize mental health in favor of other programs. Some of these important services, made available for those suffering from mental or emotional disturbances but only when funding is available, include crisis stabilization, psychiatric care, residential services, and therapy.

As part of ORS 430, Community Mental Health Programs are to provide services for the prevention of mental and emotional disturbances and promotion of mental health subject to the availability of funds and not as a priority. Community Mental Health Program preventative health services for children are intended to reduce emotional, behavioral, and cognitive disorders in children and address issues early so disturbances do not develop. However, statute requires Community Mental Health Programs to prioritize services for persons already in need of immediate or intensive mental health services, not preventative services or services aimed at promoting mental health.[18] With limited resources, it is likely counties will only serve the most acute cases.

It is also unclear how county prevention responsibilities relate to those required for OHA and CCOs. ORS 430 directs the OHA budget to give high priority to OHA's children's mental health programs that address preventative services, and a separate statute requires CCOs to focus on prevention.

According to the World Health Organization, government agencies should develop policies on prevention of mental disorders and mental health promotion as part of public health policy and in balance with treatment and maintenance practices for existing mental disorders. A statutory directive to place greater emphasis on preventive mental health services for children exists in ORS 430.708; however, the agency has devoted limited resources to it. No such provision exists for the agency to address mental health promotion. In a presentation to the legislative Joint Committee on Ways and Means and Subcommittee on Human Services in March 2019, OHA's data on historical behavioral health spending included prevention as the narrowest portion of funding. According to OHA, the funding for prevention also covered promotion.

**Figure 11: OHA historically spends a small percentage of funds on behavioral health prevention**



Source: OHA presentation to Joint Committee on Ways and Means and Subcommittee on Human Services

---

[18] Oregon Revised Statute 430.644.

### Statutes leave roles and responsibilities for planning an adequate care continuum unclear

Statutory responsibility has not been assigned to a single entity for ensuring there is an adequate continuum of mental health care within regions across the state. Instead, 15 CCOs — entities which are partly focused on cost containment — have become responsible for care management and the provision of integrated physical, mental, and oral care to its members, while counties attempt to provide services for the uninsured subject to the availability of funds. ORS 414 does not define or make clear how the integration of physical, mental, and oral health is to be achieved. ORS 430 establishes Local Mental Health Authorities as a means to determine the local plan for mental health services; however, OHA has delegated the responsibility for meeting local behavioral health needs to the CCOs, leaving it unclear for the counties and CCOs which party is responsible for mental health services.

Both Local Mental Health Authorities and CCOs hold service planning and administration responsibilities for their region. Under ORS 430, each local authority is to determine the need for mental health services in the community and adopt a comprehensive plan for mental health service delivery to children, families, and adults.

ORS 414, meanwhile, separately mandates CCOs to develop a community health improvement plan to serve as a health care services plan for the residents of the areas served by CCOs, Local Mental Health Authorities, and hospitals. While local authorities are to coordinate their planning with CCO community plan development, it is not clear how the two plans should inter-relate.

ORS 430 further requires the county plan to outline how the Local Mental Health Authority will ensure the delivery of, and be accountable for, clinically appropriate services in a continuum of care based on consumer needs. At the same time, CCOs are responsible for administering behavioral health services for their members and OHA indicated most subcontract with the counties' Community Mental Health Programs to deliver those services.

### Statutory provisions outlining OHA's role in supervising the counties have not resulted in consistent oversight or effective monitoring

OHA's oversight responsibilities for community mental health programs that are included in statute are also subject to the availability of funds and key provisions are outdated. For example, ORS 430 directs OHA, if funds are available, to develop system-level performance measures for state level mental health services monitoring and reporting. Such monitoring and reporting is to include:

- quality and appropriateness of services,
- outcomes from services,
- prevention of mental health disorders; and
- integration of mental health services with other needed supports.

The statute also assigns OHA other duties for supervising mental health programs, such as developing a long-term plan for providing adequate mental health treatment to children and adults. The statute requires the plan be consistent with elements of the Mental Health Alignment Workgroup 2001 report to the Governor and derived from the needs of local county plans. The statute further directs the agency to periodically evaluate of the methodology used to estimate prevalence and demand for mental health services. However, OHA management considers these statutory provisions outdated and non-applicable because elements of the Oregon benchmarks mentioned in statute no longer exist, or are not used, and the report to the Governor is almost 19 years old

The statute also established a requirement for a call center contract that accomplishes little due to the fragmented system. OHA meets the statutory requirement for a 24-hour call center to

Stenson Decl., Ex. X
P. 28 of 82

track and provide information on residential placement settings and monitor statewide capacity through a contractor. To fulfill the statute, OHA contracted to pay up to $533,395 for upfront expenditures and ongoing call center services from June 1, 2018, through June 30, 2021.

However, most referrals for residential care are not received by the call center because referring health care providers typically contact residential facilities directly. Per OHA staff, the intent of the statute was to facilitate the connection of children to care, as Medicaid-covered services are to be provided as necessary and not waitlisted. However, it is not clear the call center fills this purpose and healthcare providers are not mandated to call the line. This disconnect was demonstrated when auditors found the total number of monthly acute care referrals for youth received by the call center was less than the number accounted for by residential providers during the year-long study conducted by OHA from 2018 to 2019.

### Statutes attempted to develop the state's System of Care to support the Wraparound Initiative, but agency services remain siloed

After the Legislature introduced the Statewide Children's Wraparound Initiative in 2009, codified in ORS 418, OHA and DHS reported Oregon's goal was to have a fully functioning System of Care in every community, implemented using a Wraparound planning process. However, statutory language blended the construct of Wraparound with System of Care, and assigned implementation of both tasks to more than six child-serving agencies, including OHA, DHS, the Oregon Youth Authority and the Oregon Department of Education.

ORS 418 did not mandate that the state develop a System of Care. It included the caveat that, "to the extent practicable within available resources," each agency was to ensure its continuum of care was sufficiently established to sustain the Wraparound Initiative. Similar to "subject to the availability of funds," this language allows the various child-serving agencies involved to deprioritize the initiative, and does not speak to how those agencies should continue to support OHA's current Wraparound program administered under CCOs.

Without a clear legislative mandate to establish a System of Care, OHA and DHS moved forward with implementing the Wraparound service delivery model at the local level, with three demonstration sites in July 2010. The sites at the counties were initially set up through Mental Health Organizations, responsible for managing mental health services at the time, and transitioned to CCOs after their creation, with OHA assuming sole leadership and support responsibility for the program. Medicaid and General Fund dollars were used to expand the initiative to 13 CCOs across the state, and eventually to all 15 CCOs.

CCOs were to coordinate care at the local level with Community Advisory Councils that give local representatives a voice to ensure that the needs of youth involved in multiple systems are met. However, according to a 2018 OHA and DHS report, many CCO governance structures across the state remained heavily weighted by CCO direction and authority when local structures should ensure equal voice across child serving systems. The report noted that state agencies had not had success in creating state-level governance to support local efforts and respond to needs.

OHA should work with the System of Care Advisory Council and Legislature to better optimize the statute guiding mental health treatment services.

## Accountability and oversight are inadequate in the mental health system

Funding for mental health services flows through the state in two ways. The majority of funding goes through OHA and to CCOs in the form of Medicaid reimbursable payments. The remaining funding is primarily disbursed to county Local Mental Health Authorities for Community Mental Health Programs. Monitoring the use of both of these funding streams is a challenge given the

Stenson Decl., Ex. X
P. 29 of 82

complexity and scale of the system. Auditors found, in the case of funding to counties, OHA is not always able to identify how those funds are used. Auditors also found the agency has not always supported accountability in the Wraparound program.

### Funding distributed to Oregon counties for community mental health programs is not adequately monitored

State-led mental health treatment services in Oregon are funded primarily through two mechanisms: federal Medicaid dollars passed through the state to CCOs and state General Fund dollars allocated to county community mental health programs. Federal requirements for Medicaid funding necessitate that Oregon report Medicaid-related costs each quarter. However, no such reporting requirement exists for the counties to report community mental health program expenditures to the state. OHA has acknowledged a gap in monitoring the expenditure of these funds, the budgeted amount of which can be seen Figure 12.

**Figure 12: OHA budgeted about $158 million of General Funds for county Local Mental Health Authorities for the biennium ending June 30, 2019**

| Program | Mental Health General Fund |
| --- | --- |
| **Children & Families Local Mental Health Authority** | $14,455,440.40 |
| **Adult Program Local Mental Health Authority** | $143,791,677.99 |
| **Total** | $158,247,118.39 |

Source: Oregon Health Authority

Within ORS Chapter 430, several passages come close to establishing criteria for reporting of Local Mental Health Authority expenditures. For example, ORS 430.632 states: "[OHA] may require a local mental health authority to periodically report to [OHA] on the implementation of the comprehensive local plan." However, the inclusion of the term "may" in the statute renders reporting of the comprehensive local plan implementation optional. Likewise, under ORS 430.640, OHA:

> Subject to the availability of funds, shall, develop or adopt nationally recognized system-level performance measures, linked to the Oregon Benchmarks, for state-level monitoring and reporting of mental health services for children, adults and older adults, including but not limited to quality and appropriateness of services, outcomes from services, structure and management of local plans, prevention of mental health disorders and integration of mental health services with other needed supports.

As mentioned previously, the phrase "subject to the availability of funds" undermines the authority of the statute by serving to deprioritize the directive; furthermore, OHA considers this and other related 430.640 oversight provisions outdated. In either instance, ORS 430.632 or 430.640, the statute does not require OHA to monitor, nor the Local Mental Health Authorities to report, community mental health program expenditures.

OHA leadership told auditors they have not been requiring the submission of county level plans. However, even if state law does not require these expenses to be captured, leading guidance, such as that from the Government Accountability Office, states that transactions should be executed by persons acting within scope of their authority and should be promptly and accurately recorded.

Auditors spoke with behavioral health leadership at 8 counties and found that each county handles the reporting of their expenses differently. In some instances, counties contract the

Stenson Decl., Ex. X
P. 30 of 82

handling of the funding to another party. In one case, a county was found to be contracting through a firm in Washington State. Most counties did not know to whom they were supposed to report their expenses.

By not tracking county Local Mental Health Authority costs and expenditures, OHA cannot monitor for cases of potential fraud, waste, or abuse. In addition, OHA does not have a window into the effectiveness of public monies allocated for the purpose of community mental health programs.

Although the total of $158 million allocated to Local Mental Health Authorities from the Mental Health General Fund for budget period 2017-19 only represents 1% of the Health Systems Division total budget of $14.5 billion, it does represent nearly 62% of the $257 million General Fund portion of the Legislatively Adopted Budget for Non-Medicaid programs. As a result of their significance, allocations to county Local Mental Health Authorities for community-based mental health demand reporting and monitoring controls be in place to ensure financial accountability and track program effectiveness. As state General Fund impacts from COVID-19 are likely to be significant, accounting for these moneys will be even more critical.

### *Wraparound program lacks clear accountability because of the lack of state monitoring and reporting on outcomes*

OHA has not supported accountability in the state's Wraparound program in past years. Between 2010 and 2019, the state spent nearly $80 million in federal and state funds on the Wraparound program, but it has not been able to track statewide participation. Contracts with CCOs require each of them to provide Wraparound for all children who meet criteria. In a 2018 report,[19] the Oregon Health Policy Board acknowledged the eligibility requirements for the program were not enforced. OHA staff told auditors they heard some CCOs created waitlists for Wraparound or CCO subcontracted providers required Wraparound prior to administering intensive services. Staff also made clear that providers creating waitlists for Wraparound and requiring Wraparound to receive services is not allowable. CCOs are also required by contract to submit CANS Comprehensive Assessments for children receiving Wraparound services; however, not all CCOs follow this requirement.

Despite persistent issues with compliance, OHA does not have a formal policy for addressing concerns or holding the organizations accountable. To clarify expectations, the agency has developed administrative rules for Wraparound providers and plans to conduct reviews as part of CCO subcontracted provider licensing. According to OHA management, if a licensee is found non-compliant, the agency will let them know and follow up with the CCO to start an action plan. However, without a formalized escalation policy for CCOs, the level of accountability is discretionary and dependent on OHA management. OHA's direct involvement in reviewing CCO subcontracted providers confuses who is ultimately responsible for ensuring providers provide Wraparound, further supporting the need for a clear policy formalizing OHA's process for holding CCOs responsible for their role in the behavioral health system.

During the audit team's site visits to children's residential facilities, staff told us their experience with the quality of Wraparound varies depending on the coordinator they work with. One therapist said she especially enjoys working with Wraparound Coordinators in helping to support kids; however, she recognized that the quality can vary as there

**Wraparound experience may vary**
All certified programs have a Wraparound Coordinator even though other team members may differ. Coordinators collaborate across the team to tailor the family's Wraparound experience and remove barriers of health.

---

[19] CCO 2.0 Recommendations of the Oregon Health Policy Board, October 2018.

Stenson Decl., Ex. X
P. 31 of 82

has not been a lot of support for the programs. A residential provider in an urban county, conversely, had unpleasant experiences with Wraparound coordinators, finding it of limited to no value. DHS staff involved in Wraparound note that children often faced barriers to accessing mental health and other services.

According to International Organization of Supreme Audit Institutions, accountability is the process through which public service entities are held responsible for their decisions and actions, including all aspects of performance and the achievement of performance objectives. With that in mind, OHA should monitor service quality and program outcomes per guidance from the National Wraparound Initiative and hold organizations accountable as required. Increased accountability in this program will provide greater insight essential for its ongoing success.

## A lack of consistent leadership, strategic vision, and governance contributed to past system disarray

In the 2001 report by the Mental Health Alignment Workgroup, the authors concluded Oregon lacked a clear "mental health system," especially for children. Over the course of the next 15 years, other reports would be issued that reiterated this point; however, we noted no measurable improvement during the course of this audit.

In the years following that report, OHA has undergone numerous changes, leading to the implementation of the CCO delivery model in 2012. The goal of the CCOs was to transform Oregon's health care delivery system to achieve better costs and outcomes for Oregonians. However, since that time, there has not been a sustained strategic vision for behavioral health service delivery, especially with respect to children's mental health.

### High turnover of OHA leadership has left the agency without a sustained vision or guidance

This lack of sustained strategic vision is due, in part, to the high level of turnover among OHA leadership. Over the course of about a decade, there have been at least 31 changes within OHA's behavioral health leadership structure, with leaders at the director, division, and unit levels transitioning out of their positions. At the same time, the agency has undergone significant organizational restructuring. As a result, OHA's ability to maintain a vision or direction for the behavioral health system has been reduced.

Soon after CCOs were implemented, two key architects of the system departed their respective roles: the OHA director at the time, and the Governor. In 2015, the agency's Addictions and Mental Health Division, previously responsible for behavioral health service delivery, was assimilated into OHA's Health Systems Division. Afterward, OHA's behavioral health director position remained vacant for three years before three interim directors cycled in and out of the role. OHA filled the position in April 2019.

### Opportunity and need to improve strategic planning

In November 2014, the Addictions and Mental Health Division published a Behavioral Health strategic plan to guide the agency from 2015 to 2018. Most of the strategies in the plan were assigned to the Addictions and Mental Health Division; however, when the division was assimilated into the Health Systems Division in 2015, the plan no longer identified who would be responsible for carrying out those goals. A member of agency leadership told auditors they did not know whether the plan had been used. According to the OHA director, the assimilation into the Health Systems Division effectively eliminated the Addictions and Mental Health Division, and resulted in unintended consequences, such as detracting from visibility and accountability for the behavioral health system.

Stenson Decl., Ex. X
P. 32 of 82

As of this audit, OHA does not have a comprehensive strategic plan for the agency. The agency has not defined specific, departmental goals for behavioral health that are associated with performance measures. Instead, OHA has developed vague, agencywide goals, such as "Better Health," linked to high-level performance measures. The agency has not documented clear strategies for the steps it will take to achieve those goals or timelines for their achievement. Furthermore, OHA has not identified service-level objectives to support its higher-level goals, such as desired outcomes for children and youth's mental health services.

Stated goals, such as "Better Health," are further made unclear due to lack of agency definition of the term "health." How the agency conceives of health and mental health has not been documented, and staff may have differing opinions, making it more difficult to ensure there is a shared understanding of a common goal for the long-term success of the organization. According to the World Health Organization, mental health does not signify the absence of a mental disorder, but is instead an integral part of health: that is, there is no health without mental health. Clarifying OHA's definition of health and its relationship to mental health, and defining other related terms such as mental health promotion, prevention, and early intervention, would help the agency communicate a shared understanding of what it hopes to achieve and an appropriate awareness of how the agency will pursue related activities by all stakeholders.



The first year of this plan was the same year the division dissolved.

Without a defined strategy and specific, measurable, departmental goals for behavioral health, OHA is unable to effectively assess its desired impacts for Oregonians — especially for children and families. This, in turn, detracts from transparency and accountability — both characteristics of good governance as described by the International Organization of Supreme Audit Institutions.

Without measures for tracking goal progress, the agency cannot assess the effectiveness of its interventions or identify needed corrections, as demonstrated by the agency's failure to consistently monitor children's residential treatment capacity. Additionally, the audit team heard from OHA managers they perceive guidance is lacking on what behavioral health performance should be monitored. Without clear review and monitoring mechanisms in the planning stage of service delivery, there is a high probability that performance assessment will be unreliable and weak.



OHA Public Health maintains a strategic plan.

Auditors also heard from agency managers and staff that coordination and communication among OHA workgroups can be limited or ineffective. Effective strategic planning and goal setting would support cross agency efforts in areas where improving outcomes requires coordination from multiple workgroups. For example, tasks of OHA's Public Health Division and Behavioral Health Services unit overlap, yet without departmental goals for behavioral health and clearly articulated strategies, insufficient guidance may prevent the agency from making progress on areas important to the public. The Public Health Division maintains a current strategic plan with objectives for reducing alcohol and substance use and suicide rates. Timely and appropriate delivery of behavioral health services can support these objectives, but without strategic guidance for cross-functional coordination, the agency cannot maximize its efforts.

Stenson Decl., Ex. X
P. 33 of 82

Strategic planning should be used to set an organization's long-term course and can be leveraged to integrate the agency mission and vision with measurable organization-wide goals and strategies for achieving them. According to the Government Accountability Office, strategic plans and high-level organizational goals should be used as the basis for developing goals that are specific to programs, services, or organizational units connected to meaningful performance measures, which are regularly monitored. Inadequate strategic planning for behavioral health has resulted in unclear priorities, a lack of vision for the future, and the potential for duplicate and inefficient work by staff due to uncertainties around organizational direction. As the agency works to respond to the COVID-19 pandemic, a well-defined strategic plan will be all the more vital for success.

According to the International Federation of Accountants, an overarching component of good governance entails achieving intended outcomes while acting in the public interest at all times. In defining outcomes, governing bodies must develop a clear vision as the basis for strategy, planning, and decision-making and take a longer-term view. They must oversee results by monitoring performance against agreed upon goals and ensure corrective action is taken when necessary. Leadership capacity must be adequate to guide the system, with roles and responsibilities at all levels clearly defined and communicated to stakeholders. Good governance is also characterized as participatory, transparent, and accountable.

**Figure 13: OHA should strive to maintain the principles for good governance in the public sector**



Source: International Framework: Good Governance in the Public Sector, by the International Federation of Accountants

### *Improving mental health system stakeholder engagement is critically needed*

OHA can improve its use of stakeholder engagement to support decision-making. An agency manager stated OHA struggles to maintain meaningful connections between leadership and its advisory groups. Through direct observation of advisory group meetings, the audit team witnessed the concern of meaningful stakeholder engagement reiterated by advisory group members.

For instance, during a Behavioral Health Advisory group meeting, stakeholders voiced frustration with their participation on the committee, concerned they wasted time. Some members attributed these concerns to the frequent changes in OHA leadership, referring to the Behavioral Health Director position as a "revolving door." They also questioned the purpose of their role and their relationship to other advisory groups and OHA. During a separate advisory group observation, stakeholders expressed they were not clear on how to provide input to decision-making. OHA should map out the relationships of the various advisory groups and clarify how they provide input.

According to the **National Performance Management Advisory Commission**, Good strategic planning can "provide an unbiased assessment of the environment, identify critical issues, and suggest effective strategies for addressing these issues that can have power even in the most politically charged environment."

Formal strategic planning also provides an opportunity for environmental scanning and stakeholder input. Environmental scanning helps an organization identify and address internal strengths and weaknesses, while anticipating and planning for external threats and challenges such as social, economic, political and technological changes. Obtaining stakeholder input helps ensure objectives and strategies are recognized as the future of the organization. Drawing from the knowledge of a diverse set of stakeholders can help organizations navigate and understand the external environment and develop strategies for meeting the challenges those environments present.

### Problematic CCO incentive metric further demonstrates governance gaps and challenges

Despite acknowledgement by OHA and DHS that an incentive measure for tracking health assessments for children in Child Welfare custody is problematic, the state continues to use the measure. The incentive measure is part of a series of 17 measures set up to reinforce CCOs in achieving quality care for OHP members. In 2018, none of the incentive measures were specific to children and youth mental health; however, the few measures related to it, such as the one identified as problematic, either combined children's mental health with other types of care or with treatment for adults. In 2018, CCOs were awarded over $188 million for their performance on incentive measures, including the one identified as flawed. Continuing to reward CCOs for an ineffective measure instead of defining clear outcomes based on public interest is problematic.

**Assessment Timeliness**
A DHS analysis found **only 49%** of children had their mental health assessment within 60 days of foster care entry, a DHS policy requirement.

The incentive measure for tracking health assessments in Child Welfare custody considers the percentage of children who receive a mental, physical, and dental health assessment within 60 days of the state notifying CCOs the children were placed into foster care. This standard does not align with Child Welfare policy, which requires a mental health assessment within 60 days of a child entering foster care. In 2018, the measure showed 86.7% of children met this target and 13 of the 15 CCOs received their incentive payment for the measure. Auditors reviewed a separate DHS analysis that found, from January 1, 2017, through December 31, 2018, only 49% of children had their mental health assessment within 60 days of foster care entry, and only 58% had an assessment within 90 days of entry.

In June 2018, DHS and OHA staff jointly advocated to the Metrics and Scoring Committee[20] to temporarily remove the metric as a CCO incentive measure in 2019 because aspects of the metric did not align with DHS policy or practices recommended by the American Academy of

---

[20] The Metrics and Scoring Committee was established in 2012 by Senate Bill 1580 for the purpose of recommending outcomes and quality measures for CCOs. The Committee consists of nine members appointed by the OHA director to serve two-year terms.

Pediatrics. The joint group requested to delay incentivizing the metric until 2020 to allow time to form a workgroup in order to align the CCO performance measure to the DHS metric. The Metrics and Scoring Committee instead chose to retain the measure as 2019 incentive measure, but indicated a desire to change the specifications in the future.

In June 2019, OHA went on to advocate to the Metrics and Scoring Committee to retain the measure in its current form for 2020, because there was concern among DHS and OHA that, once stricken, the measure would not come back in any form. OHA noted the measure provides focus on a vulnerable population; preliminary data showed performance on this measure had increased by over 200% since it was first incentivized. The Committee once again decided to retain the measure for 2020 and said they will consider alignment in future years.

While this measure was designed to track the timeliness of assessments for children in Child Welfare, it does not attempt to track whether these children received needed care. This differs from promising practices in other states, such as New Jersey. For children entering foster care above the age of two, that state has reported the number who received a mental health assessment and the percentage of those that received mental health treatment as recommended from their assessment. Oregon's continued lack of alignment between measures, despite acknowledgement of identified limitations, serves as another example of ineffective system governance.

Mental health treatment services in Oregon have suffered from decades of fragmentation, inadequate data, and workforce challenges; however, OHA is taking steps to improve outcomes and bolster support for services for children and adults alike. The agency continues to include behavioral health budget requests in presentations to the Legislature and is working toward a streamlined process for Wraparound services. The agency has made progress, but opportunities exist to enhance the usability of data, consistent good governance, improve workforce retention, monitoring of community mental health funds, and review statutory impediments.

# Recommendations

Though budget limitations may exist as a result of the COVID-19 pandemic, OHA should:

1. Develop and document a comprehensive strategic plan for the agency and Behavioral Health Division. A process to update and report plan progress to governing bodies should be created in tandem. Once established, the plan should be communicated to the public, agency staff, and governing entities.

2. Define necessary terms, such as "health" and "mental health," and integrate those terms into all plans and contracts and propose integration into Oregon Administrative Rule and ORS in order to be institutionalized.

3. Work with the Oregon Health Policy Board and Legislature to review effectiveness and role of councils, commissions, and other advisory boards. Bodies identified as not essential should be considered for dissolution or revised in function.

4. Use the existing stakeholder map presented to Legislature on November 18, 2019, to develop and document a process for maintaining regular stakeholder input. Once the plan for receiving input has been established, it should be communicated across the stakeholder spectrum to ensure coordination.

5. Update outdated policies and procedures that refer to divisions that no longer exist within the agency, such as Addictions and Mental Health, and update all outdated policies, procedures, and evidence-based practice guidelines.

6. Identify data gaps that prevent the tracking of behavioral health performance measures and:

   a. Once identified, develop a plan for addressing the gaps, and communicate the plan and its results to appropriate bodies.

   b. Define benchmarks for children's mental health service performance measures tied to goals and document the methodology used to track the measures with appropriate data

7. Develop and deliver a proposal to request additional resources for a data analyst within the Child and Family Behavioral Unit.

8. Leverage data analysts in the Health Policy and Analytics Division and resources in the Child and Family Behavioral Health Unit to determine the extent to which Medicaid claims data can be used to accurately identify and track the number of children receiving mental health services statewide and outcomes.

9. Formalize agreements with DHS to help assess the ongoing needs for intensive mental health treatment services statewide and track performance measures of mental health services for children by foster care status.

10. Develop and document shared guidance on the methodology that will be used to track performance measures and communicate that to all stakeholders, including CCOs and providers.

11. Clarify expectations for reporting through a robust set of instructions, similar to the technical manual provided by Washington's Health Care Authority.

12. Develop and document a process for verifying that data submissions used to track performance measures are timely, complete, and accurate. Once documented, establish a policy for the process to hold stakeholders, including CCOs, accountable for timely, complete, and accurate data submissions and communicate the policy to all parties.

13. Collaborate with System of Care stakeholders to perform a systemwide needs assessment for the children and family continuum of care, including: Wraparound, secure inpatient, residential, and intensive support.

14. Utilize stakeholder input to develop and determine the methodology used to assess statewide emergency department boarding, with separate reporting for children and youth boarding and frequency, and pursue measures needed for consistent implementation. The methodology should be documented and maintained by the Behavioral Health Division.

15. Develop an intermediate proposal to Legislature for addressing issues with statutory language requiring the call center contract up to discontinuing OHA's portion of the contract.

16. Work with the newly created Senate Bill 1 System of Care Advisory Council and Legislature to better optimize the statute guiding mental health treatment services. Specifically, the collaborative effort should:

    a. Expand statutes to consider CCO framework and evaluate disconnected mental health statutes for potential revision.

    b. Clarify statutory roles and responsibilities of stakeholders.

    c. Develop alternative language for "subject to the availability of funds" in order to establish priority of mental health services.

    d. Define the requirement of integrated physical, mental, and oral health.

    e. Deliver a report on planned optimizations.

17. Collaborate with system stakeholders, such as providers and other agencies, to develop and document a comprehensive workforce retention and recruitment strategy and communicate it to all stakeholders. Reporting on strategic implementation should be delivered annually to the Oregon Health Policy Board.

18. Develop and deliver a public information campaign for mental health, including challenges faced by individuals in the system, as well as direct care workers, similar to campaigns delivered by the Public Health Division.

19. Work with Trauma Informed Oregon to become a trauma-informed agency, finalize the internal trauma-informed policy, and provide related agencywide training starting at the highest leadership levels. The agency should hold contracted organizations accountable for Trauma Informed Practices.

20. Continue to collaborate with Trauma Informed Oregon to deliver training of trauma-informed practices to direct care providers.

21. Work with the Oregon Health Policy Board, System of Care Advisory Council, and Legislature to update the statutory framework to ensure agencies within the System of Care are fully invested to support the burden costs across the system. A System of Care

Stenson Decl., Ex. X
P. 38 of 82

roadmap should be developed and documented to demonstrate process owners and related costs.

22. Develop and document internal policies and procedures for monitoring behavioral health funding to the counties through ORS 430. The agency should seek to establish a process owner for regularly reconciling and reporting on these funds.

# Objective, Scope, and Methodology

## Objective

The objective of this audit was to assess the effectiveness of mental health treatment services governance provided primarily by OHA and determine the adequacy with which the system meets the needs of the child and youth population.

## Scope

The audit focused on efforts made by OHA to oversee the state's behavioral health system and intensive mental health services for children and youth.

## Methodology

To address our objective, we used a methodology that included conducting interviews, site visits, reviewing documentation, and analyzing data. The lack of complete and accurate data kept us from completing some planned work related to children's mental health services. This included identifying the number of OHP children receiving mental health services and the length of time children spend in emergency departments for mental health issues.

We interviewed OHA executives, managers, research analysts, and other staff. Interviews with external stakeholders included mental health service providers, mental health advocacy organizers, county officials, CCO administrators, state legislators, DHS staff, and representatives from Trauma Informed Oregon.

We observed mental health advisory group meetings, Oregon Health Policy Board meetings, attended a peer support conference, and the Trauma Informed Oregon conference. We performed site visits at four psychiatric residential treatment facilities, some of which also provided day treatment, Secure Adolescent Inpatient Programs, and outpatient services, and conducted remote interviews with one residential treatment facility. During the visits, we interviewed direct care workers, therapists, supervisors, and administrators.

We identified leading governance practices in publications by the International Federation of Accountants, International Organization of Supreme Audit Institutions, and Project Management Institute. We collected leading practices in behavioral health service delivery from the Substance Abuse and Mental Health Services Administration, the World Health Organization, the National Wraparound Initiative, and other organizations.

We reviewed laws, administrative rules, and contracts. We examined OHA planning documents, performance measures, annual reports and budgets. We reviewed additional studies, reports, and data. We obtained and analyzed Medicaid data from OHA for claims submitted for the period of January 2018 to December 2018. We concluded that the Medicaid data was not reliable enough for audit purposes, based on our objectives, due to uncertain and untested data integrity, accuracy, and incompleteness.

To gain an understanding of promising practices in other states, we interviewed representatives from Washington and New Jersey and reviewed supporting documentation.

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

We sincerely appreciate the courtesies and cooperation extended by officials and employees of OHA during the course of this audit.

Stenson Decl., Ex. X
P. 41 of 82



**HEALTH SYSTEMS DIVISION**

Kate Brown, Governor



500 Summer St NE E35
Salem, OR, 97301
Voice: 503-945-5772 or 1-800-527-5772
Fax: 503-373-7689
TTY: 711
www.oregon.gov/OHA/HSD

August 21, 2020

Kip Memmott, Director
Secretary of State, Audits Division
255 Capitol St. NE, Suite 500
Salem, OR 97310

Dear Mr. Memmott,

This letter provides a written response to the Audits Division's final draft audit report titled **Chronic and Systemic Issues in Oregon's Mental Health Treatment System Leave Children and Their Families in Crisis**.

The people of Oregon need and deserve a system of behavioral health supports and services that is simple to access, responsive to their needs and that leads to meaningful improvements in their lives. The Secretary of State's comprehensive audit of Oregon's behavioral health system paints an accurate portrayal of the longstanding shortcomings and failures of our current behavioral health system: lack of common vision, clear outcomes and measures, accountable performance-based contracts, robust data and collaborative stakeholder engagement and public education.

The failures of our behavioral health system to meet the needs of the people of Oregon come at devastating human and financial cost. These impacts are even worse for our Communities of Color because they experience an even deeper chasm between what they need and what there is.
The Oregon Health Authority welcomes the Secretary of State's recommendations. As described in our Management Response below, we are taking steps to implement each of the recommendations as part of our broader efforts to reform Oregon's behavioral health system to fulfill our promise to consumers and families: to deliver a system that is simple, responsive and meaningful.

**The path forward**
Changing how we serve all of Oregon's communities is well within our grasp, but it will take all of us. Improving behavioral health requires addressing the whole person, whole families and whole communities. Treatment is not enough when people also need safety, food, shelter, employment and education to survive and thrive. And no one agency or entity can do all of that. It takes all of us working together.

The path forward from the systems we have to systems that are simpler to access and more responsive to what people need and that lead to meaningful improvements in their lives begins with engaging differently with the people we serve. The path forward requires those of us who design, deliver, oversee and support our systems of care to change how we view our roles and our responsibilities. We routinely make decisions for the people we serve without asking them what they need and what would lead to those improvements we are seeking to support. The people we serve are the true experts, and we need to elevate and amplify their voices at every level to build systems that deliver the kinds of care that works for them.

*Simplicity:* Negative impacts and costs are reduced, and outcomes are improved when people have access to the services and supports they need when they need them. Access can't be improved when we don't

have enough of what we need, and right now we don't have enough of these services. Changing that will require investments, both in programs and in the workforce needed to deliver them. We need to do more to support and retain the workforce we have while growing it. But even when services are available, too often people struggle navigating systems that have too many hurdles. We need to hold ourselves, our funders and our providers accountable to relentlessly remove barriers and simplify access.

*Responsiveness:* The path forward recognizes the depth of our existing health inequities. People within our communities of color too often find it nearly impossible to access services that are provided by people who understand them, who look like them, or even speak their language when it's not English. And too often the people with the most severe and complex conditions are the least able to obtain services that meet their needs or even help them to maintain access to basic life essentials such as a reliable source of food or safe and supportive housing.  We need to hold ourselves accountable to collaborate with people who need care and reshape services to match what people need, rather than matching people to programs.
The path forward recognizes and helps address and heal the trauma that too often accompanies mental illness and addiction.

*Meaningful outcomes:* The path to a more responsive and effective system is through measuring and rewarding achievement of clear, meaningful outcomes that can be shared across relevant agencies. Shared outcomes can lead to needed multi-agency collaboration. And too often no one has been identified as being accountable for improving the outcomes of people who are being poorly served within our existing systems. The path forward requires, creates and rewards clear accountability for improvements in individual outcomes.

With the impact of the current pandemic on our economy, we are facing the potential for deep budget cuts to behavioral health and related systems that are already under-resourced and over-taxed. We face the potential for these cuts when the people of Oregon need our behavioral health systems to work more than ever. This period of Oregon's pandemic requires that we all adapt and make tough decisions. Those decisions, if made wisely, can lead to improved long-term change. But budget cuts to Oregon's already struggling behavioral health systems in the midst of the current pandemic is a path that leads to even worse outcomes for Oregon communities.

**Audit implementation: Improving Oregon's community behavioral health system**
We agree with the audit's findings – there are no surprises here. The audit report identifies issues we need to address to help our systems meet the needs of the people of Oregon. Some recommendations would help lay the foundation for achieving our vision: focusing strategic plans, working toward consistent definitions, better data collection and analysis. Others focus on partnerships and outreach to ensure critical voices are heard. Several recommendations identify steps on the path forward, addressing workforce, funding mechanisms, strengthening oversight and accountability. The audit report identifies many areas where there are work streams that are already in progress, some of which have hit roadblocks due to the COVID-19 pandemic.

In our response to the recommendations below, we wanted to provide important context and our plans for next steps. This includes identifying where each finding fits within our agency values and strategic vision, highlighting its intersection with health equity, how we're working to center the voices of behavioral health consumers, and how it's impacted by the current fragmented system and other

challenges. We'll discuss the work we've been doing to achieve these needed changes and what comes next. We'll note what support we need to implement the recommendations and describe a timeline.

Below is our detailed response to each recommendation in the audit.

---

**RECOMMENDATION 1**
**Develop and document a comprehensive strategic plan for the agency and Behavioral Health Division. A process to update and report plan progress to governing bodies should be created in tandem. Once established, the plan should be communicated to the public, agency staff, and governing entities.**

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | July 1, 2022 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 1**
  **Management response:** OHA agrees with a primary theme of this audit about the importance of aligning agency values, principles and strategic vision with agency operations. This audit illustrates the complexities and gaps that have resulted from lack of a documented and well-communicated strategic plan. We agree with all of the elements of this recommendation, including the need to develop and document plans; conduct regular performance reviews against the plans; report performance to governing bodies; and to broadly communicate all aspects of planning to stakeholders including consumers, providers, staff, the public and governing bodies. Prior to the pandemic, OHA was nearing completion of a strategic plan whose conclusion was that OHA must eliminate health inequities. Our work during the COVID-19 pandemic has confirmed that direction as we have observed inequity in the rate of infection among communities of color, more acute illnesses for those who are infected, and higher rates of hospitalization.

  **Inequity issues:** As this audit acknowledges, COVID-19 has disrupted OHA operations since early 2020. While that is an important backdrop to some of our responses, the pandemic has also helped OHA staff and partners learn and adapt. Much of that learning, focus and adaptation will inform future strategic planning efforts.

  In addition, the Legislature allocated $25.6 million from the Coronavirus Relief Fund to focus on culturally appropriate behavioral health services during the crisis. OHA is working with Community Based Organizations and stakeholders to better understand how to provide outreach and improve access to meaningful behavioral health services for historically underserved people. Much of our effort involves engaging with stakeholders we have not previously known. These new connections will carry forward after the pandemic to inform our strategic planning.

  **Consumer voice:** Any strategic plans created for the behavioral health system must center consumers and be trauma-informed. OHA must devote time and resources to ensure that consumers can express

needs and co-create solutions. We will include people with lived experience in planning from the beginning and embed their participation in processes and procedures.

As this audit stressed, we must take a trauma-informed approach to all of our work and planning as we create a more culturally and linguistically responsive system of behavioral health services.

**Work underway:** The Behavioral Health Director was appointed in April 2019. His initial vision is included in this audit report: Behavioral health services must be simple, responsive and meaningful. For children and families, the guiding vision is that children can be at home, in school and in their community because they receive the right services, at the right time and for the right duration.

The behavioral health system does not exist in isolation from other public systems. Decisions made by OHA can affect other systems and, conversely, things happen in other systems that can affect the behavioral health system. We are embarking on strategic planning that is fully inclusive to help all systems function better.

After articulating our initial vision, OHA and the Behavioral Health Director have been working with stakeholder groups, the Governor, the Legislature and various workgroups and committees over the past year to gather input and map a direction for the behavioral health system and its components.

While the audit pointed out that the myriad groups and advisors can be overwhelming, OHA receives important input from people representing diverse interests and perspectives. That input is critical to understanding the implications of the decisions being made in the behavioral health system and in setting effective strategies for system improvement.  Recommendation #3 will be an important companion step as we implement this audit recommendation.

Other planning efforts include the strategic plan developed by Oregon's Alcohol and Drug Policy Commission (ADPC). The purpose of the ADPC is to improve the effectiveness and efficiency of state and local substance use disorder prevention, treatment and recovery services for all Oregonians. The ADPC and its state agency partners adopted a comprehensive strategic plan. The plan seeks to identify processes and resources to create, track, fund and report on strategies for systems integration, innovation, and policy development; strategies to reduce Oregon's substance use disorder (SUD) rate, including preventing SUD and promoting recovery; and strategies to reduce morbidity and mortality related to SUD. This work intersects with services to children and their families and adults, as people who have SUD often have mental health issues as well.

OHA is committed to the work that is needed to synthesize the results of all these efforts into a comprehensive strategic plan for behavioral health services.

Internally, after the audit was completed, OHA reorganized the Office of Behavioral Health Services. The new structure will allow the office to better focus on strategic planning and data analytics. The structure adds a Child and Family Behavioral Health Director, an Adult Mental Health and Addictions Director, and a Behavioral Health Operations Director, all of whom report to the Behavioral Health Director.

OHA is also integrating performance management into the expected duties and work of all staff.

**Challenges:** As this audit recognizes, the financial picture changed rapidly and unexpectedly upon the arrival of COVID-19. OHA and the behavioral health system started the 2019-2021 biennium with momentum and expectations of new funding after several years of a strong Oregon economy. The Governor and the Legislature established multiple workgroups to begin addressing chronic system underfunding, much of which is called out in this audit report.

Once the impacts of COVID-19 are fully known, we expect the funding situation to be significantly worse, and we anticipate the need to imagine a system with different financial constraints than we had been planning. We also expect that administrative resources will be constrained and that we will have to make difficult decisions about what work our staff can support and what will be deferred.

That being the case, it is more important than ever that we plan for, implement and monitor a behavioral health system that is responsive to consumers, children and families when the services are needed and that results in the best outcomes possible.

This audit recognizes the complications faced by people who receive services in a system with multiple funders, multiple stakeholder groups and multiple levels and systems of government, all with differing objectives and requirements. These realities cannot be ignored and must be synthesized during strategic planning to ensure a system that meets the vision of being simple, responsive and meaningful.

**Agency needs:** As this audit report stresses, our current data and analysis capacity is severely limited. Our Agency Requested Budget for 2021-23 includes funding to support data improvement work that is underway. If that effort is not funded, challenges will continue. Without the data improvement, we will not be able to monitor, analyze and track performance and outcomes, as the audit recommends throughout. More details are outlined in the response to Recommendation #6.

**Timeline:** This work is underway with a target completion date of July 1, 2022.

| RECOMMENDATION 2 Define necessary terms, such as "health" and "mental health," and integrate those terms into all plans and contracts and propose integration into Oregon Administrative Rule and ORS in order to be institutionalized. | | |
| --- | --- | --- |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities** | **Name and phone number of specific point of contact for implementation** |
| Agree. See below for further context. | Dec. 31, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 2**
**Management response:** OHA agrees with this recommendation, which is closely related to recommendation #1. We agree that defining key terms and integrating them into our work and guiding documents will better define the relationship between behavioral health and the broader agency goal

of "better health." OHA agrees that we need to revisit our Performance Outcome system and strengthen the behavioral health linkages to the high-level goal of "Better Health."

We will engage consumers and other stakeholders in the development of the definitions. With the vetted definitions, we will review our contractual instruments to incorporate the definitions. We will also identify OARs where these definitions need to be clarified and begin rulemaking to incorporate these changes. Finally, we will review Oregon Revised Statutes (ORS) and create legislative concepts that include these definitions as well as other needed changes identified during the strategic planning processes. We will engage a broad array of stakeholders and partners to integrate the definitions into the governance and delivery systems. OHA will craft legislative concepts, rule revisions and contract changes to ensure consistency of terms and definitions used across all ORSs, OARs, procedures and contract instruments.

**Inequity issues:** We must articulate the most basic element of our strategic vision for behavioral health, or the concept of mental health will remain invisible. Without that common understanding, consumers won't be able to find connections to the services they need, and stakeholders won't be able to effectively advocate for needed changes to the system.

**Consumer voice:** Acknowledging that mental health is an integral part of health is a trauma-informed action that will support co-creation of solutions with consumers. Definitions should center on the consumers and their experiences and emphasize that each individual defines what constitutes mental well-being. Co-creating definitions will support a responsive and meaningful system.

**Work underway:** OHA staff are familiar with consolidating and synthesizing definitions. During the recent development of Oregon Health Plan coordinated care organization contracts (CCO 2.0), we focused on using consistent definitions in the CCO contracts and OARs. This process has been completed for OAR Chapter 410, and additional work is needed on Chapter 309. OHA is also aiming to provide consistent definitions in its work on County Financial Assistance Agreements.

**Challenges:** Clear definitions will provide the foundation for all of OHA's behavioral health work. Incorporating these definitions into all statutory references, Oregon Administrative Rules (OAR) and contracts will help to prevent the fragmentation that can result from decentralized administration. If everyone is working from the same definitions, expectations will be clearer, and accountability will be easier to institute. That said, it will be complex and time-consuming.

**Agency needs:** OHA will need support and agreement from stakeholders as we develop definitions. Additionally, each governance document or protocol requires specific procedural actions that may require additional champions. Statutory change may be necessary. The support of legislative leadership will be key.

**Timeline:** Development of the definitions can begin during the next strategic planning phase, as envisioned in Recommendation #1. Implementing changes to governance documents will require calendaring and coordination with contracting, rulemaking and legislative cycles. Target completion of this recommendation is Dec. 31, 2021.

| RECOMMENDATION 3 |
| --- |

**Work with the Oregon Health Policy Board and Legislature to review effectiveness and role of councils, commissions, and other advisory boards. Bodies identified as not essential should be considered for dissolution or revised in function.**

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | July 1, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 3**

**Management response:** As the audit report demonstrates, many councils, commissions and advisory boards provide guidance for the delivery of behavioral health services in Oregon. OHA and the behavioral health system have a long tradition of seeking broad-based input and advocacy. Additionally, various system funders, including the federal Centers for Medicare and Medicaid Services and the Substance Abuse and Mental Health Services Administration, and the Oregon Legislature, have mandated many of the formal advisory bodies. Currently, there are at least 42 of these types of groups established to advise OHA about the behavioral health system. This is an unwieldly number of councils to support, and the important input provided by each group often gets overwhelmed and difficult to hear or extract. OHA agrees with the recommendation that the functions, overlaps and effectiveness of these advisory bodies should be evaluated and addressed.

When the Behavioral Health Director was appointed in April 2019, he quickly realized that he would be unable to devote the hours needed to actively engage with every advisory board within his purview. To prepare for the Governor's Behavioral Health Advisory Council, OHA staff began to identify all the formal and informal boards, commissions and groups advising the Behavioral Health Director. Most of that work is complete. To ensure that consumers and underserved communities are centered, the Office of Consumer Activities Director has taken lead in analyzing the information. Conversations have also been started with several of the advisory groups regarding the question raised in this recommendation.

**Inequity issues:** Membership and representation on these advisory groups is often pre-defined by statute and other processes. The groups typically include medical professionals, business executives and other professional-level staff, sometimes combined with other representatives such as family members or consumers. Meetings are generally conducted in English and take place on weekdays in state office buildings. This systematically excludes the voices of unserved and underserved people. In addition, some of the same people fill roles in several groups, which creates less diverse representation. The sheer volume of advisory groups also means that the individual issues identified by any one advisory group or group member may not receive full and meaningful attention from OHA leadership.

**Consumer voice:** OHA will evaluate how each group prioritizes consumer voices and ensure that we're providing the proper, trauma-informed spaces to co-create solutions that are simple, responsive and meaningful as we consider next steps with each council.

**Work underway:** Instead of identifying groups as nonessential, the Behavioral Health Director is taking a holistic look at the groups, their makeup and their missions and how they relate to one another. He's evaluating methods to engage behavioral health stakeholders as a whole and gather information and feedback from them. The goal is to find more efficient ways to synthesize the information and make it available for multiple purposes, including strategic planning, budgeting, troubleshooting, advocacy, and service delivery system improvements. Along the way, OHA is also asking who does not currently have a seat at the table and how to engage those voices.

**Challenges:** Deciding whether to disband or disengage with an advisory body is a difficult one. Understanding the history and needs of each advisory body is critical to deciding how to make it function better or whether to incorporate it into another advisory body or disband it altogether. All these advisors have been convened for legitimate purposes, so it's imperative to understand the implications of changes to the function of those groups.

Because of the decentralized and fragmented system that currently exists, this multitude of advisory councils is duplicated on every level. Community Mental Health Programs and CCOs and providers all have requirements for advisors at the local level. Often those requirements are prescribed by funders and the legislature. At any level of the system, when advisors convene with the primary goal of meeting a contract or funder requirement, we don't see engagement at the levels intended when those advisory boards were imagined and required.

**Agency needs:** OHA needs the groups' membership and stakeholders to understand the goal of the work: to have a better coordinated slate of advisory groups whose voices are heard. We will prioritize this work with a focus on culturally responsive, consumer-centered input.

**Timeline:** This work has already begun and will continue throughout the current and next biennium. Initially, work will focus on providing a trauma-informed avenue for effective input from consumers and underserved communities and be completed by July 1, 2021.

---

**RECOMMENDATION 4**
**Use the existing stakeholder map presented to Legislature on November 18, 2019, to develop and document a process for maintaining regular stakeholder input. Once the plan for receiving input has been established, it should be communicated across the stakeholder spectrum to ensure coordination.**

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | July 1, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 4**
   **Management response:** As this recommendation points out, OHA has a starting point for compiling information about the formal advisory channels in place. We are building on that list of stakeholder

partners. Tying back to Recommendation #3, we have significant work left to do to create input channels for the list of stakeholder partners – and partners who may not yet be on the list.

**Inequity issues:** The November 18, 2019, stakeholder map is the compilation of formal stakeholder input channels as of that date. OHA continues to identify and implement new methods for reaching unserved and underserved populations. As mentioned in the response to Recommendation #1, the COVID-19 emergency has helped OHA better understand and improve communications with key stakeholders who have been historically and systematically underserved. Developing and documenting a process for regular stakeholder input will require flexibility and adaptation as we become more skilled at hearing and centering the voices of those who need or receive service.

**Consumer voice:** OHA must create trauma-informed avenues that support consumer input to OHA and throughout the service delivery system so that we are able to co-create solutions to complex system issues.

**Work underway:** Since that initial list was created, OHA and the behavioral health system have shifted focus to the COVID-19 response. In that shift, we have developed more insight into the needs of stakeholders, including those who currently receive services, those who need service, providers of service, funders, and system managers. We have been forced to get creative about stakeholder engagement, which has introduced us to new ways to engage with the community and put us in touch with new people.

**Challenges:** Stakeholder input is critical at all levels of the system, and different groups need to be engaged with in different ways. Additionally, processes are evolving as we learn and implement trauma-informed approaches to working with various stakeholders and groups. The volume, complexity and ever-changing needs have made documenting and communicating across the spectrum challenging.

Also, because the system is locally driven and delivered, stakeholder input from all levels of the system and at all levels of the system is critical. This creates the need for a well-functioning web of interrelated communication channels.

**Agency needs:** The more we learn from each stakeholder group about the most responsive ways to engage with them, the more effective our communications will be. Communicating across the stakeholder spectrum will require attention, interest and patience from each stakeholder group.

**Timeline:** This work has begun and is linked to Recommendation #3.  Anticipated completion is July 1, 2021.

| RECOMMENDATION 5 Update outdated policies and procedures that refer to divisions that no longer exist within the agency, such as Addictions and Mental Health, and update all outdated policies, (s)procedures, and evidence-based practice guidelines. | | |
| --- | --- | --- |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities** | **Name and phone number of specific point of contact for implementation** |

| Agree. See below for further context. | June 30, 2021 | Jackie Fabrick, 503-756-2822 |
|---|---|---|

**Narrative for Recommendation 5**

**Management response:** OHA agrees that imprecise information in the regulatory documents creates confusion at all levels and must be updated. OHA sees this recommendation as closely related to Recommendation #2 and sees a need for comprehensive review of definitions and consistencies across policies and procedures, contractual instruments, OARs and ORS. We have been working to align terminology across OARs, CCO contracts and County Financial Assistance Agreements. As opportunities arise, staff are poised to update other documentation for consistency.

**Inequity issues:** Consistency in regulatory information is needed so that people can trust and understand how the various systems work and can be accessed. The system needs to be free of unwritten rules and informal processes; otherwise people who don't know how to navigate these informal channels cannot get access.

**Consumer voice:** Updating and cleaning up regulatory documents is a basic starting point to the process of simplifying the behavioral health service system. With access to accurate and up-to-date information on policies, procedures, and other guidelines, service users will be better positioned to make informed decisions about their care and advocate for their own needs.

**Work underway:** As described in the response to Recommendation #1, the Office of Behavioral Health Services was recently reorganized. In that restructure, a Behavioral Health Operations Division has been created that has assumed responsibility for this work.

**Challenges:** OHA is a large agency with multiple programs and rules supported by a biennial budget exceeding $23 billion. Statutes, rules, procedures and contractual instruments change frequently, and the processes that support those changes often have long lead times. Keeping all governance documents aligned requires constant attention, with staff particularly focused on that alignment. OHA is working to improve internal processes to better recognize opportunities to include consistency updates across governance documents. Inconsistencies in policies and procedures and evidence-based practice guidelines make it difficult to establish transparency and accountability in a decentralized system.

**Agency needs:** Changes to statutes and rules require open, public process, so OHA would need participation from stakeholders to ensure that changes fully reflect the needs of stakeholders.

**Timeline:** This work will begin immediately, and initial work will be completed by the end of the biennium, June 30, 2021.

---

**RECOMMENDATION 6**
**Identify data gaps that prevent the tracking of behavioral health performance measures and:**

---

> 1. **Once identified, develop a plan for addressing the gaps, and communicate the plan and its results to appropriate bodies.**
>
> 2. **Define benchmarks for children's mental health service performance measures tied to goals and document the methodology used to track the measures with appropriate data**

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | June 30, 2023 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 6**

**Management response:** OHA appreciates that this audit highlights the need we have for a defined set of outcomes and goals. Outcomes are best defined as part of a comprehensive strategic plan, which, as noted in the response to Recommendation #1, is currently underway. Once the strategic plan is in place, OHA will be set to define goals and outcomes en route to those goals. This in turn will help us better define the needs we have in data collection and administrative data sets used to collect data. But to fully achieve this and several other recommendations, we must secure funding to continue the COMPASS Modernization Project, as detailed below.

**Inequity issues:** We will continue to work to implement data systems that match REAL-D (race, ethnicity, language and disability) data requirements, which are comprehensive. As we work to achieve this goal, it will allow us to better understand and identify inequities and differences associated with underserved populations in Oregon.

**Consumer voice:** Historically, OHA has selected performance measures based on the availability of data from legacy systems. As noted above, this is a poor approach and will be corrected by defining and comprehensive strategic approach to services and using that to define need outcomes to measure progress. For this to be a success, we must engage with consumers and other advocates.

**Work underway:** While OHA does need to define an overall strategy to attach outcomes, we have consulted with national children's System of Care expert Liz Manley. Manley was the chief architect behind the New Jersey System of Care mentioned in this audit report. She will help us define targeted outcomes so we can begin to create meaningful outcome reports. Additionally, as a result of 2019's Senate Bill 1, OHA, Oregon Youth Authority and Oregon's Department of Human Services are teaming up to create a children's focused data dashboard that will include work from Recommendation #8.

OHA will incorporate this work into an overarching data collection and outcome process that is inclusive of all the populations served and integrates the work overseen by OHA in the behavioral health system.

At the foundation of our work to improve our data capabilities is the COMPASS Modernization Project. As we reported in our response to our internal audit in December 2019, the behavioral health system has long struggled with data issues. In 2014, the primary legacy system for tracking community behavioral health systems was replaced by the system now in use, Measures and Outcomes Tracking

System (MOTS). Due to budget constraints, the MOTS system that was implemented was a truncated version of what was actually needed. Implementation and data quality issues have plagued the system. As a result, OHA submitted a Policy Option Package for the 2019-2021 budget to replace MOTS. The Legislature approved funding sufficient for the planning phase of the COMPASS Modernization Project. Additional phases will require coordination across all OHA and DHS data initiatives and legislative approval and funding. In the meantime, behavioral health managers have deployed various desktop tools or relied on contracted studies and data collection to assist in managing data for key components of the behavioral health system.

Behavioral health and substance use disorder data is currently underreported by providers due to the outdated, fragmented processes and systems; under-analysis and utilization of the data by the agency is due in part to underreporting and in part to system age and fragmentation. The agency cannot adequately utilize data for required reporting or for analytical purposes that would better promote the Triple Aim.

The COMPASS redesign provides OHA with an opportunity to examine and update business processes and better align to the agency's vision and the continuity of care model. Part of this business process alignment will include the standardization of data fields, validation of business data needs, an evaluation of partner needs, and an analysis of desired inputs and outputs. OHA has the chance to reduce silos and begin integrating data from Managed Care Entities (Coordinated Care Organizations or CCOs) into the behavioral health service delivery model.

The objectives of Compass modernization:

1. A data collection system to evaluate more timely, appropriate, cost-effective services for Oregonians.

2. Reduce the administrative burden on providers and improve care coordination.

3. Streamline and update business processes for collection, analysis, and reporting of information.

4. Improve the standardization of behavioral health data.

5. Collect data to increase the agency's ability to measure and report on behavioral health outcomes.

6. Implement a solution that includes data elements necessary for tracking outcomes and providing data for a 360-degree view of the client.

7. Establish a platform that can be easily modifiable and expanded to meet evolving needs.

8. Provide more accurate and robust data for SAMHSA and Block Grant reporting.

9. Reduce use of Excel and paper surveys and improve the data collection efficiency.

10. Enable analysis of program approaches and resource allocation efficacy.

In addition, the resulting system will conform to all standard Privacy and Security requirements.

In addition to work on the underlying data infrastructure, in 2018, OHA implemented the Performance System. This system is about organizational alignment across all agency divisions. The agency identified outcome measures that are quantifiable indicators of the agency's overall performance. Process measures were then created to assess the progress of the work that supports our customers and functions in the organization. Cross-functional collaboration and engagement allows teams with different functions to move toward the same goals. The performance system is data-driven, telling us how our processes are doing. Health Systems Division units are creating metrics for their work, measuring their processes to understand current conditions and setting goals for short- and long-term continuous improvement. All units are creating dashboards for essential and priority work. At the quarterly performance reviews, measure owners share the current condition of their unit dashboard, process measures, improvements and quarterly goals. The agency-wide quarterly performance reviews focus on shared goals and outcomes. Strategic planning recommendations influence the measures highlighted at the agency-wide reviews.

**Challenges:** OHA relies on what is currently a decentralized and fragmented system to provide quality data inputs. Providers and subcontractors have varying capabilities and challenges when it comes to synthesizing local data and feeding it into the state-level collection systems. OHA will need to simplify and focus is data-gathering efforts to allow for a comprehensive view of the system envisioned by its strategic plan while keeping the administrative burden on the providers to a minimum. This will be a difficult but important task.

**Agency needs:** To implement the data system development needed to support this recommendation, OHA and OHA/DHS Shared Services will require ongoing state and federal funding support. Additionally, OHA's data needs require staffing and prioritization within Shared Services.

**Timeline:** Work is underway and will continue for at least the following two biennia. Planning and benchmarking to be completed by June 30, 2023.

| RECOMMENDATION 7 Develop and deliver a proposal to request additional resources for a data analyst within the Child and Family Behavioral Health Unit. | | |
| --- | --- | --- |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities** | **Name and phone number of specific point of contact for implementation** |
| Agree. See below for further context. | June 30, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 7**

**Management response:** OHA appreciates how this audit highlights the critical need for quality data and meaningful analysis. The audit further highlights the challenges OHA faces when attempting to identify and support staff skilled in the multiple areas needed to do this work well. While this recommendation is one way to achieve the goal, OHA may need to explore alternative solutions.

**Inequity issues:** As this audit report points out, OHA's current analytic capabilities are limited. As such, we often lack information about unserved and underserved populations, systemic racism, and outcomes related to service delivery or lack of service.

**Consumer voice:** OHA must have staff who are able to engage with children and families and direct the analytical questions posed to the data systems. Those staff must also be well-versed in the underlying data that supports needed analyses and have the technology skills to be able to extract and interpret data appropriately.

**Work underway:** Regardless of whether OHA can pursue additional resources, we are determining how to integrate analytical functions into the functions of multiple positions in the Office of Behavioral Health. Recent reorganization of the office creates a specific unit with focus on Medicaid, Policy and Analytics.

Longer term, through the COMPASS initiative, we are also looking at newer types of technology and platforms such as Behavioral Health Data Warehousing and the cloud to identify methods to get more accessibility to system data.

**Challenges:** As discussed in the response to Recommendation #1, OHA and other state agencies now face significant budget challenges. Considering those constraints, it is not prudent to expect to receive funding for additional administrative staff. We will likely need to develop an alternative method to meet the goals of this recommendation.

This audit reveals that the decentralized and fragmented system creates real challenges when it comes to understanding all the complex program and data interrelationships. These issues are further exacerbated by confidentiality and identification issues that create real barriers to data sharing. Recruiting, training, supporting and supervising staff who have information technology skills coupled with multi-system program understanding would be difficult regardless of where staff sit in the organizational structure.

**Timeline:** The work of enhancing the analytic functions within the Office of Behavioral Health Services has begun and will include submission of a proposal for an analyst position by June 30, 2021.

| RECOMMENDATION 8 |
|---|
| **Leverage data analysts in the Health Policy and Analytics Division and resources in the Child and Family Behavioral Health Unit to determine the extent to which Medicaid claims data can be used to accurately identify and track the number of children receiving mental health services statewide and outcomes.** |

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | June 30, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 8**

**Management response:** Even considering the data and analytical challenges described in this audit, OHA does have a wealth of information available through the Medicaid Management Information System (MMIS). OHA agrees that we can do more to extract and analyze data from the Medicaid system to make assessments about how many children are receiving services and their health outcomes. In consultation with national children System of Care experts Liz Manley and Shelia Pires, OHA staff are working on a project to determine what Medicaid claims data can be used to identify and track children receiving mental health services statewide and define targeted outcomes. This project work will overlap with the Senate Bill 1 data dashboard project team (DHS/OHA/OYA) and the work that is currently underway. This work is connected to Recommendation # 6.

**Inequity issues:** Through regular review of information about service delivery, we can begin identifying patterns in service utilization. These patterns can serve as proxies that will bring us closer to understanding inequities faced by certain children and families in Oregon.

**Consumer voice:** As we identify service patterns and outcomes, children and families will be equipped with information to help us co-create system solutions and identify trauma indicators.

**Challenges:** We will continue to face challenges with the massive scale of the data that is submitted through a centralized and fragmented system. All conclusions must be considered carefully as there are many nuances to the data. Developing careful understandings about how the data was extracted and for what purpose is significant to interpreting results. Also, the sheer size of MMIS, coupled with the data submission rules that must allow adequate time for service providers to submit and time for correction mean that the data system is fluid and subject to change well after the dates of service.

**Timeline:** This work is currently underway and will result in a written summary and recommendations by HPA by June 30, 2021.

---

**RECOMMENDATION 9**
**Formalize agreements with DHS to help assess the ongoing needs for intensive mental health treatment services statewide and track performance measures of mental health services for children by foster care status.**

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | Dec. 31, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 9**

    **Management response:** This audit report appropriately highlights the critical relationships between OHA and DHS in supporting the needs of children in foster care. Oregon's System of Care partners are guided by the vision that children can be at home, in school and in their community because they receive the right services, at the right time and for the right duration.

OHA and DHS are working together on a project that will identify and prioritize cross-system interventions to better serve children in foster care and children and families in Oregon. This project will address access, Medicaid services, eligibility and capacity-building.

**Inequity issues:** OHA agrees with the audit report's conclusions that without behavioral health performance measures for children in foster care, we risk perpetuating programs and levels of care that are not culturally and linguistically responsive, may be of low quality and may not meet the needs of the children who receive treatment.

Additionally, as the audit report highlights, OHA's mechanism for tracking children's intensive service capacity has not worked as intended, and data resulting from it is incomplete. This limits our ability to see inequity in access and identify the barriers children and families are experiencing.

**Consumer voice:** In collaboration with youth and families, OHA and DHS must together support a system that meets the behavioral health service needs of children in foster care. Too many times, children and their families, especially children being served in foster care, have struggled to access services in a system that is difficult to navigate, non-responsive to their needs, that forces them to endure long waitlists for intensive services, and that too often results in inappropriate placements and emergency room use for behavioral health intervention. OHA and DHS must work with system users to co-create solutions to these and other challenges.

**Work underway:** OHA and DHS have a combined Psychiatric Residential Treatment Services (PRTS) Capacity Building Project that will create a needs assessment and develop strategies to build and monitor this intensive level of behavioral health capacity. OHA has drafted a POP for the 2021 Legislative Session requesting funds to expand this capacity. To date OHA has developed seven new PRTS beds and continues to work with existing and new providers to increase capacity at this level of care.

OHA and DHS have committed to:

- Engage PRTS providers, CCOs and commercial insurance carriers to identify future state options for Oregon recognizing collective resources and knowledge.
- Identify start-up funds needed to help offset one-time costs for developing additional capacity.
- Develop programmatic and policy change recommendations that would encourage and support capacity development and operational sustainability.
- Track provider outcomes and ongoing system capacity needs.
- Review current services with an equity lens and make recommendations to ensure culturally specific service delivery is occurring.
- Explore funding models to ensure capacity is available when needed.
- Coordinate with the System of Care Advisory Council with an analysis of the current continuum of care and develop long-term recommendations for the appropriate settings needed in Oregon.

DHS and OHA are developing recommendations by December 31, 2020, for capacity, policy changes and budget to adequately build a service array for children specifically served by the child welfare system.

In addition, OHA, DHS, and the Oregon Youth Authority (OYA) are building a Children's System of Care Data Dashboard that will show the continuums of care in OYA, Child Welfare and Behavioral Health and how they overlap for children. Dashboard elements will include utilization, youth involved with multiple systems, and much more to inform policy and program development moving forward.

OHA and DHS will be working together with the System of Care Advisory Council and national experts to define performance and outcome measures to be tracked to support and monitor the children's continuum of care.

Rates were increased for PRTS and Subacute Service on July 1, 2019. The intent of the rate increases was to support the current provider network and potentially attract new providers to the system.

**Challenges:** As this audit highlights, OHA and DHS have faced many challenges in getting to this point. Some of the barriers to success include:

- Crises and lawsuits driving system and policy focus rather than data and outcomes;
- Inadequate staffing and financial resources to support and focus on this work;
- We have not yet identified the specific outcomes to measure;
- As the audit points out, the capacity tracking system has not worked as envisioned
- Development of inpatient care can be expensive and takes time;
- Need for additional financial investment into the Children's System of Care;
- Lack of funding appropriated to capacity retention and expansion (especially for inpatient levels of care);
- Children's service capacity development has been reactive and happening separately (Behavioral Health, Foster Care, Behavioral Rehabilitation Services);
- CCOs are responsible to ensure the provision of children's behavioral health services. This has led to confusion about which organizations maintain lead responsibility for capacity management and expansion, especially for statewide services such as Psychiatric Residential Treatment Services;
- Minimal demographic data in the MMIS system to support racial equity evaluation.

The children's behavioral health system is decentralized and locally managed through the CCO model. While OARs give some structure to the services, the infrastructure does not support the notion of "no wrong door" for children and families needing to access care. This is especially challenging for children in foster care who are supported by case workers and system partners throughout the state, navigating 15 different continuums of care with different access points.

**Agency needs:** To successfully and systematically monitor performance measures of mental health services by foster care status, OHA and DHS would benefit from support from the Oregon Enterprise Data Analytics (OEDA) unit. The 2015 Oregon Legislature created the OEDA unit to conduct inter-agency research. The legislation encouraged the expansion of data-informed decisions throughout state government. The research analysts, economists, and information technology positions work among agencies to translate data into information; that information promotes data-informed decisions and improves outcomes for children and families. OEDA uses advanced analytics with human service organizations, health organizations, public health

organizations, corrections, the courts, employment, housing, and education. The current projects include use of predictive analytics for health risk, identifying nongraduates during elementary school, differentiating Self-Sufficiency client groups to better serve the highest risk families, developing staff engagement surveys to recognize staff most likely to leave DHS, algorithms identifying children at risk for temporary lodging and out-of-state placement, and developing data sharing agreements among agencies.

OHA staff from the Child and Family Behavioral Health Unit will reach out to OEDA to determine what support may be available to help implement this audit recommendation.

**Timeline:** Work is underway and will continue through 2021.

---

| RECOMMENDATION 10 |
|---|
| **Develop and document shared guidance on the methodology that will be used to track performance measures and communicate that to all stakeholders, including CCOs and providers.** |

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | Dec. 31, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 10**

**Management response:** OHA agrees that clear communications and guidance are critical as we seek to improve transparency about the methods that support our performance measures. We will continue to move forward with the CCO Compliance Project described below and refine our measures in the OHA Performance System.

**Inequity issues:** Shared understandings about how systems will be evaluated improve transparency and accountability. This frees us to ask probing questions about the meaning of performance results. Understanding and communicating underlying methodologies allows advocates to highlight systemic barriers and racism inherent in those methodologies. Without the option to evaluate those methods, stakeholders and decision makers may have differing interpretations of the results.

**Consumer voice:** OHA believes that this recommended guidance will provide consumers, children and families with helpful information about how well our measures reveal whether the system is simple, responsive and meaningful. Understanding exactly what is being tracked and why, and knowing that key stakeholders have the same understanding, provides consumers and families with tools needed to ensure transparency and accountability. Also, to the extent the guidance reveals inadequate measures, consumers and families will be in a stronger position to advocate for system improvements.

**Work underway:** OHA has been working on several initiatives that relate to this audit recommendation. We are working on what we call the CCO Compliance Project, which addresses this recommendation across all CCO requirements. We developed a standard process for submission of

CCO deliverables. We have a framework to track each deliverable for each CCO based on a variety of factors, including timely submission, level of completion and an evaluation of quality. We still have work to do to refine and finalize this work, and ultimately work is needed to effectively communicate it with stakeholders.

This audit report also alludes to the OHA Performance System that we have been building for the department. This has been a multi-phase, cross-departmental effort and is described in our response to Recommendation #1. We continue to refine the measures and reporting. For the programs within Health Systems Division, including Medicaid and Behavioral Health, managers meet quarterly to review progress in establishing measures and evaluating performance. We still have work to do to finalize the performance measures and to communicate to stakeholders.

**Challenges:** To make a meaningful assessment of whether people are receiving services that are timely, meaningful and responsive, performance and outcomes must be measured from various vantage points. Data-sharing across agencies is often useful in helping determine the performance of our system. At the same time, some data, if used incorrectly, can be incriminating. Much of that data is managed by other agencies that are governed by strict data confidentiality rules. Also, there are technical challenges inherent in matching disparate data sets. Some service systems collect data for different purposes than OHA does, so matching information is structurally complicated. Oregon does not have a Master Client Index that allows us to follow the services people and families receive, and there are ethical considerations when evaluating outcomes across systems.

The current decentralized, fragmented system means that there will be multiple areas for which performance measure guidance will need to be developed, documented and shared. OHA is currently responsible to administer multiple performance measure systems. Communicating the underlying methodologies to key stakeholders can be confusing without adequate synthesis and interpretation.

**Agency needs:** To best implement this recommendation, OHA would need data-sharing agreements with other agencies, plus the underlying technical support from their staffs to extract and share information with us. Additionally, the COMPASS Modernization Project described earlier in this response is key to success with this recommendation. If that project is not funded, OHA will continue to struggle with the most basic data issues. Even if it is funded, OHA and our system partners will have a great deal of work to do to resolve deeply rooted, systemic data challenges.

**Timeline:** Work has been underway and continues to be refined by OHA staff. Anticipated completion date is Dec. 31, 2021.

| RECOMMENDATION 11 Clarify expectations for reporting through a robust set of instructions, similar to the technical manual provided by Washington's Health Care Authority. | | |
| --- | --- | --- |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities** | **Name and phone number of specific point of contact for implementation** |
| Agree. See below for further context. | Dec. 31, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 11**

**Management response:** OHA respects that clear expectations are important. While on its face, this recommendation would seem straightforward, there are differences between how the Oregon Health Plan is structured and how Washington State's Medicaid Program operates. OHA does not believe that this recommendation can be implemented as written. However, OHA does agree that we must continue to improve and clarify our written guidance, contract language, reporting requirements, and data submission instructions throughout the system.

The Oregon Health Plan Behavioral Health covered benefit is detailed on a prioritized list of conditions paired with effective treatments. Oregon's CCO model requires CCOs to understand the communities they serve and to tailor delivery of the benefit for the community. This model means that the fine details of rates and billing code requirements are not set statewide. Details for the state's Fee-for-Service (FFS) program are in OARs and on the published FFS fee schedule. CCOs are held to account through a capitation model (encounter claims history is factored in) and metrics. The state monitors complaints of all types and follows up. There is also an audit process that monitors patterns in services and can serve as a means of accountability and quality improvement when issues are discovered.

Operationalizing the CCO 2.0 contracts will also help clarify reporting requirements inside the framework of our more flexible system.

**Inequity issues:** A statewide billing code standard would reinforce the inequitable status quo, which doesn't align with stated goals of our waiver with the federal Centers for Medicare and Medicaid. The state's current flexible model is necessary to address inequities in services unique to each community across the state.  But much more work is needed in this area. The state must maintain sustained focus on identifying and eliminating differences to ensure that services as needed are available across the state. OHA must also make sure CCOs use the flexibility we give them to achieve this essential outcome.

**Consumer voice:** Consumers are one step removed from this issue, but they are impacted by it. This issue is about the details of billing between providers and payers (FFS and CCOs). Consumers' interest would not be best served by a statewide billing guide. Consumer interests are best served when the state ensures their voices influence CCO policies including billing details, the policies guiding those services, and the outcomes achieved through the services and policies.

**Work underway:** OHA revised the CCO contracts (CCO 2.0) to require much stronger oversight. OHA is building the team and defining the deliverables to operationalize these requirements. This work that will ensure OHP members receive quality well-coordinated behavioral health care. Some of the billing code detail is defined in the metrics. Additional details may be included as each CCO deliverable is defined with an initial focus on access to services across all populations.

**Challenges:** Oregon's transformation model works to reduce fragmentation at the community and CCO level. A statewide billing code standard could interfere with this work. OHA needs to continue consolidating and creating a cohesive framework associated with BH services. This will create direction for the system and reduce current fragmentation.

**Agency needs:** OHA needs sustained direction and focused resources to achieve the goals outlined.

**Timeline:** OHA's work on improved communications for providers is ongoing. This recommendation will be paired with #10 with an anticipated completion of Dec. 31, 2021.

---

**RECOMMENDATION 12**

**Develop and document a process for verifying that data submissions used to track performance measures are timely, complete, and accurate. Once documented, establish a policy for the process to hold stakeholders, including CCOs, accountable for timely, complete, and accurate data submissions and communicate the policy to all parties.**

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | June 30, 2023 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 12**

**Management response:** OHA agrees with a primary theme of this audit about the importance of high-quality data to support decision-making. This audit recognizes a long-standing challenge within the behavioral health system, which is lack of timely, complete and accurate data. There are legitimate systemic reasons why this is the situation, and OHA continues to work on developing the ability to find cost-effective levers that result in improvements.

**Inequity issues:** As so many of our responses have indicated, lack of timely, complete and accurate data means we struggle to identify indicators of systemic inequity and, thus, struggle to eliminate these inequities.

**Consumer voice:** Similarly, working without reliable data makes it extremely difficult to be adequately informed to co-create trauma-informed system solutions with consumers and families.

**Work underway:** OHA has several efforts to support behavioral health agencies' ability to collect and share client-level information, which is an important part of data quality and accountability. OHA conducted an in-depth Health Information Technology (HIT) scan focusing on behavioral health needs, and convenes a Behavioral Health HIT Workgroup to recommend strategies and oversee OHA's work. In particular, OHA supports adoption of certified electronic health records through federal Promoting Interoperability incentive payments and technical assistance to providers. OHA supports health information exchange efforts that have significantly increased behavioral health providers' ability to coordinate care and access information about their clients' hospitalizations and use of emergency departments. These data are critical for behavioral health providers' ability to meet OHA's expectations for performance, manage their clients proactively, and improve the quality of their care.

OHA also holds CCOs accountable through the CCO quality incentive program to address disparate use of emergency department visits for their members with serious mental illness. OHA supports CCO and behavioral health agencies in this metric by providing a flag for CCO members with serious mental illness. The goal is to let CCOs and behavioral health agencies to know, in real time, when these

individuals are in the emergency department, which will help inform care management and coordination efforts. Providing this simple yet critical data enables CCOs and behavioral health agencies to act quickly to address the needs of members with mental illness – and ultimately drives outcomes that positively impact CCO metric performance. For more information on this metric, see this link.

As described in the response to Recommendation #6, OHA is in the midst of a substantial redesign of the underlying data systems and warehouses that support performance measures. OHA is also currently working with CCOs on the CCO Compliance Project across all CCO deliverables, as discussed in Recommendation #10.

**Challenges:** This issue is driven by the decentralized and fragmented system. Providers regularly struggle with data-reporting requirements. Much of that struggle is the result of conflicts between local electronic systems and OHA's complex information technology requirements. Some of it is driven by needs for various data elements to meet billing requirements versus licensing requirements versus clinical requirements. Some is driven by accounting requirements.

**Timeline:** OHA has begun this work and will continue to make improvements in data monitoring processes. Improved technology will be an essential in making data collection, analysis and reporting feasible in ways it isn't currently. Anticipated completion of June 20, 2023, but dependent on anticipated technology enhancements.

| RECOMMENDATION 13 |
|---|
| **Collaborate with System of Care stakeholders to perform a systemwide needs assessment for the children and family continuum of care, including: Wraparound, secure inpatient, residential, and intensive support.** |

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | Oct. 31, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 13**

**Management response:** A 2017 OHA/DHA Continuum of Care Project explored recommendations to support the child serving systems. The recommendations were supported by extensive stakeholder engagement and feedback. The three selected projects included: State System of Care Infrastructure Implementation, Trauma Informed State Agencies and Intellectual and Developmental Disabilities-Mental Health (IDD/MH) Improvements and Capacity. Many objectives have been completed, including the work through Senate Bill 1 and both OHA and DHS developing Trauma Policies. This work continues.

In March 2019, the Child and Family Behavioral Health Unit developed a vision that will be used to launch the statewide needs assessment recommended here.  Staff have reviewed and summarized

previous needs assessments, audits and reports and are incorporating that work into the ongoing vision and policy direction.

OHA developed a Child and Family Behavioral Health Director position in July 2020. Once hired, this position will lead the statewide needs assessment of the child and family behavioral health continuum of care, which will include Wraparound, secure inpatient, residential and intensive support. OHA plans to include substance use services and outpatient level of care in this need assessment.

**Inequity issues:** Oregon lacks a full spectrum of mental health supports that meet youth and family's needs in a culturally responsive manner across Oregon's Black, Indigenous and People of Color (BIPOC) communities. Many of Oregon's nine federally recognized tribal members remain on Open Card OHP benefit that provides them less access to providers and services, including Wraparound for children and families. This inequity impacts Latinx and immigrant communities getting access to a continuum of care that meets their cultural and linguistic needs. When conducting the needs assessment, it will be essential to engage with individuals from these communities to identify needs and challenges and co-create culturally responsive solutions.

Oregon also struggles to provide a continuum of care in rural, frontier and urban areas of the state. Mental health promotion and prevention efforts have historically been limited statewide. Higher-level care options are mostly in urban areas, while rural and frontier communities do not have access to needed services and supports. A more specific inquiry into how social determinants of health are impacting children's behavioral health supports, and how that can be alleviated, is warranted.

**Consumer voice:** To adequately and accurately conduct a needs assessment across the continuum of care, it is essential to center the voices and experiences of youth and families. This approach is especially critical when identifying the needs of historically marginalized or underserved communities, including those who are Black, Indigenous or other people of color, and Oregon's rural and frontier communities. Meaningful consumer participation will be prioritized throughout the needs assessment process.

**Work underway:** The outcome of the work outlined above will guide the work of the Child and Family Behavioral Health Unit's five-year plan.

In the 2019 session, funds were allocated to support the development of Intensive In-Home Behavioral Health Treatment services. These critical services help alleviate many of the concerns addressed in this audit, including bridging the gap between emergency room use and the need for intensive services that do not require a psychiatric residential treatment level of care. IIBHT offers support in the home to children/youth and their families.  A framework for the implementation of these services has been created: OARs have been filed, stakeholder engagement has been sought, a series of webinars for potential providers have been conducted, funding mechanisms are established.

Much of the related work has been outlined in other responses, and in addition, OHA and DHS are working with the Governor's Children's Cabinet and participating in a subcommittee with members of the Statewide Child Welfare Oversight Board to develop and manage a workplan to ensure the integration of new service development with an efficient and comprehensive system of care for children. Also, OHA is supporting DHS's Family First Prevention Services Act by implementing new requirements for Qualified Residential Treatment Programs (QRTPs) and prevention models.

**Challenges:** Child-serving systems, service providers, and families and youth recognize that Oregon lacks a fully coordinated, effective network of services to support Oregon's more than 2 million children. More than 20,000 of these children are being served by multiple systems. The Governor and Legislature have established several initiatives to address this system challenge, including the Children and Youth with Specialized Needs Workgroup (2018), the Governor's Behavioral Health Advisory Council (2019–2020) and the statewide System of Care Advisory Council (Senate Bill 1, 2019).

National best practice for System of Care shows early intervention for children's behavioral health crises is a cornerstone of a strong, effective System of Care. Oregon's current service array does not support early intervention, nor does it adequately serve young people and families when they are in crisis or after they have stabilized. Additionally, there is a lack of cross-system collaboration, flexibility and responsiveness, which results in avoidable crises and inappropriate placements, including for children involved with child welfare. The current system lacks a clear delineation of roles, responsibilities and accountability around emerging and urgent issues for children and families experiencing intensive behavioral health needs and has neither the capacity nor a sustainable funding structure, to keep them in a family setting and in school.

The services and supports for youth that are involved in child-serving systems span a broad range dependent upon CCO and local county capacity. For youth with complex mental health needs involved in child-serving systems, CCOs provide Wraparound and Intensive Care Coordination; however, these coordination models do not provide direct access and coordination to other child-serving systems. Thus, barriers still exist for children and youth with complex needs. This often means that the system is reactive to children and families rather than proactive and responsive.

Oregon lacks sufficient community-based services and placements, and emergency rooms may be boarding youth with mental health issues who do not have access to treatment, or for some, a place to live. Families are navigating a service array that is inconsistently available, with waitlists for psychiatric residential treatment services, medication management and outpatient services. It often does not consistently include respite, peer delivered services, or child-focused mobile crisis response and stabilization. Mobile crisis response is extremely limited in Oregon and could alleviate cross-system barriers by providing timely identification and contributing to co-created solutions in a manner similar to that accomplished by New Jersey.

**Agency needs:** OHA needs:

- Increased opportunities for meaningful youth and family involvement and consumer co-creation.
- Partnership with the other child-serving agencies to complete a full system wide needs assessment to ensure impact and feedback includes school, juvenile justice, child welfare and intellectual and developmental disabilities.
- Continued national consultation to determine the right questions to ask our communities to get at system level structure and policy changes needed. A targeted look at racial equity across the current mental health continuum of care needs to be conducted and documented.
- Support from CCOs and outpatient providers statewide to ensure that prevention and proactive levels of care are represented in the.
- Collaboration and support from related advisory councils to participate in a robust needs assessment.

- A significant investment into data systems and development of measures/performance indicators needs to occur led by OHA but developed with extensive stakeholder input and direction.
- Legislative investment for OHA to be responsive to the children's continuum of care.

**Timeline:** Systemwide Assessment to be completed October 2020-October 2021

---

**RECOMMENDATION 14**
**Utilize stakeholder input to develop and determine the methodology used to assess statewide emergency department boarding, with separate reporting for children and youth boarding and frequency, and pursue measures needed for consistent implementation. The methodology should be documented and maintained by the Behavioral Health Division.**

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | Dec. 31, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 14**

**Management response:** OHA has long been concerned about inappropriate or excessive use of Emergency Departments (ED) for children and adults who need behavioral health services. Additionally, we recognize that it is crucial to engage people into appropriate services upon discharge from EDs. In an agreement with the U.S. Department of Justice, we have prioritized ongoing study, evaluation and improvement of this issue for adults with serious and persistent mental illness. For children, we have made and will continue to increase investments in services to help reduce overall ED utilization. We recognize that we still have work to continue to address this issue.

**Inequity issues:** National data shows 1 in 5 young people experience diagnosable mental health conditions in any given year. In the last three years on average, 8,250 Oregonians on the Oregon Health Plan ages 0 to 25 with behavioral health diagnoses were treated in EDs. In 2018, there were over 7,600 young people in foster care, and of these young people, 60 percent experienced a disruption in their foster home that led to the need for a new foster home, placement in a shelter or going to an ED. An emergency department's primary role is to address physical and not behavioral health needs, and they are adult-oriented. This lack of specialized expertise to respond to and successfully stabilize children and youth experiencing a behavioral health crisis often leads to an extended stay in an ED or discharge without effective safety planning. Children in foster care are overrepresented by our BIPOC communities.

With the increased potential for trauma response in the wake of the COVID-19 pandemic, all young people are at risk for added stress. Safety and health are a top priority during this unique time of physical distancing, and this need poses significant interruption in daily routines that impact access to support and care. Physical distancing is also disruptive to normal growth and development, particularly for older children and teens who are learning about appropriate relationships and need interpersonal

support. Children and teens will be disproportionately impacted for months and years to come, even after a vaccine is found and particularly with the prospect of future outbreaks. This will heighten existing mental health symptoms and create additional symptoms, including post-traumatic stress disorder.

These additional stressors will contribute to increased risk of abuse and neglect as people experience overwhelm and isolation. This has been previously measured and documented in areas experiencing natural disasters. Among the top concerns are Oregon's most vulnerable youth, who are at risk, or already living in a foster home.

**Consumer voice:** The development and implementation of this methodology will be informed by input from consumers, including youth and families. Consumers can provide guidance on collection and assessment of data. Consumers can also provide insight into any trends in data, give context for the information gathered and advise on actions to be taken based on the data collected.

Oregon's current service array does not support early intervention, noted elsewhere as a national best practice, nor does it adequately serve young people and families when they are in crisis or after they have stabilized. Additionally, there is a lack of cross-system collaboration, flexibility and responsiveness that results in avoidable crises and inappropriate placements, including for children involved with child welfare. The current system lacks a clear delineation of roles, responsibilities and accountability around emerging and urgent issues for children and families experiencing intensive behavioral health needs and has neither the capacity nor a sustainable funding structure, to keep them in a family setting and in school.

**Work underway:** OHA's 2021-23 Agency Requested Budget includes a policy option package (POP) to implement Children's Mobile Response and Stabilization Services (MRSS). MRSS is a prevention program specifically designed to support children and their families and/or caregivers before situations turn into a crisis. This trauma-informed program will also provide support to children and their families in their home, their schools and in the communities.

Evidence from other states shows that MRSS services and supports dramatically increase the stability of youth residing in foster homes. Further evidence shows MRSS can successfully decrease police involvement and emergency room use, while providing treatment to youth and their families in their home and community.

Other programs OHA has implemented and expanded to support ED diversion and accessing appropriate levels of care:

- **Crisis and Acute Transition Services (CATS)** are designed to provide a community-based alternative to emergency department "boarding" for children, youth and young adults in need of acute psychiatric treatment who are awaiting inpatient psychiatric hospitalization. The program includes and requires brief crisis services, stabilization, and transition to community-based supports and services when individuals from birth through age 18 present to emergency departments or crisis center and are at risk of admission for psychiatric or behavioral crises. Programs must serve all individuals presenting in the settings indicated above, including those with public, private, or no insurance. The CATS program has served over 1,300 youth and their

families in nine counties in 2019. Approximately 78 percent of youth are discharged from the emergency department within 24 hours, and 92 percent within 48 hours.

- **Fidelity Wraparound** is an intensive care coordination model and a fidelity process that supports young people and their families with complex behavioral health needs who are multi-system involved. Wraparound is a voluntary process, guided by youth and their families, that connects them to the supports and services needed to improve health and wellbeing. Wraparound reduces the use of emergency rooms, higher levels of care, reduces episodes of psychiatric hospitalization, improves school attendance and provides significant support to youth involved in child welfare and juvenile justice. Most counties and all regions have access to Wraparound care coordinators and peer-delivered service providers with specialized training in supporting youth and their families.
- **Development of Intensive In-Home Behavioral Health Treatment.** See more about this program in Recommendation #13.
- **Interdisciplinary Assessment centers (IATs).** The 2019 Legislature passed Senate Bill 1 and established a special purpose appropriation for OHA, DHS and OYA to coordinate efforts and establish regional interdisciplinary assessment centers. The teams in the centers would conduct thorough assessments and make treatment recommendations for long-term wellness. As of July 2020, IATs are in statute but the special appropriation is no longer available to finance the initiative.

OHA's 2019-21 Legislatively Approved Budget did include funding to support the Children's System of Care data dashboard as established in Senate Bill 1. Emergency Department utilization will be incorporated with separate reporting for children and youth boarding and frequency, and the Council will pursue recommended measures needed for consistent implementation.

**Challenges:** With the current wait list for residential treatment beds, we need more innovative services and resources in Oregon. These waitlists create a gap in services that causes families to wait more than 6 weeks for assessment appointments, resulting in increased likelihood of a crisis emergency department visit and worsening health of the family. Utilizing MRSS, fully implementing the 2019 investments (including IATs) and expanding other current programming (CATS, IIBHT, Wraparound) would provide supports that would prevent disruptions, interactions with emergency departments, law enforcement, foster care and higher levels of mental health care.

**Agency needs:** Oregon's System of Care aims to improve the effectiveness of state agencies serving Oregon's children and improve the continuum of care that provides services to youth, ages 0 to 25 so that mental health care is community based, family driven, effective, and culturally and linguistically responsive. Achieving this will require changes to the current systems and the filling of gaps in the continuum of services available to children and young adults. Filling the early intervention gap with MRSS and the current programming would decrease demand for higher levels of service and preserve foster placements for young people involved with DHS Child Welfare.

Coordination of services and network is critical, particularly during the pandemic. Oregon must prepare to meet this need to support children, young people and families and provide resources and support at the right time. Adequate response to COVID-19 issues requires the creation and utilization of early intervention strategies and trauma-informed mobile response and stabilization services, and an increase in the coordination of the service network.

**Timeline:** The work described above to reduce ED boarding for children and adults will continue over the next several years. The monitoring and reporting of ED boarding through dashboards is expected to be completed by Dec. 31, 2021.

---

**RECOMMENDATION 15**

**Develop an intermediate proposal to Legislature for addressing issues with statutory language requiring the call center contract up to discontinuing OHA's portion of the contract.**

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | Dec. 31, 2020 | Jackie Fabrick, 503-756-2822 |

---

**Narrative for Recommendation 15**

**Management response:** In 2017, the Governor signed SB 944 into law. The intentions of this bill were to establish a call center to help children get access to the right service at the right time and so that OHA and the community would be able to track the need for different levels of care. The call center focus is on children in emergency departments and inpatient care (Subacute and PRTS). The bill also intended that we would improve our ability to understand and track system capacity in real time.

OHA and the System of Care have learned valuable lessons, as execution of the bill did not result in the intended outcomes. OHA and the System of Care will need to reevaluate how to improve the effectiveness of the referral system and capacity management tools. While it may help to change the statute, the underlying work that needs to be done is to identify more effective methods to achieve the outcomes envisioned by the legislation.

As with other responses, the lessons and work that OHA has done through COVID-19 response may allow us to break through some of the stumbling blocks that occurred as we initially attempted to create this capacity management system for this singular level of service. Instead of abandoning the entire concept, consumers will be better served if OHA, providers and funders revisit the mechanics of how to make this work and commit to the goals of SB 944. Once a solution is crafted that works, OHA will review the statutes and rules and update if needed.

**Inequity issues:** As the crafters of SB 944 recognized, having a service delivery system dependent on existing knowledge and relationships between providers resulted in a delivery system that would often exclude people from easily accessing needed services. This is one more instance of systemic barriers that are especially difficult for those from nondominant cultures to overcome.

**Consumer voice:** While this is a very specific recommendation related to one section of the statutes, the underlying work is germane through the entire lifespan for behavioral health services. Having an easy to access, systematized capacity management system for every level and type of behavioral health service will allow consumers, families, and referring providers to identify appropriate and timely service options.

**Work underway:** On June 5, 2020, the Legislative Emergency Board approved allocation of $6 million to develop an Oregon Behavioral Health Access System. Within this initiative, OHA will be utilizing nationally recognized capacity management tools and techniques to create a one-stop shopping experience for consumers who seek behavioral health services. The system will build from lessons learned in SB 944 implementation, be sophisticated and will also support connections for providers who seek real-time information about capacity so that we can streamline referrals to appropriate levels of care.

As noted in the audit, OHA did work with the PRTS and Subacute providers in 2018-2019 to gather important data, outside of the call center, for a calendar year to specifically look at the capacity need, utilization, wait times and access barriers. OHA recognizes that this is valuable data.

**Challenges:** The current design of the children's continuum of care mental health provider participation is required to have a call center to assess system needs and access. When capacity is consistently full, the ability to consider capacity management is limited. The children's system is in crisis so there is a focus on getting urgent services to children and families rather than data gathering to make more informed decisions.

Creating a one-stop experience will be complex as providers operate under multiple governance systems and payor structures. For example, the children's behavioral health system is primarily managed through the CCO model in Oregon. CCOs contract for their provider network directly. For the inpatient levels of care there are only five providers, but CCOs are not required to contract with any or all of the them. In addition, access to these levels of care can look different depending on the CCO of the member. OHA does not contract with these providers directly so although we oversee them through certification and OARs, access and management are not directly overseen.

**Agency needs:** To be successful, OHA will need to determine an effective method for providers to keep capacity reports up-to-date and current.

**Timeline:** The work to improve capacity management is underway and OHA will work to address statutory inconsistencies as timelines allow leading up to the 2021 legislative session.

---

**RECOMMENDATION 16**
**Work with the newly created Senate Bill 1 System of Care Advisory Council and Legislature to better optimize the statute guiding mental health treatment services. Specifically, the collaborative effort should:**

**Expand statutes to consider CCO framework and evaluate disconnected mental health statutes for potential revision.**

**Clarify statutory roles and responsibilities of stakeholders.**

**Develop alternative language for "subject to the availability of funds" in order to establish priority of mental health services.**

**Define the requirement of integrated physical, mental, and oral health.**

**Deliver a report on planned optimizations.**

---

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | Dec. 31, 2023 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 16**

**Management response:** OHA appreciates the importance of aligning and optimizing foundational statutes that support the behavioral health system. Because this is needed for the behavioral health statutes covering the lifespan, we would suggest expanding the advisory process through which we accomplish this. In addition to utilizing the System of Care Advisory Council, which focuses primarily on children and families, we would also work through other advisory groups including, potentially, the Governor's Behavioral Health Advisory Council, the Alcohol and Drug Policy Advisory Council, the Alcohol and Drug and Mental Health Planning and Advisory Council, the Oregon Consumer Advisory Council, and many others. We would also need input from a vast array of stakeholder groups. Additionally, we would engage regularly with legislative committees on behavioral health as we proceed, to ensure we are addressing issues that constituents bring forth.

**Inequity issues:** Conflicts in statutes, as well as optional financing and poorly articulated roles and responsibilities, leave room for service gaps and lack of accountability and perpetuate long-standing systemic barriers to service, particularly for persons of color.

**Consumer voice:** Consumers, including youth and families, will be leaders in the process and will co-create the recommendations for changes needed to the behavioral health statutory framework. As OHA does the difficult work of clarifying and aligning statutes, consumers will benefit from a system that becomes more simple, responsive and meaningful.

**Challenges:** This work will be challenging. The current system is built from the local level. Each county and region has unique operational challenges and needs flexibility to ensure the needs of consumers can be met. Additionally, while CCOs represent a majority of the financial investment in Oregon's behavioral health system, there remains a need for safety net capacity for services that are not covered through the Oregon Health Plan or for people who are not eligible for services. Also, many people access services through private health insurance, and it will be important to factor that into the statutory work. For children and families, intersections with the other child-serving systems will influence how this work moves. For adults, it will be critical to factor intersections with justice systems, law enforcement, housing, disability services, older adults, veterans and other systems.

**Agency needs:** OHA will need stakeholder consensus for this to succeed.

**Timeline:** This work has started and will continue through 2023.

---

**RECOMMENDATION 17**
**Collaborate with system stakeholders, such as providers and other agencies, to develop and document a comprehensive workforce retention and recruitment strategy and**

| communicate it to all stakeholders. Reporting on strategic implementation should be delivered annually to the Oregon Health Policy Board. | | |
| --- | --- | --- |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities** | **Name and phone number of specific point of contact for implementation** |
| Agree. See below for further context. | Dec. 31, 2023 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 17**

**Introduction:** As referenced in the audit, the Behavioral Health Collaborative made recommendations regarding the behavioral health workforce, namely, to complete an assessment. OHA contracted with the Eugene Farley Health Policy Center to assess the current behavioral health workforce and develop a recruitment and retention plan. This work was completed in 2019 and was presented to the Oregon Health Policy Board. OHA's behavioral health Medicaid, Policy and Analytics unit work works closely with OHA's Primary Care Office and OHPB's Health Care Workforce Committee on all behavioral health workforce recommendations, including the Farley Center recommendations.

Since the publication of the Farley reports, OHA staff has conducted an analysis of Oregon-specific workforce recommendations in the past decade. These were presented to a workgroup of the Governor's Behavioral Health Advisory Council. OHA is incorporating the council's policy recommendations into requests for the 2021 legislative session.

**Inequity issues:** The behavioral health workforce in Oregon is predominantly white. BIPOC consumers are not able to receive treatment from BIPOC providers. Low wages result in individuals not entering the workforce. Some cultures don't see traditional counseling as acceptable, and this results in many people not seeking behavioral health care or being distrustful of the care they receive. Black communities experience bias from providers, which often results in misdiagnosis and poorer quality of care. This continues the cycle of mistrust and a tendency not to seek behavioral health care. Culturally competent providers have long waitlists and accept limited insurance. Lastly, systemic racism has created deep distrust.

**Consumer voice:** Consumers, including youth and families, have critical insight into this issue. Oregon must develop and retain a behavioral health workforce that is responsive to the needs of the people who rely on these services. As such, consumers will inform the development of this plan and will guide OHA in determining goals for workforce composition and training. The workforce issues, such as high turnover, results in consumers having to start over with new providers. This is not a trauma-informed system as consumers are required to retell their stories and develop a therapeutic relationship with a new provider. Our most qualified workforce tends to work in lower acuity settings, whereas our least experienced workforce is working with the most acute patients. This is a disservice to consumers as they are not able to receive care from a highly trained and senior workforce. Consumers are not able to receive treatment from providers that share their culture, language or background. These issues result in consumers not receiving meaningful services and overall poor outcomes.

**Challenges:** As the audit itself recognizes, Oregon's turnover rates within the children's behavioral health system are within the national averages, indicating that this is not only an Oregon issue, but also

a national one. Efforts to integrate behavioral health into the healthcare system are underway, but behavioral health staff is not paid in parity with physical or oral healthcare with parallel education, training and certification. OHA can raise rates, work with the Transformation Center to convene learning collaboratives, and work with partners, higher education and licensing boards to implement recommendations. But until behavioral health is fully integrated and in parity with physical and oral healthcare, we will continue to face significant workforce turnover and shortages.

The audit asserts that "while OHA is aware of the turnover problem, its efforts to reduce it have been ineffective." OHA does not have staff dedicated to work on this area. OHA has a Primary Care Office that is responsible for workforce, including loan repayment and incentive programs, workforce development issues, and the Oregon Health Policy Board's Health Care Workforce Committee; however, their primary focus is physical health. The former Addictions and Mental Health Division had a behavioral health workforce unit of approximately four FTE; those positions were lost in a reorganization.

**Agency needs:** Behavioral Health does not have staff to implement the recommendations. Adding behavioral health staff to the Primary Care Office (which oversees much of the workforce related efforts for OHA and staffs Oregon Health Policy Board's Health Care Workforce Committee) would place the staff in the right place to effectively do this work. Bringing higher education and licensing boards together with OHA and other stakeholders could require a mandate.

**Timeline:** This work is underway and was prioritized by the Governor's Behavioral Health Advisory Council. It will continue through 2023.

| RECOMMENDATION 18 | | |
|---|---|---|
| **Develop and deliver a public information campaign for mental health, including challenges faced by individuals in the system, as well as direct care workers, similar to campaigns delivered by the Public Health Division.** | | |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities** | **Name and phone number of specific point of contact for implementation** |
| Agree. See below for further context. | Dec. 31, 2020 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 18**

**Management response:** This audit report highlights how statutory provisions with no reliable source of funding have undermined OHA's ability to focus on mental health prevention and promotion. Also, OHA recognizes the serious challenges faced every day by the direct care staff.

In response to COVID-19, OHA contracted with Brink Communications to develop the Safe + Strong campaign. OHA received funding from the federal CARES Act to support current work with Brink for a behavioral health specific campaign. A key feature of that campaign will address stigma. Priority populations identified include health care workers, BIPOC, and those with behavioral health concerns.

**Inequity issues:** As mentioned in previous responses to the recommendations, the COVID-19 pandemic has had significant impact on and disruptions to OHA operations since early 2020. While that is an important backdrop to some of our responses, it is important to note that during the months of operating under the pandemic, OHA has realized some opportunities for system improvements. We received funding to support a broad-based public information campaign to help people understand mental health and to provide information about resources that can be helpful if they are experiencing mental health service needs.

Brink Communications conducted research and found high health disparity scores near Salem-Keizer, the Willamette Valley and agricultural counties. BIPOC seek support from personal networks rather than behavioral health care professionals. Income level and refugee of immigration status have a large impact on behavioral health of BIPOC. Reducing stigma in Latinx communities may help normalize help-seeking behavior.

**Consumer voice:** This work, in progress, will continue to be centered on the needs of behavioral health consumers, including those who are healthcare workers and members of high-risk or underserved populations. The first round of creative from Brink shows a simple campaign that will be transcreated into 11 languages. The campaign aims to be inclusive for gender and BIPOC. Stigma reduction and normalizing help-seeking behavior will help more people access behavioral health care. The campaign is building upon trauma-informed and supportive messages. To provide the foundation of the work, Brink and OHA staff did extensive community engagement work to speak to Community Based Organizations and other community leaders and learn about the needs of BIPOC communities. Messages and materials are being tailored from the insights gathered from that work.

**Work underway:** OHA has utilized resources from the Federal Mental Health Block Grant and funding from behavioral health investments in 2015 to contract with communities to enhance wellness practices and prevention. Since 2014, OHA has funded local Mental Health Promotion and Prevention projects. Led by community organizations, the projects aim to help everyone improve and sustain their mental health. This means children and adults can:

- Achieve developmentally appropriate tasks,
- Maintain a positive sense of self-esteem, mastery, well-being, and social inclusion, and
- Strengthen their ability to cope with adversity.

The projects promote evidence-based, community-based interventions and activities.

In 2019, OHA funded Mental Health Promotion and Prevention projects in 20 counties, serving more than 25,000 individuals and reaching thousands more through social media, websites, online learning and other outreach activities. Projects included:

- Advocacy, stakeholder engagement and interagency collaboration: Train the Trainer, Honest Open Proud (HOP), youth groups, peer support, parent support groups, life skills, coping skills and self - regulation, harm reduction.
- Onsite and School-Based Services: Professional development for staff, Question Persuade Refer, Curve It Forward, Positive Behavior Interventions, Mental Health Tool Box, Applied Suicide Intervention Skills Training, Culturally Responsive Mental Health First Aid (suicide prevention), STEPS to SUCCESS (bullying prevention), Second Step (social and emotional well-being), MindUp (social-emotional awareness to

enhance psychosocial well-being), Collaborative Problem Solving, NETSMARTZ (cyberbullying prevention), CONNECT (creating youth leaders).
- Summer school programs, food security, tutoring, art classes, after school sports.
- Culturally appropriate refugee and immigrant resources and services.

**Related work:** Also, during the COVID-19 crisis, OHA has enhanced the availability of tools for direct care workers affected by the crisis to include psychological first aid training and a self-assessment tool called PsyStart.

**Challenges:** The Brink Communications media campaign is funded for a limited period of time. There will need to be ongoing funding to continue the campaign.

**Timeline:** Work has been underway for several years and will continue to be expanded and improved. As a result of the COVID-19 work, a targeted campaign will be completed by December 31, 2020.

---

**RECOMMENDATION 19**
**Work with Trauma Informed Oregon to become a trauma-informed agency, finalize the internal trauma-informed policy, and provide related agency wide training starting at the highest leadership levels. The agency should hold contracted organizations accountable for Trauma Informed Practices.**

| Agree or Disagree with Recommendation | Target date to complete implementation activities | Name and phone number of specific point of contact for implementation |
|---|---|---|
| Agree. See below for further context. | June 30, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 19**

**Management response:** OHA is committed to a trauma-informed culture, defined as a culture that is aware of and responsive to the impact of trauma on the lives of individuals. OHA's adoption of a trauma-informed approach offers a significant contribution to the physical, mental and social well-being of the agency's diverse staff by reducing adversity and promoting resilience. This work is best done using a health equity lens in partnership and alignment with work on the social determinants of health. All levels of the system must commit to a trauma-informed approach, and OHA is committed to lead and sustain this effort.

**Inequity issues:** Lack of social determinants of health and lack of trauma awareness by health providers drives the development of responses to trauma. Trauma is inclusive of, and not limited to, the effects of racism, interpersonal abuse, adverse childhood experiences, poverty, historical and systemic oppression, heterosexism, ageism, sexism, and ableism. Inappropriate responses to people who have experienced trauma negates their experience, creates a lack of feeling of safety and trust, and can compound existing trauma response. This leads to access issues, exacerbation of existing behavioral health challenges, and at times, cycling through the system repeatedly as needs do not get adequately addressed.

**Consumer voices:** OHA is working to reconfigure its advisory group structure to better elevate and amplify consumer input in decision-making within OHA. For OHA to be successful co-creating solutions with consumers, staff need to be capable of hearing concerns, understanding context, and providing meaningful support from a trauma aware perspective. In addition to being more responsive to consumer needs, implementing a trauma-informed approach within OHA will reduce workplace stress, and increase morale, productivity, and quality of work.

**Work underway:** In February 2018, with membership from all divisions, OHA developed a charter and wrote an agencywide policy. The OHA Trauma Informed Approach and Culture Policy Workgroup, in partnership with Trauma Informed Oregon, is in the final stages of stakeholder feedback, and recommendations will be presented to OHA leadership August 2020.

OHA is expanding work with Trauma Informed Oregon, and it will include direct consultation and training with OHA leadership and Oregon's child-serving state agencies to support training and consultation.

OHA recently increased investment in Trauma Informed Oregon to support OHA in assessing progress in becoming a trauma-informed agency, finalize the internal trauma-informed approaches policy, and provide related OHA wide training starting at the highest leadership levels.

Trauma Informed Oregon also worked with DHS to support their trauma policy development and implementation. DHS put the resulting trainings for state agency staff on the shared iLearn system. OHA will develop a plan to implement these trainings agency wide in 2021.

A recommendation within OHA's 2020 Trauma Informed Approach and Culture Policy will be to update the 2014 Trauma Informed Services Policy for Behavioral Health Providers. OHA will co-create revisions to this policy in 2021 with consumers, advocates, CCOs, CMHPs, providers, OHA staff, and staff from other agencies. Trauma Informed Oregon will provide consultation and support for the effort.

Also, OHA will develop accountability strategies and metrics for contracted organizations including implementation of the Trauma Informed Oregon: Roadmap to Trauma Informed Care and Screening Tool to evaluate and support contracted organizations implementing Trauma Informed Practices in accordance with OARs 309-018-0100, 309-022-0100 and 309-019-0100.

Language was inserted into CCO 2.0 requiring CCOs to become trauma informed, starting with training for all levels of their staff. The tiered approach in this contract calls for progressive requirements over each year of the existing contract.

**Challenges:** Trauma is a difficult topic to discuss and is activating for some individuals. This can add to the complexity of this work.

Because the current systems are so fragmented and services are delivered in such a decentralized fashion, consumers are often further traumatized when their voices get lost or dismissed under the weight of multiple competing interests.

**Agency needs:** Becoming trauma informed represents culture change. This culture change must be pervasive throughout OHA and will require cooperation from all other partner agencies. For the scale of change required in Oregon, OHA will need to integrate trauma-informed concepts into all activities

of the organization and will also need to lead the strategic efforts to ensure it becomes a foundational concept from which all OHA staff and partners approach their work.

**Timeline:** This work is underway and will be complete by June 30, 2021.

| RECOMMENDATION 20<br>**Continue to collaborate with Trauma Informed Oregon to deliver training of trauma-informed practices to direct care providers.** | | |
| --- | --- | --- |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities** | **Name and phone number of specific point of contact for implementation** |
| Agree. See below for further context. | July 1, 2022 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 20**

**Management response:** OHA supports a trauma-informed foundation to all services and supports provided for children and families. As noted in the previous response, OHA currently works extensively with Trauma Informed Oregon to shape our understanding of the impacts that trauma has on how people experience services and the importance of addressing that experience so that people can expect successful outcomes. We will continue to do so.

**Inequity issues:** Trauma manifests in several ways. For people who identify as members of communities of color, systemic racism and microaggressions are recurring traumas that compound their experiences. Direct care providers must be educated to understand the subtle and overt ways that their service delivery can be improved and be trauma informed.

**Consumer voice:** Consumers, including youth and families and members of communities of color, have consistently expressed the desire for behavioral health providers who are competent in delivering trauma-informed care. Consumers often won't access services because the health care environment feels unsafe. This happens when service providers or the service system is not trauma aware. As a result, existing issues manifest to point of crisis, or illness and symptoms become worse.

**Work underway:** OHA recently invested additional funds in the Trauma Informed Oregon contract, to address technical assistance and training needs in the areas of social emotional learning, and culturally responsive practices in strength-based healing centered engagement, Trauma Informed Care (TIC), and Adverse Childhood Experiences (ACEs). This technical assistance and training will be provided for service providers serving people of color, people with physical and cognitive disabilities, LGBTQIA2S+ individuals, interested consumers, family members, young adults, and individuals across the lifespan with serious mental illness, those in recovery from mental health disorders, substance use disorders, and problem gambling issues; and to support Coordinated Care Organizations (CCOs), Community Mental Health Programs (CMHPs), individual providers of behavioral health services, and health professionals statewide https://traumainformedoregon.org/resources/resources-organizations/

**Challenges:** The decentralization and fragmentation of systems can cause consumers to be retraumatized, via having to repeat their "story" (need for treatment) to various providers because the system is not contiguous and working well together. People drop out of services when this becomes untenable for them.

**Agency needs:** As with all that OHA does, the successful and ongoing implementation of this recommendation will require sufficient funding to support training contracts and staff focus to implement and schedule.

**Timeline:** This work is underway and will be ongoing with an initial goal of providing training to all OHA regulated providers of children's services by July 1, 2022

| | | |
|---|---|---|
| **RECOMMENDATION 21**<br>**Work with the Oregon Health Policy Board, System of Care Advisory Council, and Legislature to update the statutory framework to ensure agencies within the System of Care are fully invested to support the burden costs across the system. A System of Care roadmap should be developed and documented to demonstrate process owners and related costs.** | | |
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities** | **Name and phone number of specific point of contact for implementation** |
| Agree. See below for further context. | July 1, 2025 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 21**

**Management response:** To reiterate from previous responses, Oregon's System of Care partners are guided by the vision that children can be at home, in school and in their community because they receive the right services, at the right time and for the right duration. OHA agrees that a strong, interconnected statutory framework would provide transparency and clarity in describing, defining, and ensuring financial commitment to the children's System of Care.

**Inequity issues:** Oregon's statutory direction for the children's System of Care must be fully informed and designed to break the cycle of systemic and historic racism and inequity. To make meaningful inroads in resolving health inequity, all stakeholders must learn to see past "business as usual" thinking and invest in ideas that are trauma informed. As the audit repeatedly mentions, so many of the statutes that support behavioral health services are qualified with "subject to available funds" clauses. A complete System of Care roadmap will identify funding, with proposals for elimination of gaps and barriers to success.

**Consumer voice:** Youth and family voice will be critical in the development of a System of Care roadmap and in determining policy and funding priorities. Well-written statutory framework and a System of Care roadmap will add cohesion so that individual agencies can more effectively work together toward common goals for children and families. If well written and administered, the needs of the children and families will drive service delivery and outcomes should improve.

**Work underway:** This body of work was envisioned, and the 2019 Legislature passed SB 1, which established the System of Care Advisory Council. OHA hired staff to lead this effort and the council began meeting in March 2020. OHA will collaborate with the Oregon Health Policy Board, System of Care Advisory Council, consumers and stakeholders to develop the System of Care roadmap and continue developing recommendations to update the statutory framework. This work will also include development of POPs to provide appropriate supporting financial investments and staffing.

**Challenges**: How systems are organized affects focus, alignment and effectiveness. Oregon organizes child-serving agencies along service lines with separate governance over each major service, including education, social service, justice, and medical services. Each of those organizations has evolved differently over multiple generations, and all are now uniquely structured to meet the specialized requirements tied to delivering those services. Underlying funder requirements, particularly federal partners such as Medicaid and U.S. Department of Education, also affect organizational structures and program priorities. Those structural differences are substantial and will be difficult to synthesize and simplify in the roadmap and statutory frameworks without revolutionary adaptations and compromise.

Historically Oregon's child-serving agencies have struggled with incompatible requirements and service delivery structures that have made it difficult to work across systems. Oregon has a high rate of child welfare referrals, unacceptable suicide rates for youth ages 10-24, challenges with school completion and graduation, especially for communities of color, high numbers of black, indigenous and people of color youth being incarcerated, and high numbers of children and youth needing intensive level of services. Likely, a robust array of culturally appropriate services that is easily accessible by families could have prevented escalation to that level of need.

**Agency needs:** To implement this recommendation, OHA will need full support from children and families and from all child-serving stakeholders and agencies ranging from the Governor's office to all child serving agencies, including service providers, DHS, OYA and ODE.

**Timeline:** This work has begun with OHA's convening of the System of Care Advisory Council and some preliminary POPs are being advanced through OHA's Agency Recommended Budget for 2021-2023. Full implementation of this recommendation will cross several biennia.

| RECOMMENDATION 22 |||
|---|---|---|
| **Develop and document internal policies and procedures for monitoring behavioral health funding to the counties through ORS 430. The agency should seek to establish a process owner for regularly reconciling and reporting on these funds.** |||
| **Agree or Disagree with Recommendation** | **Target date to complete implementation activities** | **Name and phone number of specific point of contact for implementation** |
| Agree. See below for further context. | Dec. 31, 2021 | Jackie Fabrick, 503-756-2822 |

**Narrative for Recommendation 22**

**Management response:** OHA values partnerships throughout the behavioral health system. An historic partnership is that which establishes the Community Mental Health Programs (CMHPs) through ORS 430. OHA's current formal relationship with the CMHPs is through negotiated County Financial Assistance Agreements (CFAAs). These CFAAs are the contractual mechanisms OHA uses to distribute state funds, federal grants and other funds to CMHPs. CMHPs, in return, operate community mental health programs and provide a locally developed array of behavioral health services. Funding from the CFAAs is combined with other resources including Medicaid billings, CCO contracted funding, private insurance, and other local resources. OHA plans to conduct an internal audit to identify methods for tightened contracts and compliance. This will help inform next steps and realistic options for ongoing reporting.

**Inequity issues:** By reviewing each county's financial resources for behavioral services, OHA will be in a better position to understand fiscal incentives that may be perpetuating inequities.

**Consumer voice:** To understand financial underpinnings of the behavioral system at the local level, consumers will have information to understand and direct a system that is more responsive and accountable.

**Challenges:** Because behavioral health services are delivered in a decentralized system, and because each of the CMHPs (covering 36 counties and Warm Springs tribe) have unique administrative structures, funding sources, and business models, creating meaningful financial reports and appropriately evaluating the reports will be complex. OHA is not currently staffed to do this work well. Additionally, the CMHPs, who don't currently provide these reports to OHA, may not be staffed to produce the reports in the formats that meet a statewide evaluation need.

**Agency needs:** To implement this recommendation, OHA will need to reach agreement with CMHPs about reporting requirements and CMHPs will need to provide requested information. Additionally, OHA will need staff to review and interpret complex financial information and who can report the results of the reviews back to CMHPs for continued system improvement and feedback.

**Timeline:** Internal audit work described above will be completed by March 31, 2021. OHA will continue to negotiate reporting requirements with CMHPs as County Financial Assistance Agreements are being revised. OARS 430 changes will ongoing with target completion of Dec. 31, 2021.

Please contact Jackie Fabrick at 503-756-2822 with any questions.

Sincerely,

Steve Allen, Behavioral Health Director
Health System Division

cc:



## Audit Team

Will Garber, CGFM, MPA, Deputy Director

Jamie Ralls, CFE, Audit Manager

Casey Kopcho, CIA, Principal Auditor

Ariana Denney, MPA, Staff Auditor

## About the Secretary of State Audits Division

The Oregon Constitution provides that the Secretary of State shall be, by virtue of the office, Auditor of Public Accounts. The Audits Division performs this duty. The division reports to the elected Secretary of State and is independent of other agencies within the Executive, Legislative, and Judicial branches of Oregon government. The division has constitutional authority to audit all state officers, agencies, boards and commissions as well as administer municipal audit law.

This report is intended to promote the best possible management of public resources.
Copies may be obtained from:

**Oregon Audits Division**

255 Capitol St NE, Suite 500 | Salem | OR | 97310

(503) 986-2255
sos.oregon.gov/audits



# Key Behavioral Health Investments (21-23 biennium) Expected to Increase Resources and Improve Outcomes for the Population Needing Intensive Services

## Executive Summary:

This report summarizes the Oregon Health Authority's progress in allocating the more than $1.35 billion in funding the Oregon legislature appropriated for the 2021-2023 biennium to transform Oregon's behavioral health system.

Reimagining and rebuilding Oregon's behavioral health system is an extraordinarily challenging undertaking.

According to national data, Oregon has a higher prevalence of behavioral health problems than most other states, but less access to care. Too many people face barriers to care or cannot find a provider who looks like them or speaks their language.

Historic underfunding has produced a patchwork system of care delivery and oversight that is complex, fragmented and inequitable – and lacks clear measures of impact. The COVID-19 pandemic further strained the behavioral health workers and programs across the state, while increasing consumer demand for services.

The legislature's 2021-2023 $1.35 billion in behavioral health investments represent a turning point for behavioral health in Oregon.

- As of September 15, OHA has spent or obligated approximately $845 million in behavioral health investments.

- OHA expects to spend or obligate an additional $291 million by the end of December 2022.

- In total, OHA will have spent or obligated $1.1 billion of the $1.35 billion in new investments by the end of 2022.

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 1 of 16

For the remaining funds, the report outlines the expected timeframes for allocating these investments. OHA has staged the timeframes for distributing these funds in recognition of various constraints and challenges programs currently face related to hiring and training, facilities expansions and other issues.

More importantly, investments (such as the implementation of Measure 110) require new grant-making processes to ensure more community members are involved in making decisions, funds are allocated to a more inclusive and equitable range of programs and more people in Oregon get the care they need.

OHA is distributing these funds within five major categories of investment:

- Aid and Assist: Funding to provide treatment, housing and other supports for people who are not competent to face a criminal proceeding due to the severity of their mental health issue.

- Behavioral Health Crisis System/988: Funding to improve Oregon's for crisis care and support, including development of a 24/7 hotline for people experiencing a behavioral health crisis.

- Ballot Measure 110 implementation: Funding for drug treatment and recovery services in Oregon counties.

- Behavioral Health Housing/Social Determinants of Health (SDOH): Funding for expansion of residential settings for people with serious and persistent mental illness.

- Behavioral Health Workforce: Funding for behavioral health providers for staff compensation, workforce retention and recruitment.

- Investment/Innovation: Funding for to better coordinate access to care, incentivize culturally and linguistically specific services, invest in workforce diversity and support staff recruitment.

These investments are an urgent response to Oregon's behavioral health crisis, and they are a vital step toward a more responsive, accessible and equitable system of behavioral health care in our state.

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 2 of 16

# Introduction: Significant Growth in Behavioral Health Spending

In 2021, the Oregon state legislature made $1 billion in investments in the Behavioral Health system as part of a broad yet specific call to action in response to health inequities highlighted and exacerbated by the COVID-19 pandemic, and heightened injustices stemming from contemporary and historical racism. Significant investments continued in the 2022 short session, with intent to further improve access and quality of behavioral health services, decrease behavioral health inequities, elevate behavioral health parity with physical health, and relieve the behavioral health workforce crisis [see Table 1].

There are several investments that, by design, intention, and strategic planning and implementation, will facilitate more supportive pathways to meet the critical needs of the population receiving an intensive level of behavioral health care services, including Aid and Assist clients in the community. These investments include:

- **Aid and Assist/Intensive Services:** Aid and Assist Community Services (2021)

- **Behavioral Health Crisis System:** 9-8-8 National suicide Prevention Hotline (2021); Mobile Response and Crisis Stabilization Services (2021)

- **Ballot Measure 110:** Drug Treatment & Recovery Services / Behavioral Health Resource Networks (2021)

- **BH Housing/Social Determinants of Health:** Regional Development and Innovation (2021); Behavioral Health Housing one-time funds (2022)

- **Behavioral Health Workforce:** Mental Health Workforce & Grants (2021); Behavioral Health Workforce Grants (2022)

- **Behavioral Health Rate Increase** (2022)

Clients under Aid and Assist orders have a myriad of complex needs, best served with a robust set of behavioral health supports and services that address underlying mental health and/or substance use disorder conditions with a trauma informed and culturally specific approach along with other needs such as housing and employment supports.  The range of investments listed above, while not all designed specifically with people under aid and assist orders as a focus, each bring resources that can substantially contribute to better addressing the needs of this population. For instance, housing is a primary need for people under Aid and Assist orders with almost two thirds reporting they were houseless at the time of their arrest for the charge that led to their Aid and Assist order. The Regional Development and Innovation funds are being prioritized for people served by the Oregon State Hospital, including those under Aid and Assist.  The Behavioral Health Resource Networks that Measure 110 establishes are likely to be helpful in serving people who have been under an Aid and Assist order or are at risk since approximately 90% have challenges with substance use that is a contributing factor in their arrest and aid and assist

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 3 of 16

determination.  The enhancements to Oregon's current crisis system through 9-8-8 which will reduce the need for law enforcement engagement with people in a behavioral health crisis is both likely to reduce arrests and incarcerations and improve overall outcomes Finally, the investments directly into a robust and diverse workforce along with associated rate increases intended to sustain workforce investments support a robust workforce is foundational to all the investments – without staff none of the above system improvement investments can be successful

Orchestrated interdependently, and reliant on collaborative action with community, these investments serve as a meaningful mechanism to further elevate our strategic goal to eliminate health inequities in Oregon by 2030. The OHA's health equity definition is:

*Oregon will have established a health system that creates health equity when all people can reach their full health potential and well-being and are not **disadvantaged by their race, ethnicity, language, disability, age, gender, gender identity, sexual orientation, social class, intersections among these communities or identities, or other socially determined circumstances.***

*Achieving health equity requires the ongoing collaboration of all regions and sectors of the state, including tribal governments to address:*

- *The equitable distribution or redistribution of resources and power; and*

- *Recognizing, reconciling, and rectifying historical and contemporary injustices.*

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 4 of 16

# Table 1: New Behavioral Health Investments within 21-23 Biennium

| Investment | Grant/Funding Focus | Legislation | General Fund | Other Fund | Measure 110 | ARPA (OF) | Federal Funds | Total Funds |
|---|---|---|---|---|---|---|---|---|
| Aid & Assist / Intensive Services | Aid and Assist Community Services | HB5024 (2021) | 18,652,326 | - | - | - | 2,336,352 | 20,988,678 |
| | Aid and Assist Evaluation of Services | HB5024 (2021) | 500,000 | - | - | - | - | 500,000 |
| | Intensive Services Unit | PKG802 (2021) | 1,818,390 | - | - | - | 297,787 | 2,116,177 |
| BH Crisis / 988 | 9-8-8 National Suicide Prevention Hotline | HB2417 (2021) | 15,000,000 | - | - | - | - | 15,000,000 |
| | Mobile Response and Crisis Stabilization | PKG801 (2019) | 6,500,000 | - | - | - | - | 6,500,000 |
| Ballot Measure 110 | Drug Treatment & Recovery Services | SB755 (2021) | - | - | 302,193,109 | - | - | 302,193,109 |
| BH Housing / SDOH | Behavioral Health Housing one-time funds | HB5202 (2022) | 100,000,000 | | | | | 100,000,000 |
| | Behavioral Health Incentive Fund | HB5006 (2021) | - | 20,253,714 | - | - | - | 20,253,714 |
| | Regional Development and Innovation | HB5024 (2021) | 65,000,000 | - | - | 65,000,000 | - | 130,000,000 |
| BH Workforce | Behavioral Health Workforce Grants | HB4004 (2022) | 132,347,979 | | | | | 132,347,979 |
| | Mental Health Workforce & Grants | HB2949 (2021) | - | - | - | 80,000,000 | - | 80,000,000 |
| Investment / Innovation | Behavior Health Accountability | HB2086 (2021) | 8,500,000 | - | - | - | | 8,500,000 |
| | Compass Modernization | POP 414 (2021) | 2,320,585 | 1,669,288 | - | - | 5,407,953 | 9,397,826 |
| | Mental Health/Substance Abuse Block Grants | PKG802 (2021) | - | - | - | - | 32,395,439 | 32,395,439 |
| | Study Behavioral Health Structures | HB3377 (2021) | 300,000 | - | - | - | | 300,000 |
| | Substance Use Disorder Waiver & SPA | HB5024 (2021) | 19,298,207 | - | - | - | 110,217,871 | 129,516,078 |
| | Behavioral Health Rate increase | Future Eboard | 42,500,000 | | | | 112,000,000 | 154,500,000 |
| System / Services | Certified Community Behavioral Health Clinics | HB5024 (2021) | 24,873,949 | - | - | - | 96,520,781 | 121,394,730 |
| | Co-occuring Disorder Treatment | PKG813 (2021) | 10,600,000 | - | - | - | - | 10,600,000 |
| | Interdisciplinary Assessment Teams | PKG801 (2021) | 5,700,000 | - | - | - | - | 5,700,000 |
| | Peer Respite Centers | HB2980 (2021) | 6,000,000 | - | - | - | - | 6,000,000 |
| | Psychiatric Residential Treatment Services Capacity | PKG802 (2021) | 7,525,000 | - | - | - | - | 7,525,000 |
| | Tribal Based Practices | PKG802 (2021) | 500,000 | - | - | - | - | 500,000 |
| | System of Care Advisory Council | HB5024 (2021) | 4,918,175 | - | - | - | - | 4,918,175 |
| | Young Adults in Transition | PKG802 (2021) | 13,123,282 | - | - | - | 8,040,437 | 21,163,719 |
| OSH | Open Two Junction City Units | PKG802 (2021) | 30,992,454 | - | - | - | - | 30,992,454 |
| | OSH Operations | HB5006 (2021) | (300,000,000) | - | - | 300,000,000 | - | - |
| Total | | | 216,970,347 | 21,923,002 | 302,193,109 | 445,000,000 | 367,216,620 | 1,353,303,078 |

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 5 of 16

# Figure 1: Behavioral Health Spending, by Expenditure Source/Focus Area

The 21-23 Legislatively Adopted Budget for Behavioral Health reflects a 44% increase in funding provided for Behavioral Health services for the 21-23 biennium when compared to the 19-21 biennium. The average growth rate for the 19-21 biennium when compared to 17-19, and 17-19 compared to 15-17 grew by an average of 13%.

Behavioral Health funds for services go out to community through Coordinated Care Organization payments for many of the services for clients enrolled in a managed care program. These funds may then be contracted from the managed care entity to providers, counties, hospitals, or facilities directly for services for those clients. Clients not enrolled in a Coordinated Care Organization receive Behavioral Health related treatment through Fee-For-Service provider visits. Additional supports may be received by clients for services through non-Medicaid, services such as community restoration services which serve the aid and assist population. These expenditures are for services that are not federally matchable by Medicaid.



OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 6 of 16

## Figure 2: Grant and Funding Timeline of Key Behavioral Health Investments

Legend: ▓ = $ awarded / initiated    ░ = $ funding period (if finite)

| Investment | Grant/Funding Focus | Funds ($) | Prior Biennium 2021 Q1 | Q2 | 21–23 Biennium 2021 Q3 | Q4 | 2022 Q1 | Q2 | Q3 | Q4 | 2023 Q1 | Q2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aid & Assist / Intensive Services | Supportive Housing NWRRC | $5.4M | ░ | ▓ | ▓ | ░ | | | | | | |
| | 3 County Housing/Restoration | $3.5M | ░ | ▓ | ▓ | ░ | | | | | | |
| | CMHP CFAA Stopgap | $2.3M | | ▓ | ░ | | | | | | | |
| | CMHP Community Restoration RFA | $15.0M | ▦ | ▦ | ▦ | ▦ | | | ▓ | ░ | ░ | ░ |
| BH Crisis / 988 | Mobile Crisis CFAA amendment | $10.0M | | | | | ▓ | | | | | |
| | 988 Call Center | $5.0M | | | | | | ▓ | | | | |
| | Mobile Response and Crisis Stabilization | $6.5M | | | | | | | | | ▓ | |
| Ballot Measure 110 | Access to Care | $39.9M | | ▓ | ░ | ░ | ░ | ░ | ░ | ░ | ░ | ░ |
| | Behavioral Health Resource Networks (BHRNs) | $265.0M | ▦ | ▦ | ▦ | ▦ | | ▓ | ░ | ░ | ░ | ░ |
| BH Housing / SDOH | Planning Grants | $5.0M | | | ▓ | | | | | | | |
| | Licensed Residential* (current infrastructure) | $10.0M | | | | | | | | | | |
| | Licensed Residential/Adult* | $112.9M | | | | | | | | | ▓ | ▓ |
| | Supportive Housing/Adult* | | | | | | | | | | ▓ | ▓ |
| | Housing one-time funds (counties) | $100.0M | | | | | | | ▓ | ▓ | | |
| BH Workforce | Clinical Supervision* | $20.0M | | | | | ▓ | ░ | ░ | ░ | | |
| | Scholarships, Loan Repayment, Housing Incentives, and Childcare Incentives* | $60.0M | | | | | ▓ | ░ | ░ | ░ | | |
| | Workforce Stability | $132.3M | ░ | ░ | ░ | ░ | ░ | ░ | ░ | ░ | | |
| Investment / Innovation | BH Rate Increase (FFS) (ongoing)** | $80.0M | | | | | | | | | ▓ | ░ |
| | BH Rate Increase (CCO) (contract)** | $74.5M | | | | | | | | | ▓ | ░ |

Definition: CMHP is County Mental Health Program; CFAA is County Financial Assistance Agreement; NWRRC is Northwest Regional Re-entry Center

* Timing and Total funds allocated to future grant solicitaton and award dispersement is dependent on the outcome of earlier rounds, including number and type of applications received and subtotal of dollars awarded.

** Total fund dollars; general fund is $42.5 across FFS and CCO and requires Emergency Board Special Purpose Appropriation

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 7 of 16

# Key Behavioral Health Investments: Overview

### Aid and Assist / Intensive Services

OHA's 21-biennium budget includes $21.5 million for community restoration, clinical services, rental assistance and wraparound support. This funding also covered OHA operations for supporting individuals who have been ordered by a court to receive services enabling them to "aid and assist" in their own criminal defense. The goal is to allow these individuals to be served in their communities when clinically appropriate and assist in moving individuals currently receiving restoration services at Oregon State Hospital back into their home communities. These services increase access to treatment, improve stabilization in local communities and reduce recidivism and local hospitalizations.

### Behavioral Health Crisis System

HB 2417 (2021) aims to build upon and improve Oregon's statewide coordinated crisis system. It outlines the expectations for local mobile crisis intervention teams, crisis stabilization centers, and other behavioral supports. This includes a 9-8-8 phone line (like 9-1-1 but focused on behavioral health) to provide behavioral health crisis intervention services and crisis care coordination anywhere in the state 24 hours per day, seven days per week, 365 days per year.

### Ballot Measure 110

In November 2020, Oregon voters passed by referendum [Measure 110, or the Drug Addiction Treatment and Recovery Act](#).

The purpose of Measure 110 is to make screening health assessment, treatment and recovery services for substance use disorder and harmful substance use available to all those who need and want access to those services; and to adopt a health approach to substance use by removing criminal penalties for low-level drug possession. The legislature funded $302 million to establish Behavioral Health Resource Networks (BHRNs) in every county and Tribal area across the state.

### Behavioral Health Housing / Social Determinants of Health

OHA's 21-23 biennium budget includes $130 million for capital, start-up, and operational costs related to increasing statewide capacity of community-based residential settings for individuals with a serious and persistent mental illness requiring a higher level of care and community-based housing for individuals with a serious and persistent mental illness who are able to live independently with appropriate support services readily available.

OHA 4247 (09/19/2022)

## Behavioral Health Workforce

The Behavioral Health Workforce Initiative (BHWi) was created through House Bill 2949 (2021). BHWi is a transformative, community-led, and community-owned initiative to increase the recruitment and retention of providers in the behavioral health care workforce who are people of color, tribal members, or residents of rural areas in this state, in order to provide culturally responsive care for diverse communities.

BHWi provides incentives to increase the recruitment, retention, and diversification of the behavioral health workforce in addition to using incentives to increase Oregonians' access to culturally responsive services. The types of incentives specified in the bill include pipeline development, scholarships for undergraduates and stipends for graduate students, loan repayments, and retention activities. It provides $60 million to increase training for diverse behavioral health professionals, both licensed and non-licensed, and $20 million for a grant program to pay licensed behavioral health professionals to provide supervised clinical experience to associates or other individuals who have the necessary education but need supervised clinical experience to obtain a license to practice.

## Behavioral Health Workforce (continued)

House Bill 4004 (2022) aims to promote staff compensation, as well as workforce recruitment and retention. The legislation provides two specific investments in response to challenges delivering services in the high risk COVID-19 environment as well as increasing need for behavioral health care which have contributed to a behavioral health care workforce crisis.

1. $132.3 million General Fund investment for OHA to distribute grants to behavioral health care providers to increase compensation to staff and pay hiring and retention bonuses if necessary to recruit new staff or retain the providers' staff; and
2. Contract funds focused on nurses and behavioral health professionals to provide care in adult and child residential behavioral health treatment facilities, opioid treatment programs, withdrawal management programs and sobering centers

## Behavioral Health Rate Increase

In the 2022 legislative session, HB 5202 included a Special Purpose Appropriation by Committee recommendation for $42.5 million in state general funds with intent to increase behavioral health provider rates by an average of 30%, contingent on federal CMS approval. The $42.5 million in state general funds are anticipated to have approximately $154.5 million total fund impact to the Medicaid system.

Broad increases to existing Fee-For-Service fee schedule will be effective July 1, 2022. Agreements that facilitate Coordinated Care Organizations (CCOs) to increase rates to their behavioral health provider network will be reflected in the 2023 CCO contract effective January 1, 2023.

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 9 of 16

# Key Behavioral Health Investments: Funding Highlights

| Investment | 21-23 Investment | Short-term Impact & Benefits | Long-term Goals & Outcomes |
|---|---|---|---|
| **Aid and Assist Community Services**<br><br>HB5024 (2021) | **Total funds:** $21.5M ($36.8M total includes $21.5M new investment + $15.3M base budget)<br><br>**Funding focus:**<br>• Community Restoration<br>• Licensed Residential<br>• Supportive Housing | • Increased funding to the County Financial Assistance Agreement (CFAA) to optimize current services and to assist in stopgap funding.<br>• Continued focused Aid and Assist funding to 3 targeted, high hospital utilizations, CMHP's for increased housing and local restoration services.<br>• Completed RFA for all Community Mental Health Programs (CMHP) to increase community restoration services and outpatient resources for individuals engaged in the Aid and Assist process. RFA allows services to be tailored to meet local CMHP needs.<br>• Dedicated Aid and Assist supportive housing as a statewide resource through Northwest Regional Re-entry Center (NWRRC)<br>• Research insights on current Aid and Assist patient histories and outcomes in addition to nationwide review of research and competency methods based on Program Design and Evaluation Services (PDES) study; PDES is a research and evaluation unit within both the Multnomah County Health Department and the Oregon Public Health Division | • Decreased admissions to OSH for competency restoration<br>• Increased discharges to community restoration<br>• Increased jail diversion due to mental illness<br>• Increased coordination and oversight of current and future contracts and initiatives<br>• Increased hospital transition teams to facilitate connection to community resources with the goal of reduction in recidivism |

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 10 of 16

| Investment | 21-23 Investment | Short-term Impact & Benefits | Long-term Goals & Outcomes |
|---|---|---|---|
| **Behavioral Health Crisis System, includes:**<br><br>**9-8-8 National Suicide Prevention Hotline (call center) and Mobile Response and Crisis Stabilization Services**<br><br>HB2417 (2021) | **Total funds:** $15.0M<br><br>**Funding focus:**<br><br>• Crisis Stabilization services<br>• Workforce development | • 988 call centers established and ready with necessary workforce by July 16, 2022<br>• CMHPs hire workforce needed to cover mobile crisis services 24/7/365 with two person teams | • Increase jail and ED diversion<br>• Increase overall capacity and coverage of mobile crisis services without break in continuum of care: Firehouse Model for Oregonians of all ages<br>• Create a statewide BH crisis system which has all three components of crisis response:<br>  ○ A place to call, Someone to respond, and A place to go.<br>• Culturally, developmentally and linguistically appropriate BH response to BH crisis. |
| **Mobile Response and Crisis Stabilization Services (MRSS)**<br><br>Legislature GF<br><br>PKG 801 | **Total funds:** $6.5M<br><br>**Funding focus:**<br><br>• Crisis Stabilization services<br>• Workforce development | • Operationalize MRSS services in all counties<br>• Continued expansion of specific crisis stabilization services, including for children, youth, young adults, and families (ages 0 – 25 years), resulting in coverage across the entire life span of Oregonians regardless of insurance status<br>• Customized training for all staff working with youth, young adults, and their families | • Increased disposition in home and community for Oregonians with BH crisis<br>• Increase overall capacity and coverage of mobile crisis services without break in continuum of care: Firehouse Model for children, youth, young adults, and families.<br>• Create a statewide BH crisis system which has all three components of crisis response:<br>  ○ A place to call, Someone to respond, and A place to go.<br>  ○ For children this will include a Community to Support to prioritize keeping children in their homes and communities.<br>• Culturally, developmentally and linguistically appropriate BH response to BH crisis. |

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 11 of 16

| Investment | 21-23 Investment | Short-term Impact & Benefits | Long-term Goals & Outcomes |
|---|---|---|---|
| **Ballot Measure 110 Drug Treatment & Recovery Services / Behavioral Health Resource Networks (BHRNs)**<br><br>SB755 (2021) | **Total funds:** $302.2M<br><br>**Funding focus:**<br><br>• Case management<br>• Low-barrier substance use disorder treatment<br>• Harm reduction services<br>• Peer-supported services<br>• Housing<br>• Mobile and virtual outreach | • Community Access to Care grants awarded to 70 organizations across Oregon in 2021; increase in community access to low-barrier treatment, housing, peer support and harm reduction services.<br>• At least one BHRN established in every county and Tribal area. | • Creation of a statewide substance use recovery system that makes screening health assessment, treatment and recovery services available to all those who need and want access to those services.<br>• Decrease in criminal punishments for people with substance use disorders or harmful substance use.<br>• Increased accessibility to trauma-informed, culturally specific and linguistically responsive services. |
| **Regional Development and Innovation**<br><br>HB5024 (2021) | **Total funds:** $130.0M<br><br>**Funding focus:**<br><br>• Licensed Residential<br>• Supportive Housing | • Collaborative engagement, technical assistance, and subject matter consultation with Planning Grant awardees<br>• Direct technical assistance for community providers to increase knowledge, comfort, and support with aim to facilitate successful grant application<br>• Optimizes existing residential bed capacity within the community; $10 million capacity extension grants (Q1 2022) resulted in an additional 70 beds<br>• Provides dedicated funding for acquisition, renovation, and startup expenses for supportive housing and licensed residential treatment facilities.<br>• Prioritizes four populations: 1. Aid and Assist, 2. Psychiatric Security Review Board – Guilty except Insanity (PSRB – GEI), 3. Civil Commitment, 4. Children with "Severe Emotional Disturbance". | • A more equitable and effective approach to the provision of community-based residential settings for individuals with a serious and persistent mental illness requiring a higher level of care.<br>• Residential care programs that prioritize Aid and Assist Community Restoration, Psychiatric Security Review Board Jurisdiction or Civil Commitment.<br>• Expansion of community-based housing for individuals with a serious and persistent mental illness who are able to live independently with appropriate support services readily available.<br>• Culturally responsive, trauma-informed, person-centered programming led by people with lived experience of behavioral health needs as well as people disproportionately impacted by health inequities. |

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 12 of 16

| Investment | 21-23 Investment | Short-term Impact & Benefits | Long-term Goals & Outcomes |
|---|---|---|---|
| **Behavioral Health Housing one-time funds**<br><br>HB5202 (2022) – counties | **Total funds:** $100.0M<br><br>**Funding focus:**<br>• Licensed Residential<br>• Supportive Housing | • Guided by a population-specific funding formula to provide an array of supported housing & residential treatment for each CMHP.<br>• Expands residential treatment capacity, short-term shelter beds, and long-term stable rental assistance by supporting operational and administrative expenses.<br>• Infuses funds to facilitate new bed capacity, including for acquisitions, renovations, and construction. | • Coordination with OHA's Social Determinants of Health unit and CMHP's to fund community partner projects.<br>• A coordinated approach to relieve bottlenecks in the continuum of care, and address health inequities and housing access disparities.<br>• Increase in low to no barrier, safe shelter options. |
| **Mental Health Workforce & Grants / BH Workforce Initiative**<br><br>+HB2949 (2021) | **Total funds:** $80.0M<br><br>**Funding focus:**<br>• Clinical Supervision<br>• Scholarships<br>• Loan Repayment<br>• Housing Incentives<br>• Childcare Incentives<br>• QMHA professionals | • Community Leadership Council (CLC) was formed to support the Behavioral Health Workforce incentive (BHWi) initiative work. This council comprised of diverse practitioners provides much needed community voice and perspective to the incentives work taking place at OHA.<br>• Clinical Supervision grants will offer support for credentialing (e.g. certification and licensure), alleviating financial burden and providing upward mobility and retention, especially for communities of color.<br>• Loan Repayment incentive will support behavioral health practitioners in critically needed service areas that do not have ready access.<br>• Housing and Childcare incentives will bridge gap to cost of living, living expenses in the State of Oregon which have been formattable for many in the field of behavioral health, influencing longer term retention.<br>• Pipeline environmental scan with a focus on development, centering those community members most impacted. The initial focus will be Qualified Mental Health Associates (QMHAs) – developing certification processes and robust professional development within the QMHA discipline. | • Increase the behavioral health system's capacity to provide culturally responsive care that is deeply embedded in equity-centered cultural responsiveness, de-stigmatization of services, promotion of restorative healing and community empowerment.<br>• Develop and invest in culturally specific workforce and increase access to culturally responsive services and interventions.<br>• Engage communities in shared decision-making to build structures/ processes/ resources/ supports for increasing recruitment and retention of a culturally specific behavioral health workforce.<br>• Support strategies for both recruitment and retention of the behavioral health workforce. |

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 13 of 16

| Investment | 21-23 Investment | Short-term Impact & Benefits | Long-term Goals & Outcomes |
|---|---|---|---|
| **Behavioral Health Workforce Stability grants**<br><br>HB4004 (2022) | **Total funds:** $132.3M<br><br>**Funding focus:**<br>• Workforce Wages & Incentives | • Higher wages and compensation bonuses for new and existing staff.<br>• Offers provider flexibility to design and apply compensation strategies, as long as 75% directed toward wages, benefits, bonuses and incentives. | • Improve workforce diversity & increase staff retention.<br>• Result in better care coordination for people with intensive BH Service needs.<br>• Incentivize culturally responsive & linguistically appropriate services. |
| **Behavioral Health Rate increase**<br><br>HB5202 (2022) | **Total funds:** $42.5M general fund; $154.5 total fund (requires Emergency Board release of Special Purpose Appropriation funding; decision June 1, 2022)<br><br>**Funding focus:**<br>• Reimbursement Rates | • Broad increases to existing FFS fee schedule, on average of 30%, will be effective July 1, 2022.<br>• Improve parity of rates within Medicaid and compared with other payers.<br>• Increase in CCO capitation rates with agreements to assure that funds have direct impact on their BH provider network. | • Reduce behavioral health inequities and elevate quality and accountability.<br>• Result in person-directed care & community-driven engagement.<br>• Improve workforce diversity & increase staff retention.<br>• Result in better care coordination for people with intensive BH Service needs.<br>• Incentivize culturally responsive & linguistically appropriate services. |

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 14 of 16

## Table 2: New Behavioral Health Investments Spend Plan

| Behavioral Health Investments (dollars in millions) | | | | | |
|---|---|---|---|---|---|
| **Category** | **SPENT as of Current Quarter: Q3 2022** | **OBLIGATED as of Current Quarter: Q3 2022** | **ALLOCATED expected to be Obligated or Spent by Next Quarter: Q4 2022** | **REMAINING FUNDS through biennium: Q1-Q2 2023** | **TOTAL Available Funding** |
| Aid and Assist Commuity Services incluidng intensive Services Unit | $ 9.1 | $ 13.8 | $ - | $ 0.7 | $ 23.6 |
| 988 implementation, mobile response, and crisis stabilization | $ 10.0 | $ 5.0 | $ - | $ 6.5 | $ 21.5 |
| Ballot Measure 110 and Access to Care awards | $ 67.4 | $ 234.7 | $ - | $ - | $ 302.1 |
| BH Housing/SDOH including BH housing one-time funds, incentive funds, and regional development and innovation | $ 47.4 | $ 88.0 | $ 67.0 | $ 47.9 | $ 250.3 |
| Behavioral Health Workforce Stability Grants | $ 132.3 | $ - | $ - | $ - | $ 132.3 |
| Mental Health Workforce & Grants/BH workforce initiative | $ 2.9 | $ 11.7 | $ 30.0 | $ 35.4 | $ 80.0 |
| Behavioral Health Rate Increases | $ - | $ - | $ 154.5 | $ - | $ 154.5 |
| BH services and support including SAMHSA block grants, SUD waiver, CCBHCs, System of Care work, Compass and other system supports and staffing costs | $ 164.6 | $ 41.4 | $ 40.8 | $ 111.1 | $ 357.9 |
| Open Junction City Units | $ 3.7 | $ 13.4 | $ - | $ 13.9 | $ 31.0 |
| **Totals** | $ 437.4 | $ 407.9 | $ 292.3 | $ 215.5 | $ 1353.2 |

**Spent**—means actual dollars spent; **Obligated**—means a contractual obligation or grant agreement signed that lays out terms of spending or formula award; **Allocated**—final decision made on funds and moving to contracting or spending of funds, also upcoming salaries or other internal charges not yet occurred

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 15 of 16

**Document accessibility:** For individuals with disabilities or individuals who speak a language other than English, OHA can provide information in alternate formats such as translations, large print, or braille. Contact the COVID-19 Communications Unit at 1-971-673-2411, 711 TTY or COVID19.LanguageAccess@dhsoha.state.or.us

OHA 4247 (09/19/2022)

Stenson Decl., Ex. Y, P. 16 of 16