### Debra A. Pinals, M.D.

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Second Report**
**Regarding the Consolidated *Mink* and *Bowman* Cases**

**Date of Report:** 6/5/22
**Neutral Expert:** Debra A. Pinals, M.D.

### Background and Context of this Report

On 12/21/21, the Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as a Neutral Expert in granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and Plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case. Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman's order stipulates further that OHA enter into a contract with the Neutral Expert and provide any needed information to her. Further, the Court ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert, due 1/31/22, shall include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)." The Court further ordered a second report by the Neutral Expert, due by 4/29/22 that should include "a short report and recommendations for a proposed long-term compliance plan for OSH." In conducting the activities needed to form recommendations, I sought and received an extension of the due date of this Second Report.

This report represents the Second Report of the appointed Neutral Expert in this matter.

### Background and Summary of the Two Consolidated Cases

In 2002, Oregon Advocacy Center, now known as Disability Rights Oregon (DRO) filed a civil rights lawsuit against the state of Oregon alleging that the state was failing to timely admit individuals found incompetent to stand trial (Unable to Aid and Assist) who were ordered to Oregon State Hospital (OSH) for competence to stand trial restoration. The ruling out of the Ninth Circuit (*OAC v. Mink*) found on behalf of plaintiffs that the State was out of compliance and must admit these individuals within seven (7) days. In June 2019, after the State had fallen out of compliance, the Court compelled the state to get in compliance with *Mink* within 90 days. Although the State met its burden at the time, compliance with became challenging once again with the pandemic creating other barriers. The State filed a motion requesting greater latitude in admitting individuals found Unable to Aid and Assist to mitigate the

*OAC v. MINK*
*3:02-cv-00339-AN*
*PRO EX A*

spread of COVID-19. That motion was granted, and DRO appealed to the Ninth Circuit Court of Appeals. The Ninth Circuit issued an order vacating the modification but also sought review by the District Court Judge. In December 2021, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide recommendations.

In November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after the Honorable Nan Waller had ordered them to OSH for treatment, without unreasonable delay. The plaintiffs remained, however at the Multnomah County Detention Center for months (Plaintiff Bowman for nearly eight months, and Plaintiff Douglas-Simpson for nearly six months) after the commitment order was issued. Plaintiffs alleged a violation of their substantive due process rights and filed a motion for a Temporary Restraining Order asking for plaintiffs to be transported to OSH within seven days of the order. The defendants argued that a lack of space at OSH, in part related to the need to timely admit individuals in the Aid and Assist process, contributed to the delays in admitting the patients. The Court granted the plaintiffs' motion for a Temporary Restraining Order, noting that "The *Mink* injunction does not address the relative priority of aid-and-assist patients and GEI patients..." noting that "any prioritization stems from Defendant's failure to provide the funds, staff, and facilities necessary to satisfy the *constitutional rights* of both groups. When satisfying constitutional guarantees, Defendants cannot rob Peter to pay Paul." In that opinion, The Honorable Marco A. Hernandez, United States District Court Judge, did agree with the defendants that a consolidation of the *Mink* and *Bowman* cases may make sense. As noted above, after the decision about the Temporary Restraining Order regarding the two specific plaintiffs, and at the time of the appointment of the Neutral Expert, the parties entered an interim agreement that no individuals found GEI would wait longer than four months for admission to OSH.

**Qualifications to Perform this Consultation**

My qualifications to render opinions as the Neutral Expert were described in my first report. In summary of that experience, I have worked for almost twenty-five years as a clinical and academic and forensic psychiatrist, and over twenty years functioning in state and local level administrative leadership, management, policy development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions.

**Sources**

To help inform the recommendations contained in this report, I reviewed numerous documents that were received since the production of my First Neutral Expert Report. I reviewed additional documentation/correspondence periodically from the Parties related to areas they each brought to my attention. I received miscellaneous correspondence from interested parties, often with rich information and perspectives regarding Oregon's history related to this matter. In addition, I also saw news outlet coverage of this matter from time to time. These various categories of items are not specifically delineated below as sources. Also, some items may have been inadvertently omitted. Apart from those caveats, to understand the scope of my activities, documents I reviewed include the following:

1. *Mink* 0339 Court Order Granting Mtn for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;

2. Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21
3. Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21
4. Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20
5. *Mink* and *Bowman* Interim Agreement, Filed 12/17/21
6. *Bowman* 1637 PLD Pltfs 1st Amended Complaint #22;
7. January 30, 2022, Neutral Expert First Report
8. Twice weekly data from OSH with metrics related to admissions and discharges, currently including net bed capacity, current census at OSH, OSH Discharge Ready list, and OSH 0.370 Admissions List;
9. Mink & Bowman Monthly Progress Reports from OHA from February 3, March 3, April 4, May 3, 2022, and June 3, 2022;
10. OSH Aid and Assist Fact Sheet;
11. OSH letter requesting resolution of a warrant for individuals under .370 deemed no longer needing hospital level of care;
12. *The Unwanteds: Looking for help, landing in Jail: An analysis of how trespass arrests at Portland-area hospitals criminalize mental illness.* Disability Rights Oregon. Spring 2019;
13. Contempt Tracker from OSH, 2/3/22, 2/15/22 No PHI, and 2/23/22 with DOJ updates no PHI, and 4/18/22 no PHI and identified version;
14. Ready to Place Statutory Process map, received 2/8/22
15. Plaintiffs' Response to Defendants' February 4, 2022 Report, dated 2/8/22;
16. OHA Oregon State Hospital Staffing Request, dated 12/6/21;
17. OHA Letter to Dr. Pinals regarding Request for OSH Contempt Data, dated 2/15/22;
18. OSH Update Legislative Session 2022 February- BROAD;
19. Draft 161.371 cost sharing amendment language from 2/16/22;
20. Memorandum from Debra Maryanov, Senior Assistant General Counsel to Circuit Court Judges, Trial Court Administration, regarding Clarification of Court Requirements in Aid and Assist Process and related attachments, received 2/17/22;
21. Intensive Services Team outline and related responsibilities, received 2/17/22;
22. Juvenile Fitness to Proceed and JPSRP, Linn County RS PowerPoint and 2020 and 2021 Restorative Services Data Points for juveniles;
23. FES evaluations by type (2010-2020);
24. OSH Master Discharge Process Map (evolving document);
25. PSRB 2019-2024 Strategic Plan, available at: https://www.oregon.gov/prb/Documents/2019%20Strategic%20Plan.pdf
26. Psychiatric Security Review Board Work Group Report, December 2021;
27. Administrative Burden Challenges and Recommendations letter from Cherryl Ramirez, Executive Director, Association of Oregon Community Mental Health Programs, to Ann Braun, Senior Advisor to the Senate President, Representatives Rob Nosse, and Senator Kate Lieber, Co-Chairs, Joint W/M Human Services Subcommittee, dated 2/3/22;
28. 2022 CCO Contract Template;
29. Materials for Aid & Assist Workgroup meetings 3/4/22, 3/18/22, 4/15/22, and 5/20/22;

30. Request for Application Aid & Assist Programming OHA, Health Systems Division, Intensive Services Unit February 2022;
31. OHA Community Consultation Template updated 8/11/21;
32. Deschutes County Behavioral Health (DCBH) Annual Report and website – Crisis and Adult Intensive Services, as of 3/5/22;
33. 9b packet that is presented to the court and CMHP upon the OSH clinical determination that hospital level of care is no longer required, provided by OSH 3/7/22;
34. LOCUS (Level of Care Utilization System) and Level of Care Decision Determination Tree, provided by OSH 3/7/22;
35. Compiled list of states and length of stay for restoration, sent from OSH 3/17/22;
36. OSH.OHA SB 295 Aid and Assist Training PowerPoint, sent 3/18/22;
37. OSH Contested Notice Process, Template Notice to Contest OSH Evaluator's Report, and Contested Notice Tracker Data for DOJ, sent 3/30/22 (data also sent 3/3/22);
38. OJD Memo re Legislative Alert SB 295 – Aid and Assist, 7/1/21 and SB 295 Enrolled Bill Section by Section review;
39. Example of Motion to Intervene for Limited Purpose 3/18/22 related to SB 295 process provided by OHA 3/30/22;
40. Aid & Assist "Ready to Place" Process and Statutory Authority to Commit summary provided by OJD 3/30/22;
41. OJD Memorandum from Debra Maryanov to Presiding Judges and Trial Court Administrators regarding Processing Contempt Filings in Aid & Assist Cases, dated 3/24/22;
42. Aid & Assist Community Restoration Data 1/1/20 to 6/30/20;
43. Competency Community Restoration Averages by County 2019;
44. OSH Forensic Admission and Discharge Dashboard drafts as well as produced versions describing data for March, April, and May 2022;
45. Psychiatric Inpatient Beds List March 2022;
46. Chat notes from Teams meeting with peers and family supports, sent 4/13/22;
47. 2021-04-12 Mink Bowman PSRB Overview;
48. Aid & Assist Workgroup minutes re time limit on community restoration from 1/19/22;
49. Letters to me from two patients at OSH received 12/20/21 and 4/18/22;
50. 1996-2019 Civil Commitment Total-NS and Civil Commitment discussion overview sent 4/19/22;
51. Media release 4/18/22 regarding the death of a 22-year-old man in the Washington County Jail;
52. GAINS Workgroup-Review of the Oregon Forensic Evaluation System;
53. GAINS Community of Practice Workgroup Goals and Objectives;
54. Patients on the OSH Admission List under Forensic Commitments Request for OSH Expedited Consultation/Admission;
55. Key Behavioral Health Investments (21-23 biennium) Expected to Increase Resources and Improve Outcomes for the Population Needing Intensive Services;
56. OHA Public Health Division, Health Security, Preparedness and Response (HSPR), bed status tracking transition information to Apprise;
57. OHA News Release: OSH to Submit Corrective Action Plan to State, Federal Regulators, 5/9/22;
58.  Sixth Amendment Center Report on The Right to Counsel in Oregon, January 2019;
59. The Oregon Project: An Analysis of the Oregon Public Defense System and Attorney Workload Standards, American Bar Association Report January 2022;
60. Mandamus Proceeding sample filing;
61. Funding of BH Services for AA/PSRB/Civil Commit Workgroup Information;

62. OJD information on forensic evaluations in Oregon including OPDS costs for Aid & Assist analyses, including Multnomah County Contract for Rapid Evaluations;
63. CMHP services for Forensic and Civil Commitment clients, 5/31/22;
64. Independent Consultant Report #5 OHA Activities to Implement the Oregon Performance Plan by Pamela S. Hyde, J.D., August 2019; and
65. Reviews of Oregon administrative rules and pertinent statutes.

In addition, to inform my work, I spoke with and/or exchanged emails, attended meetings, and spoke with numerous individuals. Because of the number of individuals at each meeting, in this report I will not summarize each of the participants in these meetings and the discussions other than the parties and select key leaders who helped introduce me to the Oregon community. That said, I would like to gratefully acknowledge the robust participation of the many stakeholders.

I engaged in numerous regular/semi-regular meetings including the following:

1. Periodic review of progress with Judge Mosman;
2. Nearly weekly meetings with OHA, OSH, and DRO representatives and leaders both separately and together, with MPD joining the regular conversations in May 2022, including:
   a. From OHA, OSH, ODDS:
      i. Steve Allen, Director of Behavioral Health, OHA
      ii. Dawn Jagger, Chief of Staff, OHA
      iii. Dolores Matteucci, OSH Superintendent-CEO
      iv. Derek Wehr, MSW, Deputy Superintendent OSH
      v. Cody Gabel, LPC, CADC 3, OPMA, Court and Corrections Liaison, Aid and Assist and Jail Diversion, OHA
      vi. Bill Osborne, BH Intensive Services Manager, OHA
      vii. Ryan Stafford, Forensic Utilization Coordinator, OHA
      viii. Isela M. Ramos Gonzalez, Senior Policy Advisor, Government Relations, OHA
      ix. Dr. Sara Walker, Interim Chief Medical Officer, OSH
      x. Scott Hillier, Chief Data Analyst, OSH
      xi. Mandy Davies. Interim Director, Forensic Evaluation Service, OSH
      xii. Micky Logan, Legal Affairs Director at OSH
      xiii. Della Huffman, Director of Social Work, OSH
      xiv. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
      xv. Tristan Fernandez, Senior Legislative Policy Analyst, OHA
      xvi. Andrea Ogston, DOJ representing ODDS
      xvii. Chelas Kronenberg, ODDS Manager
      xviii. Lilia Teninty, Director, ODDS
   b. From Oregon Department of Justice (DOJ):
      i. Carla Scott, DOJ Special Litigation Unit Counsel
      ii. Kailana Piimauna, Senior Assistant Attorney General
      iii. Melissa Chureau, Senior Assistant Attorney General
      iv. Craig Johnson, Assistant Attorney General
   c. From Disability Rights Oregon (DRO):
      i. Emily Cooper, Legal Director

      ii. KC Lewis, Managing Attorney

      iii. Timothy Roessel, Advocate

      iv. Meghan Moyer, Public Policy Director

      v. With input from Jake Cornett, Executive Director & CEO

   d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC

3. Approximately Bi-Weekly huddles with OHA, OSH, DRO, and OJD leadership. OJD leadership largely involved the following individuals:
   a. State Court Administrator Nancy Cozine
   b. Judge Nan Waller, Multnomah County
   c. Debra Maryanov, Senior Assistant General Counsel
   d. Amy Miller Director Court Programs Innovations
   e. Scott Kaplan, General Counsel
   f. Christopher Hamilton, Behavioral Health Business Analyst
   g. Connor P. Wall, Behavioral Health Data Analyst

4. Several meetings with Dr. Alison Bort, J.D., Ph.D., PSRB Executive Director, along with legal counsel, related to PSRB matters;

5. Meetings with DOJ and other legal staff, including meetings to discuss contempt hearings and PSRB processes;

I engaged in several meetings to help gather information about Oregon and understand broad perspectives. Examples of these included meeting with the following:

1. AOCMHP Executive Director, Cherryl Ramirez, Mary Rumbaugh, AOCMHP President and Clackamous County CMHP Director, Julie Dodge, Interim Director for Multnomah County CMHP, and members of OHA leadership on 2/2/22;

2. Lane County representatives including Mr. Brad Anderson and Mr. Alex Cuyler, on 2/18/22;

3. Multnomah County Pilot meetings beginning in February 2022;

4. Individuals committed to OSH under a GEI legal status on 4/18/22;

5. Jail Diversion and Community Restoration Providers on 3/3/22 (up to 42 providers in attendance)

6. Janice Garceau, Deputy Director Behavioral Health, Deschutes County, 3/9/22;

7. Klamath Basin Behavioral Health (KBBH) leadership including Ms. Amy Bolvin, Director of Clinical Services, Mr. Kendall Alexander, CEO, and Mr. Stan Gilbert, former Director, on 3/30/22;

8. Oregon Criminal Defense Lawyers Association including Mae Lee Browning, Legislative Director, as well as attorneys associated with that organization;

9. Eugene Municipal Court Presiding Judge Greg Gill, on 4/5/22, and in other meetings;

10. Oregon District Attorneys Association, including Mr. Michael Wu, Executive Director, and Ms. Melissa Merrero who has been serving on the AA workgroup;

11. Family and peer support meeting with approximately 29 participants along with OHA staff, on 4/13/22;

12. Aid & Assist workgroup meetings;

13. Legislative workgroup on the Forensic and Civil Committed Populations

14. Conversations with legislative representatives including:
    a. Senator Kate Lieber;
    b. Annaliese Dolph, Policy Advisor to House Speaker; and

c.  Anna Braun, Senior Adviser to Oregon Senate President.

I testified in front of the Oregon Legislature House Behavioral Health Committee and the Senate Human Services Mental Health and Recovery Committee on 2/17/22. In addition to the above, I was invited to speak at several meetings including an AOCMHP meeting on 5/26/22 and the Presiding Judge/Trial Court Administrator Meeting on 4/21/22. Each of these activities allowed me to field questions and gain valuable perspectives about the Oregon system. I am appreciative of the community's investment in these discussions to help facilitate my work in this matter.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
MPD: Metropolitan Public Defender
OHA: Oregon Health Authority
OSH: Oregon State Hospital
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities Since the First Neutral Expert Report**

Following the issuance of my First Report, the State and the plaintiffs met regularly discussing the implementation of my initial recommendations, and the State continued to produce a monthly progress report to me in this matter. I testified in front of two subcommittees of the Oregon Legislature to help explain my recommendations.

The OSH team worked diligently to begin crafting a data dashboard in consultation with the Neutral Expert that was developed and has been released monthly since April. The Social Work department at OSH began working on their process map related to discharges and improving efficiencies when feasible. Multiple meetings with OSH and social work services were held to review updates to discharge process map and seek input from stakeholders. OSH leadership reviewed with me their work admitting a significant number of patients after the pause in admissions due to COVID-19 and opened their Junction City unit.  I had a preliminary meeting with leadership from the Oregon Developmental Disability Services to discuss the AA population. Their office had not been directly involved with the *Mink/Bowman* matters to date. This is a conversation that will be important to continue.

An RFA for $15M dollars was released and responses received from the communities in the interim since my First Report. I have had an opportunity to review the RFA as well as the early responses. This work will help provide critical infrastructure focused specifically on the AA population. State concerns that the money be allocated for specific activities that would yield a reduction in jail wait times was clear.

In regular meetings with the parties, both plaintiffs and the State expressed an urgency related to the *Mink/Bowman* matters. Issues and concerns arose about whether residential bed numbers had decreased, and there was also recognition of significant staffing shortages across both hospital and community systems in the context of COVID-19. OSH had maximized admissions with its Junction City Unit opening but demand for evaluations continued to be high. I met with several individuals pertaining to contempt hearings against OSH for failure to timely admit AA defendants, which were taking time away from clinical services, and reviewed related data. This was useful in that it demonstrated that contempt hearings created significant work despite data showing they did not necessarily expedite admissions. This information was shared with stakeholders.

In keeping with my work on this case, I had asked that recommendations be mutually crafted with input from the parties. This created a need for multiple meetings to review ideas for specificity, feasibility, and consideration of their potential ultimate yield. As a group there was consensus that any recommendations should be made to maximize achievement of compliance with *Mink/Bowman* specifically, rather than focus on system improvements broadly. To that end, many discussions took place with challenging but earnest participation. In my opinion the discussions were productive and helped shape the recommendations outlined below. Furthermore, over the course of my work I made several data requests and include data below to help inform the Court about my recommendations.

**Data Summaries:**

*Background Data*: According to data received (See **Figure 1** and **Table 1**), there is progress in terms of overall numbers of people waiting from the time of the First Expert report, but a recent upward trend (after a downward trend) in days waited and numbers waiting. There appears to be more gains for the GEI population than for the AA population. Also, the census of OSH is nearly at capacity (See **Table 2** and **Table 3**) with about vacancies related to emergency bed need planning (generally one bed held open on each unit to allow for safety and planning for unexpected issues). Also, the numbers of individuals determined by the hospital to not need hospital level of care outnumber those awaiting admission (see **Figure 1** and **Table 4**).

Regarding the demand for admissions, A&A orders continue to increase (see **Table 4** and **Figure 2**). Because of that metric, it is important to recognize that the rise in admissions reflects improvements in discharge processes. As noted in **Figure 1**, days waiting to discharge have decreased slightly, and the state is to be commended, along with the community, for all efforts to discharge individuals who do not need hospital level of care. This work needs to continue, given patient needs and the *Olmstead* decision.

**Figure 1. Data Dashboard Charts Reflecting Progress in Mink/Bowman as of May 31, 2022**

OSH Forensic Admission and Discharge Dashboard
May 2022

### Aid & Assist Admission List



### PSRB / GEI Admission List



### Aid & Assist No Longer Needing HLOC



### PSRB / GEI No Longer Needing HLOC

OSH Quality Management – Data and Analysis
*'Informing the Pursuit of Excellence'*

Page 1 of 4
6/3/2022

**Table 1. Individuals awaiting admission**

| 1. Regarding individuals on OSH admission list with signed and received A&A court order | | | |
|---|---|---|---|
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* |
| Total Number of individuals | 46 | 93* | 67 |
| Average days waiting | 15.8 days | 22.5 days | 16.2 days |
| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days |
| 2. Regarding individuals found GEI and ordered to OSH | | | |
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* |
| Total number of individuals | 15 | 4 | 3 |
| Average days waiting | 45.6 days | 23 days | 18 days |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days |

*The marked increase in numbers awaiting admission is most likely a residual of the pauses in admissions due to COVID-19

**Table 2: OSH Bed Capacities as of 5/1/22**

| Site | Licensed Capacity | Active Capacity |
|------|-------------------|-----------------|
| Salem Main Campus HLOC | 502 | 474 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **561** |
| Junction City HLOC | 76 | 73 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | **151** | **145** |
| **OSH Total** | **743** | **706** |

**Table 3. OSH Census as of 5/23/22**

| Aid & Assist | PSRB | Civil Commitment | Other | Total |
|--------------|------|------------------|-------|-------|
| 401 | 265 | 16 | 1 | 683 |

*Data provided by OSH Quality Management – Data Analysis to OJD to the Neutral Expert

**Table 4. Individuals determined to be clinically appropriate for discharge as of 5/1/22**

| Legal Status | Total on "ready to discharge list" | Numbers and level of care needed |
|--------------|-----------------------------------|----------------------------------|
| **Aid & Assist** | 63 | LOCUS 1(0), 2(4), 3(5), 4(13), 5(40), 6(1) |
| **GEI/PSRB** | 32 | Level of care not determined until discharge |
| **Civil** | 6 | Level of care not determined until discharge |

**Table 5. Aid and Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|---------------------------|--------------|-----|
| December 2021 | 76 | 8 (5 standard/ 3 revocations) |
| January 2022 | 76 | 7 (4 standard/ 3 revocations) |
| February 2022 | 56 | 5 (2 standard/ 3 revocations) |
| March 2022 | 85 | 4 (3 standard/ 1 revocation) |
| April 2022 | 80 | 7 (4 standard/ 3 revocations) |

**Figure 2. Aid & Assist Admissions/Orders Trends through April 2022**



Oregon Neutral Expert Second Report Regarding *Mink/Bowman*
6/5/22

*Admissions Data*: In terms of the demographics of the population, however, as I noted in my First Report, the data reflects that many of the individuals especially in the AA process cycle back to the hospital multiple times (see **Figure 3** showing an almost 20% return to hospital rate within a year for AA patients compared to half that for other populations). Also, patients return multiple times as seen in **Tables 6** and **7**. In an email correspondence with OJD's Mr. Christopher Hamilton, he summarized the findings as follows

- 58.7% (401) of the current OSH census are aid & assist defendants
- 41.6% (167) of the current aid & assist defendants have been admitted to OSH previously
- 55% (92) of the 167 current aid & assist defendants have been admitted to OSH **two or more times**
- 11.4% (19) of the 167 current aid & assist defendants have been admitted to OSH **five or more times**

**Figure 3. OSH Readmission Rate by Legal Status**

| Readmission Rate By Legal Status Type | | | | | | | | | | | | | | | | | | | | | All |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | AA 634 | | | | | PSRB 69 | | | | | Civil 63 | | | | | VG 26 | | | | | 792 |
| Patients discharged from 2020-05 through 2021-04 | | | | | | | | | | | | | | | | | | | | | |
| **Readmissions** | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | All |
| Patients readmitted within 30 days of discharge | 10 | 1 | 0 | 0 | 11 | 0 | 2 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| Patients readmitted within 90 days of discharge | 30 | 2 | 1 | 0 | 33 | 0 | 4 | 0 | 0 | 4 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 38 |
| Patients readmitted within 180 days of discharge | 63 | 7 | 1 | 0 | 71 | 0 | 5 | 0 | 0 | 5 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 77 |
| Patients readmitted within 360 days of discharge | 104 | 18 | 2 | 0 | 124 | 1 | 7 | 0 | 0 | 8 | 3 | 0 | 1 | 0 | 4 | 0 | 0 | 0 | 1 | 1 | 137 |
| **Readmission Rate** | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | AA | PSRB | Civil | VG | Total | All |
| Readmission rate within 30 days of discharge | 2% | 0% | 0% | 0% | 2% | 0% | 3% | 0% | 0% | 3% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 2% |
| Readmission rate within 90 days of discharge | 5% | 0% | 0% | 0% | 5% | 0% | 6% | 0% | 0% | 6% | 0% | 0% | 2% | 0% | 2% | 0% | 0% | 0% | 0% | 0% | 5% |
| Readmission rate within 180 days of discharge | 10% | 1% | 0% | 0% | 11% | 0% | 7% | 0% | 0% | 7% | 0% | 0% | 2% | 0% | 2% | 0% | 0% | 0% | 0% | 0% | 10% |
| Readmission rate within 360 days of discharge | 16% | 3% | 0% | 0% | 20% | 1% | 10% | 0% | 0% | 12% | 5% | 0% | 2% | 0% | 6% | 0% | 0% | 0% | 4% | 4% | 17% |

*Note: The GEI patient category includes both GEI and RVC patients, the Civil patient category includes only Civil Commitment patients, and the VG header stands for Voluntary by Guardian patients*



Oregon Health Authority 19

**Table 6. Analysis of Repeat OSH Admissions for AA Defendants**

| 401 Current Aid & Assist Defendants (as of 5/23/22) | Count | Percent |
|---|---|---|
| Current admission is the only admission | 234 | 58.4% |
| One or more previous aid & assist admissions | 143 | 35.7% |
| One or more previous civil or voluntary commitment admissions | 42 | 10.5% |
| One or more previous PSRB admissions | 3 | 0.7% |
| One or more previous other admissions | 3 | 0.7% |

*Data provided by OSH Quality Management – Data Analysis to OJD to the Neutral Expert

**Table 7. Total admissions across 10 years for 167 current (as of 5/23/22) AA Defendants with prior OSH admissions\***

| OSH Admissions Count | Defendants |
|---|---|
| One previous aid & assist admission | 75 |
| Two previous aid & assist admissions | 47 |
| Three previous aid & assist admissions | 17 |
| Four previous aid & assist admissions | 9 |
| Five previous aid & assist admissions | 10 |
| Six previous aid & assist admissions | 4 |
| Seven previous aid & assist admissions | 3 |
| Eight previous aid & assist admissions | 2 |
| **Total** | **167** |

\*Data provided by OSH Quality Management – Data Analysis to OJD to the Neutral Expert

*Contested Cases Data*: Data was also collected regarding the 2-day notice policy that went into effect during the pandemic that required AA defendants to remain in the hospital if there was a notice that an evaluation opinion might be contested after OSH submitted their evaluation reports to the Court. From 5/28/20 to 2/14/22, there were 93 cases that were ultimately contested.

- The bulk of the cases that are contested were "able" findings at 55 out of 93.
- Most of the contested cases resulted in the same finding that OSH made, at 72 out of 85 (which is about 85%) that were determined of those for which information was known.

From 5/26/20 to 5/26/22, there were 965 OSH patients clinically opined as "able", and 55 patients for whom this opinion was contested, accounting for 3,301 bed days. This number of bed days compares to admitting almost 14 additional AA patients per year based on an average length of stay of 120 days.

*Demographic and Clinical Data*: Data was examined related to those individuals in forensic process that have intellectual and/or other developmental disability disorders (I/DD) based on a point in time from OSH from 4/21/22 and an informal survey of community restoration providers regarding services from October to December 2021 (see **Table 8**). The OSH numbers do not account for any people who might qualify for DD services but had not been enrolled in them, and the community restoration participant numbers do not have a specific metric that was used to identify who had IDD needs (e.g., enrolled in DD services). Still, the informal poll of community restoration providers showed that several communities were working with individuals with I/DD needs, such as Benton County were three (3) out of four (4) people were identified as IDD. Overall, these data are worth noting in that there may be more of these individuals in the community, in CMHP systems not equipped or financed to support their needs and may limit how many people can be served in community restoration. Also, even the small numbers in the hospital may create challenges for the hospital that is not designed to provide habilitation supports for individuals with these needs, which may delay discharge access.

**Table 8. Population of AA and GEI Identified with IDD**

| | Total IDD | Total | % With IDD |
|---|---|---|---|
| **OSH AA Population as 4/21/22** | 8 | 418 | 2% |
| **OSH GEI/PSRB Population as of 4/21/22** | 5 | 258 | 2% |
| **Community Restoration Population Oct-Dec 2021\*** | 31 | 246 | 12.6% |

\*Reflects only those numbers of communities that provided responses

Demographic data discussed at the AA Workgroup on 5/20/22 also warrant further analyses related to racial and ethnic backgrounds of individuals in the AA and GEI system to understand how to address disparities related to the intersection of psychiatric illness and access to care for those criminally involved vs criminalization that could potentially yield progress in *Mink/Bowman*.

*Length of Stay Data*: Length of Stay data showed that the bulk of individuals are discharged prior to 180 days (See **Figure 4**).

**Figure 4. Distribution of Aid & Assist Length of Stay for OSH Over 10 Years**



Based on the data of OSH length of stay over the last 10 years, according to OSH, the following points are relevant for a six (6) month time maximum frame for restoration:

- Since 2012, 15.5% (909) of Aid & Assist patients stayed longer than six months (180 days)
- These 909 patients accounted for 321,375 inpatient bed days over the 10+ year period
- Had those patients been limited to six (6) months of restoration services, it could have made available roughly 40 additional beds per year, which could have allowed OSH to serve roughly 130 additional patients annually and freed up resources spent on re-evaluation and restoration to be allocated elsewhere.

Based on the data of OSH length of stay over the last 10 years, according to OSH, the following points are relevant for a one-year maximum frame for restoration:

- Since 2012, 3.7% (215) of Aid & Assist patients stayed longer than 365 days for all charge types
- These 215 patients accounted for 122,286 inpatient bed days over the 10+ year period
- Had those patients been limited to one year of restoration services, it could have made available roughly 12 additional beds per year, which could have allowed OSH to serve roughly 36 additional patients annually and freed up resources spent on re-evaluation and restoration to be allocated elsewhere.

*Review of other state statutes:* To form my opinions and recommendations, I reviewed statutes from multiple states and a summary of state restoration statutes published *in Journal of the American Academy of Psychiatry and the Law*. Although data from statutes is difficult to depict in a figure, OHA staff assisted me in producing this summary, which I refer to in my recommendations.

**Figure 5. Sample State Statutes and Maximum Time Allotted for Inpatient Restoration**



**General Background Information**

In order to inform my opinions, as noted above I met with several individuals across numerous meetings. Information gathered from these discussions is summarized below.

<u>Meetings with CMHP Representatives:</u>

I had the opportunity to meet with several CMHP leaders and representatives. Themes that they discussed included:

- Concerns with individuals in the AA system and their level of clinical acuity
- Concerns about the state getting the dollars received to the community
- Many people in the AA system have co-occurring substance use disorders that are not fully addressed, and there was worry as to whether Measure 110 would help
- Funding not seeming to keep pace with the needs
- Housing capacity is limited, houseless population has grown
- There seem to be long waits for SRTF level of care, and a need for secure beds as the courts ask for these
- Secure residential bed capacity decreased during the pandemic, potentially due to pay structure and workforce along with other pressures
- Enormous workforce challenges at all levels in the context of the pandemic's impacts

- Liability concerns are high with regard to dealing with high-risk clients.
- Commitment laws are not as effective and may have over-corrected toward autonomy over helping people who need care get care
- Hard to explain the increase numbers of AA referrals, methamphetamine psychosis may play a role
- Not as many funded services for prevention
- Need more services attached to the AA population with specific models
- Need for more peer support
- Lack of clarity regarding community restoration including and what it means, what to do with someone who is not participating and there were problems with the lack of time limits
- There is often a disconnect between courts and CMHPs on whether an individual needs a secure placement, with courts erring more toward ordering confined settings
- Basic structures related to municipal courts can become an issue with the use of the AA process when alternatives might be reasonable clinically, or when housing is a need

In many of my conversations, I heard about innovations, efforts to establish more options for placement and housing, and outreach to courts. For example, at Klamath Basin and old hotel had been purchased to help house individuals who had criminal justice and behavioral health histories. More counties were accessing the Northwest Regional Reentry Center and seeing that as a positive option. The counties were eager to see how the request for a Medicaid 1115 waiver would help further their abilities to cover the costs of supporting individuals with complex needs. However, concerns were raised that there is a narrative that the counties do not care as much about people being left in the hospital, despite their sense that CMHPs are working hard with limited options and a higher risk population who is not always engaged in treatment. Also, many people with whom I spoke indicated that financial risk sharing should not be carried only by the CMHPs as there was a role for the CCOs and counties as well, and the structures made accountability complicated. I spoke to leadership in Deschutes and Klamath Basin Behavioral Health and other counties about the Certified Behavioral Health Clinic (CCBHC) model (currently available in limited places). The individuals with whom I spoke indicated it offered promise of increased flexibility and a funding mechanism to help with the more complicated populations at risk of criminal involvement. There were significant concerns that the increased dollars allocated by the legislature had not yet reached the community, though there was hope for this to help.

Information Gathered from CCOs:

In April I met with several CCO directors along with OHA staff. The CCO directors indicated that there were many good things happening in Oregon and that relationships with CMHPs were growing. They stated that there were activities to grow ACT, FACT, and other wrap around service models. They note there had been a shift for OSH to become more forensic, leaving a civil commitment population with little access to the hospital. In addition, comments included:

- Some people at OSH who would not meet medical necessity for hospitalization.
- There is no end date for community restoration
- Housing is separate from health benefits and housing solutions are needed for the population
- Certain community homes were closing because they could not pay the bills
- Comagine plays a role separate from CCOs
- Social Determinants of Health are important to consider in developing support models

- The carve out for residential settings can create barriers to accessing various levels of care
- CCBHCs and behavioral health homes are promising models
- More dedicated programs or a risk pool approach might be helpful, as well as braided funding to help support their complex needs
- An increase rate category for more care coordination would be important for the AA population

Jail Diversion and Community Restoration Provider Information:

In early March I met with about 42 staff who came to a meeting organized by OHA's Cody Gabel. The staff were from all over the state and the discussion was lively. They were invited as providers of jail diversion and AA community restoration services. Over the course of my meetings, I heard from other stakeholders who provided similar input. There were several themes that emerged from these conversations summarized here:

- Lack of community options and having information like a bed board might be helpful
- Job responsibilities that span multiple functions (e.g., crisis clinician, jail diversion, consultation and AA coordinator potentially performed by one person)
- Limited resources for PSRB populations in the community.
- Much demand for "secure" placements
- Many of the people in community restoration have IDD needs and the providers expressed often feeling ill-equipped to work with that population
- High rates of co-occurring substance use disorders
- Workforce shortages increasing strain on providers
- COVID-19 impacts still making service provision difficult
- Northwest Regional Reentry Center provides a good resource
- Post resolution of AA processes, there seems to be a gap with limited help for these individuals as they transition out of the AA system
- Individuals often push back on learning legal skills and counties handle the restoration work differently
- High levels of trauma for the AA population
- Having rapid evaluations statewide might help with demand

Perspectives of Two Patients at OSH

I met with two patients who asked to speak with me regarding OSH. Both patients were involved in the GEI process and under the PSRB authority. Both had been brought back into OSH after revocations of conditional release. Both explained that there had been discrepancies in diagnoses and determinations of what level of care was needed. Themes that emerged in these conversations were:

- Concerns that treatment teams are not pursuing discharge because of "anticipating" the outcome from the PSRB
- Concerns that the PSRB has made decisions that are conservative in nature
- Concerns that their term under the PSRB at the outset was arranged as the maximum period possible (One individual said, "it takes hope off the table" reducing motivation to do well)
- PSRB services with the community are more positive, people are given multiple chances with relapse and recovery

- Long waitlists for community placements- one individual stated he had been accepted in two different community settings but neither has a bed until 2023
- Need for greater coordination between the hospital and the community
- Limited evidence was reviewed for the revocation
- Complex diagnostic issues may warrant further analyses (both patients were not being prescribed medications with no apparent psychotic symptoms, though no formal assessment was conducted. They indicated drug-induced psychosis may have been relevant to their stories

Peer and Family Support Perspectives:

On 4/13/22 a meeting of about 29 people took place focused on hearing the perspectives of peers and family supports.  The conversation involved robust participation, and there seemed to be good geographic representation. The group was very appreciative of the meeting, and it was also very helpful to me to hear their perspectives. Though much was discussed, some of the themes included the following:

- Attorneys try their best to represent rights of individuals but may decide what is best for them, and there should be a way to have the individual voices heard more
- There is a need for more support services, more peer supports for individuals in the AA process
- There is a need for warm handoffs and continuity of care for people leaving OSH
- Continuity of care across systems and locations is a challenge, and getting to know people, their legal case, and required timelines from the courts, before they leave OSH could help
- Communities are understaffed so participation in supporting individuals upon return to the community is limited at times
- Increased capacity to serve and house people found GEI is needed
- Peers are starting to get more involved, but more should be built into systems
- The Directive for Mental Health treatment is an avenue to help people be more engaged in their own care, but needs to be more broadly discussed, but there are limits in certain settings

PSRB Perspectives:

Several meetings took place related to PSRB specific matters. Dr. Bort helped provide an overview to PSRB processes and updated protocols to OHA and OSH leadership and to me. She noted that the philosophy of the PSRB has been increasingly about helping individuals move from more to less restrictive settings. Dr. Bort noted several impediments to helping expedite discharges, though she acknowledged that many of the time issues are related to statutes and requirements for notice and the like. She explained that the hearings required of the PSRB occur timely though there was a public perception of delays, she felt that the statutory requirements were being followed. That said, impediments were identified related to getting community evaluation appointments and finding residential vacancies suitable for the PSRB client needs. There was also recognition that some of the requirements related to conditional release and risk review could benefit from updates.

Legislative Perspectives:

Oregon's legislative interest in behavioral health is a major strength that was apparent in many of my meetings. Many of the legislative staff I spoke with had worked in roles that related to the behavioral

health system and were quite knowledgeable, which was another strength I noted. In speaking to them individually and listening to broader group meetings and discussions, questions about transparency of state spending were raised. There was concern that additional dollars requested would not take into account dollars already allocated. Below I discuss how the state responded to a recommendation related to the transparency of funding utilization. Other issues that came up in my conversations with legislative representatives included a desire to better clarify overall responsibility and accountability, as funding structures between CCOs, CMHPs, counties, and the County Financial Assistance Award (CFAA) mechanics. There was a plan for ongoing conversation with OHA leadership to examine these issues. The legislative presiding officers have also convened a workgroup that would examine the needs of the "committed" populations including AA, GEI, and civil commitments. I was able to participate in some of these meetings and observed a serious review of barriers support and reduce the AA population.

Defense Attorneys Perspectives:

The defense attorneys with whom I spoke described cases where their perseverance and efforts to identify what might make positive outcomes for their clients came through quite clearly. They provided perspectives however that there were limited resources in the system, that the community restoration had no timelines making it hard to justify for their clients in many cases, and concerns that the admissions list at OSH requires contempt filings to ensure their clients' timely access. There was much discussion about this, and we discussed data from the State showing that the individuals are largely admitted by virtue of the waitlist movement that moves faster than court contempt proceedings. Concerns were raised about challenges with accessing diversion, alternative pathways or even dismissals for AA defendants, especially those that cycle through the criminal system.

Prosecution Perspectives:

I heard perspectives in the AA workgroups and in some discussion with prosecution attorneys. It is commendable to see the level of engagement in the system-wide conversations from the prosecution. I focused some discussions on restoration services. In discussing my preliminary recommendation to shorten timeframes for restoration, the prosecution registered opposition. Concerns were raised especially related to individuals with charges pertaining to violent crimes, and as such, recommendations provide some options for longer restoration for certain individuals.

Municipal Court Perspectives:

In my conversation with Judge Gill from Eugene Municipal Court, he described how the municipal courts do not have the same structure as OJD. He indicated feeling staffed with compassionate and capable people who daily work with community issues. He manages a well-established local mental health court. He described that he works hard to help the parties in matters identify community solutions, and that OSH is needed still for some of the sickest people. He noted that restoration in the community has been difficult and that there is little data related to outcomes. Although he recognized that Lane County seeks beds at OSH, he was concerned on what might happen if misdemeanant defendants were not able to access OSH. He described his willingness to partner with stakeholders to be part of any solutions.

OJD Perspectives:

Regular meetings with OJD and the Parties provided opportunities to share updated information about respective AA-related activities. Several conversations resulted in educational and informational memoranda to be written for OJD judges statewide. I had the opportunity to verbally review my preliminary recommendations and refine them based on OJD input. OJD has also been taking on, with technical assistance from the SAMHSA GAINS Center, discussions about evaluation processes in Oregon to help make improvements and gain efficiencies. This is consistent with my First Report and will be further delineated below. The leadership at OJD is to be commended for its efforts in data collection, developing innovations and working to help resolve the waitlist issues in partnership with the parties.

**Comments on Specific Areas of Focus**

*Bed Board and Bed Access:* Several conversations related to limited capacity to access beds, and challenges with the Comagine services in authorizing residential bed access. Work being done on a bed "registry" was authorized through Oregon Health Sciences University (OHSU) and is a project that is underway. Individuals at the state indicated that lessons learned through COVID revealed that knowing where "open beds" are in the system was not as straightforward as there could be numerous variables that might make an open bed not available (staffing, infrastructure, acuity). There was discussion with the parties also that ongoing work with the Intensive Services Unit might facilitate further discussions about how to improve information about beds in the community system.

*Multnomah County Pilot Initiative Initial Meeting 2/22/22 and follow Up:* Under the auspices of the interim Settlement Agreement there was discussion regarding specific work in Multnomah County. Through discussions with the parties and with OJD, it was determined that the County and Judge Waller would initiate a review of individuals in the jail who had mental health needs eligible for diversion, with a specific focus on the AA population. Some of the model was gleaned from a prior trip that stakeholders had looking at the Arizona system. Since the first meeting 2/22/22, there were several follow up meetings that appeared to foster ongoing discussion and collaboration. In conversation with OJD and Judge Waller as well as staff at DRO, these meetings seemed to bring the right partners to the table and allow for dialogue and improved understanding of various perspectives. This pilot was seen as a very beginning effort that would have promise to help find alternative pathways for those individuals waiting for AA processes or impacted by them.

*Information Gathered Related to County Risk Sharing Proposal:* In my First Report, I made a recommendation for county financial risk sharing, with legislative proposal to allow charging counties for patients who no longer require hospital level of care on the OSH 9b list beyond a date threshold. There was a great deal of discussion and concern about this recommendation. As noted below, based on feedback received, this recommendation was ultimately modified with extensive discussion with the parties who agreed with the shift.

**Information from Progress Reports to the Neutral Expert**

I received pursuant to the Court's order, monthly progress reports from the State from February through June regarding actions taken to address issues pertaining to *Mink/Bowman* compliance. The following summarizes elements of information from those reports:

- Opening Junction City second unit on 2/1/22
- Proposed legislation by OHA allowing for charging counties for patients who no longer require HLOC and are on the Ready-to-Place list proposed but not entered into budget note
- Planning for the spending of $130M in investments from the 2021 Legislature
- IMPACTS grants working to launch second grant cycle
- Added six (6) positions to the OHA Intensive Services Unit
- CCBHC received $121M in total funds
- DOJ worked with state courts to help support the discharge processes required by SB 295
- Data dashboard developed
- OSH and OHA began work reviewing and improving discharge processes, and expanding use of NWRRC
- Focused effort to build out the 988 crisis system recognizing the new three-digit phone number—988—will be available on 7/16/22
- OHA planning to restructure County Financial Assistance Agreements (CFAA) and complete a research study to better understand increases in AA referrals was underway
- CMHP Funding RFA for FY 2023 developed, with planned distribution of funds around 7/1/22
- OHA's Intensive Services Unit hired all open positions
- DOJ general counsel coordination in GEI cases where community evaluations were not orders
- Increased coordination for people on the Ready to Place List between HSD staff and OSH in coordination with CMHPs
- Expansion of Lane County Contract for SRTF beds on the grounds of Junction City Campus
- OSH received legislative approval for 228 budgeted positions and $10.8M, including position authority for 134 unbudgeted FTE and 94 new positions
- Ongoing work with the legislature regarding provider rate issues and behavioral health workforce stabilization
- Re-opening of IMPACTS grants
- RFA posted to OregonBuys on 3/18/22, and RFA applications currently under review
- CCBHC state infrastructure hired, planning underway to achieve focused work on AA population
- Development of meetings with 911 PSAP and new rules pertaining to 988
- Ongoing work regarding SB 295 adherence
- Contract with Lane County signed and in effect to expand SRTF bed capacity in that area
- Resuming meetings to examine CFAA increased accountability
- Ongoing efforts with OHA, OSH, DOJ working on discharge processes
- Multnomah County "jail review" meetings established bi-monthly with OHA engagement

Barriers initially identified included ongoing challenges with COVID-19 and the Omicron variant, leading to some earlier pauses in admissions at OHA. There were also initial concerns about whether counties and providers would bid for the funding opportunities given concerns about expanding in light of staffing crises and COVID-related issues as well as residential rates.

**Recommendations and Comments:**

As described above, the parties worked diligently with me to discuss various strategies to achieve compliance with the 7-day admission requirement of *Mink* as soon as possible, and the need of the GEI patients to be similarly released from jail and timely admitted. There was discussion about "break-the-glass" ideas, but even those were recognized to potentially have unintended consequences for certain

Oregon Neutral Expert Second Report Regarding *Mink/Bowman*
6/5/22

populations. Tragically, a death in jail of an individual on the admissions list occurred during the interim period between the First and this Second Report. Although the circumstances of that death are being examined separately, all parties recognize the critical need to maximize access to the hospital when needed, but everyone with whom I spoke recognized that there is no simple single solution that will fix the issues that are contributing to the increased referrals to OSH and difficulties with discharges that creates ongoing barriers to opening space at OSH for those waiting in jails and other places. The below recommendations are set forth with this in mind, to address, per Judge Mosman's order, both capacity issues at OSH and admissions protocols.

## I.     State Level Data and Process Improvements

In this first section, I outline priority activities that I recommend be taken that are largely within the purview of OHA/OSH or the Plaintiffs and would not require legislative changes.

### A.   Data and Information Sharing with Stakeholders

Consistent with my recommendation in January 2022 to "develop data infrastructure," and use data to help achieve compliance, the following recommendations pertain to this data development and information sharing:

1. *Enhanced utilization of data dashboard*: OSH provided the first data dashboard for this matter in April 2022, and monthly thereafter.  To understand trendlines, it will be helpful to produce these dashboards twice per month, and this should begin by *August 2022*. Future dashboards should be distributed twice per month to a distribution list consisting of the Neutral Expert, OHA, DOJ, DRO, MPD, OJD, CMHP directors, Coordinated Care Organizations (CCOs), PSRB leadership, and other stakeholders who have requested this information or are newly identified by the Parties.  OHA's Intensive Services Unit should also distribute this data dashboard twice monthly to their Aid and Assist and PSRB contact lists. By the end of *June 2022*, OHA, DRO, and MPD should begin to engage with stakeholders to review this data and develop a process to best use this data to inform system change at local levels.

2. *Consideration of additional staff for data development*: If expansion of data development is needed OHA should seek to add an additional Data Technician, through the development of a Policy Option Package (POP) to be submitted to the legislature or any means available.

3. *Partnering with OJD around data*: OHA/OSH should work in partnership with OJD to examine best mechanisms to share their own data and utilize regular data reports from each entity to mutually inform practices.

4. *Development of website*: As soon as feasible, OHA/OSH should develop a public facing *Mink/Bowman* website to inform stakeholders and provide public access to items such as related Federal Court Orders related to this matter, settlement agreements, public reports, legislative testimony, identified key relevant policies, funding opportunities, notices of open meetings, and the distributed data dashboard reports, and any other information that would help stakeholders understand this matter and progress toward compliance.

**B.  Streamlining and Improving Processes and Contract Revisions**

1.  *Review of discharge assessment processes*: In April 2022, OHA/OSH began reviewing "locus scores" and how level of care determinations are made for patients on the Ready-to-Place wait list. Starting in *June 2022*, OHA/OSH will work with consultation of the Neutral Expert to develop standardized assessment processes that support level of care determinations without over-reliance on a single score. By *August 2022*, OHA should convene key partners to review the standardized assessment process and make any final recommendations that will lead to consistent and transparent placement decisions.  Rule changes shall occur as needed. Input from individuals with lived experience would be helpful in this review.

2.  *Shift of court notification practice*: By *June 2022,* OHA should re-establish prior policy and discharge .370 defendants back to the committing county upon a forensic evaluation of "able."  For now, those individuals opined as "never able," or "med never" should be further studied for potential process change to support direct community discharge, if clinically appropriate, with CMHP assistance rather than routing back to jail. This will require further discussion. For those individuals for whom an evaluator opines they are "able" OHA should stop its temporary policy established during the pandemic of keeping defendants up to 30 days past the evaluation where a party has contested that finding. This has contributed to extended lengths of stay for many individuals. Although it is understood that the official finding is based on an adjudication, for most cases as noted in the data above, when there are external evaluations, they agree with the original forensic review.

    I have been told that there may be legal arguments against this recommendation. However, for compliance with *Mink* to be achieved, the hospital must look to practices that impede access, and this notice to the courts appeared in my review to be one of them in that it increases length of stay beyond clinical recommendations for individuals clinically thought to have improved sufficiently to be able to Aid and Assist in their defense. When state hospitals have discharge processes controlled by courts, there is a risk of challenges by regulatory bodies examining medical necessity of services, given that hospitals require medical staff to make discharge decisions on clinical grounds. With that in mind, I recommend that OSH revert in part to its long practice in place prior to the pandemic, which is anticipated to allow for additional bed space to become available on an ongoing basis.

3.  *Clinical reviews of utilization of OSH beds*: By *July 1, 2022*, OSH should develop plans for prioritization of a) early referrals for evaluations of persons in Aid and Assist process at OSH to re-examine their competence to stand trial; and b) earlier reviews for Hospital Level of Care (HLOC) determinations for AA patients at OSH to clinically determine readiness for stepdown or discharge as early as possible, with implementation of both these plans as expeditiously as possible.

4.  *Multidisciplinary training related to AA and misdemeanants*: By *July 1, 2022*, plaintiffs should develop a plan presented to the Neutral Expert working in partnership with OJD and other

stakeholders, and OHA should collaborate on this, to develop multidisciplinary education for defense, prosecution and judiciary regarding the importance of maximizing the use of diversion from Aid and Assist processes for any defendant for misdemeanant defendants and for those defendants for whom prosecution is not likely to be pursued. Training should also include information about accessing and prioritizing community restoration for those that cannot be diverted from criminal case processing and can meet the criteria for such services in the community. The work between DRO plaintiffs and OHA should not be construed to undercut plaintiff's independence and legally mandated role.

5. *Coordination with ODDS*: By *July 1 2022*, OHA, OSH and the Office of Developmental Disability Services (ODDS) should meet to review the *Mink/Bowman* case to determine where there may be needed improvements for timely discharge from OSH and diversion for individuals with IDD in the Aid and Assist and GEI processes to appropriate community alternatives in lieu of OSH admission where feasible, as well as explore community restoration support opportunities for clients eligible for DD services.

6. *Development of community navigator model*: Data from OSH discharges indicates that recidivism rates (defined as return to OSH) are highest for the people who were admitted in the Aid and Assist system (See again **Figure 3**, **Tables 6** and **7**). To help offset this risk of recidivism and sustain compliance, OHA in coordination with stakeholders and in consultation with the Neutral Expert should develop a model to create "community navigators" to support individuals sent for restoration as they transition from OSH into community settings. Model development should begin in *July 2022* with expected design for a pilot model by *December 2022*, which will then inform a mechanism for establishment of the pilot implementation date. Elements of this model should include:

   a. New, focused navigators to support individuals who were ordered for Aid and Assist restoration at OSH and in the community, and to connect with those hospitalized prior to discharge, and to continue to work with them for no less than six months most discharge and three months after community restoration has ended. The goal of the navigators would be to provide support and reduce recidivism into the Aid and Assist systems.
   b. Implementation of augmented transitional support structures to help individuals stay connected to services after their involvement with the Aid and Assist processes. This service should leverage existing potential resources, such as might be available through CCOs and ACT services or other supports that can be expanded with this targeted approach.
   c. Use of evidence-informed practices and other state examples of similar services to help inform best available approaches.
   d. Engagement of peer supports as part of the model.
   e. Inclusion of elements of data tracking for evaluation purposes including an examination of recidivism to OSH for Aid and Assist restoration.
   f. Establishment of a clear organizational structure with regard to management, data collection, accountability, and oversight.

7. *Consultation/Expedited admission and diversion processes*: Enhance existing *Mink/Bowman* Consultation/Expedited Admission Service and support opportunities for early diversion from OSH for individuals Awaiting Admission to OSH leveraging community resources as follows:

   a. *Consultation/Expedited Admission Service*: Modify expedited admission processes to emphasize consultative availability upon request regardless of referral source, with protocol development in consultation with the Neutral Expert to go into effect by *June 30, 2022.*

   b. *Court-lead "Jail Review"*: Starting in *July 2022*, support OJD's efforts to expand the Multnomah County "jail review" initiative and prioritize AA assessments and reviews of individuals in jail who have appeared to have positive changes in mental status that would likely yield a finding of Able to Aid and Assist prior to admission to OSH and/or be eligible for diversion from the pool of individuals waiting for admission.

   c. *Community Jail In-Reach and Diversion from OSH Admissions List*: By *August 2022* regardless of whether there is a court-led "jail review", OHA should engage stakeholders to develop a process for real-time ongoing local in-jail review/consultation of all currently detained defendants in the Aid and Assist process ordered for restoration, and leverage resources expended on jail diversion programs in the community to conduct these reviews. These reviews should provide in-jail real time coordination for individuals on the inpatient admission list and leverage opportunities for diversion from OSH admission when feasible. OHA and OSH should work in partnership with the communities and with courts to maximize opportunities for alternative pathways for individuals on the admissions list. For example, when it appears an individual has been restored or is newly taking medication and eligible for community restoration while awaiting admission, these reviews should aim to facilitate diversion from OSH admission. Contract changes may be needed to fulfill this recommendation. If resources are not available for such a process, OHA and OSH should seek support for such resources.

8. *Improvements in GEI community placement elements*: Recommended improvements related to GEI processes include the following actions to be taken by OHA and OSH:

   a. OHA should explore all available means to provide additional resources for community providers to prepare timely discharge plan development for GEI patients including evaluations by CMHPs.  This will include devising a funding mechanism to pay for evaluations by CMHPs as ordered by the PSRB.  This may include a base rate for completing evaluations within 30 days.

   b. OHA should present a plan to ensure that community evaluations are scheduled within 15 days of receipt of the order and completed within 45 days. This may include review of data on the timeliness of these evaluations, modification of contracts, rules, or other means to accomplish this recommendation. OHA should take all reasonable steps to implement such a plan and secure funding needed to implement it. OHA, in consultation with the PSRB, should present to the Neutral Expert a proposed timeline for implementing this plan as expeditiously as possible. OHA's plan for timely evaluations and expedited discharge processes should provide for a review of denials of referrals by

programs to ensure transparency with program waitlists and related resource issues and address factors including but not limited to:

  i.   Delays in interview/evaluation that are created because of a program not having a vacancy;

  ii.  Delays that may be created when the program is "open to referrals," but may not have a vacancy; and

  iii. Delays created by virtue of programs "rejecting" a referral, with potential remedies including a required review by OHA of any referrals being declined.

9. *Discharge process prioritization*: Continue implementation of SB 295 Court case specific actions and initiate any needed associated rulemaking. The parties agree that adherence to SB 295 (law providing for discharge of .370 patients who no longer require HLOC) is critical for compliance and efforts to help with this seem to be working. The state hospital must be able to make room for new admissions to OSH and to have individuals who no longer need institutional care placed in a less restrictive setting. According to tracking by the State, some state courts and CMHPs are not following this law as it is written, which results in .370 patients on the Ready to Place List staying at OSH for longer than necessary or allowed by law. To support adherence to SB 295, the parties will do the following:

   *a. Informal support.* General counsel for OSH will continue already ongoing efforts to support compliance through targeted communications with individual defense lawyers and prosecutors. MPD will now also make themselves available to try and intervene with defense lawyers to ensure they follow SB 295.

   *b. Advocacy.* DOJ will continue evaluating cases on a state-wide basis for direct legal intervention on behalf of OSH where they determine that SB 295 is not being followed by state courts or CMHPs. DRO will develop, and revise as needed, an amicus brief that it will file such cases where appropriate. DOJ will notify DRO about the OSH intervention and will provide information needed for DRO to evaluate whether to intervene or submit an amicus brief. DOJ will track reasons courts are not ordering discharge. DRO will also enlist the advocacy of MPD when appropriate.

   *c. Rulemaking and Reduced Reliance on Single Solutions for Discharge.* OHA shall amend the OARs applicable to AA Ready-to-Place defendants to clarify that the treating clinical team's clinical recommendations primarily guide discharge planning. Consistent with clinical best practice and existing legal standards regarding the ADA's integration mandate, level of care should be the least restrictive. CMHPs should provide information about what is available in the community including any reasonable options for a referral to a different community supportive placement when clinically appropriate, if the identified recommended "level" is not available. This might include, for example, providing information about a lower level of care that could be crafted with enhanced supports to meet the individual's needs.

10. *Forensic evaluation quality and efficiencies*: OHA/OSH should continue to support work to develop improved infrastructure and efficiencies for forensic evaluations. I recommended in my First Report the need to examine evaluation practices in greater depth. OJD has been taking the lead convening a broad stakeholder group to examine structures and funding for Oregon

forensic evaluation services. With this in mind, OJD has agreed to lead in the writing of a report regarding the workgroup's efforts, and OHA/OSH and the other Parties in the *Mink/Bowman* matter should review and refine any drafts of that report before finalizing. This report would help inform any future recommendations or legislative proposals. I recommend that such a report be produced by *October 2022*, and that the report include:

    a. Summary "map" of current evaluation processes across Oregon

    b. Sources of funding and evaluators and associated costs across Oregon

    c. Delineation of at least three (3) model options to highlight that include for each option:

        i. Organizational structure

        ii. Funding recommendations

        iii. Prioritization of access to court-ordered evaluations for first evaluations to maximize access to evaluators

        iv. Maximum efficiency for access to evaluators and production of their reports

11. *Contractual requirement reviews*: In consultation with the Neutral Expert and the plaintiffs and in an ongoing manner, OHA should review existing contracts with the CCOs and CMHP's to determine the scope of the existing contractual obligations to serve the Aid and Assist and GEI population. I understand these discussions are also happening in the legislative workgroups, but a focus on this population in particular is imperative and urgent. For example, OHA should explain to both CCOs and CMHPs that transport back to community from OSH through Non-Emergency Transport Provider (NEMT) is a Medicaid funded service, and OHA should work further with OJD to review this option given OJDs interest in this as a potentially helpful addition to increase timely transports from OSH. OHA should provide monthly updates on this in its regular progress reports to the Neutral Expert.

12. *1115 Medicaid waiver development*: The OHA Medicaid team will continue working on the 1115 waiver, which would continue limited Medicaid coverage and for individuals at OSH under .370 orders 6 months prior to discharge. If the waiver is accepted, OHA will amend the CCO contract in 2023 to require Intensive Care Coordination for all clients currently at OSH under 370 orders in preparation for community placement. Should this occur, such ICC should be coordinated and take into account the Community Navigators, and OHA should evaluate whether the new ICC services or other available programs (such as ACT Teams) are sufficient to perform the desired functions of Community Navigators.

13. *Substance use disorder treatments*: Expand access to substance use treatment including medications for addiction treatment (MAT) and contingency management (to address stimulant use disorder) in residential and community programs that serve people under AA orders. Similarly for the OSH population, efforts should be made to fostering greater focus on substance use treatment services for individuals in AA and GEI processes. These services are critical as the data shows there is a close nexus between recidivism or even referral for AA evaluations and restoration and co-occurring substance use disorders. These services should be incorporated into the refinements of services offered for people in Community Restoration Programs (CRPs).

14. *Community Restoration Program access*: CRPs are seen by the Parties as a necessary component of the AA system and alternatives to OSH and need to be strengthened. To that end, OHA should conduct an inventory of the current status of CRPs and their statewide availability across all

counties and present findings of this review to the Neutral Expert and DRO and MPD by *August 15, 2022*. Plans to address any gaps in these services should be prioritized.

Additional items that were discussed as potential strategies for system improvement over time include strengthening bed tracking capabilities with regard to the availability of residential beds (SRTF, RTF, RTH, with ACT availability when feasible) and the closure of existing beds that are available to divert GEI or aid and assist patients from OSH or to such patients discharging from OSH, as well as reviewing Comagine Health activities. The development of any expanded bed tracking in the future should consider whether to link to the developing bed tracking system through Oregon Health Sciences University (OHSU) or whether a separate bed tracker would be more useful to help achieve and sustain compliance. Also, future reviews of additional contracts such as Comagine Health may be needed to ensure that barriers to access to care are minimized. Although these would be useful, in my opinion, these items should be re-evaluated after the above priority items are underway.

## II.    Recommendations Likely Requiring Legislative Actions, Rulemaking, or Federal Authorities

In addition to the recommendations noted above, several items are outlined below that would likely be helpful in achieving more timely compliance, yet they are dependent on factors not as directly under the purview of OHA/OSH. These items will generally require legislative or significant rule change or might be considering by the Federal Court in an effort to help the state move toward compliance. Such recommendations are as follows:

1.  *Finances Regarding State Hospital Utilization*: In my First Neutral Expert report, I made recommendations that were supported by the Parties regarding county financial risk sharing. Currently fiscal responsibility for utilization of OSH beds lies entirely with the state and not the counties. A greater shared focus with local entities on this resource could potentially improve its utilization management for communities, which would help increase access to more populations. In my own clinical experience, I saw this very active engagement with discharge processes when payment for bed days was also being factored into need for care.

    After my First Report, legislative language was proposed by OHA on the county risk sharing concept but was not picked up in budget notes. Many CMHPs and others raised concerns that the community system is still too fragile without having gained the dollars allocated by the legislature, and that funding for AA defendants is more complicated and involves more than the CMHPs. Some CMHP directors thought a risk sharing proposal had some merit but might be better with incentives attached. Therefore, taking feedback from communities and in consultation with OHA and DRO, I recommend shifting the January 2022 Neutral Expert Report recommendations to include incentives to the proposed cost sharing a program with CMHP and further recommend that counties, and CCOs share in both the risk and incentives aimed at reducing length of stay for individuals in the AA and GEI processes on the ready to place list. The parties should work with appropriate legislators and others to help develop formulas for this activity in advance of the 2023 legislative session.

2.  *Duration of Competence Restoration*: It is a Constitutional right to be competent to stand trial if one is to be tried criminally. With that in mind, efforts at restoration are critical. Nevertheless,

notions for the appropriate and permissible duration of competence restoration vary widely across states For Oregon, I recommend the parties work jointly with willing stakeholders to propose new legislation that decreases the maximum restoration time limits, Current legislation (ORS 161.370) for inpatient restoration holds that:

> *(10) ...in no event shall the defendant be committed for longer than whichever of the following, measured from the defendant's initial custody date, is shorter:*
> *(A) Three years; or*
> *(B) A period of time equal to the maximum sentence the court could have imposed if the defendant had been convicted.*

There are no current time limits for community restoration. In my opinion, Oregon's processes could be improved and access to services gained if the law aligns more with clinical data, case law, and legislation in other states that focus restoration on its intended purpose. To that end, I recommend legislative change regarding restoration time limits and practices as follows:

a. Time for both inpatient and community restoration services should be:
   i. For misdemeanors, the lesser of the maximum permissible sentence (or a portion thereof) for the underlying offense or 90 days
   ii. For felonies, the lesser of the maximum permissible sentence (or a portion thereof) for the underlying offence or six (6) months, unless the felony involves serious violence in which case an option for an additional six-month period of restoration could be sought for a total not to exceed one (1) year.

   1. For serious violent felonies, after the initial six-month period of restoration and a finding that the defendant remains unable to Aid and Assist but restorable, a further period of restoration should require an affirmative request by a party to the litigation. The optional additional six (6) months for restoration of defendants charged with a serious violent felony should then require the Court to enter a finding that the Government's interest in prosecuting the case is strong, and that factors in progress toward restorability to date and likelihood of further restorability, as well as the pre-trial defendant's interest under *Olmstead v. L.C.* (1999). to be in the least restrictive setting to meet their clinical needs, as distinct from those that would allow a defendant to be held in custody. The finding by the Court authorizing an additional period would then allow for up to six months for a total restoration period not to exceed one (1) year.

b. In my opinion, the Court in making its findings should rely upon clinical opinions, and the forensic evaluators in rendering their opinions of restorability should provide compelling clinical data to support a substantial likelihood beyond probability that the defendant shall regain their capacity to aid and assist at the end of the restoration period, based on evidence that with treatment, the defendant is likely to evidence signs such as, symptom attenuation related to thought, mood, orientation or memory, capacity to recognize reality, reasoning, judgment and/or behavior, or improvements in functional and adaptive deficits related to being able to Aid and Assist. Evaluators should take into

account the nature of the condition rendering the defendant unable to Aid and Assist with regard to restorability. For example, restorability opinions and adjudications should require specific data to support substantial likelihood beyond probability especially for defendants whose ability to aid and assist is less likely to be restored timely through inpatient or community-based restoration services such as those defendants who have repeatedly been previously found unrestorable or who have neurocognitive disorders (such as dementia and traumatic brain injury) or significant neurodevelopmental disorders contributing to their inability to aid and assist. Clinical evidence of symptom attenuation or improvements in competency functional deficits should be noted for defendants charged with a serious felony for whom an extension of the restoration period is granted.

c.  Restoration across multiple charges should be consolidated and contiguous consecutive periods of restoration should be eliminated unless there are new charges incurred after an initial period of restoration has ended.

d.  Aid and Assist progress/periodic Aid and Assist reports should be brief, relying on more complete evaluations that were made for the initial findings of a defendant being Unable to Aid and Assist. The brief periodic update reports should be done at intervals, with the first three at no longer than 30, 60 and 90 days, followed by every 90 days. Aid and Assist progress updates should also be filed as soon as feasible after there is clinical data supporting that the defendant has regained abilities to Aid and Assist, and no later than the external time limits. Again, these updated reports should be brief and delineate whether there have been any changes in mental status or clinical functioning related to Aid and Assist capacities (rather than complete de novo evaluations), sufficient for the Court to make a finding as needed.

e.  Although beyond these legislative recommendations, there should be further exploration of opportunities for defendants found Unable to Aid and Assist or "Med Never" to ensure access to appropriate services as needed.

The above recommendations are based on several supporting considerations, many of which are as follows:

*Background*: Case law (*Jackson v. Indiana*, 1972) specifies that the duration of restoration should be for the period of time in which there is a reasonable probability that an individual will be restored, and that commitment to an institution for restoration be for the purpose for which it was intended. Thus, once a defendant is thought to no longer be able to be restored, any additional confinement must be on other grounds.

*Clinical Studies*: Studies of inpatient restoration report restoration to be most likely between 90 days and six months, though methodological issues in these studies are complicated, making the findings limited. This data is likely skewed by days spent in legal processes and other factors that add time to the reported duration of restoration, given what we know about response to

medication occurring more rapidly in most cases of serious mental illness. Furthermore, reported times for "successful" restoration condense across defendants, regardless of diagnoses and charges and allowable duration.   Also, in a recent comprehensive review[1] of outpatient competency restoration programs (OCRP), states reported an average of 149 days for restoration for individuals restored, and with outliers removed, that average was 111 days even though some programs had individuals in residential services and others did not.

*OSH data and Community Restoration factors*: Data from 10 years of OSH admissions shows extended use of bed days-for some small population of individuals beyond one year of restoration services (See **Figure 4** above). This requires additional time and OSH resources to maintain restoration activities for prolonged periods for a few people in this process, and thus removes the potential for more timely access to beds for those that might be more likely to benefit from those restoration activities. Furthermore, having no end date to community restoration puts defendants at risk for perpetual court oversight, raising serious concerns that defendants with disabilities may be treated differently as pre-trial defendants with little meaningful purpose, and raises concerns about resource allocation.

*Policy and Other State Legislation*: According to Zapf's Washington Public Policy Institute review from 2013, almost a decade ago, the National Judicial College established proposed standards for timeframes for competency restoration, which were roughly 120 days for misdemeanants and up to one year for felony defendants.[2] A review of state statutes as noted above (see **Figure 5**) for inpatient restoration shows that of those states with timelines for inpatient restoration, Oregon's time frames are the 8th longest out of 25 states. Also, for states that distinguish timeframes for restoration between misdemeanor charges and felony charges, there are significant differences of those allotted times.

Although outpatient programs are still new, in my opinion, it is reasonable to consider timeframes for restoration that are the same as those for people in hospitals especially as some time in a hospital is often related to working with individuals who have not been adherent to medication, and in Oregon persons with serious mental illness in CRPs are required to be adherent to treatment. There are challenges at times with follow-up and accessing community appointments, but by developing a clearer CRP manualized approach, some of those issues can be addressed in practice. Also, those with more significant I/DD needs or those with chronic mental illness and lower-level offenses may not be as likely to be restored regardless. Thus, timelines should not exceed those necessary to determine restorability (or remediation). As an example, Washington D.C. provides for a maximum restoration period not to exceed 180 days for all defendants (s.24-531.05(e)) in its Outpatient Competency Restoration Program.

*Clinical experience*: In speaking to countless individuals in competency processes in multiple states as a treating psychiatrist, evaluator and/or consultant, time spent in legal education for

---

[1] Gowensmith, W. N., Frost, L. E., Speelman, D. W., & Therson, D. E. (2016). Lookin' for beds in all the wrong places: Outpatient competency restoration as a promising approach to modern challenges. *Psychology, Public Policy, and Law, 22*(3), 293–305.
[2] Zapf, P. (2013). Standardizing Protocols for Treatment to Restore Competency to Stand Trial: Interventions and Clinically Appropriate Time Periods (Document No. 13-01-1901). Olympia: Washington State Institute for Public Policy.

individuals with serious mental illness and IDD, while getting needed treatment and supports can be of assistance and is considered an important part of restoration. However, an over-focus on legal education can have intangible collateral consequences of lowering self-esteem when task demand exceeds capacity and a belief that competency is a "pass/fail" assessment that creates anxiety (while factual understanding is only one aspect of competence to stand trial), and a sense of spending time in repetitive programming. These elements can also then translates into time not spent engaging in other activities that might have a more beneficial impact on illness management, overall recovery, and reduced recidivism. Current workforce demands make it even more imperative that work be directed in the most productive ways possible, while not leading to compromised public safety. These factors support my recommendation for shortening maximum durations for restoration, while recognizing the Constitutional right to be tried as a competent criminal defendant.

3. *Community Restoration Program Refinements*: As noted above, Community Restoration Programs (CRP) provide a critical opportunity for services outside of OSH when appropriate and maximizing their potential could yield greater compliance with *Mink* (as well as *Olmstead* requirements).  Above I made a recommendation to review and ensure current program access statewide. Other actions will likely require legislative requests, either through a Policy Option Package or other means to secure the necessary staff and funds to accomplish the following further recommendations. Therefore, OHA should work with stakeholders including DRO and in consultation with the Neutral Expert in advance of the 2023 legislative session to foster enhancements, including:

   a. By *October 1, 2023*, OHA should, in consultation with Plaintiffs and other stakeholders, and with input from the Neutral Expert, develop a CRP manual, delineate best practices across regions, engage in training, develop standard court forms. Oregon's rules (309-088-0115) already identify elements of restoration services, but some may be ambiguous or appear crossover with other funded behavioral health services. As such, suggested areas of focus for protocol development including the following examples of what might be included:
      i. referral processes
      ii. qualifying criteria (and any inclusion/exclusion criteria)
      iii. acceptance/admissions procedures
      iv. scope of services minimally required including those focused on co-occurring substance use disorders
      v. measurement of outcomes and data collection (consider including items such as length of stay, total number restored and total number served, total number found unable, hospitalizations, technical pre-trial violations, new arrests)
      vi. any special provisions for clients with I/DD needs
      vii. clarification for communities to best identify which services should be covered under which payment mechanism (e.g., Medicaid or CRP funding)

   b. By *October 2023*, OHA should enhance CRP data reporting from quarterly to more active regular contemporaneous reporting (and fund the needed infrastructure to do so) so that reports can be generated as needed by OHA to include potential items such as:
      i. Number of people being served in CRP

   ii.   Number of people ultimately opined Able and those opined Unable to Aid and
         Assist related to felony or misdemeanor charges
   iii.  Categorization of clinical issues: SUD, SMI, IDD, or a combination of these
   iv.   Types of services received
   v.    Categorization of residential level of care and/or housing status
   vi.   Categorizations that examine population demographics to inform policies to
         enhance equitable access to community-based restoration for diverse
         populations

   c.   Beginning in the next fiscal year, OHA should produce an annual report on CRP activities
        for public access to inform further legislative needs for communities to best deliver CRP
        services, inform proposals for legislative change, resource needs, and inter-relationships
        of stakeholders involved with CRP participants and the courts.

   d.   OHA should foster best practices in CRP through collaborative training opportunities
        across counties and in consultation with OJD, municipal courts, defense, and
        prosecution, by offering trainings/community of practice opportunities beginning by
        October 2023.

4. *Alternative Pathways for Misdemeanant Defendants*: With regard to defendants charged with
   misdemeanors in the AA process, OHA/OJD/DRO/MPD should make every effort to work
   collaboratively with stakeholders to identify alternatives that no longer utilize OSH when there is
   no real Government interest in pursuing prosecution and work to pursue avenues for alternative
   community plans for these individuals. Alternative pathways should and could include, when
   possible, diverting them from evaluation all together, releasing them from jail on pretrial
   conditions, and diverting them from OSH or discharging them when community restoration is an
   option. The increased demand of competency services for persons charged with misdemeanant
   offenses is a national trend. Many of these individuals need hospital level of care, but their
   criminal issues are more minor, raising questions about the use of "restoration" as a means of
   accessing services when prosecution is not ultimately going to be pursued. Once referred for
   competence to stand trial evaluation and restoration, these defendants are at greater risk for
   jail stays as opposed to opportunities for diversion and treatment. Recommendation **I.B.4** in the
   section above speaks to developing training related to these issues. Beyond training, I
   recommend that the state also analyze data trends for individuals charged with misdemeanors
   sent to the state hospital to allow for further recommendations in this matter including
   legislative fixes that may provide pathways to alternative access to treatments for these
   populations. At the same time, this may be an issue of consideration also for the Federal Court,
   given the potential Constitutional and *Olmstead* issues at stake for all defendants but
   misdemeanant defendants in particular.

5. *OSH Patient Care Improvement and Community Engagement*: Separate and distinct from staffing
   recommended in the January report, and recognizing that many of the recommendations
   throughout this report will require additional staffing, I support a proposal from OHA that they
   would explore all available means to obtain funding for seek one OSH data analyst and two OSH
   data integration specialist positions to support Mink/Bowman treatment discharge approaches,

community connections, and data reporting. The OSH Treatment Quality and Patient Care Improvement Unit will improve the provision of patient-specific resources to support an individual's recovery through community engagement, recommendations for continuity of care post-hospitalization, and recommendations for community resources post-hospitalization. The OSH Treatment Quality and Patient Care Improvement unit will improve the provision of trauma-informed, patient-centered care through identification of an individual's community, cultural and linguistic needs to increase likelihood of treatment engagement/adherence post-hospitalization and potentially address diversity and equity issues. The OSH Treatment Quality and Patient Care Improvement Unit will improve the provision of direct-care services through staff training, coaching and engagement on the units where the treatment services are provided. This is an effort to sustain compliance by decreasing length of stay and recidivism rates and improving treatment engagement/adherence post-hospitalization.

6.  *CCO Enrollment*: OHA should require counties to ensure ongoing CCO enrollment for all eligible individuals who have been under an Aid and Assist order within the past two years.

II.    **Tracking Progress and Benchmarks toward Compliance Goals**

    A. **Benchmarks**

Discussions with the parties resulted in the crafting of benchmarks to help drive toward measurable progress toward compliance. The parties agreed that benchmark time frames would not include "outliers" or the rare delays that are not attributable to bed or community restoration capacity. It is my recommendation that the following incremental benchmark goals be used to assess progress toward compliance in this *Mink* case:

- By August 1, 2022 – Average wait time to admission 22 days or fewer
- By October 1, 2022 – Average wait time to admission 17 days or fewer
- By January 1, 2023 – Average wait time to admission 11 days or fewer
- By February 14, 2023 – Average wait time to admission 7 days or fewer

With the above in mind, in recommending these benchmarks, I have taken into account an examination of existing data and consideration of efforts identified in my January report, current plans for funding the community system through the RFA process, progress as reported by the State, and implementation of recommendations prioritized above.

For many years, the State complied with the 7-day standard articulated in the Court's permanent injunction and the constitutional rights of pretrial detainees. With the right planning, staffing, and community resource, Oregon can once again achieve complaint with the Court's order. That said, it will be important to review each benchmark at each time point to understand the nuances in the system dynamics at those times as they relate to compliance. Moreover, in setting these benchmarks, I recommend that the Parties continue to meet regularly to discuss progress toward compliance and determine barriers and solutions to the next benchmark. Therefore, if at the time of the Parties' meeting to discuss them, the benchmarks set out in this plan are not met, the Parties and the Neutral Expert will discuss additional actions that can be taken to meet the next benchmarks. Based on these

discussions, there may be recommendations to the Court regarding additional actions beyond those already recommended/agreed upon that can be taken to regain compliance. Of course, at any point, the Parties may also seek mediation through Federal Court processes as they see appropriate.

**B.      Tracking legislatively appropriated funding**

One theme that has arisen in my conversations with stakeholders has been whether the state has issued the dollars allocated in a timely and expedient manner to get to the communities to achieve compliance as soon as possible. Community leaders with whom I spoke have expressed several concerns about needing additional dollars, and others have wondered about why appropriated dollars have not been spent and expressed views bout perceived delays on many levels. At the same time the State has indicated that dollars that had been more widely distributed had not yielded the specific results and accountability toward compliance in this litigation that had been hoped, necessitating, from the State's perspective, alternative policy strategies for distributing dollars, and necessitating more internal staff resources to manage the newly appropriate dollars wisely.

Because of the questions raised, I asked the state to develop a high level financial analytic report that could address some of the questions. That analysis was conducted, and an early draft was shared with me. The State has since developed a website to provide information about behavioral health spending and improve transparency for it (See: https://www.oregon.gov/oha/HSD/AMH/Pages/index.aspx). This should continue to be updated. OHA should continue in regular meetings with DRO and MPD and the Neutral Expert to discuss implementation of legislatively appropriated funds that have the potential to help OHA achieve compliance, to address remaining questions about prior spending decisions and to foster planning for ongoing support of the above recommendations to achieve compliance.

**Concluding Comments:**

The parties are all in agreement that compliance with the seven-day standard is the ultimate goal set forth by the Court. Thus, in my discussions with them, there was agreement that the recommendations should be pursued with some urgency and with the timelines set forth above, and that where required, the State should utilize any available most efficient means for securing needed additional funding or staff resources. During June through September 2022, OHA has agreed to compile the above recommended legislative actions into a legislative concept and complete budget impact analyses. OHA will present the recommended legislation during upcoming 2023 legislative session.  In June 2023, if these recommendations are accepted, OHA has agreed to make any needed rule amendments and contractual changes to support the recommendations embedded in this report.

Even with the recommendations above, it is unclear which direction the legislature will go with them. As noted, the legislative presiding officers have convened a workgroup to examine funding of services for individuals in AA, PSRB and Civil Commitment processes. I recommend that the parties participate as requested in that work and help inform that workgroup of the activities and recommendations in this report. I also recommend that the State be prepared to respond to any inquiries related to funding expenditures, fiscal accountability, and requests for data to help the legislature take actions to assist the State in achieving *Mink/Bowman* compliance, including the enactment of the recommendations in this report that require the legislature's support. By doing so, it is hoped that the means to achieve these recommendations will be realized, and that proposed legislation will be met with broad-based

acceptance, recognizing the urgency of making system shifts for those individuals waiting in jail for access to needed behavioral health services. It is further hoped and recommended therefore that the parties will continue to work jointly to pursue support for the recommendations above through their own stakeholder engagement processes.

Finally, the Parties should continue to meet regularly with the Neutral Expert at a cadence to be determined as recommended by the Neutral Expert and in consultation with the Parties, but no less than monthly to track progress and discuss plans for the implementation of the recommendations outlined in both the First and this Second Report of the Neutral Expert Report in this matter.

I would like to acknowledge the stakeholders with whom I spoke and their uniform commitment to improving access to care and to serving a population with complex behavioral health needs while supporting public safety. I would like to especially commend the Parties for their incredibly thoughtful and mutual labor-intensive and good faith work within their roles to help inform the development of these recommendations and to support the work on behalf of the individuals affected by the *Mink/Bowman*-related challenges. I greatly appreciate the help of the leadership and staff at OHA, OSH, DRO, MPD, OJD, and the PSRB in my work. I also acknowledge with gratitude Mr. Cody Gabel who again assisted me in coordinating meetings and tracking information I requested, and to Mr. Scott Hillier for his data support used to inform these recommendations.

**Respectfully Submitted by:**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*