**D e b r a  A.  P i n a l s,  M.D.**

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Sixth Report**
**Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** July 24, 2023
**Neutral Expert:** Debra A. Pinals, M.D.

**Background and Context of this Report:**

On 12/21/21, The Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as the Neutral Expert in the *Mink/Bowman* matter, granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case. Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman's order stipulates further that OHA enter into a contract with the Neutral Expert and provide any needed information to her. The Court ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)." The Court further ordered a second report by the Neutral Expert to include "a short report and recommendations for a proposed long-term compliance plan for OSH." I submitted my First Report on 1/30/22 and Second Report on 6/5/22 in accordance with those orders. Then, on 6/7/22 the Court ordered my ongoing appointment and stated, "Beginning on September 7, 2022, Dr. Pinals will provide brief quarterly reports to update the Court regarding compliance status and any needed additional recommendations to address any barriers to achieving compliance." In total, I have produced and provided the following reports to the Court in this case:

- First Report, 1/30/22
- Second Report, 6/5/22
- Third Report, 9/15/22
- Fourth Report, 12/21/22
- Fifth Report, 4/17/23

In accordance with the Court's order, this report will serve as my Sixth Report in this matter.

**Background and Summary of the Two Consolidated Cases:**

DRO  EXB

A more detailed background to these cases is reviewed in my prior reports. In summary, state defendants were previously found by the Ninth Circuit (*OAC v. Mink, 2003*) to be out of compliance with Constitutional requirements and were ordered to admit individuals found unable to Aid and Assist in their criminal cases to Oregon State Hospital for restoration within seven (7) days of receipt of an order for their commitment to OSH for restoration. Compliance with that federal ruling has been an ongoing challenge with some periods of improvement, but it faltered during the COVID-19 pandemic. In December 2021, after further litigation, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide recommendations to help achieve compliance with the Ninth Circuit's seven (7) day admission requirement as outlined above. Since that time, efforts toward compliance have continued but compliance has yet to be achieved.

In a separate litigation, in November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after The Honorable Nan Waller ordered them to OSH for treatment, without unreasonable delay. After further litigation, The Honorable Marco A. Hernandez, United States District Court Judge, agreed with the defendants that a consolidation of the *Mink* and *Bowman* cases made sense. At the time of the appointment of the Neutral Expert for the consolidated cases, the parties entered an interim agreement that no individuals found GEI would wait longer than four months for admission to OSH, but this case has since been stayed.

The Neutral Expert First report recommended that given the much smaller number of GEI cases, and the longer waits in jail for a hospital bed for that population, that there be one waitlist for people waiting in jail for a bed at OSH, whether GEI or under the Aid and Assist process. Both those waiting times continue to be tracked as part of this consolidated litigation.

**Qualifications to Perform this Work:**

I have worked for almost twenty-five years as a clinical and academic and forensic psychiatrist, and over twenty years functioning in state and local level behavioral health administrative leadership, management, policy and legislative development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions. Other details are provided in my First Report.

**Sources:**

Background court and legal documents that set forth this case include:

1. Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21;
2. Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21;
3. Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20;
4. *Mink* and *Bowman* Interim Agreement, Filed 12/17/21;
5. *Bowman* 1637 PLD Plaintiffs 1st Amended Complaint #22;
6. *Mink* 0339 Court Order Granting Motion for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;

7. Order on Joint Stipulation to Continue Appointment of Neutral Expert, signed by the Honorable Michael W. Mosman, 6/7/22;
8. *Bowman* Opinion and Order, Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), signed by Judge Mosman 8/16/22;

Background court and legal documents I have reviewed during this interim period include:

1. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 9/1/22;
2. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), No. 6:22-cv-01460-MO (Member Case) Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 5/10/23;
3. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Second Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 7/3/23;
4. Activity in Case 3:02-cv-00339-MO Oregon Advocacy Center et al v. Mink et al Order on Motion for Clarification, ordered 6/5/23;
5. Legacy Health System et al v. Allen, 6:22-cv-01460-MO, Legacy 1460 PLD 2nd Amended Complaint (#97-1), dated 6/26/23;
6. Legacy Health System et al v. Allen, 6:22-cv-01450-MO, 1460 PLD Legacy Pltf's Mtn for Reconsideration of Opinion and Order, Judgment. Oral Argument requested, Filed by All Plaintiffs, dated 6/26/23;
7. Legacy Health System et al v. Allen, 6:22-cv-01460-MO, Case No. 3:02-cv-00339-MO, PLD Response to Motion for Reconsideration of Opinion and Order, dated 7/7/23;
8. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case): Marion County's Motion to Intervene, Oral Argument Requested, dated 6/8/23;
9. Opinion and Order, signed by The Honorable Michael W. Mosman, on 5/25/23, granting Defendants' Motion to Dismiss [ECF 329] in the *Legacy* matter and Dismiss Health Systems' FAC [ECF 327];
10. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case): Plaintiffs Unopposed Motion for Clarification of Order, regarding the time limits and when the time clock begins to run for commitment to OSH for restoration, filed 6/2/23;
11. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case): Defendants' Unopposed Motion for Clarification of Order, filed 6/2/23;
12. Plaintiffs Unopposed Motion for Clarification of Order
13. Documents pertaining to several AA cases including court orders and clinical records provided by OSH;
14. #381 – Joint Status Report
15. #382 -  Plaintiffs' Proposed Amendments to September Order Regarding Transportation from the State Hospital;
16. #383 – Marion County's Proposed Amendments to Order to Implement Neutral Expert's Recommendations;
17. #384 – Memorandum of Law regarding Amendment to Order to Implement Neutral Expert's Recommendations;
18. #385 – Judges' *Amicus* Brief Pursuant to April 3, 2023, Minute Order; and

19. #386 – Amici District Attorneys' Joinder in Judges' Amicus Brief Pursuant to April 3, 2023 minute order.
20. Transcript of Court hearing with Judge Mosman 11/21/22;
21. Mediation documents as permitted by amici, intervenors, plaintiffs and defendants; and
22. Oregon Advocacy Center et al., v. Mink et al. Case No. 3:02-cv-00339-MO(Lead Case) Mediation Final Term Sheet (June 2023).

I reviewed additional documents and materials separate from court filings and orders during this interim period. These include the following:

1. Revised Request for Oregon State Hospital Expedited Admission: Patients on the OSH Admission List Under Civil Commitment or Voluntary by Guardian/Health Care Representative Status, April 2023;
2. PowerPoint presentation from Lewis and Clark law students Jemma Pritchard and Christa Doerbeck presented to the parties via Ms. Emily Cooper;
3. Oregon Forensic Evaluation System Report Draft for GAINS, May 2023;
4. AA Program Design and Evaluation Services (PDES) Progress Reports from January 2022, 5/13/22, 9/7/22, 12/2/22;
5. Excel Documents regarding the Ready to Place List from OSH;
6. Data requests regarding criminal charges of patients admitted to OSH;
7. Various State Court Orders sent to me under seal by OHA;
8. OARs pertaining to informed consent and medication of AA patients at OSH;
9. OJD draft commitment orders;
10. *U.S. v. Loughner*, 672 F3d 731 (9th Cir., 2012);
11. Draft presentations by OHA regarding Second Report Recommendations activities;
12. Email communications regarding the OSH Notice regarding FES practices from Ms. Dolly Matteucci, dated 5/10/23;
13. Partner Notice FES Evaluation Priorities letter to OSH Partners from Superintendent Matteucci dated 5/26/23;
14. Draft FAQ revisions as of 7/18/23; and
15. Sample Continuing Care Discharge Plans documentation from OSH.

Regular case tracking and background documents I have reviewed in the interim between this report and my prior report include the following:

1. OSH Forensic Admission and Discharge monthly data dashboards May, June, and July 2023 reporting the month prior to production;
2. OSH Forensic Admissions and Discharge Bi-Weekly Reports;
3. Average Wait Time Prior to Admission Progress Metrics for Benchmark Goals;
4. *Mink & Bowman* Monthly Progress Reports from OHA from May, June, and July 2023; and
5. Miscellaneous media stories, including Lund reports.

Regular/semi-regular meetings during this interim period from my prior report including the following meetings and discussions:

1. Periodic meetings and communications with Judge Mosman and Judge Beckerman;



2. Numerous meetings with OHA and OSH staff including Mr. Cody Gabel , Mr. Bill Osborne, Mr. Scott Hillier regarding data requests, Drs. Beckman and Davies and Ms. Micky Logan regarding FES, Dr. Sara Walker, CMO OSH, Ms. Della Hoffman, Director of Social Work, OSH and others;

3. At least Weekly or bi-weekly meetings and several ad hoc meetings with OHA, OSH, DRO and MPD representatives and leaders both separately and together.  In addition, I met with staff from these agencies at various points in this interval period.

   a. From OHA, OSH, the weekly/bi-weekly leadership meetings have included:
      i. Current administrative leaders including Ms. Ebony Sloan Clarke, Director of Behavioral Health, OHA and Mr. Dave Baden, Interim Director of OHA;
      ii. Dolores Matteucci, OSH Superintendent-CEO
      iii. Ms. Lindsey Burrows, Deputy General Counsel, Office of Governor Kotek
   b. From Oregon Department of Justice (DOJ):
      i. Carla Scott, DOJ Special Litigation Unit Counsel
      ii. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
      iii. Kailana Piimauna, Senior Assistant Attorney General, HHS, General Counsel Division
      iv. Melissa M. Chureau, Senior Assistant Attorney General, HHS, General Counsel Division
   c. From Disability Rights Oregon (DRO), Emily Cooper, Legal Director, and Dave Boyer, Managing Attorney
   d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC

4. Periodic discussions with OJD representation through Judge Nan Waller, Multnomah County

I have also had discussions with individuals and groups, including but not limited to:

1. Mr. Billy Williams, along with elected Washington County District Attorney Kevin Barton
2. Mr. Eric Neiman, and representatives of Private Hospitals including Peace Health, Unity and Providence Hospitals
3. County Counsel for Washington and Marion Counties, Mr. Thomas Carr and Ms. Jane Vetto, respectively
4. Mr. Keith Garza and Judge Nan Waller and representative judges involved as Amici
5. AOCMHP representatives organized by Ms. Cherryl Ramirez

I observed the following Court hearings:
1. Multnomah County Court hearing regarding ready to place cases in Multnomah County, 4/25/23, The Honorable Nan Waller presiding;
2. Federal Court hearings on 4/25/23 and 6/29/23 before The Honorable Michael W. Mosman;

I also participated virtually in several formal mediation sessions overseen by The Honorable Stacie Beckerman, with representatives from private hospital intervenors and their counsel, as well as amici judges, county officials, and district attorneys and their counsel, as well as the parties to the *Mink/Bowman* case. Because of the confidential nature of that mediation further, details will not be provided in this report, though the final term sheet has now been made public and is on the *Mink/Bowman* website of the state, per agreement of the participants.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
FES: Forensic Evaluation Services
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
ISU: Intensive Services Unit
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
Mosman Order: As of this report, this will refer to the July 3, 2023 Second Amended Order unless
otherwise specified
MPD: Metropolitan Public Defender
OCBH: Oregon Council for Behavioral Health
OCDLA: Oregon Criminal Defense Lawyers Association
OHA: Oregon Health Authority
ORPA: Oregon Residential Provider Association
OSH: Oregon State Hospital
PDES: Program Design and Evaluation Services
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities During this Reporting Period:**

I have continued to meet with the state and the plaintiffs regularly to discuss progress and the
implementation of my recommendations. I have gotten to work with the new OHA leadership as they
have settled more into their roles. These last few months, one active part of the case has been my work
with Judge Stacie Beckerman, amici, and intervenors, along with the parties, in negotiating formal terms
through a mediation process. I worked with the state in reviewing and summarizing data for
consideration by the mediation participants that helped produce the final product. I have also continued
to review data, court orders, and case records, as well as speak with various stakeholders throughout
this interim period to help inform my work helping the state make progress toward compliance.

**Data Summaries**

*Background Data*: Data received shows some progress toward compliance but also some slowing in
other areas, especially in the large ready to place list. In writing this report, I was told that there have
been comparatively fewer orders in July 2023 compared to other months, but it is far too soon to
determine whether this will be a new pace of orders. The number of AA orders continued to be high in
April, May and June, despite this new July 2023 dip. The trends in numbers of orders received will
continue to be tracked and presented in future reports. Nonetheless, it appears the 9/1/22 and 7/3/23

orders by the Court are achieving effects helping the state move toward compliance but sustained compliance is not yet a reality. The new "Mosman Order" of 7/3/23, may further affect compliance-balanced between potential extensions and limits to OSH utilization. In other words, the number of bed days utilized through extended cases, will potentially be offset by bed days are no longer needed because of the restriction on admission of non-person misdemeanant defendants for restoration. The overall bed utilization will shape the direction of future compliance.  As will be seen later in this report, there are already several orders that OSH has received that are extending bed utilization, which will need to be tracked.

**Figure 1** and **Table 1** show somewhat fewer people waiting for admission, with 42 people waiting as of 7/1/23, but somewhat of a plateau if not an increase in the number of days people waited to be admitted to OSH as of June 2023. For the average numbers of days people are waiting in a snapshot of the waitlist, one can see that this was 11.1 days on 4/1/23 and 9.3 days as of 7/1/23.  For individuals on the waitlies (which is different from the snapshot average), defendants were waiting an average up to 18 days on 4/1/23, and up to 17 days on 7/1/23 (see also **Figure 3** for trends).  For those admitted during the prior month of June, the average wait time was 18.3 days.

The numbers of people waiting for discharge determined to no longer need hospital level of care is growing, as seen in **Figure 1.**  The hospital had identified as of 6/30/23 that 87 people were ready to place in the community. If those people were to be discharged, then the 42 people under AA and one person on the GEI list waiting for admission could be admitted, and the state would return to compliance. The wait times for placement of GEI patients into the community appears to be increasing, but the numbers are low, so it is difficult to make a generalization about this. Regardless, an effort to discharge patients who do not need a hospital bed should be a high priority for the defendants.

**INTENTIONALLY LEFT BLANK**



## Figure 1. Data Dashboard Charts Reflecting Progress in *Mink/Bowman* as of June 30, 2023

**OSH Forensic Admission and Discharge Dashboard**
**June 2023**

### Aid & Assist Admission List

| | Count | Avg Days |
|---|---|---|
| On the Admission List as of the last day of the month | 42 | 9.3 |
| Admitted During the Month | 97 | 18.3 |



### PSRB / GEI Admission List

| | Count | Avg Days |
|---|---|---|
| On the Admission List as of the last day of the month | 1 | 10.0 |
| Admitted During the Month | 1 | 20.0 |



### Aid & Assist No Longer Needing HLOC

| | Count | Avg Days |
|---|---|---|
| No Longer Needs Hospital Level of Care (as of the last day of the month) | 87 | 34.7 |
| Discharged for Community Restoration After Having Been Assessed to No Longer Need HLOC | 12 | 43.1 |
| Total Discharged During the Month | 101 | |

### PSRB / GEI No Longer Needing HLOC

| | Count | Avg Days |
|---|---|---|
| No Longer Needs Hospital Level of Care (as of the last day of the month) | 30 | 220.4 |
| Conditionally Released to the PSRB After Having Been Assessed to No Longer Need HLOC | 4 | 447.5 |
| Total Discharged During the Month | 4 | |



## Table 1. Individuals Awaiting Admission

| 1. Regarding individuals on OSH admission list with signed and received A&A court order | | | | | | | |
|---|---|---|---|---|---|---|---|
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* | *As of 4/1/23* | *As of 7/1/23* |
| Total Number of individuals | 46 | 93* | 67 | 70 | 104 | 51 | 42 |
| Average days current individuals have been waiting | 15.8 days | 22.5 days | 16.2 days | 19.8 days | 20.7 days | 11.1 days | 9.3 days |

| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days | 3-34 days | 1-36 days | 1-18 days | 1-17 days |
|---|---|---|---|---|---|---|---|
| **2. Regarding individuals found GEI and ordered to OSH** | | | | | | | |
| | *As of 1/5/22* | *As of 1/28/22* | *As of 5/1/22* | *As of 9/1/22* | *As of 12/1/22* | *As of 4/1/23* | *As of 7/1/23* |
| Total number of individuals | 15 | 4 | 3 | 4 | 0 | 1 | 1 |
| Average days waiting | 45.6 days | 23 days | 18 days | 13.0 days | N/A | 26.0 days | 10.0 days |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days | 3-20 days | N/A | 26 days | 10 days |

*The marked increase in numbers awaiting admission was most likely a residual of the pauses in admissions due to COVID-19

**Table 2** and **Table 3** show the capacity and census at OSH, which uses an operational active capacity metric and as of 7/1/23 had a census of 684 patients, slightly lower than that seen on 4/1/23. The operational capacity allows each unit to have one bed available for emergency situations.  Also, as per the last reports, most patients at OSH are in the A &A process. Of note, the civil commitment numbers have remained steady since my last report.

**Table 2: OSH Bed Capacities as of 7/1/23***

| Site | Licensed Capacity | Active Capacity |
|---|---|---|
| Salem Main Campus HLOC | 502 | 472 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **559** |
| Junction City HLOC | 76 | 73 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | 151 | 145 |
| **OSH Total** | **743** | **704** |

* Two Salem HLOC beds are temporarily offline, and total capacity reflects no change since 4/1/23

**Table 3**. OSH Census as of 7/1/23

| Date | Aid & Assist | PSRB | Civil Commitment | Other | Total |
|---|---|---|---|---|---|
| 9/1/2022 | 410 | 275 | 14 | 1 | 700 |
| 12/1/2022 | 396 | 279 | 13 | 0 | 688 |
| 4/1/2023 | 400 | 279 | 11 | 1 | 691 |
| 7/1/2023 | 389 | 281 | 13 | 1 | 684 |

The demands on admissions for restoration had increased during April and May to 95 and 100 orders (See **Table 4** and **Figure 2**), and although these are lower than the record numbers of orders seen in January and March of 2023, they continue to outpace the capacity to admit timely. Lower numbers of

orders in June and July may portend better outcomes toward compliance, but this remains to be seen. Trends for persons in GEI processes show some stability in order numbers but a slight increase in revocations in March and May 2023.

**Table 4. Aid and Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|---|---|---|
| April 2022 | 80 | 7 (4 standard/ 3 revocations) |
| May 2022 | 77 | 7 (4 standard / 3 revocations) |
| June 2022 | 75 | 6 (4 standard / 2 revocations) |
| July 2022 | 65 | 5 (3 standard / 2 revocations) |
| August 2022 | 74 | 7 (4 standard / 3 revocations) |
| September 2022 | 84 | 6 (5 standard / 1 revocations) |
| October 2022 | 95 | 3 (3 standard / 0 revocations) |
| November 2022 | 95 | 6 (2 standard / 4 revocations) |
| December 2022 | 73 | 4 (4 standard / 0 revocations) |
| January 2023 | 109 | 3 (3 standard / 0 revocations) |
| February 2023 | 74 | 5 (3 standard / 2 revocations) |
| March 2023 | 108 | 7 (2 standard / 5 revocations) |
| April 2023 | 100 | 5 (2 standard / 3 revocations) |
| May 2023 | 95 | 7 (3 standard / 4 revocations) |
| June 2023 | 83 | 1 (1 standard / 0 revocations) |

**Figure 2. Aid & Assist Admissions/Orders Trends through June 2023**



**Figure 3** depicts how and whether progress is being made across the benchmarks toward compliance set forth in my June 2022 report. It is noteworthy that the trends were very much in the direction of compliance with the 9/1/22 order, but are slightly up again, going against compliance. Overall, none of the benchmarks have been reached. This could mean the benchmarks were set with expectations that were too high, given challenges at the time, such as workforce, ongoing COVID-19 and other matters. Or it could reflect that the work of the other recommendations still has not been completed,

and/or that other recommendations will be in order. Regardless, the benchmarks offered a targeted goal for the state to incrementally achieve progress that the parties agreed to track. The current trend line dipping slightly away from compliance reflects concerns raised in my April 2023 report of what might occur if OSH continued to receive record numbers of orders per month. As stated above, however, in the beginning of July 2023, the number of orders decreased but it is not clear whether this is a new trend or a one-month decrease. I was told that by the date of this report, OSH had received only about 52 orders, which was a markedly low number compared to other recent months, but all the data for July 2023 is not yet known. As noted throughout my prior reports, much of the state's progress toward compliance will depend heavily on discharges accomplished as well as numbers of orders received.

**Figure 3. Admission Wait Time Projections Compared to Benchmarks Set in Second Report based on data as of 7/1/23**



**Table 5** below shows data related to the order by Judge Mosman from 9/1/23. At this time, of the 409 individuals who were in OSH at the time of that order (so-called "Cohort 1"), only 19 were in the hospital as of 7/1/23 on their initial restoration order. Of that total cohort, 169 have to date had a finding of Able or Never Able. There were 89 defendants discharged to community restoration, 19 who had charges dismissed, and another 107 discharged after a 30-day notice was given.

**Table 6** provides additional information to what is in **Table 5**. They both show that the largest group of patients are still being discharged after being found able, and many others are sent to community restoration. It is my understanding that the data for discharge reasons is such that those discharged prior to the end of restoration as unable and ordered to community restoration are labeled as "community restoration" discharges. Individuals discharged at the end of the Federal Court 9/1/22 restoration time may or may not be ordered to community restoration. According to data, the combined numbers of people discharged to community restoration and those who reached their 9/1/23 Mosman Order "restoration limit" may have both ended up in community restoration. As I have noted in prior reports, increased demand on community restoration services raises several concerns about throughput. The community and hospital restoration systems are dynamic and one impacts the other. If community restoration is overwhelmed there would be gaps in open slots for

services when they are needed. I have spoken with OSH to help determine more specificity for outcomes of these discharges.

## Table 5. Discharge Data Related to the 9/1/22 Order by Judge Mosman

- **Cohort 1:** Patients at OSH at the time of the Federal Court Order
- **Cohort 2:** Patients admitted to OSH after the issuance of the Federal Court Order on 9/1/22

| | | | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cohort 1 | At OSH as of 9/1/2022 | At OSH as of 7/1/2023 | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | Total Discharged |
| All misdemeanor | 85 | 0 | 61 | 26 | 26 | 13 | 2 | 19 | 7 | 26 | 3 | | 85 |
| Felony | 217 | 2 | 100 | 29 | 69 | 69 | 33 | 65 | 10 | 69 | | | 215 |
| Violent Felony | 107 | 17 | 36 | 14 | 12 | 39 | 23 | 5 | 3 | 12 | 2 | 1 | 90 |
| Total | 409 | 19 | 197 | 68 | 107 | 125 | 44 | 89 | 10 | 107 | 5 | 1 | 390 |

| | | | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cohort 2 | Admitted since 9/1/2022 | At OSH as of 7/1/2023 | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | Total Discharged |
| Misdemeanor | 334 | 106 | 205 | 67 | 104 | 52 | 17 | 43 | 12 | 104 | | | 228 |
| Felony | 480 | 194 | 92 | 32 | 38 | 147 | 20 | 70 | 11 | 38 | | | 286 |
| Violent Felony | 138 | 77 | 1 | | 1 | 52 | 8 | | 1 | 1 | | | 61 |
| Total | 952 | 377 | 298 | 99 | 143 | 251 | 45 | 111 | 23 | 143 | 2 | 0 | 575 |

## Table 6. Legal Status of AA Discharges in June 2023 based on Hospital Data and Hospital Restoration Limits

### June 2023 A&A Discharges

| Reason | Cohort 1 | Cohort 2 | Total |
|---|---|---|---|
| Able | 2 | 39 | 41 |
| Never Able | 1 | 10 | 11 |
| Community Restoration | | 19 | 19 |
| Dismissed | | 2 | 2 |
| Restoration Limit | | 28 | 28 |
| Total | 3 | 98 | 101 |

Data reflected in **Table 7** below attempts to project out to the future when the state may achieve compliance. The projected numbers make several assumptions and include a predicted estimate of numbers of orders that might be received. With projected numbers of orders placed between 74 and 79 per month dating back months, and discharges paced at 89 per month dating back through April 2023, the admission list would have had 10 people on it by June 2023. Because the new orders have far exceeded the predicted numbers, the traction on compliance has not been realized as projected. It should be noted however, that OSH has done tremendous work keeping up with discharges, and this could not be done without great effort. Specifically, in June 2023, OSH was able to discharge 101 Aid & Assist patients, which was well above the projected target of 89. The staff indicated they were also able to admit 97 Aid & Assist patients off the Admission List in May, also well above the projected target of 89. The number of new orders received in June (83) was the closest it has been to the expected/projected number (79) since February 2023. Staff indicated that this allowed for OSH to reduce the Admission List down from 57 in May 2023 to 42 as of the end of June 2023. At the same time, some stakeholders have raised concern about inadequate treatment at OSH while patients are there for restoration. Judge Mosman clarified that the clock of restoration starts from the moment of confinement to the hospital, regardless of a defendant's participation in treatment. This does not mean that the staff at the hospital do not have to restore or treat the patients in their care. According to my discussions and observations, active treatment is taking place on a regular basis. However,

ongoing attention to fostering engagement and participation is an ongoing challenge that OSH is tackling.

**Table 7. Projections vs. Actuals Admissions, Discharges, and New Restoration Orders**

| Month | Projected | | | | Actuals | | | |
|---|---|---|---|---|---|---|---|---|
| | Discharges | Admissions | New Orders | Admit List | Discharges | Admissions | New Orders | Admit List |
| Sep-22 | 67 | 67 | 74 | 77 | 85 | 76 | 84 | 86 |
| Oct-22 | 90 | 90 | 74 | 61 | 90 | 91 | 95 | 90 |
| Nov-22 | 90 | 90 | 74 | 45 | 85 | 81 | 95 | 104 |
| Dec-22 | 95 | 95 | 74 | 24 | 92 | 77 | 73 | 90 |
| Jan-23 | 97 | 97 | 74 | 10 | 93 | 101 | 109 | 98 |
| Feb-23 | 97 | 97 | 74 | 10 | 94 | 107 | 74 | 70 |
| Mar-23 | 107 | 107 | 79 | 10 | 129 | 128 | 108 | 51 |
| Apr-23 | 89 | 89 | 79 | 10 | 108 | 107 | 100 | 46 |
| May-23 | 89 | 89 | 79 | 10 | 88 | 87 | 95 | 57 |
| Jun-23 | 89 | 89 | 79 | 10 | 101 | 97 | 83 | 42 |

To understand the pathways of the AA defendants, it is important to look beyond what happens at OSH and to examine what happens in the community. Community restoration data is limited, as it is not entered in real time, and the state's Intensive Services Unit only gets data on a quarterly basis that then must be cleaned and reviewed. The most recent quarterly data was therefore not sufficient for presentation in this report. I worked with Mr. Cody Gabel who instead produced data to show year-over-year trends with community restoration. In the meantime, I have recommended that data improvements for community restoration be made, and the state is working on a plan to meet the needs for this recommendation.

The data on community restoration that I was able to obtain for this report is depicted in **Table 8**. Notably, community restoration episodes are increasing in number, from 173 in 2019 to 376 in 2022, which is a goal for that service. Also, the maximum period of the restoration episode has increased to 1399 days in 2022, compared to 1056 in 2019, 840 days in 2020, and 931 days in 2021. Some of the shorter days in restoration may have been related to the pandemic. Trends of duration of community restoration over time will be necessary to help determine the needed scope for the service.

**Table 8. CMHP Reported Completed Community Restoration Data by Year**

| CMHP Reported Completed Community Restoration Data | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | | 2022 | | 2019-2022 | |
| # of Completed Community Restoration Episodes* | 173 | | 248 | | 277 | | 376 | | 1074 | |
| # of Days Minimum | 1 | | 0 | | 0 | | 0 | | 0 | |
| # of Days Maximum | 1056 | | 840 | | 931 | | 1399 | | 1399 | |
| # of Days Mean | 166 | | 212 | | 201 | | 205 | | 199 | |
| # of Days Median | 149 | | 147 | | 148 | | 148 | | 148 | |
| Days in Community Restoration | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** | # of Completed Community Restoration Episodes** | % of Total Completed Community Restoration Episodes** |
| 0-90 | 64 | 37.0% | 65 | 26.2% | 90 | 32.5% | 109 | 29.0% | 328 | 30.5% |
| 0-180 | 116 | 67.1% | 132 | 53.2% | 167 | 60.3% | 216 | 57.4% | 631 | 58.8% |
| 0-365 | 160 | 92.5% | 207 | 83.5% | 233 | 84.1% | 327 | 87.0% | 927 | 86.3% |
| 0-730 | 172 | 99.4% | 243 | 98.0% | 274 | 98.9% | 366 | 97.3% | 1055 | 98.2% |
| 0-1095 | 173 | 100.0% | 248 | 100.0% | 277 | 100.0% | 372 | 98.9% | 1070 | 99.6% |

**Figure 4** below shows the trends in FES evaluations conducted at the hospital. This data was pulled in May 2023 and was shown to stakeholders to help explain the rationale for schedule prioritization for evaluations conducted by the hospital. As can be seen in the graphic figure, the number of evaluations on people within and outside of OSH has grown significantly from 2019 to 2023.

**Figure 4. Snapshot of FES Demand over 120 Days 2019 to 2023**



**Updates Since my April 17, 2023, Fifth Report**

**Updates Regarding OHA:**

With the work of this quarter, I would like to acknowledge Dr. Dana Hargunani who served as the CMO for OHA for several years during COVID-19 and then personally agreed to extend her time with the state to facilitate a warm handoff to the new leadership of Mr. Baden and Ms. Clarke. I have since met regularly with Mr. Dave Baden, in his interim capacity as the Director of OHA, and Ms. Ebony Clarke as the Behavioral Health Director. Working with them has been very positive. Ms. Lindsey Burrows, representing Governor Kotek's General Counsel, has been an active participant in meetings and has been extremely helpful ensuring timely responses from leadership to help negotiate elements of this case, including new legal challenges that seem to have appeared regularly for a time, and she has provided needed responses regarding issues raised during mediation processes.  Of note, Ms. Annaliese Dolph has also assumed a new position within the state and so has not been active in the meetings with the parties toward the latter half of these few months. As such Ms. Burrows remains the lead contact with the Governor's office for this *Mink/Bowman* work. Ms. Carla Scott and Ms. Sheila Potter have also worked diligently to stay abreast of the program leaders' efforts and the legal issues that continue to create challenges in this case. They have kept me apprised of new issues as they emerge, which is appreciated.  Mr. Cody Gabel, who was instrumental in orienting me and facilitating my work as the Neutral Expert when I started, will be shifting positions, and starting work through the Oregon Judicial Department. This marks another transition in staff, but OHA remains committed to the work Mr. Gabel was doing.  Ms. Clarke is in the process of actively recruiting managers within the Behavioral Health section of OHA and I look forward to hearing of her selections. In the meantime, she has created a

pathway for covering staff to help ensure that there are no gaps in knowledge to inform me and the plaintiffs of the work of OHA.

Overall, the participation of the current administration has been extremely positive and has helped facilitate a more concentrated effort in these last three months toward implementation planning for the other recommendations that came through my January 2022 report. The work with the new administration has been very aligned with the goals of compliance in this case, and the dialogue with the plaintiffs has allowed for a healthy debate of principles and policy priorities. This also was helpful in the negotiations with the entities involved in the mediation. That an agreement was reached was nothing short of remarkable and reflected good political will amongst individuals with very different vantage points in the matters raised in *Mink/Bowman*. It appeared that the issue of providing a balance to achieving compliance while addressing concerns raised by prosecutors, judges and others about needing "safety valves" were thoughtfully considered and the state did not ultimately object to Plaintiff's motions put forward for mediation.

While negotiations for mediation were taking place, I met several times with OHA and OSH leadership to re-review the June 2022 recommendations, and the state has just as recently as 7/19/23 presented a written workplan to the plaintiffs with new dates for accomplishing milestones toward those recommendations. This will require further vetting with plaintiffs but reflects the state's commitment toward implementation of a more complete system of supports to help achieve sustainable compliance and facilitating individuals in this matter receiving care they need outside of jails.

It should be noted that OHA staff from the Intensive Services Unit have also begun to meet with counties to review the RTP list. I have met several times with them running through these lists to understand barriers to discharge. I also attended a Multnomah County hearing regarding ready to place cases, and then was able to discuss those with OHA leadership. Work on the RTP list remains a key priority, though there is frustration with the number of letters that are sent to indicate individuals are ready to place into the community and the barriers to act on those letters. This continues to require attention.

OHA leadership has also continued to meet with the Oregon Program Design and Evaluation Services (PDES) to review progress on research they were asked to conduct under the leadership of former Behavioral Health Director Steve Allen.  The questions they are seeking to address include examining the backgrounds of individuals in the AA process, the outcomes of individuals who have received restoration services (both at OSH and in the community) and what can be learned from other states about the management of the AA population and restoration processes. This effort began before the appointment of the Neutral Expert, and I had met with PDES staff early on in my appointment. The work is going to pull information from interviews with approximately 100 people and access quantitative data.

Information reported in the PDES December 2022 report indicated that the field interviews are still revealing sentiments about a "broken system," but with strategies to adapt that have included dedicated AA court dockets, rapid forensic evaluation processes, and employment of peer specialists in various regions to assist with warm handoffs and helping clients stay engaged in treatment. The evaluation project has had several delays with hiring staff and accessing quantitative data. There was a plan that by June 2023 the qualitative data would be acquired and data use agreements for the quantitative data would be able to be processed. I will look forward to hearing of any further progress on this effort.

It should be noted that money was appropriated to allow for certain expansion including case management type services for individuals coming out of OSH. This will require further study.

**Oregon State Hospital Updates:**

Ms. Dolly Matteucci has contributed greatly to the activities related to this case, and her ongoing participation has been helpful for continuity and her sense of responsibility to help the state achieve compliance. She has noted that OSH requested 55 positions and the hospital was approved for this complement. The approvals were received within the last two months. The positions are working their way through HR processes. Many of the positions are clinical, including nursing admission positions. There are also approvals for security technicians, transport aids and activity coordinator positions that are in recruitment phases.

During the period between my last report and this report, OSH and OHA reached agreement with the private hospital intervenors in early May 2023 regarding the expedited civil admission criteria, although their motion to intervene was eventually struck down. A new version of the expedited admission criteria for patients on the OSH admission list under civil commitment or voluntary by guardian/health care representative status was finalized. The version was sent to the Court for a revised order that incorporated the new version of the expedited admission criteria under the 5/10/23 Amended Order by Judge Mosman. The new expedited admission criteria will potentially widen who can be admitted to OSH on a civil legal status.

OSH leadership agreed to meet with the private hospital leadership on a quarterly basis to track any issues that arise from the new expedited civil admission criteria. Within the document for the expedited civil admission criteria was an agreement that "all referrals, acceptances and denials, along with the rationale for such referrals, acceptances, and denials, shall be recorded in a de-identified tracking system kept by OSH and the private hospitals and reviewed on a quarterly basis" with OSH and OHA leadership and leadership from the private hospitals.

In the meantime, OSH has been adapting its Continuing Care Discharge Planning (CCDP) Form to align with the mediation agreement. I have reviewed and provided input into that form after hearing from judges and prosecutors and others as to what might be helpful information at the point of discharge back to court. I have also worked with OJD and OSH to help provide input on the new court orders that will be forthcoming considering the mediation agreement. However, there are still areas of those orders that require ongoing conferring between OSH and OJD.

Additionally, during these past few months, questions have emerged about treatment meant as "restoration." Some education was needed about individuals who may choose not to participate in group or talk therapies, and Judge Mosman's order clarified that participation in groups does not determine when the clock for restoration starts, as that begins at the point of confinement to the hospital. Still, other questions have surfaced about processes for medication treatment over objection via *Sell* processes and other related OARs. This is an area that I will continue to discuss with the staff and the parties to identify if there are any systemic barriers and work with OSH clinical leaders to help facilitate removal of any potential barriers to accessing medications or other treatment for people at OSH.

**Updates Regarding Mediation:**

A mediation process took place among several elected district attorneys, judges, county representatives, the private hospitals and the parties within *Mink/Bowman*. The framework for the mediation is available for viewing at the link regarding the "Final Term Sheet" at:
https://www.oregon.gov/oha/OSH/reports/Mink-Final-Term-Sheet.pdf

There are many elements to the framework, many of which were incorporated into the July 3, 2023 order by the Court. Key elements include no longer allowing persons charged with non-person misdemeanor crimes to be sent to OSH for restoration purposes, along with allowing for two potential extensions under very specific procedures and terms: one exception is for up to 30 days for discharge planning, and one exception is for extending the duration of restoration by 180 day increments for certain people charged with violent offenses for whom restoration has a substantial probability of being effective. The FES evaluators in those cases will need to render opinions about whether extended periods of restoration have the substantial probability of leading to a defendant's restoration within the six-month allowable time as well as in the "foreseeable future" for when community restoration is being considered.  I will be meeting with the FES evaluators to discuss these matters.

In addition to the parameters already noted, the framework document identified the state's commitment to some additional community placements at Northwest Regional Reentry Center (NWRRC), improvement of the civil admission expedited admission protocol (described elsewhere in this report), and the use of further mediation prior to a return to court when there are "supremacy clause disputes" on particular matters where state court orders may conflict with the federal court order.  In addition, the framework requires time for the shifts to be implemented with new forms and paperwork, as well as a requirement for reviewing outcomes through data and information sharing among the parties and the participants in mediation, who will confer with me as the Neutral Expert to help analyze information and input on the mediation outcomes vis a vis compliance  Finally, the state agreed to recommit to the recommendations laid out in my Second Report from June 2022, and as noted above has already been working with me on revising a document for deliberation with the plaintiffs and further presentation to the court.

**Court Processes and Issues that Do Not Appear to Comport with the "Mosman Order" Provisions:**

Despite the progress achieved in mediation, over the course of many months numerous case issues have surfaced that do not appear to comport with the provisions in spirit or intent of the Mosman Orders. Several of these have been brought to the attention of the Court (such as non-transport orders).

General Counsel and DOJ have brought several other cases to my attention to help interpret the various iterations of court orders that create nuanced changes regarding elements in question. The mediation agreement will allow some of these issues to be independently mediated or resolved through the Supremacy Clause if they cannot be resolved individually. Because of these vicissitudes, however, I asked the DOJ to provide information for my report to help the Federal Court understand the scope of the current issues. The data provided to me as of 7/14 includes the following:

*Number of Cases Past LOR limit with Non-Transport Orders*: 7 whose length of restoration has expired, 3 additional orders with non-transport language for whom the length of restoration has not yet expired

*Counties Involved*: Marion County
*Primary Issues*:
- The patients on the non-transport orders have exceeded the maximum allowable length of restoration, in contrast to the Mosman Order.

*Number of Cases with 30-day discharge extension Order*: 1*
*Counties Involved*: Marion County
*Primary Issues*:
- CMHP did not confer with OSH
- Does not appear to have an identified bed (though order did indicate that an interview was set 4 days after the order)

   *DOJ has indicated that they have heard of an additional case out of Washington County anticipated in the next week

*Number of Cases with 180-day extension order*: 3
*Counties Involved*: Washington, Benton, and Crook Counties
*Primary Issues*:
- Orders appear to be issued without hearing;
- In at least one case, without defense opportunity to be heard prior to order issuing;
- 1 case where patient was discharged already; attempted to extend retroactively;
- 1 case where petition filed by Chief Deputy DA, not Elected DA as required;
- 1 case where no petition was filed at all—just an order to extend.

**Legislative Updates:**

There is no current legislative package relevant to my recommendations, as the prior efforts to pass legislation on restoration time limits, and examine financial responsibilities for extended stays without discharge did not get picked up for formal legislative approval. There were many political variables that went into the prior outcome of the draft legislation not being heard in committee. The state is looking at options for legislative advances in the future but continues to weigh pros and cons of approaches. More of those details will likely be forthcoming as a newly formed commitment regarding the Second Report recommendations are made.

**Forensic Evaluation Models:**

I have not received the report from OJD leadership that the GAINS workgroup is finalizing regarding models to consider for forensic evaluation services in Oregon. It is my understanding that it is still being processed within the workgroup run by OJD.

At the end of May 2023, a communication went out by OSH to inform stakeholders of the growing demand on OSH forensic evaluators. As depicted above in **Figure 4**, the number of evaluations that the 11 full-time and 3 part-time OSH evaluators were responsible for conducting was becoming unmanageable for timely evaluations. The backlog of cases was reflected in the announcement that FES was scheduling evaluations as far out as December 2024. As such, OSH leadership issued a letter and held a stakeholder meeting to explain the decision to have a prioritization scheme for evaluations. The OSH and OHA leadership sought my input on this plan.

In the communication letter issued by Superintendent Matteucci, she announced that beginning 6/5/23, OSH would prioritize ORS 161.370 and ORS 161.315 evaluations of forensic patients that reside at OSH. Following that group of evaluees, other prioritization would be for the completion of evaluations of in-custody defendants. As such the communication informed the public that evaluations other than OSH evaluations would be prioritized for those in jail (for persons under ORS 161.370, 161.365, and 161.315 orders, respectively), followed by evaluations of defendants in the community (for those ordered for evaluation under ORS 161.370, then ORS 161.365, respectively).

The communication also encouraged stakeholder courts to allow FES evaluators to testify remotely, and recommended elimination of duplicative evaluations, not requiring evaluations for defendants on warrant/abscond status, not requiring community evaluations if a community restoration program is no longer providing a service to the defendant, having end dates for community restoration, and no longer requiring evaluations for individuals who do not appear for evaluation interviews. It is unclear at this time how these new priority schemes will impact evaluation efficiencies. Depending on the findings of the GAINS center group, there may be some value for Oregon in shifting how evaluations are organized.

**Input from Prosecutors, Counties and Judges who Participated in Mediation:**

As I noted in my April report, much of what has been discussed has been under the cloak of mediation and will not be repeated here. Once initial concerns were raised, there was a great deal of enthusiasm for dialogue and problem solving to ensure that the hospital and the community are working together for a more robust and effective system of competency-related services. The mediation agreement reflects the negotiations that took place to match the concerns that were raised by all participating sides. Going forward it will be important to continue to have input from these important stakeholders and I am appreciative of their willingness to confer with me and with the parties throughout the mediation processes.

**Input from CMHPs:**

There have been a few discussions with representatives from the CMHP system in these last few months. I thank Ms. Cherryl Ramirez for her persistence and interest in helping solve system issues in this matter. Recent discussions included concerns that staffing that was allocated to OSH for help with the additional work of the Mosman Order was a positive change, but that this same type of allocation was not received for community-based services. There are ongoing concerns about limited staff availability and the need to look at all options for community placements. There appears to be a willingness to continue to confer around barriers to discharge, even if there are concerns about the recommendation in my Second Report for financial incentives and risks associated with discharges that are not timely. I especially appreciated hearing recently of some of the ideas related to the complex populations that CMHPs are supporting that require innovative strategies to foster engagement.

Because there was so much work related to mediation this past few months, opportunities for ongoing discussions with the CMHPs will be helpful in addressing barriers to compliance. I have been scheduled to meet with their Association later this week to hear more of their perspectives. Ms. Clarke and her team continue to meet with CMHP leadership regularly and there are plans for Ms. Matteucci to join in some of these meetings.

**Information from Progress Reports to the Neutral Expert:**

Progress reports are submitted to me monthly, pursuant to the Court's order. They are also delineated on the state's website to help increase transparency around these matters (see: https://www.oregon.gov/oha/OSH/Pages/mink.aspx ). The most recent progress report from July 2023 shows details of the latest work being done by the state and will not be summarized here. Instead, I note to the Court that there have been several meetings between me and the defendants to review in detail all recommendations that had been made previously in this case and to delineate which are complete and which need to be developed further as part of the state's recommitment to the work. New timelines will also need to be established for completion of priorities.

The state presented a preliminary new draft workplan on the progress toward the recommendations in an all-parties meeting on 7/19/23. Plaintiffs and I will respond to that draft workplan, and once completed it will be submitted to the Court. This will allow easier tracking of progress being made for areas outside of the mediation document.

**Concluding Comments and Recommendations:**

As of July 1, 2023, 42 people were waiting in jail for admission, and these individuals had been waiting an average of 9.3 days, with some waiting as many as 17 days. In these last three months, there were some trends toward longer waits for admission and discharge. Thus, at this time, the state has not yet achieved compliance consistent with the Court's order. Whether seven (7) days is the "magic number" before which the negative impacts of jail become untenable cannot be said, as the care and treatment in jail varies by jail, and the needs of defendants are individually determined by the nature of what renders them incompetent and any other medical issues they may have. However, the metric of admission of AA defendants within seven days of the court order is the driving goal for the state to achieve compliance in this case. According to some of the projections produced by the state, there was concern that this would never be achievable if admission order rates continued at the same pace they have been over the last years. Given that July has been a "slow" month gives some hope, but one month of data does not fix the *Mink/Bowman* issues. Still, with July order rates appearing lower than they have been in years as a per month rate of orders, OSH has been able to admit more patients to lower the number on the list. This will be reported in more detail in my next report, and at that time there can be further examination of projections of whether compliance as currently defined will be feasible in the near term.

Since my report in April 2023, there has been a settling in of the new leadership at OHA, and positive participation from Governor Kotek's Office. The participation of these representatives in the work of this case has been greatly appreciated and productive. Overall, most of the efforts during this quarter related to work to reach agreement through a mediation process lead by Judge Beckerman. I was grateful for her expertise in navigating the very different positions and helping them be expressed openly so that a compromise framework could be reached. The plaintiffs themselves, in particular Mr. Jesse Merrithew, who worked closely with Ms. Cooper, helped drive much of the work by making initial proposals that allowed for refinement and debate. The mediation terms of the agreement will now require monitoring to determine what it means for overall compliance. To that end, I will continue to

work with the participants of the mediation process to help identify parameters to measure its "success."

At this time, I would not recommend substantive changes to the course this case has taken as time will be needed to see the current efforts and effects play out across the state. I would, however, I recommend a focus on the following:

1. **The State Should Continue to Work on an Implementation Plan for the Second Report's Recommendations that is agreed to by the Plaintiffs:** It should be noted that time limits on restoration became the primary focus of action for this case as administrative changes were taking place. Yet, my recommendations outlined in my Second Report were comprehensive and went beyond that one element, which I viewed as only part of a pathway to achieve sustained compliance and improve services for individuals in the AA process to help reduce the use of jails as waiting facilities and reduce unnecessary demand on OSH for restoration. Thus, I have repeatedly advised the parties to return to the work of the Second Report recommendations. There have been countless pivots required, however, with the various stages of this complex litigation during administration shifts. Nonetheless, in the next several weeks there should be a revised agreement between the parties to implement the recommendations from my June 2022 Second Report with new timelines for deliverables. I recommend that the State finalize this with the agreement of the plaintiffs and that it be submitted to the Court either through the parties or as an addendum to this report so that it can be incorporated officially into the Court's order for implementation.

2. **Participants in the Mediation Process should Track Impacts of the Mediation Agreement and and the July 3, 2023 Court Order:** The mediation agreement is posted on the state's *Mink/Bowman* website. Embedded in that agreement are provisions to review the efficacy of the September Order and its modifications with input provided by Amici to help facilitate that review. This work should be prioritized over the next several months for timely review by the fall of 2023.

3. **Focus on Discharges:** As noted in my prior reports, there remain too many people for whom discharge appears slowed. Referrals and ready-to-place letters are submitted repeatedly but to no avail. Over the next interim period more work will be needed to focus on discharges and how to affect them. I will continue to work with the parties on this matter.

4. **Continue to Track Progress Toward Compliance:** Regular data reporting should continue in earnest with new issues being brought to the attention of the parties.

5. **Foster Ongoing and Regular dialogue with the Amici:** I have recommended regular meetings with the Amici involved in the mediation. The parties have agreed to such meetings and invitations will go out for scheduling.

6. **Limit Community Restoration to its Intended Purpose and Study its Utilization:** Although this recommendation will be addressed in the forthcoming agreement between the parties as it was delineated in my June 2022 report, I reiterate it here. This part of the system will impact the OSH restoration system and vice versa. Extended community restoration that is essentially extended court oversight of individuals who, but for their disabilities, would not be under pre-

trial supervision for that length of time, raises a number of concerns regarding potential *Olmstead* and ADA violations. Legislation to limit the duration of restoration recently was dropped from consideration, and in my opinion, it should again be elevated. In the meantime, I recommend the parties focus on studying these issues further.

7. **Continue to Consider the Housing Emergency Declaration and Other Active Community Plans as a Potential Avenue for Further Remedies:** This was delineated in my April report and includes examining whether the Housing Emergency Declaration can be Leveraged for the AA and GEI Populations and whether additional Executive Orders would be helpful, as well as emphasizing CCBHC and 988 diversion strategies for their potential to help the state achieve compliance.

8. **Pursue Legislative Remedies at the Earliest Opportunity:** The forthcoming agreement of the state to recommit to my prior recommendations will include a plan for pursuing legislation along the lines I recommended. It will be important to get started with legislative packaging given the lengthy gaps in legislative action occurring.

9. **Ongoing Meetings of the Parties with the Neutral Expert.** I recommend ongoing meetings between the parties and the Neutral Expert to review data and to monitor progress.

I would like to acknowledge the many individuals whose perspectives and input once again have been invaluable in shaping my contributions to the Oregon behavioral health AA and GEI efforts and the broader behavioral health system. I commend the efforts of the parties, and the work of the elected and other officials who helped debate important issues, shed light on perspectives and worked collaboratively with me and each other to identify a potential path forward through the mediation agreement. Although it remains to be seen as to whether it will help the state in achieving compliance, the work in executing that agreement, in my opinion, went far to help foster communication amongst many entities who have important and different perspectives.

I am also very appreciative of Judge Stacie Beckerman for her able mediation skills and her work with me in helping move this matter in a positive direction on behalf of the individual defendants across the state ordered for restoration services at OSH but waiting in jails to receive them.

**Respectfully Submitted,**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*