### Debra A. Pinals, M.D.

Board Certified in Psychiatry, Forensic Psychiatry, and Addiction Medicine

**Neutral Expert Tenth (10th) Report**
**Regarding the Consolidated *Mink and Bowman* Cases**

**Date of Report:** November 12, 2024
**Neutral Expert:** Debra A. Pinals, M.D.

**Background and Context of this Report:**

On 12/21/21, The Honorable Michael W. Mosman, U.S. District Judge for the United States District Court for the District of Oregon, Portland Division, entered an order appointing me, Dr. Debra Pinals, as the Neutral Expert in the *Mink/Bowman* matter, granting a Stipulated Motion from defendants at the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) and plaintiffs Jarrod Bowman, Joshawn Douglas-Simpson, Disability Rights Oregon, Metropolitan Public Defender Services, Inc., and A.J. Madison. The Court's order consolidates two cases, *Bowman et al v. Matteucci* et al (Case Number: 3:21-cv-01637-MO) and *Oregon Advocacy Center et al v. Mink* et al (Case Number: 3:02-cv-00339-MO) and identifies *Mink* as the lead case (see below for summary). Through this consolidation, the *Bowman* case was reassigned from the Honorable Marco A. Hernandez to Judge Mosman.

Judge Mosman ordered that the Neutral Expert should "make recommendations to address capacity issues at the Oregon State Hospital." The order delineates that the first report from the Neutral Expert include "suggested admissions protocol that addresses the admission of patients found unable to aid and assist in their own defense under ORS 161.370 (.370 patients) as well as patients found to be Guilty Except for Insanity (GEI patients)." The Court further ordered a second report by the Neutral Expert to include "a short report and recommendations for a proposed long-term compliance plan for OSH." After submitting my initial reports, on 6/7/22 the Court ordered my ongoing appointment and stated, "Beginning on September 7, 2022, Dr. Pinals will provide brief quarterly reports to update the Court regarding compliance status and any needed additional recommendations to address any barriers to achieving compliance." In total, I have produced and provided the following reports to the Court in this case:

- First Report, 1/30/22
- Second Report, 6/5/22
- Third Report, 9/15/22
- Fourth Report, 12/21/22
- Fifth Report, 4/17/23
- Sixth Report, 7/24/23
- Seventh Report, 10/18/23
- Eighth Report, 12/18/23
- Ninth Report, 5/20/24

*OAC v. MINK*
*3:02-CV-00339-AN*
*DRO EX. C*

On 5/10/23 Judge Mosman issued an Amended Order, followed by his 7/3/23 Second Amended Order in this matter.  The Second Amended Order contained the following language:

> This order shall terminate upon the Neutral Expert reporting to this Court that OSH/OHA has timely admitted A&A and GEI patients for at least three consecutive months, and that the termination of this order would not cause the Defendants to fall back out of compliance. For purposes of this order "timely admission" means within seven days of a State Court order delivered to OSH ordering that the patient be admitted.

As part of the backdrop to the Second Amended Order, the parties and recognized amici entered into mediation, and a Mediation Final Term Sheet (June 2023) delineated that a report to the Court should be submitted reviewing the efficacy of the September Order, taking in input from the parties and the amici as follows:

> Review of September Order Efficacy. On or before October 2, 2023, OSH, OHA, plaintiffs, and Dr. Pinals will review the efficacy of the September order with regard to achieving compliance, factoring in any unintended negative consequences. OSH will prepare a report of their findings, and Dr. Pinals will incorporate that review and her opinions about the efficacy of the order into a report to the Court on or before November 15, 2023. Amici agree also to submit their perspectives in writing to OSH, OHA, and Dr. Pinals on or before October 2, 2023.

Prior report highlights include my Seventh report on 10/18/23, articulating a new set of recommendations that updated the recommendations in my Second Report. In my Eighth Report I offered my opinions "about the efficacy of the order", which was set to expire on 12/31/23. I recommended that the order be extended for one year, and this was subsequently ordered by Judge Mosman.  There were several threads of litigation since that time, most especially related to Supremacy Clause considerations. Judge Mosman ruled on 3/6/24 noting that the Supremacy Clause applied regarding a case out of Marion County. That same day, the *Mink/Bowman* case was re-assigned to Judge Adrienne Nelson.

The Honorable Adrienne Nelson issued two rulings related to this matter on 4/4/24 denying motions to intervene by Marion County and by a group of other Intervenors. An order on 6/20/24 for mediation set for 8/26/24 was entered by Magistrate Judge Stacie F. Beckerman. On 6/27/24 Judge Nelson granted Oregon Crime Victims Law Center's motion to appear as amicus curiae. Judge Nelson also granted orders related to the matter pertaining to the Legacy Health System case, which is yet unsettled.

Given the work being done since mediation and by the parties, Judge Nelson granted an extension of the timeline for this report, to be submitted on or before 11/12/24.

**Background and Summary of the Two Consolidated Cases:**

A more detailed background to these cases is reviewed in my prior reports. In summary, state defendants were previously found by the Ninth Circuit (*OAC v. Mink, 2003*) to be out of compliance with Constitutional requirements and were ordered to admit individuals found unable to Aid and Assist in their criminal cases to Oregon State Hospital for restoration within seven (7) days of receipt of an order for their commitment to OSH for restoration. In December 2021, after further litigation, the parties entered an interim settlement agreement that involved the appointment of a Neutral Expert to provide

recommendations to help achieve compliance with the Ninth Circuit's seven (7) day admission requirement as outlined above.

In a separate litigation, in November 2021, plaintiffs Jarod Bowman and Joshawn Douglas-Simpson brought action against the OSH and Oregon Health Authority (OHA) (plaintiffs were later joined by Metropolitan Public Defender) for failure to timely admit these individuals adjudicated Guilty Except for Insanity (GEI) by the Multnomah County Circuit Court, after The Honorable Nan Waller ordered them to OSH for treatment, without unreasonable delay. After further litigation, The Honorable Marco A. Hernandez, United States District Court Judge, agreed with the defendants that a consolidation of the *Mink* and *Bowman* cases made sense.

In accordance with and in response to my First Report recommendations, the has been a single waitlist for people waiting in jail for a bed at OSH, whether GEI or under the Aid and Assist process. Waiting times for individuals on the GEI track and on the AA restoration track are still reviewed separately as part of this consolidated litigation.

**Qualifications to Perform this Work:**

I have worked for over twenty-five years as a clinical and academic and forensic psychiatrist, and have functioned for over twenty years in state and local level behavioral health administrative leadership, management, policy and legislative development, clinical treatment, forensic evaluation, and consultative roles across several U.S. jurisdictions. Other details are provided in my First Report.

**Sources:**

Background court and legal documents for this case upon which I continue to rely include:

1. Mink 0339 COURT Order Consolidating Cases and Appointing Neutral Expert #240, signed 12/21/21;
2. Bowman 1637 COURT Order Consolidating Cases and Appointing Neutral Expert #21, signed 12/21/21;
3. Bowman 1637 COURT Notice of Judicial Reassignment from Judge Hernandez to Judge Mosman #20;
4. *Mink* and *Bowman* Interim Agreement, Filed 12/17/21;
5. *Bowman* 1637 PLD Plaintiffs 1st Amended Complaint #22;
6. *Mink* 0339 Court Order Granting Motion for Stay of Deadlines. Joint Status and 5/9/22 Joint Status Report;
7. Order on Joint Stipulation to Continue Appointment of Neutral Expert, signed by the Honorable Michael W. Mosman, 6/7/22;
8. *Bowman* Opinion and Order, Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Trailing Case), signed by Judge Mosman 8/16/22;
9. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 9/1/22;
10. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), No. 6:22-cv-01460-MO (Member Case) Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 5/10/23;

11. Oregon Advocacy Center et al., v. Mink et al. Case No. 3:02-cv-00339-MO (Lead Case) Mediation Final Term Sheet (June 2023); and
12. Case No. 3:02-cv-00339-MO (Lead Case), Case No. 3:21-cv-01637-MO (Member Case), Second Amended Order to Implement Neutral Expert's Recommendations, signed by The Hon. Michael W. Mosman on 7/3/23.

Additional recent court case activity that I have reviewed since my last report includes:

1. Number: 3:21-cv-01637-MO, Document No. 259, Opinion and Order: Defendants' Petition for Expedited Ruling on Supremacy Clause, signed on 3/6/24 by Judge Michael W. Mosman;
2. Case Number: 3:21-cv-01637-MO, Notice of Case Reassignment to Judge Adrienne Nelson, 3/6/24;
3. Case No. 24CN00829, Order to Show Cause re Contempt, Marion County Circuit Court, dated 3/7/24, signed by Judge Audrey Broyles;
4. Case No. 3:02-cv-00339-MO (Lead Case), Opinion and Order: Intervenors' Motion to Intervene, entered by Judge Adrienne Nelson, 4/4/24;
5. Case No. 3:02-cv-00339-MO (Lead Case), Opinion and Order: Amicus Curiae Marion County's Motion to Expedite or Accelerate Ruling and its Second Motion to Intervene, entered by Judge Adrienne Nelson, 4/4/24;
6. Legacy Health System; Peacehealth; Providence Health & Services-Oregon; Legacy Emanuel Hospital & Health Center, DBA Unity Center for Behavioral Health; St. Charles Health System, Inc. v. v. Allen (OHA) appeal documents, Appeal No. 23-35511, including Plaintiffs-Appellants' Opening Brief, Appellee's Brief and Legacy Health Reply;
7. State of Oregon v. Charly Josh Velasquez-Sanchez Mandamus Proceeding Motion to Intervene by Audrey J. Broyles, Circuit Court Judge, Marion County Circuit Court, 5/10/24 and related cases;
8. Velasquez-Sanchez Mandamus Proceeding, Intervenor's Memorandum, dated 5/20/24, signed by Marion County Circuit Court Judge Audrey J. Broyles;
9. State of Oregon, Plaintiff-Adverse Party, v. Charly Josh Velasquez-Sanchez, Defendant-Relator, Marion County Circuit Court, 20CR08901, 21CR46350, 22CR35776, 23CR28431, Peremptory Writ of Mandamus and Appellate Judgment S071004, issued 5/21/24;
10. State of Oregon, Plaintiff-Adverse Party, v. Charly Josh Velasquez-Sanchez, Defendant-Relator, Marion County Circuit Court, 20CR08901, 21CR46350, 22CR35776, 23CR28431, Order Allowing Petition for Alternative Writ of Mandamus and Directing State Court Administrator to Issue Peremptory Writ of Mandamus S071004, dated 5/21/24;
11. Legacy Health System et al. v. Sejal Hathi, in her official capacity as Director of Oregon Health Authority, Memorandum, submitted 5/8/24;
12. State of Oregon vs. Charly Josh Velasquez-Sanchez, Case No.: 20CR08901, 21CR46350, 22CR35776, 23CR28431, Order by Judge Audrey Broyles, 6/13/24;
13. Oregon Crime Victims Law Center's Motion to Appear as Amicus Curiae, ECF 498, Associated Cases: 3:02-cv-00339-AN, 3:21-cv-01637-AN, ordered on 6/27/24;
14. Suspension of Supremacy Clause dispute mediations, Ordered by Magistrate Judge Stacie F. Beckerman, entered on 7/15/24;
15. Legacy Emanuel Hospital and Health Center, Legacy Health System, Peace Health, Providence Health & Services-Oregon, St. Charles Health System, Inc. filing for Unopposed Motion for Leave to File Amended Complaint/Petition, filed 10/1/24, and associated declarations.

16. Plaintiffs' Unopposed Motion for Leave to File Second Amended Complaint, ECF 511, ordered by Judge Adrienne Nelson on 10/3/24;
17. Notice of Inability to Comply with Second Amended Order to Implement Neutral Expert's Recommendations, Case No. 3:02-cv-00339-AN (Lead Case), Case No. 3:21-cv-01637-AN (Member Case), Case No. 6:22-CV-01460-AN (Member Case), submitted by Carla A. Scott, on 10/4/24;
18. Proposed Intervenor-Plaintiff National Alliance on Mental Illness-Oregon's Unopposed Motion to Intervene, Legacy Emanuel Hospital et al v. Sejal Hathi MD, Case No. 6:22-cv-01460-AN, filed 10/15/24; and
19. Defendant Sejal Hathi's Unopposed Motion for Extension of Time, ECF 519, Ordered by Judge Adrienne Nelson on 10/28/24. Associated Cases: 3:02-cv-00339-AN, 3:21-cv-01637-AN, 6:22-cv-01460-AN.

Documents I reviewed since my prior report include the following:

1. OSH Forensic Admission and Discharge Dashboard and Restoration Limit Report produced monthly and reporting date reflecting the month prior to report production;
2. OSH Forensic Admissions and Discharge Bi-Weekly Reports;
3. Average Wait Time Prior to Admission Progress Metrics for Benchmark Goals, produced by OSH monthly;
4. GEI dashboard drafts;
5. OSH-PSRB Conditional Release Data Dashboard, released on 10/22/24 with cover memorandum from Dr. Sara Walker, Interim Superintendent and Chief Medical Officer, OSH;
6. *Mink & Bowman* Monthly Progress Reports from OHA from June through November 2024;
7. Miscellaneous case information sent under protective order;
8. Miscellaneous media reports;
9. Mink/Bowman Comprehensive Plan drafts;
10. Draft Memorandum regarding Processes for Medication Administered by the Oregon State Hospital to Aid and Assist Patients
11. Documents associated with the Mink Restoration Time Limits and Exceptions Workgroup, led by Kevin Neely;
12. LOCUS guidance and Clinical Progress Update;
13. Request for Information (RFI) regarding Community Service Needs for the AA and GEI populations, issued 8/29/24;
14. ACR Hospital Civil Commitment Length of Stay >60 days data;
15. Mink/Bowman OHA Project Progress Summary as of 7/29/24;
16. OHA 2025-27 Policy Package, Package 552 related to House Bill 5024(2021), Senate Bill 606 (2023);
17. Ideas for Potential Opportunities submitted by Washington County Representatives with cost estimates;
18. Mink Restoration Time Limits and Exceptions Workgroup Report, dated 10/3/24, workgroup convened by Kevin Neely and Eric B. Lindauer;
19. OHA RTP Analysis and Written Summary provided 10/10/24;
20. RTP Report Summary PowerPoint presented by OHA regarding 10/7/24-10/11/24;
21. Appeal of PSRB Dangerousness Rule filed as DRO v. PSRB No.1-2024; 3-2023, filed 5/24/24;
22. Capacity Report as of 7/16/24 produced by OHA outlining HB 5024 capacity expansion;

23. Behavioral Health Housing and Residential Treatment Investments for Aid and Assist PowerPoint by OHA, dated 6/12/24;
24. Medication, Informed Consent, and Sell Order Data for Mink/Bowman, produced September 2024;
25. LGAC CCBHCs PowerPoint provided by OHA;
26. Preliminary Community Navigator Data; and
27. Housing capacity expansion summary data.

Relevant meetings during this interim period since my prior report included the following meetings and discussions:

1. Periodic communications with Judge Nelson and Judge Beckerman;
2. Meetings with various OHA and OSH staff, including leadership and forensic evaluators;
3. Regular meetings and several ad hoc meetings with OHA, OSH, DRO and MPD representatives and leaders both separately and together as well as email communications. In addition, I met with staff from these agencies at various points in this interval period.
    a. From OHA, OSH, the weekly/bi-weekly leadership meetings have included:
        i. Current administrative leaders including OHA Director Dr. Sejal Hathi, Kristine Kautz, OHA Deputy Director, Ms. Ebony Sloan Clarke, Director of Behavioral Health, OHA, along with Samantha Byers, Lisa Nichols and Bonnie Cappa from OHA HSD/ISU and OSH Interim Superintendent and Chief Medical Officer Dr. Sara Walker, as well as Dr. Morgyn Beckman and Dr. Andy Butros of the Forensic Evaluation Services
    b. From Oregon Department of Justice (DOJ):
        i. Carla Scott, DOJ Special Litigation Unit Counsel
        ii. Sheila Potter, Deputy Chief Counsel, Special Litigation Unit, Oregon DOJ
    c. From Disability Rights Oregon (DRO):
        i. Dave Boyer, Managing Attorney
    d. From MPD as plaintiff party, Jesse Merrithew of Levi Merrithew Horst PC
4. Meetings with the parties to this case along with Amici representatives and their attorneys including:
    a. Mr. Billy Williams, along with elected Washington County District Attorneys Kevin Barton, and Paige Clarkson;
    b. County Counsel for Washington and Marion Counties;
    c. Mr. Keith Garza, Judge Waller, and Judge Hill as involved Amici;
    d. Mr. Eric Neiman, as representative of the Private Hospitals as Amici.
5. Meetings related to GEI patients attended by Dr. Alison Bort, PSRB Director, Dave Boyer of DRO, OSH and OHA leadership including Dolly Matteucci and Lisa Nichols and other representative staff;
6. Meetings with Ms. Cherryl Ramirez, Director AOCMHP, and representatives of CMHPs across Oregon;
7. Meetings with Kevin Neely and representative system partners to examine potential legislation related to restoration time limits and exceptions workgroup 1/26/24, 3/22/24, 4/26/24, 5/31/24, 6/12/24, 7/26/24, 8/16/24, and 9/20/24 and review of associated documents;
8. Visit to Northwest Regional Reentry Center on 8/27/24, attended by Ms. Bonnie Cappa from OHA and NWRRC staff including:
    a. Brian Martinek, Executive Director

       b.  Jeff Spencer, Operations Manager
       c.  Renn Salkind, A&A Case Manager
       d.  Ben Chittock, A&A Case Manager

9.  Meeting with Washington County representatives on 8/27/24, including:
       a.  Kevin Barton, District Attorney
       b.  Jeff Maclane, DDA
       c.  John Koch, Undersheriff, Washington County Sheriff's Office
       d.  Joel Peterson, DDA
       e.  Eaman McMahan, County Counsel
       f.  Mjere Simantel, Director Washington County HHS
       g.  Chance Wooley, HHS

10. Tour of Hawthorne Center, Washington County region, on 8/27/24
11. Tour of OSH Junction City Campus on 8/28/24; and
12. Meeting with the MAHPS OSH Executive team on 11/5/24.

**Glossary of Acronyms and Terms Used in this and Prior Reports**

A&A or AA: Aid and Assist
CCOs: Coordinated Care Organizations
CCBHCs: Certified Community Behavioral Health Clinics
CFAA: County Financial Assistance Agreements
CMHPs: Community Mental Health Programs
DOJ: Department of Justice Oregon
DRO: Disability Rights Oregon
FES: Forensic Evaluation Services
GEI: Guilty Except for Insanity
HLOC: Hospital Level of Care
IMPACTS: Improving People's Access to Community-Based Treatment, Supports, and Services
ISU: Intensive Services Unit
MOOVRS: Multi-Occupancy OSH Vacancy Resource & System Improvement Team
Mosman Order: As of this report, this will refer to the July 3, 2023 Second Amended Order unless otherwise specified
MPD: Metropolitan Public Defender
OCBH: Oregon Council for Behavioral Health
OCDLA: Oregon Criminal Defense Lawyers Association
OHA: Oregon Health Authority
OPDS: Oregon Public Defenders Services
ORPA: Oregon Residential Provider Association
OSH: Oregon State Hospital
PDES: Program Design and Evaluation Services
PSRB: Psychiatric Security Review Board
SHRP: State Hospital Review Panel
SRTF: Secure Residential Treatment Facility

**Summary of Activities and Updates During this Reporting Period:**

The reporting period between this report and my prior report spanned just over 5 months. In part this is related to the numbers of turns this case has taken since my last report. As I noted in my prior report, the state appeared to be nearly moving toward losing ground with compliance. Two heavy admissions months at OSH then tipped the state out of compliance. With the state once again out of compliance with the seven-day admissions limit, the work needed has once again ramped up. Mediation took place at the end of August and there were many meetings and conversations with amici and with the parties in anticipation of the mediation and after it took place. Although mediation did not result in a specific new agreement to date and is currently on pause per Judge Beckerman, the conversations outside of mediation have helped further catalyze movement on the part of the state. The most intensive work therefore continued to be to work with the state on the activities that would be needed to return to compliance.

In addition to ongoing work with the parties to develop remedies and identify barriers to compliance, an area of significant activity in which I have also engaged during this interim reporting period has involved reviewing individual cases sent to me under the Protective Order for informational purposes and several cases that have been brought to my attention for consultation as they do not fit neatly within the parameters of the Mosman Order. I have spoken with DOJ attorneys regularly about cases that they are working on related to potential contempt findings based on state court judges' rulings.

**Data Summaries**

*Background Data*: In my last report dated 5/20/24, I reported that "the state has been maintaining compliance with the 7-day admission...but the numbers are hovering near non-compliance at times." Because May and July concluded with record numbers of restoration orders (127 and 128, respectively), OSH quickly went out of compliance. As of the time of this writing, since monthly orders have not exceeded 100 in August, September and October, the state's data shows some trends back toward compliance, but overall the state has been severely out of compliance for almost six months. **Figure 1** and **Table 1** show the current trends. As of 10/31/24, the average numbers of days people ordered for restoration were waiting for admission was 12.6 days, and the average days a person waited prior to admission was 26.9 days. The number of people ready to place into the community increased, with 76 individuals on the identified list as no longer needing hospital level of care (HLOC) by 10/31/24 among those in the AA system. There were 52 people found GEI waiting an average of 223.7 days who were thought by the hospital to no longer need HLOC.

*[INTENTIONALLY LEFT BLANK]*

## Figure 1. Data Dashboard Charts Reflecting Progress in *Mink/Bowman* as of November 1, 2024

**OSH Forensic Admission and Discharge Dashboard**
**October 2024**







OSH Quality Management – Data and Analysis
*'Informing the Pursuit of Excellence'*

Page 1 of 5
11/4/2024

## Table 1. Individuals Awaiting Admission

| | As of 1/5/22 | As of 1/28/22 | As of 5/1/22 | As of 9/1/22 | As of 12/1/22 | As of 4/1/23 | As of 7/1/23 | As of 11/1/23 | As of 4/1/24 | As of 11/1/24 |
|---|---|---|---|---|---|---|---|---|---|---|
| **1. Regarding individuals on OSH admission list with signed and received A&A court order** | | | | | | | | | | |
| Total Number of individuals | 46 | 93* | 67 | 70 | 104 | 51 | 42 | 24 | 11 | 76 |
| Average days current individuals have been waiting | 15.8 days | 22.5 days | 16.2 days | 19.8 days | 20.7 days | 11.1 days | 9.3 days | 3.5 days | 5.4 days | 12.6 Days |
| Range of Days on waitlist | 2-23 days | 3-44 days | 2-28 days | 3-34 days | 1-36 days | 1-18 days | 1-17 days | 1-9 days | 3-10 days | 1-28 days |
| **2. Regarding individuals found GEI and ordered to OSH** | | | | | | | | | | |

|  | As of 1/5/22 | As of 1/28/22 | As of 5/1/22 | As of 9/1/22 | As of 12/1/22 | As of 4/1/23 | As of 7/1/23 | As of 11/1/23 | As of 4/1/24 | As of 11/1/24 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total number of individuals | 15 | 4 | 3 | 4 | 0 | 1 | 1 | 1 | 0 | 2 |
| Average days waiting | 45.6 days | 23 days | 18 days | 13.0 days | N/A | 26.0 days | 10.0 days | 1.0 days | N/A | 13.0 days |
| Range of Days on waitlist | 1-110 days | 17-28 days | 12-26 days | 3-20 days | N/A | 26 days | 10 days | 1 day | N/A | 9-17 days |

*The marked increase in numbers awaiting admission was most likely a residual of the pauses in admissions due to COVID-19

**Figure 2** represents a new dashboard that was developed between the state, the PSRB leadership as well as DRO and the neutral expert, in response to my earlier recommendation that there be a review of PSRB processes with recommendations. Metrics from this work demonstrate that for the most part (i.e., in approximately 93% of cases), the PSRB does approve community placement in accordance with recommendations from community evaluations.

### Figure 2. OSH/PSRB Conditional Release Dashboard





**Table 2** and **Table 3** show the capacity and census at OSH, which uses an operational active capacity metric and has not shown any significant changes since my prior report. Overall, the hospital continues to always operate at nearly full active capacity.

**Table 2: OSH Bed Capacities as of 11/1/24**

| Site | Licensed Capacity | Active Capacity |
|---|---|---|
| Salem Main Campus HLOC | 502 | 474 |
| Salem Main Campus SRTF | 90 | 87 |
| **Salem Main Campus Total** | **592** | **561** |
| Junction City HLOC | 75 | 72 |
| Junction City SRTF | 75 | 72 |
| **Junction City Total** | **150** | **144** |
| **OSH Total** | **742** | **705** |

**Table 3. OSH Census as of 11/1/24**

| Date | Aid & Assist | PSRB | Civil Commitment | Other | Total |
|---|---|---|---|---|---|
| 9/1/2022 | 410 | 275 | 14 | 1 | 700 |
| 12/1/2022 | 396 | 279 | 13 | 0 | 688 |
| 4/1/2023 | 400 | 279 | 11 | 1 | 691 |
| 7/1/2023 | 389 | 281 | 13 | 1 | 684 |
| 11/1/2023 | 366 | 291 | 17 | 1 | 675 |
| 4/1/2024 | 360 | 288 | 30 | 0 | 678 |
| 11/1/2024 | 375 | 270 | 27 | 8 | 680 |

One year's worth of detailed data (see Table 4) shows consistently high numbers of new orders for restoration at OSH, with record numbers in May and July 2024. Looking back to 2012, one can see an ever-increasing trend for new orders (See **Table 4** and **Figure 3**). GEI admissions do not show significant variability.

**Table 4. Aid and Assist and GEI Orders**

| Number of Orders Received | Aid & Assist | GEI |
|---|---|---|
| October 2023 | 97 | 3 (2 standard / 1 revocation) |
| November 2023 | 98 | 3 (2 standard / 1 revocation) |
| December 2023 | 92 | 3 (2 standard / 1 revocation) |
| January 2024 | 83 | 4 (4 standard / 0 revocation) |
| February 2024 | 73 | 9 (3 standard / 6 revocation) |
| March 2024 | 87 | 2 (2 standard / 0 revocation) |
| April 2024 | 99 | 1 (1 standard / 0 revocation) |
| May 2024 | 127 | 7 (3 standard / 4 revocation) |
| June 2024 | 90 | 2 (0 standard / 2 revocation) |
| July 2024 | 128 | 3 (0 standard / 3 revocation) |
| August 2024 | 99 | 4 (3 standard / 1 revocation) |
| September 2024 | 91 | 6 (6 standard / 0 revocation) |
| October 2024 | 100 | 6 (3 standard / 3 revocation) |

**Figure 3. Aid & Assist Admissions/Orders Trends through October 2024**



**Figure 4** shows data related to benchmarks that had previously been set to attain compliance when wait times significantly increased toward winter of 2021. This trend line shows the significant increase in days waiting around May 2024, the first month with a record number of AA orders for restoration at OSH.  Since that increase, the state has not returned to compliance, though the trend line appears to be flattening and perhaps leading in the direction toward compliance especially since order numbers have not been as high as they were in the record-setting months.

**Figure 4. Admission Wait Time Projections Compared to Benchmarks Set in Second Report based on data as of 11/1/24**



**Table 4** below shows data related to the order by Judge Mosman. Of the 409 individuals who were in OSH at the time of the 9/1/22 order (so-called "Cohort 1"), only 2 were in the hospital as of 11/1/24. As can be seen in **Table 4** and **Table 6**, most patients continue to be discharged after being found able or are sent to community restoration. It is my understanding that the data for discharge reasons is such that those discharged prior to the end of restoration as unable and ordered to community restoration are labeled as "community restoration" discharges. Of the total discharges for October 2024, 25 out of 109 people discharged reached the end of the restoration time limit. As per my prior reports, the demand for community restoration services is a significant issue to be addressed.

**Table 4. Discharge Data Related to the 9/1/22 Order by Judge Mosman**

- **Cohort 1:** Patients at OSH at the time of the Federal Court Order
- **Cohort 2:** Patients admitted to OSH after the issuance of the Federal Court Order on 9/1/22

| Cohort 1 | At OSH as of 9/1/2022 | At OSH as of 11/1/2024 | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | Total Discharged |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | |
| Misdemeanor | 85 | 0 | 51 | 25 | 26 | 18 | 2 | 29 | 7 | 26 | 3 | | 85 |
| Felony | 217 | 0 | 101 | 31 | 70 | 68 | 13 | 57 | 9 | 70 | | | 217 |
| Violent Felony | 107 | 2 | 43 | 24 | 17 | 45 | 29 | 6 | 3 | 17 | 2 | 3 | 105 |
| Total | 409 | 2 | 195 | 80 | 113 | 131 | 44 | 92 | 19 | 113 | 5 | 3 | 407 |

| Cohort 2 | Admitted since 9/1/2022 | At OSH as of 11/1/2024 | Restoration Limit Notice Outcomes (total since 9/1/2022) | | | Discharge Reasons (total since 9/1/2022) | | | | | | | Total Discharged |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 30-Day RL Notices Sent | Discharged Prior to Meeting 30-Day RL Notice Period | Discharged After Meeting 30-Day RL Notice Period | Found Able | Found Never Able | Community Restoration | Charges Dismissed or Released | Discharged After Meeting 30-Day RL Notice Period | End of Statutory Jurisdiction | Other | |
| Misdemeanor | 799 | 77 | 701 | 363 | 293 | 185 | 33 | 164 | 43 | 293 | 3 | 1 | 722 |
| Felony | 1285 | 202 | 504 | 357 | 200 | 504 | 75 | 250 | 50 | 200 | | 4 | 1083 |
| Violent Felony | 369 | 109 | 90 | 48 | 16 | 188 | 30 | 15 | 4 | 16 | 1 | 6 | 260 |
| Total | 2453 | 388 | 1295 | 668 | 509 | 877 | 138 | 429 | 97 | 509 | 4 | 11 | 2065 |

**Table 6. Legal Status of AA Discharges in October 2024 based on Hospital Data**

**October 2024 A&A Discharges**

| Reason | Cohort 1 | Cohort 2 | Total |
|---|---|---|---|
| Able | | 37 | 37 |
| Never Able | | 4 | 4 |
| Community Restoration | | 39 | 39 |
| Dismissed | | 2 | 2 |
| End of Statutory Jurisdiction | | | 0 |
| Other | | 2 | 2 |
| Restoration Limit | | 25 | 25 |
| **Total** | **0** | **109** | **109** |

The numbers of admission orders continue to exceed those that were originally projected upon the initial Mosman Order and as depicted in **Table 7**. The calculations shown in this table utilize certain assumptions regarding rates of orders that might be received, which were based on prior averages. It should be noted that increased rates of orders have not been predictable when there are months that reflect significant fluctuations in the numbers.

*[INTENTIONALLY LEFT BLANK]*

**Table 7. Projections vs. Actuals Admissions, Discharges, and New Restoration Orders**

| Month | Original Projections (Pre-Federal Order Implementation) | | | | Actuals *(with Current Projections)* | | | |
|---|---|---|---|---|---|---|---|---|
| | Discharges | Admissions | New Orders | Admit List | Discharges | Admissions | New Orders | Admit List |
| Sep-22 | 67 | 67 | 74 | 77 | 85 | 76 | 84 | 86 |
| Oct-22 | 90 | 90 | 74 | 61 | 90 | 91 | 95 | 90 |
| Nov-22 | 90 | 90 | 74 | 45 | 85 | 81 | 89 | 104 |
| Dec-22 | 95 | 95 | 74 | 24 | 92 | 77 | 74 | 90 |
| Jan-23 | 97 | 97 | 74 | 10 | 93 | 101 | 107 | 98 |
| Feb-23 | 97 | 97 | 74 | 10 | 94 | 107 | 78 | 70 |
| Mar-23 | 107 | 107 | 79 | 10 | 129 | 128 | 109 | 51 |
| Apr-23 | 89 | 89 | 79 | 10 | 108 | 107 | 103 | 46 |
| May-23 | 89 | 89 | 79 | 10 | 88 | 87 | 94 | 57 |
| Jun-23 | 89 | 89 | 79 | 10 | 101 | 97 | 86 | 42 |
| Jul-23 | 87 | 87 | 79 | 10 | 103 | 104 | 73 | 14 |
| Aug-23 | 87 | 87 | 79 | 10 | 112 | 100 | 109 | 17 |
| Sep-23 | 90 | 90 | 84 | 10 | 102 | 95 | 93 | 19 |
| Oct-23 | 91 | 91 | 84 | 10 | 97 | 93 | 97 | 24 |
| Nov-23 | 91 | 91 | 84 | 10 | 103 | 108 | 98 | 14 |
| Dec-23 | 92 | 92 | 84 | 10 | 64 | 83 | 92 | 23 |
| Jan-24 | 92 | 92 | 84 | 10 | 96 | 82 | 83 | 22 |
| Feb-24 | 92 | 92 | 84 | 10 | 97 | 81 | 73 | 14 |
| Mar-24 | 92 | 92 | 89 | 10 | 79 | 85 | 87 | 11 |
| Apr-24 | 92 | 92 | 89 | 10 | 84 | 96 | 99 | 22 |
| May-24 | 92 | 92 | 89 | 10 | 93 | 108 | 127 | 34 |
| Jun-24 | 92 | 92 | 89 | 10 | 79 | 74 | 90 | 58 |
| Jul-24 | 92 | 92 | 89 | 10 | 102 | 103 | 128 | 79 |
| Aug-24 | 92 | 92 | 89 | 10 | 95 | 95 | 99 | 79 |
| Sep-24 | 92 | 92 | 94 | 12 | 86 | 84 | 91 | 85 |
| Oct-24 | 92 | 92 | 94 | 14 | 109 | 107 | 100 | 76 |
| Nov-24 | 92 | 92 | 94 | 16 | 92 | 92 | 98 | 82 |
| Dec-24 | 92 | 92 | 94 | 18 | 92 | 92 | 98 | 88 |

Community restoration is depicted in **Table 8,** showing that community restoration episodes through June 2024. For the first time there appears to have been some decrease in community restoration episodes, as for the first six months of 2024 there were 240 episodes compared to 684 for the full year in 2023 (meaning that if 2024 extrapolates to a year, there would be only 480). In the first six months of 2024, 39 people had more than one year of community restoration, and two had more than two years. The mean and median days in restoration exceeded 150, but the maximum number of days was 889 for the most recent six months of data, a marked difference from prior years. It may be that a few people who had been in long-term community restoration were discharged from this and that may have caused the significant drop in numbers. On the other hand, the data on community restoration is not as accurate as other data given how it is collected, so it is difficult to know how to interpret this shift in these findings. The state continues to work on improving data reporting on community restoration.

**Table 8. CMHP Reported Completed Community Restoration Data 1/1/2019-6/30/2024**

| CMHP Reported Completed Community Restoration Data 1/1/2019-6/30/2024 | | |
|---|---|---|
| # of Completed Community Restoration Episodes* | 1831 | |
| # of Days Minimum | 0 | |
| # of Days Maximum | 1660 | |
| # of Days Mean | 192 | |
| # of Days Median | 143 | |
| Days in Community Restoration | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* |
| 0-90 | 592 | 32.33% |
| 0-180 | 1104 | 60.29% |
| 0-365 | 1587 | 86.67% |
| 0-730 | 1801 | 98.36% |
| 0-1095 | 1825 | 99.67% |
| *Completed does not reference success of restoration, but rather indicates the community restoration episode. It includes ongoing community restoration episodes. | | |

| CMHP Reported Completed Community Restoration Data by Year 1/1/2019-6/30/2024 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | | 2020 | | 2021 | | 2022 | | 2023 | | 2024 (through June 2024) | |
| # of Completed Community Restoration Episodes* | 342 | | 389 | | 452 | | 608 | | 674 | | 240 | |
| # of Days Minimum | 1 | | 0 | | 0 | | 0 | | 0 | | 1 | |
| # of Days Maximum | 1660 | | 1660 | | 1660 | | 1660 | | 1660 | | 889 | |
| # of Days Mean | 278 | | 302 | | 278 | | 250 | | 155 | | 187 | |
| # of Days Median | 201 | | 222 | | 195 | | 184 | | 119 | | 151 | |
| Days in Community Restoration | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* | # of Completed Community Restoration Episodes* | % of Total Completed Community Restoration Episodes* |
| 0-90 | 74 | 21.64% | 66 | 16.97% | 100 | 22.12% | 133 | 21.88% | 189 | 28.04% | 88 | 36.67% |
| 0-180 | 156 | 45.61% | 157 | 40.36% | 203 | 44.91% | 291 | 47.86% | 390 | 57.86% | 141 | 58.75% |
| 0-365 | 252 | 73.68% | 274 | 70.44% | 334 | 73.89% | 485 | 79.77% | 578 | 85.76% | 201 | 83.75% |
| 0-730 | 324 | 94.74% | 364 | 93.57% | 429 | 94.91% | 587 | 96.55% | 663 | 98.37% | 238 | 99.17% |
| 0-1095 | 337 | 98.54% | 383 | 98.46% | 446 | 98.67% | 602 | 99.01% | 672 | 99.70% | 240 | 100.00% |

Forensic evaluation data continues to show high numbers of evaluations conducted by FES staff, including requests for evaluations of individuals outside of OSH. **Table 9** shows recent data on active cases for which FES has been assigned to evaluate as of 10/1/24, 341 of which are not currently at OSH.

**Table 9. Number of Active FES Cases as of 10/1/24**

| Type of Evaluation and Location | Number |
|---|---|
| .370 Evaluations at OSH | 377 |
| .370 Evaluations not at OSH | 341 |
| .365 Evaluations not at OSH | 65 |
| .315 Evaluations not at OSH | 22 |
| **Total Cases** | **805** |

Ready to Place (RTP) assessments done 10-days at OSH showed about a quarter of people who were thought to be ready to place (See **Table 10**). The data shows how many A&A patients admitted to OSH did not need hospital level of care and could have been sent directly to community restoration instead.

**Table 10. RTP 10-day assessments**

| Period | 10-Day RTP Assessments | Patients Found RTP | Percent Found RTP |
|---|---|---|---|
| 2022 (Aug-Dec | 205 | 87 | 42.4% |
| 2023 | 648 | 250 | 38.6% |
| 2024 (Jan-Sep) | 432 | 116 | 26.9% |
| **Total** | **1285** | **453** | **35.3%** |

The mediation that resulted in the Second Amended order from 7/3/23 offered exceptions to the original Mosman restoration duration limits. From 7/3/23 to 9/30/24 there were 77 requests granted out of 78 requests for the 180-day violent felony extensions, and 83 out of 83 requests granted for 30-day discharge related extension requests. However, it was noteworthy in discussions and review of data that many of the 30-day discharge-related extension requests did not appear to meet the requirements laid out in the amended order derived from the mediation.

**Table 11. Number of 180-day and 30-day Requests to Extend Restoration Duration**

| Period | 180-day violent felony extension requests (Requests / Granted) | 30-day discharge-related extension requests (Requests / Granted) |
|---|---|---|
| 7/3/23 – 9/30/24 | 78 / 77 | 83 / 83* |

In addition, civil expedited admission requests and admissions were also examined. The data produced by OSH indicated is in **Table 12**.

**Table 12. Civil Expedited Admissions 9/1/22 to 9/30/24**

| Period | Requests | Accepted | Denied |
|---|---|---|---|
| 9/1/22 – 11/1/23 | 19 | 11 | 8 |
| 11/2/23 – 9/30/24 | 52 | 35 | 17 |
| **Total** | **71** | **46** | **25** |

**Medication Data Report:**

After several discussions with Amici and other interested partners who raised questions pertaining to the work being done at OSH, at my request OHA produced a data report related to timeliness to medication administration for patients at OSH. The following **Table 13** presents the number and percentage of patients in the hospital with orders for antipsychotic, mood stabilizer or benzodiazepine medications at the following points after admission: 3 days, 7 days, 30 days, 60 days, and 90 days.

*[INTENTIONALLY LEFT BLANK]*

**Table 13. Data on Number, Percent and Time to Medication Orders following Admission**

| Date | A&A Pts | Count | | | | | | Percent | | | | | | Avg Days |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 3d | 7d | 30d | 60d | 90d | 91+d | 3d | 7d | 30d | 60d | 90d | 91+d | |
| 12/1/2021 | 399 | 283 | 312 | 356 | 368 | 373 | 385 | 70.9% | 78.2% | 89.2% | 92.2% | 93.5% | 96.5% | 10.6 |
| 3/1/2022 | 349 | 249 | 271 | 309 | 324 | 328 | 338 | 71.3% | 77.7% | 88.5% | 92.8% | 94.0% | 96.8% | 9.5 |
| 6/1/2022 | 398 | 295 | 324 | 365 | 377 | 379 | 388 | 74.1% | 81.4% | 91.7% | 94.7% | 95.2% | 97.5% | 7.5 |
| 9/1/2022 | 409 | 303 | 340 | 375 | 385 | 388 | 395 | 74.1% | 83.1% | 91.7% | 94.1% | 94.9% | 96.6% | 6.2 |
| 12/1/2022 | 394 | 298 | 321 | 356 | 366 | 369 | 376 | 75.6% | 81.5% | 90.4% | 92.9% | 93.7% | 95.4% | 6.0 |
| 3/1/2023 | 395 | 309 | 333 | 357 | 371 | 377 | 382 | 78.2% | 84.3% | 90.4% | 93.9% | 95.4% | 96.7% | 5.8 |
| 6/1/2023 | 389 | 309 | 334 | 361 | 374 | 379 | 384 | 79.4% | 85.9% | 92.8% | 96.1% | 97.4% | 98.7% | 5.8 |
| 9/1/2023 | 374 | 284 | 300 | 335 | 346 | 354 | 361 | 75.9% | 80.2% | 89.6% | 92.5% | 94.7% | 96.5% | 7.2 |
| 12/1/2023 | 366 | 297 | 317 | 344 | 352 | 358 | 363 | 81.1% | 86.6% | 94.0% | 96.2% | 97.8% | 99.2% | 5.4 |
| 3/1/2024 | 353 | 293 | 307 | 333 | 342 | 346 | 351 | 83.0% | 87.0% | 94.3% | 96.9% | 98.0% | 99.4% | 5.2 |
| 6/1/2024 | 384 | 317 | 330 | 351 | 367 | 370 | 377 | 82.6% | 85.9% | 91.4% | 95.6% | 96.4% | 98.2% | 5.7 |
| 9/1/2024 | 379 | 321 | 339 | 357 | 365 | 368 | 373 | 84.7% | 89.4% | 94.2% | 96.3% | 97.1% | 98.4% | 4.2 |
| **Pre-Federal Order** | 1555 | 1130 | 1247 | 1405 | 1454 | 1468 | 1506 | 72.7% | 80.2% | 90.4% | 93.5% | 94.4% | 96.8% | 8.4 |
| **Post-Federal Order** | 3034 | 2428 | 2581 | 2794 | 2883 | 2921 | 2967 | 80.0% | 85.1% | 92.1% | 95.0% | 96.3% | 97.8% | 5.7 |

According to this analysis, since the federal order was implemented, higher rates of patients are on these medications for all post-admission time frames, and the average time to receive the first medication order has decreased from 8.4 days to 5.7 days.

Given that medication refusals can be overridden when certain legal parameters are met, either through a consent override process or via a Sell order, OSH also produced data examining the timing of these overrides.  For the consent override process, before the Mosman Order, 58.5% of the AA patients were on a consent override, while that percentage has increased to 62.8% in the Post-Federal Order period.

There was a rule change recently implemented to allow a broader interpretation of medication used and purposes in the consent override processes, given findings that made it more difficult to pursue consent overrides in situations where patients were not actively aggressive. It will be important to track how this rule change helps ensure timely access to medications for people who need them but do not have the capacity to consent to the medications.

For Sell orders, after the federal order was implemented, there have been lower rates of Sell letters and testimony resulting in hearings and Sell orders (See **Table 14**).  This may be related to an increased number of people for whom medications have been administered in the informed consent override process.

**Table 14. Data on Number of Sell Letters Sent vs. Number of Hearings**

| Year | Letters Sent/Testimony | Hearings/Sell Order Issued | Rate |
|---|---|---|---|
| 2021 | 16 | 12 | 75.0% |
| 2022 | 28 | 18 | 64.3% |
| 2023 | 34 | 18 | 52.9% |
| 2024 YTD | 29 | 15 | 51.7% |
| **Pre-Federal Order** | **35** | **23** | **65.7%** |
| **Post-Federal Order** | **72** | **40** | **55.6%** |

**Summary of Site Visits:**

At the end of August, I visited Oregon and attended the mediation session at the Federal Court House. Over the subsequent two days, I conducted site visits and tours. These included touring the units on the Junction City Campus. Although the building is one that is architecturally appealing, one thing that was made clearer during the site visit was that the SRTF beds in Junction City cannot meet the current Joint Commission standards for a hospital. There are certain architectural features such as size of rooms and other factors that make this a reality for the state of Oregon, and thus there is less flexibility in the use of those beds. At the same time, it does make those beds "different" from other SRTF beds in Oregon in that they are more able to access clinical services akin to a hospital including elements related to medication administration and activities.

During my site visits I toured the Northwest Regional Reentry Center (NWRRC), the site of an independent contracted service for people ordered to community restoration under the AA provisions. The facility serves federal inmates who are returning to Oregon and others who are reentering after being in carceral settings. The facility has staff that monitor all entrances and egress points. There is some programming available. The program has a clinical lead and contract manager that are very devoted to making it a success and very knowledgeable about the needs of individuals with criminal justice histories. Its prior work did not involve serving individuals primarily with mental illnesses or behavioral health challenges (though many of the inmates did have those challenges). Still, the focus of community restoration on individuals who largely have serious mental illness or developmental disabilities, with and without co-occurring substance use conditions, remains new to the NWRCC. There was work with psychiatry trainees, but that linkage was temporary. There were efforts and discussions about ensuring access to psychiatric consultation. Although the program provides restoration and support-type services, the clinical services were not as robust as one might see in an SRTF or Medicaid funded service. In addition, we were told that there were people there who the staff thought were competent to stand trial, and yet there was no clear mechanism to refer them for evaluation, so they were waiting for this to be ordered by the court. After visiting the site, it became clear that there needed to be more active utilization management to ensure that people are not remaining there unnecessarily. Several cases were able to be evaluated after that visit with work between OHA and OSH FES and the CMHPs.

**Select Updates from OHA and OSH:**

I have discussed processes related to discharges from the RTP list with a variety of partners and especially with the defendants and the CMHP leaders as well as with the plaintiffs in the all-parties meetings. To assist with discharges, the defendants updated guidance pertaining to Clinical Progress Notes for the courts to better understand the needs of defendants leaving OSH. Some of this work came about through intensive discussions with the amici and with the input of the judges involved in mediation. In addition, the state has provided documents to help guide the field on the LOCUS evaluations and what they mean since we have been discussing that one of the barriers to discharge appears to be that communities see LOCUS scores in discharge packets and then attempt to find placements to match the scores, rather than looking at the LOCUS as a tool to guide placement decisions and with the idea that additional supports can help individuals do well in different settings.

In addition, the OHA leadership reported on an analysis of the RTP list, conducted primarily by DOJ General Counselors who did a thorough review of barriers noted based on court findings. In this review

there appeared to be numerous cases in which the documentation suggested non-compliance with ORS 161.371 that fell into two basic categories including (1) court providing no written statutory findings to justify continued commitment; and (2) delays in statutory process such that RTP notices were not being resolved. Specifically, according to the OHA analysis, "in 336 RTP cases (167 misdemeanor cases; 169 felony cases), the court either made no required written findings after holding the mandatory statutory hearing or made insufficient findings to support the patient's continued OSH commitment. In 43 RTP cases, the court found that the patient did not require HLOC [hospital level of care] but continued the patient's commitment in direct violation of the statute." Furthermore, the analysis showed, "in 119 RTP cases, the court continued the RTP hearing past the 10 judicial day timeframe required by the statute." Separately, "in 102 RTP cases, the court ordered continued commitment for a defendant because of the lack of an SRTF when OSH was recommending a lower level of care."  Additionally, there were several cases where the work with the CMHPs appeared to be a barrier, including 180 RTP cases in which the CMHP was recorded as not responding to OSH's request for an update.

As a result of the review by DOJ General Counselors, DOJ trial attorneys have begun to submit letters to courts where it appears that the statutes have not been followed. From October 2024 to date, DOJ Trial has filed 27 letters to courts who they determined had not followed the statutory ready to place process in some way or another. Given that each day an individual waits at OSH outside of the restoration requirements limits the admission of other people, this work is critical. In forthcoming work with the parties, the DOJ will report data about what happened after these letters were filed and whether it has had an impact on compliance.

I was given a summary of capacity expansion of community-based residential facilities and homes as well as supportive housing settings specifically for persons with serious mental illness, utilizing an appropriation of $130 million under HB5024, which provided $65 million from the General Fund and $65 million from the American Rescue Plan Act funding. According to this summary, between 2/29/24 and 12/31/25, 284 residential slots would be available through new grant agreements across the state. Although this represents significant potential expansion, staffing would still be required for these sites and vacancy rates for staff are not known at this time.  In addition, the state provided updates on projected capacity increases by Calendar Quarter (see **Table 15**).

*[INTENTIONALLY LEFT BLANK]*

**Table 15. Projected Capacity Increase by Calendar Quarter for Licensed Housing & Facilities and Non-Licensed Housing\***

| Licensed Housing & Facilities | | | *Non-Licensed Housing | |
|---|---|---|---|---|
| Quarter | Capacity | | Quarter | Capacity |
| Quarter 4 2022 | 5 | | Quarter 4 2022 | 7 |
| Quarter 1 2023 | - | | Quarter 1 2023 | 12 |
| Quarter 2 2023 | 8 | | Quarter 2 2023 | - |
| Quarter 3 2023 | 10 | | Quarter 3 2023 | 25 |
| Quarter 4 2023 | 5 | | Quarter 4 2023 | 20 |
| Quarter 1 2024 | 11 | | Quarter 1 2024 | 13 |
| Quarter 2 2024 | 47 | | Quarter 2 2024 | 20 |
| Quarter 3 2024 | 26 | | Quarter 3 2024 | 76 |
| Quarter 4 2024 | 67 | | Quarter 4 2024 | 26 |
| Quarter 1 2025 | 103 | | Quarter 1 2025 | 58 |
| Quarter 2 2025 | 141 | | Quarter 2 2025 | 61 |
| Quarter 3 2025 | 96 | | Quarter 3 2025 | 14 |
| Quarter 4 2025 | 52 | | Quarter 4 2025 | 54 |
| Quarter 1 2026 | 67 | | Quarter 1 2026 | - |
| Quarter 4 2026 | 72 | | Quarter 4 2026 | 26 |
| TBD | 100 | | TBD | 339 |
| TOTAL | 810 | | TOTAL | 731 |

\*Non-Licensed Housing includes transitional housing, supportive housing and recovery housing

Data discrepancies between reports describing residential services development likely reflect different funding sources and different time frames for snapshot estimates. To help increase clarity and transparency, OHA has launched a website that provides information regarding behavioral health housing and licensed capacity investments (see https://www.oregon.gov/oha/HSD/AMH/Pages/Housing-Dashboard.aspx).

Based on discussions with OHA, work has progressed to allow for the recent expansion of NWRRC by 5 additional beds, for a total of 35 slots at the site. In addition, OSH FES leadership have met with Judge Waller and with other forensic evaluation leaders in other states to discuss options for shorter reports to help expedite their completion.

OSH has recently regained its CMS certification after work done on corrective action plans.

In addition to the above, OHA has developed resources related to Certified Community Behavioral Health Centers (CCBHCs). These are special types of clinical services with Medicaid funding that allows for more flexible dollars to pay for a broader range of services for individuals not on a fee-for-service basis. There are 12 demonstration clinics that cover 21 sites across 14 counties. Nine of the 12 clinics are CMHPs. There are plans to expand CCBHC clinics, with a plan for about eight clinics joining by April 2026 and six more by April 2027 and OHA must make efforts to achieve statewide coverage for these types of clinics. This work includes jail diversion and community partnerships to enhance opportunities for mobile crisis and same-day access to behavioral health services.

OHA also reported on the pilot of the community navigator initiative that stemmed from the recommendations I made in my earlier reports. The state indicated that formal reports were due into OHA by 11/15/24, with more comprehensive data review in February 2025. The pilot sits included Cascadia/Multnomah (contract executed 7/12/24), Deschutes (contract executed 7/12/24), Lane County (contract executed 7/16/24), Marion (contract executed 8/9/24) and Polaris/Washington (contract executed 7/22/24). Caseloads to date have been smaller than they are designed to be, ranging from 14

(split across people at OSH and the community) to eight in total. The Community Navigators incorporate a peer support specialist and case manager team. Preliminary analysis showed some positive feedback. Initial anecdotal feedback included:

- Engagement with client at OSH led to a successful step down in level of care, and now they are seeking long term housing and employment. Additionally, this client has reconnected to their family supports.
- Due to OSH in-reach and rapport building, one client has engaged in SUD treatment.
- CMHP was able to maintain a housing placement for a client due to the Community Navigator team intervention with emergency medication and transportation.
- CMHPs reports they find that face to face contact has been crucial to building and maintaining rapport.
- CMHPs are assisting with phones, groceries, transportation, interventions and helping individuals apply for benefits (e.g. food cards).

**Summary of the Mink Restoration Time Limits and Exceptions Workgroup:**

I participated in approximately seven regular meetings with Mr. Kevin Neely and a variety of partners who met regularly at the request of OHA in the "Mink Restoration Time Limits and Exceptions Workgroup" (henceforth the Mink Workgroup) that began convening in December 2023. The purpose of the group was to sort through potential legislative principles for restoration time limits as well as other legislative concepts for proposal for the 2025 legislative session. Membership of the workgroup consisted of court personnel including a judge, a district attorney and a defense attorney, as well as representatives from DRO, CMHPs, Forensic Evaluation Services and two people with lived experience. Former Superintendent of OSH, Ms. Dolores Matteucci assisted in the group process on behalf of OHA. At the conclusion of this meeting, the consensus was reached that there should be community restoration time limits, but consensus was not reached as to what those time limits should be or when they should start. There was strong sentiment that access to forensic evaluators for community evaluations was critical and a major barrier to resolving cases at present. There was general enthusiasm also for deflection programs such as those approved by HB 4002 (2024). Alternative pathways for people to be supported outside of AA process were thought important but it was also recognized that it would require further investment by the legislature.

The OHA Mink Workgroup delineated elements of a forthcoming report by OJD known as the GAINS report that looks at evaluation system re-design as discussed and requested in my prior reports. The elements outlined by the Mink Workgroup included:

- Administrative centralization
- Blend of state staff and independent evaluators
- Centralized rules
- Centralized training
- Centralized funding (not through the Oregon Public Defense Services Fund and with state investments to support increasing the number of forensic evaluators)

Ultimately, there were three consensus recommendations that were delivered through the Mink Workgroup that included the following:
1. Enact admissions requirements at OSH that are more restrictive

than current statute, but slightly broader than the terms of the Mosman Order (principally expanding the potential for a limited number of non-person misdemeanant defendants to be restored at OSH based on specific factors including public safety, state interest in pursuing criminal charges, prior performance on community restoration, and impact of restoration at OSH on Mink compliance statewide)

2. Alternate Pathway Pilot Programs / Deflection
3. Forensic Evaluation Access and Expansion, with support of the forthcoming GAINS report and its currently outlined elements.

In the all-parties meeting, there were many conversations about what might be helpful for communities to better serve people in the AA and GEI systems.  As a result of many facets of these discussions the State issued a Request for Information regarding Community Service Needs for the AA and GEI populations.  I worked with the state as they analyzed the results and helped prepare a response to me based on some broad recommendations I had made to the parties.

**Legal Issues in this Matter in this Interim Reporting Period:**

Several court filings have been presented related to this matter since my last report. Jurisdictional contempt proceedings continue, and the state is spending time focusing on those matters. In addition, crime victim representatives argued in court and filed a motion to appear as amicus curiae. As a result of those court filings, Judge Nelson has allowed representatives of victims to appear as Amici. Separately, on 7/15/24 Judge Beckerman entered a ruling noting that due to the numerous conflicts between the Second Amended Federal Order and committing jurisdiction orders, and due to the "futility of prior Supremacy Clause mediation efforts and pending contempt proceedings" mediation options with respect to the Supremacy Clause disputes were suspended and would need to be individually litigated in Federal Court. In addition, Mediation between the Amici, the plaintiffs and the defendants took place on 8/26/24 in Oregon at the Federal Courthouse, with Judge Beckerman presiding over the mediation.  A status conference was held in front of Judge Nelson on 7/11/24, with a plan for a follow up status conference set for 11/18/24.

The case filed by the Legacy Health System and other private hospitals is also continuing to move forward, with a motion to file a second amended complaint granted by Judge Nelson on 10/3/24 with an expected response due 11/27/24.

In addition, the National Alliance on Mental Illness-Oregon filed a motion to intervene in the matter at hand as well, with a deadline of defendants to respond of 11/18/24.

**Forensic Evaluation Services:**

Several new staff were hired and began working for OSH Forensic Evaluation Services.  As a result of new staff, there has been greater ability to catch up on the demand for evaluations. In addition, during this interim reporting period, OSH FES issued a memorandum indicating the availability of staff to begin to conduct more community evaluations. Some placements were holding people pending these evaluations. For example, on the tour of NWRRC, we were told that several individuals had been placed there for over a year but were thought to be Able to Aid and Assist but no evaluations had been completed on them. As a result, OHA facilitated the necessary referral processes and scheduled to complete these evaluations to open slots at the site for other defendants on CR.

**Additional Information During this Interim Period:**

Progress reports from the defendants have been completed monthly, the details of which can be found on the state's OHA Mink/Bowman website and will not be summarized here. I remain encouraged by the work done on the prior recommendations, but many of the tasks are still in progress. In addition, the finalized updated work plan was developed and is provided below as part of the concluding recommendations.

**Conclusions and Recommendations:**

Over the course of the interim period between my last report and this report, compliance with the seven-day admission requirement has yet again seriously faltered. In large part this was due to two particularly challenging months of record orders for Aid and Assist restoration services at OSH. Because of that, there were large increases in the numbers of people waiting for admission from jails around Oregon and increases in the days people waited prior to admission. Because most defendants are discharged within the 90- to 180-day range separate from the Federal Court's prior orders, there is now a downward trend toward compliance. Still, defendants are waiting in jail over 25-days to get into the state hospital, and this is too long and violates the Constitutional requirements set forth by the Ninth Circuit in this legal mater. Moreover, the state has remained very close to non-compliance even in the best of months since my work with this matter began and before.

That record numbers of restoration orders have so greatly tipped the balance away from compliance is concerning. Recidivism of the population remains too high, and the effectiveness of community restoration remains uncertain overall. In addition, although OSH is getting people on medication orders sooner than prior to the Mosman order, there remain a significant number of people are discharged unrestored. Whether this is a factor related to how opinions are delivered, the shortened time period for restoration, or the idea that community restoration will always be available is still unclear. Regardless, the state must continue to work diligently and more so to return to compliance and to sustain compliance with the Federal Court Order. Deflection of people from arrest and criminal case processing is an imperative, and the state has several promising initiatives in this regard, such as the development and expansion of CCBHCs and mobile crisis services. At the same time, people deemed ready for discharge either from the AA or GEI process are waiting far too long for discharges to occur.

Pathways to achieve compliance include reduction in the number of arrests of people with mental health, IDD and substance use disorders in the first place, and to ensure that people within jails receive adequate and required behavioral health care. Additional means would be to decrease the number of orders to OSH for restoration and enhance community services and infrastructure, and to increase discharges. Solutions will require improving along all of those dimensions and more. As I have said in prior reports, the seven-day mandate is one based on the Constitutional requirement set forth in the Ninth Circuit. Other states do not have the obligation to follow this time-frame either statutorily or because of their relevant federal jurisdiction. There is nothing magic about seven days, and many of the amici and other partners have stated that a sole focus on this one metric has the unintended consequence of creating other problems in a larger system where all the parts are interconnected. Nonetheless, this requirement remains for Oregon, and this has also helped focus the state on areas of priority interests.

With all this in mind, the rest of this report sets forth my current recommendations for the Court's review and consideration.

1. **Implement State Proposed Remedies**: Given the recent trends that show the state to be out of compliance with the seven-day admission order, I have worked closely with the state and with the plaintiffs to vet a series of recommendations that should be implemented within agreed upon timelines to maximize the potential to return to compliance as soon as possible. It should be noted that several of these items are those that can be executed within current staffing, budget and statutory schemes, and others will require the Governor's sign off as well as legislative appropriations. Specifically, of the below list, Items 1, 3, 4, and 5 can begin implementation immediately. The specifics for some of these items also will depend on other partners that will need to execute contracts and sort through any regulatory barriers to achieve these goals. The legislative proposal in addition will obviously require legislative buy-in. As such, in recommending adoption of the below remedies, I am also recommending that there be some flexibility in adopting them, Specifically, should new barriers develop or become more apparent, the recommendations should pivot toward new plans. I have indicated to the state that commitment to their proposed remedies is reasonable, with any shifts from the agreed upon deliverables requiring input from the plaintiffs and review by the Neutral Expert. In this way, the realities of system development can allow for unforeseen vicissitudes without changing the intent and commitment of the state to deliver on its commitments.  The proposed and agreed upon state remedies are as follows:

   *State Proposed Remedies as Vetted by the Neutral Expert and the Plaintiffs:*

   *The Aid and Assist GEI/PSRB Request for Information (RFI) responses indicate clear gaps in health services, some of which OHA can address directly, while others require a collaborative approach. OHA has developed a set of recommendations in response to the RFI and discussions with the state's neutral expert Dr. Pinals, focusing on strategies to address funding, training and education, housing capacity, coordination efforts, community navigators and forensic evaluations. These recommendations, with statements of likely impact, are detailed below.*

   *RECOMMENDATIONS*

   1. *Expand Oregon State Hospital (OSH) Forensic Evaluation Service by Hiring Three (3) Full-Time Equivalent Forensic Evaluators: $85,734 – 4-6 month timeline.*

      *There is no statutory requirement for defendants in community-based competency restoration to be re-evaluated for competency to stand trial under ORS 161.370. In the absence of statute, most courts order Oregon State Hospital's (OSH) Forensic Evaluation Service (FES) to complete these evaluations.*

      *OSH FES prioritizes evaluation of OSH inpatients; therefore, evaluations for defendants in Community Restoration (CR) are completed as evaluator resources permit. OSH FES receives an average of 35 new orders per month for individuals in CR. While OSH FES is currently able to complete this monthly volume of evaluations, there is a backlog of 292 evaluations for individuals in CR that have accumulated over time which OSH has not been able to address due to lack of capacity; for much of 2024, OSH FES had vacancies in several*

*evaluator positions. Evaluators have been hired to fill these vacancies, with the last evaluators beginning work by the end of December 2024.*

*Once all current vacancies are filled, OSH FES's projected capacity to complete evaluations for individuals in CR will be 40-55 per month. At that rate, it will take more than a year to clear the backlog. OSH therefore proposes to hire three (3) additional full-time evaluators to begin work in March 2025. This will increase FES's capacity to complete evaluations for individuals in CR by another 25-30 evaluations per month. With this additional capacity, assuming no increase in the average number of new orders, OSH FES will be able to clear the backlog in 4-6 months.*

*Impact statement: The anticipated impact on compliance with the Mink injunction is related to improved flow, by placing individuals at the appropriate level of care in a timelier manner. Completing all evaluations in the queue, and then completing evaluations promptly as new orders come in, can free up CR resources (since individuals who are either able or never able to aid and assist no longer require them). This may permit OSH patients who have been designated Ready to Place (RTP) to be discharged to CR, opening OSH beds for individuals who require a hospital level of care for restoration.*

*While it is difficult to predict how many individuals in CR are presently able or never able, there are typically 65-75 OSH patients designated RTP, and an average of 15 patients are discharged to CR each month. As OSH completes the evaluations in its backlog, assuming the monthly volume of newly ordered evaluations does not increase, it is hoped that more OSH patients will be able to discharge to CR. Still, as previously discussed, OSH cannot be required to perform all CR evaluations without commensurate increases in funding over time. Adding only 3 FES evaluators, therefore, is not a permanent solution. But it is a stopgap that may be able to loosen current bottlenecks in a system that, over time, deserves a larger overhaul. A number of different issues require discussion for long-term community restoration evaluations, including when evaluation should be done (at what intervals), who is eligible for evaluations, and where a community evaluation program should reside. While in the short term the hospital is adding more evaluation capacity, the preferred model (in use in other states) would move community restoration evaluations to the Behavioral Health Division as a centralized hub, with an appropriate plus-up in funding.*

*Estimated Cost: $85,734 (requesting funds in 2023-25 OSH rebalance)*

2. ***Establish an Aid & Assist Flexible BH Housing Funds Resource: $3.5M – 2-3 months from receipt of funds with prioritization by contracts***

*Flexible housing funds support individuals by providing immediate and long-term stability. These supports include items such as rental assistance, application fees, moving costs, storage fees, repair and maintenance fees, eviction avoidance, and utilities. OHA BH estimated the flexible funding range for each county to be between $75,000 and $300,000, totaling up to $3.5 million for flexible housing funds.*

*This funding would be administered via a partnership between OHA and OHCS to incorporate lessons learned from OHCS' existing behavioral health pilot being administered as part of the homelessness emergency in the State of Oregon. Resources should be administered in a way that builds effective coordination between counties and housing/homeless service providers to promote the housing stability of people experiencing homelessness who have a behavioral health need. Assistance can also be structured to support people in accessing vouchers from their local housing authority.*

*Impact Statement: In OHA's most recent Aid & Assist RFI, requested by Dr. Pinals and shared with the Governor's Office, Community Mental Health Programs (CMHPs) identified housing as a significant barrier to stability and a driver of recidivism. While this recommendation does not have a direct impact on compliance with the Mink injunction, keeping individuals housed and/or creating access to housing could keep them engaged in CR. We know from the literature that housing stability is a protective factor against legal/criminal involvement due to behavioral health concerns.*

*Estimated Cost: $3.5 million (in partnership with OHCS)*

3. **Aid & Assist SRTF Expansion:  $9.4 million HB 5024 (funding already identified) – Up to 6-month timeline until contract execution**

   *OHA's 2023-2025 budget includes a onetime only appropriation of $9.4 million from HB 5024. The Intensive Service Unit within OHA BH will use these funds for Secured Residential Treatment Facility (SRTF) and Residential Treatment Facility/Housing (RTF/H) expansion projects in order to increase bed capacity throughout the state of Oregon and improve access to services. Priority service populations for expansion have been identified as the Aid & Assist (A&A) and Guilty Except for Insanity (GEI)/Psychiatric Security Review Board (PSRB) populations with a goal to compete contract amendments within 90-days of approval (January 31, 2025).*

   *Multiple funding requests were received and assessed for project appropriateness and feasibility. Of those requests, the following projects are in the final stage of review, one of which (Lifeways PSRB RTH) is still being evaluated for potential Institution for Mental Disorder exclusion:*

   i. *Jackson House (Multnomah County) requested $750,000 of one-time only gap funding to complete their project. The completed project will be a 16-bed facility with a focus on the Aid and Assist population.  Anticipated completion timeline of this project is 14 months.  The facility will also be able to support individuals with medical needs by creating medical appropriate beds, which will add seven months to the project.*

   ii. *[TBD funding request for $3 million to create an RTH with capacity for GEI populations to be completed within 24 months upon receipt of confirmed*

*funding, or the allocation of these funds for alternative types of housing opportunities with equivalent capacity in a rural area].[1]*

iii. *Northwest Regional Reentry Center (NWRRC, Multnomah County) has requested $4.2 million to remodel an existing building for residential placement for the Aid and Assist population. The remodel incudes adding 44,000 sq ft for approximately 20-24 beds. NWRRC is estimating that they will be able to get to 38 beds, barring significant construction challenges. The project is expected to be complete in 12-18 months once construction begins. OHA staff are working with NWRRC to identify a construction start date.*

iv. *Sequoia has requested $400,000 to convert a Room and Board facility to a dedicated Aid and Assist SRTF in Aloha (10 beds). The anticipated completion date is the end of 2025.*

v. *Lifeworks has requested a total of $1.5 million, to convert a vacant home to a dedicated Aid and Assist RTH in Hillsboro (10 beds) and for a 5 bed SRTF to serve individuals with severe and persistent mental illness (SPMI). Both projects are anticipated to be complete by the end of 2025.*

*Impact Statement: There were 72 individuals on the RTP list as of October 31, 2024. If partners are able to add these new beds, they should create additional placement opportunities for OSH discharges. This could in turn help shorten the waitlist for OSH admissions, and thereby facilitate compliance with the Mink injunction.*

*Estimated Cost: The $9.4 million in funding to support these projects has been identified. Combined, these proposals would result in an increase of 47-67 residential beds across the state.*

4. ***Provide Specific Training and Education to Oregon Judicial Department (OJD), District Attorneys, and Community Mental Health Providers (CMHPs) – Initial training provided in Q1 2025***

*To improve shared understanding of contractual roles, level of care determinations, and competency restoration and evaluation, the following training topics will be offered to the audiences noted below:*

- *Curriculum development on community placement services and supports, levels of care, and OSH's Ready to Place determination will be completed by Dec. 15, 2024. The trainings will occur in the first quarter of 2025. Annual refresher trainings will begin in the first quarter of 2026*
  - o *Education for Courts, District Attorneys, defense attorneys, and County CMHP Commissioners on the contractual responsibilities of the CMHP, OHA and OSH as it relates to services for A&A and GEI/PSRB populations.*

---

[1] It should be noted that as this report was being completed, the state learned of a new barrier to supporting the build of a five-bed RTH in a particular rural county. As such, the state has committed to looking for a similar project to fund or to re-allocating the funds with input from the Neutral Expert and others after vetting with OHA leadership and Governor's office.

*This will be a collaborative training offered by OSH and the Behavioral Health Department.*

o   *OSH will lead the creation of materials and provide training to Courts, District Attorneys, defense attorneys, and CMHPs on Level of Care Utilization System (LOCUS) scores and OSH's use of medical criteria for "Ready to Place" determination.*

- *Curriculum development on the legal process of A&A and GEI/PSRB will be completed by Dec. 15,2024. The trainings will occur in the second quarter of 2025. Annual refresher trainings will begin in the second quarter of 2026*

o   *A collaborative training for substance use disorder (SUD) providers, provided with the DOJ and a judge/District Attorney (DA)/defense attorney, on 1) the legal process of A&A and GEI/PSRB populations, and 2) service delivery models that improve outcomes as identified by OHA Behavioral Health. This will include minimum standards of service delivery for all the behavioral health needs of this population.*

- *Curriculum development on competency restoration and forensic evaluation will be completed by January 17, 2025. Trainings will be delivered in the first and second quarter of 2025 with annual refresher trainings beginning in the first quarter of 2026.*

o   *OSH will lead the creation of materials and provide training to Courts, Attorneys, and CMHPs about competency restoration, focusing on effective treatments and therapeutic approaches to address barriers to competency, how psychotropic medications work and what to expect from them, the difference between capacity and willingness to engage in treatment, and how to read a forensic report.*

*Impact Statement:  There is an under-reliance on placements to less restrictive levels of care that are likely more clinically appropriate for the individual, which creates a lengthy waitlist for residential services in general. While there are many factors that contribute to this, including prioritized safety needs, it is clear that education about LOCUS scores, levels of care, and role clarity is needed to impact placement decisions. Greater awareness of these issues could lead to growing acceptance of lower levels of care for OSH discharges; because these lower levels of care have shorter waiting lists than SRTFs, it is possible that this shift could expedite OSH discharges.*

*Estimated Cost: There are no expected costs. Trainings will be developed and delivered by OHA Behavioral Health and Oregon State Hospital staff. Continuing Legal Education credit will be offered wherever possible to incentivize attendance.*

5. **Oregon Health Authority Behavioral Health (OHA BH) Coordination Integration: Phased Approach to Reinstitute Extended Care Management Unit (ECMU) – over 3-to-4-month timeline, with full implementation likely by February 2025**

*Until 2015-2016, OHA had a work unit called the ECMU which managed bed flow, maintained oversight of the residential system and service delivery within the system.  This resulted in more individuals flowing through different levels of care due to OHA having a state-wide scope of bed availability. Through this work unit, OHA provided technical*

*assistance to smaller community agencies to guide them on how to eliminate barriers for individuals.*

*OHA BH supports the recommendation brought forward by the Washington County CMHP to pilot bringing back the ECMU within OHA. Phase 1 would include oversight of placement beds in Washington, Lane, and Multnomah Counties. Program staff would work with CMHP coordinator(s) to ensure that all individuals receive appropriate referrals to living facilities and therapeutic interventions that lead to lower levels of care. A full team for this pilot would require five staff and one dedicated staff at OSH. OHA currently has five positions that may be repurposed for this team and is sufficient to support the work of moving individuals off the RTP List and into community.*

*Implementation Timeline beginning November 1, 2024:*
- *The following activities would take place in the first 90 days of implementation:*
  - *OHA positions would be re-purposed, and staff trained to work with CMHP coordinators to provide oversight on individual placements.*
  - *Communication plan development*
  - *Partner and community engagement*
- *The following activities would take place in the first 120 days of implementation:*
  - *Contract development with residential providers who do not currently contract with OHA within the identified pilot counties*
  - *Policy and procedure development*

*Although there would be a need to reflect the role of this unit within the County Financial Assistance Agreement (CFAA), no rules or legislative authority is necessary for this work to begin. Statutory changes would be needed if OHA determined the unit needed more authority to oversee residential waitlists and care coordination. The county positions would work in the field to facilitate placements, oversee facility conditions and person-centered care. Policy and contract changes would be necessary as residential services would move "in house." Rule changes may be needed depending on the authority of the ECMU.*

*Impact Statement: Reviving the ECMU would proactively facilitate placement for individuals ready to discharge from OSH by increasing and improving communication and resource identification. While the courts ultimately approve the discharge and transition plan, the ECMU program would work with Multnomah, Washington and Lane counties that make up 35% of all individuals on the RTP list to ensure timely transition to the appropriate level of care. Our goal is to reduce the amount of time an individual spends on the RTP list.*

*Estimated Cost: There are no expected costs. Five (5) existing positions can be repurposed to form the team. The existing adult mental health manager would oversee the team.*

6. ***Community Navigator Pilot Expansion - $ 2.9M - 6 months from receipt of funding timeline***

*The Community Navigator pilot supports case management for individuals discharging from OSH. Currently there are five pilot sites that began in March 2024, with in-reach to*

OSH which started in July 2024. The current pilot was funded by SB525 for $6,000,000. Initial feedback from CMHPs indicates successful client engagement and positive impact on care transitions, housing stability, and participation in SUD treatment. The primary goal of this pilot is to reduce rates of recidivism for individuals, especially those at risk of houselessness, on A&A orders from involuntary state hospitalization.

Dr. Pinals' recommendation is to expand this model. Given OHA's understanding of need across the state, we would use a regional approach for this expansion, expanding to two regions (Southern Oregon and North Coast) chosen based on the number of individuals at OSH. Expansion would occur six months after receipt of funding.

Impact Statement: The first set of reports from the pilot are due on November 15, 2024, and OHA's Health        Policy and Analytics Division is scheduled to conduct the first data review in February 2025 to identify if programs are meeting expected outcomes. Already, however, CMHPs have expressed appreciation for the pilot and a desire for it to continue – initial anecdotes include:

- Engagement with client at OSH led to a successful step down in level of care, and now they are seeking long term housing and employment. Additionally, this client has reconnected to their family supports.
- Due to OSH in-reach and rapport building, one client has engaged in SUD treatment.
- CMHP was able to maintain a housing placement for a client due to the Community Navigator team intervention with emergency medication and transportation.
- CMHPs report that face to face contact has been crucial to building and maintaining rapport.
- CMHPs are assisting with phones, groceries, transportation, interventions and helping individuals apply for benefits (e.g. food cards).

In her second report, Dr. Pinals had specifically tasked OHA with submitting a legislative proposal to fund care coordination services for adults discharging from the OSH to community or jails – referencing an evaluation and expansion of the Community Navigator pilot as a potential beneficiary of these funds. This legislative proposal meets this recommendation.

Estimated Programmatic Cost: $1 million for each site spanning two years. (Total of $2 Million).

Estimated Staffing Cost: 2.0 FTE Program Analyst 1 positions and 1.0 FTE Operations Policy Analyst 3 position would be needed (OSH 2.0 FTE and OHA 1.0 FTE).
- Classification: Program Analyst 1: $531,308/biennium.
- Classification: Operations & Policy Analyst 3: $364,794/biennium.

Estimated Total Cost is $2.9 million (requesting as a new policy option package)

### RELEVANT RULES

Relevant to the proposed capital projects, Oregon Administrative Rule (OAR) 09-035-0163 (10)(b) states that a provider may not deny an individual admission due to county of origin, responsibility, or residency. The rule requires that facilities must be open to accept individuals from around the State of Oregon to ensure equity for residential placements across the state. However, with the implementation of the ECMU (see recommendation number 5), using a phased approach, OHA will develop contracts for increased oversight over mental health residential placements starting with bed management for the Aid and Assist and GEI/PSRB population across the three identified counties. During this phase, OHA will evaluate the impact of the current waitlist rule (OAR 09-035-0163 (12)) to determine if rule change is needed under this new model.

Additionally, the following information has been confirmed by the Department of Justice (DOJ) and Medicaid regarding residential treatment, priority populations and payment: There is no federal language that prohibits facilities specifying the population that they will serve and that for Medicaid to pay, medical necessity, other federal settings, and payment requirements must be met. Therefore, facilities that are proposing capital projects for Aid and Assist and/or GEI/PSRB individuals can develop such facilities and be paid by Medicaid for services as long as medical necessity is met. Oregon's State Medicaid Plan provides for Home and Community Based Services (HCBS) protections for residents in non-SRTF residential facilities, which means residents have protection against eviction substantially equivalent to Oregon's landlord-tenant laws. The protection outlines that a resident cannot be immediately evicted from a placement because they are terminated from a particular court's jurisdiction. OHA will continue to evaluate the feasibility of either changing this rule or in educating providers about how best to work within this rule to maximize the appropriate use of slots for residents who need them based on appropriate criteria (e.g., medical necessity).

### LEGISLATIVE CHANGE NEEDED

OHA is obligated under the federal court order to make recommendations for legislative change based on Dr. Pinals' reports. There are three primary proposals for legislative change to ORS 161.370 which OSH must therefore make, which will support compliance with the Mink/Bowman injunction and impact provision of restoration services at the Oregon State Hospital (OSH) and in Community Restoration (CR).

#### Restoration Limits at OSH and in Community Restoration

The federal court issued an order in September 2022, limiting the duration of inpatient hospital restoration to competency at OSH to return to compliance with the Mink injunction. A legislative workgroup was formed to make recommendations about restoration limits at OSH and in the community. That workgroup did not achieve consensus.

Dr. Pinals' second report recommended the limits which are currently applied to OSH restoration; her recommendation at the time was that those limits apply to OSH and CR restoration concurrently. After subsequent input from all parties and amici and given the

lack of a consensus recommendation from the legislative workgroup, Dr. Pinals will revise her recommendation in her upcoming November report. To meet its court-ordered obligation, OHA will therefore be submitting the following legislative concept for restoration limits:

- Modify statutory language to limit restoration at OSH to the limits imposed by the May 2023 federal order.
- Individuals whose most serious charge is a non-person misdemeanor are not eligible for restoration at OSH.
- If a patient is admitted to OSH for restoration, the limit for further restoration in the community for patients whose most serious charge is a felony is half the maximum duration of OSH restoration. For those whose most serious charge is a misdemeanor, the limit for CR is equivalent to the duration of OSH restoration. If an individual is placed in community restoration directly, the restoration limit is the same as the maximum duration of OSH restoration.
- A patient at OSH may be placed in community restoration following OSH admission only if a forensic evaluation indicates there is a substantial probability that additional restoration efforts will restore the patient.

Restoration limits for OSH and CR are therefore proposed as follows[2]:

| Most Serious Charge | OSH restoration limit | CR limit if OSH restoration first | Total restoration limit if OSH + CR | CR restoration limit if no OSH |
|---|---|---|---|---|
| Non-person misdemeanor | N/A | N/A | N/A | 90 days |
| Person misdemeanor | 90 days | 90 days | 180 days | 90 days |
| Non-violent felony | 180 days | 90 days | 9 months | 180 days |
| Violent felony | 1 year | 180 days | 18 months | 1 year |

**Required Evaluations for Individuals in Community Restoration**

There is currently no statutory requirement for individuals in CR to be evaluated for competency to stand trial. Dr. Pinals will recommend establishing requirements equivalent to the existing requirements for evaluation for OSH inpatients. OHA will propose change to the .370 statute to require that evaluations must be provided to the court at specified intervals following either admission to OSH or initiation of community restoration services.

---

[2] The proposed timelines differ from those delineated in my Second Report in that they allow for extended time in community restoration and a sequential framework for community restoration following OSH restoration. The rationale for this change includes data on current restoration rates as well as expressed views of many participants in the Mink Time Limits workgroup regarding the potential for some individuals to become able to Aid and Assist with additional community restoration periods following an OSH hospitalization.

*Those intervals are: evaluation due by 90 days, 180 days, 360 days, and then every 180 days thereafter if restoration continues past one year.*

**Clarification of Restoration Likelihood**

*Currently, the statute requires that a forensic evaluator opine on whether an individual can be restored in "the foreseeable future." This is generally interpreted so broadly as to be the indefinite future, leading to repeated forensic opinions that the individual is not presently able to aid and assist their attorney, even for individuals who have not substantially responded to treatment or are unlikely to respond more substantially given more time or a different treatment. In an earlier report, Dr. Pinals has already recommended a change to the statutory language such that evaluators are required to opine about whether the defendant can be restored within the time available for restoration. OHA will therefore be submitting this legislative concept.*

*Impact statement: taken together, these changes to ORS 161.370 will allow individuals to receive treatment and restoration services for a duration that is clinically appropriate and preserves the state's interest in prosecution, while facilitating a timely resolution to the individual's case and ensuring that restoration services are available to a greater number of individuals each year.*

POLICY OPTION PACKAGES

**Policy Option Package (POP) 552: $55M**
*OHA submitted a Behavioral Health Investment 2025-2027 Policy Option Package to address the housing gaps identified in the Res+ Facilities Study. OHA proposes expanding behavioral health residential treatment and support services to address insufficient infrastructure for substance use disorders, psychiatric treatment, and co-occurring needs across the state. The plan includes purchasing, constructing, or renovating facilities, stabilizing current providers, and supporting culturally and linguistically diverse services. While the POP highlights youth facilities it also outlines improvements addressing the adult population. It will improve access to developmentally responsive licensed residential and SUD treatment and housing, emphasizing equitable distribution of funds to smaller, culturally specific providers, and providers that serve the A&A population.*

*This policy package aims to enhance intensive behavioral health services using three overall strategies:*

1. *Expand capacity for residential psychiatric and SUD treatment services for youth and families, particularly in smaller home-like settings where possible, with greater regional diversity, and a focus on serving mandated individuals.*
2. *Improve current method of disbursing funding across the system in addition to expanding capacity of licensed residential and SUD treatment and housing for adults. This includes providing community coordination and technical support to culturally and linguistically diverse and smaller organizations serving marginalized communities.*

3.  *Increase access to residential treatment facilities and community-based SUD treatment, including community-based supports for court mandated populations as they transition into the community. Increasing access to community-based services will help ensure that individuals under court orders are served in the least restrictive setting possible.*

*For the adult behavioral health system, this package will provide funding for multiple capital development projects to purchase, build, or renovate existing licensed residential and SUD treatment and housing for adults. The package will prioritize culturally and linguistically diverse services and supports as well as services for the mandated population. Funding disbursements will be aligned with the 5-year plan for increasing statewide capacity as outlined in the Res+ Facility Study. Historical data from House Bill 5024 (2021) project development costs has shown the average cost per bed is approximately $230,428. Based on this data, we anticipate a total increase in capacity of approximately 642 beds/units from the funding through this policy package. Considering the restricted number of data points and the substantial ranges, these figures are subject to change as more data on facility costs becomes available.*

IMPACT STATEMENT

*The above recommendations will let people move from residential placements to independent housing, thus opening community spaces for people discharging from OSH, creating positive long-term benefits for the system as whole.*

*Flexible housing funds allow for quick access to resources that support individuals urgent housing needs. Without funding, CMHPs will be limited in their ability to provide flexible housing supports resulting in increased risk for houselessness, further destabilization and increase in risk for further criminal/legal system exposure and need for higher levels of care.*

2.  **Re-exploration and Clarification of the Mosman Order for admissions limits to OSH**. There have been a number of cases involving questions about youth competency restoration commitments, commitments for individuals charged with crimes such as Fugitive from Justice when the defendant is to be extradited to other jurisdictions, among others. I recommend that the plaintiffs and the state work together to examine the impact of these types of cases on compliance balanced by need within the state and pursue a new federal order to clarify these issues.

3.  **Socialization of legislative proposals and policy option packages**. More than just drafting requests for funding or possible legislation, it is imperative that the state socialize the legislative proposals outlined above as well as the requests for new funding. This will require the gathering of information and potential presentations to legislators and meetings with them to review strategies delineated in this matter. It will be most helpful if the parties can work together to help socialize these initiatives with relevant partners.

4. **Ongoing meetings between the parties and with Amici**. I recommend ongoing dialogue amongst the parties to ensure timely updates on state activities to move toward compliance. In addition, periodic meetings with Amici will be important on at least a quarterly or bi-monthly basis if they are willing to continue to engage in dialogue and share their perspectives.

5. **Ongoing review of the cost for a centralized OHA forensic evaluation capacity or combined OHA/OSH forensic evaluation service**. I have previously recommended and continued to support the potential establishment of an office for forensic services at OHA that is also touched upon in the above state recommendations.

6. **Review of implementation status of prior and current recommendations**: During the next reporting period, the state should be prepared to discuss and review progress on prior and current recommendations. Although there are written regular reports, it will be important to discuss any barriers among the parties and with the Neutral Experts to determine how best to overcome them.

7. **Increase in GEI discharge efficiencies**: The new data dashboard pertaining to GEIs reveals a number of stages with delays. From initiation of a discharge request up until the time an individual is discharged from OSH far surpasses the 171-day total requirement. This is not acceptable, and flies in the face of *Olmstead* requirements and must be remedied. Some discharge delays are related to PSRB processes and definitions (some of which are currently being litigated by DRO), but per the dashboard, many if not most of them also pertain to OHA and OSH responsibilities. As such, to make room and space for those who need the OSH resource, I recommend that the state work toward the development of solutions to gain efficiency and ultimately consider rule changes shortening discharge processes overall.

In conclusion, there has been notable hard work by the parties and all the partners with whom I have met and spoken who have provided meaningful input into this report. The court personnel and others that can impact outcomes for people within the AA and GEI systems are to be commended for continuing to help work within a system that is under-resourced and demanding. The collective efforts of the partners help support the recovery of the individuals in the AA and GEI processes as well as any potential victims of their conduct. I appreciate the attention that this *Mink/Bowman* matter receives across state and local government leaders and by the community at large. For the *Mink/Bowman* class members, it is important that the partners across the state continue to work together to achieve promising solutions to ensure timely access to appropriate restoration and therapeutic services outside a carceral setting in accordance with this case and the Constitution.

**Respectfully Submitted,**

Debra A. Pinals, M.D.
Neutral Expert, *Mink/Bowman*