Emily Cooper OSB #182254
ecooper@droregon.org
Thomas Stenson OSB #152894
tstenson@droregon.org
David Boyer OSB # 235450
dboyer@droregon.org
Hanah Morin OSB # 230043
hmorin@droregon.org
Disability Rights Oregon
511 SW 10th Avenue, Suite 200
Portland, Oregon 97205
(503) 243-2081
*Counsel for Plaintiff, Disability Rights Oregon*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| **DISABILITY RIGHTS OREGON, METROPOLITAN PUBLIC DEFENDER SERVICES, INC.,** & **A.J. MADISON,** Plaintiffs, | Case No. 3:02-cv-00339-MO (Lead Case) Case No. 3:21-cv-01637-MO (Member Case) |
| v. | |
| **SAJEL HATHI,** in her official capacity as head of the Oregon Health Authority, & **JAMES DIEGEL** in his official capacity as Superintendent of the Oregon State Hospital, Defendants. | DISABILITY RIGHTS OREGON'S OPPOSITION TO MOTION TO STAY |
| **JAROD BOWMAN** and **JOSHAWN DOUGLAS-SIMPSON**, Plaintiffs, | |
| v. | |
| **JAMES DIEGEL**, Interim Superintendent of the Oregon State Hospital, in his official capacity, **SAJEL HATHI**, Director of the Oregon Health Authority, in her official capacity, Defendants. | |

**Disability Rights Oregon**
511 SW 10th Avenue, 2nd Floor
Portland, OR  97205
(503) 243-2081

**DISABILITY RIGHTS OREGON'S OPPOSITION TO MOTION TO STAY**

State Defendants[1] seek to obtain a stay of some, though not all, of the injunctive relief and all contempt fines imposed through the Court's June 2025 order. ECF 604; ECF 610. Defendants do not begin to articulate the highly restrictive grounds justifying a stay in these proceedings.

A court should enter a stay pending appeal only where four factors all weigh in the applicant's favor: "1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 418 U.S. 770, 776 (1987). The party seeking the stay must bear the burden of justifying the stay. *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). The state has utterly failed to bear this burden.

## I. The State Only Alleges Monetary Harm, Which Is Not Irreparable, And Is Occasioned by the State's Own Malfeasance

The state defendants argue that contempt sanctions cause irreparable harm. "[A]t this juncture, the government has the burden of showing that irreparable injury is likely to occur during the period before the appeal is decided." *Doe #1 v. Trump*, 957 F.3d at 1059. That harm must be "probable, not merely possible" and assertions must be supported by evidence, not "conclusory factual assertions and speculative arguments." *Id.* at 1059.

As to the injunctive relief, the Defendants make no argument that they could be irreparably harmed by the injunctive relief. Their arguments on irreparable harm focus

---

[1] Per Fed. R. Civ. Pro. 25(d), a successor public officer is "automatically substituted" as a party. Mr. Diegel was named Interim Hospital Superintendent in June 2025.

exclusively on the monetary consequences of the fines. ECF 610, at 8-9. Even assuming that

their arguments of likelihood of prevailing regarding injunctive relief are correct, the state's

failure to allege that it would be irreparably harmed by any part of the injunctive relief dooms the

stay application as to the injunctive relief provisions.

  Defendants' arguments on irreparable harm focus instead on the contempt fines. As a

matter of law, "monetary injury is not normally considered irreparable." *Doe #1 v. Trump*, 957

F.3d at 1060; *see also Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502 (7th Cir. 2008)

(prospect of contempt sanctions for violating injunction not irreparable harm). "The key word in

this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and

energy necessarily expended . . . are not enough." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th

Cir. 2020). By contrast, the ongoing harms to detainees forced to remain in jail cells *do*

constitute irreparable harm. *Edmo v. Corizon, Inc.,* 935 F.3d 757, 798 (9th Cir. 2019)

("Unlike monetary injuries, constitutional violations cannot be adequately remedied through

damages and therefore generally constitute irreparable harm."). In the present case, the monetary

injuries complained of are not only reparable, but can be remedied at any time by the state's

compliance with a 23-year-old permanent injunction. *Al Otro Lado*, 952 F.3d at 1008 (declining

to find irreparable harm where "[a]ny harm suffered is largely the result of the government's own

failure"). Where the government's harm is "self-inflicted," that harm "severely undermines its

claim for equitable relief." *Id.* The monetary sanctions will not go into some private purse, but

will be distributed—consistent with recommendations of the Monitor after discussions with the

parties—to improve Defendants' compliance with the injunction, speeding elimination of these

sanctions.

Defendants present an elaborate, but evidence-free recitation of a parade of horribles that would ensue if the fines are imposed, wherein the Defendants would cut the services for the detainees found unable to aid and assist. Nowhere do the Defendants argue, much less prove, that any element of this plan is compelled by law. Instead, a declaration generally states that defendants "anticipate splitting the cost of the fines" among their own budgets. ECF 611, at 3. Defendants allege, using the passive voice, that particular "reductions in OSH's budgets are likely to occur." *Id.* What led Defendants to "anticipate" this distribution of funds? Why are those particular reductions "likely to occur"? Who made that determination? How were the cuts selected? What alternatives exist? Defendants say nothing on these points. They do not allege that they have sought funding from the legislature—which is still in session—or consulted the governor regarding these funds. Defendants do not discuss whether the "rainy day fund," the risk management pool, or any other state funds could be tapped, much less allege that payment from those sources is impossible. Defendants also make no showing that the $35 billion dollar budget of the Oregon Health Authority contains absolutely no other place where such savings might be found, at less harm to public interests or detainees at the heart of the case.[2] ECF 582-1, at 31.

---

[2] State agencies routinely experience revenue shortfalls, whether because of decreased tax revenues, increased or unexpected expenses, or diminished federal contributions. In the past, OHA has planned to accommodate such shortfalls, often by finding millions of dollars of unspent funds already in its own budget, freezing already vacant positions, or reducing discretionary functions. *See, e.g.,* Or. Health Auth., "Agency Reduction Options 2019-21," *at* https://www.oregon.gov/oha/Budget/Agency-Reduction-Options-2019-21.pdf (finding millions of dollars in proposed savings by, *inter alia*, accounting for reduced DAS reimbursements, keeping vacant administrative positions unfilled, freezing hires on "non-direct care" staff, discovering $11 million and $1.9 million dollars in unspent mental health block grant funds, finding unused and unneeded funding for a project already completed, eliminating funding for "large convenings for coordinated care organizations," and finding a half-million dollars of "unobligated administration funds"). In other cases, state agencies have routinely tapped the emergency board for unexpected needs. *See, e.g.,* State of Oregon, Legislative Fiscal Office,

Defendants' allegations of harm are just the kind of "conclusory factual assertions and speculative arguments" that do not support a finding of irreparable harm. *Doe #1 v. Trump*, 957 F.3d at 1059. The proposed cuts identified by Defendants—which happen to strike exclusively at services central to this litigation—originate nowhere in any legal limitations in state or federal law. The proposed cuts instead reflect intentional choices by Defendants, apparently in a clumsy and transparent attempt to manipulate the court. If the proposal is sincere, Defendants would put themselves further from compliance to spite the Court and Plaintiffs. The Court should consider Defendants' willingness to threaten the constitutional rights of detainees, either as a bluff or in sincerity, to gain a respite from contempt fines.

## II.    Defendants Fail to Show Any Likelihood of Success on the Merits, Much Less the "Strong Showing" Required

Defendants claim a likelihood of success on the basis of 1) alleged misuse of the eleventh report of the neutral expert and 2) allegedly vague terms relating to "all reasonable steps" in the injunction. A party seeking a stay must show more than a "mere possibility" of success, but must make a "strong showing." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Defendants make no such showing on either point.

### A.    The Eleventh Neutral Expert Report

Regarding the neutral expert report, Defendants have failed to preserve any appealable issue regarding its use. Defendants never filed an objection to the document before the district court, nor has any record been developed in the district court following such an objection. *Turnacliff v. Westly*, 546 F.3d 1113, 1120 (9th Cir. 2008); *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d

---

Summary of Emergency Board Action (Sept. 2024), *at* https://www.oregonlegislature.gov/lfo/eboard/EB%20Summary%20Sept%202024.pdf.

Disability Rights Oregon
511 SW 10th Avenue, 2nd Floor
Portland, OR  97205
(503) 243-2081

891, 901 (9th Cir. 1994); Fed. R. Evid. 103. An argument raised for the first time in a motion to stay pending appeal is waived. *Natera, Inc. v. NeoGenomics Labs., Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024); *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 308 (7th Cir. 2010).

Defendants' motion is vague as to the Defendants' actual legal claim as to the Eleventh Report. They do not cite a rule, constitutional provision, or statute that was allegedly violated. Ordinarily, a "strong showing" of future success should include some kind of legal premise. Defendants' only citation in the discussion of the eleventh neutral expert report is to a generic comment in a case on criminal contempt that notice and an opportunity to be heard is required before civil contempt issues. ECF 610, at 5 *citing Int'l Union, United Mine Workers of Am v. Bagwell*, 512 U.S. 821, 827 (1994). Defendants had notice of the contempt proceedings and hours of opportunity to be heard, including the opportunity to cross-examine Dr. Pinals. ECF 560 (advising parties of a two-day hearing on contempt); ECF 584; ECF 586. This notice and opportunity to be heard easily meets the *Bagwell* standard.

Defendants had ample notice of Dr. Pinals' Eleventh Report, even assuming that they were entitled to specific notice of that report. On May 6, plaintiffs' and defendants' counsel received a copy of the eleventh report by email. *See* Ex. A & B. Dr. Pinals stated that she had "already shared and discussed this [report] with Judge Nelson." Ex. B. Following the receipt of this report, Defendants did not file any objection with the court, request an opportunity to rebut the report's findings, submit supplemental documents into evidence, or even inquire whether the court would rely on the report. Defendants then posted Dr. Pinals' Eleventh Report on their website, where it has remained for more than a month.

**Disability Rights Oregon**
511 SW 10th Avenue, 2nd Floor
Portland, OR  97205
(503) 243-2081

Defendants have waived their objections to the Court's consideration of Dr. Pinals' reports. Defendants have *requested* Dr. Pinals' involvement, *paid for* her continued participation in the case, and have frequently *benefited* from Dr. Pinals' findings in these reports. Years ago, Defendants prepared an initial order to appoint Dr. Pinals as the neutral expert in this matter. ECF 239. Later, the parties submitted a joint motion to continue Dr. Pinals' appointment. ECF 250. As part of that joint motion, Defendants requested that the court issue an order that Dr. Pinals should "provide brief quarterly reports to the Court regarding compliance status and any needed additional recommendations to address any barriers to achieving compliance." ECF 250, at 3. This motion contained no limitations on how the Court could use the reports Defendants requested and paid for. Having insisted that the Court receive quarterly reports from Dr. Pinals assessing the State's "compliance status," Defendants cannot now complain about the Court's use of the reports for the purpose described in that motion. Defendants cite no caselaw or rule impugning this practice. The Supreme Court's generic observation that notice and an opportunity to be heard prior to civil contempt findings does not sustain the proposition that the court "committed reversible error" by considering a report that the Defendants had specially requested that Dr. Pinals produce to the court, subsequent to a full hearing of which defendants had full notice. ECF 610, at 5. With regards to notice, Defendants fail to explain what they lacked notice of, why they were entitled to such notice, and where a notice requirement, however formulated, might be found in the law.

Defendants do not dispute that they had an opportunity to be heard on their impossibility defense in March 2025, but suggest that the court should have initiated a *second* hearing before relying on Dr. Pinals' Eleventh Report, without providing any legal basis for such a second

**Disability Rights Oregon**
511 SW 10th Avenue, 2nd Floor
Portland, OR  97205
(503) 243-2081

hearing. ECF 610, at 5. Defendants did not receive such a hearing because they never requested one. *Tasby v. Black Coal. to Maximize Educ.*, 771 F.2d 849, 852 (5th Cir. 1985) (district court did not abuse discretion where party failed to request evidentiary hearing until motion to stay after notice of appeal was filed). The court did not err by not providing a second evidentiary hearing that Defendants never requested.

Defendants offer no explanation for failure to request the hearing, but allege—without providing any evidence in support—that at such a hearing they would have contested and fully rebutted Dr. Pinals' findings on the effects of certain personnel changes at OSH and Dr. Pinals' opinions about the Defendants' "less than perfect" performance. Aside from having no evidence to back up such claims, Defendants' position is absurd. The "personnel changes," one assumes, refers to the very public resignation of Dr. Walker, one of the Defendants' lead witnesses at the March 2025 contempt hearing, associated with the death of a patient a few days after that hearing. Ex. C. Defendants have a very high likelihood of facing a tort suit surrounding the patient death. Defendants are already enmeshed in a series of licensing actions by the Joint Commission and the Center for Medicaid and Medicare Services, arising out of that death and a variety of other violations of standards of care. Ex. D & E. Governor Kotek indicated that she was closely involved in the personnel decisions at OSH following the patient death. Ex. C. Defendants would have the Court believe that, notwithstanding tort liability, licensing problems, public embarrassment, and a host of other concerns, Defendants were very prepared to hold a public hearing exploring a very sensitive matter in order to gain what was at best a collateral factual point in these proceedings. The evidence shows the opposite. The state Defendants would not even discuss these matters in any depth in private communication with Dr. Pinals. Ex. A, at

35 (stating that the "circumstances for [Walker's] resignation are somewhat vague" and that she had not received any documentation regarding the patient death). Although Defendants were apparently unwilling to discuss the matter in depth with Dr. Pinals, they now claim that they would have held a full public hearing with cross-examination of OHA witnesses on the topic.

Such a hearing might have explored details about the decision-making leading up to the patient death; whether Dr. Walker resigned of her own volition or was encouraged, coerced, or ordered to resign; details about a series of other allegations of patient neglect at the hospital; public allegations that OSH supervisors instructed staff to take certain remedial measures to improve patient care for the benefit of inspectors and then to discontinue those same changes as soon as the inspections were over; and to explore fully the nature of the governor's involvement in these personnel changes. *See* Ex. D & E.

Whether Dr. Walker's resignation was a very necessary and appropriate step (because of flaws in her leadership), or whether her resignation represented the scapegoating of an innocent party (to conceal the larger flaws in the system), it is hard to see how *either* conclusion would benefit the state defendants. If Dr. Walker was in the wrong, Defendants relied for more than a year on Dr. Walker's flawed leadership to run the hospital and allowed her to serve as a chief witness at the March 2025 hearing, seriously damaging her credibility. If Dr. Walker was competent and capable, then OSH lost an important leader at a time of great crisis. Neither of those conclusions militate against contempt findings.

Nevertheless, if Defendants wish, DRO would gladly participate in such a hearing, provided Governor Kotek, Dr. Walker, Acting Director Kautz, and (if she has returned from parental leave by the time of the hearing) Dr. Hathi are made fully available for cross-

**Disability Rights Oregon**
511 SW 10th Avenue, 2nd Floor
Portland, OR  97205
(503) 243-2081

examination.[3] DRO believes the public would benefit from full, transparent discussion of these matters under oath, in open court, and on the record. Defendants will surely not agree to such a hearing, for the same reason they did not seek such a hearing previously: it would not alter the outcome on contempt, but would cause an enormous, embarrassing public spectacle, exposing OHA and OSH to greater liability and further licensing problems. Defendants may not manufacture issues for appeal by failing to make timely objections and later complaining that they never received hearings they never requested (and likely never wanted in the first place). *Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007).

Last, even in the remote event that the Ninth Circuit should find that the district court ought not to have relied on Dr. Pinals' Eleventh Report, the district court's decision on contempt could be upheld on any basis in the voluminous record before the court. *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (appellate court may "affirm based on any ground supported by the record"). The district court's decision on contempt is reviewed only for abuse of discretion. *Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986). Here, the state's noncompliance was not in dispute, and the state had the burden to show that its noncompliance was excused by impossibility of compliance. Defendants failed to make a showing of impossibility at the hearing. Dr. Pinals' Eleventh Report was hardly the only evidence to rebut the limited showing made by the state at the March hearing, to the extent any rebuttal was even required. *See, e.g.*, Tr., March 12, 2025 hearing, 61:8-9 (Dr. Pinals: "There have been waxing and waning commitments from different leaders."); *id.* 63:8-11 (Ms. Cooper:

---

[3] Although the Defendants already filed a notice of appeal, they could withdraw their notice of appeal and file a motion to reconsider.

**Disability Rights Oregon**
511 SW 10th Avenue, 2nd Floor
Portland, OR 97205
(503) 243-2081

"Would you say there was less of a sense of urgency last summer regarding the State's efforts to comply with this federal court order? Dr. Pinals: I would say in some aspects there was a lack of urgency."). While the Eleventh Report helpfully summarized many long-standing issues, many of those same points were made in the hearing or supporting exhibits undisputedly in the record. The Ninth Circuit could uphold the district court's ruling on any basis in the record and would almost certainly do so. Defendants present a vague legal claim that has almost no prospect of success on appeal, for myriad reasons.

> **B.    The "All Reasonable Steps" Directives Comply with Legal Standards for Injunctions**

Defendants object to numerous directives in the June order of the court indicating the state should take "all reasonable steps" to address its contempt, including expediting release of OSH and PSRB patients, limiting community restoration timelines, and increasing evaluation processes. ECF 604, at 19-20. Defendants' arguments are ill-taken.

The phrase "all reasonable steps" is not vague, but well-defined in the law. Defendants are *already obligated* to take "all reasonable steps" to come into compliance with the 2002 permanent injunction in this case. *Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025) (defendant obliged to take "all reasonable steps to comply" with injunction); *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016) (district court appropriately held defendant in contempt by finding it had "failed to take all reasonable steps to comply"). Defendants' obligations to take "all reasonable steps" to prevent or to abate violation of the permanent injunction have existed for 23 years. The Court's order clarified particular areas where the court would like to see such efforts: recruiting forensic evaluators, discharging OSH/PSRB patients, and limiting community restoration timelines. If the term "reasonable steps" is too vague to be understood, then so is

**Disability Rights Oregon**
511 SW 10th Avenue, 2nd Floor
Portland, OR  97205
(503) 243-2081

Ninth Circuit law on contempt generally. "Decrees of that generality are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).

To the extent that Defendants were unclear on the scope of the terms of the order, they were free to file a motion to clarify the order. "Yet if there were extenuating circumstances or if the decree was too burdensome in operation, there was a method of relief apart from an appeal. Respondents could have petitioned the District Court for a modification, clarification or construction of the order." *McComb*, 336 U.S. at 192. Defendants did not file any such pleading but rushed to file a notice of appeal. *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014) ("Though they had every opportunity, the Defendants did not seek clarification of their obligations."). In the present context—a long-term enforcement case, involving a neutral expert regularly communicating with the parties and the court specifically about her recommendations to regain compliance—Defendants are not likely to be taken by surprise about the expectations of the court. *Melendres v. Skinner*, 113 F.4th 1126, 1139 (9th Cir. 2024) (order broadly entrusting court monitor with "backlog-reduction-related decisions to effectuate compliance with" injunction was sufficiently specific).

The June 2025 order has as its overarching aim the restoration of compliance with the permanent injunction. As long as the injunction makes it clear the act or acts "sought to be restrained," the district court need not "elucidate *how* to enforce the injunction." *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004) (emphasis in original). The Court was free to direct the State defendants to comply with the permanent injunction and provide no guidance at all as to how the State defendants should accomplish that aim. *Id.*

**Disability Rights Oregon**
511 SW 10th Avenue, 2nd Floor
Portland, OR  97205
(503) 243-2081

(injunction was sufficiently specific in requiring movie theater to "modify its policies" such that wheelchair users would have priority seating up to ten minutes before showtime). That the Court chose to elaborate further on its expectations on *how* to come into compliance helps clarify the court's order and its expectations above and beyond the requirements of law.

The June 2025 order directs the state to take "all reasonable steps" towards certain ends to facilitate compliance with the permanent injunction, but these directives are subordinate to the overarching goal of compliance with the permanent injunction. If the state comes into compliance with the permanent injunction, the Court will surely not care whether it did so by expediting the release of PSRB patients from the hospital, by hiring more evaluators, or by some other means. If the state remains out of compliance with the permanent injunction, continued contempt sanctions or further penalties will depend on whether it has taken "all reasonable steps" to comply with the permanent injunction—by virtue of long-standing Ninth Circuit law, not just because of the June 2025 order. Even if the challenged portions of the June 2025 order were struck out, Ninth Circuit law would continue to require the state to take "all reasonable steps" to come into compliance with the permanent injunction. Defendants have not made any showing, much less a "strong showing," of reversible error.

### III.    Conclusion

Considering the paucity of evidence of irremediable harm or likelihood of prevailing on appeal, little more needs to be said about the remaining stay factors, except that the only parties clearly experiencing irreparable harm are the detainees sitting in jail cells in violation of the U.S. Constitution and the permanent injunction. Detainees have been stranded in these cells for almost seven years now. This Court has already found that the spur of contempt fines is necessary to

**Disability Rights Oregon**
511 SW 10th Avenue, 2nd Floor
Portland, OR  97205
(503) 243-2081

keep up the efforts of Defendants and to abate this long-standing constitutional violation.

Defendants have made no allegation of irreparable harm as to the injunctive relief. Their claim of

irreparable harm as to the fines flies in the face of long-established case law that monetary harms

are not irreparable. Defendants do not present a coherent legal theory of why Dr. Pinals'

Eleventh Report should not be considered, nor would the contempt findings be jeopardized if the

report were excluded. The Court has provided in its June 2025 order *more* detail than the law

requires, not less. Defendants have resoundingly failed to articulate even the basic elements

required for a stay. The motion should be denied in its entirety.


DATED this 24th day of June, 2025.

DISABILITY RIGHTS OREGON

/s Tom Stenson
David Boyer OSB # 235450
dboyer@droregon.org
Emily Cooper OSB # 182254
ecooper@droregon.org
Thomas Stenson, OSB # 152894
tstenson@droregon.org
Hanah Morin OSB # 230043
hmorin@droregon.org
511 SW 10th, Suite 200
Portland OR 97205
Telephone: (503) 243 2081
Facsimile: (503) 243 1738
*Counsel for Plaintiff Disability Rights Oregon*

OPPOSITION TO MOTION TO STAY
Page 14

**Disability Rights Oregon**
511 SW 10th Avenue, 2nd Floor
Portland, OR  97205
(503) 243-2081